IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| POWER INTEGRATIONS, INC., | ) | **REDACTED PUBLIC VERSION** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1371-JJF |
| | ) | |
| FAIRCHILD SEMICONDUCTOR | ) | |
| INTERNATIONAL, INC., and FAIRCHILD | ) | |
| SEMICONDUCTOR CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT OF
NON-INFRINGEMENT (FOREIGN SALES)**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19801
Telephone: 302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

G. Hopkins Guy, III
Vickie L. Feeman
Bas de Blank
Brian H. VanderZanden
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7400

Dated: March 24, 2006

# TABLE OF CONTENTS

**Page**

I.    GENERAL INTRODUCTION .................................................................. 1

II.   INTRODUCTION – INDIRECT INFRINGEMENT UNDER 35 U.S.C. §
      271(B)/(C) ............................................................................................ 2

III.  BACKGROUND – INDIRECT INFRINGEMENT UNDER 35 U.S.C. §
      271(B) OR (C) ...................................................................................... 3

      A.    There Is No Evidence That Any Third Party Has Imported Fairchild
            Parts Sold Abroad Into the United States ...................................... 3

            1.    Background of the technology and its global distribution ................. 3

            2.    Fairchild does not track other companies' products containing
                  its parts and has no record of what parts, if any, are later
                  imported into the United States .............................................. 4

            3.    Power Integrations' top executives and corporate designees
                  admit they have no evidence that end products containing
                  accused Fairchild parts are imported into the United States .............. 7

            4.    Power Integrations has produced no documentary or physical
                  evidence that accused Fairchild products sold abroad are
                  imported into the United States by third parties ................................ 9

            5.    Despite the lack of any evidence of importation or sale in the
                  United States of Fairchild products sold abroad, Power
                  Integrations' expert report calculates damages based on
                  Fairchild's global sales .................................................... 9

            6.    Power Integrations had ample opportunities to obtain evidence
                  on third-party importation of Fairchild devices but failed to do
                  so ...................................................................... 11

IV.   ANALYSIS – INDIRECT INFRINGEMENT UNDER 35 U.S.C. § 271(B)
      OR (C) .......................................................................... 13

      A.    Summary Judgment Standard and Burden of Proof ....................... 13

      B.    Power Integrations Cannot Prove Inducement of Infringement Under
            35 U.S.C. § 271(b) Or Contributory Infringement Under 35
            U.S.C. § 271(c) Because It Has No Evidence of Direct Infringement .......... 13

            1.    There Is No Evidence Of Any Acts Of Direct Infringement In
                  The United States Involving Fairchild Devices Sold Abroad
                  And Later Imported By A Third Party ..................................... 13

            2.    Power Integrations' Only Alleged "Evidence" Is Speculative
                  And Inadmissible ......................................................... 14

V.    INTRODUCTION – DOMESTIC "OFFER TO SELL" UNDER 35 U.S.C. §
      271(A) ......................................................................... 16

VI.   BACKGROUND – DOMESTIC "OFFER TO SELL" UNDER 35 U.S.C. §
      271(A) ......................................................................... 16

      A.    Fairchild Products Sold Abroad Did Not Result from Offers to Sell in
            the United States ........................................................ 16

## TABLE OF CONTENTS
### (continued)

Page

1. Fairchild's sales data by region reflect the placement of purchase orders, which are evidence of an offer to sell .................. 18

2. Fairchild's design and promotional activities in the United States in connection with foreign sales fall short of an "offer to sell ........................................................................................... 19

3. The Evidence of Fairchild's sales practices and of actual transactions shows that foreign sales results from foreign offers to sell ........................................................................... 22

VII.   ANALYSIS – DOMESTIC "OFFER TO SELL" UNDER 35 U.S.C. § 271(A) ........................................................................................... 27

A.   Power Integrations Cannot Prove That Any Foreign Sale Was The Subject Of an Offer for Sale in the United States Under 35 U.S.C. § 271(a) ........................................................................................... 27

1. The undisputed evidence shows that Fairchild's offer to sell is made when the buyer places a purchase order .................................. 28

2. Even if Fairchild's sales activities leading up to the customer's placement of a purchase order could be considered offers to sell, there is no evidence that those activities occur in the u.s. as a matter of general practice or in any specific instance ................ 29

3. A "valid" price quote that travels from the United States abroad is not an offer to sell and there is no evidence of even one actual sale made in this manner .................................................. 31

4. Fairchild's higher-level management activities in the United States are not offers to sell ............................................................. 32

VIII.   CONCLUSION ............................................................................................. 32

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Audio Visual Assoc., Inc.* v. *Sharp Electronics Corp.*,
210 F.3d 254 (4th Cir. 2000) ...................................................................29

*Beverly Hills Fan Co.* v. *Royal Sovereign Corp.*,
21 F.3d 1558 (Fed. Cir. 1994)...............................................................13

*Celotex Corp.* v. *Catrett*,
477 U.S. 317 ...........................................................................................13

*Civix-DDI LLC* v. *Cellco Partnership*,
387 F. Supp. 2d 869 (N.D. Ill. 2005) .....................................................32

*Dean Foods Co.* v. *Brancel*,
187 F.3d 609 (7th Cir. 1999) .................................................................31

*Epcon Gas Sys., Inc.* v. *Bauer Compressors, Inc.*,
279 F.3d 1022 (Fed. Cir. 2002)........................................................2, 13

*Fasolino Foods* v. *Banca Nazionale Del Lavoro*,
761 F. Supp. 1010 (S.D.N.Y. 1991)......................................................15

*Group One, Ltd.* v. *Hallmark Cards, Inc.*,
254 F.3d 1041 (Fed. Cir. 2001)...........................................................30

*Gulf States Util. Co.* v. *NEI Peebles Elec. Prods., Inc.*,
819 F. Supp. 538 (M.D. La. 1993).......................................................28

*Imagexpo, LLC* v. *Microsoft Corp.*,
284 F. Supp. 2d 365 (E.D. Va. 2003) ...................................................14

*Linear Technol. Corp.* v. *Micrel, Inc.*,
275 F.3d 1040 (Fed. Cir. 2001), *quoting* Rest. 2d Contracts § 26 (1979) ...................28, 32

*MLMC, Ltd.* v. *Airtouch Communications, Inc.*,
215 F. Supp. 2d 464 (D. Del. 2002).................................................28, 30

*Novartis Corp.* v. *Ben Venue Labs., Inc.*,
271 F.3d 1043 (Fed. Cir. 2001)............................................................27

*Oiness* v. *Walgreen Co.*,
88 F.3d 1025 (Fed. Cir. 1996)...............................................................14

*Pfaff* v. *Wells*,
525 U.S. 55, 119 S. Ct. 304 (1998).......................................................28

*Rhenalu* v. *Alcoa, Inc.*,
224 F. Supp. 2d 773 (D. Del. 2002)................................................30, 31

# TABLE OF AUTHORITIES
### (continued)

Page

*Rotec Indus., Inc.* v. *Mitsubishi Corp.,*
  215 F.3d 1246 (Fed. Cir. 2000), *quoting Celotex,* 477 U.S. at 322-23 ............13, 16, 17, 28, 32

*Unisplay, S.A.* v. *American Electronic Sign Co., Inc.,*
  69 F.3d 512 (Fed. Cir. 1995)........................................................................................15

*United States* v. *ReBrook,*
  58 F.3d 961 (4th Cir. 1995) ..........................................................................................15

## STATE CASES

*Agere Sys., Inc.* v. *Atmel Corp.,*
  2004 WL 945162 (E.D. Pa. 2004) ................................................................................15

*Hamburger Color Co., Inc.* v. *Landers-Segal Color Co., Inc.,*
  1996 WL 379562 (E.D. Pa. 1996) ................................................................................13

## FEDERAL STATUTES

35 U.S.C. § 102(b)........................................................................................................28, 30

35 U.S.C. § 271.............................................................................................................*passim.*

## I.    GENERAL INTRODUCTION.

Plaintiff Power Integrations, Inc.'s ("Power Integrations") case largely depends on illegally extending the U.S. patent laws into the territory of every foreign country where Fairchild sells its products. Power Integrations' expert damages report                REDACTED

                    REDACTED

                                        during the relevant period. The United States patent laws have no extraterritorial effect. Power Integrations does not hold counterpart patents to the ones in suit in any foreign country. Nevertheless, Power Integrations has taken the position that its patents apply to Fairchild products sold anywhere in the world.

