IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC., a
Delaware corporation,

       Plaintiff,

    v.

FAIRCHILD SEMICONDUCTOR
INTERNATIONAL, INC., a Delaware
corporation, and FAIRCHILD
SEMICONDUCTOR CORPORATION, a
Delaware corporation,

       Defendants.

C.A. No. 04-1371 JJF

**HIGHLY CONFIDENTIAL**

**FILED UNDER SEAL**

**PURSUANT TO COURT ORDER**

---

**POWER INTEGRATIONS' JOINT COUNTERSTATEMENT IN RESPONSE
TO SIX OF FAIRCHILD'S SEVEN MOTIONS FOR SUMMARY JUDGMENT**

**REDACTED**

FISH & RICHARDSON P.C.
William J. Marsden, Jr. (#2247) (marsden@fr.com)
Sean P. Hayes (#4413) (hayes@fr.com)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Telephone: (302) 652-5070
Facsimile: (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

Michael R. Headley
Howard G. Pollack
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

**REDACTED**

Date: April 7, 2006

## TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ...................................................................................1

II.     MSJ NO. 1: FAIRCHILD'S MOTION FOR SUMMARY
        JUDGMENT OF INVALIDITY OF CLAIM 1 OF THE '876
        PATENT [D.I. 207, 208] ........................................................................3

        A.      The '876 Patent Is Not Anticipated by U.S. Patent No.
                4,638,417 ("Martin" or "the '417 patent")..................................3

        B.      The Wang Reference Does Not Anticipate the '876
                patent...........................................................................................6

        C.      The Habetler Reference Does Not Anticipate the '876
                patent...........................................................................................6

III.    MSJ NO. 2: FAIRCHILD'S MOTION FOR SUMMARY
        JUDGMENT OF NONINFRINGEMENT OF CLAIMS 17-19
        OF U.S. PATENT NO. 6,249,876 [D.I. 204, 205] ...............................7

        A.      There are Numerous Factual Disputes Regarding
                Whether the Accused Fairchild Products Infringe Claims
                17, 18 and 19 of Power Integrations' '876 Patent. ....................8

        B.      Fairchild Is Also Incorrect in its Arguments Regarding
                the Scope of Power Integrations' Assertion of
                Infringement and the Doctrine of Equivalents............................9

IV.     MSJ NO. 3: FAIRCHILD'S MOTION FOR SUMMARY
        JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT
        NO. 4,811,075 [D.I. 210, 211]............................................................10

V.      MSJ NO. 4: FAIRCHILD'S MOTION FOR SUMMARY
        JUDGMENT OF UNENFORCEABILITY AND
        INVALIDITY OF U.S. PATENT NOS. 6,107,851 AND
        6,229,366 [D.I. 213, 214]....................................................................13

VI.     MSJ NO. 5: FAIRCHILD'S MOTION FOR SUMMARY
        JUDGMENT OF INVALIDITY OF CLAIMS 1 AND 5 OF
        U.S. PATENT NO. 4,811,075 [D.I. 215, 216] .....................................21

VII.    MSJ NO. 6: FAIRCHILD'S MOTION FOR PARTIAL
        SUMMARY JUDGMENT OF NON-INFRINGEMENT
        (FOREIGN SALES) [D.I. 218, 219] ...................................................29

        A.      Numerous Questions of Fact and Credibility
                Determinations Underlie the Issue of Whether Fairchild
                Has Offered the Accused Products for Sale from within
                the United States. ......................................................................30

        B.      Fairchild Also Ignores Disputed Facts Regarding the
                Importation of the Accused Parts...............................................33

C.     Fairchild's Joint Defense Agreements with Dongyang, Lite-On, and other Major Overseas Customers Support the Inference that Fairchild Is Hiding Information Regarding Infringing Offers for Sale, Downstream Products, and Importation of Accused Parts, and Thus Preclude Summary Adjudication of These Issues. ...................................38

VIII.    CONCLUSION.................................................................................................39

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*3D Systems, Inc. v. Aarotech Laboratories, Inc.,*
  160 F.3d 1373 (Fed. Cir. 1998)................................................................................32

*Berges v. Gottstein,*
  618 F.2d 771 (CCPA 1980) ....................................................................................24

*Berry v. Webb,*
  412 F.2d 261 (CCPA 1969) ....................................................................................23

*Golden Blount, Inc. v. Robert H. Peterson Co.,*
  438 F.3d 1354 (Fed. Cir. 2006)..............................................................................29

*Holmwood v. Sugavanam,*
  948 F.2d 1236 (Fed. Cir. 1991)..............................................................................23

*Medichem v. Rolabo,*
  437 F.3d 1157 (Fed. Cir. 2006)..............................................................................24

*Price v. Symsek,*
  988 F.2d 1187 (Fed. Cir. 1993)........................................................................23, 24

*Stern v. Columbia University,*
  434 F.3d 1375 (Fed. Cir. 2006)..............................................................................23

3

Despite Fairchild's failure to file a Statement certifying that there are no genuine issues of material fact in its seven summary judgment motions as required by the Court's Order of February 7, 2005 [D.I. 19], Plaintiff Power Integrations, Inc. ("Power Integrations") hereby submits this Counterstatement, per the Court's Order, certifying that genuine issues of material fact exist with respect to the issues raised in six of Fairchild's seven motions for summary judgment. For the sake of convenience, Power Integrations has provided this single, joint counterstatement to these six Fairchild motions, with the explanations of the key material factual disputes broken out separately by motion, below, for the Court's reference. With respect to the seventh motion (marking), Power Integrations is simultaneously filing a separate response.

## I.    INTRODUCTION

This is a straightforward case of willful patent infringement.  Although this case involves highly technical inquiries into Power Integrations' patents, the functionality of Fairchild's devices, and the disclosures of Fairchild's alleged prior art, the evidence tells a simple, familiar tale: that Fairchild set out to imitate Power Integrations' successful products as well as Power Integrations' related marketing collateral and design tools, by reverse engineering the former and "benchmarking" (Fairchild's euphemism) the latter; that Fairchild learned during this process about Power Integrations' patents and realized those patents presented difficulties; and that Fairchild sold the accused parts, as originally designed, nonetheless. The facts underlying this story, and likewise underlying Fairchild's seven motions directed toward preventing Power Integrations from telling that story, present a host of underlying factual disputes which make Fairchild's motions for summary judgment inappropriate.

For example, Fairchild's motion for summary judgment of non-infringement regarding "DMOS" (Motion No. 3) (D.I. 210) is emblematic of the shortcomings in Fairchild's motions.  In this motion, Fairchild asserts that it should be found not to

infringe one of Power Integrations' patents because Fairchild labels its own devices "DMOS" and argues that Power Integrations surrendered during prosecution any claim that a "DMOS" device infringes the patent. The "DMOS" motion thus largely rehashes Fairchild's unsuccessful DMOS-related claim construction arguments, which the Court has decided should await resolution at trial. For the same reasons, the Court should decline to decide Fairchild's "DMOS" summary judgment motion prior to trial.

Even apart from the issues Fairchild sought unsuccessfully to raise in the claim construction context, the DMOS motion should be denied because it glosses over other fundamental underlying factual issues—including what "DMOS" means and whether Fairchild's accused devices in fact are "DMOS" devices. Indeed, Fairchild concedes that "Power Integrations argu[es] that Fairchild's devices are not truly DMOS structures." [D.I. 211 at 2.] Despite acknowledging this factual dispute in the introduction to its motion, Fairchild spends another seventeen pages attempting to explain what is and is not DMOS. In addition, Fairchild's own expert, Dr. Peter Gwozdz, has taken inconsistent positions during the course of this litigation regarding the teaching of the "DMOS" art Fairchild relies upon, a fact that Fairchild ignores when it cites to the "Supplementary" expert report of Dr. Gwozdz (a report served well past the cutoff for expert reports). These core factual disputes preclude summary adjudication of Fairchild's "DMOS" motion, and Fairchild's similar approach to all six motions addressed in this response provides grounds for denial.

Fairchild also failed to certify the absence of factual issues for any of its seven motions as required under this Court's procedures. That failure makes all seven motions facially invalid and is unlikely to be a mere oversight. It is more likely a concession that factual disputes in fact exist, which should prevent the issues presented from being resolved in any summary fashion.

2

II.    **MSJ NO. 1: FAIRCHILD'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 1 OF THE '876 PATENT [D.I. 207, 208]**

Fairchild's motion alleges anticipation of claim 1 of the '876 patent, but this motion must fail because it raises fundamental factual questions, including what one of skill in the art would understand to be taught in the art relied upon by Fairchild and whether that teaching discloses certain claim limitations as they have now been construed by the Court. Specifically, there are underlying factual issues at least as to (1) whether any of the counters disclosed in the art are "coupled" to a digital to analog converter ("DAC") and (2) whether any of the counters causes a DAC to change the frequency of an oscillator. Both are questions of fact with respect to each of the three cited references, particularly in light of the references' insertion of a memory device, such as a "ROM," between a counter and a DAC and the use of the ROM's programming and output to control the DAC. The parties' technical experts disagree on all of these issues. [*Compare* Ex. A[1] at ¶¶ 139-140, 144-146, 148-149 with D.I. 209 at ¶ 2-8.] Therefore, Fairchild's first motion is not appropriate for summary adjudication.[2]

Fairchild seeks to rely on conclusory statements from its expert Dr. Horowitz and attorney argument regarding what the cited art teaches with respect to certain limitations [*see, e.g., Id.* at ¶ 8 ], but such conclusory statements cannot be determinative. Given the experts' divergent conclusions as to the teaching of the cited art and what one of ordinary skill in the art would take from the references, the issue of the validity of the '876 patent turns on issues of material fact that must be tried.

