Case Management Conference that liability discovery has closed.  Therefore, Fairchild will not produce a witness on this Topic.

ASHBY & GEDDES

_____
Steven J. Balick (I.D. 2114)
John G. Day (I.D. 2403)
222 Delaware Avenue
17th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888

Attorneys for Defendants
FAIRCHILD SEMICONDUCTOR
INTERNATIONAL, INC. and
FAIRCHILD SEMICONDUCTOR
CORPORATION

Of Counsel:

ORRICK, HERRINGTON & SUTCLIFFE LLP
G. Hopkins Guy, III (#124811)
Bas de Blank (#191487)
1000 Marsh Road
Menlo Park, CA  94025
(650) 614-7400

Dated:  July 24, 2006

- 9 -

# EXHIBIT H



ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CA 94025
*tel* 650-614-7400
*fax* 650-614-7401
WWW.ORRICK.COM

July 18, 2006

Brian H. VanderZanden
(650) 614-7629
bvanderzanden@orrick.com

*VIA FACSIMILE*

Michael R. Headley
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94036

Re:    Power Integrations v. Fairchild Semiconductor et al. (CA 04-1371 JJF)

Dear Michael:

I write in regard to Power Integrations' recent 30(b)(6) notices. Fairchild confirms that, subject to its objections, which it will be serving shortly, Mr. Ronald Dupuis will be its testifying witness. As Bas de Blank previously wrote, however, the deposition topics are vague and ambiguous as they do not identify the "accused devices." Please correct this shortcoming immediately so that Mr. Dupuis can be fully prepared.

While Mr. Dupuis works in Portland, Maine, he is available for deposition in the Bay Area on Thursday, August 3, 2006. Please confirm whether Power Integrations will be able to proceed with his deposition at that time.

Fairchild is currently searching for and gathering documents responsive to the deposition topics. Fairchild hopes to produce responsive documents no later than Tuesday, July 18, 2006.

Sincerely,

Brian H. VanderZanden
BHV:ma5

cc:    William J. Marsden, Jr.
       Howard G. Pollack

US_WEST:260057843.1

# EXHIBIT I

# EXHIBIT REDACTED IN ITS ENTIRETY

# EXHIBIT J



# ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CALIFORNIA 94025

tel 650-614-7400
fax 650-614-7401
WWW.ORRICK.COM

Bas de Blank
(650) 614-7343
basdeblank@orrick.com

August 11, 2006

*VIA FACSIMILE*

David J. Miclean
Fish & Richardson P.C.
500 Arguello Street
Suite 500
Redwood City, CA 94036

Re:    Power Integrations v. Fairchild Semiconductor et al. (CA 04-1371 JJF)

Dear David:

I write in response to your letter of August 10, 2006. Mr. Dupois was produced as a 30(b)(6) witness to address Power Integrations' concerns that Fairchild had manufactured accused devices within the United States. Mr. Dupois clearly testified that none of the devices accused by Power Integrations have ever been manufactured in the United States. Therefore, Power Integrations does not need and is not entitled to further discovery on this issue.

Your letter repeatedly refers to Fairchild's FSD210HD device and demands additional documents and testimony concerning this product. Power Integrations has long been aware of this device and has made the calculated decision not to accuse it of infringement. Discovery concerning such non-accused devices is simply not relevant to this litigation.

Sincerely,

Bas de Bl

Bas de Blank

cc:    William J. Marsden, Jr.
       Howard G. Pollack

US_WEST:260071747.1

# EXHIBIT K

# EXHIBIT REDACTED IN ITS ENTIRETY

# EXHIBIT L

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF DELAWARE
2

3

4

5    POWER INTEGRATIONS, INC.,
     a Delaware corporation,

6
                          Plaintiff,
7
         vs.                        Case No. 04-1371 JJF
8
     FAIRCHILD SEMICONDUCTOR
9    INTERNATIONAL, INC., a
     Delaware Corporation, and
10   FAIRCHILD SEMICONDUCTOR
     CORPORATION, a Delaware
11   corporation,
12                        Defendants.
                                          /
13

14

15            DEPOSITION OF GU-YEON WEI
16            FRIDAY, FEBRUARY 17, 2006
17                 PAGES 1 to 60
18

19

20   REPORTED BY:  LOUISE MARIE SOUSOURES, CSR NO. 3575
21

22

23

24

25

Page 6

1  LLC, 182 Second Street, Suite 202, San Francisco,
2  California, 94105, telephone is 415-624-1300.
3        The court reporter is Louise Sousoures for
4  Comp-U-Scripts/Grossman & Cotter/Weber & Volzing.
5        Would counsel present please identify
6  themselves and state whom they represent.
7        MR. POLLACK:  Howard Pollack of Fish &
8  Richardson representing Power Integrations.
9        MR. de BLANK:  Bas de Blank of Orrick,
10  Herrington & Sutcliffe representing Fairchild
11  Semiconductor International, Incorporated and
12  Fairchild Semiconductor Corporation.
13        THE VIDEOGRAPHER:  If there are no
14  stipulations, the court reporter may administer the
15  oath.
16              GU-YEON WEI,
17  called as a witness by the Plaintiff, and who, being
18  first duly sworn, was thereupon examined and
19  testified as hereinafter set forth.
20        EXAMINATION BY MR. POLLACK:
21        Q.  Good afternoon, Dr. Wei.
22        A.  Good afternoon.
23        Q.  Can you please state your full name and
24  address for the record?
25        A.  Gu-Yeon Wei, my address is 173 Pleasant

Page 7

1  Street, Apartment 404, Cambridge, Massachusetts,
2  02139.
3        Q.  Have you ever had your deposition taken
4  before?
5        A.  No, I have not.
6        Q.  I know you've been to a few, so you have a
7  general sense for what goes on, but just so we're all
8  clear, basically I'm going to ask you a series of
9  questions, it's my intent to get your best and most
10  complete answer.
11        So if there's anything about my question you
12  don't understand, it's confusing in any way, please
13  let me know and I'll do my best to rephrase it so you
14  understand it.
15        Can you do that for me?
16        A.  Yes.
17        Q.  Everything we say is being taken down both
18  by video but also by the court reporter.
19        So it's important, two things, one that when
20  you answer a question, you answer verbally; nods or
21  shakes of the head are sometimes hard to transcribe.
22        The other thing is it's important for you to
23  wait until I finish my question before you answer and
24  I'll try to do the same so we're not talking on top
25  of one another.

Page 8

1        Can you do that for me?
2        A.  Yes.
3        Q.  From time to time, your attorney, Mr. de
4  Blank, might make an objection.  He is doing that to
5  preserve it for the record.  Just because he objects
6  to the question doesn't mean you don't have to answer
7  it if you understand it.
8        Is that okay?
9        A.  Yes.
10        Q.  Is there any reason that you can think of
11  that you can't give any -- can't give testimony here
12  today?
13        A.  No.
14        Q.  Great.
15        MR. POLLACK:
16        (Exhibit No. 1 was marked.)
17  BY MR. POLLACK:
18        Q.  Dr. Wei, I've had marked as Exhibit Wei 1 a
19  document entitled "Rebuttal expert report of Gu-Yeon
20  Wei on Fairchild's alleged copying of Power
21  Integrations' devices and patents."
22        Do you recognize Exhibit 1?
23        A.  Yes, I do.
24        Q.  Is this a report that you prepared as part
25  of your work on this matter?

