IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC.,                      )
                                               )
                    Plaintiff,                 )
                                               )
        v.                                     )        C.A. No. 04-1371-JJF
                                               )
FAIRCHILD SEMICONDUCTOR                        )
INTERNATIONAL, INC., and FAIRCHILD             )
SEMICONDUCTOR CORPORATION,                     )
                                               )
                    Defendants.                )

**ANSWERING BRIEF IN RESPONSE TO POWER
INTEGRATIONS' MOTION TO DE-DESIGNATE DX-483**

Defendants Fairchild Semiconductor International, Inc. and Fairchild Semiconductor

Corp. (collectively, "Fairchild") oppose Power Integrations' Motion to dedesignate Fairchild's

highly confidential opinion letter, DX-483 (the "Motion"). DI 469.

**I.      INTRODUCTION.**

DX-483 is a highly confidential letter provided to Fairchild by its outside counsel. This

letter sets forth the attorneys' opinion that Fairchild products do not infringe the '366 Patent.

Power Integrations does not dispute that DX-483 (i) contains Fairchild' confidential information

and (ii) was properly designated as "highly confidential" pursuant to the Court's Protective

Order. Despite this, Power Integrations seeks to publicly disclose DX-483. This is improper and

Power Integrations' Motion should be denied.

Power Integrations argues that Fairchild inadvertently "waived" the protections afforded

its confidential information under the Protective Order since (i) DX-483 was admitted into

evidence or (ii) it was "discussed" in open Court. Neither argument has merit.

First, Power Integrations now concedes that merely admitting exhibits into evidence does

not strip them of their confidentiality designation. Second, even a cursory review of the

- 1 -

transcript cited by Power Integrations reveals that no part of DX-483 was ever read in open Court, the exhibit was never displayed to the courtroom, and the confidential subject matter was never discussed. Thus, there is no possible waiver of the protection afforded such highly confidential information under the Protective Order.

Further, Power Integrations' purported obligation to disclose the opinion letter to the United States Patent and Trademark Office is a red herring. The exhibit – and, indeed, the opinion of either parties' attorneys – is irrelevant to the reexamination of Power Integrations' patents. The Patent Office will determine the outcome of the reexamination by comparing the prior art to the Patent Office's construction of the patent's claims. DX-483 is neither prior art nor evidence of the proper claim construction and, thus, is irrelevant.

## II.    BACKGROUND.

### A.    The Court Entered A Protective Order To Protect Confidential Information.

On March 16, 2005, the Court entered the parties' stipulated Protective Order. DI 26. This Order facilitated discovery by allowing the parties to designate material as "Confidential" or "Highly Confidential", as appropriate. The Court specifically ordered that "Confidential Information shall be disclosed, disseminated and used by the Receiving Party only for purpose of litigation between the parties to this action." *Id.*, ¶ 2. There was no exception for ancillary proceedings before the Patent Office.

### B.    Fairchild Properly Designated DX-483 As "Highly Confidential" Pursuant To the Protective Order.

Power Integrations instituted this action without any notice to or discussion with Fairchild. Indeed, the first Fairchild learned of Power Integrations' allegations was when it read Power Integrations' press release. As part of its investigation, Fairchild sought opinions from outside attorneys concerning the infringement and invalidity of the asserted claims. DX-483 was one such "opinion letter".

Power Integrations later amended its complaint to allege willful infringement. To rebut this allegations, Fairchild waived its attorney client privilege and produced DX-483. Fairchild,

however, **_never_** waived the confidential nature of these documents. Indeed, the letter was properly designated as "Highly Confidential".

Power Integrations has never disputed that DX-483 (i) contains Fairchild's confidential information and (ii) was properly designated "Highly Confidential".

### C. The Only Reason That Power Integrations Seeks To Publish Fairchild's Confidential Information Is Because The Patent Office Is Reexamining Power Integrations' '366 Patent.

DX-483 was produced on July 14, 2006 – over eight months ago. In all that time, Power Integrations never once suggested that the confidential information should be made public. On January 22, 2007, the Patent Office decided to reexamine the '366 Patent because "substantial new questions of patentability" were raised by prior art that Power Integrations had not provided to the Patent Office during the original prosecution of the '366 Patent. Exh A, p. 3.

In response to the Patent Office's decision, Power Integrations suddenly demanded that Fairchild de-designate highly confidential DX-483. Power Integrations claims that this is necessary because "Power Integrations believes Fairchild's attorney analysis of the same prior art that Fairchild relied on to request reexamination is material...." DI 471, Exh. C. Fairchild immediately replied and explained that the Patent Office had already been provided with the underlying prior art and could make its own determination.[1]  *Id.*, Exh. D. Despite the parties' further efforts to resolve the issue, Power Integrations filed the instant Motion.

