# Exhibit 1

# CONFIDENTIAL DOCUMENT

# Exhibit 2

# CONFIDENTIAL DOCUMENT

Exhibit 3

# CONFIDENTIAL DOCUMENT

# Exhibit 4

UNCERTIFIED TRANSCRIPT

Page 1

ROUGH DRAFT OF ERICH SPECKIN - 3/29/07


        VIDEOGRAPHER:  We are on the record.  This is
tape and disk one of the deposition of Erich Speckin,
being taken at the law offices of Brooks Kushman, 1,000
Town Center, 22nd floor, Southfield Michigan.  Today is
Thursday, March 29, 2007.  The time is approximately
9:15 a.m..  this is in the matter of Armament Systems
and procedures ink versus IQ Hong Kong limited et al.
Civil action until 00-C-1257, pending in U.S. district
court for the eastern district of Wisconsin.  My name
is Patrick Murphy, legal videographer for Esquire
Deposition Services.  The attorneys will now introduce
themselves for the record.
        MR. McLAREN:  My name is Richard McLaren, I
represent Armament Systems and with me today is expert
Emily Will and my client, Kevin Parsons.
        MR. CUNNINGHAM:  Tom Cunningham on behalf of
IQ Hong Kong and Zen Design.
        MR. CURTIN:  Peter Curtin of Venable, here on
behalf Vector projects, Northland, fishing and tackle,
mills fleet farm and the carqwest defendants.
        MR. SCOTT:  Craig Scott on behalf of Admissive

UNCERTIFIED TRANSCRIPT

Page 46

1　A. To a reasonable degree of scientific certainty, I
2　　believe that they are. Not to a certainty, though.
3　Q. To a reasonable degree of scientific certainty, those
4　　are impressions?
5　A. Correct.
6　Q. When were they put into the document from which you did
7　　this ESDA lift?
8　A. I don't --
9　　　MR. SCOTT: Objection to form.
10　　　MR. McLAREN: Basis.
11　　　MR. SCOTT: When what was what put into the
12　　document.
13　　　MR. McLAREN: We will be real careful here.
14　Q. (By Mr. McLaren): Referring to the two green lines,
15　　which are impressions in the document, where were the
16　　impressions put in the document, Mr. Speckin?
17　　　MR. CUNNINGHAM: Objection.
18　　　MR. McLAREN: Basis.
19　　　MR. CUNNINGHAM: The green lines themselves
20　　aren't impressions.
21　　　MR. McLAREN: Try it again.
22　Q. (By Mr. McLaren): Mr. Speckin, referring to the green
23　　highlighting, you have highlighted impressions,
24　　correct?
25　A. Correct.

Page 47

1　Q. When were those impressions put in that piece of paper?
2　A. I don't know.
3　Q. With regard to the orange lines to the lower right,
4　　when were those impressions put into the piece of
5　　paper?
6　A. I don't know.
7　Q. What about the yellow line, when was that impression
8　　made?
9　A. I don't know.
10　Q. Can you opine to a reasonable degree of scientific
11　　certainty with regard to the date of the piece of paper
12　　Q-2 based on those three sets of impressions?
13　A. Sorry, I don't understand that question.
14　Q. There is a piece of paper you call Q-2, correct?
15　A. Right.
16　Q. And the five lines that you have highlighted on your
17　　ESDA lift are impressions in that piece of paper,
18　　correct?
19　A. Right.
20　Q. And you don't know when those impressions were made,
21　　correct?
22　A. That's right.
23　Q. Can you opine to a reasonable degree of scientific
24　　certainty with regard to the validity of the date that
25　　is written on the piece of paper Q-2, based on those

Page 48

1　　impressions we have just mentioned?
2　A. No, I haven't drawn an opinion as to whether the date
3　　-- let me back up. Your question appears to me to be
4　　that can I say anything about whether Q-2 was written
5　　on February 20th, 1999, or at some other time?
6　Q. Yes. Based on those five impressions we have just
7　　discussed?
8　A. And the answer would be no, I don't know one way or the
9　　other and I don't have an opinion.
10　Q. Okay. And with regard to Q-6, I'm going to shoot for
11　　the same question. Can you opine to a reasonable
12　　degree of scientific certainty with regard to whether
13　　the piece of paper was sketched on 20 May 2000 based on
14　　the impressions that we have just discussed for the
15　　last five minutes?
16　A. No, not -- no opinion one way or the other.
17　Q. Is it possible to reach an opinion to a degree of
18　　scientific certainty based on your ESDA lifts of the
19　　impressions we have just discussed with regard to the
20　　validity of that date?
21　A. Based on what I have in front of me right now, the ESDA
22　　films and what I know at this point in time?
23　Q. Yes.
24　A. I haven't really thought about this before. I'm really
25　　not prepared to answer. I don't -- I don't know of any

Page 49

1　　way off the top of my head, but there very well could
2　　be something, I just haven't thought about it with all
3　　the sequences that we have from one document into the
4　　next, so I can't really answer it as I sit here though.
5　Q. All right. Let me follow upon the sequences point.
6　　　Assume with me that I take a pen and do a
7　　sketch on a sheet of paper A, all right, would you
8　　assume that.
9　A. Sure.
10　Q. Okay. Pen and I do a sketch on sheet of paper A. And
11　　underneath it is sheet of paper B. Are you with me so
12　　far?
13　A. Not too complicated yet.
14　Q. Yes, sir. It is your opinion that there would be an
15　　impression on sheet B, the one underneath, from my
16　　sketch on sheet A, correct?
17　A. That there would be a fact? Not necessarily.
18　Q. To a reasonable degree of scientific certainty, would
19　　there be an impression?
20　A. Well, it wouldn't be a question of scientific
21　　certainty, it would be a question of circumstance. In
22　　most instances, yes, it would be.
23　Q. Fair enough.
24　A. But there are things that could happen that would cause
25　　an impression to not be there, but in most instances

UNCERTIFIED TRANSCRIPT

Page 62

1   primarily used.
2   Q.  Okay.  And in the course of this examination with
3       microscope, camera and hand held, did you do a line
4       sequencing analysis of any of the graphite with any of
5       the impressions on any of the documents you examined?
6   A.  I think I looked at it on Q-1, I believe.  And I didn't
7       see anything at all that would help me out.  I don't
8       think I looked at the sequencing on any of the other
9       documents.
10  Q.  Would you look at either one of your reports and show
11      me where you refer to a line sequencing analysis?  And I
12      will represent to you that I do not believe that those
13      words are in either report?
14  A.  They are not.
15  Q.  Why is it you did not disclose you had done a line
16      sequencing analysis?
17  A.  Because I just looked at it briefly and I didn't think
18      it would help me one way or the other.
19  Q.  You testified a minute ago, Mr. Speckin, as I
20      understood it, that it is possible to tell which came
21      first, the impression or the graphite, based on those
22      nine factors you listed?
23  A.  I said it is possible in some instances, that's
24      correct.
25  Q.  Okay.  Are you telling me that it is not possible with

Page 63

1   regard to any of the documents here?
2   A.  No.
3   Q.  But you did it in Q-1 and you found nothing, correct?
4   A.  Correct.
5   Q.  Okay.  And you did not do it on any others?
6   A.  Not that I recall, that's correct.
7   Q.  But you don't know whether it would have revealed
8       something if you had done it?
9   A.  Of course not, I don't know.
10  Q.  Well, I mean, you saw impressions on your ESDA list,
11      correct?
12  A.  Right.
13  Q.  And you said that the size of the impression was number
14      one factor on whether or not you could do an
15      intersection analysis between graphite and an
16      impression, right?
17  A.  That's correct.
18  Q.  Okay.  So based on the size of the impressions you saw,
19      okay, based on your ESDA lifts, would it be possible to
20      do an intersection sequencing analysis?
21  A.  First, as I said, I don't know, I didn't look at it.
22      Second of all, the ESDA impression doesn't tell you the
23      size of the impression.  Looking at a film, you don't
24      know how big the impression is in the paper.
25  Q.  Okay.

Page 64

1   A.  It is a two dimensional rendition of impressions, not a
2       three dimensional one, so the first part of the
3       question is non sense calendar to the examination.
4   Q.  Okay.  I apologize.  You are the expert here.  Is there
5       a thing called side lighting examination?
6   A.  Yes.
7   Q.  Does that show you the size of the impression?
8   A.  Yes.
9   Q.  Did you do it?
10  A.  Yes.
11  Q.  And based on the side lighting examination of any of
12      the documents, can you tell me whether it would be
13      possible to do an intersections sequence analysis of
14      the graphite with the impressions you found?
15  A.  I didn't look at it for the purpose of anything other
16      than Q-1, so I don't know.  I don't recall the document
17      specifically enough to answer your question and I
18      didn't examine it for that purpose.
19  Q.  Was it your purpose, Mr. Speckin, to determine which
20      came first, the impressions or the graphite?
21  A.  Only as it related to Q-1 at the time I was in Chicago.
22  Q.  Can you opine to a reasonable degree of scientific
23      certainty which came first on Q-1, the impressions you
24      found or the graphite that's on Q-1?
25  A.  No.

