# EXHIBIT 1

# REDACTED

# EXHIBIT 2

# REDACTED

# EXHIBIT 3

# REDACTED

# EXHIBIT 4

# REDACTED

# EXHIBIT 5

# Suspect Documents

### THEIR SCIENTIFIC EXAMINATION

BY

## WILSON R. HARRISON, M.Sc., Ph.D.

*Director, Home Office Forensic Science Laboratory,*
*Llanishen, Cardiff*

*NEW YORK*

FREDERICK A. PRAEGER, PUBLISHERS

*The Appearance of the Document*          45

number is
tances the
o establish



ing

he presence
y having a
tamp which
unsuspecting
on of a thin
e which can

sed cheques
h a manner



e unsymmetrical
the stamps with
raving may prove
hen questions of
ty are raised.

row. This lack of symmetry may sometimes be used to test whether two or more stamps were or were not contiguous on the sheet, a test which has, on occasion, proved important when the statement of a witness is being tested for accuracy.

Sometimes it is possible to show that stamps were once contiguous on the sheet by matching the perforations as already described. This rather diffi- cult task may be simplified if the stamps are torn in such an irregular fashion that a recognisable fragment from one remains attached to another. The proof that stamps on receipts supposed to have emana- ted from different firms were at one time contiguous has proved of vital importance when the authenticity of insurance claims was tested.

When stamps have been removed from one document and reaffixed to another by the use of extra adhesive, examination of the perforations with



Fig. 3-12. The perforations in the lower right-hand corner can be seen to be covered with adhesive. This indicates that the stamp has been re-affixed with fresh adhesive.

a good lens will almost invariably show the presence of excess adhesive on the upper surface of the perforated edges as it is almost impossible to refix a stamp without the fresh adhesive spreading to these areas.

### Holes and Tears

It is wise, in the first instance, to regard all holes and torn places on a suspect document, even if there appears good reason for their presence, *e.g.*, a hole for fastening the sheets together, as deliberately made to cover up a forgery. Any perforation in an unusual place or one which is abnormally large has probably been made to eliminate unwanted data which, if allowed to remain, would betray the fraud.

Important documents are often drawn up on stamped paper. Most British Government stamped paper bears two figures inside a small circle to indicate the year the sheet was officially stamped. This circle is generally sited near the top left-hand corner of the sheet and it is remarkable how often in a suspect document the whole of this tiny circle will be found to have been neatly removed by the punch which made the hole for filing the document. Figure 3-13 shows how this occurred in connection with a document which bore a suspect signature of a man who died in 1932. Unfortunately for the forger the punch left sufficient of the final figure for it to be positively identified as " 4." This evidence was overlooked and the document submitted for comparison of the signature thereon with others known to be by the alleged signatory. Whilst the signature on the document could have been shown to have been forged—see Figure 11-15, in Chapter 11— the evidence from the hole was sufficient in itself to brand the document as a forgery.

46              *The Preliminary Examination*

It is equally remarkable how often in documents, such as receipts, there occur tears which have the effect of removing the serial number. It is good policy to regard as fraudulent every receipt which has had its serial number torn off. It sometimes happens that great care has apparently been taken to reaffix the torn-off portion, bearing the printed number or other identifying data, with stamp edging or cellulose tape. Whilst such a repair might pass muster on casual



Fig. 3–13. The upper photograph shows a portion of an agreement wherein two perforations occur in the official stamp at the top left-hand corner. The signatory died in 1933. In the lower photograph "A" is an enlarged photograph of one of the perforations showing two tiny remnants from the second of the two figures which represents the year of stamping. Whilst this figure could very well have been "4" as shown in "B" it could not have been "3," "2," "1" or "0" as shown in "C," "D," "E" and "F" because perforations made in these figures could not have yielded the two tiny remnants shown in "A." This proved quite conclusively that the signature was a forgery. An enlarged photograph of the signature is shown in Chapter 11, figure 11–15, wherein traces of fraudulent retouching can be seen.

examination, the sceptical will study the restored portion with the greatest care wondering why or whether the restored piece ever formed part of the original document. The wiremarks already referred to are sometimes of vital importance when such a question is raised, as by their aid it is sometimes possible to show that the restored fragment is foreign to the rest of the document.

Tears in documents are not always the result of genuine wear. It is quite a simple operation to get rid of an inconvenient date which cannot be trimmed off by making two parallel folds which narrowly contain the date and then tearing the document along the folds. The narrow strip bearing the unwanted date is removed and the two remaining portions carefully joined with a thin strip of adhesive. Such a join will often pass unnoticed. Some forgers join the two portions with stamp edging or cellulose tape whilst others just place the two portions back into the envelope. This latter is perhaps the safest course for few

will take the trouble to place the parts together and then examine them for continuity of wiremarks or for other evidence which will show that a strip has been removed.

A document vital to a case is sometimes produced in a torn and tattered condition to give colour to the story of the vicissitudes through which it is supposed to have passed. If examination shows that nothing of real importance has been lost or rendered illegible and that the damage has been done only to those parts of the document which are not very significant, the document should be regarded with suspicion. If this happy state of affairs proves to be the case with not one but with a whole group of documents, then it can safely be concluded that they are forgeries because the odds against this happening are too great for it to be fortuitous. In the literature there are many examples of forgeries being exposed after suspicion has been aroused in this way. One of the best known is that quoted by A. C. Mitchell, in which a series of forged letters, alleged to have been written by Burns, Scott, Thackeray and other celebrities, contained worm holes; but in every instance the worms had been careful to avoid damaging the writing! The more reasonable explanation, that the forger had avoided the worm holes, was subsequently proved to be true.

Most forgers of ancient documents are well aware of the importance of using genuinely old paper, the most convenient source of which is the fly leaves of old books. As one book can yield but a limited amount of material, leaves from a number of books must be collected when fabricating a document of any size and imperfect sheets may have to be pressed into service. With this in mind, any reputedly ancient document made up of a number of different papers must be regarded with suspicion. At the same time, the examiner will be on his guard for the appearance of variable spacing of the writing or of cramped and unnatural phraseology on a damaged document, which often indicate that the writer has used material which was already in a damaged state and has taken care to avoid writing anything of importance on the damaged or fragile portions of the sheet.

### Holes Made by Fastenings

The tiny perforations made by wire stapling machines may easily be overlooked; often they can only be seen by holding the document up to a strong light. These holes occur in pairs and should more than one pair be present because more than one staple was used, it may be possible, from the relative position of the holes, to discover which of a number of separate documents had at one time been stapled together.

This is the basis on which the author has investigated thefts of pay-packets. It is the custom in many organisations to staple the bank notes to the pay-packet envelope which bears the name or number of the employee. As more than a single staple is almost invariably used for this purpose, it has been found possible to link bank notes found in the possession of a suspect with the stolen pay-packet which, as it bears the name of the loser, is thrown away at the earliest opportunity but may be found on thorough search of the vicinity. If two wire staples have been used, then the pay-packet and the notes it once contained will all have groups



here occur
policy to
n off. It
the torn-
ith stamp
on casual

perforations
in the lower
mants from
uld very well
own in " C,"
the two tiny
forgery. An
of fraudulent

eatest care
he original
importance
le to show

is quite a
immed off
ien tearing
ed date is
n strip of
n the two
e the two
rse for few

48            *The Preliminary Examination*

of four holes which are perfectly matched. The odds against these coinciding with the holes in other pay-packets or in other notes are exceedingly great. In the illustration Figure 3–14, three wire staples were used in which case the degree of certainty is even greater.



