# EXHIBIT 11

# Document Examiner Textbook

Jess E. Dines

# 12

# COMPARISON OF WRITINGS

Once an individual executes a freehand writing, including printscript and numbers, it cannot be identically reproduced in every intricate detail, including its characteristics, by another individual—in fact, not even by the same individual. This occurs since each freehand writing contains its own unique characteristics, which are habitual, automatic, and involuntary. All of this results from the fact that each of us perceives writing differently, our physiological make-up is different; and other variables enter in, such as the well-being of the writer and the conditions under which the writing occurred.

Furthermore, an individual cannot change unconscious habitual writing patterns formed over the years that he is unaware of. Nor can he duplicate all of the precise writing habits of another for the most part, when attempting simulation, even when he is aware of them. Discovery depends upon the examination and expertise of a competent document examiner. Of course, the aforementioned precludes mechanical and electronic devices such as photocopiers, faxes, and computer printers where identical non-freehand writing or tracing is produced. The differences which do result are explained in subsequent chapters.

Documents written by the same hand not containing accidentals have no discrepancies. Conversely, documents written by different hands must contain discrepancies that cannot be accounted for. There are no exact number of coincidences or discrepancies that must exist to prove a similarity or difference between two writings. However, the greater the number, and the more unusual and intricate they are, the more likely the identification of the writer can be realized.

155

## The Comparison

Examination and comparison of handwriting, printscript, and numbers is essential as demonstrative evidence in the court. Comparison is conclusive since most intended forgers are unaware of or how, or unable, to precisely duplicate all of the various, characteristic differences that exist between genuine and non-genuine writing, especially those that are not letter forms.

In disguised writing, the intention of the forger is to make the non-genuine writing look different from his own hand. Thus, the differences of the characteristics generally outnumber the similarities. In the case of disguised writing, although the similarities are unintentional, they bear greater significance for the examiner than the number of differences. In simulated writing, the reverse is true where the differences are more significant than the similarities.

Comparing signatures is more common than comparing text where the examiner has a more distinctive style to work with and compare, facilitating somewhat the comparison. In most cases, because of this distinction, it is sometimes not advisable to compare the characteristics of the questioned document signature with the text if it doesn't contain a signature. In any case, a comparison of text to text should be used.

Signatures in wills are often contested since they differ noticeably from known signatures. The reason for this is that the writer at the time of the writing may have been under emotional stress or he may have had a serious ailment, was handicapped, situated in an awkward writing position, etc. Then again, the signature may be non-genuine to begin with.

A detailed examination and comparison of handwriting should result in a written opinion by the document examiner. This opinion is the result of the examiner's training, experience, and knowledge. The strength of the opinion will depend upon the number, type, and condition of the documents. Accuracy of the comparison is directly dependent on the examiners experience, his ability to perceive and judge similarities and differences.

The final opinion is based on evidence reflected in the examined document. The examiner should be capable of explaining and demonstrating the means by which he arrived at his opinion. The investigation and opinion should never be influenced by personal feelings, by any circumstances surrounding the case, or by a desire to accommodate someone.

The examiner should be prepared to provide picture proof of this comparison and demonstrate it using exhibits that entail approved and accepted principles and techniques. This comparison should not be performed half-heartedly or be incomplete in any way. It should not be

performed under pressure or within a predetermined time frame. Each detail must be carefully analyzed, each conclusion checked and double checked. In many cases, it is suggested that the examiner lay the case aside after a few hours of study and then return to it when his mind has cleared and is rested. If possible, he should avoid distractions during the examination and comparison, since each examination needs undivided attention. It is only after each detail is analyzed to his satisfaction, that he can objectively view the entire comparison. He must feel comfortable that the accurate history of the document is clearly revealed and substantiated.

The importance of analyzing every detail of every characteristic from the smallest stroke to the ink and paper used, cannot be overemphasized. This detailed analysis must, in turn, be integrated with an analysis of the document as a whole and must be made under the guidelines of common sense, good judgment, and experience. It is not simply the differences and similarities between details that determine the outcome of such an analysis, but the combination of all factors including the circumstances surrounding the creation of the document. Thus, the examination of a document should take place simultaneously on a microscopic and macroscopic level in order to reach the most logical and supportable conclusion.

A visual, simultaneous side-by-side comparison of two writings can be made using a comparator. A comparator is a device with two optical lenses and a screen. The letter, word or signatures under inspection are placed under the lens and projected onto a screen in enlarged form. Newer, scanning devices portray comparative writings on a computer monitor. (See Chapter 23.)