There are only two possible bases for such a position. One is that Fairchild products sold in other countries are subsequently coming into the United States, and that Fairchild has actively induced or contributed to this infringing importation. The second is that Fairchild sales in other countries result from offers to sell in the United States (domestic offer to sell under 271(a)). Power Integrations has no admissible evidence to support either theory of recovery as regards Fairchild's foreign sales. Consequently, summary judgment of non-infringement must be entered with respect to Fairchild's foreign sales, and Power Integrations' damages must be restricted to what it can prove based on U.S. sales only.

The relevant facts cannot be colorably disputed in view of the evidence. Plaintiff Power Integrations brought this suit accusing Fairchild of infringing four of its U.S. Patents, Nos. 6,107,851 ("'851"), 6,229,366 ("'366"), 6,249,876 ("'876"), and 4,811,075 ("'075"). In its First Amended Answer and Counterclaims, Fairchild admitted that                REDACTED

                REDACTED

                            D.I. 198, at 2 (¶ 7). But Fairchild denied that the United States patent laws apply to its activities outside the United States. D.I. 198, at 9 (¶ 9). Consequently, Fairchild maintains that its foreign sales are irrelevant to Power Integrations' patent infringement claims and has objected to producing evidence of those sales. D.I. 31 (Opposition to Power Integrations' Motion to Compel Discovery re Foreign Sales). The Court

1

nevertheless granted discovery as to Fairchild's foreign sales, on the ground that they were potentially relevant to Power Integrations' theories of (i) indirect infringement by third-party importation and (ii) infringing offers to sell in the United States. D.I. 54, at 4 (8/9/05 Order). Now, with discovery complete, Fairchild moves the Court to find that on the undisputed facts, Power Integrations cannot, as a matter of law, carry its burden to prove infringement by Fairchild's foreign sales under any subsection of 35 U.S. §271.

## II.    INTRODUCTION – INDIRECT INFRINGEMENT UNDER 35 U.S.C. § 271(b)/(c)

It is hornbook law that a patentee cannot establish *indirect* infringement – whether inducement under 271(b) or contributory infringement under 271(c) – unless it can prove an underlying *direct* infringement by a third party. *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1033 (Fed. Cir. 2002). Because the Fairchild products at issue in this motion are manufactured and sold abroad – where the U.S. patent laws do not apply – they could be involved in direct infringement only if some third party imports them into the United States. Throughout the case, Power Integrations has insisted that Fairchild products sold abroad are indeed coming back into the United States in third-party end products such as cellphones and LCD monitors. On this basis, Power Integrations has sought to encompass Fairchild's foreign sales in its discovery and in its damages case. Indeed, Power Integrations' recent expert damages report claims some        REDACTED        based almost entirely on accused Fairchild parts that were manufactured and sold overseas.

Yet with discovery now closed, Power Integrations has failed to present any evidence of direct infringement in the United States to support its claims. Power Integrations' top executives have admitted they are unaware of any admissible evidence of direct infringement resulting from Fairchild's foreign sales. Power Integrations' numerous subpoenas to third parties and other discovery measures seeking such evidence have yielded nothing. Therefore summary judgment should be entered dismissing Power Integrations' claims of active inducement under section 271(b) and contributory infringement under section 271(c) with respect to Fairchild's foreign sales.

III.    **BACKGROUND – INDIRECT INFRINGEMENT UNDER 35 U.S.C. § 271(b) or (c)**

    A.    **There Is No Evidence That Any Third Party Has Imported Fairchild Parts Sold Abroad Into the United States.**

        1.    **Background of the technology and its global distribution.**

The technology at issue in this case is pulse width modulation ("PWM") integrated-circuit devices, which are extremely small commodity parts used in such applications as power converters in Liquid Crystal Display ("LCD") monitor power supplies, battery chargers for mobile telephones and other portable electronics. Power Integrations and Fairchild compete with a number of other companies throughout the world to sell a range of different devices of this type. Such sales are through various channels – some to original design manufacturers ("ODMs"), who in turn sell to original equipment manufacturers ("OEMs"), some directly to OEMs, and still others to distributors, who sell to various customers. Exh. A, Jensen Depo., 48:2-11; Exh. B, Engelbrechten Depo., 62:21-63:1; Exh. C, Rowe Depo., 14:16-22; Exh. D, Im Depo., 41:2-8. The parts at issue eventually make their way into much larger items containing countless small devices (e.g., LCD monitors, cell phone chargers, washer-dryers, etc.). These downstream products are manufactured in many different countries and may then be exported to yet other countries before finally being sold to end customers. (Throughout this brief, these larger goods at the end of the production chain are referred to as "end products" or "third party end products.")

    Most the end products incorporating these components are manufactured abroad and the accused products are all manufactured by Fairchild in Korea. Fairchild only makes a tiny fraction of its sales in the United States. As stated in Robert E. Keeley's Rebuttal Expert Report on Damages, Fairchild has earned approximately      REDACTED

    REDACTED    Exh. E, Keeley Expert Report, Exh. 3; FCS1688295-1688319. These U.S. sales are not at issue in this motion. Rather, this motion addresses only Fairchild's sales outside the territory of the United States, which Power Integrations claims infringe the patents-in-suit under 35 U.S.C. § 271(b) by inducing foreign customers to import the infringing products into the United States and sell them here. There is, however, no evidence of direct infringement

in the United States by any foreign customers.

### 2. Fairchild does not track other companies' products containing its parts and has no record of what parts, if any, are later imported into the United States.

Neither Fairchild nor Power Integrations has any evidence of direct infringement in the United States by third party importation of Fairchild devices purchased abroad. Although Fairchild does, in some cases, track *which* manufacturers ultimately incorporate its products into theirs, (Exh. D, Im Depo., 43:10-16, 44:17-45:7, it does not track *where* those manufacturers sell *their* end products. Fairchild has produced both documents and witnesses on the question of third-party importation and sale, and the undisputed record is that Fairchild has no information about where downstream purchasers export products containing its devices, or in what quantities.

Fairchild has produced to Power Integrations all the evidence it possesses relating to its customers for the accused products during the relevant time period, including the region where the product was sold, the customer, the quantity of devices sold, the per unit and total price, revenue and profits, and where available, the downstream purchaser of the part from the Fairchild distributor. *See, e.g.,* Exh. F, FCS1688278-323; Exh. G, FCS1688327-388. Fairchild also produced many thousands of pages of "narrative" evidence of its interactions and transactions with customers, such as presentation foils, email strings discussing particular customers, and the like. Jeffrey Barnes, Director of Finance for Fairchild's Analog Products Group, was Fairchild's 30(b)(6) witness on identification of customers who have purchased the accused products worldwide, and on Fairchild financial records relating to the accused products, including as to prices, revenues, volume, profits and losses, balances, and cash flow. Exh. H, Barnes Depo., 153:18-20, 156:6-157:18; Exh. I, Barnes Depo. Exh. 1 (30(b)(6) notice), at 8-9. Mr. Barnes authenticated Fairchild's financial records, explaining the meaning of each entry, and testified that these records exhaust Fairchild's corporate knowledge of these topics. Exh. H, Barnes Depo., 112:20-153:17, 153:20-154:23, 156:6-24. None of these records (nor any other document in Fairchild's possession, custody or control) indicate whether the end customer imported its products into the United States, or sold to another company that did so, much less

which products or in what quantities.

Mr. Barnes confirmed that there is nothing in Fairchild's sales or financial records that would indicate how customers use the accused products. Exh. H, Barnes Depo., 154:6-23.

Stephen Jensen, Fairchild's Director of Sales for the Americas and 30(b)(6) corporate designee on the topic of importation of Fairchild products into the United States, (Exh. A, Jensen Depo., 4: 14-17; 75: 9-13), explained that he                                    REDACTED

REDACTED                                                                                                                He

testified that *neither he nor anyone else at Fairchild tracks the end uses of Fairchild products sold abroad nor the importation, if any, of Fairchild parts into the United States by customers.* Exh. A, Jensen Depo., 75:14-77:22.