A.    **The '876 Patent Is Not Anticipated by U.S. Patent No. 4,638,417 ("Martin" or "the '417 patent").**

As noted above, there is a question of fact as to whether the '417 patent discloses the claimed "counter coupled to a digital to analog converter" or whether the "counter [is]

---

[1]    All Exhibit citations refer to the accompanying Declaration of Sean P. Hayes unless noted otherwise.

[2]    Although, under the Court's recently-delivered constructions, Power Integrations believes that no reasonable jury could conclude that the cited art anticipates the '876 patent, Power Integrations is not cross-moving for summary judgment on the issue.

3

causing the digital to analog converter to adjust the control input and to vary the switching frequency." A reasonable fact finder could conclude that the Martin patent does not disclose the claimed counter coupled to a DAC because no voltage, current or control signal is passed from the counter to the digital to analog converter.

In Martin, the digital to analog converter receives a pseudorandom code sequence from a storage medium such as a ROM or EPROM rather than a counter's signal. [*See* D.I. 208, Ex. A ('417 patent) at 2:22-36.] Fairchild concedes that an EPROM is interposed between the counter and the DAC [*id.* at 2], and Fairchild's expert, Dr. Horowitz, agrees. [Ex. B at 206:10-15 ("Q. Okay. Now, it's true that the -- a purpose of the EPROM shown in the Martin reference is to provide a pseudorandom code to the D to A converter, right? A. Yes, in the Martin reference that's what he intends.").] The pseudorandom code produced by the ROM, not the information contained in the counter's output, dictates how the converter adjusts the oscillator's control input and varies the power supply's switching frequency. Indeed, one of the primary purposes of the Martin invention is to prevent a power supply from generating a "signature," as might be caused by the cyclically repeating pattern of a counter, because such a repeating pattern can be used to identify the source of radiated signals and thus can create significant problems in "secure" usages, for example, certain military applications. [*See* D.I. 208, Ex. A at 1:25-41.] Dr. Horowitz concedes that the signal the counter sends to the EPROM is different from the signal the digital to analog converter receives, stating: "The EPROM element merely functions as a lookup table, using the signal provided by the counter to look up a stored signal. That stored signal is then provided to the DAC." [D.I. 209 at ¶3.] Dr. Horowitz does not mention, however, that without such a storage element providing a randomizing function, the very purpose of the Martin system cannot be accomplished.

4

Power Integrations' expert, Mr. Blauschild, testified that intervening components such as a ROM between the counter and digital to analog converter prevent the coupling required in the claims:

> "Q.  And what type of intervening components are ruled out?
> A.  Well, as I talk about in my report, I certainly would rule out a ROM with respect to the '876. Anything that would prevent -- can we talk specifically with respect to the '876?
> Q.  All right.
> A.  Anything that would take away the control aspect of the coupling.

[Ex. C at 84:10-18.]  As Power Integrations' expert explained, the counter shown in Martin is purposely *decoupled* from the digital to analog converter specifically so that the counter output *does not control* the digital to analog converter in the simple known and fixed way described in the '876 patent.  [Ex. A at ¶ 148.]  The whole purpose of Martin is to use the ROM to vary frequency in a pseudo-random manner to avoid generating a known frequency "signature."  [*Id.*]  The disagreement between the parties' experts concerning the teaching of the reference, the purpose of the ROM element, and its interrelationship with the counter and DAC of the claims raises genuine factual disputes that preclude summary judgment.

Moreover, Fairchild's suggestion that the '417 patent teaches "a known and fixed—not random—frequency variation" directly contradicts the language of the '417 patent itself: "This technique produces independent means of varying the operating frequency in a pseudo random pattern without changing the output voltage and so forth." [D.I. 208, Ex. A at 2:56-59.]  The Court's recent claim construction of the term "frequency jittering" in the preamble of claim 1 gives rise to a further potential issue of fact as to whether the disclosed system of the Martin patent, including a ROM programmed to vary frequency in a pseudo-random manner, is such a frequency jittering circuit.  In view of the evidence contained in the Martin patent itself and Mr. Blauschild's opinions, a reasonable fact-finder could certainly conclude the Martin patent fails to disclose such a circuit as construed.

5

**B.    The Wang Reference Does Not Anticipate the '876 patent.**

Wang does not have the counter coupled to a digital to analog converter or a counter causing the digital to analog converter to adjust the control input and to vary the switching frequency as recited in claim 1 of the '876 patent. Instead, Wang places a ROM between his counter and DAC, like the system discussed above with respect to the Martin patent. Most of the Wang reference details why the ROM is necessary and how it should be designed; the reference, in fact, includes pages of design equations regarding dependencies and how the digital to analog converter should be driven by the ROM to achieve the effect Wang seeks. As with Martin, the ROM used in Wang purposely decouples the counter and the digital to analog converter, so that the counter output does not control the digital to analog converter. [*See* Ex. A at ¶139; D.I. 208, Ex. B at 604.]

Because the parties' experts have stated their disagreement with respect to the teachings of Wang in terms similar to the dispute regarding the Martin patent [*see id.*; D.I. 209 at ¶5 ("The ROM element in Wang functions in the same way as the EPROM element in the Martin patent.")], validity of claim 1 in view of the Wang reference is also not properly the subject of summary judgment.

**C.    The Habetler Reference Does Not Anticipate the '876 patent.**

The parties also dispute whether the Habetler and Divan reference ("Habetler") anticipates the '876 patent. Like the other Fairchild references, Habetler does not have a counter coupled to a digital to analog converter or a counter causing the digital to analog converter to adjust the control input and to vary the switching frequency as recited in claim 1 of the '876 patent. Instead, Habetler places a ROM between his counter and digital to analog converter as with the two previously discussed references. As Mr. Blauschild has noted, the ROM purposely decouples the counter and the digital to analog converter, so that the counter output does not control the digital to analog converter. [*See* Ex. A at ¶139.] Again, Fairchild's expert disagrees. [*See* D.I. 209 at ¶ 7.]

6

There is also an additional factual issue as to whether the Habetler reference is applicable to claim 1 of the '876 patent in view of the Court's construction of "frequency jittering circuit." The Habetler reference is actually concerned with acoustic noise, not Electromagnetic Interference (EMI). [*See generally* D.I. 208, Ex. C (Habetler, entitled "Acoustic Noise Reduction in Sinusoidal PWM Drives Using a Randomly Modulated Carrier").] As the Court's construction reflects, the claimed circuit is specifically addressed to reducing EMI, a different issue altogether from the kind of noise we humans can hear. Moreover, Habetler also teaches <u>random</u> modulation of switching frequency to achieve its goal of reducing audible noise [Ex. A at ¶ 145], which, as explained above, raises additional issues of fact in view of the Court's construction of the preamble of claim 1.

Because the parties' experts disagree with respect to the teaching of and application of the cited art to the claim, and because Fairchild's motion relies in part on improper claim constructions, the Court should decline Fairchild's invitation to address the validity of claim 1 of the '876 in the context of summary judgment.

### III.  MSJ NO. 2: FAIRCHILD'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT OF CLAIMS 17-19 OF U.S. PATENT NO. 6,249,876 [D.I. 204, 205]

Fairchild's motion is predicated on a new claim construction argument not previously raised in this case: that the "combining" step of claim 17 must occur at a time different, and "after," the steps of "generating" the primary and secondary voltages. This argument seems to be a new spin on the concept that the voltages allegedly must be generated by "separate and distinct" voltage "sources," an argument Fairchild must have finally realized was contrary to the patent disclosure and that was properly rejected by the Court in its recent claim construction order.[3] Because Fairchild has only now presented

---

[3]    Fairchild's brief and its expert's declaration continue to refer to "separate" and "distinct" voltages and combining "pre-existing" and "separate" voltages. This attempt to import artificial distinctions into the claims has already been addressed and rejected by the Court.

7

this new claim construction argument as to the alleged ordering of the method steps, the argument and motion should be rejected outright as waived because it was not part of the claim construction proceedings. Even if the Court addresses this new Fairchild argument, though, the argument relies on underlying factual questions of when and how the primary and secondary voltages are generated and used in Fairchild's accused devices. The parties' experts disagree on these factual issues – Power Integrations' expert found infringement while Fairchild's expert did not – making the summary adjudication of infringement of claims 17-19 of the '876 patent improper.

**A.    There are Numerous Factual Disputes Regarding Whether the Accused Fairchild Products Infringe Claims 17, 18 and 19 of Power Integrations' '876 Patent.**

Fairchild alleges that 24 accused Fairchild products (of which the FSD210, FSDL0365RN, and FSDL0365RNB are representative) do not infringe independent claim 17 (and, therefore, dependent claims 18 and 19) of the '876 patent either literally or under the doctrine of equivalents, based on a single assertion:

> "In Fairchild devices, there is no time or place in which distinct primary and secondary voltages exist in an uncombined state and accordingly, no step in which such voltages are combined."