Page 9

1        A.  Yes.
2        Q.  If you would turn for me to what is marked
3  as Exhibit A of Exhibit 1 and Exhibit A is an
4  eight-page document.
5        Do you recognize Exhibit A to your report?
6        A.  Yes, I do.
7        Q.  What is Exhibit A to your report?
8        A.  This is my CV.
9        Q.  Is the CV that's attached to your report,
10  Exhibit 1, is this current as of approximately
11  January of this year?
12        A.  Yes, it is.
13        Q.  So from your CV, which is attached to
14  Exhibit 1, am I correct in understanding that as of
15  1998, you were in school at Stanford working on your
16  Ph.D.; is that right?
17        A.  Yes.  I actually began my Ph.D. work in
18  1994, '95 but did not receive my M.S. until '97
19  mainly as a technical -- administrative reason.
20        Q.  Now, during the time you were in school,
21  between 1994 and 2001 when you received your Ph.D.
22  degree, were you also employed by anyone other than
23  Stanford?
24        A.  Yes.  I was employed with a company called
25  Accelerant Networks from August of 2000 and also, I

3 (Pages 6 to 9)

Page 14

1    that he filed in this case; is that right?
2        MR. de BLANK:  Objection, vague.
3        THE WITNESS:  I have reviewed Dr. Horowitz's
4    reports.
5    BY MR. POLLACK:
6        Q.  Is it your understanding that Dr. Horowitz
7    did not rely on this alleged difference in generating
8    a DC max signal to assert that because of that, the
9    Fairchild products at issue don't infringe the patent
10   claims?
11       A.  From my recollection, I do not believe that
12   his report included some of the descriptions here.
13       Q.  So although you've provided a description of
14   the differences you see in the two implementations,
15   is it your understanding that Dr. Horowitz hasn't
16   relied on those differences that you point out in
17   asserting that the Fairchild products don't infringe
18   the claims that are asserted in PI's patents?
19       MR. de BLANK:  Objection, calls for
20   speculation.
21       THE WITNESS:  As far as I remember -- well,
22   first, I believe I wrote these sections or these
23   paragraphs after Dr. Horowitz's initial invalidity
24   report and therefore, I do not believe he would have
25   seen them prior to the submission of his report.

Page 15

1        So -- does that answer your question?
2    BY MR. POLLACK:
3        Q.  Well, I guess it's not really your
4    recitation specifically that I'm asking, but in
5    Dr. Horowitz's report where he asserts his opinions
6    that the Fairchild parts do not infringe, he doesn't
7    rely on the DC max differences that you point out
8    here in asserting that's a reason the patents don't
9    infringe, to your understanding?
10       A.  I would have to take a closer look at his
11   report, but -- I can't exactly remember what his
12   arguments were in reference to the DMAX signal and
13   whether they infringed or whether they were invalid
14   or not.
15       So actually in order to answer that question
16   more accurately, I would actually like to look over
17   his documents or maybe come back after reviewing
18   those documents.
19       Q.  Okay.  This was marked in Dr. Horowitz's
20   deposition, so I'm not going to remark it, but I'll
21   hand you what is entitled "Rebuttal expert report of
22   Paul Horowitz on noninfringement of U.S. patents
23   No. 6,107,851, 6,229,366 and 6,249,876."
24       First of all, do you recognize what I've
25   just handed you as Dr. Horowitz's noninfringement

Page 16

1    report?
2        A.  Yes, I do.
3        MR. de BLANK:  I'm sorry, Howard, do you
4    have a copy?
5        MR. POLLACK:  Sorry.
6        MR. de BLANK:  Thank you.
7    BY MR. POLLACK:
8        Q.  You've seen this document before?
9        A.  I have skimmed the document.
10       Q.  First, the DC max aspect of the patents,
11   that -- am I correct is it your understanding that
12   the DC max signal is something that's only called out
13   in the '366 and '851 patents?
14       MR. de BLANK:  Objection, vague.  Are you
15   saying DC max or do you mean DMAX?  I'm sorry, I
16   don't mean to interrupt.  I wasn't sure what you were
17   referring to.
18       THE WITNESS:  Should I answer, okay.
19   BY MR. POLLACK:
20       Q.  Go ahead.
21       A.  The DMAX signal I remember is only in the
22   '366 and the '851 patents, yes.
23       Q.  So I'll refer you to page 7 of Dr.
24   Horowitz's rebuttal report which is where his
25   discussion of the '851 patent, claim 1 starts and if

Page 17

1    you would take a look through his discussion of claim
2    1 of the '851 patent and let me know if that
3    refreshes your recollection as to whether he relied
4    on any differences in generating a maximum duty cycle
5    signal in asserting being noninfringement.
6        A.  So based on my perusal at this point, Dr.
7    Horowitz does not seem to utilize the description
8    I've placed in my report in reference to the DMAX
9    signal in his arguments.
10       Q.  Okay.  Just to cover the '366 patent, I'll
11   refer you to page 14 of Dr. Horowitz's report which
12   is where he starts his discussion of the '366 patent
13   claim 1 and ask you to take a look through that
14   section and confirm for me the same is true with
15   regard to his arguments on the '366 patent.
16       A.  So I would have to take maybe a closer look
17   at the, since it's been quite a while, at the
18   Unitrode devices, but it does state in his report
19   that -- it says here I have found in my report of
20   11-30-05 that claim 1 is clearly anticipated or
21   rendered obvious by at least the Unitrode UCC3800
22   series of switchmode converter ICs, and if I remember
23   correctly, there is circuitry within those series
24   devices that resembles the usage of something like a
25   DMAX signal in that circuitry and therefore, maybe

Page 22

1 sake, the other related patent is the '876 patent and
2 his discussion of the '876 patent, claim 1, starts at
3 page 20 of his report.
4     A. So again, I do not believe Dr. Horowitz
5 draws that distinction in his report.
6     Q. Okay. As part of your work on this case,
7 you've reviewed the three patents, three circuit
8 patents that have been asserted by Power
9 Integrations, correct?
10     A. Yes.
11     Q. It's not a memory test, so I'll just give
12 you a copy specifically because I want to ask you
13 about the '876 patent. And I'm not going to mark
14 this.
15         MR. de BLANK: Thank you.
16 BY MR. POLLACK:
17     Q. Based on your reading of the patent, am I
18 correct in understanding the '876 patent expressly
19 refers to using a voltage controlled oscillator as a
20 possible embodiment of what's shown in the '876
21 patent?
22         MR. de BLANK: Objection, the document
23 speaks for itself.
24         THE WITNESS: So I believe there's a
25 paragraph within the specification that states that a

Page 23

1 voltage controlled oscillator may be used. However,
2 it's not clearly shown how that would be the case.
3     Sorry.
4 BY MR. POLLACK:
5     Q. Are you finished?
6     A. Yes.
7     Q. Okay. Referring you back to your report,
8 which we've marked as Exhibit 1, so I'd like to refer
9 you to page 10 of the report.
10         And the bullet points at the top which
11 continues, just for your reference, from a list
12 started on page 9, these are -- am I correct in
13 understanding these are different features that are
14 possible features of a PWM controller circuit that
15 you're listing as features that are potentially
16 available in these types of devices?
17     A. Yes.
18     Q. I notice that the last two, you've broken
19 out something called frequency dithering and then a
20 separate bullet as frequency modulation.
21         Am I correct in understanding that you
22 believe that those two things are different features
23 that are potentially available in a PWM controller?
24     A. Yes. I -- well, I chose to describe
25 frequency dithering to be a little bit more specific,

Page 24

1 specifically targeting EMI, whereas frequency
2 modulation, I intended to be a little bit broader and
3 not as restrictive.
4     Q. Later on in your report, this is at page 13,
5 in paragraph 39, you're addressing the FSDM311, but
6 the last sentence of that paragraph says that this
7 device does not have frequency dither or frequency
8 variation features.
9         Did you intend to, again, refer to frequency
10 dither as something different from frequency
11 variation in this paragraph?
12     A. In this paragraph, I was stating that based
13 on my description prior of frequency dither and the
14 description of frequency variation, this device had
15 neither of those two.
16     Q. So you are making a distinction those are
17 separate things in this analysis?
18     A. In this analysis, again, as I described
19 before, frequency dither was intended to specifically
20 describe a method for EMI frequency variation --
21 modulation. Hmm, so let me read this one more time
22 just to refresh my memory.
23         So frequency variation here is a broader
24 term in terms of any way of changing the frequency.
25         And I was basically stating here that there

Page 25

1 was no frequency dither method to reduce EMI nor
2 any -- at least my understanding of the circuitry was
3 that there was no intentional way of changing the
4 frequency implemented.
5     Q. Okay. In paragraph 31 of your report, at
6 page 11 --
7     A. Sorry.
8     Q. -- in that paragraph, you refer to frequency
9 variation and then you describe different possible
10 purposes of frequency variation, am I correct?
11     A. Yes.
12     Q. One thing you didn't mention is changing
13 frequency to prevent short circuit runaway.
14         Is that a purpose for frequency variation
15 that you're aware of?
16     A. I do recollect that one would or could
17 change the frequency to prevent frequency runaway, I
18 do recollect that.
19     Q. So that would be something that you would
20 maybe want to add to this list as another possible
21 thing you could do with frequency variation?
22     A. Yes, actually that's true.
23     Q. Now, you say in the next paragraph that the
24 '851 patent describes two approaches to implementing
25 frequency dither and that's the first category,

7 (Pages 22 to 25)