## III.    ARGUMENT.

### A. There Is No Dispute That DX-483 Contains Fairchild's "Highly Confidential" Information.

Fairchild designated the documents that became DX-483 as "Highly Confidential" since they contain sensitive, non-public information. This includes details of the design and operation

---

[1]    Power Integrations suggests that "Fairchild's request for reexamination of the '366 patent gives rise to an obligation that Power Integrations disclose all known information that may be material to patentability." DI 471, Exh. C. This is perplexing. If Power Integrations truly believes that Fairchild's attorney analysis is material information that Power Integrations must provide to the Patent Office, then Power Integrations is obligated to produce **_all_** of the opinion letters, not just the one letter that Power Integrations believes advances its position. Indeed, it would constitute inequitable conduct were Power Integrations merely to provide self-serving documents while failing to seek to provide other similar, admittedly "material" information.

of Fairchild's devices as well as the confidential opinions of Fairchild's attorneys. Power

Integrations has never disputed that DX-483 contains confidential Fairchild information and was

properly designated by Fairchild pursuant to the Protective Order. Thus, the only issue is

whether Fairchild inadvertently "waived" the protection provided to such confidential

documents.

> **B.     Power Integrations Agrees That Admitting An Exhibit Into Evidence Does Not Waive Its Confidentiality Designation.**

In its Motion, Power Integrations made the surprising argument that the mere fact that an

exhibit was admitted into evidence waived the protection afforded by the Court's Protective

Order. *See* Motion, p. 6 ("Fairchild' failure to object to the admission of DX-483 into evidence

thus constitutes a waiver of the Highly Confidential designation, and this Court should formally

de-designate the document for all purposes.")

After reviewing Power Integrations' Motion, Fairchild pointed out to Power Integrations

that if this were the rule all of Power Integrations' confidential exhibits would also be de-

designated since they were admitted into evidence without restriction. Exh. B. In response,

Power Integrations immediately back-tracked and abandoned this argument. "It is not our

position that Power Integrations waived its confidentiality designation for every exhibit admitted

into evidence." Exh. C. Thus, Power Integrations now concedes that a party does not waive the

confidentiality of its documents simply because they were admitted into evidence.

Indeed, were this not the case, a tremendous administrative burden would be imposed on

both the Court and the parties. Presumably, parties would have to insist that virtually all of their

exhibits be admitted under seal or else risk waiving their rights under the Protective Order. As

Power Integrations now admits, this is not now and never has been the rule or the parties'

intention.[2]

---

[2]     The cases cited by Power Integrations are readily distinguishable as both involved requests for documents made by organizations that are not bound by any protective order. Here, Power Integrations consented to the Protective Order and agreed to use confidential information "only for purpose of [this] litigation". DI 26, ¶ 2. Should the Court, however, determine that the admission of exhibits into evidence waives their confidentiality, Fairchild requests that the Court order that exhibits designated as "Confidential" or "Highly Confidential" by either party be admitted under seal.

**C.    The Substance Of DX-483 Was Never Disclosed In Open Court.**

Thus, Power Integrations' entire argument boils down to whether or not Fairchild disclosed the confidential substance of DX-483 in open court, which Power Integrations suggests would waive any confidentiality restrictions. The record is clear – Fairchild did not do so.

Power Integrations only identifies two instances in the entire trial where DX-483 was even alluded to. Motion, p. 2. In the first, Power Integrations asked Mr. Conrad, Fairchild's reliance witness, four questions about DX-483. *See* Tr. 918:3-919:9 (for the convenience of the Court, this page and a half of transcript is attached as Exhibit D). As can be seen from the transcript, Mr. Conrad never quoted the confidential exhibit, never displayed it to the Court, and never revealed any of the confidential subject matter. Instead, he simply testified that the letter concerned non-infringement of the '366 Patent.

Power Integrations also argues that Fairchild's opinion counsel, Bob Morrill, "discussed the opinion letters in open court." Motion, p. 2. The transcript cited by Power Integrations, however, proves that this is not the case. *See* Tr. 1296-1304 (attached as Exhibit E). In this passage, Mr. Morrill simply speaks in general about the process of preparing opinion letters. He does not even identify DX-483, let alone disclose its confidential contents in "open court."

**D.    DX-483 Is Irrelevant To The Patent Office's Reexamination.**

DX-483 contains Fairchild's confidential information, was properly designated as "Highly Confidential" pursuant to the Protective Order, and Fairchild never waived that protection. Thus, the Court should end the inquiry and deny Power Integrations' Motion.

DX-483 is not prior art and, thus, is not relevant to the Patent Office's reexamination of the '366 Patent. Quite frankly, the opinion of Fairchild's attorneys is of no more relevance to the Patent Office's determination than the opinion of Power Integrations' attorneys. What matters is the ***Patent Office's*** opinion on the claims and the prior art, all of which has been provided.