Page 65

1   Q.  You say that you can opine on paragraph nine that of
2       your Exhibit 3 -- are you with me -- 9 A, B, C?
3   A.  Correct.
4   Q.  Okay.  That Q-2 was written while fixed in perfect
5       alignment on top of but within a few a pages or less of
6       the page that became Q-1.  Did I read that correctly?
7   A.  That's correct.
8   Q.  Okay.  And in that phrase, you say the page that became
9       Q-1, rather than saying how you described Q-2, which is
10      just referring to it as its designation Q-2.  Do you
11      notice that?
12          MR. SCOTT:  Objection to form.
13  A.  Did I say it became Q-1?
14  Q.  Yeah.  You say that that page that became Q-1.
15  A.  Sure, I understand why.
16  Q.  Okay.  My first point is, you contrast the two in A,
17      you say Q-2, not the page that became Q-2, right?
18  A.  Correct.
19  Q.  And then you say the page that became Q-1, correct?
20  A.  Absolutely.
21  Q.  But you cannot opine which came first, the graphite or
22      the impressions on Q-1, you just said so, right?
23  A.  From the ESDA film or the side lighting, but based on
24      the fact that it was fixed on the tablet and people
25      normally write from the top of the tablet down as

Page 66

1    opposed to the bottom of the tablet up, that would be a
2    correct statement.
3    Q. Okay.
4    A. So if you want me to assume that the person wrote from
5        the bottom of the tablet up, then I would say well,
6        then that may not be the case. But based on everything
7        else, that's my conclusion.
8    Q. All right. Let's assume -- let's just take your answer
9        and talk about that.
10           Can you tell me where in your report you site
11       a scientific article, peer reviewed, that people
12       ordinarily write sketch, not write, sketch, a drawing
13       on a pad of paper from the top down.
14   A. You know, I don't know if that's ever been published in
15       a scientific journal or not.
16   Q. You site none in your report?
17   A. I definitely do not site one in the report.
18   Q. Have you ever read one?
19   A. Not that I can think of.
20   Q. Can you tell me whether there is any recognized
21       treatise in the area of forensics that says that people
22       have been studied in ordinarily sketch inventions on a
23       pad from the top page down?
24   A. You know, it seems so obvious to me that I don't know
25       that I have ever even looked for that or heard anyone

Page 67

1    discuss it before. I have never heard anyone argue to
2    the contrary that I can think of in my lifetime. There
3    probably is one that exists, but I have never paid
4    attention.
5    Q. You go none 9 B and you say Q-6 -- I'm reading, so
6        check me on this. Quote Q-6 was written while fixed in
7        perfect alignment on top of the page that became Q-2
8        while Q-2 was fixed above Q-1. Paren, both Q-2 and Q-1
9        were purportedly done one and three years prior to Q-6.
10       Closed paren. Did I read that correctly?
11   A. I believe that was verbatim.
12   Q. Okay. Now looking up in paragraph eight, reading that
13       last sentence, begins the common impressions, are you
14       with me?
15   A. Okay. Yes.
16   Q. Quote the common impressions are much stronger on Q-6
17       than on Q-2 and spaciously lined up with the graph
18       paper lines which again shows that Q-6 was fixed in
19       near perfect alignment on top of Q-2 when the drawing
20       was of unknown origin was made. Did I read that
21       correctly?
22   A. I believe so.
23   Q. So in paragraph eight, you describe them as being fixed
24       in near and I am emphasizing near perfect alignment,
25       but in the next paragraph you describe them in nine B

Page 68

1    as being fixed in perfect alignment. Correct?
2    A. That's correct.
3    Q. Why did you make that change?
4    A. Because I don't have the document that of unknown
5        origin to say exactly that the graph paper lines up
6        with the document itself, so I was more conservative
7        when I said near perfect. And the other one, I have
8        Q-1, Q-2 and Q-6. In other words, every document
9        that's referenced in that paragraph, I have and was
10       able to examine. I was not able to examine the
11       document, quote unquote, of unknown origin, so I was
12       more conservative in my opinion.
13   Q. Okay. Maybe I am misreading this. In paragraph eight
14       you are talking about common impressions on Q-6 and
15       Q-2, correct?
16   A. Correct.
17   Q. Okay. And you are saying that Q-6 and Q-2 were lined
18       up?
19   A. Correct.
20   Q. So the exact words were -- I'm reading the second to
21       last line, paragraph eight. Q-6 was fixed in near
22       perfect alignment on top of Q-2. Etcetera. End quote.
23       Did I read that correctly?
24   A. Correct.
25   Q. So you are referring to Q-6 on top of Q-2?

Page 69

1    A. Correct.
2    Q. Okay. Now in nine, B, Q-6, same Q-6, right, Mr.
3        Speckin,?
4    A. That's correct.
5    Q. Okay. Was written while fixed in perfect alignment on
6        top of the page that became Q-2, etcetera, end quote.
7        Did I read that correctly?
8    A. Yes.
9    Q. Same Q-2, right?
10   A. That's correct.
11   Q. So from paragraph 8 to paragraph 9, your opinion
12       changed from near perfect to perfect, right?
13   A. Based on something -- they are not exactly the same
14       thing that was examined there.
15   Q. Okay. Let me go back. Paragraph 8 refers to exactly
16       two things. Q-6 and Q-2, I'm referring to the last
17       line that I just read you. Shows that Q-6 was fixed in
18       near perfect alignment on top of Q-2, etcetera,
19       etcetera.
20   A. I didn't follow exactly along because I was reading
21       something else when you said it, but the last four
22       times you read it it was verbatim, I assume that time
23       it probably was.
24   Q. Okay. Paragraph eight refers to Q-6, near perfect, on
25       top of Q-2. Paragraph nine B refers to Q-6, perfect on

UNCERTIFIED TRANSCRIPT

Page 122

1   A. I don't believe it is in there.
2   Q. I don't believe it is either. How about the word
3      perforations as when you rip off a page like on my
4      legal pad here, perforations, is the word perforations
5      in your report?
6   A. No.
7   Q. In your addendum?
8   A. No.
9   Q. Did you examine the pages to see if they had
10     perforations?
11  A. Yes.
12  Q. And where they there?
13  A. I did not see any.
14  Q. And you did not report the fact that they weren't
15     there?
16  A. No, I don't believe I did.
17  Q. The absence of any perforations would tend to suggest
18     that they were -- that the piece of paper was not in a
19     pad, it would be one element of evidences that it was
20     not part of a pad, true?
21  A. Not with graph paper, no.
22  Q. You are telling me it is impossible that graph paper
23     could have been bound like my legal paper?
24  A. Of course I didn't say that.
25  Q. So it is possible and the absence of perforations would

Page 123

1      be evidence that the piece of paper you are dealing
2      with didn't come from a pad like this, would it not?
3          MR. SCOTT: Objection to form.
4   A. Would it be evidence of that? No. I wouldn't say it
5      would be evidence of that because most of the graph
6      paper that I am familiar with that I have seen isn't
7      perforated.
8   Q. That wasn't the hypothetical, Mr. Speckin. I'm asking
9      you about your finding that you didn't report that
10     there were no perforations, that you looked for them
11     and there were none. That's what I'm asking you about.
12     Are you with me?
13  A. I'm with you so far. That's what I have been
14     answering.
15  Q. Do you regard the absence of perforations to be not
16     useful whatsoever in determining whether the pieces of
17     paper came from a pad?
18         MR. SCOTT: Objection. That's precisely the
19     question he was answering before you accused him of not
20     answering your question. As the record will reflect,
21     sir.
22  A. Do I consider the absence of impressions any evidence
23     at all?
24  Q. Absence of perforations?
25  A. That's what I meant, right, right.

Page 124

1   Q. Yes?
2   A. Do I consider any evidence at all that what?
3   Q. That the piece of paper came or didn't come from a pad?
4   A. No, not with graph paper. Like I said, because most of
5      the time it is not perforated.
6   Q. All right. How about glue, do you -- did you examine
7      the edges of the original documents for glue?
8   A. I looked visibly and with a microscope, yes.
9   Q. And you did not report that in your report?
10  A. Specifically that, no, I said I examined it with a
11     microscope and I said I examined the edges with a
12     microscope when you asked me earlier, but I don't think
13     it is as specifically that in the report.
14  Q. The word glue is not in there, we agreed to that,
15     right?
16  A. Yes.
17  Q. Okay. So you did not report that you looked for glue,
18     fair?
19  A. That's correct.
20  Q. Okay. But you're testifying today that you did look
21     for glue, true?
22  A. True.
23  Q. And you found none, right, Mr. Speckin?
24  A. Yes, that's right.
25  Q. Not on any of the documents that you reviewed?

Page 125

1   A. I believe I only looked at Q-1 and maybe Q-2 for that.
2   Q. And found no glue?
3   A. That's right.
4   Q. Do you regard that as being useless as far as evidence
5      of whether the piece of paper came from a pad?
6   A. I wouldn't say it is useless, no.
7   Q. Isn't it some evidence that the piece of paper did not
8      come from a pad?
9   A. Not based on everything else that I have, no.
10  Q. Why is that?
11  A. Because the --
12  Q. Understand I'm asking why isn't the absence of glue
13     important here? That's the question.
14  A. Because the alignment of the impressions and all the
15     films that I have is so overwhelminging obvious that it
16     was in a pad that I didn't consider that to be a likely
17     scenario that just because it didn't have the glue that
18     it wasn't from a pad.
19  Q. So if you were able to do a test microscopically of the
20     edges of the paper and determine that there had been no
21     glue on them ever, you still would not consider it
22     important because of the alignment of the graph paper?
23  A. There would be no way to conclude that there had never
24     been no glue on them. That's why your hypothetical --
25     that's why you don't think I'm making sense probably.