Fig. 3–14. Pin-holes in the Treasury Notes, indicated with circles, match the staple holes in the transparent envelope (one set indicated with circles). This proves that the Notes, shown on the right, had been fastened into the envelope, shown on the left.

### THE CONTENT OF THE DOCUMENT

When the physical examination of the document has been completed, attention can be paid to what has been printed, written or typed thereon.

#### Secret Writing

If there is any reason to suspect the presence of secret writing, the attention should first be directed to the spacing of the visible handwriting or typescript present, generally referred to as the " overt text." It is comparatively common practice to space widely the overt text so as to accommodate the secret writing—the " covert text." If this is not done, there is the risk of the pen used for the secret writing crossing some of the overt text and producing a defect in the line which might lead to discovery of the secret writing. Apart from

this, it is
overwritin

Many
test for s
electric li
becomes l
can be m
whole of

If this
document
amateur
of a doc
Chapter 5

Extraneo

An e
which are
words fro
document
it is not
so that it
underneat
enable it
contact.

Docum
which has
come into
for it is
mirror-im

If blo
which ga
blotted an
rest of th
had been
pages hav

Even
from an
This is
These wr
become s
of paper
and, on
appeared.

When
R.S.D.

# EXHIBIT 6

# THE WHOLE DOCUMENT

## Ordway Hilton



520
COPY

In the great majority of cases document examiners function as handwriting identification experts. All examiners must be skilled in this field. However, handwriting identification experts are not necessarily document examiners. There are many other aspects of document problems that a document examiner must be proficient in whereas a handwriting identification specialist very probably is not. The document examiner's skills cover a very broad field including typewriting problems, alterations and erasures, dating questions, photocopy problems, differentiating between pens, pencils and papers, printing examinations and other less frequent questions.

When a suspected document is presented the client generally points out the aspect of it troubling him. But one of the skills of a document examiner is to recognize other evidence within the document that can also have a bearing on the full answer. With every problem we need to react to the whole document to be sure that all evidence that controls a conclusion of genuineness or forgery has been evaluated.

In most instances the layman, attorney or man on the street, when confronted with an unfavorable document or with one of importance to him that another party is attacking, is to assume that the signatures are the key to the problem. If document examiners direct their attentions to this question alone, and stop after reaching an opinion concering the signature, the answer may be eroneous. The signature may be good but the document is a forgery. The signature was "borrowed" from another document and added to new pages, or a few modifying lines of the text were inserted, or a few key words deleted. On the other hand the signature is found to be forged, but there are other significant factors in the document that also establish forgery although no one has looked for them. These omissions will not occur if we always examine the whole document.

There are some types of routine cases that normally do not require such thoroughness. The forged endorsement to a government check can be such a problem. In many instances laboratory routine mitigates against more extensive examinations. Endorsement examinations should be disposed of with all possible dispatch. However, even with such a direct problem, inspection of the face of the check may suggest other evidence. Was the amount changed? Something suggests an ESDA test, and a name or address of value to the field investigator is revealed. With every questioned document the examiner should ask himself "Am I missing something?", as he makes at least some inspection of other elements.

The whole document consideration plays a role with every document of more than a few handwritten words or a single signature on a standard form. Of course even such a form may occasionally serve as a significant dating element[1]. A single page document normally does not suggest problems besides the one raised by the client. However, a check list may be consider. Is the letterhead one that might be challenged for date? Authenticity? Is the sheet standard size? Is there evidence of cutting to create an unusual size? What is the significance of the folds[2]? Are there erasures or crowding of lines or words? Or is the document unaltered?[2] If handwritten, should the text and signature be written with the same pen? Was the backing of the sheet during preparation the same through out? If typewritten, was only one machine used? Was the document typed continuously? Do all lines align properly? Is the arrangment of material on the page normal or usual? Are there unusually wide gaps between the text and signatures or any other arrangement not typical of normal documents? In other words might the document have been written over or around a genuine signature? Are there stains or marks on the paper? Are there suggestions of indentations from writing on another document? Some may have a logical explanation, but until questioned one cannot be sure.

- 2 -

If dealing with a photocopy of a document, where is the original? Has it been compared with this copy? If no original, is this a first copy of it? If not, where is the first copy? Can we be dealing with a forged photocopy? What evidence suggests this or proves it?

If the document consists of more than a single page, the problem is more extensive. Is there evidence that suggests that a page has been inserted or deleted? Has one been substituted? There is a need to show that all pages are properly related to one another. Is all the typewriting by the same typewriter? In the same condition? Same handwriting? Same ink and same pen? Same paper? From the same box or tablet? Were the pages bound together once? Or the same number of times? How? by staples, pins, or paper clips? Is each page consistent in itself? (Review the point discussed for a single page document.) Are there writing impressions on a page from the one before or some other source? Are all of the signatures authentic, principals and witnesses? Is there evidence to show that the document was bound in its present form when executed? If there are marginal notes do they reveal evidence that the document was assembled when they were made. If each page bears initials are all written by the same pen, or by each writer's pen, that was used to execute the document? These are the more obvious and general considerations. Every document may contain its own special problems. What is important is to think about them and raise questions before they are revealed by your opponents.

In many instances these various aspects of the document appears on a careful initial inspection to be consistent with documents of the type under consideration. These inspections must be made of course under proper conditions of lighting and examination. The thorough examiner, however, will make such a study and will also be alert to signals that more extensive and detailed study is needed. A document examiner should take pride in being throrough. If he is, he will not be surprised by a new challenge of the document or by any other opinion rendered.

It is common knowledge that every element of a document can have a bearing on its genuineness or nongenuineness. Thus, the examination of the whole document is the logical procedure to assure that the final opinion reflects an evaluation of all of these details.

References

1.   Elbridge W. Stein, Dates in Documents, American Law Review, 61 (Jan.-Feb. 1927)
2.   Ordway Hilton, Proof of an Unaltered Document, Journal of Criminal Law, Criminology and Police Science 49 (1959) 601-604.   Ordway Hilton, Scientific Examination of Questioned Documents, revised edition, (1982) 122-124.
3.   Ordway Hilton, Detecting Fraudulent Photocopies, Forensic Science International, 13 (1979) 117-123.   Ordway Hilton & Douglas Cromwell, Fraud by Photocopy, Case and Comment, (March-April, 1977) 34-36.

# EXHIBIT 7

VAN STRATT 3283

## PHYSICAL CHARACTERISTICS OF PAPER AS A MEANS
## OF IDENTIFICATION

*******************

Paper presented to

The Questioned Document Section

of the

American Academy of Forensic Sciences

by

George F. Mesnig, B.S.

Sun City Center, Florida

at

Annual Meeting

Sheraton - Biltmore Hotel, Atlanta, Ga.

February 29 - March 4, 1972

# PHYSICAL CHARACTERISTICS OF PAPER
## AS A MEANS OF IDENTIFICATION

The value of paper comparisons should not be overlooked in the course of any investigation of a case in which paper was used. Paper comparisons have helped solve many cases which might have taken much longer to solve.