## Similarities and Differences

The purpose of an examination comparison is to determine the similarities and differences between two writings executed by hand. These should be closely studied and interpreted to determine all of their characteristics in order to make an identification or elimination.

The similarities and differences cannot be construed in a general way since this may be interpreted as a class characteristic rather than specific individual characteristics which are necessary. This is analogous to saying that a writing that uses the phonetic alphabet is *similar* to all other writings using the *phonetic* alphabet in an overall way, but it also differentiates from all other writings using the same phonetic alphabet in a specific way. Only the precise interpretation of similarities and differences in side-by-side comparison will lead to the correct solution. Differences in writing emanate from different writers when there is forg-

ery involving disguised tracing or simulation. Caution is advised that some differences may also come from natural variations and must not be discounted.

In two writings with extensive similarities, basic and repeated differences can often be the determining factor in concluding that they were written by different hands. A comparison of all the characteristics and unique combinations of characteristics is essential in making an identification or elimination. Similarities that do exist are primarily inconspicuous features.

If the examiner finds no apparent evidence that definitely indicates two different individuals are involved, he should not mistakenly conclude that the writings are of the same authorship. The reason for such an erroneous conclusion may be, for example, an insufficient number of exemplars to make this determination. Then again, the writings might be the result of tracing or be produced by a mechanical or electronic device. Although the examiner may give an opinion on these, it should be qualified. He should always treat with suspicion two writings that strongly resemble each other.

If a dissimilarity is consistent, but appears too obvious, its analysis and conclusion must be treated with caution since there always exists the possibility that is was intentionally introduced to create confusion and diversion. In this case, the examiner should carefully delve into, and not overlook, the individual structure of the character.

Fundamental characteristics show both similarities and differences when one writing is compared to another. Those differences which show a particular unique deviation using copybook as a reference, are fundamentally different from all other characteristics in a writing, e.g., slant, size, pressure. A unique form is sometimes all that is needed to identify a writer.

## Unexplainable Differences

The unique form referred to above is one that is fundamentally peculiar in that it does not fall within the normal range of variations and cannot be found, for all practical purposes, in any other writing. It can be considered to be an *idiosyncrasy*. This is called a "significant difference" or "unexplained difference" because the differences are unexplainable, yet they are significant. Full consideration must be given to the type of idiosyncrasy and the number of times it appears within the writing. Recognizing unexplainable differences comes with training and experience.

These idiosyncrasies cannot be accounted for by occasional habits, different writing or conditions, accident, or other reasonable causes. They

have unique or distinguished features rarely seen in other forms, if at all. Their unusual structure might consist of unnecessary or additional strokes, including hooks or tics that become an integral part of the letter form. It might, for example, be a circle substituted for an i-dot or a triangle substituted for a t-bar.

The precise explanation as to how such idiosyncrasies occur is a mystery and thus is unexplainable. It is an inherent characteristic of the writer borne from his physical and mental makeup. In any case, it is unique and habitual and most writers cannot duplicate it, except, of course, when there is an attempted forgery. One or two such idiosyncrasies is sufficient to identify the writer. It is not difficult to conceive that one distinct, fundamental difference can far outweigh the value derived from many similar characteristics.

## Procedure

The essence of comparison is methodically to examine all documents and then compare their characteristics before reaching a conclusion as to the genuineness or non-genuineness of the questioned document. This comparison should never be accomplished in a mechanical-like way or as if it were a jig-saw puzzle since it requires the human element such as the recognition of inherent rhythm and form. The difference might be due to natural variations which, in itself, is an individual characteristic.

Before performing the comparison, carefully examine the documents to become familiar with all of their features and make sure they are acceptable for examination. Answer these questions to your satisfaction: Are the documents original or are they exact replicas? Are they clear enough for examination? Do the documents reveal the possibility of more writers involved than those specified? Under magnification, determine if the writings are from a photocopier, fax, or computer printer. Be aware that negative answers to the above questions may limit your analysis, resulting in the possibility of qualifying your opinion. If necessary, produce enlarged photographs to prove your point.

There is no single, simple way to approach the comparison of two or more documents. It depends upon the examiner, himself, who will ultimately develop his own method, that by which he feels most comfortable. Even then, he may deviate from his method at certain times since each case presents a unique set of circumstances. Don't underestimate the complexity of this technique—since knowledge, experience, proficiency and skill all come into play simultaneously.