Fairchild has no reason to keep track of that information because, as Power Integrations' own expert has admitted, the accused parts (and their Power Integrations equivalents) are made to a single technical standard that is used throughout the world:

REDACTED

Exh. J, Troxel Expert Report, p. 44 (¶101). This is confirmed by the undisputed testimony of all the Fairchild witnesses. Hubertus Engelbrechten, Fairchild's former General Manager of the Integrated Circuits Group, testified:                                    REDACTED

REDACTED                                                                                Exh. B,

Engelbrechten Depo., 22:2-4, 56:21-24, 57:8-19. Fairchild's other witnesses echoed this. Exh. D, Sang-Tae Im, Senior Marketing Manager (Power Supply Line), Fairchild Korea, Depo., 48:22-24; Exh. K, Robert Gendron, Americas Manager of Field Application Engineers, Depo., 62:4-8; Exh. L, Dan Godbout, Director of Industrial Sales for the Americas, Depo., 76:8-18. Because the parts need not function in a country-specific way there is no reason to track them geographically and thus no business justification for going to the expense of doing so, and so Fairchild does not.

a.    **Power Integrations has admitted it doesn't track the importation of its own parts into the United States.**

Ignoring all the evidence, Power Integrations has repeatedly argued that Fairchild must be hiding something – that it must be keeping track of whether downstream purchasers import Fairchild parts into the United States inside their products. Yet remarkably, ***Power Integrations has admitted that it does not keep track of this information for its own parts.*** When asked if he knew of "anyone at PI who does have any proof of importation of your own products into the United States," Power Integrations CEO, Balu Balakrishnan, answered,     REDACTED

REDACTED

Exh. M, Balakrishnan Depo., 162:1-7. Mr. Renouard, however, admitted that just like Fairchild, Power Integrations                         He could testify only that

REDACTED

REDACTED

Exh. N,

Renouard Depo., 379:23-380:15. Power Integrations has no specific data or records of where its products eventually go:

Q.

...

A.

REDACTED

Q.

A.

Exh. N, Renouard Depo., 380:10-381:8 (emphases added; objections omitted). Just like Fairchild, Power Integrations manufactures to a global standard, and thus has no reason to monitor which parts are eventually imported into the United States or sold there by other companies. Consequently, just like Fairchild, Power Integrations has no idea of the types or amounts of its parts, if any, that downstream purchasers import into the United States.

In sum, Power Integrations has absolutely no evidence that any of the accused Fairchild

6

devices manufactured and sold abroad are imported into the United States. The undisputed evidence shows that neither Fairchild nor Power Integrations tracks these devices geographically because there is no reason to do so.

### 3.    Power Integrations' top executives and corporate designees admit they have no evidence that end products containing accused Fairchild parts are imported into the United States.

Power Integrations insists that Fairchild products are flowing into the United States, yet has no evidence that any of the accused devices have been imported into the United States by a third party. Bruce Renouard, Power Integrations' Vice-President for Worldwide Sales, claimed that

REDACTED

Yet Power Integrations' 30(b)(6) corporate designee for the topic of "[c]ommunications between Power Integrations and any third party concerning Fairchild" testified that he was not aware of that happening. Exh. M, Balakrishnan Depo., 284:6-11; Exh. O, Fairchild's Second 30(b)(6) Depo. Notice, topic 3. When asked if he knew of any third party end product that was imported into the United States containing a Fairchild part, the designee – Power Integrations' President and CEO, Balu Balakrishnan – testified that

REDACTED

Exh. M, Balakrishnan Depo., 151:24-156:18.

Bruce Renouard was Power Integrations' 30(b)(6) designee on (i) Power Integrations' alleged lost sales, lost profits and price erosion due to Fairchild's sales, and on (ii) identification of products that compete with Power Integrations' products, and the sales and marketing of such competing devices. Exh. N, Renouard Depo., 12:6-13:23; Exh. Y, Renouard Depo. Exh. 1 (3rd 30(b)(6) notice), at 4-5 (topics 2, 4, 5, 7). Yet Mr. Renouard testified that he, too,   REDACTED

REDACTED

Mr. Renouard

7

strenuously maintained that                    REDACTED                but like Mr. Balakrishnan,

could offer no admissible evidence of this.  Specifically, Mr. Renouard testified that


REDACTED


Exh. N, Renouard Depo., 238:18-24.  Yet when asked if this assertion was

REDACTED
Exh. N, Renouard Depo., 238:25-240:25.

Second, Mr. Renouard claimed that .                    REDACTED

REDACTED                                              Yet when asked

when this occurred, which devices were found, whether they were the accused devices, and

whether they were imported after October 20, 2004 (the notice date), Renouard

Exh. N, Renouard Depo., 236:1-237:5, 241:12-16.  After insisting that   REDACTED

REDACTED

Despite Fairchild's

outstanding discovery requests, Power Integrations never provided this information after Mr.

Renouard's deposition.  Nor did any of Power Integrations' experts, damages or infringement,

know of any such "evidence."

         After admitting that he did not know who at Power Integrations had supposedly found

Fairchild parts in imported end products, Mr. Renouard suggested that the most appropriate

person to ask would be Cliff Walker, Power Integrations' Vice President of Corporate

Development, or Jim Herrington, Director of North American Sales.  Exh. N, Renouard Depo.,

237:1-9.  Yet when asked if he knew who at Power Integrations had opened up an end product

and discovered a Fairchild device, Mr. Walker gave the same testimony as the other Power

Integrations witnesses: ·
                              REDACTED

Exh. P, Walker depo., 92:4-

17. (emphasis added).  Power Integrations has no evidence of the importation into the United

States of Fairchild products sold abroad.

4.  **Power Integrations has produced no documentary or physical evidence that accused Fairchild products sold abroad are imported into the United States by third parties.**

If there were any records or physical evidence of a disassembled product in which a Fairchild chip had been found, or even emails referring to it, Power Integrations would have been required to produce that evidence in discovery.  Presumably it would have wanted to do so to support its case.  Yet, no such evidence has been forthcoming.  Nor has Power Integrations produced any other documentary or physical evidence showing that third parties import Fairchild devices into the United States.

Fairchild propounded interrogatories asking Power Integrations to identify, for each alleged instance of indirect infringement by Fairchild: (i) the direct infringer(s); (ii) how the direct infringer infringes (on an element-by-element basis), and (iii) the documents relied upon in answering.  *See* Exh. R, Power Integrations' Responses to Defendants' 1st Set of  Interrogatories, Nos. 2, 28.  Power Integrations' responses to these interrogatories contained only one specific (though unsupported) assertion – that "Fairchild has sold accused products to Dong Yang, Echostar, American Power Conversion (APC), LG, and Liteon, knowing that they would be incorporated into other devices which have been imported, used, offered for sale and sold in the U.S." *Id.*, Response to Interrogatory No. 2.  Power Integrations provided no details of how it "knew" this to be true, and identified no documents.  Instead, it stated that "the information was obtained... and the documents identified are to be produced in accordance with the Federal Rules of Civil Procedure."  Exh. R, Power Integrations' Responses to Defendants' 1st Set of Interrogatories, Nos. 1 - 28, at 27.  Power Integrations never supplemented this responses and never produced or identified responsive documents.

5.  **Despite the lack of any evidence of importation or sale in the United States of Fairchild products sold abroad, Power Integrations' expert report calculates damages based on Fairchild's global sales.**

The starkest reflection of Power Integrations' lack of evidence for its indirect infringement claims is its recent expert report on damages.  The report cites no admissible

evidence of any kind to show what portion of Fairchild's foreign sales are later imported or sold in the United States, or indeed that any Fairchild parts are imported at all. Nevertheless, Power Integrations' damages expert bases his      REDACTED      and the vast majority of his report, on Fairchild's      REDACTED      Exh. J, Troxel Expert Report, at 5 (¶11), 44 (¶102). Ignoring the obvious limitation that Power Integrations' patents apply only in the United States (Power Integrations holds no foreign counterpart patents to the patents-in-suit), Mr. Troxel explains his approach as follows:

REDACTED

Exh. J, Troxel Expert Report, 44 (¶102). This reasoning rejects any effort to determine how many Fairchild parts, of which type and price, were imported into the United States, by whom, because Power Integrations has no evidence to establish those facts, and therefore has no evidence of direct infringement in the United States.