[D.I. 205 at 1.] Therefore, Fairchild says, "[e]ven assuming, as Power Integrations contends, that

**REDACTED**

[*Id.* at 4 (internal citations omitted).]

Fairchild's assertion, in turn, relies on a single conclusory supposition in its expert's declaration, with no corroborating or supporting evidence: "None of the Fairchild devices accused of infringing claims 17-19 of the '876 Patent first generates separate primary and secondary voltages and then combines these distinct voltages as required by claim 1. At no point in time during the operation of these devices do primary and secondary voltages exist in an uncombined state." [D.I. 206 at ¶2.] This unsupported testimony cannot establish noninfringement as a matter of law, particularly

8

as it ignores the Court's ruling that the primary and secondary voltages need not be "distinct." [*See* D.I. 231 at 25 (noting that "'combining' should not be construed as requiring different sources.").] By way of contrast, Power Integration's expert, Mr. Blauschild, explained with reference to schematic diagrams of representative accused products how the accused products generate a primary voltage [Ex. D at 27], cycle one or more secondary voltage sources to generate a secondary voltage which varies over time [*id.* at 27-30], and combine the two voltages [*id.* at 30] as called for by the claims in accordance with the Court's constructions. This evidence is sufficient in and of itself to raise material factual disputes over the actual structure and operation of the accused circuits that preclude summary adjudication of Fairchild's infringement of claims 17-19 of the '876 patent.

**B.    Fairchild Is Also Incorrect in its Arguments Regarding the Scope of Power Integrations' Assertion of Infringement and the Doctrine of Equivalents.**

Fairchild also misstates the nature of the parties' dispute with respect to the scope of Fairchild's infringement in this motion for summary judgment. Fairchild is incorrect when it states that Power Integrations' is not asserting infringement by equivalents for claims 17-19 of the '876 patent. Power Integrations' expert, Mr. Blauschild, specifically addressed literal infringement in addition to infringement by equivalents for claims 17-19 of the '876 patent. [*See* Ex. D at 27-32.]

If the Court should reach the issue of equivalents, though, Fairchild has not shown that Power Integrations surrendered all manner of equivalents with respect to claims 17-19 of the '876 patent. Although the meaning and import of prosecution history arguments can be amenable to resolution as a matter of law, Fairchild's conclusory prosecution history argument fails to provide the necessary factual predicates and is logically flawed.

First, Fairchild has offered no evidence regarding the underlying factual issues its argument might resolve, *i.e.*, how Power Integrations is purportedly trying to recapture

9

anything (by equivalents or otherwise) allegedly disclaimed during prosecution. Simply stating that the claims were amended is insufficient to determine the scope, if any, of an estoppel.

Moreover, although Power Integrations amended claim 17 of the '876 patent during prosecution to recite "combining the secondary voltage with the primary voltage," the file history shows that Power Integrations added the limitation in question to clarify the invention with respect to a reference (Albach) that disclosed comparing a primary voltage and a secondary voltage. [*See* D.I. 205, Ex. C at FCS0000095.] Instead of comparing two voltages with a comparator as recited in Albach, claim 17 calls for combining two voltages, and the Court construed "combining" to mean "adding together." [*See* remarks at *id.*] As Power Integrations' expert Mr. Blauschild explained, combining (and not comparing) is precisely what Fairchild's accused parts do. [*See* Ex. D at 26-33.]

Thus, Fairchild has failed to show that there is no dispute of material fact regarding its infringement of claims 17-19 of the '876 patent. As such, the Court should reject Fairchild's efforts to resolve issues of infringement of the '876 patent in the context of summary judgment.

## IV.    MSJ NO. 3: FAIRCHILD'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 4,811,075 [D.I. 210, 211]

Fairchild's third motion attempts to resolve critical factual disputes, including the meaning of the much-discussed term "DMOS" and its bearing on Power Integrations' '075 patent. There are a host of disputed issues of material fact underlying this motion, including what "DMOS" meant to one of ordinary skill at the time the '075 patent was prosecuted and whether the accused Fairchild parts are, in fact, DMOS devices within that meaning. [Ex. E at ¶ 18, 27 (explaining the meaning of DMOS in the relevant time frame and that Fairchild's devices are not DMOS within that meaning).] There is also a material dispute as to what one of ordinary skill would understand from a review of the

10

prosecution history was being disclaimed in the context of the discussion of DMOS and the Colak reference. [*Id.* at ¶ 22 (explaining that one of skill would not read the prosecution to disclaim all transistor structures having source diffusions within another diffusion that simply modified a channel's characteristics)] Further factual issues are raised by Power Integrations' contention that Fairchild does not practice the disavowed Colak structure [*see id.* at Ex. I] while Fairchild argues the two are one and the same. Given these fundamental factual disputes, the '075 infringement issue is not amenable to summary adjudication.

More fundamentally, however, the Court need not and should not reach any issue of prosecution history estoppel here, because Power Integrations is not even asserting that Fairchild infringes the '075 by equivalents. Rather, Fairchild's device structures literally infringe claims 1 and 5 of the '075 patent and, as such, estoppel does not come into play. Further, as the Court has already noted, the DMOS debate (whether potentially relevant to equivalence, estoppel, or otherwise) requires a full factual record, which Fairchild's motion does not provide. [*See* D.I. 231 at 9, n.3.]

Moreover, there are a number of further underlying factual disputes with respect to the teaching of the prior art that Fairchild cites in support of its motion, including at least the following disputes:

- What the Wakaumi reference teaches one of skill in the art: Fairchild's expert, Dr. Gwozdz, has already taken inconsistent positions regarding what Wakaumi teaches, and he did so independent of the Court's recent claim construction ruling. Dr. Gwozdz argued in his initial expert report that Wakaumi taught every element of claim 1 of the '075 patent with the exception of the PTOP layer [Ex. F at ¶ 52], but Dr. Gwozdz's "Supplementary" Expert Report of Feb. 23, 2006 argues that

**REDACTED**

Putting aside for the moment the impropriety of Fairchild's efforts

to rely on expert opinions not disclosed in accordance with the schedule for expert discovery, Fairchild's own expert's conflicting testimony regarding the teaching of this art precludes the summary adjudication of the "DMOS" issue in this case. [*See also* Ex. H at ¶ 30, 35-36 (explaining the flaws in Dr. Gwozdz's evaluation of the Wakaumi reference).]

- What the Sze reference teaches one of skill in the art: Fairchild suggests that Sze [D.I. 211 Ex. F] teaches that DMOS is defined solely by the presence of a "source" that is "entirely within" a "channel region." [D.I. 211 at 7.][4] This is simply wrong. As Power Integrations has pointed out on several occasions, and as can be seen in the very quote from Sze in Fairchild's brief – which refers to *how the length of the channel is determined* – Fairchild's argument ignores the following portion of the Sze reference, which distinguishes the use of lithography to control channel length from its definition of "DMOS" and which is fatal to Fairchild's reliance on Sze. [*See* D.I. 211 Exhibit F at 556 (noting that the DMOS structures "do not depend on a lithographic mask to determine channel length"); D.I. 164 at 5 (explaining Fairchild's errors in evaluating the Sze reference).]

- What the Parpia reference teaches: Fairchild seeks to rely on the Parpia reference in support of this motion. [*See* D.I. 167 Ex. C.] Howevr, Fairchild and Dr. Gwozdz ignore that Parpia explicitly says that the structure under discussion "is not fabricated using the conventional double diffused process but will still be designated as an LDMOS in this paper." [*Id.* at FCS 1689182.] In other words,

---

4    Fairchild again states that the parties allegedly "agree" that such a structure allegedly defines a "DMOS structure." What Fairchild again turns a blind eye to is the fact that the parties dispute that a "p body" within a p-substrate which is not present in either Colak or Sze) is, in fact, a "channel" region at all because, as explained by Power Integrations' expert, such a region does not form a channel – it simply modifies the properties of what already exists in the p-substrate. [Ex. I at 189:15-190:12; 236:21-237:8.] Fairchild's monotonous repetition that a source within a "channel region" defines "DMOS," and its attempt to map its devices to this "definition," will ultimately be exposed as mere semantics that have no bearing on the true facts in dispute.


REDACTED

Parpia has to explain to those of skill in the art that he will refer to the structure as a DMOS, even though they will recognize that it really doesn't meet the "conventional" definition. This admission—precisely the sort of linguistic gymnastics Fairchild employs in labeling its own devices "DMOS," but without the candor of admitting the label really does not properly apply—emphasizes the importance of the underlying factual question as to what "DMOS" means. This specific issue also demonstrates the fact-intensive nature of the dispute regarding the teaching of the art in question.

Fairchild also resurrects its failed "structure v. process" argument in this motion. As explained during claim construction, the argument is beside the point, as the process, including the requirement for self-alignment, is key to the understanding of DMOS among those of ordinary skill at the relevant time. Fairchild cannot show (and has not shown) a single reference from 1988 or earlier that does not show and explain that the source and "channel" diffusions are referenced from the same point, a fact that comports with Mr. Shields' explanation of the meaning of DMOS at the relevant time. [*See* Ex. E at ¶¶ 17-21.]

The Court should decline any further briefing and deny Fairchild's present motion for summary judgment regarding non-infringement of the '075 patent based on "DMOS."