Page 30

1  when I looked at the circuitry, was not specifically
2  the frequency dithering that I had seen for the Power
3  Integrations' devices.
4      Q.  And with regard to the LM2588 which is
5  discussed a little further down, on page 20 -- in
6  paragraph 81, excuse me, you refer to that part as
7  having a frequency variation function rather than a
8  frequency dither function, correct?
9      A.  Yes.
10     Q.  Is that sort of for the same reason as we
11 just discussed with regard to the 2262?
12     A.  I believe so, yes.
13     Q.  On page 15, paragraph 44 of your report,
14 which is Exhibit 1, first of all, you're discussing
15 here in paragraph 44 the FSD210 series of devices,
16 correct?
17     A.  Yes, I am.
18     Q.  And in paragraph 44, you say that this
19 counter, referring to the counter shown in the
20 voltage scaling block, is used to also generate
21 signals for soft start as described in the previous
22 section.
23         Am I correct in understanding that at least
24 based on your review of the FSD210 materials, that
25 it's the same counter that's used both to drive the

Page 31

1  frequency scaling function and also, to drive the
2  soft start function?
3      A.  Yes, there's one counter.
4      Q.  And having a single circuit component
5  provide a signal to drive both the soft start
6  function and the frequency dither function, that's
7  also something that's shown in the '366 and '851
8  patents, right?
9      A.  I'm sorry, can you repeat that, sorry.
10         MR. POLLACK:  Can you read that back?
11         (The record was read by the Reporter.)
12         MR. de BLANK:  Objection, vague.
13         MR. POLLACK:  I think I said a circuit
14         component.
15         (The record was read by the Reporter.)
16         THE WITNESS:  Yes, there is a single
17 oscillator circuit in the patents.
18 BY MR. POLLACK:
19     Q.  And in discussing the various other
20 potential prior art devices in your report, you
21 didn't point to any of those other devices as having
22 a similar feature of driving two functions,
23 specifically frequency dither and soft start, with
24 the same signal, correct?
25     A.  There was no -- so in my description of

Page 32

1  frequency dither, no.  However, there were examples
2  of a signal that's shared for frequency variation and
3  soft start.
4      Q.  Do you describe that somewhere in your
5  report?
6      A.  So if you looked at paragraph 79 -- 78 and
7  79, I describe the soft start function within the
8  TEA2262 and paragraph 79 says that the TEA2262 also
9  implements an ability to reduce a switching frequency
10 by a factor of four during the start-up phase by
11 reducing the charge current in the oscillator by a
12 factor of four.
13         And I believe that, although I guess it's
14 not explicitly stated here in that device, there is a
15 connection between the soft start and the frequency
16 variation, if I remember correctly.
17     Q.  But you didn't at least describe such a
18 connection here in your discussion -- in your report
19 Exhibit 1?
20     A.  No, I did not.  My purpose, I guess, for
21 this was not to try to explicitly draw parallels or
22 distinctions between specific aspects of the patents
23 and the products.
24         So I guess I did not include those.
25     Q.  Okay.  I'd like to refer you to paragraph 34

Page 33

1  of your report, Exhibit 1, which is at page 12.
2          The last sentence of paragraph 34 says
3  "While the patent briefly mentions that a similar
4  implementation is possible by combining voltages,
5  such an implementation is not obvious."
6          What do you mean by not obvious there?
7      A.  Oh, so what I meant by not obvious here is
8  that in the patent, there was a clear description
9  with several figures showing how one can combine
10 currents.
11         And however, for the case of voltages, there
12 was -- there was no corresponding figures or
13 corresponding detailed description and therefore,
14 upon just reading -- it appeared to me as if one can
15 just replace current with voltage and try to
16 implement the same thing, but it did not appear
17 obvious to me how one would just replace current
18 sources with voltage sources and get the same result.
19     Q.  You were using obvious in sort of the plain
20 English vernacular, wasn't some reference to
21 invalidity?
22     A.  No, no, no.
23     Q.  Okay, thank you.
24     A.  I guess I leave those things to the
25 attorneys who understand the definitions much better

9 (Pages 30 to 33)

Page 38

1    Am I correct in understanding that you're
2  addressing differences you see between the
3  implementation of soft start in the Fairchild devices
4  and what's described associated with the soft start
5  feature of, for example, the '366 patent; is that
6  correct?
7    A. Yes, I believe so, yes.
8    Q. And you say that the '366 patent describes a
9  low frequency oscillator that generates a soft start
10  signal.
11    Do you see that?
12    A. Yes.
13    Q. Is the low frequency oscillator the only
14  possibility that the '366 patent mentions for
15  generating a soft start signal?
16    A. The '366 patent, if I remember correctly,
17  also has -- mentions in the figure 1 a different or
18  another way of implementing a form of soft start
19  utilizing a soft start capacitor.
20    Q. Am I correct -- based on your recollection,
21  isn't it true that the '366 patent also mentions that
22  a ramp generator can be used to generate the signal
23  that drives a soft start?
24    A. I don't remember exactly.
25    Q. Well, do you recall that the patent, the

Page 39

1  '366 patent also says that you can use counter output
2  signals as the signal that drives the soft start
3  function?
4    A. That sounds vaguely familiar.
5    Q. But you don't address those different
6  alternatives described in the '366 patent in your
7  analysis in your report, correct?
8    A. In my report, I do not. The -- I was
9  focusing primarily on the figures in describing and
10  understanding how soft start was being described in
11  those patents.
12    Q. Okay. In paragraph 91, you're discussing
13  differences you see in what's shown in the '876
14  patent and what Fairchild does with its frequency
15  variation and am I correct one of the differences you
16  point out here is that the digital counter and DAC
17  used by the Fairchild device provides a stair-step
18  triangle-wave form rather than a ramp or a digital
19  ramp?
20    A. Yes.
21    Q. To your recollection, that's not a
22  distinction that Dr. Horowitz relies on in his
23  asserting noninfringement of the '876 patent, right?
24    A. I do not recollect what was written in the
25  report, because I do recollect at least one

Page 40

1  conversation with Dr. Horowitz about the fact that
2  the -- in the Fairchild products, the output of the
3  counter and the associated circuitry following that
4  counter generated a signal that was a stair-step
5  triangle-wave.
6    So we did discuss that. Whether it's in the
7  report or not, I don't remember.
8    Q. Okay.
9    MR. POLLACK: We've been going for an hour
10  now. Why don't we take a short break.
11    THE VIDEOGRAPHER: Off the record at 2:06
12  p.m.
13    (Recess taken.)
14    THE VIDEOGRAPHER: Back on the record at
15  2:12 p.m.
16  BY MR. POLLACK:
17    Q. Dr. Wei, would you agree with me in order to
18  copy something, you have to know what that thing is?
19    A. Yes.
20    Q. And conversely, if you don't know about
21  something, you couldn't be considered to have copied
22  it, right?
23    A. Yes.
24    Q. I believe we went through your CV, but just
25  confirm for me, you've never worked for Fairchild,

Page 41

1  right?
2    A. I've never worked for Fairchild, yes.
3    Q. And am I correct that in your report, you
4  don't refer to or rely on any documents associated
5  with Fairchild's research and development of the
6  products that are accused of infringing Power
7  Integrations' patents, right?
8    A. I am -- I've only reviewed Fairchild's data
9  sheets, schematics.
10    And I have had brief conversations with
11  their engineers in regards to how their different
12  devices operate.
13    Q. You don't refer to or discuss any
14  conversations you've had with Fairchild's engineers
15  in your report, do you?
16    A. No.
17    Q. Did you discuss with Fairchild's engineers
18  how they went about the process of designing,
19  originally designing the circuits that you studied as
20  part of your analysis?
21    A. No.
22    Q. In your report and specifically it's
23  attached as Exhibit B, the documents that you say
24  that you reviewed, you don't list as materials
25  reviewed any deposition transcripts of the Fairchild

11 (Pages 38 to 41)

Page 46

1 TEA2262."
2       You don't have any knowledge that anyone at
3 Power Integrations knew about the TEA2262 when they
4 filed for their patents, correct?
5    A. No, I do not know.
6    Q. And similarly, in paragraph 93, you say,
7 "one may equivalently argue that the frequency
8 variation circuit found in the '876 patent copied the
9 designs shown in the Habetler and Divan and Wang and
10 Saunders publications."
11       But you don't have any knowledge as to
12 whether any of the Power Integrations engineers
13 responsible for the '876 patent even knew about those
14 articles, right?
15    A. I personally have no explicit knowledge as
16 to what they know or do not know, yes.
17    Q. As part of your work on behalf of Fairchild
18 in this matter, did you also support Dr. Horowitz in
19 his analysis of the prior art?
20    A. Yes, I did.
21    Q. In Dr. Horowitz's report on invalidity,
22 attached as exhibits, there are various claim charts
23 that analyze prior art references.
24       You're familiar with those charts?
25    A. Yes, I am.