Indeed, the Patent Office's own rules state "prior art considered during reexamination is limited to prior art patents or printed publications...." *See* Manual of Patent Examining Procedure, § 2209. DX-483 is neither a prior art patent nor a printed publication, and is, thus,

irrelevant to the reexamination.  Further, since the reexamination is an *ex parte* proceeding between Power Integrations and the Patent Office, Fairchild will have no opportunity to comment upon the DX-483 or explain it to the Patent Office.

If Power Integrations believed that Mr. Morrill's opinions were relevant to the Patent Office's determination, Power Integrations would be obligated to disclose **_all_** such opinions, including those opinions that support the Patent Office's determination that the prior art presents a substantial new question of patentability.  Instead, Power Integrations self-servingly and improperly seeks to pick and choose between purportedly "material" opinion letters and provide the Patent Office with only that information that Power Integrations believes advances its position.

## IV.    CONCLUSION.

The Court should deny Power Integrations' motion and decline to strip Fairchild's highly confidential opinion letter of the protections afforded by the parties' Protective Order.

ASHBY & GEDDES

/s/ *John G. Day*

Steven J. Balick (I.D. 2114)
John G. Day (I.D. 2403)
Lauren E. Maguire (I.D. 4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendants*
*FAIRCHILD SEMICONDUCTOR*
*INTERNATIONAL, INC. and FAIRCHILD*
*SEMICONDUCTOR CORPORATION*

*Of Counsel:*

G. Hopkins Guy, III
Bas de Blank
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
(650) 614-7400

Dated: March 30, 2007
179345.1

# EXHIBIT A

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/008.327 | 11/09/2006 | 6229366 | 10414-25 | 7730 |

7590    01/22/2007

James Y. Go
BLAKELY, SOKOLOFF, TAYLOR & ZAFMAN LLP
12400 Wilshire Blvd.
Seventh Floor
Los Angeles, CA  90025-1026

| EXAMINER |
|---|

| ART UNIT | PAPER NUMBER |
|---|---|

DATE MAILED: 01/22/2007

Please find below and/or attached an Office communication concerning this application or proceeding.

FCS1693374

| *Order Granting / Denying Request For* *Ex Parte Reexamination* | Control No. 90/008,327 | Patent Under Reexamination 6229366 |
| | Examiner Margaret Rubin | Art Unit 3992 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>09 November 2006</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892,    b)☒ PTO/SB/08,    c)☐ Other: _____

1. ☒    The request for *ex parte* reexamination is GRANTED.

**RESPONSE TIMES ARE SET AS FOLLOWS:**

For Patent Owner's Statement (Optional): TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐    The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)).  **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181  ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a)☐ by Treasury check or,

b)☐ by credit to Deposit Account No. _____ , or

c)☐ by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

Margaret  Rubin
Primary Examiner
Art Unit: 3992

cc:Requester ( if third party requester )
U S Patent and Trademark Office
PTOL-471 (Rev 08-06)    Office Action in *Ex Parte* Reexamination    Part of Paper No. 20070103

FCS1693375

Application/Control Number: 90/008,327                              Page 2
Art Unit: 3992

## DECISION GRANTING EX PARTE REEXAMINATION

### Information Submissions

Information Submissions in *Ex Parte* Proceedings are bound
by 37 CFR § 1.555 which incorporates 37 CFR § 1.98(a). It
appears as if Requester made typographical errors in
transcribing the title of citation CB and the date of citation
CC.  Further, page numbers were not supplied for citations CB,
CC and CD.  Corrections have been made by the Office on PTO form
1449.

### Summary

Substantial new questions of patentability affecting claims
1, 2, 8, 9, 10, 14, 16 and 18 of United States Patent No.
6,229,366 (hereafter "the base patent") are raised by the
following references:

FCS1693376

Application/Control Number: 90/008,327                          Page 3
Art Unit: 3992

1.) SGS-Thomson "TEA2262, Switch Mode Power Supply Controller"

pp. 1-9 (April 1996) (hereafter, "TEA2262");

2.) U.S. Patent No. 4,638,417 to Martin;

3.) "Programmed Pulsewidth Modulated Waveforms for

Electromagnetic Interference Mitigation in DC-DC Converters";

IEEE Transactions on Power Electronics, Vol. 8, No.4 (October

1993) by A.C. Wang and S.R. Sanders, pp. 596-605 (hereafter

"Wang");

4.) Unitrode UCC 3800/1/2/3/4/5 biCMOS Current Mode Control

IC's, Bill Andreycak, pp. 9-344 – 9-361 (1994) ("U-133") and

5.) "Off-Line Power Integrated Circuit for International Rated

60-watt Power Supplies" by Richard Keller, Applied Power

Electronics Conference and Exposition, February 1992 (pp. 505-

512) (hereafter, "Keller").