UNCERTIFIED TRANSCRIPT

Page 126

1 You could never like at it microscopically and say this
2 document never had glue on it. It is not possible.
3 Q. Is that your testimony under oath, Mr. Speckin, that
4 you cannot look at the edge of a piece of paper and
5 tell whether there has never been any glue on it?
6 A. Correct.
7 Q. Okay. Now let me ask you this. You mentioned Ampad
8 here in your report correct?
9 A. Which report?
10 Q. I will find it. Would you look for it too, please? See
11 if you can find it.
12 A. I believe it is paragraph 19 of the first report.
13 Q. And that would be the manufacturer of my legal pad?
14 A. One in the same.
15 Q. Yes. And do you know whether or not the original
16 pieces of paper that you examined, for example, the
17 original that is right there, was in fact manufactured
18 by Ampad?
19 A. No.
20 Q. Do you know who the manufacturer of any of the pieces
21 of paper in fact was?
22 A. I think one of them it is on the paper. I would have
23 to review -- I have the copies here.
24 Q. Yes. That's all right. I will tell you Q five says 3M
25 in tiny letters across the bottom. Other than that

Page 127

1 one, do you know the manufacturer of any of the
2 documents?
3 A. Accepting that that's correct, then I don't know any of
4 the other ones, no.
5 Q. Did you take any steps to determine the actual
6 manufacturer of any of the pieces of paper?
7 A. Yes.
8 Q. And what steps did you take?
9 A. I looked for any identifying characteristics on the
10 paper, either the front or the back, or for a water
11 mark that was embedded into the paper, and I didn't see
12 anything. In any of the documents other than the one
13 that had the notation on the front.
14 Q. Since you don't know the manufacturer of any of the
15 pieces of paper but the one, which I represented, not
16 you, okay, says 3M, you also therefore don't know what
17 plant manufactured any of the pieces of paper, true?
18 A. Of course.
19 Q. And you don't know what paper making machine in the
20 plant manufactured any of the paper, true?
21 A. Of course.
22 Q. Okay. And similarly, you do not know what cutting
23 machine cut any of the edges of any of the pieces of
24 paper, true?
25 A. What specific machine?

Page 128

1 Q. Yeah.
2 A. Of course, I don't.
3 Q. And you don't know even the type of cutting machine
4 that is the manufacturer of the machine, for example,
5 that cut any of the edges of any of the pieces of
6 paper, true?
7 A. Can you read that one back to me, please.
8 (Whereupon the question was read.
9 Back by the court reporter.)
10 A. I don't know the type or the manufacturer, I guess that
11 would be a compound question, but I don't know either
12 one.
13 Q. Okay. You don't know how many times the cutting blade
14 comes down per day, would that be fair?
15 A. Of course not.
16 Q.
17 A. That's fair.
18 Q. And you don't know how many times the blade is used per
19 year, could be used to cut 10 million sheets of paper
20 for all you know, correct?
21 A. Could very well be.
22 Q. Do you know how often a company that makes graph paper
23 uses a blade to cut the sheets of paper to eight and a
24 half by 11 size, do you know the answer?
25 A. Every tablet. No, I don't know how many times though.

Page 129

1 Q. Well, let me rephrase the question. Do you know how
2 many sheets of paper are cut by a blade before they
3 changed the blade?
4 A. I have no idea.
5 Q. Could it be 10 million?
6 A. Although I don't know, that strikes me as really high,
7 but I have to say, I don't know.
8 Q. Do you know the size of the piece of paper when it is
9 made graph paper? Do you understand the question?
10 A. You mean before it is cut?
11 Q. No, I'm talking about when the paper which is plane,
12 let's say white, becomes graph paper, with grid lines,
13 do you know what size that paper is when it is made
14 graph paper?
15 A. When the lines are printed on it you mean?
16 Q. Yes.
17 A. No.
18 Q. Do you know how the lines are printed on it?
19 A. No.
20 Q. Do you know the proximate size of the machine that
21 prints the graph paper on it?
22 A. No idea.
23 Q. Do you know how many eight and a half by 11 sheets are
24 printed at a time when graph paper is made?
25 A. Well first, I don't even know what size they are as I

Page 130

1    said earlier.
2    Q. Except that they are bigger than eight and a half by 11
3       or maybe exactly eight?
4    A. I don't know.
5    Q. Well, they can't be smaller, can they?
6    A. They definitely aren't smaller, but I don't know that
7       they are exact. They could be bigger and then cut, I
8       don't know.
9    Q. Yes. Okay. Do you know what size -- assume with me
10      that the paper is manufactured and placed on a roll.
11      Do you know how big the roll is?
12   A. It varies by manufacturer.
13   Q. Okay. And of course you don't know the manufacturer of
14      these originals that we are talking about here?
15   A. That's correct.
16   Q. During your second examination --
17   A. Is this okay for like a five minutes.
18      MR. McLAREN: Yeah, sure. 1:345. Off the
19   record.
20      VIDEOGRAPHER: We will go off the record at
21   1:43.
22      (Whereupon a break was taken .
23      From
24      VIDEOGRAPHER: We are back on the record at
25   2:03. Please proceed.

Page 131

1    Q. (By Mr. McLaren): Mr. Speckin, you testified a number
2       of places that the graph paper lines line up, correct
3       in in your reports?
4    A. It is mentioned in many places. Is that your question?
5       Yes.
6    Q. Yes. I did not find any reference to any tests that
7       you did with regard to pads of paper or reams of paper
8       other than the originals involved in this case. Is
9       there any such reference in your reports.
10   A. Any such reference to what, testing on reams or pardons
11      of paper?
12   Q. Right.
13   A. I don't believe so.
14   Q. Did you do any testing or analysis of reams or pads of
15      paper other than the originals that are involved here?
16   A. Let me take that back. 19 A pretty clearly says the
17      graph paper is similar to a commercially available pad
18      made by Ampad as well as others. So that was one thing
19      that I did do, I did get some Ampad pads to look at the
20      paper in them, the layout, formatting, that sort of
21      thing. So that would be the answer to both of your
22      questions, that is what I did and I take back my answer
23      previously that I did do something that was mentioned
24      in the report and it is under 19 A.
25   Q. All right. Did you make any measurements of the graph

Page 132

1    paper lines on the Ampad pads that you purchased?
2    A. I don't believe so.
3    Q. Do you still have the Ampad pads that you purchased?
4    A. Yes.
5    Q. Are they here today?
6    A. No.
7    Q. Did you consider them?
8    A. No.
9    Q. Did you consider any other sources of graph paper such
10      as reams of graph paper or other manufacturers of pads?
11   A. Nothing directly. I mean, other than what I have seen
12      in my lifetime.
13   Q. Have you -- do you have any knowledge or experience
14      with regard to the tolerances adhered to by
15      manufacturers of graph paper?
16   A. What do you mean tolerances?
17   Q. I mean the distance between the tiny blue lines and the
18      distance between the tiny blue lines and the edge of
19      the paper. Two examples.
20   A. The first, the distance between the tiny blue lines, I
21      would say is pretty standard. The distance between the
22      blue lines and the edge of the paper, I have no idea if
23      they even pay attention to that or not.
24   Q. And do you know what the margin of error is on an Ampad
25      pad for the distance between the Titanly little blue

Page 133

1    lines?
2       MR. SCOTT: Objection to form.
3    A. No, I don't know what the margin of error is.
4    Q. Are the -- how far apart are the tiny little blue lines
5       on the originals of Q-6?
6    A. I don't know.
7    Q. Well, eye ball it and just give me your best estimate.
8       Would you say they are a millimeter apart?
9    A. Well, actually, I I don't think I am that good at the
10      metric system to be able to tell you.
11   Q. 8th of an inch or 16th of an inch?
12   A. Let's see.
13      MR. CUNNINGHAM: Objection. Calls for
14   speculation.
15   A. Yeah, probably an eighth maybe. I don't know exactly
16      though. Just a guess.
17   Q. How many major squares are there top to bottom?
18   A. Pretty close to 11.
19   Q. Okay. Would you say that the major squares an inch?
20   A. Probably a little bit over, but I don't know, I am just
21      guessing.
22   Q. Yes. Well, I mean, it is an eight and a half by 11
23      piece of paper, correct?
24   A. Right.
25   Q. And how many squares major squares across?

Page 134

1    A. About eight and a half.
2    Q. Okay. And how many little tiny squares within a major
3       square, would you agree ten by ten?
4    A. Yes.
5    Q. Okay. And do you know what the tolerance -- I think I
6       asked you that before. You do not know what the
7       tolerances are that the printing companies follow for
8       the accuracy of those little blue lines, right?
9            MR. CUNNINGHAM: Objection.
10   A. So your question is based on what we just said, that
11      the squares are probably a tenth of an inch?
12   Q. Right.
13   A. So how exactly are they -- how close are they to a
14      tenth of an inch?
15   Q. Exactly. What's the plus minus, the margin of error
16      for the little blue lines?
17   A. No idea.
18   Q. Okay. And how about the edges?
19   A. How about them?
20   Q. What's the margin of error that typical graph paper
21      manufacturers follow with regard to the distance
22      between the little tiny blue lines and the edge of the
23      paper?
24           MR. CUNNINGHAM: Objection.
25   A. That's the one I said I don't even know if they pay

Page 135

1       attention to that.
2    Q. Yes. Okay. And you didn't do any testing of that,
3       correct?
4    A. I looked at other pieces of graph paper when I got the
5       Ampad to see how it varied from pad to pad, and I saw
6       that there was a variance from pad to pad.
7    Q. How many pads did you test or look at?
8    A. I think there were six. I bought a bundle and I think
9       there was six pads in the bundle or maybe five.
10   Q. Do you still have the pad, the bundle?
11   A. Yes.
12   Q. Did you bring it here today?
13   A. No.
14   Q. Have you ever mentioned that in your report anywhere?
15   A. As I said when you asked me before, I think it is
16      mentioned peripherally in 19 A when I said it is
17      commercially available -- similar to commercially
18      available pad made by Ampad.
19   Q. Okay. And did you consider those Ampad pads, five or
20      six of them, in coming to your conclusions in this
21      report?
22           MR. SCOTT: Objection. Asked and answered.
23   A. I don't believe so, no, not in the conclusion, no.
24   Q. So you didn't consider the degree of variation that you
25      saw among the six, for example?