The physical characteristics of the paper should be taken when an examination is made of two or more pieces of paper to determine if the questioned piece or pieces of paper are similar to any of the known pieces of paper. Some of the various factors to be considered are as follows:

(1) Thickness

(2) Size

(3) Watermark

(4) Color

(5) Ruling

(6) Padded or loose sheets

(7) Finish or surface

(8) Corners

(9) Cutting or tool marks

(10) Weight

(11) Torn edges

(12) Miscellaneous factors

One of the quickest tests to check on possible similarity of two sheets of paper, which outwardly appear to be the same, can be made

(2)

by the use of a micrometer caliper which should contain a vernier to read in ten-thousandths of an inch. By use of this instrument it is possible to eliminate many papers which may look alike. Actual measurements of many types of papers in minute fractions of an inch showed wide variations in thickness. Thin Japanese tissue, calendered, sometimes measures as little as .0009" while forty-ply card sometimes measures as much as .0763". By accurate measurement writing paper alone can be segregated into many distinct classes, when measured by means of a micrometer caliper.

When measured in ten-thousandths of an inch there is some variation in the thickness of sheets of paper from the same pad, package or "run". This variation in thickness between sheets from the same pad is greater in cheap paper than in better quality paper. As a result of experiments it was observed that when several measurements for the same sheet are averaged the cheaper papers show an occasional variation of three ten-thousandths of an inch. When measuring the thickness of a sheet of paper it is advisable to take several measurements at different positions on the paper and then average the readings inasmuch as paper sometimes varies slightly in thickness thruout the sheet.

The size of the paper under examination, that is the length and width, should be measured with an accurate rule which can be read in hundredths of an inch. As a result of experiments conducted it was noted that the lengths of sheets of paper from the same pad seldom varied, although in some few instances variations of as much as three hundredths of an inch out of a maximum of ten and one half inches were noted.    This variation occurred in folded writing paper and not in

(3)

pad paper. In pad paper the greatest variation noted was three hundredths of an inch out of a maximum of ten inches but the average variation was only one hundredth of an inch between the first and last sheets in a pad. The variations in the widths of the sheets of paper were relatively the same as the variations in the lengths. One interesting fact which was noted was that in several instances the widths of the tops of sheets from the same pad varied from one to two hundredths of an inch from the widths of the bottoms of the same sheets.

Most of the better quality papers contain a watermark which is an excellent means of identification. Watermarks sometimes contain defects which are due to some imperfection in the "dandy-roll" and these defects aid in identifying the paper under examination with a certain "dandy-roll" design. The absence of a defect in a watermark in one sheet of paper and the presence of a defect in a watermark in another sheet of paper would not necessarily mean they were not from the same "dandy-roll" inasmuch as the "dandy-roll" usually contains a number of the designs for making watermarks on the paper. These are set some distance apart and a defect may appear only in one of several designs on one "dandy-roll". Likewise the absence of a watermark on one piece of paper and the presence of a watermark on another piece of paper should not necessarily mean they are not similar inasmuch as the papers may have been cut in such a manner that one piece contains the watermark and another does not.

The color of paper is another factor used in the comparison of papers. The tint of different "runs" of the same color paper often varies slightly. By the use of a microscope and the Munsell Book of Color or other color book, the exact tint and shade of the papers in question can

(4)

be ascertained, provided they are examined in good daylight. Likewise two pieces of colored paper may be compared with each other under the microscope.

The exact width, uniformity, location, color and number of rulings on ruled paper should all be carefully observed. Any deviations of the parallelism of the rulings from the upper and lower edges of the sheet should be noted. Many papers are not ruled alike on both sides and this is another matter which should receive attention when such a paper comparison is being made. As a result of experiments it was noted that the average distance between the lines on ruled paper from the same pad or package does not appreciably vary even when measured in thousandths of an inch. However, the distance that the first line appears from the top on sheets from the same pad varies as much as five hundredths of an inch out of a maximum of two inches. In the majority of the ruled papers examined the parallelism of the rulings from the upper and lower edges of the sheet was imperfect. The distance of the left edge of the first line from the top of the sheet varied as much as three hundredths of an inch out of a maximum of one inch from the distance of the right edge of the same line from the top of the sheet. The distances of the left and right edges of the last line from the bottom of the sheet varied by this amount also. The color of the rulings may be determined by the use of a microscope, the Munsell Book of Color or some other color book. In the same manner the color of the rulings on different sheets of paper may be compared under the microscope.

Another factor to be considered when examining paper is whether the sheets originally were loose or in a tablet or pad. All edges should

(5)

be examined microscopically for evidence of glue or some other adhesive on an edge of the sheet. If there is evidence of any adhesive on an edge, the edge on which it appears should be noted as well as the color of the adhesive which was used to bind the paper.

The finish or surface of the paper under examination is another important factor in the comparison. There are several different finishes to paper such as bond, linen, laid, rippled, etc., all of which would help to eliminate a sheet of paper or aid in identifying it when it is being compared with another sheet of paper.

Corners of sheets of paper also are used in the comparison of paper. If the corners are square, usually that is as far as one can go in the examination of the corners, but if they are rounded the degree of roundness and where the roundness starts along the two edges should be examined to determine if they are the same on the sheets of paper under comparison.

A very important factor in the comparison of two papers is the tool or cutting marks on the edges of the paper. All sheets of paper of letter, note, etc. sizes are cut from larger sheets of paper by means of a cutting machine. This machine cuts the paper by means of a knife. If the knife has irregularities on the edge, these irregularities will sometimes cause marks to run along the sides of the sheets cut. If these marks are fairly well pronounced, as they sometimes are, especially in the cheaper papers, it is possible by means of a microscopic examination and photomicrographs to determine whether two sheets were cut with the same knife by comparing the tool marks on the edges of the papers. If the tool marks on two sheets match up it does not necessarily mean they were in the same pad, but it does mean they were cut by the same knife

(6)

and, inasmuch as the knives are changed often for sharpening purposes, it would mean the papers were at least from the same days cutting. This might be of considerable value if the other factors also pointed toward the similarity of the two papers.

Weight on occasions can also be considered in a paper examination. Both papers should be weighed on a chemical balance and the proper weight recorded. The presence of writing on the paper will not materially affect the weight of a sheet of paper. Since both papers would undoubtedly be maintained under similar conditions for a reasonable period of time, humidity should not materially affect the weight. The presence of any foreign matter, dirt or tears on one of the papers may make this step of questionable value.

While examining paper any torn edges should be noted inasmuch as the sheet may have been irregularly torn from a pad and the missing portion of the sheet may still remain in the pad. If a pad is later located and it contains torn edges, the torn edge of the questioned sheet of paper can be compared with the torn edges in the pad. If the torn edge of the questioned paper and the torn edge of one of the stubs in the pad match, when examined under the microscope or by means of photomicrographs, one can be sure that they are similar and the case in all probability is solved.

There are several other factors to be considered when comparing two sheets of paper. One is the presence of holes for filing purposes near the edges of sheets of paper. The number of holes; the distance from the top, bottom and sides; the distance between the holes; the size of the holes and irregularities left by the cutting tool should be con-

(7)

sidered. Another factor to consider is the red vertical margin line which often appears near the left margin of loose leaf notebook paper. The color of this line as well as the respective distances of this line from the left edge on both the front and back of the sheet should be considered. If the paper is writing paper and is folded the location of the fold should also be noted. If the paper has been stapled in a pad form the distance between the staples should be noted in addition to the size of the staples.

It is necessary that all the factors set forth above agree within certain limits before one piece of paper can be concluded to be similar to another. If one of these factors should deviate considerably it necessarily would eliminate the paper under consideration. Accuracy in all measurements and observations is a necessity in any comparison of paper. Accurate instruments should at all times be employed.