Which should you examine first, the questioned writing or the

160                                                                          *Document Examiner Textbook*

known writing? For all practical purposes, it is immaterial. However, a preliminary examination of the questioned writing can save valuable time and unnecessary work, especially if the suspected writing is a simulated or traced forgery. A thorough examination of the questioned writing also indicates the type and quantity of exemplars required to form a basis for comparison. In the initial examination of the questioned writing, close attention must be paid to see if the writing is natural. Natural writing can be identified if sufficient exemplars are available for comparison. The identification of unnatural writing depends upon the extent and cause of the unnaturalness.

Some suggested methods for performing the comparison follows. An examination that consists of looking at one document and continually shifting the eyes to the second document, back and forth, is not recommended. The human mind has a difficult time retaining the same impressions while the eyes are shifting from document to another. An excellent way to remedy this is to photograph the document and then cut out individual letters and words and place them side-by-side for comparison. This is an effective method, but prohibitive because of the expense required. A similar and *less expensive method is to photocopy the documents, then use the copies to cut out the individual letters and words for comparison.* Keep in mind that once photocopies are made, certain characteristics such as retracing, overwriting, and pressure variations are lost. However, the analysis of most of the letter forms themselves can still be used.

A laboratory worksheet should be devised. There are probably as many different types of worksheets as there are laboratories that use them. An examples of such a form is shown in Figure 12-1. This can be used as a guide and modified or expanded depending on the needs of the examiner. The entire alphabet is listed, including numbers where boxes are provided for the letter forms which are drawn in for comparison. Note the questioned documents "Q" and known documents "K" are indicated on the vertical left and right columns, respectively. These should be numbered for identification as needed such as Q1, Q2, K1, K2, etc. A similar chart can be constructed to include class characteristics and some individual characteristics such as size of the various zones and their ratios. Also, a form can be made to include slant, space, pressure, alignment, arrangement, punctuation, initial and terminal strokes, etc.

In Figure 12-1 by comparing all of the individual letters in the questioned and known writings, the form of every letter and any of its variations can be noted and established. Compare all of the capital letters "A," letters "B" and all the small "a," "b," etc., until all letters that appear in the writing have been included. The more often a letter

*omparison of Writings* 161

| CHARACTER-ISTICS | QUESTIONED WRITING | | | | | | | KNOWN WRITING | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q | Q | Q | Q | Q | Q | Q | K | K | K | K | K | K | K |
| a | | | | | | | | | | | | | | |
| b | | | | | | | | | | | | | | |
| c | | | | | | | | | | | | | | |
| d | | | | | | | | | | | | | | |
| e | | | | | | | | | | | | | | |
| f | | | | | | | | | | | | | | |
| g | | | | | | | | | | | | | | |
| LETTER FORMS h | | | | | | | | | | | | | | |
| i | | | | | | | | | | | | | | |
| j | | | | | | | | | | | | | | |
| k | | | | | | | | | | | | | | |
| l | | | | | | | | | | | | | | |
| m | | | | | | | | | | | | | | |
| n | | | | | | | | | | | | | | |
| o | | | | | | | | | | | | | | |
| p | | | | | | | | | | | | | | |
| q | | | | | | | | | | | | | | |
| r | | | | | | | | | | | | | | |
| s | | | | | | | | | | | | | | |
| t | | | | | | | | | | | | | | |
| u | | | | | | | | | | | | | | |
| v | | | | | | | | | | | | | | |
| NUMBERS | | | | | | | | | | | | | | |

COMPARISON ANALYSIS   NAME_____

Figure 12-1. A sample of a worksheet which lists the alphabet and numbers of questioned and known documents for comparison purposes.

appears, the greater its value for identification. Proceed using this method of comparison, including every stroke and line until all individual characteristics have been compared.

A simpler, inexpensive, yet effective method employs a plain sheet of paper divided into two columns, one for "Q," the other for "K." Select as many letters, words, and/or signatures from the questioned document as you feel is necessary and reproduce them under the "Q" column. Repeat this procedure by selecting the same letters, words, and/or signatures for "K" column. (See Figure 13-1 in Chapter 13.) By using this method, not only can a side-by-side comparison be made of the

characteristics, but the writer's rhythm, movement, and speed can also be noted. The aforementioned methods may also be used when encountering printscript. There you will find more similarities of individual characteristics than in handwriting.