Even more amazingly, the damages expert's assertion that      REDACTED      REDACTED      In footnote 195 in the above quotation, Mr. Troxel makes clear that his only support for his proposition that Fairchild parts "came to the United States" in end product      REDACTED      Exh. J, Troxel Expert Report, 44 n. 195. Leaving aside that this "evidence" would be hearsay, *this is the same Bruce Renouard who admitted that he had no personal knowledge that any Fairchild device was found in any end product in the United States.* See *supra*, at pp. 8-9. In other words, Power Integrations' expert report cites no evidentiary basis for basing its damages estimates on Fairchild's worldwide sales.

Power Integrations' expert damages report does consider one alternative "scenario" for

calculating damages. The report purports to calculate what Power Integrations' damages would be if, instead of using Fairchild's total worldwide sales, it relied                REDACTED

                        REDACTED                    Exh. J, Troxel Expert Report, 5

(¶11), 61 (¶142). Under this approach, Fairchild's foreign sales would be included in Power

Integrations' damage estimates only insofar as Power Integrations' expert can

                                                            REDACTED

                    REDACTED

                        Exh. J, Troxel Expert Report, 61 (¶143). This

approach suffers from the same defect noted above – there is no evidence that *any* specific third

party imported *any* accused Fairchild devices into the United States, let alone evidence that each

of the 38 accused products were so imported.

    Power Integrations attempts to solve this problem by citing irrelevant and inadmissible

hearsay. Specifically, Power Integrations' damages expert purports to estimate the percentages

of Fairchild's worldwide sales that end up in the United States based on

                        REDACTED

                    Exh. J, Troxel Expert Report, 61 (¶143). Yet the report provides no

explanation or reasoning to show why these particular data are probative of, or even relevant to,

the importation or sale in the U.S. of the specific, accused Fairchild parts sold abroad. More

importantly, even this "evidence" consists of inadmissible hearsay. The statistics Power

Integrations uses are                    REDACTED                    Exh. J, Troxel Expert

Report, 61 (¶143) and Appx. 9.

    6.    <u>**Power Integrations had ample opportunities to obtain evidence on third-party importation of Fairchild devices but failed to do so.**</u>

    If evidence of sold-abroad Fairchild products entering the U.S. does exist, Power

Integrations had every opportunity to gather it yet failed to do so. Instead, Power Integrations

made essentially no effort to gather relevant evidence directly from the sources that would

possess it – the third party manufacturers of end products allegedly containing Fairchild parts.

In its response to Fairchild's Interrogatory No. 2, Power Integrations named five direct infringers to whom it believes Fairchild sells the accused products: "Dong Yang, Echostar, American Power Conversion (APC), LG, and Liteon." *See* Exh. R, PI's Rog. No. 2. Yet Power Integrations never sought any discovery whatsoever from four of these five companies. As for the fifth, Power Integrations waited seven months after serving this interrogatory response before it propounded a subpoena duces tecum to LG Electronics. Exh. R, Power Integrations' Responses to Defendants' 1st Set of Interrogatories, at 28; Exh. S, Notice of Deposition of LG Electronics USA, Inc., at 3. Even then, Power Integrations subpoenaed the wrong LG entity – LG Electronics USA ("LGE-USA"), which clearly had no responsive information. LGE-USA successfully moved to quash, mainly on the ground that it did not have possession, custody or control of documents that may or may not exist with its Korean parent. D.I. 141; Exh. T, Court Order Granting LG Electronics' Motion to Quash. LGE-USA's counsel informed Power Integrations on September 22, 2005 that responsive documents, if any, would be in the possession of LGE-Korea. Exh. U, Declaration of Lionel M. Lavenue in Support of LGE-USA's Motion to Quash. Power Integrations never even sought those documents from LGE-Korea.

Power Integrations also failed to pursue other third-party evidence. Power Integrations did propound nine other subpoenas to non-parties seeking depositions and documents that would show "the types and identities" of their products that allegedly incorporate the accused Fairchild devices, and "the unit volume of importation into the United States and unit volume of sales within the United States" of those products. *See* Exh. V. However, it first issued those subpoenas between six and nine months after the commencement of discovery and did not follow up on any of them. None of the subpoenas yielded any relevant, admissible evidence, and tellingly, Power Integrations cites no evidence produced by non-parties in its expert damages report. In short, Power Integrations knowingly declined to pursue the evidence it needed to show direct infringement in support of its indirect infringement claims against Fairchild.

IV.    **ANALYSIS – INDIRECT INFRINGEMENT UNDER 35 U.S.C. § 271(b) or (c).**

A.    **Summary Judgment Standard and Burden of Proof.**

As the party who bears the burden of proof on patent infringement, Power Integrations must "affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324. This requirement applies to each and every element of its claims. Fairchild is entitled to summary judgment if Power Integrations "fails to make a showing sufficient to establish the evidence of an element essential to that party's case... since a complete failure of proof concerning an essential element... necessarily renders all other facts immaterial." *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1250 (Fed. Cir. 2000), *quoting Celotex*, 477 U.S. at 322-23.

B.    **Power Integrations Cannot Prove Inducement of Infringement Under 35 U.S.C. § 271(b) Or Contributory Infringement Under 35 U.S.C. § 271(c) Because It Has No Evidence of Direct Infringement.**

Power Integrations cannot prove either inducement of infringement or contributory infringement because it has no evidence of underlying direct infringement, a required element for either theory of indirect infringement. "Upon a failure of proof of direct infringement, any claim of inducement of infringement also fails... [and] contributory infringement likewise." *Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1033 (Fed. Cir. 2002).

1.    **There is no evidence of any acts of direct infringement in the United States involving Fairchild devices sold abroad and later imported by a third party.**

As shown above in great detail, there is no admissible evidence that any third party products containing any accused Fairchild device directly infringes the patents in suit. In fact, there is no evidence that even *one* end product containing a single accused device was even imported or sold in the United States. It is undisputed that all of the accused Fairchild devices are manufactured abroad. Thus, Power Integrations cannot prove direct infringement. "Under 35 U.S.C. § 271(a)..., only an affirmative act (making, using, or selling the patented design) can give rise to the tort of direct infringement" needed to establish indirect infringement. *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1569-70 n.25 (Fed. Cir. 1994);

13

*Hamburger Color Co., Inc. v. Landers-Segal Color Co., Inc.*, 1996 WL 379562, at *7 (E.D. Pa. 1996) ("there is no evidence that [defendant] itself actually sold any infringing product, and therefore it cannot be held liable for direct infringement under 35 U.S.C. § 271(a)"). There being no evidence that any third party sold or imported an infringing device, there is no direct infringement and therefore no active inducement of infringement.

      2.    <u>**Power Integrations' only alleged "evidence" is speculative and inadmissible.**</u>

    The only alleged "evidence" of direct infringement that Power Integrations has produced is three press reports cited in its expert damages report to show       **REDACTED**

        **REDACTED**

    Exh. J, Troxel Expert Report, 61 (¶143) and Appendix 9. This reflects Power Integrations' recognition that under an inducement theory, not every foreign sale will lead to an infringement, but only those where the accused devices are later imported into the United States. "'[I]n cases in which there is a question whether every sale leads to an instance of direct infringement, a patentee must... establish the connection between sales and direct infringement.'" *Imagexpo, LLC v. Microsoft Corp.*, 284 F. Supp. 2d 365 (E.D. Va. 2003).