## V.    MSJ NO. 4: FAIRCHILD'S MOTION FOR SUMMARY JUDGMENT OF UNENFORCEABILITY AND INVALIDITY OF U.S. PATENT NOS. 6,107,851 AND 6,229,366 [D.I. 213, 214]

Fairchild's fourth motion grossly overreaches, as Fairchild attempts to summarily adjudicate issues of intent, materiality, and invalidity despite losing its arguments on claim construction and facing competing views of the evidence from the parties' respective experts. To make matters worse, and apparently to impugn the integrity of the inventors in the eyes of the Court, Fairchild misrepresents what the inventors "admitted" during their depositions. When the rhetoric is stripped away, Fairchild's motion boils down to an allegation that the lack of specific discussion during prosecution of a common

13

and well-known feature of power supply controllers is decisive of validity and enforceability. Specifically, Fairchild's fourth motion argues that the fact that Power Integrations' SMP211 product, cited as part of the admitted prior art of Figure 1 of the patent specification, included an oscillator with a "maximum duty cycle signal" raises critical problems with respect to the validity and enforceability of the '366 and '851 patents.[5] Fairchild is incorrect in several respects.

First, the SMP211 was disclosed to the Patent Office by being described in the specification and illustrated as prior art in the figures of the patents—all evidence that there was no intent to hide this device from the Patent Office. Any further description of the SMP211, including its use of a maximum duty cycle signal, would have been cumulative of other art of record, which disclosed similar power supply controllers having such a feature. Indeed, the evidence of record supports the conclusion that such a feature was common knowledge to those skilled in the art at the relevant time. [Ex. J at 832:7-18; 837:12-841:21; 843:18-844:17.]

Second, despite Fairchild's attempt to slant the record of what happened during prosecution, the prosecution record shows clearly that the examiner himself appreciated that the maximum duty cycle signal was **not** a requirement for patentability of the claims. The fact that the examiner allowed claim 9 of the '366 patent without comment – a claim that does not recite an oscillator or a maximum duty cycle signal at all[6] – shows that it was the claimed soft start circuit of the '366 patent and the claimed frequency variation circuit of the '851 patent that the examiner considered novel, not the well-known feature of an oscillator with a maximum duty cycle signal.

The issues of the prevalence of such a maximum duty cycle signal element in the art, including the art cited to the examiner, and the examiner's apparent understanding of that fact all are factual determinations that are fundamental to the issue of whether or not

---

[5]   The '366 and '851 patents share a nearly identical specification, as the '366 patent is a divisional of the '851 patent.

[6]   These limitations are added in claims that depend from claim 9.

the existence of a maximum duty cycle signal in the SMP211 is material to patentability of any claim of either the '366 or '851 patent. These questions are also relevant to the factual issue of intent to deceive. As outlined in more detail below, these and other factual disputes preclude summary resolution of whether the SMP211 invalidates or renders unenforceable any of the '366 and '851 patents.

Further, the Court's recent Claim Construction Order and Memorandum [D.I. 231 and 232] explicitly rejected Fairchild's invalidity theories based on the prior art of Figure 1. The Court's constructions demonstrate that the Figure 1 art, asserted again here by Fairchild against the '366 patent, is missing at least the claimed soft start circuit. As asserted against the '851 patent, the art also lacks at least the claimed frequency variation circuit that generates a frequency variation signal as construed by the Court. This is precisely what the examiner noted during prosecution, and the invalidity portions of Fairchild's motion asserting invalidity based on the "admitted prior art" should be rejected outright on this basis alone.

There are also numerous other factual disputes underlying Fairchild's assertions of invalidity and inequitable conduct, including at least the following issues:

Disputed Factual Issues Regarding Inequitable Conduct:

- Materiality of the statements concerning Figure 1: Even presuming that an oscillator with a maximum duty cycle signal is material, Fairchild's selective recitation of the prosecution history distorts the facts. Fairchild seems to argue that by agreeing with the examiner that the prior art of Figure 1 did not show an oscillator that provides a maximum duty cycle signal **and** an oscillation signal having a frequency range that is varied according to a frequency variation signal, Power Integrations committed inequitable conduct. As the Court has already commented, however, the examiner's statement is objectively true and it is unclear how stating agreement with a true statement can be misleading or material in any way. Fairchild suggests that Power Integrations "knew" that the part of the

15

statement referring to the maximum duty cycle signal was "wrong" and should have "corrected" the examiner. It is unclear where the alleged duty to correct part of an examiner's comment, especially when you agree with the whole, comes from.

- Materiality of the SMP3: As Fairchild relies only on the allegation that the SMP3 had a maximum duty cycle signal, the same questions of fact exist as to whether this information would be relevant to a reasonable examiner or cumulative of other disclosed prior art.

- Materiality of the SMP240/260: Again Fairchild seems to rely on an allegation that this device included an oscillator generating a maximum duty cycle signal. Despite Fairchild's selective and misleading citation to the record (addressed below), there is a material issue of fact as to whether the SMP240/260, in fact, had such a signal. [Ex. A at ¶ 84; Ex. C (Blauschild Tr.) at 111:17-112:13; Ex. K at 38:7-40:23.] Clearly, if the device had no such signal, Fairchild assertion of materiality is incorrect. Further, even if the SMP240/260 did have a maximum duty cycle signal, the materiality of such a signal is again a disputed fact.[7]

- Intent: Initially, there is a material issue of fact as to whether the applicants were, in fact, "aware" at the time of prosecution of these patents of the SMP devices and the particular features of them that Fairchild now asserts are "material." Based on the inventors' testimony that the devices were not commercially successful and that substantial time had passed since their design, a finder of fact could reasonably conclude that the inventors had forgotten the details that Fairchild now says are important and, therefore, were not "aware" of them at the relevant time. [Ex. J at 58:21-61:10; 64:19-65:23; 111:10-112:17; Ex. K at 63:2-67:3; Ex. L at

---

[7]    As explained below, Power Integrations' expert has also opined that the SMP240/260 fails to disclose the claimed "soft start circuit," and Fairchild's selective quotation of Mr. Lund's discussion of *the function* of the SMP240/260, in the absence of any analysis of its structure, is irrelevant and misleading.

20:6-9; 22:18-21; 100:11-102:6; 113:13-114:6.] Fairchild's arguments to the contrary presume a standard of recall that a reasonable fact finder would be free to reject. Furthermore, even presuming the inventors had the requisite awareness, it is also an issue of fact whether or not they intentionally "withheld" such information with an intent to deceive. As it stands today, the record in the form of the inventors' deposition testimony reflects that the inventors had no intent to deceive the PTO and that they believed the SMP devices had nothing to do with their inventions, regardless of Fairchild's assertions to the contrary. [Ex. J at 54:15-56:4; 111:10-112:17; Ex. L at 113:13-114:6.]

### REDACTED

[Ex. J at 832:7-18; 837:12-841:21; 843:18-844:17.] Finally, there are issues of fact concerning any intent to deceive associated with the agreement with the examiner's statement addressed above. The testimony from Mr. Balakrishnan on this issue provides evidence in support

### REDACTED

[Ex. J at 832:7-18; 835:24-837:10; 837:12-841:21; 843:18-844:17.] Accordingly, there was never any mistake that allegedly required correction. For all these reasons and others, a conclusion on the question of intent requires the fact finder to judge the credibility of Mr. Balakrishnan's testimony and that of the other witnesses. Such determinations are not properly the subject of summary determination based on the current record.

17

Disputed Factual Issues Regarding Obviousness of Dependent Claims:

- Fairchild asserts that the additional limitations of dependent claims related to "monolithic" devices are obvious. Because this argument is predicated on the arguments that the independent claims are anticipated, they should be rejected. As explained above, Fairchild's assertion that the SMP211 as part of the Figure 1 circuit anticipates any claim of these patents is predicated on the incorrect claim construction arguments Fairchild made earlier in this case; they should be rejected as a matter of law. Further, Fairchild's obviousness argument is based solely on a statement of the examiner taken out of context. As the Court is well aware, obviousness is a fact-intensive analysis requiring an analysis of the scope and content of the prior art, the differences between the art and what is claimed, the level of skill in the art and whether one of skill in the art would consider the differences to be obvious, all without applying in hindsight the teachings of the patent. Power Integrations' expert has provided opinions that the claims addressed by Fairchild are not obvious in view of the admitted prior art. [Ex. A at ¶¶41-45; Ex. C at 96:1-97:15.] Thus, if the Court did consider obviousness of these claims in the context of this motion, which it should not in view of the improper predicate, such consideration would show significant material issues of fact that require resolution by the jury.

Disputed Factual Issues Regarding Anticipation by the SMP240/260:

- There are material issues of fact regarding how the SMP240/260 products operated. Power Integrations' expert explained

**REDACTED**    This explanation, if true, would preclude a finding that these parts anticipate the claims of the '366 patent implicated in Fairchild's motion. [Ex. A at ¶ 84; Ex. C at 111:17-112:13.] Further, Power Integrations' expert has also opined that the SMP devices fail to teach or suggest the claimed soft start circuit. [Ex. A at ¶¶ 82-83; Ex. C at 96:1-

18

97:15.] This evidence raises material issues of fact that preclude summary judgment.