Page 47

1       MR. de BLANK: Objection, vague.
2 BY MR. POLLACK:
3    Q. Did you, in fact, personally prepare some of
4 the charts that were attached as exhibits to Dr.
5 Horowitz's invalidity report?
6    A. He asked me to help in the process of
7 compiling those claim charts, and so yes.
8    Q. And I apologize, we did get a Bates stamped
9 version of this, but we didn't have time to prepare
10 the Bates stamp version as an exhibit.
11       This is -- I'm going to hand you what was
12 marked during Dr. Horowitz's deposition as Exhibit 6
13 and I'll represent to you that this is a set of the
14 claim charts that were attached to his invalidity
15 report with Dr. Horowitz's handwritten notations
16 added. I'll hand that to you. I'll refer to this as
17 Horowitz Exhibit 6.
18       MR. de BLANK: Thank you.
19 BY MR. POLLACK:
20    Q. Have you seen the Horowitz Exhibit 6, the
21 version of the claim charts with Dr. Horowitz's
22 mark-ups on it before?
23    A. I've seen a version of this, meaning Dr.
24 Horowitz provided me with a copy of some of the pages
25 where he had made his notes.

Page 48

1    Q. Okay. Again, you know, it's not supposed to
2 be a memory test, but if you could, to the best of
3 your recollection, can you identify for me which of
4 the claim charts that are here in Exhibit -- Horowitz
5 Exhibit 6 you were involved in preparing?
6    A. I was involved in preparing or at least
7 looking through most of them. I did look through, I
8 believe, every single one of the claim charts.
9       I was involved in, shall we say, touching
10 some more than others.
11       The way these claim charts came about was I
12 began with a version of the claim charts that had
13 previously been created by the attorneys and then I
14 used that as a starting point to then go through and
15 make whatever modifications I felt was necessary.
16    Q. Okay. So with regard to the claim charts
17 that you worked on related to validity, every one of
18 the charts that you worked on, had a version that
19 already been prepared by one of Fairchild's attorneys
20 before you started working on it?
21    A. I don't remember if it was every single one
22 because there may have been prior art references that
23 were found after the initial claim charts were
24 created.
25       But for a good number of them, yes, the

Page 49

1 claim charts had already been -- had been created in
2 some form or another.
3    Q. Okay. Where did the references -- prior art
4 literature that you analyzed in this case, where did
5 you get it from?
6    A. The literature I got them either from the
7 attorneys or from Dr. Horowitz.
8    Q. Did you yourself do any searching to look
9 for any prior art references that you independently
10 thought might be relevant to the case?
11    A. I did do some online searches going
12 through -- primarily going through the web pages for
13 Fairchild and for Power Integrations. That was my --
14 that's where I did most of my looking around and that
15 I may have flipped through some databooks that Dr.
16 Horowitz had available in his office.
17    Q. In, for example, the first page, the first
18 claim chart of Horowitz Exhibit 6, I'd like to refer
19 you to the discussion there of claim 2.
20       And on the right-hand column, the discussion
21 says it is inherent.
22       Do you have an understanding as to what it's
23 meant by it is inherent in the claim charts that you
24 worked on in the case?
25    A. I have a vague -- I do have a vague

13 (Pages 46 to 49)

Page 54

1    There were other sections where, as I
2 described before, I felt it was not too -- it was not
3 a stretch to combine a regulator circuit with the
4 rectifier circuit whereas Dr. Horowitz at the time
5 said, no, let's play it conservatively because there
6 was plenty of prior art that did have the rectifier
7 circuitry and therefore there was no need to try to
8 overextend references, if --
9 BY MR. POLLACK:
10    Q.  Did you have any discussions with any of the
11 attorneys about any of the positions that Dr.
12 Horowitz, in his more recent review of the claim
13 charts, decided needed modification?
14    A.  One of the attorneys was present during our
15 discussions.  So to that effect, I guess we -- I did
16 consult or speak with one of the attorneys.
17    Q.  Which of the attorneys is that?
18    A.  Ms. Feeman.
19    Q.  Do you -- I'm sorry, strike that.
20    Have you presently been asked to do any
21 additional work or additional analysis with regard to
22 any of the validity issues that you've worked on thus
23 far in the case?
24    A.  At this time, no.
25    Q.  Have you been asked to do any additional

Page 55

1 analysis related to the issues of whether any of the
2 Fairchild products may or may not infringe any of the
3 asserted claims of the PI patents?
4    A.  At this time, no.
5    Q.  Other than what's contained in Wei
6 Exhibit 1, do you have any present intention of
7 providing any additional opinions on any issue that
8 might be relevant to the dispute between Power
9 Integrations and Fairchild, at least at this point in
10 time?
11    A.  If I'm asked to, I can.
12    Currently, I myself have no intention of
13 offering more opinions than is asked of me.
14    Q.  Okay.  I'd like to refer you -- you have Dr.
15 Horowitz's Exhibit 6 in front of you, if you would
16 flip -- and he had done some handwritten page
17 numbering at the top right.
18    If you will turn to what's got the
19 handwritten notation D-16, and D-16 is part of the
20 claim chart related to the '366 patent and the Keller
21 article, but I'd like to refer you to claim 14
22 where you see Dr. Horowitz has put Xes through the
23 analysis that's shown there for claim 14.
24    Did you have any discussion that you can
25 recall with Dr. Horowitz about the claim 14 analysis

Page 56

1 of the '366 patent vis-a-vis the Keller article?
2    A.  With respect to claim 14?
3    Q.  Yes.
4    A.  I do not explicitly recollect the
5 conversation but not to say that we didn't have a
6 conversation.  It's just not ringing a bell right
7 now.
8    Q.  If you would flip a little further along,
9 there's a claim chart that starts with the
10 handwritten notation E-6?
11    A.  I assume it's -- I see E-7 so I assume this
12 is E-6?
13    Q.  Actually, keep going.  He had the same
14 confusion.
15    E-6 has a claim chart related to the '851
16 patent and the Stasi article.
17    Do you see that?
18    A.  Yes.
19    Q.  If you would flip to the next page, you'll
20 see there's a discussion of claim 4, Dr. Horowitz,
21 again, has put an X through the analysis of claim 4
22 related to this reference.
23    Do you have any recollection as to
24 discussing this or why he did that for this claim
25 chart?

Page 57

1    A.  I believe I do.  When I was constructing
2 these claim charts, there was a subtle difference
3 between the '366 patents and the '851 patents, where
4 I believe in the '851 patent, the same frequency
5 variation signal was being used for soft start.
6    Whereas in the '366 patent, it describes --
7 the claims describe soft start and then there's
8 another dependent claim, I believe, that has a
9 frequency variation signal but the two were not
10 connected explicitly in '366 but they were connected
11 in '851.
12    I believe in my mind, I was still, since the
13 patents were very similar, when the two were within
14 the same device, I applied that without -- I should
15 have read a little bit more carefully and remembered
16 that in the '851 claim, it's the same signal and
17 therefore, upon discussion, we came to the
18 realization at that time, I believe, that well, this
19 doesn't quite apply, because it's not the exact same
20 signal.
21    I do believe at the time I did posit the
22 notion of whether, since there are other products
23 that have that -- that do share a signal, that
24 someone in the -- who's aware of various art at the
25 time may be able to then combine the two signals or

15 (Pages 54 to 57)