Application/Control Number: 90/008,327                    Page 4
Art Unit: 3992

## Issues Raised by Requester

Although the merits of the rejections suggested in the request are not decided herein, it is noted that the Requester proposes that the references supplied raise substantial new questions of patentability when viewed in the following manner:

1.) "Claims 1, 2, 8, 9, 10, 14, 16 and 18 are rejected under 35 U.S.C. §§102(a)(b) as anticipated by TEA2262";

2.) "Claims 1, 2, 8, 9, 10, 16 and 18 are rejected under 35 U.S.C. §§102(a)(b) as anticipated by Keller";

3.) "Claim 14 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Keller in view of Martin or, alternatively, in view of Wang"; and

4.) "Claims 1, 2, 8, 9, 10, 16, and 18 are rejected under 35 U.S.C. §§102(a)(b) as being anticipated U-133."

## Background

The base patent issued from United States Patent Application No. 09/573,081 (hereafter "the base application").

FCS1693378

Application/Control Number: 90/008,327                    Page 5
Art Unit: 3992

The base application was allowed in the first Office action. It is noted that a statement regarding allowable subject matter mailed December 13, 2000 cited "a pulse width modulation circuit comprising a switching transistor wherein the switching transistor can be driven into a non-conducting state by a maximum duty cycle signal, a drive circuit, or a soft start circuit." It is noted that there are two independent claims within the base patent: claims 1 and 9. Neither of them include recitation of a switching transistor. In addition, claim 9 does not require a pulse width modulation circuit, or a maximum duty cycle signal. Lastly, claim 1, for instance, requires that a switch allows a signal to be transmitted between first or second terminals in accordance with a drive signal. The drive signal is provided "according to said maximum duty cycle signal" and a signal from the soft start circuit instructs the drive circuit "to disable said drive signal during at least a portion of said on-state of said maximum duty cycle." Assuming that the switch recited in claim 1 correlates with the switching transistor of the before mentioned reasons for allowance, the reasons for allowance describes different causal relationships between recited elements. In a similar fashion, the causal relationship between recited elements of claim 9 differs from the description included in the reasons for allowance.

FCS1693379

Application/Control Number: 90/008,327                    Page 6
Art Unit: 3992

In summary, the prosecution history does not provide a clear record of the reasons the base patent was allowed.

### TEA 2262

It is agreed that TEA 2262 raises an SNQ for claims 1 and 9. More particularly, Requester has provided plausible item-matching for a number of limitations of claims 1 and 9 on pages 8-12 and 15-18, respectively, of the request. In view of the fact that the prosecution history does not provide a clear record of the reasons the base patent was allowed, the teachings presented in the request cannot be judged as merely cumulative. By raising an SNQ with regard to independent claims 1 and 9, an SNQ is also raised for the dependent claims 2, 8, 10, 14, 16 and 18 which come freighted with the limitations of the claims from which they stem.

Such teachings are not cumulative to any written discussion on the record of the teachings of the prior art, were not previously considered nor addressed during a prior examination and the same question of patentability was not the subject of a final holding of invalidity by Federal Courts.

FCS1693380

Application/Control Number: 90/008,327                Page 7
Art Unit: 3992

Keller

It is agreed that Keller raises an SNQ for claims 1 and 9.
More particularly, Requester has provided plausible item-
matching for a number of limitations of claims 1 and 9 on pages
24-25 and 29-31, respectively, of the request. In view of the
fact that the prosecution history does not provide a clear
record of the reasons the base patent was allowed, the teachings
presented in the request cannot be judged as merely cumulative.
By raising an SNQ with regard to independent claims 1 and 9, an
SNQ is also raised for the dependent claims 2, 8, 10, 16 and 18
which come freighted with the limitations of the claims from
which they stem.

Such teachings are not cumulative to any written discussion
on the record of the teachings of the prior art, were not
previously considered nor addressed during a prior examination
and the same question of patentability was not the subject of a
final holding of invalidity by Federal Courts.

Martin and Wang

It is agreed that Martin and Wang raise an SNQ for claim
14. More particularly, Requester has provided plausible item-

FCS1693381

Application/Control Number: 90/008,327                    Page 8
Art Unit: 3992

matching for a number of limitations of claim 14 on pages 32-35,
respectively, of the request.  In view of the fact that the
prosecution history does not provide a clear record of the
reasons the base patent was allowed, the teachings presented in
the request cannot be judged as merely cumulative.

   Such teachings are not cumulative to any written discussion
on the record of the teachings of the prior art, were not
previously considered nor addressed during a prior examination
and the same question of patentability was not the subject of a
final holding of invalidity by Federal Courts.


   U-133

   It is agreed that U-133 raises an SNQ for claims 1 and 9.
More particularly, Requester has provided plausible item-
matching for a number of limitations of claims 1 and 9 on pages
41-42 and 44-45, respectively, of the request.  In view of the
fact that the prosecution history does not provide a clear
record of the reasons the base patent was allowed, the teachings
presented in the request cannot be judged as merely cumulative.
By raising an SNQ with regard to independent claims 1 and 9, an
SNQ is also raised for the dependent claims 2, 8, 10, 16, and 18

Application/Control Number: 90/008,327                      Page 9
Art Unit: 3992

which come freighted with the limitations of the claims from
which they stem.