Page 136

1    A.
2            MR. CUNNINGHAM: Objection.
3    A. I didn't consider the degree of variation, I saw among
4       the six anymore than I already knew from the history of
5       my life in looking at graph paper and being around it
6       and using it, just confirmed what I already knew. I
7       mean, I relied on my life's knowledge.
8    Q. And is it your testimony that pieces of graph paper
9       from different pads cannot possibly have the same lines
10      vis-a-vis the edges of the paper?
11   A. Of course I didn't say that.
12   Q. Okay. Is it your testimony that they probably don't
13      have the same tolerances to the edge?
14           MR. CUNNINGHAM: Objection.
15   A. What was the question, they don't have the same
16      tolerances?
17   Q. Yeah.
18   A. My answer is I have no idea what the tolerances are.
19   Q. Right. But you just said a minute ago that you had a
20      group of five or six Ampad pads and you looked at them
21      and you relied on your life experience, all right, and
22      my question is, is it your testimony that different
23      pads could not have pieces of paper in them that match
24      up?
25   A. That's right what you asked me and I said of course I

Page 137

1       didn't say that.
2    Q. And you are not saying that now?
3    A. Of course not.
4    Q. Okay. So you cannot testify that the various pieces of
5       graph paper that we have before us here in this case
6       are from the same pad or from a different pad, true?
7    A. Not true.
8    Q. You can testify that they are from the same pad?
9    A. I can testify to a reasonable degree of certainty based
10      on everything that I have found that they are, yes. Of
11      the ones that I noted in my report, and I said which
12      ones were from the same pad.
13   Q. Okay. And that is -- you are able to testify to that
14      to a reasonable degree of scientific certainty even
15      though you have only looked at six other Ampad pads and
16      no other manufacturer and don't know the tolerances, is
17      that a fair summary?
18           MR. CUNNINGHAM: Objection.
19   A. Right. It is not based on that, so yeah, all those are
20      true though. You didn't state the basis for my
21      conclusion, which is why all the other ones didn't
22      matter, but I agree with you.
23   Q. The graph paper lines don't matter, is that fair?
24   A. No, that's not what I said.
25   Q. The graph paper lines do matter in your conclusion that

Page 138

1  they are from the same pad?
2  A. They are a factor.
3  Q. Okay. And I'm trying to explore that. You have
4    testified that you got life experience and you
5    purchased six pads, right?
6  A. That's one of the things that I have said since I have
7    been here, that's right.
8  Q. And you did not consider that and I think you have said
9    that twice over objection of counsel at the other end
10   of the table, you did not consider that in coming to
11   your conclusion, right?
12        MR. SCOTT: Objection as to your former
13   question, sir.
14  A. I didn't say that, no. I said I did consider my life's
15   experience. I said when I saw the pads that I got, it
16   confirmed what I thought I would see and what I had
17   seen in my life, soy didn't necessarily consider that
18   to arrive at the opinions that I did.
19  Q. You consider your life experience but not the six pads,
20   do I have it correct?
21  A. To segregate the two like that is misleading. I did
22   not specifically consider the six pads, that's correct,
23   but it confirmed what I saw and what I remembered and
24   what I have seen in my life. So it had something to do
25   with it but it isn't the basis for an opinion is what

Page 139

1  I'm saying.
2  Q. And you have not measured the degree of margin of error
3    of either the graph lines or the graph lines to the
4    edges of any pads, fair?
5        MR. SCOTT: Objection. Asked and answered.
6  A. Correct.
7  Q. But nevertheless, the six pads that you bought
8    confirmed your life experience?
9        MR. SCOTT: Objection.
10        MR. McLAREN: Having not measured anything.
11  A. The six pads are exactly what I thought I would see
12   when I looked at six different pads of graph paper.
13  Q. And you have not measured them or in your life
14   experience the lines or the edges of any of the others,
15   is that fair?
16  A. That's correct, I don't think I have ever measured the
17   distance in a piece of graph paper in my life.
18  Q. Do you know how many manufacturers of graph paper there
19   are in the United States?
20  A. No.
21  Q. Do you know how many graph paper is sold in a year in
22   the United States?
23  A. No.
24  Q. In Exhibit 3, --
25  A. Refresh my memory. What is that.

Page 140

1  Q. That's your addendum report.
2  A. Do you want me to give you Q-6 back to is it is not on
3    table?
4  Q. That will be great. I will have it here.
5  Q. Exhibit 3, paragraph A2, we talked about this already
6    and you testified that you microscopicly examined the
7    edges of the paper in question here, right?
8  A. That was one of the things that I mentioned, right.
9  Q. Did you make any analysis of the graph paper or the
10   lines or the lines to the edge of the paper here in
11   question, Q-1 through Q-6, when you microscopically
12   examined?
13  A. Well, ignore -- when I answer those questions about
14   that, I will ignore Q-5 for obvious reasons because it
15   is not the same kind of paper.
16  Q. Okay.
17  A. So if that's all right, we will just --
18  Q. Sure?
19  A. I believe it is Q-5. Let me just make sure.
20  Q. I agree?
21  A. Just assume that I am not referring to that when eye
22   talk about it. So for all the other ones, yes, I did
23   look at the distance between the grid lines and the
24   edge of the paper.
25  Q. Where is that reported in your report?

Page 141

1  A. Okay. We have got it I think in three places or four
2    places. First is the addendum report, paragraph seven,
3    talks about it.
4        In the first report, paragraph 17 talks about
5    it; paragraph 18 talks about it; so I think those
6    three. I thought there might have been one more that I
7    didn't see that I did earlier.
8  Q. Okay?
9  A. Paragraph eight in the addendum. Sorry. I skipped
10   over that one.
11  Q. All right. Let's start with the first report first.
12   Paragraph 17. First point out to me where your
13   measurements are reported in paragraph 17. I don't see
14   any measurements?
15  A. I never said that there were. That wasn't the question
16   you asked me.
17  Q. The question I asked you was where in your report did
18   you report measuring with the microscopic examination?
19        MR. CUNNINGHAM: Objection.
20        MR. McLAREN: The edges of --
21  A. Maybe we should have her read it back. I didn't answer
22   the right question then. Could you read back the one
23   that was pending before that I was looking at, please.
24  Q. That's all right. I will restate it.
25        Did you in the course of doing the microscopic

UNCERTIFIED TRANSCRIPT

Page 142

1  examination that you described, measure the edges, the
2  graph paper lines to the edges of Q-1 through Q-6.
3  A. No, I have answered that several times. I have never
4  done it in my life, I don't think, is what I said,
5  including this case.
6  Q. Okay. So now turning to paragraph 17, you say that in
7  paragraph 17, you compared the graph lines, is that
8  what you are focusing on, fourth line down, can be
9  easily seen by comparing the graph lines?
10 A. Correct.
11 Q. Okay. Is that what you were referring to before?
12 A. Yes.
13 Q. Did you compare the graph lines?
14 A. Yes.
15 Q. Did you compare them to any control, anything other
16    than Q-1 to Q-6?
17 A. In that specific paragraph?
18 Q. Anywhere.
19 A. Well, yes, there is four different paragraphs that talk
20    about what was compared to what.
21 Q. Okay. My question is, in any of the reports, did you
22    compare the graph lines of any of the Q-1 through Q-6
23    documents to a control document, something other than
24    Q-1 through Q-6? Any pad from any manufacturer.
25 A. I don't think so, no.

Page 143

1  Q. Okay. So you compared the graph lines from the graph
2     paper among themselves, is that fair?
3  A. What's your question, relative to paragraph 17 or
4     relative to the two reports?
5  Q. Well, I'm looking at paragraph 17 because you pointed
6     it to me, but my question is, broadly, you compared the
7     Q-1 through Q-6 graph lines to each other but not to
8     any control, fair?
9  A. That's a two part question. The first part, Q-1
10    through Q-6 was compared to each other but not
11    exclusively and only that one to each other. Part two,
12    I did not compare it it to a control, as I said
13    earlier.
14 Q. And you did not measure?
15 A. I never measured anything. I don't know how much more
16    clear I can be.
17 Q. Okay. All right.
18 A. Relating to graph paper, I have never measured
19    anything.
20 Q. Right. You said paragraph 18. And there you say
21    spacially lined up with the graph paper lines which
22    again shows that Q-1 was fixed -- and this time you say
23    near perfect alignment, all right. When you say
24    spacially lined up with the graph paper lines, same
25    question, did you compare Q-1 for these common

Page 144

1  impressions to any graph paper other than Q-1 through
2  Q-6?
3  A. First thing, you misquoted the report, it says Q-2 was
4     fixed in near perfect line alignment, not Q-1, as you
5     said. Second of all, I compared Q-1 to Q-2, as it says
6     there. I don't believe I compared either one of them
7     to any document other than Q-1 through Q-6, as I said
8     earlier.
9  Q. Now paragraph 19, you talk about the blade marks. Do
10    you see that?
11 A. Of the first report?
12 Q. Yes. Next paragraph down?
13 A. Yes.
14 Q. Did you compare the blade marks of Q-1 through Q-6 to
15    any cuts of any edges of any graph paper other than Q-1
16    to Q-6?
17 A. No.
18        MR. SCOTT:  With respect to his initial
19 report?
20        MR. McLAREN:  Or any report.
21        THE WITNESS:  No.
22 Q. (By Mr. McLaren):  Is it your testimony that the blade
23    marks on Q-1 through Q-6 are unique?
24        MR. CUNNINGHAM:  Objection.
25        MR. McLAREN:  Basis.