# EXHIBIT 8



*Second Edition*

# Scientific Examination of Questioned Documents

*Edited by*

Jan Seaman Kelly

Brian S. Lindblom

Taylor & Francis

Questioned Documents

The Examination of Computer-Generated Documents 197

ns usually progress from
xaminers to step through
stics, followed by efforts
nis formula, the starting
l usually involve a micro-
he most general type of

of as attempts to *classify*
om visual (microscopic)
tions: Has the document
t or non-impact process,
ese simple classifications
it they are not *mutually*
or, using dry ink (toner)
technology descriptions
; processes fit neatly into
istance, utilizes ink that
ure hybrid combinations

printing technologies. In
some common causes of
ute for live samples. It is
wn samples of the printer

**to Prepare the**

nstrumental analysis) to
ce a computer-generated
luced, however, this may
s where this information
substitution. In the first
parties have signed and
printed with a different
roof that the document
patent case, in which all
ter while the questioned
inter at the bottom of a
case (page substitution),
fferent ones are inserted.
gnature page of a will is
what stories the various
it, merely being able to
y be sufficient to resolve

Table 16.1 Major Types of Computer Printing Technologies

| Technology | Liquid Ink | Dry Toner | Thermal | Other | Impact |
|---|---|---|---|---|---|
| High-speed mainframe | Through ribbon | | | | Yes |
| Daisy wheel typeball | Through ribbon | | | | Yes |
| Dot matrix | Through ribbon | | | | Yes |
| Inkjet | Yes, ballistic (may be more than 4 colors) | | | | No |
| Laser/LED monochrome | | Yes | | | No |
| Laser/LED color | | Yes, 4 colors | | | No |
| Magnetography (similar to electrophotography, but with a magnetic drum) | | Yes, ferrous (magnetic) | | | No |
| Thermal wax/pigment | | | Dry wax/pigments melted onto page | | No |
| Dye sublimation | | | Resinous inks heated to a gaseous state (sublimated) | | No |
| Thermal paper | | | Heated pins in ceramic head produce characters much like dot matrix | | No |
| Solid-ink/thermal jet Xerox/Tektronix | | | Dry ink "stick" melted and drops sprayed onto drum | Solid ink sticks, 4 colors | No |
| Hybrid digital offset HP Indigo and Heidelberg | Yes, liquid toner up to 7 colors | | | Blanket impression | No |

### 16.1.2.4 Is There Evidence That One or More Pages Are Prepared Differently Than the Others or That Text Has Been Altered?

In the above section we discussed the possibility that different printers were used within the same document. Here, we will deal with situations wherein entire pages have been substituted within a document. The difference in these examples from those above is that the text on substituted pages may actually be printed by the *same* printer as was utilized to prepare the original text. If there is a possibility that page substitution has taken place, such things as font changes, formatting, paper type, etc., must be considered. In general, a forensic document examination that is conducted to determine if entire pages or lines of text have been added or removed from a document is, in a word, an analysis of *consistency*. Although many parts of a document can be checked for consistency (spelling, punctuation, staple holes, formatting, etc.), these analyses typically boil down to three



198                    Scientific Examination of Questioned Documents              The Examination of Com

different types of examinations: technological, chronological, and "Does the story fit?" Although it is often true that a forensic scientist should enter an examination without much information about the factual issues of a case, there are exceptions — and potentially altered documents are one of the big exceptions. This is definitely an area where knowing the story about the document's creation, in advance of the examination, can be quite helpful. Following are some reasons why.

Evidence that pages in a multi-page document have been created differently may or may not be evidence of tampering. There are some perfectly logical reasons why pages in a long text are formatted differently, are on different paper, or even printed on a different printer than the surrounding text. For instance, some documents are regularly modified or appended. These may include bylaws, contracts (especially real estate contracts where commission rates, governmental regulations, and fees change often), forms relating to taxes, procedure manuals, and, in general, documents that only need to have sections revised over time (rather than the entire document having to be rewritten).

Another consideration involves the use of boilerplate language. If certain long phrases (such as disclaimers) are used in the creation of, say, new contracts, it is possible that these passages are being electronically cut and pasted from an older document into the one being created. It is not unusual for the original formatting and fonts used in the boilerplate to remain intact after they have been pasted into the new document — the point being that a sudden change in the typeface or spacing characteristics of a page may not necessarily be evidence of alteration or addition. Again, this is another reason why a detailed statement as to how the document was created is such an important piece of information to be obtained before a forensic conclusion is issued. If there is testimony that the document was typed in its entirety (all in one sitting), for instance, being able to prove that part of the document is inconsistent with the other can be highly significant.

Finding chronological inconsistencies can be a powerful tool in discrediting pages within a document or, in fact, the entire document. These examinations are often complex and can require extensive research to establish dates of introduction for the printing technology, paper production (watermarks), business form or letterhead printing dates, etc. On the other hand, discrediting a document may be as simple as showing that an office or individual did not have access to a particular type of printer on the date the document was allegedly produced. As an example, a forensic examination may determine that a four-color toner process was used to render a document, but an investigation proves that an office had not yet purchased its color laser printer at the time the questioned item was supposed to have been printed. It is not, of course, the job of the forensic document examiner to prove access to a particular machine, but rather to identify as thoroughly as possible the machine/process used to prepare the document and then let the case investigators handle the fieldwork.

Virtually every aspect of a document can have some sort of anomaly. FDEs are well aware of the importance of checking staple hole patterns, paper types, watermarks, indentations, printed form numbers, etc., as part of their routine casework. Any of these typical examinations may show evidence of an addition or alteration. In the case of computer printing technology there are several approaches that one can take to help determine if text (or entire pages) have been added, removed, or altered. The first step should be an attempt to determine if the same printing technology was used throughout the document.

In this regard, literally eve
including the printing pro

Even if only one techn
passages were created on d
determination non-destru
and toner analyses will pro
the ink on an inkjet-printec
with an ink that reacts dif
caution is necessary here c
sages in a document react
care must be taken to ens
composite black, in which
gled with the black). Befor
thorough microscopic exar
ink to black ink.

On a more subtle level,
in most inkjet printings ma
Most modern inkjet printe
ments (about 10 points to
one rightward or leftward ¡
be printed simultaneously.

The rule here is that th
size of the nozzle array in
48 points high, then only
be executed in one pass. Be
over time, the vertical spac
phenomenon (see color Fij
(following p. 366) shows
groups of three and four, l

The fonts and line spa
fonts that contain only sul
examples." In addition, tl
general, slowly decreased
increased.*** What had on
Roman font (14.4 points o
in line spacings of just a
certainly possible (and pro

Of course, the media o
to the possibility that page
inations of paper waterma

The author has had a backdati
text of a document, but had use
*See example at the end of this
**As electronic font outlines ha
the letters. The higher-output ¡
still remain readable.

| | |
|---|---|
| of Questioned Documents | |

l, and "Does the story fit"
ter an examination without
xceptions — and potentially
itely an area where knowing
examination, can be quite

:en created differently may
rfectly logical reasons why
ent paper, or even printed
ance, some documents are
s, contracts (especially real
gulations, and fees change
n general, documents that
ie entire document having

iage. If certain long phrases
acts, it is possible that these
ocument into the one being
s used in the boilerplate to
ent — the point being that
a page may not necessarily
on why a detailed statement
piece of information to be
timony that the document
g able to prove that part of
iificant.

tool in discrediting pages
iinations are often complex
oduction for the printing
letterhead printing dates,
le as showing that an office
on the date the document
may determine that a four-
ivestigation proves that an
e the questioned item was
of the forensic document
identify as thoroughly as
d then let the case investi-

if anomaly. FDEs are well
types, watermarks, inden-
work. Any of these typical
. In the case of computer
take to help determine if
he first step should be an
hroughout the document.