### *Initials*

Examination and comparison of initials is sometimes encountered in document examination. Initials, like the signature, can identify the individual. It is not unusual, when examining wills, to find the signature on the last page, together with each preceding page bearing the initials of the person writing the will. Initials are also found on important documents where changes have been made or mistakes have been corrected. Initials are often formed as a whole unit rather individual letters, which produces different characteristics from one's natural capital letters.

The examiner must realize that his success or failure to identify initials depends upon the reliability of comparison. As a general rule, initials should not be compared to a signature, just as a signature should not ordinarily be compared to text. Initials should be compared with initials. Each individual develops his own habit of writing his initials. It is not unusual for a person to use different letter form shapes in his initials than those in his normal signature. In fact, the individual characteristics of his initials may be inconsistent with the individual characteristics of his normal signature, including the size, proportions, spacing, slant as well as the letter form. There is no basis for comparison between an individual's signature and his initials. The same methods of comparing initials are used for handwriting.

### *The Crossbar "X"*

An individual who is illiterate can legally use a cross-bar or "X," in place of his signature. Such an individual can sign his name in a will this way. Identifying such a signature becomes complicated when there are no witnesses, when they are not available or reliable, or if their integrity is in doubt. It is always helpful, if not essential, that all facts leading to, and following from, such a writing are first obtained. In disputes involving fraudulent election ballots containing cross-bars, such as in union voting, a comparison of cross-bars with exemplars is sometimes done. However, before undertaking such an examination, the examiner should always discover the circumstances surrounding the writing of the cross-bars. In fact, the entire voting procedure is likely to be helpful to the examiner.

The cross-bar is usually highly personalized, and when compared with sufficient exemplars, could very well reveal its genuineness. It is helpful to know that there are countless variations in shape, slant, size, position, stroke segments, pressure pattern, skill and speed which can reveal numerous individual characteristics. The importance of obtaining as many exemplars as possible for comparison purposes cannot be overemphasized since the examiner is working with only one letter.

## Examination Details

The essence of this book primarily devotes itself to determining whether or not an examination of the text of a questioned document is genuine or non-genuine. This is accomplished by determining the type and quantity of similar and different characteristics that exist between the questioned and known documents. These characteristics were discussed in Chapters 8 and 9 and are briefly reviewed below. They should be used as both a reference and checklist when comparing documents.

1  *Class Characteristics:* type of handwriting, including copybook.

2  *Rhythm, Form Level and Natural Variations:* see if writing is free flowing, harmonious, awkward, simplistic, flexible, rigid, consistent, original.

3  *Style:* garland, arcaded, angular or threaded including their connectives.

4  *Alignment:* direction of baseline, and relative position of the letters and words.

5  *Arrangement:* paragraphs, margins, text layout.

6  *Line Quality:* thickness, variations, tremor, hesitations, pen lifts, feathering.

7  *Size:* letters, words, proportion of UZ, MZ and LZ, tapering of letters in words.

8  *Slant:* three zones using a vertical reference.

9  *Spacing:* letters, words, lines, paragraphs and margins.

10  *Pressure:* variations, shading, vertical and horizontal displacement.

11. *Initial and Terminal Strokes:* absence, feathering, relative position to baseline, hooks, zones.

12. *Letter Forms:* angles, curves, flourishes, idiosyncrasies, "i" dots and "t"-bars.

13. *Speed and Movement:* fast, slow, flexible, letter formations.

14. *Punctuation, Symbols and Strokes:* omissions and unnecessary additions.

15. *Loops:* relative position in all zones, round, angular, needle-like, squared-off, irregular, absent, unfinished, out-of-place.

16. *Circle Formations:* broad, narrow, elliptical, ink-filled, contaminated, eylets.

17. *Hooks, Tics, Claws:* location, direction, flourished, feathered, fade out, unintentional, shape, size.

18. *Skill:* maturity.

19. *Spelling and Grammar:* errors, habits.

There are other factors which need to be included in the comparison, such as obliterations, alterations, erasures, retracing and overwriting, all of which are discussed in Chapter 16. Also, there are the subjects of ink, writing instruments, and paper; Chapters 19 and 20 are devoted solely to these. Comparisons of printing from the photocopier, fax, typewriter, computer printer and other electric and mechanical devices are provided in subsequent chapters.

## Examining An Actual Case

An actual case is given here to exemplify the comparison of documents. Refer to Figure 12-2. A bank accused Kenneth Hall of allegedly forging a check. It must be determined if the writing on the check is genuine.