    There is, however, no logical relationship between the contents of the submitted materials and what Power Integrations must establish that accused Fairchild devices have been imported into the United States. The **REDACTED** and contains no data showing how many **REDACTED** contain specific accused products, much less the numbers of accused products in chargers made by other manufacturers. The LCD statistics are even more speculative – there is no information about specific brands, or monitors, or which ones contain specific accused devices, or how many, or in which North American country they are sold. There is no way to generate from these sources any specific, reliable data on which accused devices were later imported or sold in the U.S., if any, or how many of each. Thus, the information in these press articles, even if credited, is too general and requires too many logical leaps to carry Power Integrations' burden to prove damages under any

theory. *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1029-30 (Fed. Cir. 1996) (reversing jury award of lost profits because "[i]nstead of presenting evidence of actual sales combined with reliable economic analysis of demand, supply, and price over time, [plaintiff] invites the jury to engage in rapt speculation" by reasoning from three photographs of a store display, to average store display size, to total square footage across all stores, to "vague concept of sales per square foot"); *Unisplay, S.A. v. American Electronic Sign Co., Inc.*, 69 F.3d 512, 517 (Fed. Cir. 1995) ("a trier of fact must have some factual basis for a determination of a reasonable royalty").

In any case, the discussion of the press articles is academic because there is literally no factual basis on which damages could be established. Even if these press reports contained probative information, they still would be inadmissible hearsay. *United States v. ReBrook*, 58 F.3d 961, 968 (4th Cir. 1995). A court may take judicial notice of the contents of press reports only if they state matters that cannot reasonably be controverted. *Id.*; Fed. R. Evid. 201(b). They cannot substitute for the taking of evidence. *Fasolino Foods v. Banca Nazionale Del Lavoro*, 761 F. Supp. 1010, 1019 (S.D.N.Y. 1991). Thus, Power Integrations has no admissible evidence of direct infringement.

Another District Court in the Third Circuit faced a remarkably similar situation and granted summary judgment dismissing an inducement claim. In *Agere Sys., Inc. v. Atmel Corp.*, 2004 WL 945162 (E.D. Pa. 2004), the patentee's damages expert submitted a report "whose calculations predict market penetration of Defendant products as contained in end-products exported by foreign companies" using the same kind of evidence as in this case. *Id.* at *12. The defendant, arguing that the damages report was the patentee's only evidence of direct infringement, moved for summary judgment. The Court found that:

> To estimate the percentage of those products that may incorporate Defendant's products, *the report relies on an industry report of the total U.S. imports of cellular telephones and base stations. However, it does not point to specific Defendant customers, confirm that those customers use the accused products, or suggest that Defendant tracks such data.* Without a showing that Defendant knowingly induced infringement, with the specific intent to encourage its customers to infringe, that Defendant's acts did induce such infringement, and that Defendant knew or should have known that actual infringement would result, inducement under § 271(b) has not been adequately demonstrated.

15

*Id.* The Court found that without evidence of specific customers, or evidence that they use the accused products, or evidence that the defendant tracks such data, the patentee could not establish *any* of the elements of inducement of infringement. Here, too, all of that evidence is lacking. At a minimum, direct infringement cannot be established as a matter of law. Accordingly, Power Integrations' claims for active inducement under 271(b) and contributory infringement under 271(c) must be dismissed.

## V.    INTRODUCTION – DOMESTIC "OFFER TO SELL" UNDER 35 U.S.C. § 271(a).

Not having bothered to pursue or produce evidence that the accused products enter the United States, Power Integrations advances a second basis for bringing all of Fairchild's worldwide sales within the reach of the U.S. patent laws – that they were the subject of "offers to sell" in the United States under section 271(a). In fact, there is no triable issue as to whether Fairchild made an infringing "offer to sell" within the United States in connection with its foreign sales. To constitute an infringing "offer to sell," the communication must qualify as an offer under traditional contract principles, so that the offeree need do no more than indicate its acceptance to form a binding contract of sale. *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1255 (Fed. Cir. 2000). There is no evidence that any of Fairchild's foreign sales resulted from such an "offer to sell" in the United States.

## VI.    BACKGROUND – DOMESTIC "OFFER TO SELL" UNDER 35 U.S.C. § 271(a).

### A.    Fairchild Products Sold Abroad Did Not Result from Offers to Sell in the United States.

Having wreaked enormous damage on Fairchild's U.S. sales with its ambush lawsuit, Power Integrations now claims that Fairchild's U.S. sales figures seem understated and that some of those Fairchild's foreign must derive from offers made in the U.S.[1]

In fact, the undisputed evidence shows each Fairchild sale is recorded in the location where the purchase order is placed. Purchase orders are a well-established means of proving

---

[1]                                                                    **REDACTED**

Gendron Depo., 49:6-10, 51:6-11, 51:23-52:2.

(and dating) the "offer to sell" because the buyer and seller typically discuss key terms necessary to formation of a contract (e.g., quantity, time and place of delivery) when the buyer attempts to place the order. As a matter of common sense, this means no offer to sell could have been made before the buyer tried to place the order, because further agreement was required by the seller before a contract was formed. There is no offer that the buyer can simply accept to form a binding contract. *Rotec*, 215 F.3d at 1255. As will be discussed below, the undisputed evidence shows that this is exactly what happens when a purchase order is placed for a Fairchild product.

To show that Fairchild's data nevertheless understate U.S. offers for sale, Power Integrations would have to submit evidence that (i) Fairchild made offers for sale in the U.S. at an earlier stage of the selling process than the purchase order and (ii) the U.S. offer was accepted abroad and recorded as a foreign sale. There is no evidence of this. While Fairchild does engage in U.S.-based activities that relate to foreign sales, these activities lack the requisites of an offer for sale. They are either high-level, worldwide planning activities, or promotion and technical assistance aimed at getting Fairchild designs approved by potential purchasers as a precondition to later offering them for sale.

The evidence relating to international transactions shows that even when there is pre-purchase order activity that has some attributes of an "offer to sell" – such as a sales pitch – it takes place where the manufacturer is located who will buy the part. As Power Integration's damaged expert admits, those manufacturers are usually located abroad and separate entities from the U.S. company that gave design approval. Thus, not only are "offers to sell" made abroad in these cases, they are typically made to a completely different company. Therefore, the U.S. dealings cannot have been an offer to make a binding contract.

Power Integrations' theory appears to be that customers receive binding price quotes from Fairchild U.S. on the basis of which they place orders abroad. Power Integrations has no evidence that this ever actually happened in connection with an accused product. Even if it had happened, a price quote alone is not an offer for sale. Other terms like availability, quantity, time frame, etc. remain to be negotiated after a quote is made. Power Integrations has no

17

evidence of any complete U.S. offer for sale that resulted in a foreign sale or even that Fairchild mode any such offers.

       1.    **Fairchild's sales data by region reflect the placement of purchase orders, which are evidence of an offer to sell.**

       Fairchild sales are recorded in the region where the purchase order is placed. Purchase orders are a time-honored form of evidence of offers to sell under the patent laws, as commercial bulk sellers typically will not accept a P.O. unless they are willing to sell a product, and will not ship product without one. *See, e.g.*, Exh. W, http://en.wikipedia.org/wiki/Purchase_order. As Brent Rowe, Fairchild's recent Vice-President of Sales and Marketing for the Americas (and former VP of Sales and Marketing for Europe and for Japan), explained:

       Q.                         **REDACTED**

                                  \*\*\*

       A.

       Q.                        **REDACTED**
       A.
       Q.
       A.

Exh. C, Rowe Depo., 36:13-37:2; Exh. J, Troxel Expert Report, 42 (¶97). This was echoed by Thomas Beaver, Fairchild's Executive Vice-President of Sales and Marketing, (    **REDACTED**

         **REDACTED**                  ') and Robert Gendron, Americas Manager of Field Application Engineers ("             **REDACTED**

       **REDACTED**                        ") Exh. X, Beaver Depo., 15:3-7, 91:25-92:1; Exh. K, Gendron Depo., 27:6-29:6. The clear and undisputed evidence establishes that the records Fairchild has produced showing its U.S. sales reflect domestic purchase orders, while foreign sales data reflect foreign purchase orders.