In addition to these disputes, Fairchild's fifth motion contains a number of false or misleading statements, including at least the following:

- Fairchild incorrectly asserts that Leif Lund "admitted that the prior art SMP240 and SMP260 devices incorporated each and every element of many of the claims." [D.I. 214 at 2.] Fairchild's assertion ignores the fact that the Court has construed the claimed soft start circuit as a means-plus-function element. Fairchild selectively quotes from Mr. Lund's discussion of how the SMP240/260 functioned and completely ignores any discussion of structure for performing this function, a pre-requisite to any validity analysis. Fairchild's failure to compare the allegedly invalidating prior art to the claim as construed is fatal to its case.

- Fairchild misleadingly suggests that the attorney who prosecuted the '366 patent "submitted [a] barrage of references even though he had not reviewed of any of them." [*Id.* at 4.] In fact, the line of questions cited for this proposition specifically addressed the submission of art in a divisional application, when that art *had already been cited* in a parent application with a common specification filed by another prosecuting attorney. [Ex. M at 97:1-7.]

- Fairchild incorrectly states that the PTO examiner "made clear that the claimed 'frequency variation circuit' and 'frequency variation signal' were in Prior Art Figure 1 and the only reason claims were allowed was the inclusion of the oscillator with a maximum duty cycle signal." [D.I. 214 at 7.] Fairchild repeats this assertion in varying forms throughout the motion. In fact, the examiner did nothing of the sort. First, Fairchild's assertion failed as a matter of law during claim construction when the Court rejected Fairchild's proffered claim constructions. Second, Fairchild ignores the fact that it was not merely the oscillator but the combination of the claimed oscillator **and** frequency variation

19

circuit, along with the rest of the claimed invention that led the examiner to allow the claims at issue, and it was that combination that was specifically cited by the examiner in the reasons for allowance. Fairchild also ignores that the initial reason the examiner rejected original claim 29 was because he failed to understand its terminology. [D.I. 214 Ex. C at FCS0000438; Ex. J at 832:7-18; 835:24-837:10; 837:12-841:21; 843:18-844:17.] Fairchild's selective citation to portions of the examiner's statements [*e.g.* D.I. 214 at 7] cannot summarily resolve the factual issues surrounding the materiality of the prior art and the understanding of the examiner as one of skill in the art.

- Fairchild incorrectly states that the inventors testified that "they forgot" to submit the SMP devices to the PTO [*id.* at 21], but Fairchild provides no citation for this proposition. In fact, the inventors made no such statements, as explained above.

Fairchild's attempt to resolve inequitable conduct by summary judgment illustrates the weakness of Fairchild's position on the merits in the instant case, as the charge raises complicated factual issues that rely heavily on credibility determinations regarding the inventors' testimony. Fairchild may not like the inventors' testimony regarding the SMP devices, but its argument that the witnesses' testimony is "unbelievable" [D.I. 214 at 21] simply establishes that these issues are not properly the subject of a summary judgment motion.

Fairchild tries to skirt this problem by noting that a high level of materiality can permit an inequitable conduct finding based on a lower degree of intent. [*Id.* at 14 (citations omitted)]. But Fairchild has not shown any high level of materiality to support its conclusion, and nowhere does Fairchild suggest that it can entirely dispense with the intent prong. Moreover, the fact that a few cases may have affirmed summary judgments of inequitable conduct does not mean that the issue is typically decided in such a manner; in fact, as the Court knows, summary judgment of inequitable conduct is exceedingly

20

rare, particularly given that all inferences are to be drawn in favor of the non-moving party (Power Integrations).

Because all the issues in Fairchild's fourth motion concerning inequitable conduct and some concerning validity rely on underlying factual issues and credibility determinations, which require a weighing of the evidence, the Court should decline to address Fairchild's charges in the context of summary judgment.

## VI. MSJ NO. 5: FAIRCHILD'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1 AND 5 OF U.S. PATENT NO. 4,811,075 [D.I. 215, 216]

The sheer number of factual citations in Fairchild's 22-page motion for summary judgment highlight the fact that the validity of the '075 patent in view of the Beasom patents is a question for the jury, particularly in light of Fairchild's heavy burden of proving invalidity of an issued patent by clear and convincing evidence. In this case, Fairchild relies on the '173 patent, and Power Integrations counters by asserting that (1) the '173 patent does not invalidate because it does not anticipate or render obvious the inventions and (2) in the alternative, Dr. Klas Eklund, the '075 inventor, invented first.

To prevail on the second issue, priority of invention, Power Integrations must establish that Dr. Eklund conceived the subject matter of the asserted claims before the filing date of the '173 patent and was diligent in working on the invention until either an actual reduction to practice or the constructive reduction to practice afforded by the filing of the '075 patent. Because Power Integrations intends to rely in part on Dr. Eklund's testimony to prove such facts, Power Integrations also must provide "corroborating evidence." In response to the evidence produced during discovery concerning Eklund's conception and diligence, some of which is discussed below, Fairchild sought to establish that the inventor or the '173 patent, Mr. Beasom, conceived of the claimed subject matter earlier than his filing date. Even if this were the case, Fairchild would also have to establish that Beasom was diligent from the alleged conception date to either an actual or constructive reduction to practice.

21

The factual disputes underlying Fairchild's motion therefore include inquiries into conception dates, diligence, reduction to practice, and the credibility of witnesses regarding what they did over twenty years ago. Despite Fairchild's selective quotes from various sources, the inquiry at hand involves an evaluation of all of what the testimony and contemporaneous documents show and would mean to one of skill in the art, regarding work that took place long ago. As such, summary judgment is improper for resolving the issue presented in Fairchild's motion.

Initially, Fairchild suggests the key issue in this motion is the invention date of Klas Eklund's '075 patent and James Beasom's '173 patent, but there is a predicate issue as to whether the Beasom patent discloses each and every element of the '075 patent such that it is even necessary to move to the dispute over who was the first to invent. In fact, the Beasom patent does not anticipate; at the very least, the experts' disagreement regarding the anticipation issue precludes summary resolution of Fairchild's motion. Specifically, with regard to claim 1, there is a factual dispute as to whether the "contacts" limitations are "inherent" in the Beasom disclosure, inherency being a fact-intensive inquiry. Further, Fairchild's invalidity position with regard to dependent claim 5 is based on obviousness and, as the Court well knows, obviousness is also a fact-intensive inquiry. In this case, there is expert testimony from Power Integrations' expert which should alone preclude summary judgment on the obviousness of dependent claim 5.

Apart from the alleged substantive disclosure of Beasom, Fairchild's motion also raises many factual disputes regarding who invented what, and when. Credibility is key to these determinations, and they are not amenable to summary adjudication. As set out in more detail below, these inquiries include what exactly Dr. Eklund and Mr. Beasom will testify they invented, whether the documents and testimony of others they rely on to corroborate such invention are sufficient to do so, whether either was diligent in reducing to practice and, if so, whether there were any gaps in such diligence that would result in loss of the alleged priority date.

22

Fairchild seeks to avoid the weighing of the evidence on these issues at trial by presenting an inaccurate description of the law of priority and the corroboration requirement in particular. None of the cases relied upon by Fairchild stands for the proposition that this Court can decide the issue of priority on summary judgment without a full airing of the evidence at trial. Indeed, the cases Fairchild cites involve appeals after trials, where the entirety of the evidence was considered.[8] The *Price v. Symsek* case, in a portion not cited by Fairchild, provides a good summary on the issue of corroboration of a claim of conception:

> A "rule of reason" analysis is applied to determine whether the inventor's prior conception testimony has been corroborated. *Coleman*, 754 F.2d at 360. *See also Holmwood v. Sugavanam*, 948 F.2d 1236, 1238 (Fed. Cir. 1991) (applied in reduction to practice determination); *Berry v. Webb*, 412 F.2d 261, 266 (CCPA 1969) ("There is no single formula that must be followed in proving corroboration.") An evaluation of *all* pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached. *Coleman*, 754 F.2d at 360. [FN3]
>
> FN3. Factors bearing on the inventor's credibility and on whether the inventor's testimony has been adequately corroborated are: (1) delay between the event and the trial, (2) interest of corroborating witnesses, (3) contradiction or impeachment, (4) corroboration, (5) the corroborating witnesses' familiarity with details of alleged prior structure, (6) improbability of prior use considering state of the art, (7) impact of the invention on the industry, and (8) relationship between witness and alleged prior user. *In re Reuter*, 670 F.2d at 1021 n. 9. Notwithstanding this list of factors, case law clearly mandates some type of corroborating evidence to support an inventor's testimony. *Coleman* 754 F.2d at 360.

*Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993) (emphasis in original). The Court in that case went on to further state that "[l]ikewise, as with conception, all of the evidence of record must be collectively evaluated in determining whether Price

---

[8]    The one case Fairchild's cites that was decided on summary judgment, *Stern v. Columbia University*, 434 F.3d 1375 (Fed. Cir. 2006), is factually distinguishable because it was actually decided based on a conclusion that an alleged "co-inventor" did not really understand the invention or contribute to its conception; the mention of laboratory notebooks—that in fact did not exist in that case—was not determinative in that case or even relevant to the factual situation here.

communicated his conception to Symsek or was reasonably diligent in reducing his conception to practice." *Id.* at 1196 (citation omitted).

Another more recent Federal Circuit case Fairchild cited, *Medichem v. Rolabo*, 437 F.3d 1157 (Fed. Cir. 2006), likewise emphasizes the importance of weighing all the evidence, again in a portion Fairchild chose not to quote:

> Sufficiency of corroboration is determined by using a "rule of reason" analysis, under which all pertinent evidence is examined when determining the credibility of an inventors testimony. *See Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993) ("'A rule of reason' analysis is applied to determine whether the inventor's prior conception testimony has been corroborated."); *Berges v. Gottstein*, 618 F.2d 771, 776 (CCPA 1980) ("In the final analysis, each corroboration case must be decided on its own facts with a view to deciding whether the evidence as a whole is persuasive.").