POWER INTEGRATIONS V.FAIRCHILD SEMICONDUCTOR    GU-YEON WEI    FEBRUARY 17, 2006

Page 1

**A**

ability 32:9
able 57:25
Accelerant 9:25 10:8
access 37:22
accurate 60:11
accurately 15:16
accused 36:14 37:11,14
41:6 42:23 43:4 44:14
44:23 45:3
acoustic 34:14,17,20
action 5:13
actual 36:19
add 25:20
added 47:16 50:4
additional 52:23 54:21
54:21,25 55:7
address 6:24,25 39:5
42:16 43:2,19 44:20
addressed 34:12
addresses 21:21
addressing 24:5 34:14
38:2
adjourned 59:20
adjust 20:4
adjusted 20:7
adjusting 20:4
administer 6:14 60:2
administrative 9:19
affixed 60:15
afternoon 6:21,22
agree 35:8 37:2 40:17
51:19,23
agreed 12:3
ahead 16:20 53:13
58:22
al 5:12
alleged 4:10 8:20 14:7
alternatives 39:6
Analog 10:17,21 11:1
analysis 24:17,18 39:7
41:20 42:6 43:19,21
46:19 50:12,18 52:25
54:21 55:1,23,25
56:21
analyze 46:23
analyzed 49:4
and/or 18:16
answer 7:10,20,20,23
8:6 15:1,15 16:18
anticipated 17:20
Apartment 7:1
apologize 47:8
appear 33:16
appeared 26:20 33:14
applied 57:14
apply 57:19

approaches 25:24
approximately 9:10
area 11:25 12:6
argue 45:23 46:7
Arguello 2:8 5:3,18
argument 18:2 21:9
45:22 53:11
arguments 15:12 17:9
17:15 51:22 52:3
art 11:19 19:2 29:13
31:20 46:19,23 48:22
49:3,9 53:2 54:6
57:24 58:3,5,7,8,21
article 34:5,10,12,14
55:21 56:1,16
articles 46:14
asked 35:19,21 36:13
44:6 47:6 54:20,25
55:11,13
asking 15:4
aspect 16:10
aspects 32:22
assert 14:8
asserted 14:18 22:8
55:3
asserting 14:17 15:8
17:5 21:10 39:23
assertions 51:17
asserts 15:5
assessment 12:3
associated 12:20,21
13:7 38:4 40:3 41:4
50:25
association 50:17
assume 20:12 56:11,11
attached 9:9,13 41:23
46:22 47:4,14
attend 42:3
attended 43:12
attorney 2:7,19 8:3
60:19
attorneys 5:21 33:25
35:23,24 48:13,19
49:7 50:11 54:11,14
54:16,17
audible 34:20,24 35:7,8
August 9:25
authorized 60:1
available 23:16,23
43:22 49:16
availed 60:16
aware 11:9 13:4 19:24
25:15 43:4 45:1,18
57:24 58:8

**B**

B 41:23
Bachelor's 11:23

back 15:17 18:4 23:7
31:10 40:14 59:3
Bas 2:18 6:9
basdeblank@orrick.c...
2:23
based 17:6 22:17 24:12
27:3 30:24 38:20
45:16
basically 7:8 24:25
37:19 43:23 53:12
basing 42:11 43:21
basis 11:18
Bates 47:8,10
began 9:17 48:12
beginning 5:8 10:14
13:10 18:21
behalf 5:21 46:17
believable 43:17
believe 13:6 14:11,22
14:24 21:23 22:4,24
23:22 27:3 28:7,10
30:12 32:13 34:19
36:9 38:7 40:24 48:8
50:8 51:24 57:1,4,8
57:12,18,21
bell 56:6
benefits 26:21
best 7:9,13 48:2
better 33:25
beyond 26:16
bias 16:6
bit 13:8 23:25 24:2
57:15
Blank 2:18 6:9,9 8:4
14:2,19 16:3,6,14
19:21 20:9,20 22:15
22:22 26:11 28:3
31:12 44:15 47:1,18
53:15 58:13 59:7,9
Blauschild 36:16
Blauschild's 52:25
block 30:20
break 40:10 58:23
brief 41:10 51:2
briefly 27:11 33:3
broad 26:18
broader 24:2,23
broken 23:18
buffer 20:3
buffers 20:2
bullet 23:10,20

**C**

C 2:1 3:1
CA 2:9,21 3:9
California 5:4,19,24
6:2 59:16 60:3
called 6:17 9:24 16:12

19:13 23:19
calls 14:19 58:13
Cambridge 7:1
capacitor 38:19
caption 60:20,22
careful 52:19
carefully 57:15
case 1:7 13:5 14:1 22:6
23:2 28:20 33:11
35:20 44:4 49:4,10,24
50:21,25 54:23
categorization 26:19
category 25:25
cause 60:6,21
causes 35:12
Certified 5:5
certify 60:4,18
chance 21:17 50:20,22
change 18:20 25:17
53:13,14
changed 19:9
changes 20:15 53:17,18
53:20
changing 18:25 19:18
20:7 24:24 25:3,12
26:22
charge 18:15,21 19:10
20:8 32:11
charge/discharge 19:18
chart 49:18 50:6,8
55:20 56:9,15,25
charts 46:22,24 47:4,7
47:14,21 48:4,8,11,12
48:16,18,23 49:1,23
50:3,5 51:5,6,10,12
51:18,22 52:5 53:8,19
54:13 57:2
child 36:16
chip 36:20,21
choose 26:24,25 43:18
chose 23:24
circuit 22:7 23:14 25:13
31:4,13,17 34:15,16
43:24 46:8 52:13,16
52:17 54:3,4
circuitry 10:24 12:21
17:23,25 20:11 25:2
30:1 40:3 52:8 54:7
circuits 18:24 36:24
41:19 42:23 43:4,6
44:23 45:12,15
cited 60:7
City 2:9 5:4,19
civil 5:13 60:3
claim 16:25 17:1,13,20
21:22 22:2 46:22 47:7
47:14,21 48:4,8,11,12
48:16,23 49:1,18,19

49:23 50:3 51:5,6,10
51:12,18,22 52:5 53:8
53:19 54:12 55:20,21
55:23,25 56:2,9,15,20
56:21,24 57:2,8,16
58:10
claims 14:10,18 26:17
52:5 55:3 57:7
clear 7:8 26:17 33:8
clearly 17:20 23:2
close 53:17
closer 15:10 17:16
Code 60:3
column 49:20
combine 33:9 52:17
54:3 57:25
combining 33:4
come 12:21,23,25 15:17
coming 37:10
commencing 5:2
commercial 27:12,25
company 9:24
comparison 37:24
compiling 47:7
complete 7:10 60:10
completely 43:16
completeness 21:25
component 31:4,14
components 34:17
compound 53:15
comprised 20:1
Comp-U-Scripts/Gro...
6:4
concede 53:12
concludes 59:12
confirm 17:14 40:25
confusing 7:12
confusion 56:14
connected 57:10,10
connection 27:8 32:15
32:18
conservative 52:19
conservatively 54:5
consider 18:1,2 36:14
considerations 12:1
considered 11:21,22
40:21
constructing 57:1
consult 54:16
consultant 10:17
consulting 10:20,22,25
11:1
contained 55:5
contents 36:23
Continued 3:2
continues 23:11
control 13:22 19:14,25
controlled 19:6,23 20:6

POWER INTEGRATIONS V.FAIRCHILD SEMICONDUCTOR    GU-YEON WEI    FEBRUARY 17, 2006

Page 3

familiar 13:25 39:4
    45:5 46:24
far 14:21 26:12 54:23
FCC 13:1
feature 27:22 28:1,1
    29:6,11,16,23 31:22
    38:5 58:10
features 23:13,14,15,22
    24:8 28:23 42:19
February 1:16 5:2,15
    59:19
Feeman 54:18
felt 48:15 52:13 53:9,18
    54:2
figure 38:17
figures 33:9,12 39:9
filed 11:20 14:1 46:4
finish 7:23
finished 23:5
first 6:18 14:22 15:24
    16:10 19:9 25:25
    28:14 30:14 35:15,18
    36:5,9 49:17,17
Fish 2:5 5:18 6:7
flip 55:16 56:8,19
flipped 49:15
flyback 53:3
focusing 26:13 39:9
following 5:6 40:3
foregoing 60:4,10,19
forgot 42:15
form 38:18 39:18 49:2
forth 6:19
found 17:19 45:25 46:8
    48:23
four 32:10,12
frame 36:10
Francisco 3:9 5:25 6:1
    59:16
frequencies 21:1,3,5
frequency 18:14,19
    19:1,9,17 20:5,7,15
    23:19,20,25 24:1,7,7
    24:9,10,13,14,19,20
    24:23,24 25:1,4,8,10
    25:13,14,17,17,21,25
    26:5,9,15,19,22 27:1
    27:1,6,16,22 28:9,25
    29:5,11,16,19,23,25
    30:2,7,8 31:1,6,23
    32:1,2,9,15 38:9,13
    39:14 42:19 44:10
    46:7 57:4,9 58:12
Friday 1:16 5:2
front 42:12 55:15
FSDL0365RNB 29:8
FSDL321 29:3,5
FSDM311 24:5