Such teachings are not cumulative to any written discussion
on the record of the teachings of the prior art, were not
previously considered nor addressed during a prior examination
and the same question of patentability was not the subject of a
final holding of invalidity by Federal Courts.


**Conclusion**


Since Requester did not request reexamination of claims 3-
7, 11-13, 15 and 17 and did not assert the existence of a
substantial new question of patentability (SNQ) for such claims,
these claims will not be reexamined unless at the discretion of
the Office.

Extensions of time under 37 CFR 1.136(a) will not be
permitted in these proceedings because the provisions of 37
CFR 1.136 apply only to "an applicant" and not to parties in a
reexamination proceeding.  Additionally, 35 U.S.C. 305 requires
that *ex parte* reexamination proceedings "will be conducted with
special dispatch" (37 CFR 1.550(a)).  Extensions of time in

FCS1693383

Application/Control Number: 90/008,327                          Page 10
Art Unit: 3992

*ex parte* reexamination proceedings are provided for in 37

CFR 1.550(c).

The patent owner is reminded of the continuing

responsibility under 37 CFR 1.565(a) to apprise the Office of

any litigation activity, or other prior or concurrent

proceeding, involving Patent No 6,229,366 throughout the course

of this reexamination proceeding. The third party requester is

also reminded of the ability to similarly apprise the Office of

any such activity or proceeding throughout the course of this

reexamination proceeding.  See MPEP §§ 2207, 2282 and 2286.

Please mail any communications to:

Attn: Mail Stop "Ex Parte Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria VA    22313-1450

Please FAX any communications to:
(571) 273-9900
Central Reexamination Unit

FCS1693384

Application/Control Number: 90/008,327                    Page 11
Art Unit: 3992

Please hand-deliver any communications to:

Customer Service Window
Attn:  Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA  22314


Any inquiry concerning this communication or earlier
communications from the Reexamination Legal Advisor or Examiner,
or as to the status of this proceeding, should be directed to
the Central Reexamination Unit at telephone number (571) 272-
7705.

_____
Margaret Rubin
Primary Examiner
Central Reexamination Unit 3992
(571) 272-1756

conferees:

71208  U.S PTO
Please type a plus sign (+) in this box ▢☒

PTO/SB/08A (10-96)
Approved for use through 10/31/99, OMB 0651-0031
Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

11/09/06

Substitute for form 1449A/PTO

## INFORMATION DISCLOSURE STATEMENT BY APPLICANT

*(use as many sheets as necessary)*

| | | | Complete if Known | 11/09/06 |
|---|---|---|---|---|
| | | | Patent Number | 6,229,366 |
| | | | Issue Date | May 8, 2001 |
| | | | First Named Inventor | Balu Balakirshnan |
| | | | Group Art Unit | 3992 |
| Sheet | 1 | of | 1 | Examiner Name | Rubin |
| | | | Attorney Docket Number | |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No.[1] | U.S. Patent Document Number | Kind Code[2] | Name of Patentee or Applicant of Cited Document | Date of Patent of Cited Documents MM-DD-YYYY |
|---|---|---|---|---|---|
| MR | AA | 4,638,417 | | Hubert C. Martin, Jr. | |
| | AB | | | | 01/20/1987 |

### FOREIGN PATENT DOCUMENTS

| Examiner Initials | Cite No.[1] | Foreign Patent Document Office[3] | Number[4] | Kind Code[5] | Name of Patentee or Applicant of Cited Document | Date of Publications of Cited Documents MM-DD-YYYY | T[6] |
|---|---|---|---|---|---|---|---|
| | BA | | | | | | |

### OTHER PRIOR ART - NON PATENT LITERATURE DOCUMENTS

| Examiner Initials | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[2] |
|---|---|---|---|
| MR | CA | SGS-Thompson datasheet entitled "TEA2262, Switch Mode Power supply Controller," pp. 1-9 (April 1996) ("TEA2262"). | |
| MR | CB | R. Keller, "Power Integrations," Off-Line Power Integrated Circuit for International Rated 60-Watt Power Supplies," (February 23-27, 1992) Keller  pp 505 - 512 | |
| MR | CC | "Programmed Pulsewidth Modulated Waveforms For Electromagnetic Interferences Mitigation In DC-DC Converters", IEEE Transactions on Power Electronics, Vol. 8, No. 4 (October 103) A.C. Wang and S.R. Sanders ("Wang").  pp 596 - 605   1993 | |
| MR | CD | Unitrode UCC 3800/1/2/3/4/5 biCMOS Current Mode Control IC's (1994) ("U-133")  pp 9-344 - 9-361 | |

Bill Andreycak

| Examiner Signature | M Rubin | Date Considered | 1/3/07 |
|---|---|---|---|

EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] Unique citation designation number  [2]See attached Kinds of U.S. Patent Documents.  [3]Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3).  [4]For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [5]Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST. 16 if possible.  [6]Applicant is to place a check mark here if English language Translation is attached.