Page 145

1        MR. CUNNINGHAM:  You are including Q-5 in
2  that.  And I believe he testified that he would rather
3  keep that out.
4        MR. McLAREN:  Yes.  We have been doing that
5  all along, but I should rephrase.  I will.
6  Q. (By Mr. McLaren):  Mr. Speckin, are you testifying
7     that Q-1 through Q-6 with the exception of Q-5 are
8     unique with regard to their blade marks?
9  A.
10       MR. CURTIN:  Objection.  Vague.
11 A. What do you mean, unique?
12 Q. Well, you say that they have blade marks and you say
13    they are likely the result of the manufacturing process
14    and I'm asking you whether or not you know whether or
15    not there are other individual sheets of paper that
16    have the same blade marks?
17 A. I don't know of any other than the ones I mentioned
18    that had the same ones.
19 Q. Do you know that there are not any others?
20 A. In the world?
21 Q. Yes.
22 A. I have no idea.
23 Q. And that's because you don't know how often a blade is
24    used to cut how many sheets of paper, we established
25    that before?

UNCERTIFIED TRANSCRIPT

Page 146

1  A.  That's a two part question again.  We did establish
2    that before, but no, that's not why I don't know.
3  Q.  All right.  Why don't you know whether or not there
4    were other pieces of paper in the world that have the
5    same blade marks?
6  A.  Well, if the blade is a rotary blade that cuts down the
7    paper, it is not going to be the same on -- even if
8    that same blade cut ten million sheets, it is not going
9    to have the same marks and same nicks because the
10   imperfections in the blade are not going to hit at
11   exactly the same place down the page, so it doesn't
12   mean there is going to be multiple ones that are the
13   same.  At this point in time, I can't establish the
14   uniqueness of what those blade marks are.  Also, I have
15   to consider that there is four sides to the paper so
16   based on all four sides, it may very well be unique
17   that no other document in the world from any pad would
18   have the same blade marks.  It is possible.  But I
19   don't know the answer as I sit hereod to.
20 Q.  Well, if it is -- first if it is a circular blade as
21   you hype op size, it is going to turn a full
22   revolution, you know, within some space of time,
23   correct?
24 A.  Is that answer really obvious that it is yes? I think
25   it is.  Of course it will.

Page 147

1  Q.  Sure.  So when it comes around full circle, then that
2    next pad is going to have the same blade marks as the
3    pad that was cut by that segment of the circle, one
4    revolution before, right?
5  A.  Not necessarily in the same place though, no, there
6    won't.
7  Q.  Do you know how paper is manufactured?
8  A.  I know there are several different ways it can be
9    manufactured.
10 Q.  And do you know how graph paper is printed?
11 A.  I said no.
12 Q.  Okay.  Do you know how it is cut?
13 A.  No.
14 Q.  Do you know if it uses a circular blade?
15 A.  No.
16 Q.  Okay.  If it is a not a circular blade but a straight
17   blade, how many millions of sheets of paper could have
18   exactly the same blade marks, do you know?
19 A.  Again, I don't know.
20 Q.  Okay.  And you don't know whether the exact same blade
21   marks might be on pieces of paper that came from a pad
22   and also on pieces of paper that were packaged as a
23   ream, correct?
24 A.  I don't know, right.
25 Q.  Okay.  At the end of your first report, Mr. Speckin,

Page 148

1    you sign it Erich J Speckin, forensic document analyst.
2    Do you see that?
3  A.  Yes.
4  Q.  Did I read it correctly?
5  A.  Yes.
6  Q.  And let me start with this.  Did a college award that
7    title?
8  A.  No.
9  Q.  Did a university award that title?
10 A.  No.
11 Q.  Have you passed the board of forensic document
12   examination examiners examination?
13 A.  No.
14 Q.  So you are not board certified by the board of forensic
15   document examiners?
16 A.  That's correct.
17 Q.  And have you passed the examination given by the
18   national association of document examiners?
19 A.  No.
20 Q.  So you are not certified by the national association of
21   document examiners, correct?
22 A.  That's right.
23 Q.  Okay.  So if this forensic document analyst title
24   doesn't come from a college or a university or the
25   board of forensic document examiners or the national

Page 149

1    association of document examiners, from whence does it
2    come?
3  A.  What does whence mean?
4  Q.  Where did you get the title?
5  A.  From my father.
6  Q.  Okay.  You on the front page say that you have
7    completed three years of training in two renowned
8    forensic libraries -- laboraties in the field.  Did I
9    read that correctly?
10 A.  Yes.
11 Q.  And one of those is your father's?
12 A.  That's correct.
13 Q.  You also say I have a degree in chemistry from Michigan
14   State University, did I read that correctly?
15 A.  Yes.
16 Q.  What kind of a degree?
17 A.  A Bachelor of arts degree.
18 Q.  Not a bachelor of science?
19 A.  That's right.
20 Q.  And you have used that sentence before, correct, Mr.
21   Speckin, the sentence quote I have a degree in
22   chemistry from Michigan State University, end quote?
23 A.  Of course.
24 Q.  And a judge has opined that it is quote misleading,
25   true?

Page 158

1    yourself, for example?
2    A. That's it. That's all I was told, the court of final
3    -- all I was told about it.
4    Q. Okay. Well, there are other quotes about you in this
5    document, but if you have not heard of this -- of what
6    contents are, there is no point in reading it.
7    A. Same answer for all these. I have never seen this
8    document, I have never even heard about it, I just knew
9    that the court of final appeal made a decision in 05,
10   but I have never seen it.
11   Q. How about the decision by Yam judge, have you ever seen
12   that in writing?
13   A. Yes, many times.
14   Q. And are you aware that he found that you had
15   exaggerated your credentials?
16   A. I think that was one of the things in there, Yes.
17   Q. And are you aware that he found that your credentials
18   that you stated your credentials in a way that was
19   misleading?
20   A. I don't -- something to that effect. I don't recall
21   exactly what he said every heir paragraph, but
22   something like that.
23   Q. Let's take a break for ten minutes while I find my
24   copy. That way I can direct you right to the quotes.
25        VIDEOGRAPHER: This completes tape and disk

Page 159

1    two. We will go off the record at 2:44.
2        (Whereupon a break was taken .
3        From
4        VIDEOGRAPHER: We are back on the record at
5    3:01. This is tape and disk three of the deposition of
6    Erich Speckin. Please proceed.
7    Q. (By Mr. McLaren): Mr. Speckin, would you take the
8    Westlaw document and what exhibit is that, please?
9    A. 11.
10   Q. Okay. Would you turn to page 198 at the top right hand
11   corner. A quarter of the way down on left hand column,
12   paragraph 29.3, under forensic training, E J S gave the
13   following description. Do you agree that E J S is you,
14   Mr. Speckin?
15   A. Yes.
16   Q. You gave the description quote two year residency with
17   Leonard A Speckin, his father, in the examination of
18   questioned documents and one year residency with
19   Brunell forensics laboratories in the identification
20   and dating of inks, end quote. Did I read that
21   correctly?
22   A. You read it correctly, yes.
23   Q. And then the judge Yam goes on to say 29.4, his alleged
24   residency with his father as he admitted has no bearing
25   to this case. Did I read that correctly?

Page 160

1    A. Right.
2    Q. His a lend residency where Mr. Brunell lasted about 50
3    days only over a period of one year etcetera, etcetera.
4    Did I read that correctly?
5        MR. SCOTT: No, you did not.
6        MR. McLAREN: What did I read wrong.
7        MR. SCOTT: Where does it say etcetera
8    etcetera.
9        MR. McLAREN: I clipped the paragraph because
10   it is so long.
11       MR. SCOTT: No, if you want to take an
12   improper approach by reading portions of a
13   decision for the record, then to do it correctly.
14       MR. McLAREN: Your objection is noted.
15       MR. McLAREN: I will do it again, Mr. --
16       MR. SCOTT: You are asking if it is correct
17   and we are answering it no. You just want to read it,
18   go ahead and read it, don't ask us it it is correct and
19   be concerned that we are telling you that it is not
20   correct.
21       MR. McLAREN: Would you like to be sworn under
22   oath?
23   Q. (By Mr. McLaren): Mr. Speckin, 29.4 says in part his
24   alleged residency with his father as he admitted has no
25   bearing on this case, his alleged residence dean see

Page 161

1    with Mr. Brew Mel lasted about 50 days only over a
2    period of one year, and then goes on from there,
3    correct?
4    A. Yes.
5    Q. Turning to the bottom of 198 in the right hand column,
6    29.7, do you have it?
7    A. Yes.
8    Q. It says in part it is doubtless that E J S acquired
9    some learning in his association with his father and
10   Mr. Brunell but given the absence of any formal
11   curriculum and again given his penchant for
12   exaggeration, this court cannot really draw any
13   conclusions as to the extent of his knowledge. Period.
14   And it goes on from there. Did I read that correctly?
15   A. Yes.
16   Q. The top of page 29.-- I'm sorry, page 199, paragraph
17   29.8, judge Yam says that you attempted to magnify your
18   experience by claiming to have examined over 100,000
19   documents. Is that true?
20   A. No. Oh, weighs your question, is it true or does it
21   say that?
22   Q. Well, does it say that?
23   A. Yes.
24   Q. Is it true that you claim to have examined over 100
25   thousand documents in that case?

# Exhibit 5

# CONFIDENTIAL DOCUMENT

# Exhibit 6

# EXPERT REPORT OF ALBERT H. LYTER III

### *Power Integrations v. Fairchild, C.A. No. 04-1371 JJF (D. Del.)*

## I.    QUALIFICATIONS/PUBLICATIONS

1. My areas of expertise, work experience, and educational background are listed on my curriculum vitae attached as Exhibit A. I am an expert in the area of questioned document examination, and I specialize in the dating of documents and the dating of inks and papers.

2. A list of papers and publications that I have authored or co-authored is included in the curriculum vitae attached as Exhibit A.

3. I am currently in private practice, and I have been since 1981, with prior government service dating back to 1975, serving in my capacity as a Forensic Chemist specializing in the examination of questioned documents.

## II.    PRIOR TESTIMONY

4. I have testified over 350 times at deposition or trial regarding forensic testing and analysis of documents. A list of these appearances over the last 4 to 5 years is attached as Exhibit B.