In this regard, literally everything that is printed on the document should be examined, including the printing process used to prepare the letterhead.[*]

Even if only one technology was used to create a document there may be evidence that passages were created on different machines. In some cases it may be possible to make this determination non-destructively; in other instances only destructive testing such as ink and toner analyses will provide definitive evidence in this regard. Infrared examination of the ink on an inkjet-printed document may well show that a questioned passage was printed with an ink that reacts differently than all of the other ink in the document. A word of caution is necessary here concerning infrared examinations of inkjet-printed text. If passages in a document react differently in reflected or infrared luminescent examinations, care must be taken to ensure that both texts are printed in black ink only (rather than composite black, in which combinations of cyan, magenta, and yellow inks are intermingled with the black). Before making a determination that two inkjet inks are different, a thorough microscopic examination should be made to ensure that the comparison is black ink to black ink.

On a more subtle level, the overspray patterns (satellite drops) that occur as an artifact in most inkjet printings may also provide useful evidence of a printer change (Figure 16.1). Most modern inkjet printers are capable of printing the font sizes found in typical documents (about 10 points to 14 points) as multiple lines in a single pass. In other words, in one rightward or leftward pass of the inkjet head, two, three, or even four lines of text may be printed simultaneously.

The rule here is that the printer cannot print more lines in one pass than the vertical size of the nozzle array in the printhead. For example, if a black-ink print nozzle array is 48 points high, then only combinations of text and line spacing of 48 points or less can be executed in one pass. Because the number of inkjet nozzles on printheads has increased over time, the vertical spacing of consecutively printed lines of text may itself be a dating phenomenon (see color Figure 16.2 following p. 366). The micrograph in color Figure 16.3 (following p. 366) shows a Hewlett-Packard 960C black printhead. The nozzles are in groups of three and four, left to right.

The fonts and line spacings should be carefully examined. There are many look-alike fonts that contain only subtle differences — Times New Roman and CG Times are good examples.[**] In addition, the default line spacings of computer-generated texts have, in general, slowly decreased over time as the output resolutions of the printers have increased.[***] What had once been default single-line spacing for a 12-point Times New Roman font (14.4 points of leading) may now be only 13.5 to 13.8 points. The difference in line spacings of just a few 720ths of an inch require careful measurements, but are certainly possible (and probably mandatory) in a modern forensic laboratory.

Of course, the media on which the document is prepared may provide information as to the possibility that pages have been added or substituted. The standard forensic examinations of paper watermarks and other identifying characteristics of the media (such as

---

[*]The author has had a backdating case wherein the perpetrator used a Selectric typewriter to prepare the text of a document, but had used an inkjet copier to reproduce a 1960s' letterhead.
[**]See example at the end of this section.
[***]As electronic font outlines have been rendered with greater fidelity, it is easier for the eye to distinguish the letters. The higher-output resolutions have allowed the lines of text to be moved closer together and still remain readable.

of Questioned Documents

lfunction of the receiving

in traces left by the feed
opies and computer-gener-
dges on the reverse side of
ough indentation analysis.[7]

submission of both devices
y them. Sample fax copies
ritical in any comparative
to identify the origin of a
achine's function while in

son purposes, *J. Forensic Sci.*,

uction characteristics of fac-
*zers*, 6, 38, 2003.

at the American Society of

e American Society of Ques-

it Database, paper presented
meeting, Ottawa, 2000.
presented at the American
ach, CA, 1994.
identify individual and class
iers: a preliminary study, *J.*

# Manipulated Photocopies, Faxes, and Computer-Printed Documents

# 19

BRIAN S. LINDBLOM
ROBERT GERVAIS

## Contents

19.1 Original Signatures vs. Color Reproductions ..................................................235
19.2 Identifying and Comparing the Printing or Reproduction Process ...............236
19.3 Typographic Considerations ..............................................................................238
19.4 Assessing Alignment, Spacing, and Copy Distortion .....................................238
19.5 Special Considerations for Manipulated Faxes................................................241
19.6 Conclusion ...........................................................................................................242
References .....................................................................................................................245

Photocopied, faxed, and computer-generated documents are particularly susceptible to text insertion, page substitution, cut-and-paste manipulation, and the use of multiple genuine documents to form fraudulent new composites. This is due in part to the ease with which such alterations can be made using the above technologies. Equally enticing to the would-be fraudster is the fact that reproductions of this type often conceal many of the common indicia of alterations. It is not at all uncommon to receive documents in which the distorting effect of the copying process and loss of detail have been increased through multi-generation reproduction (i.e., providing a copy of a copy of a copy ...). Therefore, it is wise to consider all aspects of a document in order to discover indications of alteration.

## 19.1 Original Signatures vs. Color Reproductions

One of the first examinations that should be undertaken is an assessment of any signatures or other handwritten information on the document to establish whether the writings are original or reproductions. Many document examiners have been presented with a document

235

f complete and accurate
attempts under slightly

; material can sometimes
ss depends upon whether
or at least have a more
aniline inks obliterating
trokes hiding typewriting
:k. Ordinary erasers and
nanipulated may achieve
proach to the problem is
eptible to this treatment

This is the use of correc-
riting. One technique is
line of the letters to be
he other technique is to
:d on or placed over the
ection material. In most
Illy the original material
ng the back of the sheet
rned into a read right
s interference from the
:um ether,16 or some of
ne substitute has been
no detrimental effect to
opaquing material may





1 under normal lighting
: when viewed from the

e faulty and some portions of the original writing may yet be discernible. These partial strokes or weak outlines of semiobliterated letters can be intensified and deciphered. All these obliterations by and large require a diversity of methods combining various techniques, experimentation, perseverance, and often a full measure of luck to ensure ultimate success.

### 27.5.1 Overwritings and Insertions

Documents may be changed by overwriting words and portions of sentences or by insertion of a character, word, sentence, or more. At times it is necessary to attempt to determine what was originally written. In other instances, it is necessary only to show that the changes were not made at the time of preparation of the document. Insertions in the form of interlineations may be very obvious, but if it can be shown that they were made with another writing instrument, by another writer, or on a different typewriter or printer, it can go a long way toward attacking the value of the present version.

Insertions may be disclosed by differences in the writing material or differences in the handwriting. Crowding of the inserted material compared to surrounding writing suggests an addition. Microscopic study is used to detect differences in ink or writing instruments. Intersecting strokes may disclose the wrong sequence. Using filters, ultraviolet and infrared, is a useful tool. Most of the methods discussed in previous sections may come into play in these problems as well.

Overwriting that is not very obvious may be established by disclosing double strokes. Strokes that are not a part of the letters of the overwritten words assume significance. If there is enough writing, it may be possible to show that there are writing characteristics of someone other than the person who prepared the balance of the document.

Cases of this nature are not common. They are more often found in manipulation of accounting records and check frauds (see color Figure 27.15 and color Figure 27.16 following p. 366). Occasionally, they are incidental issues in document problems of entirely different kinds. They do, however, represent another way that documents can be changed, and despite the obvious appearance, changes of this nature will arise from time to time as evidence in the case of one party to a litigation. They must be accurately evaluated.

Whole pages may be inserted in a multiple-page document. Their detection often depends upon study of binding marks (such as staple holes if the pages are assembled in this way) (see Figure 27.7), the paper for kind and size, the pen and ink, the printed text, or the pencils. Indentations on a following page may be the key.