    Q1. Questioned document (check # 2025.)
    K1. Requested exemplar.
    K2 and K3. Collected exemplars magnified to facilitate comparison
    K3. It is to be determined if Q1 is written by the same hand as K1, K2 and K3.

r Textbook                              Comparison of Writings                              165

osition to

" dots and

s.

ssary addi

needle-like

taminated

ed, fade out



he compan
nd overwrit
e the subjects
O are devoted
ier, fax, type
al devices are

rison of doc
ll of allegedly
n the check

Figure 12-2. Comparison of Q1, K1, K2 and K3 in a case involving an alleged check forgery.

Differences:
- Portions of the words "Jewelers" and "Kenneth" are written below the baseline for Q1, but not in the case of K1, K2, and K3.

e comparison
ne hand

- The lower section of the capital letter "H" in "Hall" is triangular and not retraced in Q1, but not for K1, K2, and K3 where it is rounded and partially retraced. These are magnified and depicted in Figure 12-3A and B, respectively, for closer observation.

- In Q1 the stem in the small letter "d" in "thousand" is split and its terminal stroke extends above the baseline unlike that of K1.

- The number "1" in Q1 ("10,000") remains at the same level as the digits that follow it. In K1 ("10,000") and K2 ("15-36") the bottom portion of the "1" extends below the numbers that follow it.

*Similarities:*
Those that do exist are conspicuous and, therefore, are not considered in the examination.



**A**  **B**

Figure 12-3. Comparison of the letter forms of the capital letter "H" in an alleged fraud case.

*Conclusion:*
Q1 was not written by the same hand as K1, K2, and K3 and therefore is not genuine. The check has been allegedly forged.

## Summary

ting of an individual cannot be reproduced meticulously by : each of us perceives writing differently; our physiological p is different; and other variables pertain.

t replica of the writing produced by an individual cannot be ' repeated regardless of the number of attempts that are made..

arison of writings should not be made while the examiner is ressure for time. The comparison must be objective and not :ed by circumstances surrounding the case or made to ac-date others.

ties and differences of a writing is the heart of a comparison ;. They must be finely delineated with a discovery of indi-haracteristics in mind.

cteristic that occurs in the writing of one individual and does ır in the writing of any other is classified as an "unexplain-'erence."

ıould be significant similarities and no unexplainable differ-ween two writings before the examiner can positively con-ıat they were written by the same hand.

ıces do not have to occur in great numbers to differentiate s. One or two idiosyncrasies is all that is necessary even there may be many more similarities than differences.

e an identification that writings were made by the same here must be suitable significant similarities and no unex-le differences. Differences that do occur are unexplainable.

miner should devise his own laboratory worksheet to use ɔmparing characteristics.

## Questions

ndividual aware of a handwriting change while it occurs?

As far as the courts are concerned, why is the comparison of two writings conclusive?

What problems exist, if any, when comparing the signature on a will with known signatures?

Why must natural variations be taken into consideration when comparing similarities and differences? How is this done?

What is meant by "unexplainable differences" when comparing two writings? Why are "unexplainable differences" unexplainable?

Why must the close similarity of two writings that appear too obvious be treated with caution?

Can the discovery of only two similarities or differences between two writings produce a reliable opinion? Why?

Name two procedures that could be used for the comparison of writings. How would photography come into play?

Can initials be compared with the corresponding capital letters in the signature? Why?

As an examiner, should you take on a case in which the signature is only a cross-bar? Why?

Name nine individual characteristics to look for when comparing documents. (If you can name an additional nine, consider yourself very proficient.)

Is only one "unexplainable difference" in a handwriting enough to be conclusive?

Which has a greater significance—the number of similarities or differences in a disguised writing and in a simulated writing? Why?

# 16

# ALTERATIONS OF DOCUMENTS

The alteration of a document must not be overlooked by the astute and meticulous examiner who should constantly be aware that it may exist. Alterations can be accomplished by obliterations, erasures, insertions, indentations, intersections, invisibility, transfer of a signature and charred and water soaked documents, all of which are discussed here. Insertion of a single word can completely change the meaning of a document. Pages can be inserted or substituted. Documents can be backdated. Dollar amounts can be manipulated. Accounting records can be altered in embezzlement cases. Entries or substituted pages in proposals or contracts, and changed entries in medical records are some other possibilities.