18

The testimony of Jeffrey Barnes, Director of Finance for Fairchild's Analog Products Group, confirms that the actual offer for sale takes place at the time a purchase order is placed:

REDACTED

Exh. H, Barnes Depo., 56:7-17.  Clearly, quantity and time of delivery are not specified before the customer places a purchase order.  There might be sufficient inventory or more product might have to be built, which affects the date by which the order can be filled.  Although this is not mentioned, it seems implicitly obvious that the place of delivery would also have to be specified at the time a purchase order is placed, because the purchaser would have to inform the agent taking the order where to deliver the product on the date desired.  Accordingly, the company buying product from Fairchild is not merely accepting an outstanding offer whose terms are fixed, but is stating its needs and asking Fairchild to make an offer (or alternatively, making an offer to buy that Fairchild may accept, decline or meet with a counteroffer).  The buyer and seller undisputedly determine key terms of the sale contract at the time of ordering.

Despite its claims that Fairchild understates U.S. sales, Power Integrations' own public 10-Q reports state that only 7 to 8 percent of its annual net revenues derive from sales to U.S. customers.  Exh. Q, Balakrishnan Depo. (Rough), 70:18-74:18.  Power Integrations' CEO tried to explain this low figure by stating that

REDACTED

Id., 72:25-73:4.  This self-serving explanation aside, it is clear that Power Integrations treats its Asian orders as Asian sales precisely as Fairchild does.

**2.      Fairchild's design and promotional activities in the United States in connection with foreign sales fall short of an "offer to sell.**

In order to show that Fairchild's foreign sales data include some domestic offers for sale,

19

Power Integrations would have to submit evidence of instances where Fairchild's actions (in the U.S.) before a purchase order was placed (abroad), constituted an offer for sale. There is no evidence that this ever happened. The evidence shows that Fairchild engages in design and promotion in the United States in order to get its parts approved for subsequent purchase by major computer and electronics corporations,    REDACTED    for use in their products. Exh. D, Im Depo., 44:3-19; Exh. B, Engelbrechten Depo Exh. 2.[2]

> **a.    Fairchild's pursuit of design approval is not an offer to sell.**

Though they are commodity parts, the accused Fairchild devices are complex and multi-featured products meant for incorporation into even more complex, precision electronics. Before considering a purchase of Fairchild parts, a potential customer must determine that they can be integrated successfully into its product and perform as desired. Thus, before it can offer a part for sale to a particular customer, Fairchild must first engage in a process that will persuade that customer to place the product on its approved list. This "design in" process typically involves several steps. First,    REDACTED

Exh. L, Godbout Depo., 44:6-15, 47:1-5. Then

REDACTED                Exh. L, Godbout Depo., 47:7-21.

REDACTED

Exh. K, Gendron Depo., 121:16-122:11.

REDACTED                REDACTED

The field application engineers specifically                As Fairchild's Americas Manager of FAEs testified,    REDACTED

---

[2]    Fairchild also has high-level strategic, management and coordination functions in the United States. None of these constitutes making offers to sell and Fairchild has no reason to believe that Power Integrations will contend that they do. Power Integrations may contend that    REDACTED    REDACTED    Exh. L, Godbout Depo., 37:19-38:21. However, there is no evidence that the higher-ups who can make such decisions interact directly with customers or make sales proposals that customers can accept.

REDACTED                                          Exh. K, Gendron Depo.,

16:21-23 (emphasis added).  FAEs depend on sales people both to persuade customers to

purchase from Fairchild and to take purchase orders:

    Q.

    A.                     REDACTED

    Q.

                                              ***

    A.

    Q.

    A.                     REDACTED


Exh. X, Beaver Depo., 41:25-43:8.  Quite often,

                                             REDACTED

REDACTED             Exh. K, Gendron Depo., 35:18-21.

    Fairchild also provides                          Exh. C, Rowe

Depo., 44:3-5.  This is not a sale price, but an       REDACTED

                                Exh. C, Rowe Depo., 43:15-44:1 .

          REDACTED

Based on the components used, the engineer will

                                REDACTED

                REDACTED

                                       Exh.

C, Rowe Depo., 44:18-23 (emphasis added).]  This allows the customer to know if the price is

going to be "in the ballpark" so that a design-in makes sense.  Asked if Fairchild must honor the

quote if the customer makes a purchase, Mr. Rowe testified,       REDACTED

          REDACTED

REDACTED                                     Exh. C, Rowe

Depo., 45:3-6 (emphasis added). '             REDACTED

REDACTED          Exh. C, Rowe Depo., 44:3-5.  As will be discussed

below, an estimate is, as a matter of law, not an offer for sale.

Thus, the undisputed evidence is that the design-in does not constitute an offer by

Fairchild, but rather a process whose successful conclusion is an approval by the customer – a

precondition to Fairchild making an offer to sell – after which someone other than the FAE who

conducts the design-in must try to convince the customer to buy.  This leaves still unanswered

the question of where the next steps in winning an actual purchase occur when the design-in

takes place in the United States, but the purchase order is placed overseas.

### 3.  The Evidence of Fairchild's sales practices and of actual transactions shows that foreign sales results from foreign offers to sell.

That foreign sales can rest on design-ins in the United States does not complete the

picture of how a Fairchild product is sold.  After a potential customer approves a Fairchild

design, Fairchild must still negotiate terms and convince the customer to buy the product – i.e.,

Fairchild must later make a offer to sell.  In the case of a foreign sale, this offer for sale takes

place abroad where the foreign buyer is located.  The undisputed evidence of Fairchild's sales

practices and of actual transactions shows this.

#### a.  Fairchild's worldwide sales and marketing organization.

All sales of Fairchild products
                                              REDACTED
                    Exh. X, Beaver Depo., 21:9-10

REDACTED          The organization has three types of employees who interact with

customers:                        Exh. X, Beaver Depo., 21:20-24.
                    REDACTED
As explained above,

The job of proposing terms to a customer that are sufficiently detailed to enable the

customer to place a purchase order falls within the purview of the field marketers and inside

22

salespeople.  The field marketers

**REDACTED**

Exh. X, Beaver Depo., 21:25-22:6.  The field marketers engage

Exh. X, Beaver Depo., 19:11.  As Mr. Beaver, Fairchild's Executive Vice-President of Sales and Marketing, testified, this refers to:

**REDACTED**

Exh. X, Beaver Depo., 19:12-18.  As for the

**REDACTED**                    Exh. X, Beaver Depo., 23:5-6.  Obviously, if the inside salesperson – the person who takes the purchase orders – makes the "offer to sell," then as discussed above, the purchase order reflects where the offer was made (and so do the sales data).

    **b.**    <u>**Field marketers pitch foreign offers to sell where the foreign buyers are.**</u>

But even if the field marketer, and not the inside salesperson, is considered to be making the "offer to sell," the norm is to pitch sales and negotiate terms in the region where the buyer is located.  A foreign order placed by a foreign buyer will reflect a sales pitch received in the buyer's country.  Mr. Beaver, trying to explain how his organization operates generally, provided the following illustrative example:

**REDACTED**

Exh. X, Beaver Depo., 23:8-16.  Though high-level coordination occurs in the United States, "the people that call on customers" to make sales operate locally

**REDACTED**

23

REDACTED

Exh. X, Beaver Depo., 22:3-7.

Beyond the ability to address local customer needs in a foreign region, there is another reason why field marketers, as a general practice, make offers to sell in the customer's country:

REDACTED                                                In such

cases, Fairchild must, after winning approval of its design by a company in the U.S., propose a sale to a different manufacturer abroad for incorporation into a power supply of some kind.  The manufacturer will then sell that power supply to another company and somewhere down the chain, it will find its way into an end product that can ship anywhere in the world.  Power Integrations' own damages expert has acknowledged that this is "usually" what happens:

REDACTED

Exh. J, Troxel Expert Report, 41(¶94) (emphasis added).  Obviously, any prior communications in the United States cannot have been an offer to sell or even intended as one, because those communications were knowingly made to a ***different company***, which could not accept an offer on behalf of the foreign manufacturer.

        c.     **<u>Every international transaction in evidence shows an offer to sell abroad.</u>**

Power Integrations cannot cite a single specific foreign sale where the offer was made in the United States.  Every transaction in evidence shows that the offer to sell was made abroad. For example, Stephen Jensen, Fairchild's Director of Sales for the Americas, testified about a failed transaction with

REDACTED

Q.
A.

24

Q.