*Id.* at 1170.

The remainder of the cases relied upon by Fairchild all consistently emphasize the factual nature of the inquiry and the need to evaluate all the evidence and weigh the credibility of the inventor and other witnesses. While the selective quotations Fairchild makes to the effect that certain evidence "standing alone" is insufficient to corroborate conception or reduction to practice, this is not a case where there is such stand-alone evidence, and these cases do not support the proposition that the Court can decide piecemeal, as a matter of law, that certain evidence should not be weighed by the trier of fact to assess what all the evidence, collectively, proves.

Because all factual inferences are to be drawn in favor of Power Integrations at this stage, the specific evidence set out below demonstrates the existence of sufficient disputes of material fact such that summary adjudication on the issue of invalidity of the '075 patent is inappropriate:

Disputed Factual Issues Concerning the Disclosure of the '173 patent:

- There is a material issue of fact as to whether the source and drain contacts limitations of claim 1 are disclosed in the '173 patent. Fairchild's motion

24

concedes at several points that the '173 patent does not expressly teach these elements. [*See, e.g.*, D.I. 216 at 15 ("except for the source and drain contacts") and 16 (chart with blanks in the sections regarding source and drain contacts).] Rather, Fairchild and its expert argue that such limitations are inherent in the disclosure, but Power Integrations' expert has provided opinions to the contrary. [Ex. I at 86:16-87:23.][9] Thus, there is an issue of fact concerning whether all the limitations of claim 1 are taught by the '173 reference.

Disputed Factual Issues Regarding Obviousness of Claim 5:

- As the Court is well aware, obviousness is a fact-intensive analysis requiring an analysis of the scope and content of the prior art, the differences between the art and what is claimed, the level of skill in the art, and whether one of skill in the art would consider the differences to be obvious without applying in hindsight the teachings of the patent. Fairchild has presented <u>no evidence</u> in support of its conclusory statement "it would have been inherent or obvious to combine the MOS transistor described in the '173 patent on the same chip with a low voltage CMOS implemented device" or for any of its other fact-based allegations. Rather, Fairchild cites to the '075 patent itself – the essence of hindsight. Power Integrations' expert, on the other hand, provided detailed opinions explaining why the combination of claim 5 is not obvious in view of the '173 patent and such evidence is sufficient to raise a material issue of fact on the question of obviousness. [Ex. H at ¶¶ 24-27.]

---

[9] Fairchild raises for the first time in their motion a contention regarding the '236 patent, namely that it is allegedly incorporated by reference in the '173 patent. Because this reference was not relied upon by Fairchild's expert in any of his reports and is raised for the first time in this motion, it should be disregarded. Even if considered, however, it at best suggests that contacts <u>could be</u> present in an application of the '173 patent, not that they must be, and therefore this evidence is not determinative on the issue of inherency.

Disputed Factual Issues Concerning Priority of Invention:

- It is disputed whether Dr. Eklund conceived of the complete inventions recited in claims 1 and 5 of the '075 patent before the filing date of the '173 patent. Dr. Eklund testified that he had. [*See, e.g.,* Ex. N at 28:7-32:25.] Fairchild argues otherwise. The finder of fact is entitled to judge the credibility of Dr. Eklund's claim in reaching a conclusion on priority.

- As part of assessing the credibility of Dr. Eklund's testimony, there are material issues of fact as to whether Dr. Eklund's testimony concerning conception is corroborated by any or all of the following:

   o Dr. Eklund's hand written notes—a fact finding regarding the date of those notes. Both Dr. Eklund and Power Integrations' expert have testified as to what those notes disclose. [*Id.* at 109-125; 129:19-131:9; Ex. I at 213-14 (testifying that Dr. Eklund's early notes provide an "almost perfect description" of the claimed invention of the '075 patent).] As noted below, evaluating these notes also requires consideration of Mr. Brunnberg's testimony that they are substantially the same as notes he remembers witnessing in an inventor notebook at the relevant time.

   o Testimony from Dr. Eklund's friends and colleagues at the relevant time, including testimony regarding what Dr. Eklund conceived at what point in time with respect to high voltage devices (Mr. Sarkissian's testimony), testimony regarding the witnessing of the invention in Dr. Eklund's notebook (Jan Brunnberg), and testimony by those who were present when the notebook was stolen (Ed Ross) concerning the later theft of this inventor's notebook.

- Whether Dr. Eklund was diligent in reducing to practice an embodiment of his claimed inventions between the date of conception and the filing of the patent.[10]

---

[10] Fairchild focuses much attention on the alleged lack of corroboration of an actual reduction to practice, but Power Integrations is entitled to and will rely also on the constructive reduction to practice evidenced by its patent filing, regardless of whether

Dr. Eklund's testimony on the subject is supplemented by the testimony of at least Mr. Sarkissian and Mr. Brunnberg concerning his activities during the relevant time, and substantial documentation concerning experiments related to the invention in the relevant time frame. Dr. Eklund produced an entire banker's box full of binders of such documentation, totaling more than 1400 pages.

- Fairchild's counter-allegations concerning Mr. Beasom's conception also raise genuine disputes of material fact related to whether Mr. Beasom conceived of the subject matter of claims 1 or 5 of the '075 patent before Dr. Eklund. Fairchild has cited to no testimony from Mr. Beasom even alleging that he had. Power Integrations disputes that Mr. Beasom conceived before Dr. Eklund.

- Whether any alleged conception by Mr. Beasom is corroborated. Fairchild relies only on a few pages from Mr. Beasom's lab notebook (D.I. 216, Ex. E to its brief, D.I. 216). Mr. Beasom's notes, however, fail to disclose at least two elements of the claimed invention—the contacts, and the extended drain region extending laterally both ways to surface-adjoining positions—a fact that Fairchild fails to mention in its motion. [Ex. I at 47:23-48:11; 49:20-24.] With respect to the latter element, Mr. Shields explicitly stated that Mr. Beasom's notes do not teach an extended drain region extending laterally both ways to surface-adjoining positions [*id.* at 71:25-72:4], but Fairchild ignores this point in its motion and focuses solely on the contacts issue. Mr. Shields' testimony concerning what Mr. Beasom's notes would disclose to one of skill in the art is sufficient, alone, to raise a material issue of fact concerning conception by Mr. Beasom and corroboration of that alleged conception.

---

any actual reduction to practice happened earlier. Fairchild's motion, on the other hand, is rather sparse in its attack on the evidence of diligence, perhaps because the evidence establishes that between the time of conception and the filing the '075 patent application, Dr. Eklund quit his job to devote all his time to proving out his concept, obtaining resources to conduct actual test manufacturing, and founding a company – Power Integrations – to ultimately bring his ideas to market.

27

- Whether Mr. Beasom was diligent in reducing to practice from the alleged date of conception to an actual or constructive reduction to practice. The evidence from Mr. Beasom and others associated with him suggests that any alleged conception was, in fact, abandoned for long stretches of time, including a stretch of more than a year between Mr. Beasom's alleged conception and his constructive reduction to practice. Fairchild's brief makes no reference to this delay, or any attempt by Mr. Beasom to explain the delay, no doubt because Fairchild cannot support a claim for diligence during this timeframe.

In addition to ignoring critical evidence and associated factual disputes, Fairchild also makes a number factually incorrect statements in its motion:

- Fairchild says Dr. Eklund's early notes are not dated, [D.I. 216 at 12 ("His unbound, undated...")], but the very first page of Dr. Eklund's documents bears a date of September 26, 1984, precisely in line with the timeframe Dr. Eklund testified to in describing his invention. *[Id.* Ex. G.] In fact, during Dr. Eklund's deposition, Fairchild's counsel referred to the first four pages of Dr. Eklund's notes as "the September 26th pages." [Ex. N at 59:9-10.] Fairchild's counsel also noted that Dr. Eklund's early notes contained "a document from January 1985." *[Id.* at 281:11-14.] These previous statements, both of which flow from the dates written on the face of the documents, directly contradict Fairchild's current position regarding Dr. Eklund's documentation.

- Fairchild suggests Mr. Brunnberg did not recognize Dr. Eklund's invention [D.I. 216 at 7], an invention Mr. Brunnberg witnessed in 1984, but Fairchild is wrong. When asked about Dr. Eklund's drawings of the invention, Mr. Brunnberg identified the structure as being that of Dr. Eklund's invention. [Ex. O at 100:24-101:11 (Q: "Is there anything familiar about the diagram on the first page? A: Yes, the structure. Q: And when you say the structure on the first page is familiar -- A: Yes. Q: Can you explain a little bit about what you mean? A: I

28

recognize that it's the PTOP structure. Q: And this is the structure that Mr. Eklund showed you back in 1984 and had you witness; correct? A: Yes, it looks very much like it, yes.").] Elsewhere in his deposition, Mr. Brunnberg provided details regarding what he recalls of countersigning Dr. Eklund's invention notebook around Christmas-time of 1984. [*Id.* at 48:25-49:13; 50:9-51:11.] This testimony, in combination with Dr. Eklund's notes and testimony, is sufficient for a reasonable finder of fact to conclude that Eklund conceived his invention prior to the '173 patent filing date.