FSD210 28:15,18,24
    30:15,24
full 6:23
function 28:2 29:24
    30:7,8 31:1,2,6,6 32:7
    34:15 39:3
functions 28:11 31:22
    44:11
further 13:9 30:5 56:8
    59:8 60:18

_____ G _____
gather 26:22
general 7:7
generate 13:21 30:20
    38:22
generated 34:15 40:4
generates 38:9
generating 13:19 14:7
    17:4 38:15
generator 38:22
getting 37:1 51:4 58:19
give 8:11,11 22:11
    37:15
given 58:2 60:12
go 16:20 48:14 53:13
    58:22
goes 7:7
going 7:8 15:20 18:4
    22:13 27:10 40:9
    47:11 49:11,12 56:13
good 6:21,22 48:25
govern 21:18
Graphics 10:2,4
Great 8:14
guess 13:9 15:3 26:13
    32:13,20,24 33:24
    35:23 36:22 37:1
    51:11 52:18 54:15
guidelines 13:6
Gu-Yeon 1:15 4:10 5:9
    6:16,25 8:19 59:1,13
    59:20,25

_____ H _____
Habetler 34:5,12,13
    46:9
hand 13:19 15:21 21:4
    34:23 47:11,16
handed 15:25
handwritten 47:15
    55:16,19 56:10
hard 7:21 43:22
Harvard 10:13,15
head 7:21
heading 28:15
hear 34:21 35:3
heard 19:5,13

help 47:6
helping 35:24,24
hereinafter 6:19
Herrington 2:17 6:10
high 10:23
Hmm 24:21
Horowitz 11:10 14:6,15
    15:22 17:7 18:2 21:24
    22:4 35:24 36:1 39:22
    40:1 46:18 47:17,20
    47:24 48:4 49:7,16,18
    50:17,23 51:5 52:11
    52:18 53:4,7 54:4,12
    55:22,25 56:20 58:9
Horowitz's 11:15,17
    12:2 13:25 14:3,23
    15:5,19,25 16:24
    17:11 21:8 46:21 47:5
    47:12,15,21 50:21
    55:15
hour 5:3 40:9
Howard 2:6 6:7 16:3
humans 34:21

_____ I _____
ICs 10:8 17:22
identifies 21:24
identify 6:5 48:3
IEEE 13:6
illustrated 34:9
implement 33:16 44:10
implementation 26:4
    29:25 33:4,5 36:23,24
    38:3 45:25
implementations 14:14
    43:24
implemented 25:4
    28:23
implementing 25:24
    27:21 37:12 38:18
    45:18
implements 27:16 32:9
implies 36:16
important 7:19,22
improvidently 53:9
inappropriate 53:2
include 32:24
included 14:12 52:7
including 26:13 28:24
Incorporated 5:10,12
    6:11
independently 49:9
induce 34:16
infringe 14:9,17 15:6,9
    55:2
infringed 15:13
infringement 37:11
    44:5,7,24

infringing 41:6
inherency 50:5
inherent 49:21,23 50:2
    50:12,17 52:6
initial 14:23 48:23
initially 53:11
inspection 53:17
Instruments 10:1,4
Integrations 1:5 4:11
    5:10 6:8 8:21 21:1
    22:9 27:11 30:3 35:20
    36:15 37:14,16,41:7
    43:5 44:9,22 45:2,8
    45:11,17,17 46:3,12
    49:13 55:9
intend 24:9
intended 24:2,19
intent 7:9 34:9 37:8,13
intention 55:6,12
intentional 25:3
interested 60:21
interfaces 10:23
interference 12:20 35:2
    35:6,10
intern 10:1
International 1:9 5:11
    6:11
internships 10:3
interpretation 52:22
interrupt 16:16
invalid 15:13
invalidity 14:23 33:21
    46:21 47:5,14 50:12
    51:17,22
inverter 20:2,2
involved 48:5,6,9
issue 13:21 14:9 28:19
    52:24 55:7
issues 54:22 55:1
i.e 19:18

_____ J _____
January 9:11 10:14
JJF 1:7
June 35:17

_____ K _____
keep 56:13
Keller 55:20 56:1
kind 10:20 13:7 20:14
    34:11 35:3 51:18
kinds 19:23
knew 42:23,25 43:13
    44:12,18 45:11,14
    46:3,13
know 7:6,13 12:17 17:2
    20:10 35:9 40:18,20
    43:17 45:14,17 46:5

46:16,16 48:1 50:18
    50:25 52:21 53:12,21
knowledge 21:12,13
    45:10 46:2,11,15
known 19:2 20:8,11,18
Korea 42:4

_____ L _____
LAW 2:7,19
learned 42:8
leave 33:24
Leftwich 3:7 5:23
legal 50:15
let's 20:1 36:9 54:5
level 11:18
likes 52:20
line 18:10
list 23:11 25:20 41:24
listing 23:15
literature 49:4,6
little 13:8 23:25 24:2
    30:5 36:12 56:8 57:15
LLC 3:6 6:1 59:15
LLP 2:5,17
LM2588 30:4 53:11
look 15:10,16 17:1,13
    17:16 21:15 35:22
    42:12 48:7 49:8
looked 21:20 30:1 32:6
    37:15,18,21 51:9
looking 20:11 37:13
    43:23 48:7 49:14
    52:15 53:21
looser 52:21
Louise 1:20 5:4 6:3
    60:1,25
low 38:9,13

_____ M _____
magnitude 18:15 19:10
main 34:9
making 24:16 34:4
MARIE 1:20 5:4 60:1
    60:25
mark 22:13
marked 8:16,18 9:2
    15:19 23:8 47:12 51:6
marked-up 51:4
mark-ups 47:22
Marsh 2:20
Massachusetts 7:1
material 52:20
materials 30:24 41:24
    42:11 45:16
matter 5:10 8:25 35:16
    46:18
max 14:8 15:7 16:10,12
    16:15

POWER INTEGRATIONS V.FAIRCHILD SEMICONDUCTOR    GU-YEON WEI

60:12
reading 12:2 22:17
  33:14
realization 57:18
really 15:3
reason 8:10 9:19 15:8
  29:24 30:10
rebuttal 4:10 8:19
  15:21 16:24
recall 38:25 50:13,19
  55:25
receive 9:18
received 9:21 10:12
Recess 40:13 59:2
recitation 11:12 15:4
recognize 8:22 9:5
  15:24
recollect 25:16,18 36:8
  39:24,25 52:4 56:4
recollection 14:11 17:3
  21:23 38:20 39:21
  43:9 45:6 48:3 56:23
record 6:24 8:5 31:11
  31:15 40:11,14 58:24
  59:1,3,18 60:11
rectifier 52:7,17 54:4,6
reduce 25:1 26:20 27:7
  32:9 34:10
reducing 26:1,15 32:11
reduction 26:9
Redwood 2:9 5:4,19
refer 11:4 13:8,14
  16:23 17:11 18:5,7
  21:25 23:8 24:9 25:8
  27:1 28:24 29:4,14,19
  30:6 32:25 34:3 37:24
  41:4,13 47:16 49:18
  55:14,21
reference 12:11 15:12
  17:8 23:11 33:20 34:4
  53:2 56:22
references 46:23 48:22
  49:3,9 52:11 54:8
referred 19:5
referring 12:15 16:17
  23:7 28:13 29:13
  30:19
refers 12:18 22:19
refresh 24:22
refreshes 17:3
regard 17:15 21:8
  27:15,20,24 29:3,8
  30:4,11 44:4 48:16
  50:24 51:17 52:2 53:1
  54:21
regarding 10:23
regards 41:11 43:8
  44:7

regulation 52:16
regulator 52:7,13,18
  53:3 54:3
rejecting 52:3
relate 11:1
related 10:5,8 21:1 22:1
  35:19 48:17 55:1,20
  56:15,22 58:9
relevant 11:19 13:4
  21:20 49:10 55:8
relied 14:16 17:3 58:9
relies 39:22
rely 14:7 15:7 21:10
  41:4
remark 15:20
remember 14:21 15:11
  16:21 17:22 21:14,17
  28:4 32:16 34:13
  38:16,24 40:7 43:10
  43:11,15 48:21 51:25
  58:15,16,17,21
remembered 5:1 57:15
rendered 17:21
repeat 31:9
rephrase 7:13
replace 33:15,17
report 4:10 8:19,24 9:5
  9:7,9 11:12,15,17
  12:10 13:9 14:12,24
  14:25 15:5,11,21 16:1
  16:24 17:8,11,18,19
  18:4,6 21:15 22:3,5
  23:7,9 24:4 25:5 27:2
  27:9 28:14 29:9 30:13
  31:20 32:5,18 33:1
  34:4 36:6,11,16 37:23
  37:25 39:7,8,25 40:7
  41:3,15,22 42:7,11,16
  42:21,24 43:2,7,20
  44:8,11,16,18,20
  45:21 46:21 47:5,15
reported 1:20 60:8
reporter 5:5 6:3,14
  7:18 31:11,15
reports 13:25 14:4
  35:21
represent 6:6 47:13
representing 6:8,10
research 41:5
resembles 17:24
respect 51:3 56:2
response 52:25
responsible 46:13
restrictive 24:3
result 33:18
results 35:13
retained 11:10 35:14
  35:15,18 36:1,2,3