Burden Hour Statement.  This form is estimated to take 2.0 hours to complete.  Time will vary depending upon the needs of the individual case.  Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, DC 20231.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

FCS1693386

# EXHIBIT B



# ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CALIFORNIA 94025

tel 650-614-7400
fax 650-614-7401
WWW.ORRICK.COM

March 16, 2007

Bas de Blank
(650) 614-7343
basdeblank@orrick.com

*VIA FACSIMILE*

Howard G. Pollack
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063

    Re:    Power Integrations v. Fairchild Semiconductor et al. (CA 04-1371 JJF)

Dear Howard:

    We received Power Integrations' motion to designate DX-483. In its Motion, Power Integrations argues that "the failure to object to the admission of evidence is sufficient to find the confidential nature of the information has been waived." Motion, p. 4. There were a great many exhibits admitted into evidence that purport to include Power Integrations' confidential information. Power Integrations did not object to the admission of any of these exhibits based on their allegedly confidential nature. Is it Power Integrations' position that Power Integrations has waived the confidentiality designation for every exhibit admitted into evidence?

                    Sincerely,

                    Bas de Blank

cc:    William J. Marsden, Jr.
       Michael Headley

OHS West:260197001.1

# EXHIBIT C

# FISH & RICHARDSON P.C.

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

500 Arguello Street
Suite 500
Redwood City, California
94063-1526

Telephone
650 839-5070

Facsimile
650 839-5071

Web Site
www.fr.com

**VIA FACSIMILE & U.S. MAIL**
650/614-7401

March 21, 2007

Bas de Blank
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025

Re:    Power Integrations Inc. v. Fairchild Semiconductor Int'l
       USDC-D. Del. - C.A. No. 04-1371-JJF

AUSTIN

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Dear Bas:

I received your letter regarding the motion to de-designate Fairchild exhibit DX-483, and it is not our position that Power Integrations waived its confidentiality designation for every exhibit admitted into evidence. However, Fairchild made no effort to limit the discussion of its exhibits during trial or to clear the courtroom, thus waiving confidentiality for such exhibits. Power Integrations does not agree that the confidentiality designation was waived for its financial materials, which the parties both took steps to protect by clearing the courtroom when they were discussed in detail during trial, or for materials admitted as background without any discussion on the record.

If you have any questions in this regard, please let me know as soon as possible.

Sincerely,

Howard G. Pollack

50406383.doc

# EXHIBIT D

**10/4/2006 Trial Transcript**

```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3    POWER INTEGRATIONS, INC., ) Trial Volume III

4                             )

5             Plaintiff,    )

6                             ) C.A. No. 04-1371-JJF

7    v.                      )

8                             )

9    FAIRCHILD SEMICONDUCTOR   )

10   INTERNATIONAL, INC., and )

11   FAIRCHILD SEMICONDUCTOR   )

12   CORPORATION,            )

13                            )

14          Defendants.  )

15             Wednesday, October 4, 2006

16             9:30 a.m.

17             Courtroom 4B

18             844 King Street

19             Wilmington, Delaware

20   BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.

21        United States District Court Judge

22   APPEARANCES:

23        FISH & RICHARDSON

24        BY:  WILLIAM J. MARSDEN, JR., ESQ.

25        BY:  FRANK E. SCHERKENBACH, ESQ.

26        BY:  HOWARD G. POLLACK, ESQ.

27        BY:  MICHAEL R. HEADLEY, ESQ.

28                  Counsel for the Plaintiff
```

1    just looked at for the '366 Patent?

2        A.   Didn't change it.

3        Q.   Let's look at the next opinion you got,

4    DX-483.  This is the third and last written

5    opinion that you received on the '366 Patent;

6    correct?

7        A.   Yes.

8        Q.   And this opinion did change the basis for

9    the conclusions on the '366 Patent; right?

10       A.   Yes.  In the original, I have learned a

11   new term, through this process construed, I

12   learned the ordinary meaning of SoftStart circuit

13   which was also present in the  STS Thompson

14   product.  And later the Court determined a more

15   specific construction of that term.  So, in the

16   former opinion, invalidity was clear because it

17   was pre-existent.  And in this opinion it was not

18   infringement because our implementation did not

19   include elements of that specific Power

20   Integrations implementation.  So yes, it changed

21   from the original in the second to the third.

22       Q.   You have an understanding at least as of

23   today that the '366 Patent is about the

24   SoftStart; right?

1    A.  I think that is the name of the title in

2    it, yes.

3    Q.  In this third opinion that the Sidley firm

4    sent you, they said they didn't construe the term

5    SoftStart circuit in their prior letters?

6    A.  Because they used an ordinary meaning.

7    SoftStart was a common meaning used by many

8    companies, so they utilized it that way is my

9    understanding.

10    Q.  Let's go to the '075 patent.  You got an

11    opinion from the Sidley firm?