## III.    COMPENSATION

5. I am being compensated for my work on this case at my standard rate of $350.00 per hour. This hourly rate applies to all time spent, and a minimum fee of $1500.00 is required for depositions.

## IV.    SUMMARY OF OPINIONS

6. The following is a summary of my opinions, based upon my forensic analysis of the documents at issue in this case and the review of the Expert Report of Erich J. Speckin in this case.

      A. All of the documents Mr. Speckin addressed in his report (PX-29, PX-30, PX-37, KE1447 – KE1449, and KE1466) were xerographic reproductions with several containing original ink writings. Because these documents are reproductions, Mr. Speckin is limited in what he can say about them. Nevertheless, Mr. Speckin does not say any of these documents are

forgeries or that any of the substance of the documents has been altered in any way.[1]

B.  A basic visual inspection of the underlying documents labeled PX-29, PX-30, the first four pages of PX-37, and KE1447-KE1449 shows that the documents are aged, and they have clearly yellowed.  Mr. Speckin has not presented anything inconsistent with Dr. Eklund's testimony that the original documents, from which these reproductions were created, were made on or about the dates listed on the face of the documents (January 1985 for PX-30 and September 1984 for the others) and that the copies themselves were created in approximately that same timeframe.

C.  The last two pages of PX-37 and the document labeled KE1466 appear to be copies of more recent vintage; they do not bear the aging characteristics of the documents mentioned above, and the paper on which they are copied is not yellowed.  Mr. Speckin spends a great deal of his report addressing KE1466, but he has ignored this basic observation (a likely explanation for which is that KE1466 was copied from Dr. Eklund's papers during the course of the litigation and then found its way into the stack of papers when they were being assembled for production).  I do not agree with Mr. Speckin that the reproduction labeled as KE1466 has any bearing on the other documents containing the same substance or the underlying documents from which these reproductions were made.  The observations reported by Mr. Speckin are all consistent with the presence of different generations of copies of similar documents, and in no way impact the vintage of the documents.  Mr. Speckin comments on the presence of different markings on KE-1446 in the area of the date as it relates to the page number that is present on the second page of PX-30.  I believe that Mr. Speckin's interpretation is flawed and that the markings he is referencing are the ending stroke of the number 2 and an extraneous mark associated with the grid lines that are evident on KE-1446.  Any other interpretation is not supported by the evidence, especially in light of the other observations noted regarding KE-1446.

D.  The ink from the blue ball pen writings that appear on page 1 of PX-30 is similar to an ink formulation that was commercially available in 1984.

E.  A single black ball pen ink formulation was found on page 1 of PX-30 as overwriting[2] of the date and several lines in the middle right portion of the

---

[1]  Mr. Speckin only addressed a handful of Klas Eklund's documents, and he does not suggest that any of the remainder of Dr. Eklund's thousand-plus pages of documents, many of which are original documents, are anything other than what they purport to be.

[2]  References to "overwriting" in this report refer to instances where marks on an underlying photocopy have been traced over in pen to darken or enlarge the markings, and do not suggest that the underlying content of the writings has been altered or changed in any way by the addition of pen markings. Mr. Speckin seems to have the same understanding, as he does not contend that the overwriting altered the substantive content of any document in any way.

page. This same black ball pen ink formulation was found on page 2 of PX-30 as the dashed line that runs perpendicular to the drawing on the page. Additionally, this black ball pen ink formulation was found on KE-001449 as the writing along the bottom, and on KE-001447 as the writing inside the "G box" of the drawing.

F. The black ball pen ink formulation referenced in paragraph E matches a standard ink formulation that has been commercially available since prior to the year 1984. Specifically, samples of the black ball pen ink writings referenced in paragraph E were found to contain unique components that are indicative of manufacture of the ink during the year 1983. The presence of this particular ink within the available universe of useable inks would decrease as one progresses from the year 1983. Mr. Speckin's conclusions regarding the dates of blue and black inks are inappropriate because he admittedly does not rely on anything conclusive regarding their commercial availability.

G. The presence of staple holes, different types of paper, multiple hole punches and photocopy damage patterns (trash marks) in the absence of known standards cannot aid in determination of the preparation date of the original documents. Any evidence of sequence of production of copies, use of multiple paper types that were then copied, or presence of multiple staple holes or punch holes only applies to the available copies and provides no information about the originals from which they were made.

H. Based on my evaluation and my experience in the field of forensic examination of documents, it is my opinion that the evidence of the documents themselves and my forensic analyses detailed below is consistent with Klas Eklund's testimony that the original documents from which the copies were made were created on or about the dates indicated on the documents.

## V.    EVIDENCE CONSIDERED AND RECEIVED

7. I received the following evidence to review in California in January 2007:

A. Six photocopied pages labeled as PX-37 (containing 4 pages on standard 8 ½ by 11 inch for which a similar document has now been labeled PX-29 and 2 additional pages on A-4 size paper for which similar copies have been labeled as PX-30, the last page of the group being a color copy) (hereinafter "PX-37");

B. Four photocopied pages labeled as PX-29 on 8 ½ by 11 inch paper in black and white (hereinafter "PX-29");

C. Two photocopied pages labeled as PX-30 on 8 ½ by 11 inch paper (the first page contains original black and blue ball pen overwriting, the second page contains only black ball pen writing) (hereinafter PX-30);

3

      D. I was also provided a series of other documents from Klas Eklund, including documents labeled as KE-00001 to KE-001436 (hereinafter KE-00001 - KE-001436).

8. I reviewed the depositions of Klas Eklund. In July of 2007, I also examined the following additional documents and was in the presence of Mr. Speckin during his examination.

      A. One black and white photocopied page on A4 size paper that was bates labeled KE-1446 (similar to page 2 of PX-30) (hereinafter KE-1446);

      B. Three photocopied pages on 8 ½ by 11 inch paper labeled as KE-1447 to KE-1449 (similar to the first three pages of PX-29, with an additional handwritten line in black ball pen ink on page three and some overwriting in black ball pen ink on page 1) (hereinafter KE-1447 – KE-1449);

      C. A series of documents labeled as KE-001437 to KE-001703 (hereinafter KE-1437 – KE-001703);

      D. The documents previously examined in January of 2007 were also present at this examination.

## VI.    EXAMINATION TASK

9. The examination task was to determine whether the examined documents were prepared in a method and manner, or at a time, that was inconsistent with their purported preparation. I was also asked to review the Expert Report of Erich Speckin for completeness and correctness regarding methodology and consistency of examination results.

## VII.    EXAMINATIONS CONDUCTED AND PROCEDURES USED

10. **Visual Examination:** The documents referenced were reviewed visually with the aid of magnification. The presence of ink overwriting on photocopied documents was noted. Various other characteristics involving the method and manner of preparation were noted, but due to the absence of known standards and the absence of clear evidence of the actual method and manner of preparation or construction of the documents, these notations were deemed to have no forensic value regarding the examination task.

11. **ESDA Examination:** This examination results in the preparation of a positive print of the indented impressions present on the examined sheet of paper. These prints are referred to as "ESDA lifts". Mr. Speckin performed this examination on numerous documents, and we were provided these "ESDA lifts" for the purpose of duplication and study.

4

12. **INK COMPARISON:** It is possible to determine similarity between various ink writings by performing a sequence of examinations. This sequence is reported in the ASTM guide E-1422-05, Standard Guide for Test Methods for Forensic Writing Ink Comparison. I performed the following examinations: visual examination, infrared reflectance and luminescence, and thin layer chromatography (TLC). This examination protocol has been shown to provide enough evidence to allow certain conclusions to be drawn regarding the number of different ink formulations present in handwritten entries. The thin layer chromatographic examination was performed as follows:

    A. Small samples of ink and paper were removed from the documents by using a 0.5mm diameter hole punch. These samples were collected from the various documents in July of 2007 and transported to my laboratory in small plastic vials with snap enclosures. These vials were labeled accordingly. A portion of the ink samples contained in each vial was transferred to a glass vial for this examination.

    B. Control samples without ink were taken from the paper of the various documents, as well as a sample of the toner material from one of the documents. These samples insure that no interference or contamination was present in the ink samples.

    C. Because the writing ink samples were identified as ball pen, the appropriate extraction solvent is pyridine. This solvent was added to each glass vial containing a sample.

    D. With a glass capillary, the extraction solution containing both ink and pyridine was transferred in small applications to a pre-activated, glass back, silica gel high resolution thin layer chromatographic plate;

    E. The solvent was allowed to evaporate from the plate;

    F. The plate was developed in Solvent System I from the referenced ASTM Guide.

13. **INK IDENTIFICATION:** Through the use of a similar sequential examination in comparison with a known collection of standard ink formulations, it is possible to determine the manufacturer of the ink being examined and assign a formulation designation and first commercial availability date. This procedure is described in ASTM Guide E-1789-04, Standard Guide for Writing Ink Identification. The collection of ink formulations used in this examination is maintained by Federal Forensic Associates, Inc. and has existed since the early 1980's, with subsequent additions as new ink formulations become available. Federal Forensic Associates' library has been relied on by dozens of companies and government agencies, including the Equal Employment Opportunity Commission, the Bureau of Indian Affairs, the US Postal Service, and the Attorneys General of Ohio and New York. Having previous experience with the standard collection maintained by the USSS (United States Secret Service) and interfacing with the various ink manufacturers both domestically and foreign, the standard collection maintained by Federal Forensic Associates is reasonably complete regarding ink formulations that were commercially

available within the time period represented by the dates that appear on the examined documents. I performed an examination consistent with the ASTM Guide and using the referenced standard collection to identify the manufacturer or determine the commercial availability of the ink used to prepare the writing present on the examined documents. This procedure involves the following steps:

A. The thin layer chromatographic separation of the components of the blue ball pen ink and black ball pen ink that were found within the examined documents were compared with similar chromatographic results of the standard collection of ink formulations.