### 27.6 Proof of an Unaltered Document

In the previous sections various techniques that may reveal alterations in documents were discussed. The question does arise, however, as to whether it is possible to establish that a document has not been altered and, if so, what procedures are necessary.

Proving that a paper is unaltered is a challenging problem.19 It is an important one, however, since it is incumbent upon document examiners to be able to prove genuineness as well as fraud. This proof of genuineness is necessary to support the validity of certain disputed documents. Actually, the procedure involves not the application of any single test, but a consideration of all the applicable procedures to determine whether there has been an erasure, a substitution, or any other type of alteration in a document. In each instance,

the findings must be that no significant alteration has occurred that in any way would change the intended purpose of contents of the document. It is the cumulative evidence that establishes that the document is unaltered.

Therefore, depending upon how the document was prepared, the FDE must apply those tests that are appropriate to establish that there has been no significant erasure, or if there has been some minor erasure, that it is clear that such an act was merely to correct an error, such as a misspelling, made in the preparation of the document. To accomplish this requires the application of every appropriate test that could disclose the presence of an erasure, and each must show negative results. It is the combination of these tests that supports the conclusion that the document contains no erasures.

By the same token, tests that may reveal additions to the document must be considered, such as those showing the use of more than one writing instrument, the addition of typed or computer-generated text, or the insertion of material by an improper sequence of intersecting lines or lines with folds or perforations. With a handwritten document, was all the writing done with the same writing instrument and by the same writer, and is the document free from evidence of undue crowding of key material? Thus, in dealing with each specific page, the document examiner must be able to say that there is no evidence that a word, sentence, or paragraph had been added.

A further consideration in a multiple-page document is whether any pages may have been removed and others substituted, or new pages added into the document after execution. Such examinations, of course, involve consideration of the writing instrument, printer, paper, manner of binding, and presence of writing indentations that may have resulted from preparation of material on the previous page. There are the problems of determining whether the entire document was prepared at one time in a continuous manner, which involves considering the margins on page after page, the spacing between lines, the manner of handling paragraphs, and, if handwritten, whether there is an abrupt change in the quality of handwriting, which might suggest a different writing episode. In this way the FDE should be able to show that no evidence is present that suggests or establishes that the preparation of any page is inconsistent with any other pages.

Actually, an unaltered document is one that contains no erasures, no additions, and no substituted pages. To establish this situation in a positive and definite manner involves considering a great number of factors. There may be some instances when after considering all the elements in which the FDE is unable to say positively that the document is unaltered, but he or she can certainly point to the preponderance of the evidence that is inconsistent with any change. Thus, the physical facts found within the document itself many times govern just how positively this question can be answered.

## 27.7  Conclusions

Regardless of how a document is altered — whether it is by erasing, obliteration, or insertion of new matter — it is vital to those who stand to be defrauded that all of the evidence contained within the document itself be brought to light. The extent to which this internal evidence can be extracted has been indicated and the limitations frankly discussed. Despite occasional inadequacies, these techniques are more often potent tools by which fraud can be revealed and, in a number of problems, the facts set forth.

The need to establisl
There is no single, simpl
added, or modified in an
it can be stated that ther

## References

1. Licht, G.A., Comn
   Questioned Doc. Ex

2. Pfefferli, P. and Ma
   Police Tech., 4, 407,

3. Flynn, W.J., Paper

4. Hilton, O., Photog
   Rev., 85, 47, 1955.

5. Longhetti, A. and
   indented writing, J

6. Casey, M.A. and P
   the correctable film

7. Harris, J.I., Eyeing

8. Casey, M.A., Altera
   1971.

9. Godown, L., Seque

10. Igoe, T.J. and Reyn
    intersecting ball-po

11. Godown, L., Recen
    227, 1982.

12. Berx, V. and De Kir
    Lines" Problem, pa
    14–18, 2002.

13. Novotny, M., Deter
    presented at the AS

14. Aginsky, V.N., Deter
    pen ink and laser t

15. Ezcurra, M., Differe
    Ink Pen Entries, p
    22–26, 2004.

16. Lewis, J.A., Petrolet
    tion Fluid Obliterat
    August 25–29, 200C

17. Licht, G.A. and Brc
    Soc. Questioned Doc

18. Beal, B.L., Removal
    ican Academy of Fc

19. Hilton, O., Proof or
    1959.

Alterations in Documents

d that in any way would
the cumulative evidence

ed, the FDE must apply
no significant erasure, or
act was merely to correct
locument. To accomplish
l disclose the presence of
nation of these tests that

nent must be considered,
nt, the addition of typed
i improper sequence of
dwritten document, was
e same writer, and is the
d? Thus, in dealing with
hat there is no evidence

her any pages may have
e document after execu-
he writing instrument,
intations that may have
ere are the problems of
: time in a continuous
ge, the spacing between
ether there is an abrupt
rent writing episode. In
resent that suggests or
iy other pages.

ures, no additions, and
efinite manner involves
s even after considering
document is unaltered,
nce that is inconsistent
nent itself many times

asing, obliteration, or
rauded that all of the
. The extent to which
he limitations frankly
ore often potent tools
facts set forth.

The need to establish that a document has not been altered may involve a complex study. There is no single, simple test. All potential tests for showing that something has been erased, added, or modified in any way must be applied. When the combined results reveal no change, it can be stated that there is no evidence to support that this document was altered.

## References

1. Licht, G.A., Common chemicals for common criminals: check washing again, *J. Am. Soc. Questioned Doc. Examiners*, 3, 65, 2000.
2. Pfefferli, P. and Mathyer, J., Eraser Mate un stylo a bille à encre effacable, *Rev. Int. Criminol. Police Tech.*, 4, 407, 1979.
3. Flynn, W.J., Paper Mate's new erasable pen, *J. Police Sci. Admin.*, 7, 346, 1979.
4. Hilton, O., Photographic methods of deciphering erased pencil writing, *Int. Criminal Police Rev.*, 85, 47, 1955.
5. Longhetti, A. and Kirk, P.L., Restoration and decipherment of erasures and obliterated or indented writing, *J. Criminal Law Criminol.*, 41, 518, 1950.
6. Casey, M.A. and Purtell, D.J., IBM correcting Selectric typewriter: an analysis of the use of the correctable film ribbon in altering typewritten documents, *J. Forensic Sci.*, 21, 208, 1976.
7. Harris, J.L., Eyeing the evidence, *South. Calif. Alumni Rev.*, 21, 16, 1940.
8. Casey, M.A., Alteration of pari-mutuel tickets, *J. Criminal Law Criminol. Police Sci.*, 62, 282, 1971.
9. Godown, L., Sequence of writing, *J. Criminal Law Criminol. Police Sci.*, 54, 101, 1963.
10. Igoe, T.J. and Reynolds, B.L., A lifting process for determining the writing sequence of two intersecting ball-point pen strokes, *Forensic Sci. Int.*, 20, 201, 1982.
11. Godown, L., Recent developments in writing sequence determination, *Forensic Sci. Int.*, 20, 227, 1982.
12. Berx, V. and De Kinder, J., The Application of Profilometry in the Analysis of the "Crossing Lines" Problem, paper presented at the ASQDE Annual Meeting, San Diego, CA, August 14–18, 2002.
13. Novotny, M., Determining the Sequence of Original Ink Writing and Toner Printing, paper presented at the ASQDE Annual Meeting, San Diego, CA, August 14–18, 2002.
14. Aginsky, V.N., Determining the sequence of non-intersecting media on documents: ballpoint pen ink and laser toner entries, *J. Am. Soc. Questioned Doc. Examiners*, 5, 1, 2003.
15. Ezcurra, M., Differences between Toner Particles, above and below the Roller Ball and Gel Ink Pen Entries, paper presented at the ASQDE Annual Meeting, Memphis, TN, August 22–26, 2004.
16. Lewis, J.A., Petroleum Ether Immersion: A Technique to Visualize and Photograph Correction Fluid Obliterations, paper presented at the ASQDE Annual Meeting, Ottawa, Canada, August 25–29, 2000.
17. Licht, G.A. and Brown, J.L., Shandon Xylene substitute in document examinations, *J. Am. Soc. Questioned Doc. Examiners*, 2, 94, 1999.
18. Beal, B.L., Removal of Opaquing Solutions from Documents, paper presented at the American Academy of Forensic Sciences Annual Meeting, Dallas, TX, February 16–21, 2004.
19. Hilton, O., Proof of an unaltered document *J. Criminal Law Criminol. Police Sci.*, 49, 601, 1959.