The key to detecting and solving such alterations lies in a detailed and comprehensive examination of the questioned documents. The complicating factor here is the need to distinguish between normal changes, innocuous corrections and alterations made for the purpose of fraud. Sometimes fraudulent alteration is obvious, other times it is meticulously made to be either extremely difficult to detect or mistaken for a common correction. The examiner often has to view the alteration in terms of its impact on the document in its entirety, and/or seek additional supporting indications of fraud. Does the insertion of a word appear to be a simple correction of an oversight or does it change the entire meaning of the document? Sometimes determining the difference between a correction and an alteration depends completely upon knowledge of the circumstances surrounding the case.

The existence of an alteration of a document should be suspected by the examiner if any of the following indications are noted:

236                                                    Document Examiner Textbook

- Anytime an erasure or obliteration is encountered, especially when new words or numbers have been substituted.

- Any sign of overwriting, such as heavier writing over a faint writing.

- Any sign of crowding in letters or words, or writing between lines, or in the margins could suggest that insertions have been made. Determine if the spacing between other words and lines is consistent throughout the rest of the document.

- Indications of a different writing instrument, evidenced by different shades of ink color, is possibly an alteration.

- Any sign of a different size or style of handwriting, punctuation, typewriting, printing, etc. They must all be the same.

### *Multi-page Documents*

- The type of ink and paper should be the same for all pages (See Chapters 19 and 20.) Are the pages in the correct numerical sequence or are some missing or out of order?

- The alignment and arrangement, such as margins and paragraphs, must be almost identical for all pages.

- Any signs of staple holes and clip indentations must occur or match up identically on all pages.

In photocopies, look for :

- "Trash" marks to see if they are identically located on the pages. This depends upon the cause of the trash marks; in the case of a dirty platen, it would hold true throughout.

- Extreme pressure variations that become more prominent as more "generation" copies are made.

- "Shadow lines" circumventing a portion of the document (e.g. the signature, date, or numbers) indicating a "cut-and-paste" occurrence.

Depending upon the type of alterations, the following can be used for diagnosis. In addition to these, the examiner should conduct his own

innovative experiments in search better and more reliable methods. As with any procedure, the examiner should always use non-destructive methods first. The destructive methods are used only when nothing else works and then, only with the permission of all parties involved. Make sure you know how each procedure will affect the document before using it.

The use of photography is essential for proof of discovery and it is recommended that it always be used, not only for obliterations but for all other types of document alterations.

## Solutions For Determining Obliterations

Obliteration problems have been explored since the earliest days of document examination. Many of the original techniques for deciphering and/or restoring these writings are still used today. The methods used to detect and restore obliterated writing depends on the medium used to produce the writing. Obliteration and restoration peculiarities for ink writing are the same as for pencil writing. Nevertheless, it is ink that is mostly used and, therefore, is of greatest concern to the examiner.

There is no one ideal procedure to solve the problem of obliterations. Each document problem is unique and its response to a particular procedure is also unique. There are no guaranteed results to the solution. The detection and restoration of obliterated writing is primarily a process of trial and error, utilizing the most logical and basic techniques first, then proceeding through other known techniques until a solution, or a new technique, is discovered.

One of the first methods that should be tried to reveal obliterated words is the use of oblique or diagonally-transmitted light. This works especially well when "liquid ink" or "liquid paper" correction fluid has been used as the obstructing material, one of the more common mediums encountered. This method should be used with the aid of a stereomicroscope. An example is shown in Figure 16-1. Discovery of the obliteration "May 1993" caused by liquid ink is illustrated in "A." Photography and a reversal negative produced the proper word sequence.

The use of a strong backlight or underlight (transmitted lights placed beneath the document) will sometimes reveal the obliteration. An example of this is shown in Figure 16-2 where the obliterating material is "liquid paper" placed over a portion of a questioned agreement, shown in "A." In "B," using magnification with a stereomicroscope, the words "first and" appear faintly visible under the word "all" which was typed over them in an effort to alter the intended meaning of the agreement.

Case 1:04-cv-01371-JJF    Document 543-3    Filed 09/14/2007    Page 20 of 20

238                                               *Document Examiner Textbook*



Figure 16-1. Using oblique lighting, the obliteration of a document revealed the words "May 1993" shown in "A." Photography and a reverse negative produces the proper word sequence, as shown in "B."

Figure 16-2. Obliteration caused by "liquid paper" in "A" and revealed using backlighting and a stereomicroscope shown in "B."