....
A.
Q.

A.
Q.
A.

**REDACTED**

Q.
A.
Q.

A.
Q.

....
A.

Q.


Exh. A, Jensen Depo., 102:24-104:12.  The design approval process in the United States got
Fairchild only to the point where it could begin to pursue a sale in Asia with a different
customer.  A field marketer in Asia would have to approach the Asian customer to try to
convince it to buy, and to discuss price, availability, time of delivery, quantity and other contract
terms.  Indeed, the U.S. part of the team was so removed from the actual selling process that they
still do not know if a purchase was ever made.

Power Integrations' own examples follow the same pattern.  Power Integrations' expert
damages report cites five companies with which Fairchild sought U.S. design-ins that would

involve manufacture abroad:                    REDACTED

The evidence that Power Integrations adduces in support of its argument demonstrates
that Fairchild had to make its offer to sell overseas:


                                   REDACTED


Exh. J, Troxel Expert Report, 42 (¶¶ 95-96), quoting Exh. B, Engelbrechten Depo., 64:7-18.
After the demo board design was approved in the U.S., the sales force would have to
                                   REDACTED
                                             *Id.* This is not evidence of an offer to sell
in the United States; rather, the testimony clearly points to negotiation of the sale in Asia.

>     **d.**    **There is no evidence of a U.S. price quote being honored**
>            **abroad, or that such a quote would constitute an offer ror sale.**

Finally, Power Integrations advances the theory that Fairchild issues binding price quotes
in the United States to be fulfilled abroad, and these are foreign sales based on U.S. offers.
Though his testimony, discussed above, makes clear that the norm is to give only estimates at the
design-in stage, Mr. Rowe acknowledged that it            REDACTED
          REDACTED            Exh. C, Rowe Depo., 45:7-18. There is, however, no
evidence that this ever actually happened with respect to any accused products. In any case, a
price quote is not an offer for sale.

Power Integrations cites just one example of an actual transaction involving a negotiated
price quotation in the United States that was arguably intended to be used in a purchase in Asia:
                        REDACTED                    Exh. J, Troxel Expert
Report, 25, 43(¶98). However, Power Integrations' evidence argues against its position. First,
                REDACTED                            REDACTED
Exh. L, Godbout Depo., 73:4-6; Exh. C, Rowe Depo., 35:3-8.

. Second,                          REDACTED

REDACTED                         A price quote was

but the actual customer for the Fairchild parts REDACTED *See* Exh. J, Troxel Expert

Report, 25.  Even if one accepted the premise that a price quote by itself could constitute an offer

to sell, an                          and a new offer would have to be made.  Perhaps

most importantly,          REDACTED                REDACTED

REDACTED          *See* Exh. J, Troxel Expert Report, 25.  That Fairchild Japan did not feel

bound, contractually or as a matter of corporate policy, by the quote made by its own U.S.

sibling shows that the quote could not have been an offer to sell.

Moreover, Power Integrations has no evidence beyond a naked quote to support its

premise of a U.S. offer for sale.  There is no evidence of such a quote being issued in connection

with a sale of an accused product.  There is no evidence of any Fairchild practice of issuing

quotes in the United States accompanied by any other proposed terms, such as quantity, time

frame, place of delivery, a promise of availability, or the like, in connection with foreign sales.

Thus these international price quotes – even if there were evidence of Fairchild having issued

one in connection with an accused product — still would not constitute offers for sale.

## VII.    ANALYSIS – DOMESTIC "OFFER TO SELL" UNDER 35 U.S.C. § 271(a)

### A.    Power Integrations Cannot Prove That Any Foreign Sale Was The Subject Of an Offer for Sale in the United States Under 35 U.S.C. § 271(a).

35 U.S.C. § 271(a) provides that "whoever without authority… offers to sell… any

patented invention, within the United States… infringes the patent."  Although by definition

Fairchild's foreign sales of accused products occurred outside the United States, Power

Integrations contends that they were the subject of offers to sell within the United States and

therefore infringing.  Because Power Integrations has the burden of proving infringement at trial,

it must, to avoid summary judgment, show that it can introduce evidence sufficient to establish

each essential element of its claim.  *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043,

1046 (Fed. Cir. 2001).  Because there is no evidence that Fairchild engaged in any activities

27

within the United States that constituted a contractually adequate "offer for sale" in relation to its foreign sales, Power Integrations' claim under 35 U.S.C. § 271(a) must be dismissed.

1. **The undisputed evidence shows that Fairchild's offer to sell is made when the buyer places a purchase order.**

The Federal Circuit has held that section 271(a)'s term "'offer to sell' is to be interpreted according to its ordinary meaning in contract law, as revealed by traditional sources of authority." *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1255 (Fed. Cir. 2000). To have made an offer to sell, Fairchild must have "communicated a 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Id.*, *citing* REST. 2D CONTRACTS § 24 (1979). In other words, there is no offer until the point is reached where ***no further assent*** is required from Fairchild, and the buyer has the power to bind Fairchild by simply accepting the offer. *Linear Technol. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001), *quoting* REST. 2D CONTRACTS § 26 (1979) ("a manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.").[3]

The undisputed evidence shows that Fairchild gives the buyer the power to accept an offer and bind it only when Fairchild accepts the buyer's purchase order. "Under the common law, a price quotation or proposal does not generally constitute an offer; the purchase order usually is the first document having the legal attributes of an offer." *Gulf States Util. Co. v. NEI Peebles Elec. Prods., Inc.*, 819 F. Supp. 538, 549 (M.D. La. 1993) (collecting cases); *see also Pfaff v. Wells*, 525 U.S. 55, 67, 119 S. Ct. 304 (1998) (purchase order suffices to show offer for sale for purposes of on-sale bar). This general rule is properly applied in this case. Specifically, the undisputed evidence shows that until the purchase order is placed, Fairchild and its buyer have not agreed on time of delivery or availability of product (or, implicitly, quantity or place of

---

[3]    *Linear Technology* was construing the term "offer to sell" in the context of the on-sale bar of 35 U.S.C. § 102(b). Its reasoning is equally applicable here, however, in light of *Rotec*'s holding that "offer to sell" analysis under traditional contractual principles is the same for section 271(a) as for section 102(b). *Rotec Indus., Inc.*, 215 F.3d at 1254-55.

delivery), which are terms necessary to form a contract. Exh. H, Barnes Depo., 56:7-17; *MLMC, Ltd. v. Airtouch Communications, Inc.*, 215 F. Supp. 2d 464, 477 (D. Del. 2002) ("Generally, *price quotations are not offers, because a quotation leaves many terms necessary to a contract unexpressed, for example, time and place of delivery, terms of payment*, and other matters usually agreed upon before closing a deal.") (emphasis added).

There is no evidence to support the proposition – which Power Integrations would have to prove to carry its burden at trial – that Fairchild has already made its offer to sell before the customer attempts to place a purchase order, in that all essential terms have been specified and the customer need only accept those terms to bind Fairchild. Mr. Barnes' undisputed testimony that                                   REDACTED

REDACTED     makes clear that a customer attempting to place an order does not have the power to bind Fairchild without a "further manifestation of assent" from Fairchild. Addressing specifically the unpredictable variable of availability, the Fourth Circuit explained why this is so:

> [Plaintiff] cannot maintain that upon its receipt of a price quotation from Sharp, it could have formed a binding contract to purchase, for example, 1.5 million units–a proposition yet more untenable if it turned out that [defendant] were unable to deliver 1.5 million units.... *It would bring an end to the competitive practice of shopping products if every quotation exposed the "quoter" to an enforceable contract on whatever terms the "quotee" chose, regardless of product availability.*

*Audio Visual Assoc., Inc. v. Sharp Electronics Corp.*, 210 F.3d 254, 259 (4th Cir. 2000). Lacking evidence that the placement of a purchase order is the mere acceptance of an outstanding offer, Power Integrations cannot carry its burden and, thus, there is no triable issue of fact.