Therefore, the numerous factual disputes regarding the teaching of the '173 patent to one of skill in the art, the alleged obviousness of claim 5, who invented what and when, and the credibility and weight of the evidence and testimony regarding these issues, collectively preclude summary adjudication of the issues presented in Fairchild's fifth motion for summary judgment.

## VII. MSJ NO. 6: FAIRCHILD'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT (FOREIGN SALES) [D.I. 218, 219]

Fairchild suggests the Court can resolve the issue of "foreign sales" in the context of summary judgment. The Court cannot do so because there are factual disputes regarding (1) whether the alleged "foreign sales" are indeed foreign sales and (2) the degree and import of Fairchild's United States-based sales force's involvement with respect to the alleged "foreign sales." Further, Fairchild's argument that there is no evidence of importation into the U.S. of downstream products incorporating the accused Fairchild devices is incorrect. Both of Fairchild's arguments ignore the fact that infringement can be proven by circumstantial evidence, *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1362-63 (Fed. Cir. 2006), which abounds in this case. Because the disputed issues involve a host of underlying factual determinations, including evaluations of what Fairchild's documents show and, importantly, the credibility of various witnesses' testimony on these issues, Fairchild cannot establish that

29

the importation issue should be resolved on summary judgment, either. Fairchild's
motion should therefore be denied in its entirety.

> **A.    Numerous Questions of Fact and Credibility Determinations Underlie
> the Issue of Whether Fairchild Has Offered the Accused Products for
> Sale from within the United States.**

Fairchild's motion suggests that its U.S.-based sales force has not made a single
offer for sale of any infringing product to be delivered outside the U.S. But this assertion
is not credible and is contradicted by admissions in Fairchild's own brief. Fairchild's
motion acknowledges the integral involvement of its U.S.-based sales force at all levels
of the sale of the accused Fairchild parts:

- Fairchild admits that Tom Beaver, Fairchild's Portland, Maine-based head of
  Worldwide Sales and Marketing, conceded that     **REDACTED**
  [D.I. 219 at 22 (quoting Beaver Tr. at 21:9-10).]

- Fairchild admits that it is possible for U.S. sales employees to give a "valid quote"
  for a price on a part that is ultimately delivered outside the U.S. [*Id.* at 26], and
  Fairchild relies on unsupported argument for the proposition that a valid U.S.
  price quote for commodity parts such as the accused devices does not constitute
  an infringement. [*Id.* at 31.]

- Fairchild admits that U.S. sales personnel

**REDACTED**     when the ultimate delivery of the
accused part "was arguably intended to be used in a purchase in Asia." [*Id.* at
26.] The fact that the sale was not ultimately consummated is of no import, as the
statute merely requires an offer for sale to establish infringement, and Fairchild's

REDACTED characterization of the     transaction as a "naked quote" without reference to any
authority that would put such a "naked quote" outside the realm of infringement is
equally unpersuasive. [*See id.* at 27.] The finder of fact will need to determine
whether it agrees with Fairchild's assertion that the "naked price quote" was not
an infringing offer for sale.

- Fairchild admits that Fairchild's U.S. sales personnel are involved in major sales-related activities, including work on the design, planning, promotion, and service of the accused parts. [*Id.* at 17.]

Fairchild's U.S. employees, including those based in Fairchild's Portland, Maine headquarters, have also admitted during depositions and in their documents that they have been involved in alleged "foreign sales" of the accused parts:

- Bob Conrad, head of the Analog Products Group at Fairchild (the division that contains the accused Fairchild products), is based in Portland, Maine. Mr. Conrad's documents reflect that **REDACTED** [*See* Ex. P at FCS1686116.]

- Tom Beaver, Fairchild's head of Worldwide Sales and Marketing, admitted during his deposition to engaging in price negotiations and discussions with **REDACTED** [Ex. Q at 61:1-13.] As noted above, Mr. Beaver also accepted responsibility for the sales of the accused parts, as he admitted that **REDACTED** [D.I. 219 at 22 (quoting Beaver Tr. at 21:9-10).]

- Mr. Troxel relies on voluminous documents and testimony regarding U.S. sales activity involving the accused Fairchild parts which is not surprising in light of Fairchild's stated intent to go after Power Integrations' business supplying ICs with frequency jitter and internal soft start technology, especially big Power Integrations customers like Samsung. [*See* Ex. R at 21-26.]

Fairchild attempts to downplay the significance of these U.S.-based activities, but at a minimum this evidence, the inferences to be drawn from it, and the credibility assessment of Fairchild's witnesses together raise substantial questions of fact regarding whether Fairchild offered the accused parts for sale from within the United States, or whether U.S. activity is a material part of the sales or offers to sell the accused parts.

31

Fairchild's documented offer to sell the accused parts in the United States to

for delivery abroad, by itself precludes summary judgment on the issue of "foreign sales"

Even though Fairchild tries to downplay the significance of its dealings with        the

standard Fairchild proposes in addressing this transaction in its motion would effectively

preclude ever finding that Fairchild made an offer to sell an infringing part from the

United States, no matter how much work is done in the United States prior to the final

purchase order, because Fairchild could classify the quotation as something other than an

"offer." To reach this conclusion, Fairchild characterizes as "offers" only purchase

orders delivered to Fairchild and "acceptance" as something only Fairchild can do. [D.I.

219 at 28-29.] This is nonsense. Fairchild acknowledges its ICs are like commodities

[*id.* at 3], and Fairchild knows that price (as in price quotes and price point negotiations)

are the real offers to sell in this industry. This is why Fairchild "protests too much" that

its U.S. sales staff and FAEs are only occasionally involved in supplying price quotes.

The dispute over whether Fairchild's admitted occasional price quotes are offers to sell is

enough to preclude summary resolution of the issue of "foreign sales."

Moreover, the Federal Circuit has explicitly rejected efforts like Fairchild's to

exalt form over substance with respect to offers for sale:

> If we were to permit potential infringers to avoid jurisdiction by
> denominating what otherwise would be an offer to sell merely by asserting
> the contrary in the offer, the prohibition added to § 271(a) against offers
> to sell would be hollow indeed. One of the purposes of adding "offer[] to
> sell" to § 271(a) was to prevent exactly the type of activity Aaroflex has
> engaged in, i.e., generating interest in a potential infringing product to the
> commercial detriment of the rightful patentee. As a matter of federal
> statutory construction, the price quotation letters can be regarded as
> "offers to sell" under § 271 based on the substance conveyed in the
> letters, i.e., a description of the allegedly infringing merchandise and the
> price at which it can be purchased.

*3D Systems, Inc. v. Aarotech Laboratories, Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998).

Taken as a whole, and construing the evidence in the light most favorable to non-movant

Power Integrations, the facts outlined above raise issues of triable fact as to whether

32

Fairchild's U.S.-based activity constitutes direct infringement as an offer for sale, even if the final purchase orders are signed and orders are fulfilled overseas.

### B.    Fairchild Also Ignores Disputed Facts Regarding the Importation of the Accused Parts.

Fairchild devotes considerable time and energy to its argument that there is no evidence that downstream products incorporating the accused Fairchild parts are imported into the United States. Again, Fairchild plays the ostrich. Infringement and importation are questions of fact, and the documents and testimony adduced to date show that end products incorporating the accused Fairchild parts are imported into the United States in large quantities.

The findings in Mr. Troxel's report of substantial Fairchild importation of the accused parts are supported with factual evidence—not "made up" as Fairchild suggests. The weight to be given this factual support, including the testimony of Power Integrations head of sales Bruce Renouard, is similarly a factual issue for trial. The fact that Power Integrations can prove such direct infringement by direct and circumstantial evidence also dictates that this issue is not appropriately resolved on summary judgment.

The issue of importation is not one of "if," but rather one of "how much." To date, Power Integrations and Fairchild have produced evidence sufficient for the finder of fact to conclude that a number of widely-recognizable consumer electronics manufacturers' products that incorporate the accused Fairchild parts are imported into the United States, including       LCD monitors [Ex. S] and millions of Samsung of cell phones and cell phone chargers. [*See infra.*] The fact that no Fairchild employee has as yet been willing to confirm these facts,[11] much less admit that a single Samsung cell phone is shipped into the United States, does not resolve the issue as a matter of law,

---

[11]   The upcoming deposition of H.K. Kim is likely to provide further evidence of Fairchild's knowledge of, and the extent of, end-customers' importation of products incorporating the accused Fairchild parts into the United States. Although other Fairchild employees have professed not to know any details regarding end-customers' uses of the accused products, it is highly unlikely that Mr. Kim—head of the Green FPS Product Line—will make such statements.

**REDACTED**

because the weight to be afforded this testimony regarding Fairchild's concerted "head in the sand" approach to a                    per year business involves a credibility determination for the jury.

In the event the finder of fact wishes to award Power Integrations damages only for the portion of Fairchild's sales that are ultimately imported into the United States (an issue that is by no means a foregone conclusion at this stage in light of Mr. Troxel's analysis), the evidence will show that Power Integrations' expert's calculation of the volume of downstream products imported into the United States is accurate—accuracy recently confirmed in Fairchild's deposition of Shawn Slayton, an independent financial analyst who estimated that Samsung cell phones and chargers, which incorporate the infringing Fairchild chips, are imported into the U.S. in numbers even greater than set forth in Mr. Troxel's report. [Ex. T at 81:3-17.]