59:15
reverse 44:21 45:2
review 30:24 43:16
  50:20 54:12
reviewed 14:3 22:7 41:8
  41:24,25
reviewing 15:17
Richardson 2:5 5:18
  6:8
right 9:16 10:13 13:23
  14:1 18:16,22 26:1,10
  28:20 29:20 31:8
  34:21 35:4,11 36:3
  37:5 39:23 40:22 41:1
  41:7 42:1,19,24 43:6
  43:14 44:5,14 45:5,8
  45:13 46:14 51:11
  53:11 55:17 56:6
right-hand 49:20
ringing 56:6
Road 2:20
runaway 25:13,17
rush 53:23

## S

S 2:1 3:1
sake 22:1
San 3:9 5:24 6:1 59:16
Saunders 46:10
saying 16:15
says 17:19 24:6 32:8
  33:2 36:13 39:1 49:21
scaling 30:20 31:1
schematics 41:9
school 9:15,20
Science 11:24
searches 49:11
searching 49:8
second 3:8 6:1 19:17
  59:16
section 11:5 17:14
  21:21 30:22 53:22
  60:2
sections 14:22 21:18
  54:1
see 11:7 12:13 14:14
  18:9 27:13 28:16 34:6
  36:9 37:6 38:2,11
  39:13 55:22 56:11,17
  56:20
seeing 58:17
seen 14:25 16:8 28:5,5
  30:2 45:16 47:20,23
Semiconductor 1:8,10
  5:11 6:11,12
sense 7:7 37:7
sentence 24:6 33:2 34:8
separate 23:20 24:17

series 7:8 17:22,23
  30:15
set 6:19 47:13
shakes 7:21
share 57:23 58:3
shared 32:7
sheets 28:6,7 41:9
  52:10 58:17
short 25:13 40:10 58:23
Shorthand 5:5
showing 33:9
shown 20:25 22:20 23:2
  30:19 31:7 39:13 46:9
  55:23
shows 13:19
sign 60:16
signal 13:14,19,22 14:8
  15:12 16:12,21 17:5,9
  17:25 31:5,24 32:2
  34:15 38:10,15,22
  39:2 40:4 57:5,9,16
  57:20,23 58:3,11
signals 30:21 39:2
  57:25
signature 60:14,17
Silicon 10:1,4
similar 18:2 31:22 33:3
  35:12 42:18 57:13
similarly 45:7 46:6
single 31:4,16 48:8,21
skill 11:6,14,19 12:3,10
  19:2
skimmed 16:9
soft 30:21 31:2,5,23
  32:3,7,15 38:3,4,9,15
  38:18,19,23 39:2,10
  42:18 44:10 45:18,25
  57:5,7 58:12
sorry 11:5 16:3,5,15
  23:3 25:7 31:9,9
  54:19
sort 30:10 33:19
sounds 39:4 45:5
sources 33:18,18
Sousoures 1:20 5:5 6:3
  60:1,25
speak 54:16
speaks 22:23
specific 12:17 23:25
  32:22 36:23 45:18
  51:21 53:5
specifically 12:17 15:4
  21:24 22:12 24:1,19
  26:18 27:4 30:1 31:23
  36:5 41:22 45:20 58:5
  58:21
specification 22:25
  26:14,14 27:4

specifications 27:18
  45:24
speculation 14:20
  58:14
speed 10:23 20:2
spoken 50:23
spotty 50:1 58:19
stair-step 39:17 40:4
stamp 47:10
stamped 47:8
standards 12:12,15,16
  12:18,19,23,25 13:1,2
  13:4,7
Stanford 9:15,23
start 30:21 31:2,5,23
  32:3,7,15 38:3,4,9,15
  38:18,19,23 39:2,10
  42:19 44:11 45:19,25
  57:5,7 58:12
started 23:12 48:20
starting 21:21 27:10
  48:14
starts 16:25 17:12 22:2
  29:4 56:9
start-up 32:10
Stasi 56:16
state 6:6,23 17:18
  42:25 44:17
stated 18:1 32:14 35:1
statement 50:5
statements 51:11,11
states 1:1 5:12 22:25
stating 24:12,25
step 52:17,23
Steve 3:7 5:23
stipulations 6:14
Street 2:8 3:8 5:3,18
  6:1 7:5 19:16
stretch 54:3
strike 54:19
structure 20:12
studied 41:19
stuff 51:1
submission 14:25
subscribe 60:13
subset 26:19
subtle 57:2
suit 45:13
Suite 2:8 3:8 6:1 59:16
summer 10:1
supplies 10:9
supply 10:5 12:6 13:5
  20:3,17,18 36:25
support 46:18
supporting 50:18
supposed 48:1
sure 16:16 18:3 21:19
  28:5

**5**
**5:21** 59:18,20
**50** 29:10
**500** 2:8,8 5:3,18

**6**
**6** 4:5 13:9 47:12,17,20
   48:5 49:18 55:15
**6,107,851** 15:23
**6,229,366** 15:23
**6,249,876** 15:23
**60** 1:17
**614-7400** 2:22
**624-1300** 3:10
**650** 2:10,22

**7**
**7** 16:23 21:21
**77** 29:15
**78** 32:6
**79** 32:6,7,8

**8**
**8** 4:10 13:10
**81** 30:6
**839-5070** 2:10
**84** 34:4
**851** 16:13,22,25 17:2
   21:20,22 25:24 26:7
   27:17 31:7 45:24
   56:15 57:3,4,11,16
**876** 22:1,2,13,18,20
   26:4,8,25 34:23 39:13
   39:23 46:8,13
**89** 37:25 45:21

**9**
**9** 23:12
**91** 39:12
**93** 46:6
**94025-1015** 2:21
**94063** 2:9
**94105** 3:9 6:2 59:17
**95** 9:18
**97** 9:18

# EXHIBIT M

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT N

## EXHIBIT 9

## Defendants' Witness List

Defendants Fairchild Semiconductor International, Inc. and Fairchild Semiconductor Corp. may call one or more of the following witnesses in its case in chief as a live witness. Fairchild reserve the right to have the witness testify through deposition:

| Name | Address |
|---|---|
| James D. Beasom | James D. Beasom<br>506 South Wildwood Ln<br>Melbourne FL  32904-2562 |
| Thomas Beaver | Fairchild Semiconductor Corporation<br>82 Running Hill Road<br>South Portland, ME 04106 |
| Robert Conrad | Fairchild Semiconductor Corporation<br>82 Running Hill Road<br>South Portland, ME 04106 |
| Peter Gwozdz<br>*Fairchild's Expert Witness*<br>Specialty – Semiconductor processes and structures. | College of Engineering<br>San Jose State University<br>San Jose CA 95192 |
| Paul Horowitz<br>*Fairchild's Expert Witness*<br>Specialty – Electronic circuit design, including PWM devices. | Harvard, FAS Department of Physics<br>Lyman Lab 225<br>19 Oxford St<br>Cambridge MA 02138 |
| KO Jang | Fairchild Korea Semiconductor Ltd.<br>(420-711) 82-3 Todang-Dong<br>Wonmi-District<br>Bucheon City, Kyonggi Province<br>Korea |
| C.K. Jeon | Fairchild Korea Semiconductor Ltd.<br>(420-711) 82-3 Todang-Dong<br>Wonmi-District<br>Bucheon City, Kyonggi Province<br>Korea |
| Michael Keeley<br>*Fairchild's Expert Witness*<br>Specialty – Economics, including patent damages. | Cornerstone Research<br>1000 El Camino Real<br>Menlo Park, CA 94025 |
| Bob Moore | Bob Moore<br>143 Dickinson St. NE<br>Palm Bay, FL  32907 |

| Robert Morrill | Sidley, Austin, Brown & Wood LLP<br>555 California Street<br>Suite 2000<br>San Francisco, CA 94104 |
| --- | --- |
| John Prentice | Conexant<br>2401 Palm Bay Rd., NE<br>Bldg. 62, Mail Stop B017<br>Room B294<br>Palm Bay, FL  32905 |
| Stephen Schott | Fairchild Semiconductor Corporation<br>82 Running Hill Road<br>South Portland, ME 04106 |
| Gu-Yeon Wei<br>*Fairchild's Expert Witness*<br>Specialty – Electronic circuit design, including PWM devices. | Harvard, FAS Department of Physics<br>Lyman Lab 225<br>19 Oxford St<br>Cambridge MA 02138 |

In addition, Defendants Fairchild Semiconductor International, Inc. and Fairchild Semiconductor Corp. may call one or more of the following witnesses to testify via deposition.  Fairchild reserves the right to have them testify as a live witness:

Fairchild will provide this identification along with its deposition designations according to the schedule agreed to by the parties.