12    A.  Yes.

13    Q.  This is dated May 6th, 2005 to Mr. Schott

14    on the 075?

15    A.  Received it, yes.

16    Q.  And the opinion says Fairchild did not

17    infringe the '075?

18    A.  Yes, the conclusion was we didn't infringe

19    because the patent was applicable to a lateral

20    DMOS device.

21    Q.  Your takeaway from the first opinion was

22    that Fairchild was DMOS and the patent didn't

23    cover DMOS?

24    A.  Yes, the file wrapper or prosecution

# EXHIBIT E

10/5/2006 Trial Transcript

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC.,  ) Trial Volume IV
                           )
        Plaintiff,         )
                           ) C.A. No. 04-1371-JJF
v.                         )
                           )
FAIRCHILD SEMICONDUCTOR    )
INTERNATIONAL, INC., and   )
FAIRCHILD SEMICONDUCTOR    )
CORPORATION,               )
                           )
        Defendants.        )

                    Thursday, October 5, 2006

                    9:30 a.m.

                    Courtroom 4B

                    844 King Street

                    Wilmington, Delaware

BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.

         United States District Court Judge

APPEARANCES:

         FISH & RICHARDSON

         BY:  WILLIAM J. MARSDEN, JR., ESQ.

         BY:  FRANK E. SCHERKENBACH, ESQ.

         BY:  HOWARD G. POLLACK, ESQ.

         BY:  MICHAEL R. HEADLEY, ESQ.

                    Counsel for the Plaintiff

```
 1              Q.  Now, sir, in connection with this

 2    case, you have issued a series of opinion

 3    letters?

 4              A.  Yes, I have.

 5              Q.  And we have them stacked right

 6    before you in that white binder.  Would you just

 7    take a look at those and tell us what those are?

 8              A.  Yes.  I had a look at these before

 9    I came over today, so I don't have to go through

10    the binder.  They are basically 12 opinions that

11    I helped prepare and signed on behalf of Sidley

12    Austin, my law firm.

13              Q.  Okay.  You said help prepare.  Can

14    you explain that?

15              A.  Yes.  Certainly every word in here

16    is something that I believe in.  But I worked

17    with a another one of my partners at Sidley

18    Austin, Phil Woo, in preparing these.  And we --

19    it was really a collaborative project in getting

20    these opinions done, Phil and myself.

21              Q.  Okay.  Why Mr. Woo?

22              A.  He has done work for Fairchild

23    before.  And, also, I really respect him as a

24    technologist.  He's actually an electrical
```

**10/5/2006 Trial Transcript**

1    engineer as well as being a lawyer, a patent

2    lawyer.

3            So he's got technical background.

4    It's more directly relevant to electronic

5    circuitry then I do.  I like to think I brought

6    some, since I'm quite a bit older than Phil, I

7    perhaps brought some age to the project, if that

8    contributed anything.

9            Q.  But ten years younger as of today;

10   right?

11           A.  Right.

12           Q.  And so how does -- how did it come

13   about that you wrote these opinions?

14           A.  Fairchild requested that I get

15   involved with Mr. Woo in writing these opinions,

16   and I was happy to do so.

17           Q.  Is Fairchild a name that was

18   familiar to you?

19           A.  Fairchild is a name I have known

20   ever since I became aware of the semiconductor

21   industry.  They're one of the very early

22   companies, and they're people that have left

23   Fairchild over the years, have gone out and

24   started many other semiconductor companies.

**10/5/2006 Trial Transcript**

1          So it was the first chance I had

2     to work with Fairchild, and I was pleased to be

3     able to do so.

4          Q.  Okay.  Now, sir, tell us how you

5     went about preparing these opinions.

6          A.  Well, we -- we had an initial

7     meeting with the client to really find out a bit

8     about the project, which patents were in issue,

9     what the prior art was and then Mr. Woo and I

10    went back to the office and started on the first

11    opinion.

12          We talked about the approach that

13    we should use.  We studied the patent, looked at

14    the prosecution history, which is the record of

15    the back and forth between the patent applicant

16    and the patent examiner.

17          And one of us would take a crack

18    at the first draft, and then the other one would

19    work on that copy on the electronic copy first

20    of the draft.  We didn't ever have hard copy.

21    We just passed it back and forth on the

22    computer.

23          And we also periodically talk

24    about it.  And when we -- after a period of

1    probably a couple months, it would take for most

2    of these, we would -- and we were happy with the

3    result, we would sign it and send it off to the

4    client.

5            Q.   Okay.  Now, you mentioned 12

6    opinion letters.  Is that correct?

7            A.   That's correct.

8            Q.   Why so many?

9            A.   Well, there are four patents in

10   issue in this case and initially we wrote one

11   opinion letter for each patent.  But then those

12   were finished about May, June time frame of

13   2005.