B. A list of possible standard ink formulations was compiled based on their similarity to the chromatographic separation of the writing inks found on the examined documents. The goal at this stage is to include all standard ink formulations that "may" be similar and not to exclude any ink formulations without cause.

C. All of the ink formulations present in this list are sampled and examined using the same thin layer chromatographic procedure outlined in paragraph 12, items A-F. Additionally, a sample of the ink writing that appears on the examined documents was also included in this analysis. This step resulted in the preparation of two different thin layer chromatographic plates: one for blue ball pen samples and one for black ball pen samples.

D. Determinations regarding similarity and difference were then made regarding the comparison of the ink writing from the examined documents and the standard ink formulations by visual examination of the TLC plate in white and ultraviolet light.

E. This procedure was repeated with the inclusion of various production samples from a single ink manufacture to ascertain the consistency among various batches of the same ink formulation that were manufactured over several years from 1980 to 1991.

14. **DATING TAGS:** The Ink Identification process relies on frequent changes in the various ink formulations manufactured by companies both domestic and foreign. In the 1970's, the Bureau of Alcohol, Tobacco and Firearms, part of the U.S. Treasury Department, contacted the various ink manufacturers and requested that they add unique components to their ink on an annual basis. This would act as a forced formulation change and aid in the detection of fraudulently produced writings. Various unique components were used during the 1970's and into the 1980's. One specific manufacturer, Formulabs, Inc. of Escondido, California, choose to add unique fluorescent dyes to their ink formulations, either individually or in combination, to permit identity of the actual year of manufacture of the examined ink writing. During the development of this process, I was an employee of the U.S. Treasury Department, and I was intimately involved in this process, including the choice of unique components, their implementation into the manufacturing process, and the methods of detection of Dating Tags. The following procedure was used to

determine the presence of Dating Tags in the writing from the examined documents. This procedure is referenced in the ASTM Guide E-1789-04, Standard Guide for Writing Ink Identification.

    A.  Thin layer chromatography is used to separate any of the unique components present in the examined ink writings.  A pre-activated, standard E.M. Merck, silica gel thin layer chromatographic plate and Solvent System III are used in the analysis.

    B.  Hole punch samples, similar to those referenced in paragraph 12A, were obtained from previously stored samples from the writings that appear on the examined documents and standard ink samples from Formulabs, Inc.

    C.  These samples were placed into glass vials and extracted with pyridine.

    D.  The pyridine and ink extract was transferred to the E.M. Merck thin layer chromatographic plate via glass capillary.

    E.  The pyridine was allowed to evaporate.

    F.  The plate was developed in Solvent System III for 10 minutes and viewed under ultraviolet light.

    G.  Images of this separation were recorded electronically.

    H.  A determination of the Dating Tags that were present was made.

    I.  References were consulted to determine the specific year of manufacture of the examined ink writings.

## VIII.  OBSERVATIONS, RESULTS, AND OPINIONS

15. **Ink Analysis of blue ball pen ink overwriting:** The blue ball pen ink found in the overwriting on page 1 of PX-30 was similar to a formulation of ink found in a writing instrument of Italian origin.  The specific manufacturer of this ink was not determined, but the particular writing instrument was purchased in London, England in 1984.  Accordingly, the blue ball pen ink formulation appearing on PX-30 was likely commercially available at least as early as 1984.  Mr. Speckin's report does not contradict this finding.

16. **Ink Analysis of black ball pen ink overwritings:**

    A.  The black ball pen ink on page 1 of PX-30, which was used to overwrite the wavy line on the right side of the page, the overwrite of the "8" and "5" of the date, the vertical dashes on page 2 of PX-30, the single sentence on the bottom of page 3 (KE-1449), and the lines in the box on page 1 (KE-1447) all contained the same ink formulation from the same manufacturer.

    B.  The black ball pen ink referenced above was identified as an ink formulation manufactured by Formulabs, Inc.  The initial introduction of this ink formulation is prior to the dates that appear on the examined documents.  Production samples of this ink formulation from 1980 to

1991 are available and found to be consistent in dye composition with the black ball pen ink found on the examined documents. This is contrary to Mr. Speckin's results and due to an error in his examination, both in interpretation and in completeness of pertinent knowledge.

C. Formulabs, Inc. is a manufacturer of writing inks and usually prepares ink for insertion into writing instruments that do not bear the name Formulabs. Several writing instrument manufacturers have employed Formulabs, Inc., including A.T. Cross and Papermate Pen Company.

D. Dating tags were detected in several of the writings from the examined documents that indicated that the ink used to prepare the writings was manufactured in 1983. Given the limited amount of this ink formulation manufactured during the time period, 1983, it is unlikely that the examined writings were prepared years after the time period referenced by the dates appearing on the examined documents.

E. Therefore, the black ink on pages 1 and 2 of PX-30 and the first and last pages of KE1447-KE1449 is consistent with these documents having been made on or about the time they are dated, January 1985 and September 1984, respectively.

## 17. EDSA Lifts Performed by Erich Speckin

A. As noted above, Mr. Speckin made a number of ESDA lifts during his day-long examination of Dr. Eklund's documents, but Mr. Speckin did not address those lifts in detail in his report.
B. The ESDA lift from page 2 of PX-30 clearly shows the imprint of the tracing of various areas from the first page of PX-30. Additionally, the copies produced as PX-37 clearly show the folding of page 1 of PX-30 behind page 2 of PX-30 and that these pages were attached at the time they were copied.
C. Based on my evaluation of these materials, it is apparent that pages 1 and 2 of PX-30 were and have been together since they were created from the originals of these documents. It is also clear that the last two pages of PX-37 were copied from PX-30. All of these findings are consistent with Klas Eklund's testimony concerning the documents and his handling and treatment of them.

## 18. Other Testing Results as Reported by Erich Speckin

A. All of the examined documents are xerographic copies of previously prepared documents. The exact sequence of preparation of these copies is unknown, according to Klas Eklund. However, the presence of multiple staple holes or multiple hole punches is irrelevant in the determination of

8

when the original documents, that are the source of these copies, were generated.

B. The use of multiple types of paper in the preparation of notes or drawings is not an uncommon occurrence for most of the literate public. The fact that some papers bore evidence of a grid and some did not is simply evidence of multiple paper types.

C. The presence of xerographic damage, or trash marks, is common among xerographically produced documents. The presence of multiple constellations of these marks is an indication of multiple machines being used. This is not an uncommon occurrence in an industrial environment.

D. Mr. Speckin spends a great deal of time addressing KE1466, but he ignores the fact that this document appears to be a copy of recent vintage. The fact that the number "2" in the upper-right hand corner of the copy labeled KE1466 was partially cut off when the copy was made does not suggest anything to contradict my analysis of PX-30, which bears the same substance as KE1466, nor does it change the fact that PX-30 is numbered and dated January, 1985.

## IX.  CONCLUSIONS

19. Therefore, based on my experience and analysis, it is my opinion that there is nothing in the evidence I have been provided and have analyzed that is inconsistent with the conclusion that the original Eklund notes reflected in the relevant documents were created on or about the dates indicated on them (September 26, 1984 and January 1985), as Klas Eklund has explained during his testimony in this case.

20. The above conclusions are drawn to a reasonable degree of scientific certainty, and are based on generally accepted scientific procedures. The observations and examination results were based on recognized scientific techniques.

Dated: August _9_ , 2007

By: _____

Dr. Albert H Lyter III

9





# FEDERAL FORENSIC ASSOCIATES, INC.

Post Office Box 31567 • Raleigh, North Carolina 27612
(919) 848-3696 • FAX (919) 848-9849

## ALBERT H. LYTER III

**EDUCATION:**
B.S. Chemistry, Oklahoma City University, 1973
B.S. Biology, Oklahoma City University, 1973
M.S. Forensic Science, George Washington University, 1975
Ph.D. Analytical Chemistry, University of North Carolina-Chapel Hill, 1999

**TRAINING:**
Fiber Microscopy, Institute of Paper Chemistry, 1975
X-ray Spectrometry, State University of New York, 1976
Questioned Documents, United State Secret Service, 1977
High Pressure Liquid Chromatography, Waters Associates, 1978
High Pressure Liquid Chromatography, American Chemical Society, 1978
Forensic Microscopy, McCrone Research Institute, 1978
Surface Analysis Techniques, Physical Electronics, 1992
Identification of Photocopiers, New Mexico State Police, 1983
Canon Facsimile Workshop, American Society of Questioned
Document Examiners, 1991

**EXPERIENCE:**
September 1981 to present

President and Chief Scientific Officer of Federal Forensic Associates, Inc.
Engaged in consultation, examination, training, research and
testimony in Forensic Science, including ink and paper
analysis, trace evidence and questioned document examination
Qualified trace evidence areas include fire debris, explosives, paint, hair, fibers,
glass and wood.