# EXHIBIT 9



**Designation: E 444 – 98**

# Standard Descriptions of
# Scope of Work Relating to Forensic Document Examiners[1]

This standard is issued under the fixed designation E 444; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This description covers in general the duties of forensic document examiners, also referred to as questioned document examiners, examiners of questioned documents, document examiners, or document analysts.

## 2. Job Description

2.1 The forensic document examiner makes scientific examinations, comparisons, and analyses of documents in order to: (1) establish genuineness or nongenuineness, or to expose forgery, or to reveal alterations, additions, or deletions, (2) identify or eliminate persons as the source of handwriting, (3) identify or eliminate the source of typewriting or other impression, marks, or relative evidence, and (4) write reports or give testimony, when needed, to aid the users of the examiner's services in understanding the examiner's findings.

## 3. General Duties

3.1 Examiners in this field are sometimes known by the term "handwriting experts." Forensic document examination includes expertise in handwriting identification. Handwriting includes cursive or script style writing, handprinting, signatures, numerals, and other written marks or signs. Forensic document examination does not involve the employment of calligraphic or engrossing skills, nor does it involve a study of handwriting in an attempt to create a personality profile or otherwise analyze or judge the writer's personality or character.

3.2 Questions about documents arise in business, finance, civil and criminal trials, or in any matter affected by the integrity of written communications and records.

3.2.1 Typical problems in this field are:

3.2.1.1 the identification of handwriting, typewriting,

3.2.1.2 the identification or elimination of the source of/and the output of other mechanical or electronic imaging devices such as printers, copying machines, facsimile equipment, and the like,

3.2.1.3 the identification or elimination of ink, paper, and writing instruments,

3.2.1.4 the establishment of the date, source, history, sequence of preparation, alterations or additions to documents, and relationships of documents.

3.2.2 Other problems are the decipherment and sometimes the restoration, or both, of obscured, deleted, or damaged parts of documents.

3.2.3 The work often includes a study of the information carried by a document for discovery of evidence of spuriousness, identification of persons, or to show significant relationships.

3.2.4 Document examination also includes the recognition and preservation of other relevant physical evidence that may be present on documents.

3.3 Equipment used in forensic document examination includes: microscopes and other optical aids; photographic and other imaging devices, a wide variety of imaging materials adaptable for use with a variety of lighting methods, including those involving radiant energy in the ultraviolet, visible, infrared, and other regions of the electromagnetic spectrum; as well as electrostatic or other devices for the detection, or visualization, or both of indentations and other features present in or on paper or similar substrata. Other analytical instrumentation may be used where appropriate.

3.4 Questions about documents are answered through the application of knowledge, skill, experience, training, or education specific to forensic document examination (usually acquired through 24 or more months of contact training, or apprenticeship, or the equivalent and the study of the recognized texts in the field) as well as from a number of other fields, such as the physical sciences, mathematics, language studies, and the like. The field of interest includes manufacturing processes and the materials that go into the production of documents, as well as the methods, machines, instruments, and human agencies by which the parts of documents are formed or brought together.

3.5 The results of examinations are reported for use by the judiciary, administrative and executive officers, law enforcement agencies, boards, commissions, lawyers, and individuals. These results are often presented in the form of expert testimony, explaining the bases for the conclusions, which may be illustrated by the use of demonstrative evidence.

---

[1] These descriptions are under the jurisdiction of ASTM Committee E-30 on Forensic Sciences and is the direct responsibility of Subcommittee E 30.02 on Questioned Documents.
Current edition approved Jan. 10, 1998. Published April 1998. Originally published as E 444 – 72. Last previous edition E 444 – 93.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

 E 444

The American Society for Testing and Materials takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, 100 Barr Harbor Drive, West Conshohocken, PA 19428.

# EXHIBIT 10

A Monograph in
THE POLICE SCIENCE SERIES

Edited by
V. A. LEONARD
Professor of Police Administration
The State College of Washington
Pullman, Washington

# EVIDENTIAL DOCUMENTS

By
JAMES V. P. CONWAY
Examiner of Questioned Documents
San Francisco, California
Postal Inspector
in charge
San Francisco Identification Laboratory
U. S. Postal Inspection Service

*Police Series*

CHARLES C THOMAS • PUBLISHER
Springfield • Illinois • U.S.A.

MICHIGAN STATE UNIVERSITY
JAMES J. BRENNAN MEMORIAL LIBRARY
SCHOOL OF CRIMINAL JUSTICE
EAST LANSING, MICHIGAN 48823

1959

226

*Evidential Documents*

denied the needed services of a document examiner because none is readily available? Are you expending fees covering one or two or a few cases a year which are the equivalent of the annual salary of an examiner who could handle several hundred cases? What is the potential case volume of your department in the foreseeable future?

Case volume is of prime importance because document examination, properly conducted, is a specialized, full-time assignment. It is not a part-time chore for the fingerprint technician, photographer, chemist, or criminalist with little or no training in document examinations, who is pushed or pushes himself into repair reasonably his deficiencies through experience. Document examinations vary greatly in their complexities and requirements, temporily and otherwise, but an average case volume of twenty-five cases per month is probably advisable before any department establishes the position of document examiner.

A desirable arrangement in some cities is for an enforcement agency to retain a qualified examiner or firm of examiners in private practice on an annual basis. This sort of arrangement can provide qualified service on a permanent basis if consistent with the case volume of the employing agency. If the volume increases, arrangements can be considered for the training of staff examiners for the enforcement agency, under the aegis of the private examiner who is qualified and who is familiar with the specific needs of the employing agency. Another advantageous procedure in many local situations is the utilization of state facilities. A state identification laboratory, with appropriate support from various local departments, usually generates a volume of case work which is much more conducive to a high standard of proficiency than the requirements of the local departments individually.

At whatever level of law enforcement the position of document examiner is established, it will usually be necessary to train existing or specifically recruited personnel. The selection of a trainee examiner should never be be haphazard. Errors in training

227

*The Document Examiner*

will not necessarily nullify a trainee. An error in the selection of the trainee will negate any and all training. Mr. George G. Swett, Examiner of Questioned Documents, Saint Louis, Missouri, aptly stated some time ago: "The document examiner must be judged upon his ability to search, to reason, to interpret properly, and to report accurately . . . . What is needed in a laboratory is a well trained fact finder who operates within the limits of his science . . . . Although the examiner of questioned documents of today is much more than a 'handwriting expert' the determination of facts through the comparison of handwritings remains his major function."