The undisputed evidence further shows that Fairchild records each sale where the purchase order is placed and, thus, where the offer to sell is made. Fairchild's foreign and domestic sales data are entirely consistent with where Fairchild makes offers to sell. There is no basis for treating any foreign sales as resulting from infringing U.S. offers.

2.    **Even if Fairchild's sales activities leading up to the customer's placement of a purchase order could be considered offers to sell, there is no evidence that those activities occur in the u.s. as a matter of general practice or in any specific instance.**

The undisputed evidence of what occurs leading up to the customer's placement of a purchase order shows that Fairchild's normal practice ·            REDACTED

REDACTED                        Exh. X, Beaver

Depo., 22:3-7, 23:8-16.  Therefore, even if the offer to sell is deemed to occur before Fairchild

responds to the customer's attempt to place a purchase order, it still occurs in the foreign

purchaser's country.  There is no evidence of even one sale of accused products that deviates

from this practice.  On the contrary, all the transactions of record show that Fairchild pitched the

actual terms of sale in the foreign manufacturer's region.

In the        REDACTED            the offer to sell was to be made overseas to a

different customer than in the United States.  Thus, Fairchild's domestic communications with

REDACTED                    "Only an offer which rises to the level of a

commercial offer for sale, *one which the other party could make into a binding contract by*

*simple acceptance* (assuming consideration), constitutes an offer for sale." *Rhenalu v. Alcoa,*

*Inc.*, 224 F. Supp. 2d 773, 801 (D. Del. 2002) (applying 35 U.S.C. § 102(b)), *quoting Group*

*One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001).  A second

communication with a different company altogether is not an offer to sell that the first (domestic)

company in those transactions could have accepted to form a binding contract.  Power

Integrations' own expert admitted that                REDACTED

REDACTED                Exh. J, Troxel Expert Report, 41(¶94).

In the                    REDACTED

there was no evidence of any transaction in the U.S. beyond a design-in approval, following

which Fairchild would pursue buyers and offer sale terms overseas.  Exh. J, Troxel Expert

Report, 42 (¶¶ 95-96), quoting Exh. B, Engelbrechten Depo., 64:7-18.  Even assuming a

"budgetary price" was provided in the U.S. at the design-in stage, there was still no offer to sell.

Generally, *mere price quotations without other contractual terms (time and*

*place of delivery, terms of payment, etc.) do not constitute offers.* Nevertheless, if the quotation comes in reply to a specific request for an offer, contains language of commitment, or comes after prolonged negotiations, and the quotation contains detailed terms, it may be deemed an offer. *An estimate is not considered to be an offer or a quotation.*

*Rhenalu*, 224 F. Supp. 2d at 801; *see also MLMC Ltd. v. Airtouch Communications, Inc.*, 215 F. Supp. 2d 464, 479-81 (D. Del. 2002) ("budgetary quotations" were estimates and could not be offers to sell as they were more like list prices and not "customized to a particular customer so as to manifest a 'willingness to enter into a bargain'"). The undisputed evidence is that

REDACTED

REDACTED

Exh. X, Beaver Depo., 41:25-43:8. There is no evidence that the FAEs attempt to make sales, or that they discuss any contract terms. There is no evidence that at the end of the design-in process, either party has made a proposal that the other party could simply accept to form a binding sales contract.

### 3. A "valid" price quote that travels from the United States abroad is not an offer to sell and there is no evidence of even one actual sale made in this manner.

Finally, the testimony that it is possible for a "valid quote" to be issued in the U.S. but taken elsewhere in the world to have the part built there does not suffice to create a triable issue of fact as to whether some of Fairchild's foreign sales arose from U.S. offers to sell. There is no evidence of even one actual foreign sale of an accused product based on a "valid quote" in the U.S. Power Integrations' only purported example,

REDACTED

REDACTED

Exh. L, Godbout Depo., 73:4-6; Exh. C, Rowe Depo., 35:3-8. Moreover, "mere price quotations without other contractual terms (time and place of delivery, terms of payment, etc.) do not constitute offers." *Rhenalu*, 224 F. Supp. 2d at 801; *Dean Foods Co. v. Brancel*, 187 F.3d 609, 619 (7th Cir. 1999) (price quote commonly deemed invitation to offer rather than offer even if directed at particular customer). There is no evidence that  REDACTED  or any such price quotes, travel overseas with any other terms specified. There is rather the undisputed testimony of Jeff Barnes that time

31

of delivery and availability are determined only when the purchase order is placed.  Exh. H, Barnes Depo., 56:7-17.

Accordingly, Power Integrations has no evidence of even one Fairchild foreign sale that was the subject of an infringing offer to sell in the United States, or of any practice of making offers to sell in the United States that can be accepted abroad by a buyer without a further manifestation of assent from Fairchild.  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Rotec*, 215 F.3d at 1251, *quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986).  Power Integrations must present sufficient evidence to prove at trial that the defendant committed at least one infringing act. *Civix-DDI LLC v. Cellco Partnership*, 387 F.Supp.2d 869 (N.D. Ill. 2005).  With respect to Fairchild's foreign sales, it cannot meet this burden.

### 4.    Fairchild's higher-level management activities in the United States are not offers to sell.

Finally, none of Fairchild's higher-level strategic, management and coordination activities in the United States constitute offers to sell.  No internal communications among Fairchild employees can constitute offers to sell "to a customer not privy to the communications."  *Linear Technology Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001).  This is true even if the communication occurs between Fairchild sales representatives and their U.S. superiors regarding pricing.  *Id.*; Exh. L, Godbout Depo., 37:19-38:21.  Indeed, even if someone higher up at Fairchild communicates with a customer, there is no offer to sell until a communication occurs that indicates Fairchild's intent to be bound.  *Linear*, 275 F.3d at 1050.  Thus, again, the offer to sell takes place where the salesperson books business and Fairchild accepts a purchase order.  For sales recorded as foreign sales, the undisputed evidence shows that these activities take place abroad.

**VIII.   CONCLUSION.**

   For the foregoing reasons, Fairchild respectfully requests that the Court grant partial

summary judgment of non-infringement as to Power Integrations' claims under 35 U.S.C.

§271(a), (b) and (c), insofar as they apply to Fairchild's sales outside the territory of the United

States.

                                          ASHBY & GEDDES

                                          Steven J. Balick (I.D. #2114)
                                          John G. Day (I.D. #2403)
                                          Lauren E. Maguire (I.D. #4261)
                                          222 Delaware Avenue, 17th Floor
                                          P.O. Box 1150
                                          Wilmington, DE  19899
                                          (302) 654-1888
                                          sbalick@ashby-geddes.com
                                          jday@ashby-geddes.com
                                          lmaguire@ashby-geddes.com

                                          *Attorneys for Defendants*

*Of Counsel:*

G. Hopkins Guy, III
Vickie L. Feeman
Bas de Blank
Brian H. VanderZanden
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
(650) 614-7400

Dated:  March 17, 2006
167766.1

                                          33

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of March, 2006, the attached **REDACTED PUBLIC VERSION OF OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT (FOREIGN SALES)** was served upon the below-named counsel of record at the address and in the manner indicated:

William J. Marsden, Jr., Esquire  
Fish & Richardson, P.C.  
919 N. Market Street  
Suite 1100  
P.O. Box 1114  
Wilmington, DE  19899  

HAND DELIVERY

Frank E. Scherkenbach, Esquire  
Fish & Richardson P.C.  
225 Franklin Street  
Boston, MA  02110-2804  

VIA FEDERAL EXPRESS

Michael Kane, Esquire  
Fish & Richardson P.C.  
60 South Sixth Street  
3300 Dain Rauscher Plaza  
Minneapolis, MN  55402  

VIA FEDERAL EXPRESS

Howard G. Pollack, Esquire  
Fish & Richardson P.C.  
500 Arguello Street, Suite 500  
Redwood City, CA  94063  

VIA FEDERAL EXPRESS

Andre G. Bouchard, Esquire  
Bouchard Margules & Friedlander, P.A.  
222 Delaware Avenue, Suite 1400  
Wilmington, DE  19801  

HAND DELIVERY

*/s/ Lauren E. Maguire*
_____

Lauren E. Maguire