The recent deposition testimony of Mr. Slayton also confirms Mr. Troxel's conclusions and their underlying support. Mr. Slayton is an independent third party market analyst, subpoenaed and noticed by Fairchild. Mr. Slayton has highly relevant experience and knowledge of the importation issues at hand. Mr. Slayton holds a degree in electrical engineering, has an MBA, and has spent the past several years working as a financial analyst covering companies like Power Integrations. [Ex. T at 7:18-10:9; 13:2-10.] Relying on publicly available information, including information from Samsung and information in Fairchild press releases, and independent research, Mr. Slayton recently published a report stating that Fairchild's infringement with respect to the Samsung cell phone market alone costs Power Integrations approximately $10,000,000 per year. [Ex. U at 9 ("[T]hese products currently cause POWI to forego $10 million per year in sales."); Ex. T at 84:25-85:11 ("Q: So this is based entirely on recovering it in Samsung? A: That's right.").] Mr. Slayton supported and explained the conclusions in that report during his recent deposition, and he also confirmed many other important findings in Mr. Troxel's report to which Fairchild takes exception:

34

- That Samsung would not buy any Fairchild parts for use in any Samsung cell phones if the parts infringed Power Integrations' U.S. patents. [Ex. T at 79:2-80:24 ("Common sense says that Samsung a multinational firm is not going to buy a part and put it into a certain device and then have to mark that device with askew [SIC—a SKU] that this device can only go outside the United States because it has an infringing part and these electronics can go to the U.S. because they don't have any infringing parts. That would be very inefficient. You would just get rid of infringing part.").]

- That Power Integrations would recover most if not all of the sales it lost to Fairchild if Fairchild were forced to stop selling the accused parts. [*Id.* at 76:15-77:7.]

- That Power Integrations could not raise prices for existing customers even if it obtained an injunction preventing Fairchild from further infringement. [*Id.* at 125:14-126:4 ("In my opinion, you never get to raise prices in the microcomponent industry.").]

- Mr. Slayton also provided estimated calculations that support a finding that Samsung imports ten million cell phones and cell phone chargers incorporating the accused Fairchild parts into the United States each year. [*Id.* at 70:8-25 (noting that it was common sense that Fairchild parts are in the United States even though he "did not physically verify that there is a piece of electronics sold in the United States that has a Fairchild part."); 72:22-75:17 (noting that Power Integrations has lost between 30 and 50 percent of its Samsung cell phone charger business to Samsung in the past few years); 81:3-17 (noting that he did not have firm numbers off the top of his head but calculating the volume of Samsung cell phones imported into the U.S. each year at more than 30,000,000 (one-third of Samsung's 100,000,000 cell phones sold each year).]

35

The finder of fact could reasonably conclude, from the Slayton testimony alone, that the portions of Mr. Troxel's report addressing the Samsung business (including sales to Samsung power supply subcontractors) are credible and accurate. Moreover, the Slayton testimony provides reasonable inferences from which one could reach the same conclusion as to other large, multi-national companies that purchase the parts in question.

As Fairchild's motion shows, Mr. Troxel's damages calculation is based on industry-accepted data, including:

- Annual reports and other publicly available company filings such as SEC filings [*see, e.g.*, Ex. R at n. 50; Ex. T at 75:10-14];

- Company publications, including websites and press releases [*see, e.g.*, Ex. R at n. 13; Ex. T at 72:22-73:8];

- Analyst reports. [*See, e.g.*, Ex. R at n. 14, 15, 20.]

Fairchild relies on this same sort of information, both in its everyday business and in its expert's analysis of the damages attributable to Fairchild's infringement in this case. [Ex. Q at 27:25-29:6 **REDACTED** Ex. V at n. 21-26 (citing analyst reports).]

The fact that the accused parts are designed to work in any country in the world, which Fairchild acknowledges [D.I. 219 at 5], further supports Mr. Troxel's finding that the end-customers for the accused Fairchild parts would not purchase the accused parts if they were found to infringe Power Integrations' U.S. patents. [Ex. R at ¶¶ 101-102; Ex. T at 79:2-80:10.] This finding is important, because it further demonstrates that Power Integrations is indeed entitled to compensation for all of Fairchild's sales of the infringing parts on large accounts, regardless of the destination to which the raw parts are initially shipped, because Power Integrations would have captured the entire account with such large customers like Samsung but for the infringing U.S. Fairchild sales.

Moreover, Fairchild's employees' persistent and consistent denials of any knowledge of what happens to the parts Fairchild ships to customers such as Samsung,

36

HP, Motorola, LG, and GE for use in power supplies for cell phone chargers, LCD monitors, televisions, ranges, and other consumer goods, coupled with these end customers' U.S. subsidiaries' claimed lack of knowledge as to what components are in the products they import, render Mr. Troxel's calculation all the more necessary to get an accurate view of importation. This is particularly true if the finder of fact should choose to award Power Integrations damages only for the portion of alleged "foreign sales" that are subsequently imported into the United States. Fairchild has not offered any evidence to contradict Mr. Troxel's well-supported calculations to date. At the most basic and intuitive level, though, the finder of fact does not need to make a leap of faith to appreciate that companies like Samsung, Motorola, LG, and Dell directly import cell phones, LCD monitors, TVs, and other popular consumer electronics products into the United States, because they see them every day at Best Buy, Circuit City, Costco, Fry's Electronics, and a myriad of other electronics retailers. Nor is it outrageous to evaluate the strong evidence that this sort of infringement is taking place on a massive scale. Fairchild's documents show that Fairchild sells the infringing parts for incorporation into these popular end products overseas [Ex. W at FCS1687873], and the volume of their subsequent importation is a key question of fact.

All of this evidence, taken together, raises questions for the finder of fact as to (1) whether Power Integrations is entitled to recover damages for worldwide Fairchild sales of the infringing parts, or alternatively, (2) if Power Integrations is only entitled to recover on a portion of those sales, the calculation of the portion for which Power Integrations is entitled to recover. The Court should therefore decline to address the issues presented in Fairchild's motion in the context of summary judgment.

C.  **Fairchild's Joint Defense Agreements with Dongyang, Lite-On, and other Major Overseas Customers Support the Inference that Fairchild Is Hiding Information Regarding Infringing Offers for Sale, Downstream Products, and Importation of Accused Parts, and Thus Preclude Summary Adjudication of These Issues.**

At the very end of its brief, Fairchild states in passing that "none of Fairchild's higher-level strategic, management and coordination efforts in the United States constitute an offer to sell the accused parts" [D.I. 219 at 32], but this argument ignores the fact that Fairchild has entered four "joint defense agreements" with customers and/or prospective customers for the accused parts. Not surprisingly, the list of customers with whom Fairchild has entered joint defense agreements includes major Fairchild customers such as Dongyang and Lite-On, two of the largest power supply manufacturers in the world. [*See* Ex. X entries 421-424.] Even were the Court to find the evidence outlined in the previous two sections did not raise an issue of triable fact on the issue of "foreign sales," Fairchild's joint defense agreements give rise to the inference that U.S.-based Fairchild personnel are engaged in sales negotiations regarding the infringing parts with major foreign customers, and Power Integrations should be permitted to argue this inference to the finder of fact. Fundamentally, the Court should not permit Fairchild to use its joint defense agreements as both a sword and a shield as Fairchild now seeks to do by withholding obviously relevant documents at the same time it attempts to slice off a major portion of Power Integrations' infringement case and damages case.

In light of these significant and material factual disputes, the Court should not summarily resolve the issue of Fairchild's allegedly "foreign" sales.

## VIII.  CONCLUSION

Power Integrations certifies that at least the identified genuine issues of fact exist and are in dispute and asks the Court to deny each of the six Fairchild motions for summary judgment addressed herein and to permit the parties to take this case to trial.

Dated:  April 7, 2006                    FISH & RICHARDSON P.C.

By:  */s/ Sean P. Hayes*
    William J. Marsden, Jr. (#2247) (marsden@fr.com)
    Sean P. Hayes (#4413) (hayes@fr.com)
    919 N. Market Street, Suite 1100
    P.O. Box 1114
    Wilmington, DE  19899-1114
    Telephone: (302) 652-5070
    Facsimile:  (302) 652-0607

    Frank E. Scherkenbach
    225 Franklin Street
    Boston, MA  02110-2804
    Telephone: (617) 542-5070
    Facsimile:  (617) 542-8906

    Michael R. Headley
    Howard G. Pollack
    500 Arguello Street, Suite 500
    Redwood City, CA  94063
    Telephone: (650) 839-5070
    Facsimile:  (650) 839-5071

    Attorneys for Plaintiff
    POWER INTEGRATIONS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2006, I electronically filed a REDACTED POWER INTEGRATIONS' JOINT COUNTERSTATEMENT IN RESPONSE TO SIX OF FAIRCHILD'S SEVEN MOTIONS FOR SUMMARY JUDGMENT with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Steven J. Balick, Esq.
John G. Day, Esq.
Ashby & Geddes
222 Delaware Avenue, 17th Floor
P. O. Box 1150
Wilmington, DE 19899

I hereby certify that on April 14, 2006, I have sent via United States Mail, to the following non-registered participants:

Bas de Blank
Orrick, Herrington, Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025

Sean P. Hayes