# EXHIBIT O

# FISH & RICHARDSON P.C.

500 Arguello Street
Suite 500
Redwood City, California
94063-1526

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

**VIA FACSIMILE & U.S. MAIL**
650/614-7401

Telephone
650 839-5070

Facsimile
650 839-5071

July 21, 2006

Web Site
www.fr.com

Brian VanderZanden
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025

Michael R. Headley
(650) 839-5139

Email
headley@fr.com

Re:    Power Integrations Inc. v. Fairchild Semiconductor Int'l
       USDC-D. Del. - C.A. No. 04-1371-JJF



AUSTIN

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Dear Brian:

Thank you for indicating today that Steve Schott will be available for deposition in
California on August 11. We are prepared to go forward with Mr. Schott's deposition
at that time in our offices, but I note that it does not make sense to go forward with
the deposition at that time if Fairchild intends to instruct Mr. Schott not to answer
questions regarding the infringement and/or the validity of Power Integrations'
patents-in-suit on grounds of attorney-client privilege, as any privilege on those topics
was waived with Fairchild's production of thirteen (13) opinion letters addressed to
Mr. Schott on these topics (four of which were produced to us just this week).

The law in this area is clear. In *Novartis Pharmaceuticals Corp. v. Eon Labs Mfg.,
Inc.*, 206 F.R.D. 396 (D. Del. 2002), the Court held that "where, as here, a party relies
on the advice of counsel defense to a charge of willful infringement, the Court
concludes that the party has expressly waived its privilege with respect to attorney-
client communications and work product documentation." *Novartis*, 206 F.R.D. at
398. When these privileges have been waived, "everything with respect to the subject
matter of counsel's advice is discoverable, despite the protection that is normally
afforded to attorney-client communications and work product material." *Id.* Earlier
this year, the Federal Circuit confirmed that when a party relies on the advice-of-
counsel as a defense to willful infringement, the party waives privilege "with regard
to any attorney-client communications relating to the same subject matter." *In re
EchoStar Comm. Corp.*, 2006 WL 1149528 at *3 (Fed. Cir. May 1, 2006). As such,
Fairchild has no basis to assert of the attorney-client privilege with respect to
documents and communications regarding infringement and/or the validity of Power
Integrations' patents-in-suit.

The parties staked out their respective positions on the scope of waiver on the record
during the deposition of Robert Conrad, when Fairchild improperly limited the scope
of discovery regarding the subject matter of Fairchild's opinion letters. Specifically,
Fairchild's lawyers instructed Mr. Conrad not to answer questions regarding whether
the substance of discussions with litigation counsel regarding the patents-in-suit

FISH & RICHARDSON P.C.

Brian VanderZanden
July 21, 2006
Page 2

differed in any way from the opinion letters Fairchild produced in this case. (Conrad
Tr. at 162-63, 172-73, 179-80, 191.) Fairchild's counsel similarly (and improperly)
instructed Gary Dolny with respect to questions regarding his conversations with
Steve Schott, allowing Mr. Dolny to provide testimony only as to conversations
regarding a specific opinion letter, rather than the subject matter of that letter. (Dolny
Tr. at 34-36.)

Fairchild is also withholding a number of documents on the basis of its incorrect
assertion of privilege, including documents from Mr. Schott and a number of entries
on Fairchild's privilege log that cannot be privileged in light of the clear waiver. For
example, entry 180 on Fairchild's supplemental privilege log is labeled as "legal
analysis of competitor's patents and/or products at direction of attorney," and Mr.
Schott sent it to Fairchild's opinion counsel, Phil Woo (among others). Other entries
reflect similar communications with Mr. Schott, including entries 45, 175, 184, 209,
213, 310, 312, 316, 319-320, 322, 327, 329, 336, 340, 342, 355, 362, 364, 367-368,
370-371, 375, 379, 383-386, 388, 390, 393, 408, and 417-420. As such documents
are clearly directed to the subject matter of the opinion letters Fairchild produced,
there is no basis for withholding them.

In light of the four additional opinion letters Fairchild produced this week, we will
need to depose Mr. Conrad again, and given the apparent dispute regarding the scope
of waiver, it may make more sense to depose both Mr. Schott and Mr. Conrad in
September, as the Court will likely have had time to resolve the issue by that time.
To that end, we propose the parties schedule both depositions for the week of
September 18.

Let us know your position on this issue as soon as possible so that we can make the
best use of the Court's, the parties', and the witnesses' time.

Sincerely,

Michael R. Headley

50361544.doc

```
                        ***********************
                   ***    TX REPORT    ***
                        ***********************


TRANSMISSION OK

TX/RX NO               0207
CONNECTION TEL                         96147401
CONNECTION ID
ST. TIME              07/21 15:52
USAGE T               01'09
PGS. SENT             3
RESULT               OK
```

# FISH & RICHARDSON P.C.

500 Arguello Street
Suite 500
Redwood City, California
94063-1526

Telephone
650 839-5070

Facsimile
650 839-5071

Web Site
www.fr.com

Michael R. Headley
(650) 839-5139

Email
headley@fr.com

**Date**   July 21, 2006

**To**   Brian VanderZanden
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025
Telephone: (650) 614-7400

**Facsimile number**   10256-00453531 / (650) 614-7401

**From**   Michael R. Headley

**Re**   Power Integrations, Inc. v. Fairchild Semiconductor International

**Number of pages including this page**   3

**Message**   Please see attached.

# EXHIBIT P

# FISH & RICHARDSON P.C.

Suite 1100
919 N. Market Street
P.O. Box 1114
Wilmington, Delaware
19899-1114

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

Telephone
302 652-5070

Facsimile
302 652-0607

Web Site
www.fr.com

**VIA ELECTRONIC FILING**

August 16, 2006

The Honorable Joseph J. Farnan, Jr.
United States District Court
    for the District of Delaware
844 King Street
Wilmington, DE 19801

Re:    Power Integrations, Inc.'s Withdrawal of it's Motion re Fairchild's Waiver of
       Privilege in Reliance on Opinions of Counsel (D.I. 307)
       *Power Integrations, Inc. v. Fairchild Semiconductor International*
       USDC-D. Del. - C.A. No. 04-1371-JJF



ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Dear Judge Farnan:

Power Integrations agrees that the series of concessions Fairchild has made in
response to Power Integrations, Inc.'s August 8 motion -- removing its in-house
counsel from its trial witness list, producing additional documents from its privilege
log, and finally confirming that it will allow unfettered questioning of Mr. Conrad --
largely moots Power Integrations, Inc.'s motion to compel (D.I. 307). The last of
these concessions came only by letter on August 15, the day Fairchild filed its
opposition (D.I. 317), so Power Integrations had no opportunity to respond and
confirm its understanding of the representations being made and thus perhaps avoid
the need for Fairchild even to file that opposition.

There do remain a few minor issues relating to the recently-produced and heavily
redacted documents on Fairchild's privilege log, but they should be easily worked out.
Power Integrations will not maintain its motion for that purpose and hereby
withdraws it.

Respectfully submitted,

William J. Marsden, Jr.

cc:    Clerk of the Court
       Steven J. Balick, Esq. (By Hand)
       Bas de Blank, Esq. (By Email)

50366338 (2).doc

# EXHIBIT Q

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT R

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT S

# EXHIBIT REDACTED
# IN ITS ENTIRETY