14           But then there was some

15   developments that took place.  The first one was

16   a very important new decision that came down

17   from the Federal Appeals Court that handles all

18   patent appeals.  It's called the Federal

19   Circuit.  And that was called a Philips case.

20           We knew that case was pending when

21   we wrote the initial opinions, but we didn't

22   know what the outcome would be.  However, we had

23   every reason to think it would be important

24   because the Federal Circuit had agreed to hear

**10/5/2006 Trial Transcript**

1   the case en banc which means instead of the

2   normal three-judge panel, every judge in the

3   Federal Circuit was going to have a part in

4   hearing and writing that decision.  And that

5   decision was specifically on claim construction.

6            And, of course, in writing the

7   opinions, we had to construe the claims.  And it

8   was thought that that was going to perhaps

9   change the law, and it, in fact, did.

10           We put a footnote in our original

11  opinion saying that the Philips case was under

12  submission, and we thought we owed it to the

13  client to go through all the opinions after the

14  Philips case came down and consider whether

15  there was anything in there that we ought to

16  read.

17           Q.  Okay.  So you had the original

18  four opinions, one for each patent?

19           A.  Right.

20           Q.  And then Philips caused how many

21  more opinions?

22           A.  Then we wrote four more opinions,

23  one for each patent.  It's much easier to keep

24  it straight if you do it on a patent-by-patent

**10/5/2006 Trial Transcript**

1    basis.

2            Q.  Okay, so we have four opinions in

3    addition to those eight to make up the 12.  What

4    about the last four?

5            A.  The Philips opinion was, I call, a

6    supplemental opinion.  It didn't restate

7    everything that we had said in the first

8    opinion.  It just talked about anything that

9    perhaps ought to be changed.

10           Then the -- then we wrote four

11   more opinions, one for each patent.  After this

12   Court construed the claims of the patents that

13   was about, I think the middle of 2000.

14           Well, it was earlier this year,

15   sometime perhaps April or May of this year.  And

16   every in every patent case that gets near trial,

17   there's claim construction.  And, of course, we

18   had construed the claims in our original

19   opinions.  We realized that we -- our

20   construction probably wouldn't be the same as

21   that other Court, and so once again, we felt we

22   owed it to the client to revisit the opinions

23   after the Court's claim construction was made

24   and see if anything needed -- needed changing or

```
 1        discussing.

 2               Q.  And so did you revisit?

 3               A.  Oh, yeah, yes.  We reconsidered.

 4        We studied the claim construction very carefully

 5        and considered whether there was anything in

 6        there that didn't remain accurate, because we

 7        were sort of starting with a new set of

 8        definitions in the case.

 9               Q.  And did you comport with the

10        Court's claim constructions in this third

11        supplement?

12               A.  Oh, yes, we accepted all of the

13        claim constructions, of course, because the

14        Court has the final say and we use those and we

15        wrote another supplemental letter for each of

16        the four patents at issue here.

17               Q.  Now, what standards did you apply,

18        what professional standards did you apply in

19        writing these twelve opinion letters?

20               A.  Well, writing these formal

21        opinions is serious business in my mind.  The

22        client has to make decisions based on these,

23        they have to decide really whether or not to

24        stay in the business depending on our opinion.
```

## 10/5/2006 Trial Transcript

1    And so we took a lot of time, we put a lot of

2    thought and study into it, both studying the

3    prior art reference in the opinions, that is the

4    developments that existed in the field before

5    the patent application and studying the client's

6    products.  We approached them with the highest

7    level of intensity that I possibly could, and

8    I'm sure Mr. Woo felt the same way.

9          Q.  And in preparing these opinions,

10    how much time did you spend approximately on the

11    whole effort?

12          A.  We spent probably in the hundreds

13    of hours.  I have never added up the time, but

14    it's way over a hundred hours, 200, 300, maybe,

15    a lot of time.

16          Q.  And do you make your living by

17    writing these opinions?

18          A.  No, I have only done this a few

19    times before.  I don't normally -- in my

20    practice I don't write formal opinions.  I give

21    a lot of clients opinions in the course of

22    representing them in litigation, but I don't

23    write these sort of opinions very often at all.

24          Q.  You have had your deposition taken

**10/5/2006 Trial Transcript**

1    in this case?

2              A.  I have.

3              Q.  And you have been examined on your

4    opinions?

5              A.  Yes.

6              Q.  And were you taken to task on any

7    parts of your opinions?

8              A.  Clearly some of the questions

9    implied that, implied criticism of my work, yes.

10   I didn't take it very personally, but yes, there

11   were negative comments made through the

12   questions I was asked.

13             Q.  And as a result of your deposition

14   being taken and any negative comments made in

15   the course of that deposition, have you found

16   cause to change any of your opinions?

17             A.  No.

18             MR. ANTHONY:  Your Honor, I'm

19   going to start down through the opinions now.  I

20   don't know if this is a good breaking point for

21   the Court.

22             THE COURT:  We'll break now for

23   the evening.  I'm going to ask the jury for

24   tomorrow morning we can start at nine o'clock.