January 1975 to September 1981

Forensic Chemist, U.S. Treasury Department, Bureau of Alcohol, Tobacco and
Firearms, National Laboratory Center, Rockville, Maryland
Engaged in consultation, examination, training, research and
testimony as service to federal and state law enforcement

Court qualified in federal, state and military courts in over 33 states, U.S. Virgin
Islands, Australia, Canada, Mexico, Malaysia and Singapore
Instructor at the FBI Academy, Federal Law Enforcement Training Center,
Naval Investigative Service, Air Force Office of Special Investigation, United
States Secret Service, Florida Department of Law Enforcement, colleges and
universities
Lecturer at numerous scientific and legal organization meetings to include the
American Academy of Forensic Sciences, American Society of Questioned
Document Examiners, California Association of Criminalists, International
Association of Forensic Scientists

**PROFESSIONAL
ORGANIZATIONS:**

American Academy of Forensic Sciences - Fellow
Mid-Atlantic Association of Forensic Scientists
California Association of Criminalists
Southwestern Association of Forensic Document Examiners
International Association of Forensic Sciences
American Chemical Society
Society for Applied Spectroscopy
American Society for Testing and Materials

**PUBLICATIONS:**

Comparison of Paper Samples - IAI News, 1976
Comparison of Typewriter Ribbon Inks by Thin Layer Chromatography - Journal of Forensic Science, 1977
A Scientific Study of Pencil Lead - Journal of Forensic Science, 1978
Analysis of Water Soluble Paper - Journal of Forensic Science, 1980
Comparison of Typewritten Carbon Impressions - Journal of Forensic Science, 1982
Examination of Ball Pen Ink by High Pressure Liquid Chromatography - Journal of Forensic Science, 1982
Ink Analysis, A Key Element in Questioned Document Examination - Trial, 1983
A High Performance Liquid Chromatographic (HPLC) Study of Seven Common Explosive Materials - Journal of Forensic Science, 1983
Finding Fraudulent Documents - Family Advocate, 1989
Attempted Determination of Authorship by Ball Pen Line Characteristics - Forensic Science International, 1990
Analysis of Writing Ink - chapter in the book HPLC in Forensic Science, 1982
Contributions to the book Forensic Ink and Paper Examination by Brunelle and Reed, 1982
Examination of Gel Pen Ink by Microspectrometry – Journal of the American Society of Questioned Document Examiners, Dec. 2005
Examination of Gel Pen Ink by Physical and Thin Layer Chromatographic Examination – Journal of the American Society of Questioned Document Examiners, Dec. 2005
Ph.D Dissertation - Surface Characterization of Polymeric Materials by X-ray Photoelectron Spectroscopy and Time-of-Flight Secondary Ion Mass Spectrometry: Biomedical Materials and Forensic Applications

**HONORS:**

Honorary Assistant Attorney General, State of Alabama
Treasury Award for Outstanding Performance
Honorary Member - Southwestern Association of Forensic Document Examiners

**CERTIFICATION:**

Diplomate of the American Board of Criminalistics

**CASES OF NOTE:**

Mormon Will of the late Howard R. Hughes
Slander trial of CBS, Sixty Minutes and Dan Rather
Nazi war crimes case of Ivan Demjanjuk
Sam Shephard murder trial – 2000
Martha Stewart case

B

| CASE NAME | LOCATION | DEPOSITION | TRIAL |
|---|---|---|---|
| Antidote International Films v. Underdogs, Inc | New York, NY – Federal | | 6/15/07 |
| O'Connor v. Allied International | Tampa, FL – State | 5/16/07 | 6/27/07 |
| Silmi v. Ahmed | San Francisco, CA – State | 4/26/07 | |
| Howe v. Service Tampa | Tampa, FL – State | 2/28/07 | 4/25/07 |
| US v. Lin | San Jose, CA – Federal | | 2/14/07 |
| Fitzpatrick v. Immune Technologies | Ft. Lauderdale, FL – Federal | | 1/24/07 |
| Petti v. O'Connor | New Castle County, DE – State | 3/23/06 | |
| Elborno v. University Anesthesiologists | DuPage County, IL – State | 3/15/06 | |
| Lenahan v. Unicom | Portland, OR – State | | 12/15/05 |
| LG Phillips v. Tatung | Los Angeles, CA – Federal | 10/27/05 | |
| Maxxim v. McCauley | Tampa, FL – Bankrupcy | | 10/17/2005 |
| Thompson v. Awesome Porducts | Western Dist. of Missouri – Federal | 10/7/2005 | |
| Pangle v. Greenwood | Kansas City, MO – State | 5/19/2005 | |
| Privacy Infrastructure, Inc. | Dallas, TX – Federal Bankrupcy | | 3/30/2005 |
| Tannis v. Watson | Board of Patent Appeals | 1/12/05 | |
| Cohen v. Manzullo MD | New Jersey – State | 11/11/04 | |
| Probate Matter Vera L. Sauer | Nevada County, CA – State | | 11/9/04 |
| Bratt v. Laskas MD | Broward Co., FL – State | 8/17/04 | |
| Jupiter Medical Center v. Carr MD | West Palm Beach, FL – State | 6/30/04 | 12/5/05 |
| Bednaz v. Phillips | Raleigh, NC – State | 9/29/04 | |
| DCI v. CMCC | Seattle, WA – Federal | 4/29/04 | |
| Applegate v. Stephan | Los Angeles, CA – State | 3/5/2004 | |
| Colleran v. Blodgett | Santa Ana, CA – Arbitration | 9/17/2003 | 3/30/2004 |
| Boyette v. Delatorre | Hardee County, Florida – State | 3/9/2004 | 3/10/2004 |
| Armas v. South Florida Emergency Physicians | Miami – Dade County, Florida – State | 3/9/2004 | |
| US v. Stewart/Baconovic | New York, NY – Federal | | 2/20/2004 |
| Clark v. DLJ | Santa Monica, CA – Arbitration | | 1/12/2004 |
| Paymaster v. US | Washington, DC – Federal | 11/20/2003 | 5/10/04 |
| Rahenkamp v. Jupiter Medical Center | Palm Beach County, FL – State | 10/16/2003 | |
| State v. Felts | Sanford, FL – State | | 6/27/2003 |
| Evans v. GM | Waterbury, CT – State | | 3/7/2003 |
| Estate of Yvette Smith | Los Angeles, CA –State | | 3/12/2003 |
| Minchew v. McMillan | Raleigh, NC – State | 2/26/2003 | |
| Sargon v. USC | Los Angeles, CA – State | 1/23/2003 | |
| US v. Clifford | Helena, MT – State | | 1/21/2003 |
| Montaldo v. Northern Trust | Miami, FL – State | 12/16/2002 | |
| Whitley v. Interstate Fire & Casualty | Parish of St. Helena, LA – State | 11/19/2002 | |
| State v. Pino | Miami, FL – State | 11/25/2002 | |
| Estate of Jennie Stanton | Pikesville, KY – State | 12/3/2002 | |
| Hawthorne v. Parikh | Atlantic City, NJ – State | | 9/25/2002 |

| | | | |
|---|---|---|---|
| Miller v. Miller | Santa Ana, CA – Arbitration | | 9/13/2002 |
| Multiut v. Draiman | Chicago, IL – State | | 8/7/2002 |
| Poole v. Stark | New York, NY – State | | 7/16/2002 |
| Keller v. GWU | Washington, DC – State | 10/16/2002 | |
| Puma v. Torres | West Orange, NJ – State | 2/27/2002 | |
| US v. Hively | Little Rock, AR – Federal | | 3/6/2002 |
| SLT Group v. Wadworth's Nissan | Denver, CO – State | 3/20/2002 | 4/19/2002 |
| US v. Ethan Allen | Cleveland, OH – Federal | 2/7/2002 | |
| CABN Investments v. Starlight | Los Angeles, CA – State | 11/9/2001 | |
| Anderson v. Mardirossian | Rockville, MD – State | 12/30/2001 | 1/9/2002 |
| Murphy v. Murphy | Rock Island, IL – State | 10/17/2001 | 11/28/2001 |
| Dahodwala v. McNeill | Boston, MA – State | | 10/16/2001 |
| Silessi v. Darryl Jones | New Orleans, LA – State | 8/22/2001 | |
| Heitland v. Heitland | Naples, FL – State | 10/3/2001 | 10/3/2001 |
| Lemelson v. Intel | Phoenix, AZ – State | 10/28/2001 | |
| Atlantic Broadcasting v. Estate of Joseph J. Knox Sr. | Lawrenceville, NJ – State | 8/3/2001 | |
| Long-Vandewalle v. Motiani | Joliet, IL – State | 9/25/2001 | |
| Alcivar v. Lifemark Hospitals | Miami, FL – State | 6/20/2001 | |
| Palmas & Bambu v. Dupont | Maimi, FL – State | 5/11/2001 | |
| MA Bar Assoc. | Boston, MA – State | 3/2/2001 | |
| Hunter v. Hunter | Las Vegas, NV – State | | 2/13/2001 |
| U Mass Hospital | Worster, MA – Admin. Hearing | | 1/24/2001 |
| Gabeler, Baise & Miller | Fairfax, VA – State | | 1/31/2001 |
| Marriage of Jones | San Jose, Ca – State | 1/4/2001 | 2/6/2001 |
| Barker v. Presman | Miami, FL – State | | 11/16/2000 |
| Ferris v. Fleischer | Ft. Lauderdale, FL – State | 10/20/2000 | |
| Brittingham Sada De Ayala v. Brittingham | Laredo, TX – State | 10/27/2000 | 5/8/2001 |
| D'Angelo v. Polish | Mentor, OH – State | 8/1/2000 | |
| Smotherman Estate | Lebanon, TN – State | | 6/21/2000 |
| Taber v. Taber | Puris, MS – State | | 5/30/2000 |
| Orange Bang v. Juicy Whip | Detroit, MI – State | 5/25/2000 | |
| Harman v. Hummell, MD | Marengo, IL – State | 5/11/2000 | |
| Gardim Exim Enterprises | Kuala Lampur, Malaysia | | 2/17/2000 |
| Alphin v. Picral | Danville, VA – State | 2/23/2000 | |
| Weiss v. Liberty Mutual | Miami, FL – State | | 11/17/1999 |
| Singh v. Takhar | Bakersfield, CA – State | | 1/25/2000 |
| Aptix v. Quickturn | San Francisco, CA – Federal | 1/20/2000 | 5/10/2000 |
| Smith v. Felsen | Hackensack, NJ – State | | 2/10/2000 |
| Schwarz v. Robinson | Hackensack, NJ – State | 6/20/1997 | 11/17/2000 |