Examiner Swett's observations are appropriate in reviewing the basic requirements of the trainee. He should have a sound educational background. Chemistry, physics, mathematics, statistics, psychology, philosophy, photography, law, advanced penmanship, criminalistics—all will help the trainee but none is indispensable at the outset of his training and none or all will necessarily guarantee his success. In assessing an applicant's educational background, a prima facie acceptance of completed courses may satisfy the personnel officer but it does not represent an adequate appraisal for the efficient administrator. The applicant's educational performances by courses should be carefully evaluated, and in the light of his activities subsequent thereto, with the view to gaining a correct insight into his real and not imagined or desired aptitudes.

Psychological tests and searching interviews of the prospective trainee are recommended to determine whether he is argumentative, impatient, opinionated, egotistical, or given to shallow reasoning. His basic judgment and common sense should be explored searchingly. The manner in which the applicant has acquired himself in the more difficult situations of his own experience and his responses to test situations will frequently confirm the applicant's orderly thought processes or expose deficiencies in common sense.

Training should not be despaired on the evasive or intellectually dishonest applicant who resolves all doubtful issues in his own favor through untruths, half truths, or deliberate omissions. Tendencies to sophistry are irreconcilable with the frame of mind

228        Evidential Documents

which is essential to the search for the truth in documents or anything else. Such disqualifying proclivities should not escape the initial scrutiny to which the would-be examiner is subjected. Scientific integrity in evidential matters can hardly be expected from examiners of dubious moral or intellectual fiber.

Always assuming the applicant's deep interest in document examination, an initial requirement is his proficiency in recognizing, adjudging, and differentiating minutiae of sizes, shapes, and design. Visual acuity by commonly accepted criteria is insufficient. The prospective trainee should be carefully tested for his aptitude in distinguishing and memorizing inconspicuous variations and spatial relationships in lines, angles, curves, circles, typewritten characters, fingerprint patterns, and handwritten letter conformations. One who stumbles in differentiating geometric configurations, who cannot accurately count the ridges in a fingerprint pattern, who cannot distinguish two different typeface styles, or who cannot readily fit together a "jigsaw" puzzle is not a likely prospect for success in the field of document examination.

The aspirant for training must have the ability to express himself with precision, orally and in writing. This qualification should never be unduly compromised. The examiner's first duty is to discover the facts. Thereafter, his value is measured by his ability to explain and establish these facts in the minds of others. A distinct asset is the somewhat indefinable quality of inspiring confidence and belief through forceful verbal and written presentations. These abilities can be developed in the trainee, but the applicant should be appraised carefully for his capacity to respond to such training. Any serious deficiencies in these particulars are obvious disqualifying grounds.

The capacity to accept responsibility, current and potential and accumulative, is another requisite for the successful document examiner. Admittedly this talent has no constant common denominator in the human equation. As a necessary ingredient of the document examiner in a strictly personal sense, its manifestations must be viewed critically. Without the inherent capability to embrace grave responsibility, the trainee will never develop beyond mediocrity.

The Document Examiner        229

The qualified document examiner must routinely accept individual responsibility for his findings and conclusions, as revealed by the evidence. He is not responsible for the existence of evidence but he must not flinch in the face of its correct interpretation. His findings on the evidence in many cases will affect personal liberties, personal reputations, extensive properties. They will not always be pleasing to his clients or administrative superiors. They may be very controversial at times, perhaps publicly controversial. If the document examiner is imbued with any predisposition to shoulder the pressure of personal findings and personal conclusions, better that he labor in some less demanding field.

The opposite extreme of reckless encroachment on responsibilities not properly within one's own province likewise must be guarded against. The examiner's proper acceptance of his own responsibility embodies no arrogation of the discrete areas of, for example, the field investigator, the attorney, judge, and jury. Another consideration is the mental apprehension of error. If one's fear of error exceeds that salutary fear which seasons one's judgment to that overwhelming fear which destroys one's judgment, better that he seek a situation wherein another makes the difficult decisions.

There is no room in the efficient document laboratory for the "yes" man, the "no" man, or the "I hesitate" man, the "I know everything" man, or the "this pressure is killing me" man. But the door opens wide for the mentally alert young man with keen, accurate, and highly developed powers of rapid and intelligent observation. Diligent cataloging of observations, sustained concentration, deductive reasoning, and honest, clear reporting are rewarding to, if demanding of, the true fact finder. He invites the challenge of the cases which seem to defy solution. Such are high among the basic attitudes and aptitudes to be sought in the prospective document examiner trainee.

The needs of different agencies, the receptivity of individual trainees, and the effectiveness of the training presentation will tend to regulate the advisable emphasis and extensiveness of the various training phases for the aspiring document examiner. It

would be presumptuous to attempt to delineate each and every step which would be requisite to the needs of every agency, or the order in which the various training phases should be undertaken. Nevertheless, there are certain basic data which should be within the knowledge of the general practitioner in the document examination field, subject to elaboration to fit case requirements. The development of these data require studies of and case assignments in:

1. Statutes, regulations, policies, procedures, and objectives governing the employing agency.
2. Specific classes of documents and document problems confronting the employing agency.
3. Typeface designs utilized by the several typewriter manufacturers.
4. Individualities of typefaces and typewriter operation which identify the individual typewriter.
5. History of handwriting and development of American handwriting.
6. Handwriting systems in the United States.
7. Foreign handwriting systems which influence handwriting encountered in the United States.
8. Handwriting movement and execution as applied to cursive script, manuscript writing, block printing, numerals, and punctuation.
9. The characteristics of traced and simulated signatures and writings.
10. Various volitional and non-volitional factors affecting handwriting variations and execution, for example, intentional deception, nervousness, fatigue, illness, excitement, intoxication, missing spectacles, advanced age, undue hurry, muscular strain, unusual writing implements, abnormal writing position, etc.
11. Effective methods of procuring exemplars.
12. Mathematics of handwriting probabilities.
13. The laboratory report and its verbal exposition.
14. Chemical and mechanical erasures and alterations.
15. Development of erased and obliterated writings.
16. Photographic copying of documents by reflected, trans-

mitted, and oblique visible light, and by infrared and ultra-violet.
17. Composition of photographic charts illustrating differences and agreements in handwriting, typewriting, etc.
18. Differentiation of writing inks and classification of writing inks; sympathetic inks; characteristics of typewriter ribbons.
19. Printing and duplicating processes; adhesives, sealing and binding; cutting and fastening processes.
20. Differentiation of writing papers and the classification of writing papers.
21. Differentiation of writing instruments and the classification of writing instruments.
22. Sequence of crossed lines, sequence of written and typewritten lines and stamped impressions, sequence of writings and folds and creases.
23. The development of latent fingerprints on documents.
24. Court procedures—qualifying the document expert, the development of the expert's conclusions, reasons, and demonstration on direct examination, and the expert's responses on cross-examination.
25. Questioned Document law.

There is considerable practical merit to assigning typewriting classification and identification early in the training program. Such procedure is a medium of demonstrating to both the trainee and his instructor the former's ability to distinguish inconspicuous agreements and differences, as well as the trainee's thoroughness, patience, objectivity, and courage of conviction. The trainee's confidence can be opportunely developed by enabling him to gain early proficiency in typewriting examinations wherein, unlike handwriting examinations, the trainee can be provided with rather readily understandable criteria of individualities.

Throughout the trainee's internship on case assignments he should invariably be caused to commit the reasons for his conclusions in somewhat detailed fashion. The reasons for his conclusions provide a greater insight to the trainee's ability than do the conclusions themselves. His reasoning should be closely scrutinized, case by case, to direct deficiencies. The complexity of