# Exhibit A



Fairchild Semiconductor to Continue to Fight Following Patent Verdict: Fairchild Semiconductor

Home >> Company >> Press Room >>

# Fairchild Semiconductor to Continue to Fight Following Patent Verdict

*San Jose, California – September 21, 2007 –* Fairchild Semiconductor (NYSE: FCS) said it will keep fighting following Friday's setback in its longstanding patent dispute with Power Integrations.

Meanwhile, the enforceability phase of the litigation is continuing before the judge in the case and is expected to be completed on Monday. Rulings from that phase of the litigation may take several weeks and may overturn parts of the jury verdict.

Late Friday, a jury for the U.S. District Court for the District of Delaware found four Power Integrations patents asserted in the lawsuit are valid. Fairchild said the verdict finding was incorrect and disappointing, and said it was planning to contest those findings and several other errors the company says have been made during the litigation that began in 2004. The company will begin this process soon, with a series of motions it expects to file in coming days and weeks and, if necessary, on appeal.

Fairchild has already released a new generation of advanced pulse-width modulation (PWM) controllers and related products that replace the products that are accused in the lawsuit.

Fairchild is also suing Power Integrations for patent infringement in a separate lawsuit.

The company said one aspect of an earlier verdict, which found Fairchild had willfully infringed the Power Integrations patents, should be dismissed or put to a new trial because of an August 20 higher court ruling that overturned a quarter-century of precedent related to willful patent infringement. And the company said it would request a reduction in the level of damages awarded in an earlier round of the litigation because of errors in the way damages were calculated. Fairchild said it would also contest several decisions made by the court over the course of the three-year-old dispute, including the division of the trial into several phases, rulings construing the claims of the patents involved, and limitations on the evidence Fairchild was permitted to present.

To learn more contact:

Fairchild Semiconductor:
Patti Olson
Corporate Communications
(800) 341-0392 X 8728
Fax: (207) 775-8161
Email: patti.olson@fairchildsemi.com

Agency Contact:
Marsha Lisak, Senior Account Executive
WelComm, Inc.
(805) 223-2311 | Fax: (858) 279-5400
Email: marsha@welcomm.com

**About Fairchild Semiconductor:**

Fairchild Semiconductor (NYSE: FCS) is the global leader in power analog and power discrete technologies delivering energy-efficient solutions for all electronic systems. Recognized as The Power Franchise®, Fairchild provides leading-edge silicon and packaging technologies, manufacturing strength and system expertise. In 2007, Fairchild celebrates its '50/10' anniversary, commemorating 10

Fairchild Semiconductor to Continue to Fight Following Patent Verdict- Fairchild Semiconductor

years as a new company and 50 years in the industry. Known as the "Father of Silicon Valley," Fairchild developed the planar transistor in 1958—and with it a new industry. Today, Fairchild is an application-driven, solution-based semiconductor supplier providing online design tools and design centers worldwide as part of its comprehensive Global Power ResourceSM. Please contact us on the web at www.fairchildsemi.com.

**Special Note on Forward-Looking Statements**
Some of the paragraphs above contain forward-looking statements that are based on management's assumptions and expectations and that involve risk and uncertainty. All statements in this release, other than statements or characterizations of historical fact, are forward-looking statements. Forward-looking statements usually, but do not always, contain forward-looking terminology such as "we believe," "we expect," or "we anticipate," or refer to management's expectations about Fairchild's future performance. Many factors could cause actual results to differ materially from those expressed in forward-looking statements. Important factors that may cause such a difference for Fairchild Semiconductor in connection with the company's litigation with Power Integrations include, but are not limited to, the company's ability to prevail in the enforceability phase of the litigation, the company's ability to prevail in post-trial motions and possibly on appeal, and the risks associated with litigation in general, including the costs and time that must be devoted to litigation, the potential diversion of attention of management and key employees that may result from being engaged in litigation, and the possibility of adverse results. Risk factors affecting the company generally, including those related to intellectual property and litigation, are discussed in the company's quarterly and annual reports filed with the Securities and Exchange Commission (SEC) and available at the Investor Relations section of Fairchild Semiconductor's web site at investor.fairchildsemi.com or the SEC's web site at www.sec.gov.

© 2007 Fairchild Semiconductor

Products | Design Center | Support | Company News | Investors | My Fairchild | Contact Us | Site Index | Privacy Policy | Site Terms & Conditions | Standard Terms & Conditions of Sale

Last updated: September 21, 2007


the p⚛wer franchise

# Exhibit B

Fairchild Semiconductor International, Inc. Presentations

# FAIRCHILD
## SEMICONDUCTOR®

日本語 한국어 简体中文

## Fairchild Semiconductor Says Lawsuit is Not Over and it Expects to Ultimately Prevail Against Power Integrations

Business Editors/Technology Editors

SOUTH PORTLAND, Maine--(BUSINESS WIRE)--Oct. 10, 2006--Fairchild Semiconductor announced Tuesday that it continues to believe it will prevail in the patent infringement lawsuit brought against the company by Power Integrations, despite a jury verdict to the contrary in the first of three phases of trial in the case.

The company also said it will continue offering its full line of pulse-width modulation (PWM) products.

The company announced that it was disappointed by the jury's verdict in the first phase, but that it has yet to present all of its defenses to Power Integrations' claims. The company believes that Power Integrations' patent claims are invalid, and its invalidity defenses have yet to be heard by a jury.

The trial in the case has been divided into three phases. The first phase, held last week, was on infringement, the willfulness of any infringement, and damages. The second phase, scheduled to begin Dec. 4 before a different jury, will be on the validity of the Power Integrations patents being asserted. Unenforceability will be handled in a final phase before the court. Fairchild believes it has identified inventions and publications, known as prior art, that pre-date the Power Integrations patents and that Fairchild believes would invalidate the Power Integrations patents.

A jury in the first phase found Tuesday that Fairchild willfully infringed four patents asserted by Power Integrations and awarded approximately $34 million in damages. For Power Integrations to prevail in the case and receive a judgment and injunction against Fairchild, the patents found to be infringed must also be found to be valid and enforceable in the remaining phases of trial scheduled for December. Final resolution of the matter is not expected until 2007.

Special Note on Forward-Looking Statements:

This press release contains forward-looking statements that are based on management's assumptions and expectations and that involve risk and uncertainty. Forward-looking statements usually, but do not always, contain forward-looking terminology such as "we believe," "we expect," or "we anticipate," or refer to management's expectations about the future performance of Fairchild Semiconductor or the industries and markets we serve. Many factors could cause actual results to differ materially from those expressed in forward-looking statements. Although we believe we have invalidity defenses to the Power Integrations patents found to have been infringed by Fairchild products in this case, the results of litigation are difficult to predict and no assurances can be given that Fairchild will ultimately prevail in this case. Our intellectual property and other risk factors are discussed in the company's quarterly and annual reports filed with the Securities and Exchange Commission (SEC) and available at the Investor Relations section of Fairchild Semiconductor's web site at investor.fairchildsemi.com or the SEC's web site at www.sec.gov.

About Fairchild Semiconductor:

Fairchild Semiconductor (NYSE: FCS) is the leading global supplier of high-performance power products critical to today's leading electronic applications in the computing, communications, consumer, industrial and automotive segments. As The Power Franchise(R), Fairchild offers the industry's broadest portfolio of components that optimize system power. Fairchild's 9,000 employees design, manufacture and market power, analog & mixed signal, interface, logic, and optoelectronics products. Please contact us on the web at www.fairchildsemi.com.

CONTACT:
Corporate Communications -
Fairchild Semiconductor
Fran Harrison, 207-775-8576
Fran.harrison@fairchildsemi.com

Public Relations Firm -
CHEN PR
Barbara Ewen, 781-466-8282
bewen@chenpr.com

SOURCE:
Fairchild Semiconductor

# Exhibit C

549

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC., ) Trial Volume III
                          )
            Plaintiff,    )
                          ) C.A. No. 04-1371-JJF
v.                        )
                          )
FAIRCHILD SEMICONDUCTOR   )
INTERNATIONAL, INC., and  )
FAIRCHILD SEMICONDUCTOR   )          COPY
CORPORATION,              )
                          )
            Defendants.   )


                  Wednesday, September 19, 2007
                  9:05 a.m.
                  Courtroom 4B


                  844 King Street
                  Wilmington, Delaware


BEFORE:   THE HONORABLE JOSEPH J. FARNAN, JR.
          United States District Court Judge




APPEARANCES:


          FISH & RICHARDSON
          BY:  WILLIAM J. MARSDEN, JR., ESQ.
          BY:  FRANK E. SCHERKENBACH, ESQ.
          BY:  HOWARD G. POLLACK, ESQ.
          BY:  MICHAEL R. HEADLEY, ESQ.


                  Counsel for the Plaintiff

605

1    be located.

2              Q.   Sir, where are you incorporated

3    at?

4              A.   We're incorporated here in

5    Delaware.

6              Q.   Do you have other U.S. factories?

7              A.   We have U.S. factories for wafer

8    fabs for making the wafers that we have seen

9    here this week in South Portland, Maine, in Salt

10   Lake City, Utah, and in Mountain Top,

11   Pennsylvania.

12              The factory in Maine has been

13   there for forty years.  Some of the employees

14   there have forty-year badges.  And we believe

15   it's actually the oldest continuously operating

16   semiconductor fab sites in the country.

17              Q.   How many U.S. employees does

18   Fairchild have?

19              A.   In the U.S. we have approximately

20   2,200 employees, and about 1,300 of those are in

21   manufacturing in the three sites that I

22   mentioned.

23              Q.   And so what is your strategy with

24   pursuing U.S. manufacturing?

606

1              A.    Well, the overriding strategy is

2     always to manufacture in the most cost effective

3     way.  Of the three factories that I mentioned,

4     the one in Maine is primarily focused on the

5     analog business, on my business.  The other two

6     are focused on another big business area which

7     is our MOSFET.

8              Currently we are doing about a $30

9     million expansion in South Portland, Maine and

10    one of the primary purposes of that as we expand

11    the factory is to lower cost.  And we are moving

12    the next generation of the products that we're

13    talking about here, our power conversion

14    products from some subcontractors in Asia as

15    well as another factory that we have in Asia to

16    the Maine site.

17             Q.    And, sir, have you been doing

18    other investing in U.S. companies and

19    facilities?

20             A.    Yes.  Over the last ten years, I

21    have only been there four, so some of the events

22    predated me, but in 2001 one of the three

23    factories I mentioned, the one in Pennsylvania,

24    came from Intersil, which you have heard that

633

1    Fairchild, you knew the green FPS products were

2    going to be a big part of your business; right?

3          A.    Well, I came to learn that the

4    expectations were high.  I had done a -- I think

5    actually -- I think it was in October of that

6    year.  I visited Europe.  It was my first visit

7    to a field sales.  It was a large meeting and

8    there was a lot of interest, yes.

9          Q.    Okay.  And in fact, when the

10   products were introduced in 2003, you though

11   that they would achieve some tens of millions of

12   dollars in revenue; is that right?

13         A.    Well, I came to that conclusion

14   within six to nine months of that, you know,

15   kind of after early adoption.

16         Q.    Okay.

17         A.    Yes.

18         Q.    And, in fact, in the first two

19   years you sold about $60 million worth of green

20   FPS products; is that right?

21         A.    As I recall, yes, it grew to

22   around 30 million a year and kind of stayed

23   there.

24         Q.    And so what would the total be as

887

1    variation.  But it's all the same.

2              And that's how this one works.

3         Q.   Now, is the invention of the '851

4    patent used in Power Integrations' products?

5         A.   Yes, it is.

6         Q.   Which products is it used in?

7         A.   It's used in TOPSwitch FX, and

8    TOPSwitch GX.

9         Q.   Can you turn to PX 34 in your

10   book?  What's that exhibit?

11        A.   This is the TOPSwitch FX family of

12   products.  It's a datasheet for this product

13   family.

14        Q.   And what's a datasheet?

15        A.   Datasheet is basically a

16   description of the operation of the product that

17   we provide to our customers to help our

18   customers use our products to build a power

19   supply.

20        Q.   And does the datasheet refer to

21   the integrated frequency jitter invention?

22        A.   Yes, it does.  In fact, right on

23   the top on the front of the datasheet, you can

24   see that under product highlights, it says

888

1    frequency jittering reduces EMI and EMI

2    filtering costs.

3          Q.   And does the datasheet describe

4    the frequency jitter feature in more detail?

5          A.   Yes, actually inside the data

6    sheet, we talk more about it.

7               So, for example, here, this is the

8    slow waveform.  That is the frequency variation

9    signal, that's actually changing the frequency

10   of the main oscillator.

11              So when the lines have grouped

12   together, the frequency is higher than when they

13   are stirred apart.  So the frequency, you know,

14   moves from low to high around an average target

15   frequency.  So it goes higher and lower to do

16   this jittering function.

17         Q.   And for the record that's PD 1214,

18   PX 34 at PIF 37-484 and five.

19              Does the data sheet describe the

20   benefits of the frequency jitter feature?

21         A.   Yes, it does.  So to further --

22   because it talks here about the benefits, the

23   frequency jitter feature modulates the switching

24   frequency over the narrow bands as means to --

889

1      of reducing conducted EMI peaks.

2                   So if you look at the EMI without

3      the jitter and compare it to the EMI with the

4      jitter under those same conditions, you can see

5      that the noise is much lower.  By the way, these

6      lines are the limits.  You have to be under

7      those limits to meet the government regulation.

8                   You can see this is much lower in

9      EMI than that figure.

10                  Q.   Are the TOPSwitch FX and GX

11     products commercially successful?

12                  A.   Very successful actually.

13                  Q.   Has the integrated frequency

14     jitter feature contributed to the commercial

15     success of the TOPSwitch products?

16                  A.   Absolutely.

17                  Q.   And in what way?

18                  A.   Well, it reduces the cost of EMI

19     components, and also the size of the power

20     supply.  In some cases, you can't even fit the

21     power supply into the enclosure because of the

22     size of the EMI component.

23                  Q.   Okay.  I'd like to turn your

24     attention to the next patent, the '366 patent.

896

1          overshooting or overflowing in that example.

2                    And so this circuit solves both of

3          those problems.

4                    Q.   If you would turn to PX 387 in

5          your book.  It's actually a big thick one.

6                    What is that document?

7                    A.   This is our annual report.

8                    Q.   And does this describe the sales

9          of Power Integrations' products?

10                   A.   Yes, it does.

11                   Q.   I'm just going to put up some

12         excerpts from that report.  This is PD 1227 from

13         PX 387 at Page 7 and 39.

14                   What are we seeing here?

15                   A.   Well, on the top it shows the

16         revenue for the company in 2004 and 2005.  And

17         on the bottom table, it shows how much of that

18         revenue comes from TOPSwitch FX and GX.

19                   And as you can see in 2004 and

20         2005, approximately 27 to 28 percent of the

21         revenue came from these two products.

22                   Q.   Okay.  And just so we're clear,

23         these numbers up here, what's the units?

24                   A.   Well, this is $143 million.

897

1    That's in 2005.  And in 2004, $130 --

2    approximately $137 million.

3         Q.   And has having the integrated

4    SoftStart feature also contributed to the

5    commercial success of Power Integrations'

6    products?

7         A.   Yes.

8         Q.   Last patent, the '876 patent, the

9    one we've called the digital frequency jitter

10   patent.  It's PX 1 in your book.  Are you also a

11   named inventor on this patent?

12        A.   Yes, I am, along with, again, the

13   two other inventors.

14        Q.   And what generally does the '876

15   patent relate to?

16        A.   Well, the '876 is also relating to

17   frequency jittering, but it is a different way

18   to implement it.  In this case, we use a digital

19   technique to implement it.

20        Q.   Okay.  I'll just put a slightly

21   larger version of Figure 1.

22             Can you just describe generally

23   how what's shown in Figure 1 works to do

24   frequency jitter?

900

1          A.   Yes, it is.

2          Q.   I'm going to show you some more

3    excerpts.  This is PD 1232.  What does this

4    describe?

5          A.   Well, this is another way to show

6    the frequency jitter.  You can actually see --

7    just to give some background here, this is --

8    this is when the switch is on and then the

9    switch is off here.

10              So you can see that this is one

11   cycle, by the way.  This is on and off.  It's on

12   again.

13              If you look at the cycle, it

14   actually jitters.  Can you actually physically

15   see the jitter on the waveform.

16              It's just a different way of

17   showing it.

18         Q.   Is the invention of the '876

19   patent used in any other products?

20         A.   Yes.  It's used in TinySwitch II,

21   TinySwitch III, and most of the LinkSwitch

22   family of products.

23         Q.   And have the Power Integrations

24   TinySwitch and LinkSwitch products been

901

1    successful in the market?

2         A.    Very successful, actually in fact

3    even more successful than TopSwitch FX and GX.

4         Q.    We're looking back at PX 387.   Is

5    there showing the sales of TinySwitch?

6         A.    This is the same slide we showed

7    earlier except we are highlighting the

8    TinySwitch I or II.  As you can see it's more

9    than fifty percent of our revenue in 2004 and

10   2005.

11        Q.    Has having a digital integrated

12   digital feature contributed to the commercial

13   success of the TinySwitch and the LinkSwitch?

14        A.    Based on the feedback we have

15   gotten, it definitely has.

16        Q.    Mr. Balakrishnan, I would like to

17   ask you a few questions now about some of the

18   earlier Power Integrations products.  But first

19   what I want to ask you is when you filed the

20   circuit patents that are at issue in this case,

21   did you believe that your invention that you

22   were describing there was new and nonobvious?

23        A.    Absolutely.

24        Q.    And has anything you have heard in

914

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


POWER INTEGRATIONS, INC., )  Trial Volume IV
                          )
          Plaintiff,      )
                          )  C.A. No. 04-1371-JJF
v.                        )
                          )
FAIRCHILD SEMICONDUCTOR   )
INTERNATIONAL, INC., and  )
FAIRCHILD SEMICONDUCTOR   )
CORPORATION,              )
                          )
          Defendants.     )


                    Thursday, September 20, 2007
                    9:05 a.m.
                    Courtroom 4B


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
         United States District Court Judge




APPEARANCES:


         FISH & RICHARDSON
         BY:  WILLIAM J. MARSDEN, JR., ESQ.
         BY:  FRANK E. SCHERKENBACH, ESQ.
         BY:  HOWARD G. POLLACK, ESQ.
         BY:  MICHAEL R. HEADLEY, ESQ.


                    Counsel for the Plaintiff

958

1    you tell us what this documents shows?

2          A.    Well, it's not very well focused,

3    at least not from my perspective.  These are our

4    FX datasheet, and it shows highlighted there the

5    fact that we're stressing the fully integrated

6    soft start overshoot as well as the EMI savings

7    and the filtering cost from the digital

8    frequency jitter -- excuse me, from analog

9    frequency jitter in this case.

10         Q.    Turning to PX 35 in your notebook

11   and up on the screen.  What does this show?

12         A.    Again this is a standard datasheet

13   we give to all of our customers detailing the

14   features and benefits of our part showing the

15   fact that the soft start and the frequency

16   jitter are key features.

17         Q.    And which product is this?

18         A.    The TOPSwitch GX.

19         Q.    Have the products that use analog

20   and digital jitter been commercially successful?

21         A.    Very much so.

22         Q.    What about the products that use

23   internal SoftStart?

24         A.    It's a key feature for us as well.

959

1          Q.    Okay.

2          A.    Because --

3          Q.    Oh, pardon.  Go ahead.

4          A.    I would just say the SoftStart is

5     one of the ways that simplifies engineering

6     design time and also gives a more reliable

7     system.  What we've also found is that key OEMs

8     require SoftStart because they're aware that a

9     system that just immediately ramps to full --

10    full output upon plug in or turn on is not as

11    reliable as something that's got SoftStart,

12    which takes a nice gentle ramp.

13         Q.    Approximately how many chips has

14    PI sold in its --

15         A.    Billions.  We're starting to sound

16    like McDonald's.

17         Q.    If I could direct your attention

18    to PX 387 in your binder, and I have an excerpt

19    up on the screen.

20               Do you recognize this?

21         A.    Yes, I do.

22         Q.    What does this show?

23         A.    This looks like some data from our

24    annual report in 2005 showing our revenues at

960

1    143 million -- $143 million.

2              And it also shows the breakout

3    between our different families, the TinySwitch,

4    the TOPSwitch family and the original TOPSwitch

5    I and II families.

6         Q.   And those are the same products

7    that we discussed earlier that incorporate the

8    analog and digital jitter?

9         A.   Correct.

10        Q.   Do analog and digital jitter and

11   external SoftStart contribute to the success of

12   these products?

13        A.   Absolutely.

14        Q.   How does external SoftStart drive

15   sales?

16        A.   As I -- well, as I started to

17   mention to you, if you're going to build like a

18   reliable power supply or one that doesn't have

19   an overshoot when you first turn it on, you have

20   to apply some sort of a SoftStart technique.

21   And it's not always obvious how to do this,

22   because we have integrated it into our part.

23              It basically takes that out of the

24   hands of the engineer.  So the keeps it much

961

1    more simple.

2              And as such, our customers

3    appreciate it.  So the saves in space, saves

4    components and offers a higher integrated

5    solution.

6         Q.   What about integrated frequency

7    jitter, how does that drive sales?

8         A.   Frequency jitter -- pardon me.

9    Frequency jitter is the granddaddy in my eyes.

10   It saves a tremendous amount of money,

11   especially as you go up in the power curve.  As

12   products need more power, like from five watts

13   up to, call it, 40 or 50 watts, the EMI problems

14   become -- become increased.

15             And the fact that we've got a

16   frequency jitter integrated into our part gives

17   our engineers advice and advantages to provide a

18   power supply that costs less.  So frequency

19   jitter saves on the filtering cost and the size

20   of the components that are necessary on the

21   secondary part of and the primary part of the

22   power supply.

23        Q.   Okay I'm showing you plaintiff's

24   demonstrative 10006.

# Exhibit D

*Power Integrations, Inc.   v.*
*Fairchild Semiconductor International, Inc.*

---

*Trial Volume 2*
*October 3, 2006*

---

*Hawkins Reporting Service*

*715 N King Street*

*Suite 3*

*Wilmington, DE  19801*

*(302) 658-6697*

*Original File 100306–1.TXT, 327 Pages*
*Min-U-Script® File ID: 0556485286*

**Word Index included with this Min-U-Script®**

---

Page 317

[1]  Q: Is the invention of the '876 Patent used
[2] in any other Power Integrations' products?
[3]  A: Yes, it is used in the next generation
[4] with the TinySwitch 2 product family and
[5] TinySwitch 3 product family and it is also used
[6] in a number of products within the LinkSwitch
[7] family, LinkSwitch-HF, Link Switch-TM,
[8] LinkSwitch-XT and LinkSwitch-LE.
[9]  Q: Has having a digital frequency jitter
[10] circuit from the '876 Patent contributed to the
[11] commercial success of those products?
[12]  A: Yes, very much so. It significantly
[13] reduces the cost of the power supply by making
[14] the EMI circuitry simpler.
[15]  Q: I would like to turn to a couple of other
[16] topics.
[17]  First of all, patent licensing.
[18] Does Power Integrations have a general patent
[19] policy regarding licensing its technology?
[20]  A: Yes. We don't license our technology to
[21] other competitors.
[22]  Q: And why do you have that policy?
[23]  A: Because we are determined — we have
[24] determined that having our own intellectual

---

Page 318

[1] property number of chips maximizes the value for
[2] our company and our investors.
[3]  Q: Have you ever licensed your patents to
[4] anyone?
[5]  A: Only people who are our manufacturing
[6] partners and that's a much broader reason for
[7] licensing, they actually do the manufacturing for
[8] us, but all of those have expired.
[9]  Q: I would like to turn to the issue of PI's
[10] market customers. Who are their customers for
[11] the products we have been discussing?
[12]  A: There is actually a list of customers in
[13] the Celatron presentation. I could name some of
[14] the large customers for you, such as Samsung, is
[15] a customer of ours. Motorola is a customer. And
[16] I have to be careful, because we generally supply
[17] to power supply companies who then sell it to
[18] their customers who have all OEMS, original
[19] equipment manufactures. And those OEMS are like
[20] Samsung, Motorola, Dell and HP and so on.
[21] Sometimes we sell directly to them, but most of
[22] the time we sell to the power supply companies.
[23]  Q: Okay. I will put up a slide from Exhibit
[24] PX-324 this is from PIF-94800; is this what you

---

Page 319

[1] were referring to?
[2]  A: Yes.
[3]  Q: Does this slide refer to some power supply
[4] manufactures?
[5]  A: Yes. Phihong was one of ours, LiteOn,
[6] Artesyn, were manufactures.
[7]  Q: And Samsung and Motorola, do you sell your
[8] chips directly to them?
[9]  A: Most cases we don't we sell to the power
[10] supply manufactures.
[11]  Q: Are Power Integrations' products used all
[12] over the world?
[13]  A: Yes.
[14]  Q: Are the same models of chips used
[15] everywhere?
[16]  A: Yes. In fact all of our current products
[17] are universal, meaning they will work off of wall
[18] socket even in the wall and that's what our
[19] customers want for multiple reasons, because
[20] people tend to travel, they like to take their
[21] cell phone charger when they go to other
[22] countries. But also because the manufactures
[23] don't want to make different products for
[24] different countries.

---

Page 320

[1]  Q: Does Power Integrations make any IC
[2] products that are designed to work only in a
[3] specific country.
[4]  A: No.
[5]  Q: Okay. Last topic, Fairchild. When did
[6] Power Integrations first hear about Fairchild?
[7]  A: Well, we have known Fairchild when they
[8] purchased the Samsung division — the power
[9] division of Samsung. They have had products that
[10] compete with ours, but those were what is known
[11] as hybrid products, meaning they had two chips
[12] inside the package. And those are not very good
[13] products. But more recently in 2003 they
[14] announced this integrated product with features
[15] similar to ours which came as a total surprise to
[16] us.
[17]  Q: How did you first hear about the new
[18] integrated product?
[19]  A: We heard it through one of the
[20] subcontractors at Samsung.
[21]  Q: And what was your initial reaction?
[22]  A: Well, it was a surprise, because I didn't
[23] know that they had the technology to do a new
[24] integrated product.

---

**Page 341**

[1]  Q: All right. Now, did you issue any other
[2]  press releases that day?
[3]    A: I believe that is the same day we had our
[4]  quarterly earnings press release.
[5]  MR. GUY: DX-366.
[6]                  BY MR. GUY:
[7]  Q: The same day you were going to issue your
[8]  statement about earnings, you filed the lawsuit
[9]  and you issued a press release about the lawsuit
[10]  against Fairchild; is that correct?
[11]    A: I'm sorry. Could you repeat that
[12]  question? I missed the first part.
[13]  Q: Yes. On the same day that you issued your
[14]  third quarter financial results for 2004, you
[15]  also filed a lawsuit against Fairchild and issued
[16]  a press release regarding that lawsuit?
[17]    A: That's right.
[18]  Q: Now, there's a connection between those,
[19]  isn't it?
[20]    A: The only connection is that we were going
[21]  to have a conference call, because when you do a
[22]  press release, you always have a conference call
[23]  following that. And it was convenient to explain
[24]  the lawsuit at the same time.

**Page 342**

[1]  Q: So your testimony is it was just
[2]  convenient to do a lawsuit, a press release about
[3]  the lawsuit, and your earnings all on the same
[4]  day?
[5]    A: Absolutely.
[6]  Q: Mr. Balakrishnan, you stated, I believe,
[7]  that you only licensed your patents to your
[8]  manufacturing partners; is that correct?
[9]    A: That is correct.
[10]  Q: Now —
[11]    A: Just — I correct myself. We have done
[12]  that in the past. We don't have any right now.
[13]  Q: Now, even though you did it in the past,
[14]  didn't those manufacturing partners still have
[15]  rights to build their own products using your
[16]  patents?
[17]    A: With the previous technology that they
[18]  acquired, you know, when they had the technology
[19]  license in effect, that's true.
[20]  Q: And wouldn't that include every single
[21]  patent that's in this case?
[22]    A: In one case, I believe that is true.
[23]  Q: Okay. That's true about Matsushita; is
[24]  that correct?

**Page 343**

[1]    A: That is correct.
[2]  Q: I'll show you DX-173.
[3]    That's a license agreement that
[4]  Power Integrations entered into with Matsushita;
[5]  is that correct?
[6]    A: That is correct.
[7]  Q: It's entered into in 2000; is that right?
[8]    A: I'm sorry. I didn't see the date.
[9]  Q: Up there on the top right-hand corner.
[10]    A: Yeah. That's right.
[11]  Q: Do you know what the royalty rate is on
[12]  that patent?
[13]    A: Well, the —
[14]  Q: On that patent license — excuse me. Make
[15]  sure we have a clear record.
[16]    Do you know what the royalty rate
[17]  was for the license you entered into with
[18]  Matsushita?
[19]    A: The royalty rate was five percent;
[20]  however, the technology license had lots of other
[21]  benefits that AMI provided. AMI meaning
[22]  Matsushita provided to us. It was not done for
[23]  the royalty.
[24]  Q: But in the royalty section of the

**Page 344**

[1]  agreement where it says compensation, do you see
[2]  that?
[3]    A: Right.
[4]  Q: Okay. The royalty rate listed under
[5]  compensation is five percent of net sales; is
[6]  that right?
[7]    A: That's correct.
[8]  Q: It says "During the term of this
[9]  Agreement"?
[10]    A: That is correct.
[11]  Q: And for the four years after the term of
[12]  this agreement, the royalty rate actually goes
[13]  down to three and a half percent, doesn't it,
[14]  sir?
[15]    A: That is right.
[16]  Q: All right. Now, with respect to this
[17]  agreement, are we still in the five percent or
[18]  are we in the three and a half percent part?
[19]    A: Right now?
[20]  Q: Yes?
[21]    A: We're in the three and a half percent
[22]  part, because that has expired.
[23]  Q: All right. So that means that Matsushita
[24]  can use all of your patents, both U.S. and

Power Integrations, Inc.   v.
Fairchild Semiconductor International, Inc.

Trial Volume 2
October 3, 2006

Page 345

[1] foreign to build products in Japan and sell them
[2] worldwide for three and a half percent; isn't
[3] that correct, sir?
[4]     A: No. That's not correct.
[5]         First of all, they don't get all of
[6] the patents. They only get patents they got
[7] during the term of the technology license
[8] agreement.
[9]         Secondly, they're only allowed to
[10] sell to Japanese customers.
[11]     Q: All right. I'll start over again.
[12]         Let me try it one more time. All
[13] four patents that are in this case are within the
[14] group of patents that are licensed at the five
[15] and three and a half percent; isn't that correct?
[16]     A: That is right.
[17]     Q: All right. And there are other patents
[18] involved as well; is that right?
[19]     A: Yes. That's right.
[20]     Q: How many patents are there that have been
[21] licensed to Matsushita under this agreement?
[22]     A: I don't remember, but it is — it is a
[23] large number.
[24]     Q: Large number? Well, you put a graphic up

Page 346

[1] at the beginning of the opening. It said you had
[2] 150 patents.
[3]     A: Right.
[4]     Q: That's today?
[5]     A: That is right.
[6]     Q: How many patents does Matsushita have
[7] under this license agreement?
[8]     A: I don't know the number, but it's probably
[9] a hundred or a hundred plus.
[10]     Q: Okay. And they got that for five percent;
[11] is that right?
[12]     A: Well, they got — we got a lot more than
[13] five percent from them. So this is only a small
[14] portion of what we got from them.
[15]         They were manufacturing partners.
[16] They guaranteed capacity for us.
[17]         They gave us very preferential
[18] pricing. They gave us up-front money in many of
[19] these instances.
[20]         So there was a lot of different
[21] things we got from them. So this is not the same
[22] as licensing a competitor.
[23]         This is licensing a manufacturing
[24] partner to address the market that we have a

Page 347

[1] difficult time addressing. It was a Japanese
[2] market.
[3]         So we consider them more as a
[4] distributor in Japan, rather than a licensee who
[5] can compete with us in other areas of the world.
[6]     Q: But they also got a license over or about
[7] a hundred patents; isn't that correct?
[8]     A: Yeah, but I'm saying this is not — this
[9] is a very restricted license for a lot of
[10] benefits we got from them.
[11]     Q: And in 2004, they sold, approximately, $40
[12] million worth of products, didn't they?
[13]     A: Roughly, that sounds about right.
[14]     Q: And they paid you five percent on that
[15] sales?
[16]     A: Yes, but they also gave us — it was very
[17] preferential prices, which is a lot of money.
[18]     Q: All right. Now, they still have the right
[19] and currently Matsushita is paying only three and
[20] a half percent; is that correct?
[21]     A: That is right.
[22]     MR. GUY: Your Honor, is our break
[23] at 10:30? I know we had an issue yesterday.
[24]     THE COURT: It's going to be 11

Page 348

[1] o'clock, 11 o'clock to 11:15.
[2]     MR. GUY: Eleven o'clock.
[3]         BY MR. GUY:
[4]     Q: Mr. Balakrishnan, has your company ever
[5] received a letter or an accusation that a Power
[6] Integrations' product infringed someone else's
[7] patent?
[8]     A: Yes.
[9]     Q: And in that situation, did you go to an
[10] attorney to get an opinion letter?
[11]     A: Yes, we did.
[12]     Q: And did you rely upon that opinion letter?
[13]     A: Yes, we did.
[14]     Q: And did you believe that was appropriate?
[15]     A: I believe it is appropriate.
[16]     Q: It's appropriate that you relied upon the
[17] opinion of your counsel in making a business
[18] decision; is that correct?
[19]     A: As long as it's competent advice, yes.
[20] Opinion, yes.
[21]     Q: And you believe that you were acting as a
[22] prudent businessman in relying upon the opinions
[23] of your attorneys; is that correct?
[24]     A: As I said, as a prudent businessman you

Power Integrations, Inc.   v.
Fairchild Semiconductor International, Inc.

Trial Volume 2
October 3, 2006

Page 609

[1] manufacturers call an AVL list. So the first
[2] step is to work with making sure that the
[3] merchant account is capable. That's the AVL
[4] list.
[5]     The second step, go to all the
[6] merchants and sell them on our value and our
[7] capability to meet the end customer spec. If we
[8] are successful doing that, then the third step is
[9] we will work with them to build maybe up to
[10] ten golden samples where they can go back to
[11] Samsung corporate and show them that their power
[12] supply with a Power Integrations chip can meet
[13] that specification. If it meets that
[14] specification and Samsung gives the green light
[15] special, then they invest almost another $100,000
[16] to meet the safety requirements that you need to
[17] ship these products around the world. So it is
[18] really difficult for a merchant account to switch
[19] a chip between a PI solution and Fairchild
[20] solution.
[21]     Q: So you have described four steps just to
[22] get a chip approved by Samsung wireless?
[23]     A: Yes.
[24]     Q: What companies have gone through all four

Page 610

[1] of those steps to have their chip approved for
[2] use with Samsung wireless chargers?
[3]     A: Only two of us, Power Integrations and
[4] Fairchild. Before Fairchild used our
[5] intellectual property and our feature set. We
[6] had all of the Samsung business by ourselves.
[7]     Q: Are you telling me that Samsung wireless
[8] chargers for Samsung phones you had a hundred
[9] percent of that business?
[10]     A: Every Samsung wireless cell phone that's
[11] ever been produced in the world, is using either
[12] a PI chip or Fairchild chip now. And prior to
[13] Fairchild copying our intellectual property they
[14] were all PI chips. That's exactly what I'm
[15] telling you.
[16]     Q: And those are for Samsung cell phones sold
[17] everywhere in the world?
[18]     A: Yes.
[19]     MR. DE BLANK: Objection, your Honor.
[20] Lack of foundation.
[21]     THE COURT: Objection is overruled.
[22]     BY MR. MICLEAN:
[23]     Q: Would that include cell phones and cell
[24] phone chargers imported by Samsung into the U.S.

Page 611

[1]     MR. DE BLANK: Objection, your
[2] Honor. Same objection.
[3]     THE COURT: Overruled.
[4]     BY MR. MICLEAN:
[5]     Q: If I see a Samsung cell phone on the table
[6] here, does that mean it is going to have a
[7] Fairchild chip in its charger?
[8]     A: Yes.
[9]     Q: Are these chips from Power Integrations
[10] that use the technology that is at issue in this
[11] case?
[12]     A: Yes, they are.
[13]     Q: What is the technology that is used in the
[14] Samsung cell phone charger?
[15]     A: Among other things it is the frequency
[16] jitter and the internal SoftStart, plus the, I
[17] think what you call the PTOP patent which is to
[18] help with the integration.
[19]     Q: Are there other ways that you know that
[20] your customers ship Power Integrations' chips
[21] into the United States?
[22]     A: I have been in the semiconductor business
[23] for 23 years. And it is common knowledge, that
[24] if you look at end consumer markets,

Page 612

[1] approximately one third of the end market is
[2] United States, one third Europe and one third
[3] Asia. So you can take any common consumer
[4] electronics good, like a cell phone charger or
[5] like an LC monitor and pretty much understand
[6] that at least one third of those products will go
[7] into every market. This is not something that we
[8] just choose at PI, it is common knowledge by
[9] anyone who is in the business. So the answer is
[10] that we can tell it is basically one third, one
[11] third, one third. The other thing I can say is
[12] because all we do is power we can tell by the
[13] energy efficient standards that the customer gets
[14] us where it is going to go. If they are trying
[15] to beat an Energy Star standard, they are trying
[16] to meet that standard for an LC monitor, we know
[17] that product is going to be coming to the U.S.
[18]     Q: Is that because Energy Star is a U.S.
[19] standard?
[20]     A: Yes. Then we know what the voltage is.
[21] If it is 110 voltage we know it is going to come
[22] into the United States?
[23]     Q: Do the OEMS like Samsung use different
[24] chips for different products targeted for

*Power Integrations, Inc.   v.*
*Fairchild Semiconductor International, Inc.*

---

*Trial Volume 3*
*October 4, 2006*

---

*Hawkins Reporting Service*
*715 N King Street*
*Suite 3*
*Wilmington, DE  19801*
*(302) 658-6697*

Original File 100406~1.TXT, 331 Pages
Min-U-Script® File ID: 0640525804

**Word Index included with this Min-U-Script®**

**Page 644**

[1]     (Jury entering the courtroom at 9:54
[2] a.m.)
[3]     THE COURT: All right.
[4] Be seated, please. Good morning.
[5]     THE JURY: Good morning.
[6]     THE COURT: I wanted to let you know
[7] that I can still tell time. I know it's not
[8] 9:30, and I apologize to you.
[9]     We were out here going over some
[10] evidentiary questions that will allow the
[11] testimony to move a little more smoothly for you.
[12] So we were working with the lawyers.
[13]     But we apologize for keeping you
[14] back in that room when we told you we would start
[15] up at 9:30. But I think we're ready to go.
[16]     Thank you for your patience.
[17]     MR. MICLEAN: Ladies and gentlemen,
[18] just introducing again Bruce Renouard. Excuse
[19] me.
[20]             BY MR. MICLEAN:
[21]     Q: Mr. Renouard, we discussed, as you closed
[22] testimony yesterday about Power Integrations and
[23] Fairchild being the only competitors for the
[24] Samsung Wireless business. And I want to kind of

**Page 646**

[1]     We met with the customer who had a
[2] competing design, had 72 components in its
[3] competing design. It just so happened that our
[4] design had 45 components. So we saved the
[5] customer 27 components in that — in that
[6] program.
[7]     And specifically he was really
[8] pleased because the prices of the commodities,
[9] the prices of the components that we took away
[10] from the system were — now he doesn't have to
[11] worry about them going up.
[12]     And there have been some shortages
[13] in the industry now, and the price of copper has
[14] gone up. Silicon has gone up. A lot of prices
[15] have gone up.
[16]     So the prices of all these
[17] components, you know, they all have copper legs
[18] to them. They've all got aluminum around them.
[19]     So those prices have actually gone
[20] up in recent months.
[21]     Q: So when you sell these devices, you can
[22] take a list of materials for your competitor,
[23] list the materials for them, compare them in
[24] overall to sell your products?

**Page 645**

[1] shift gears into some questions about some
[2] pricing to customers.
[3]     Does Power Integrations have a
[4] policy about not raising prices to customers?
[5]     A: Yes.
[6]     Q: And what is that policy?
[7]     A: Well, we pretty much have committed to our
[8] customers that we no longer — we've never raised
[9] the prices in the history of the company to any
[10] of our customers.
[11]     And the reason we do that is because
[12] as we reduce the amount of components in a sale,
[13] we sell a selected insurance policy so that the
[14] components that we take out of the system don't
[15] fluctuate in prices anymore.
[16]     So it's basically a way that the
[17] customer can get an added benefit of the PI
[18] value.
[19]     Q: Do you have an example that you can give
[20] us?
[21]     A: Yeah. I just got back from Taiwan right
[22] before coming to this trial, and we actually sat
[23] down with a customer there, pretty similar to
[24] what you have here.

**Page 647**

[1]     A: Correct.
[2]     Q: Okay. Let me ask you specifically: Are
[3] Power Integrations' patented technologies
[4] involved in this case helpful in selling these
[5] chips?
[6]     A: Yes, very much so.
[7]     Q: Why is that?
[8]     A: Well, as we've kind of said, touched on in
[9] the past, the — the frequency jitter is a key
[10] benefit for our customers in that it enables us
[11] to do a design with a much smaller footprint and
[12] with less components.
[13]     And in the SoftStart syngenic
[14] feature that our customers appreciate, because it
[15] gives them a more reliable system, and the fact
[16] that we can have integrated a power MOSFET with a
[17] controller using our P-TOP patent, eliminates a
[18] whole other package or the complexity of doing a
[19] hybrid device.
[20]     So we are — so it's very much a key
[21] benefit in the selling of our products.
[22]     Q: Are there other players in the market who
[23] do this frequency jitter feature provided by
[24] Power Integrations?

Page 656

[1] So if you combine all the sales from
[2] the subcontractors, as well as or what we called
[3] yesterday merchant accounts, if you combined all
[4] the sales of the merchant accounts to Samsung,
[5] and Samsung that we sold to directly, Samsung's
[6] clearly the biggest customer we have, by both
[7] value and dollars.
[8]    Q: So we know Samsung's the OEM. Who are the
[9] manufacturers for Samsung Wireless?
[10]    A: The merchant accounts that manufacture for
[11] Samsung Wireless are going to be Dongyang, which
[12] is the biggest one. RF Tech, which is the next
[13] biggest one. Dongyang Dream, H & T and Unitron.
[14]    Q: Okay. And, again, which products do these
[15] subcontractors manufacture for Samsung Wireless?
[16]    A: They manufacture a variety of what — the
[17] travel adaptors known as the TA products. So
[18] there's the TA0137, the TA077, the TA037, and
[19] then the TA177.
[20]    Q: So those model numbers are Samsung model
[21] numbers —
[22]    A: Yes.
[23]    Q: — for their chargers?
[24]    A: Correct. If you buy a cell phone from

Page 658

[1]    Q: Okay. Did you have a hundred percent of
[2] that business, before Fairchild came into the
[3] market, with Samsung Wireless?
[4]    A: Yes, we did.
[5]    Q: No other company had that business until
[6] Fairchild came?
[7]    A: No one.
[8]    Q: Can you estimate for me what percentage of
[9] the Samsung Wireless charger business that PI has
[10] today?
[11]    A: Approximately, 60 percent.
[12]    Q: And the other 40 would be Fairchild?
[13]    A: Correct.
[14]    Q: Roughly, how much money per year does that
[15] 40 percent lost Samsung charger business amount
[16] to?
[17]    A: It's at least $10 million. We are —
[18] we're losing 3.5 million units per month in unit
[19] volume to Dongyang, which is their largest, which
[20] is Samsung Wireless' largest subcontractor.
[21]    And although we're still selling
[22] some very small unit volume on some of the older
[23] models to Dongyang, we've lost all the big
[24] business over night.

Page 657

[1] Samsung, you look in the bottom of your adaptor
[2] that you get with your phone, it will say —
[3] likely it's going to say TA0137. It's their
[4] high-volume one.
[5]    Q: Okay. How do you know the Samsung
[6] products that your chips go into at that level of
[7] detail?
[8]    A: Our company's business depends on it. I
[9] try to stay on top of everything I can we have
[10] our sales managers in Korea, track every sale to
[11] every subcontractor by adaptor type, by charger
[12] type. And so we track them on a regular basis.
[13]    Q: And do those four Samsung Wireless cell
[14] phone chargers that you just described practice
[15] the patents that are involved in this action?
[16]    A: Yes, very much so.
[17]    Q: They have the chips in them that we sell?
[18]    A: Yes, we do.
[19]    Q: They have chips in them that Fairchild
[20] sells?
[21]    A: Unfortunately.
[22]    Q: Does Power Integrations sell chips to all
[23] of the Samsung Wireless subcontractors?
[24]    A: Yes.

Page 659

[1]    Q: How did Fairchild break into that market
[2] for Samsung Wireless?
[3]    A: This is always painful, but they —
[4] basically, we had been hearing rumors from
[5] Samsung Wireless and from the — specifically
[6] Dongyang and some other —
[7]    MR. de BLANK: Objection, Your
[8] Honor. Hearsay rumors.
[9]    MR. MICLEAN: State of mind, Your
[10] Honor.
[11]    THE COURT: All right. It will be,
[12] with that representation, permitted. The
[13] objection will be overruled.
[14]    THE WITNESS: So our customers were
[15] telling us that there was a new clone, what they
[16] called a PI clone chip that was coming out that
[17] had the same features, included the frequency
[18] jitter.
[19]    And so — and they were trying to
[20] use that as an emphasis to drop our prices, make
[21] us drop our prices. And what we did is we
[22] basically kept the normal course of our business
[23] and waited until the product became real.
[24]    Then in late 2003, Samsung Wireless

Page 660

[1] instructed us that they'd qualified the new
[2] Fairchild chip, the 0165, and the FSD210 for the
[3] Samsung Wireless business.
[4]     And even though Fairchild had tried
[5] to quote 30 cents on their 0165 product line, and
[6] we were quoting 40 cents, roughly, on our TNY266,
[7] the customer felt like there was at least 10
[8] cents of value, what we call PI value, what we
[9] explained yesterday, between the two designs.
[10]     So even at a 10-cent difference,
[11] they could not make penetration into the account.
[12] And part of that is because of the
[13] requalifications cost and the engineering cost.
[14]     And, then, Fairchild was a risk. It
[15] was not a — it was not proven in the market.
[16]     So none of the subcontractors wanted
[17] to just try it and risk their business with
[18] Samsung. So what ended up happening was that in
[19] late 2003 Fairchild rolled a special deal with
[20] Dongyang where they dropped the price from 30
[21] cents to, approximately, 22 cents on the same
[22] program, which is almost half of what we were
[23] charging for the business.
[24]     And at that point, you know, the

Page 662

[1] subcontractors, including Dongyang. But Dongyang
[2] had already done the development effort on the
[3] FSD0165 and the FSD210. So they were unwilling
[4] to switch for the reasons we mentioned earlier.
[5]     Q: Did you make any effort to specifically
[6] try to get the business back from Dongyang?
[7]     A: Yes, very much so.
[8]     Q: What did you do?
[9]     A: Well, we had a good relationship with
[10] Dongyang. We went back with the SC1009 and
[11] offered to them at a special pricing, but —
[12]     MR. De BLANK: Objection, Your
[13] Honor. Also, objection to the extent that this
[14] is prior to the filing of the complaint.
[15]     This is all 2003 information.
[16]     THE COURT: All right. I think it's
[17] permissible background. I'm going to allow it.
[18] I'll overrule the objection.
[19]     You can continue.
[20]             BY MR. MICLEAN:
[21]     Q: You can provide the background.
[22]     A: Excuse me?
[23]     Q: I think —
[24]     THE COURT: You can continue.

Page 661

[1] bait was just too good. So Dongyang switched
[2] overnight to the Fairchild, switching with the
[3] 0165.
[4]     Q: Were you — what happened at that point
[5] when the market got penetrated by Fairchild
[6] Dongyang?
[7]     A: It was really demoralizing for us. We
[8] ended up going back to — I ended up working with
[9] our executive staff, and we spent a lot of time
[10] analyzing the business, and we very hastily
[11] introducing a new chip.
[12]     We called it the SC1009, which we
[13] introduced at about 28 cents. So our ASP fell
[14] from approximately 40 cents to about 28 cents.
[15] Samsung loved it, but — but we really were hurt
[16] very badly by that.
[17]     Q: So your average selling price for the
[18] TNY266 that you were selling before Fairchild,
[19] you dropped that because you had to introduce the
[20] SC1009 to be competitive?
[21]     A: Correct.
[22]     Q: And did you offer that to the other
[23] subcontractors at the Samsung Wireless?
[24]     A: We offered it to our — to all of the

Page 663

[1]     THE WITNESS: Yeah. Thank you.
[2]     So where was I?
[3]             BY MR. MICLEAN:
[4]     Q: You were talking about your visit to
[5] Dongyang, I think.
[6]     A: Oh, so we tried to win back the Dongyang
[7] business. You know, and my sales team fearlessly
[8] went back, tried to do our very best to win it,
[9] but they had already made the conversion to
[10] Fairchild.
[11]     They already, you know, started
[12] volume production. In fact, Dongyang didn't
[13] really tell us that they had made this switch,
[14] because it was this big secret they had done with
[15] Fairchild.
[16]     So we kind of had to find out, you
[17] know, almost after the fact.
[18]     Q: And you still continue to try to get the
[19] Dongyang business?
[20]     A: Yes, we do.
[21]     Q: And you still try to sell to them?
[22]     A: Yes, we do.
[23]     Q: Would you have had to change to the SC1009
[24] if Fairchild hadn't offered the PI feature set at

Page 664

[1] lower prices to the Samsung Wireless?
[2]    A: No, not at all.
[3]    It's — interestingly, because I
[4] don't know if this has come out of this Court of
[5] law, but Fairchild bought the device from Samsung
[6] that builds these chips and designs these chips.
[7]    And so prior to PI winning — having
[8] all this business at Samsung Wireless, Samsung
[9] themselves had a chip that would potentially do
[10] that business, but as I mentioned to you didn't
[11] have the frequency jitter, didn't have a lot of
[12] the other features.
[13]    So Samsung couldn't even use their
[14] own Samsung chip to use for their Samsung
[15] chargers. So it wasn't until basically Fairchild
[16] came back in with the PI feature set that they
[17] used that they started to switch to an
[18] alternative from PI.
[19]    Q: Your binder has some exhibits, and I'd
[20] refer you now to these. It's marked PX-83 to
[21] PX-101.
[22]    Do you see these those?
[23]    A: Yes, I do.
[24]    Q: Okay. Can you tell me generally, if you

Page 665

[1] will, you've had a chance to look at those, what
[2] those are?
[3]    MR. De BLANK: Objection, Your
[4] Honor. These are all before the October 20, 2004
[5] date.
[6]    MR. MICLEAN: Your Honor, these are
[7] just describing the competition layers between
[8] the two companies.
[9]    MR. De BLANK: Prior to the
[10] complaint.
[11]    THE COURT: I'm going to allow this
[12] on a limited basis. So I'll overrule the
[13] objection, but you can object again if you think
[14] it goes beyond the idea of setting up the issue
[15] of competition.
[16]    MR. De BLANK: Thank you.
[17]        BY MR. MICLEAN:
[18]    Q: Mr. Renouard, what are these documents?
[19]    A: These are the weekly reports that my sales
[20] team do. As you can probably see, this is from
[21] Taiwan. I have highlighted some good news and
[22] some bad news. This one actually is particular
[23] to the SD-210 back in '03 — looks like '03.
[24]    Q: Prepared in the ordinary course of

Page 666

[1] business?
[2]    A: Yes.
[3]    Q: Prepared by your group?
[4]    A: Yes.
[5]    Q: What are they used for?
[6]    A: Used for communications between my sales
[7] team and myself to understand what is taking
[8] place on accounts on a weekly basis. And I
[9] highlight key passages and send them on to our
[10] executive staff and other key members at Power
[11] Integrations. And we also use it to help
[12] coordinate among the different geographies.
[13]    Q: Did you use some of this information to
[14] track this type of competition generally on a
[15] spreadsheet or something?
[16]    A: Very much so.
[17]    MR. MICLEAN: This is a point where
[18] we are introducing confidential financial
[19] information so we would ask the courtroom to be
[20] cleared.
[21]    THE COURT: Clear the courtroom of
[22] anybody who is not authorized to be here during
[23] that.
[24]    MR. GUY: We assert that company

Page 667

REDACTED

REDACTED

Powe~ Integrations, Inc.    v.
Fairchild Semiconductor International, Inc.

Trial Volume 3
October 4, 2006

---

Page 672

REDACTED

---

Page 673

REDACTED

---

Page 674

[1]    THE COURT: All right. We will
[2] re-open the courtroom.
[3]                    BY MR. MICLEAN:
[4]    Q: How long do the programs for these chips
[5] run on the Samsung Wireless accounts?
[6]    In other words, you have a program
[7] for the particular charger and chip, how long do
[8] they usually last?
[9]    A: A long time. When the TAO137, has been in
[10] production for three, almost four years now, and
[11] that's likely to be in production for another
[12] three to four years, nothing has changed on that
[13] adapter.
[14]    Q: If Power Integrations was able to give the
[15] opportunity to make the sales could make that
[16] demand?
[17]    A: Yes.
[18]    Q: Why is that?
[19]    A: We had that before and it was no problem,
[20] along with the upside that Samsung would give us.
[21] Two, is every month I sit down with operations
[22] managers and give them an overview of how much I
[23] see the demand that is coming down from our
[24] customers. And three is that Power Integrations

---

Page 675

[1] has a very conservative approach to the way we
[2] provide product for our customers. We make sure
[3] we have extra, 2X amount of inventory we are
[4] going to expect to ship and then backup plans
[5] with our FAB and assembly subcontractors so if we
[6] do have a demand we can certainly meet it.
[7]    Q: We talked about lost sales to Donyang
[8] Samsung and price erosion on the Samsung Wireless
[9] vendors. Do these losses capture the entire
[10] universe of harm to Power Integrations from
[11] Fairchild's products with the PI feature sets
[12] since October 20, '04?
[13]    A: No way.
[14]    Q: Why is that?
[15]    A: Oh, my gosh. First place, our business
[16] has been hurt dramatically on a worldwide basis.
[17] We have been hurt in the LC monitor market. We
[18] have been hurt in the PC standby market and the
[19] other charger market outside of the United States
[20] for BlackBerries and so on. We have been hurt in
[21] settop box, hammered in DVD market. So many of
[22] the other products are still being imported into
[23] the United States and it's been very
[24] significantly negative for our business.

---

Power Integrations, Inc.   v.
Fairchild Semiconductor International, Inc.

Trial Volume 3
October 4, 2006

---

Page 744

[1]   Q: What was that communication about?
[2]   A: Just asking about the parts, what they do,
[3] you know, technical questions, application for
[4] the parts, you, know trying to understand the
[5] technology — trying to better understand the
[6] technology.
[7]   Q: Did any of those engineers ever talk about
[8] other technology companies infringing their
[9] patents?
[10]   A: No.
[11]   Q: Did any of those engineers ever talk about
[12] other companies copying their designs?
[13]   A: No.
[14]   Q: How many conversations have you had with
[15] someone from sales over the past three to four
[16] years?
[17]   A: Two or three.
[18]   Q: What were those conversations about?
[19]   A: They often — the ones that happened that
[20] I focused on, the Power Integrations chips in the
[21] context of energy efficiency electronics, because
[22] that was something that was interesting to me,
[23] and how those chips are used in applications
[24] where California law and other regulatory —

---

Page 745

[1] California has initiated law that is mandating
[2] energy efficient electronics. It's happening
[3] elsewhere. Energy Star is not a law, it's an
[4] initiative towards advancing energy efficient
[5] electronics. That's what I would talk to the
[6] salesmen about.
[7]   So a question might be, are you
[8] selling more parts as a function of these
[9] initiatives? That might be a question that I
[10] would probably ask.
[11]   Q: Okay. At any point did you ever have
[12] communication with a sales representative from
[13] Power Integrations about a Fairchild lawsuit?
[14]   A: No.
[15]   Q: Did a sales representative ever say that
[16] some of their patents were being infringed?
[17]   A: No.
[18]   Q: Did a sales representative ever say one of
[19] their products was being copied?
[20]   A: No.
[21]   Q: Did you ever have — did you ever consult
[22] with an expert while reviewing these patents.
[23]   A: What kind of expert.
[24]   Q: In the field of semiconductors.

---

Page 746

[1]   A: I'm an expert in the field of
[2] semiconductors.
[3]   Q: Okay. What did you base that opinion on
[4] that they'd be forced to exit a large segment
[5] upon?
[6]   A: I base that opinion on — I base that in
[7] the context of the size of the power supply
[8] convert IC market.
[9]   Q: Okay.
[10]   A: Meaning share, market share.
[11]   Q: A market share. I see what you are
[12] saying. So is this sentence premised then that
[13] Fairchild has a relatively large segment of the
[14] power supply converter IC market?
[15]   A: That is correct.
[16]   Q: Okay. Are you aware of what products
[17] Power Integrations — are aware of the Fairchild
[18] products that Power integrations is accusing of
[19] infringement?
[20]   A: I know the family. It is the FPS. It's
[21] the Fairchild power switch.
[22]   Q: Sure. Okay. So when you wrote this, you
[23] had no direct knowledge of — you had no direct
[24] knowledge of any Fairchild products being sold in

---

Page 747

[1] the United States?
[2]   A: Yeah. It's common sense that Fairchild
[3] would be selling parts in the united States.
[4]   Q: I understand that. But did you have any
[5] actual evidence of any Fairchild products being
[6] sold in the United States when you wrote this?
[7]   A: No.
[8]   Q: Okay.
[9]   A: I did not physically verify that there is
[10] a piece of electronics sold in the United States
[11] that has a Fairchild part.
[12]   Q: Okay. Okay. I'd like to take you to page
[13] — okay. At the top page 7.
[14]   A: Okay.
[15]   Q: See the bottom of page 6 going to the top
[16] of page 7 it says: And we also expect Power
[17] Integrations to regain share at Samsung when/if
[18] the company prevails in the Fairchild lawsuit.
[19]   A: Where are you? Okay. Yes.
[20]   Q: What did you base that opinion on?
[21]   A: The same — the same things we have
[22] previously discussed. When/if the company
[23] prevails in the Fairchild lawsuit. And obviously
[24] in the context of Samsung, Fairchild in late 2003

---

Trial Volume 3
October 4, 2006

Power Integrations, Inc. v.
Fairchild Semiconductor International, Inc.

Page 748

[1] had taken meaningful market share away from Power
[2] Integrations as it relates to chargers for
[3] Samsung cellular phones.
[4]    Q: Okay.
[5]    A: So PI lost share to Fairchild starting in
[6] late 2003.
[7]    Q: How do you know that?
[8]    A: I know that for a couple of reasons. I
[9] know that because Fairchild put out a press
[10] release that said they started winning business
[11] with — with a Korean manufacturer of power
[12] supplies.
[13]    Q: So how did you know — how did you know?
[14]    A: It was — September 2003 Fairchild put out
[15] a press release. Said they'd won business at
[16] Dongyang, and Dongyang was a power supply
[17] manufacturer selling to Samsung.
[18]    Q: Okay. And how do you know that it was —
[19] they took shares from Power Integrations?
[20]    A: Because I knew that Power Integrations had
[21] 100 percent of that business previously.
[22]    Q: Did you ever talk to Samsung about whether
[23] or not they actually bought all of their products
[24] from Power Integrations?

Page 749

[1]    A: No.
[2]    Q: Okay. Were you aware of what percentage of
[3] their products they purchased from Power
[4] Integrations?
[5]    A: What's the question again.
[6]    Q: Samsung, were you aware — of these
[7] products you're saying that earlier they, Power
[8] Integrations, in your opinion had 100 percent
[9] sales at — of Samsung's purchasing —
[10]    A: Uh-huh —
[11]    Q: — and that Fairchild took some of that
[12] share?
[13]    A: That's correct.
[14]    Q: Do you know what percentage of the share
[15] he took?
[16]    A: Off the top of my head, I don't, but you
[17] can back into the number; and you back into the
[18] number — companies disclose their 10 percent
[19] customers. So we know what the percentage of
[20] revenue that Samsung was a contributor to for
[21] Powered Integrations. We know how many handsets
[22] Samsung makes every quarter because they tell us
[23] on the conference call. And we know the
[24] approximate average selling price of the part.

Page 750

[1] So that's how you would determine share.
[2]    Q: Did you determine that share for Power
[3] Integrations?
[4]    A: Yes.
[5]    Q: And is that in this report?
[6]    A: Well the share was 100 percent.
[7]    Q: Okay well at the time you wrote this
[8] report it wasn't 100 percent.
[9]    A: It wasn't. And by that time I was using
[10] more of a back of the envelope. I think it had
[11] dropped to about 50 percent, five, zero.
[12]    Conversations with the company, and
[13] also the publicly available information that
[14] Samsung had ceased being a 10 percent customer, I
[15] think in a certain instance.
[16]    Q: Yeah. Was this report or what — was this
[17] report written based on the assumption that
[18] Fairchild has the other 50 percent of that share?
[19]    A: Yes. It's based on the assumption that
[20] Fairchild has meaningful portion of that
[21] non-Power Integrations share.
[22]    Q: Are you aware of any third-party suppliers
[23] that would have some share?
[24]    A: Yeah. We should assume that there are.

Page 751

[1] They're not household names.
[2]    Q: Okay?
[3]    A: But we should assume that yeah, maybe it's
[4] Infineon. Maybe it's ON Semiconductor. Maybe
[5] it's STMicroelectronics. You know, the list goes
[6] on.
[7]    Q: Okay. Now in this report you said you
[8] expect Power Integrations to regain share at
[9] Samsung when/if the company prevails in the
[10] Fairchild lawsuit. Does that assume that Power
[11] Integrations will get all of the sales that
[12] Fairchild currently has if it prevails?
[13]    A: Yes.
[14]    Q: Okay. And what is that based upon?
[15]    A: Well, it's based upon the fact that when
[16] electronics manufacturers have a second source,
[17] if one of those sources goes away, certainly in
[18] the near term they're not going to identify
[19] someone to come in and be a second source. The
[20] guy who is already there selling parts to them is
[21] going to take all the business. That's the
[22] assumption.
[23]    Q: Okay. So was it your opinion, then, if
[24] Power Integrations was successful in its lawsuit

Page 756

[1]    Q: Are all of those competitors direct
[2] competitors in Power Integrations' field?
[3]    A: Yes.
[4]    Q: Okay. And is it possible that nay one of
[5] those competitors could sell products to Samsung?
[6]    A: Yes, they could.
[7]    Q: All right. Does Power Integrations have
[8] any competitors other than these ones you've
[9] listed here to your knowledge?
[10]    A: Yes, but I can't name any off the top of
[11] my head, but we should assume there are several
[12] others who occupy obviously a very small market
[13] share.
[14]    Q: Okay. Let me show you another exhibit
[15] here. This will be Slayton Exhibit 4.
[16]     Do you recognize tis document?
[17]    A: I do.
[18]    Q: Okay. Could you describe this document?
[19]    A: This is the Power Integrations investor
[20] presentation. So this is the standard
[21] presentation that either the CEO, CFO and/or IR
[22] would give to institutional investors and would
[23] give them to members of the analyst community
[24] like myself. They would use this presentation.

Page 758

[1]    A: They do.
[2]    Q: All right would that include companies
[3] such as System General and STMicro?
[4]    A: It would.
[5]    Q: And Toshiba?
[6]    A: Yes, and many others.
[7]    Q: In this segment, doe Power Integrations
[8] also compete with companies that manufacture
[9] linear transformers?
[10]    A: They do.
[11]    Q: Wold that include Friwo and A=Salcomp?
[12]    A: Yes.
[13]    Q: And would that also include many Asian
[14] companies?
[15]    A: It would.
[16]    Q: Let me take you to the second page which
[17] should be on the back of that first page. At
[18] this time let me take you to the third paragraph
[19] towards the bottom. The statement says: At
[20] present, we believe Fairchild's PowerSwitch
[21] currently cause PI to forego 6 to $7 million per
[22] year in sales.
[23]     On what was your basis for saying 6
[24] to $7 million per year in sales?

Page 757

[1]    Q: Let me flip you to what's been stamped
[2] SGC0024. Have you ever seen this before?
[3]    A: I have.
[4]    Q: Could you describe it?
[5]    A: This is a slide depicting the size of the
[6] power converter market and it not only depicts
[7] the size, but it depicts the underlying segments.
[8] So it depicts the power converter market by
[9] segment in the context of the technology. One of
[10] them is a linear transformer and the other is a
[11] discrete electronic switcher solution, and the
[12] third is an integrated electronic switcher
[13] solution.
[14]    Q: Okay. Now at the top is a pie chart
[15] listing Fairchild, STMicro, and Infineon and ON
[16] Semi?
[17]    A: Uh-huh.
[18]    Q: Okay. Is it your opinion tat these are
[19] competitors to Power Integrations in the
[20] integrated portion of that market?
[21]    A: Yes.
[22]    Q: Okay. In this market, does Power
[23] Integrations also compete with discrete
[24] electronic components?

Page 759

[1]    A: I'd written this document prior to the
[2] document where I mentioned $10 million. And it's
[3] because I thought that Fairchild had less share
[4] than it did.
[5]    Q: Okay.
[6]    A: So once my understanding of the situation
[7] as articulated by PI, once that situation became
[8] more apparent to me that perhaps Fairchild
[9] occupies more market share of Samsung than I had
[10] previously understood, I moved that number to 10
[11] million. Again, far form scientific, but I
[12] previously mentioned how we back into those
[13] numbers.
[14]    Q: And so you're saying that change from 6 to
[15] 7 to 10 was based in part on something that Power
[16] Integrations told you?
[17]    A: That's correct.
[18]    Q: Do you rmember again who that would have
[19] been?
[20]    A: No. I believe it was on a conference
[21] call. It potentially was on a conference call.
[22] But also we can calculate that because we know
[23] what percentage of sales to Samsung has Power
[24] Integrations.

Power Integrations, Inc.   v.
Fairchild Semiconductor International, Inc.

Trial Volume 3
October 4, 2006

Page 760

[1] Q: Okay. So is it possible that based on the
[2] way you calculate it, that it was in fact a
[3] third-party competitor taking those sales and not
[4] Fairchild?
[5] A: That's possible.
[6] Q: So all of your reports were written based
[7] on the assumption that Fairchild was taking a
[8] majority of those sales?
[9] A: That's correct.
[10] Q: And what's the average selling price
[11] decline?
[12] A: It depends on the part. So for a really
[13] high performance analog intensive part, it may be
[14] three or five percent a year. For a commodity
[15] part like DRAM, flash memory, a diod, a
[16] transistor, could be 30 percent a year or more in
[17] the context of memory, you know.
[18] Q: What about in power ICs?
[19] A: Power ICs, the more integrated the power
[20] IC, the less the ASP decline, the less the
[21] selling declines. So and integrated power IC you
[22] would hope might only have less, less than 10
[23] percent ASP erosion a year.
[24] Q: Okay. Have you noticed a similar declikine

Page 761

[1] in ASP for the POWER Integrations products?
[2] A: Yes.
[3] Q: Could you describe that?
[4] A: I believe that Power Integrations as a
[5] company undergoes the average ASP erosion for its
[6] chips, if we were to take the average over five
[7] years or so. However, in certain years the
[8] competitive dynamic could be such that they have
[9] more ASP erosion. It's almost unheard of that
[10] they would be able to raise prices. So in a
[11] steady state market, ten percent or so would be
[12] reasonable. You could have a competitor enter
[13] the market and he could try to gain share by
[14] lowering his prices and you have to match that,
[15] that's quite common.
[16]    Also alternative solutions. Maybe
[17] the price of copper is very inexpensive so people
[18] start to use linear power supplies again, you
[19] know. That's another scenario. There's so many
[20] things that can impact pricing.
[21] Q: Okay. N the scenario where one competitor
[22] such as say Faircild were forced out of the
[23] market would it be likely that Power Integrations
[24] could raise it's prices?

Page 762

[1] A: In my opinion, you never get to raise
[2] prices in the microcomponent industry.
[3] Q: Even if you force a competitor out of the
[4] market?
[5] A: Even if you force a competitor out of the
[6] market. For existing customers.
[7] Q: Sure.
[8] A: I'll qualify that. For new customers, you
[9] may be ale o sell that part at a higher rate of
[10] speed than you would if there were another very
[11] tough competitor out there. But for your existin
[12] customers, I doubt if you're going to get to
[13] raise prices.
[14] Q: Who do you see as Power Integrations' main
[15] competition?
[16] A: The main copetition is alternative
[17] technologies. Linear power supplies and discrete
[18] switchers.
[19] Q: What about in the integrated field; what
[20] other competitors would be seen as their chief
[21] competition?
[22] A: I think the principal competitor right now
[23] the integrated field is Fairchild. And I say
[24] that because Fairchild has grown its share, and

Page 763

[1] really the trajectory that Fairchild has grown
[2] that share, it's been over the past two years, I
[3] think Fairchild has — has taken share and has
[4] been aggressive in their effort to take share.
[5] Q: Okay. Do they also pose — are there
[6] other competitors that pose threats?
[7] A: Not meaningful threats right now.
[8]    (Conclusion of the read-in of the
[9] deposition of Shawn Slayton.)
[10]    MR. SCHERKENBACH: If you will bear
[11] with us a couple more minutes we will get to the
[12] lunch break.
[13]    The next is a Fairchild employee,
[14] his name is Mr. Engelbrechten. He is the former
[15] marketing director and head of the analog
[16] products group at Fairchild. He will testify
[17] about Fairchild 's marketing efforts including
[18] its relationship with Samsung.
[19]    MR. DE BLANK: If I could just
[20] clarify, Mr. Engelbrechten was not a Fairchild
[21] employee at the time of his deposition. He
[22] worked for Raytheon Semiconductor and was not an
[23] actual Fairchild employee.
[24]    MR. SCHERKENBACH: I clarify. He is

Trial Volume 3
October 4, 2006

Power Integrations, Inc. v.
Fairchild Semiconductor International, Inc.

---

**Page 772**

[1] had all the computing accounts. I'm trying to
[2] think who had the cell phone accounts. There was
[3] a couple of sales managers that had kind of
[4] worldwide responsibility.
[5]     They made that change particularly
[6] because of the outsourcing situation and the
[7] interactions with the ODMs, so they wanted to
[8] have an account like Dell basically under one
[9] sales management team, and then that sales
[10] management team would deal with our Asian Sales
[11] team and really manage the hand-off between the
[12] two regions, while Steve Jensen had what they
[13] called geographic accounts, smaller account.
[14]     MR. MICLEAN: We have one more, Mr.
[15] H.K. Kim. You have heard him referred to in some
[16] of the testimony. He is the head of power
[17] conversion line in Fairchild Korea.
[18]     His excerpt relates to Fairchild,
[19] Portland, Maine.
[20]     (The deposition read-in of H.K. Kim
[21] follows:)
[22]              BY MR. HEADLEY:
[23]     Q: Mr. Kim, I would like to mark for the
[24] record A two-page document bearing FCS1661316

**Page 773**

[1] through FCS1661317 marked PX-334. Mr. Kim have
[2] you ever seen this document before?
[3]     A: Well, this type of documents usually are
[4] distributed to me, but I don't look at them very
[5] carefully.
[6]     Q: Do you have any reason to believe you did
[7] not receive document?
[8]     A: No. Probably this was distributed to me.
[9]     Q: Do you understand what's being discussed
[10] there?
[11]     A: What.
[12]     Q: What does that mean to you?
[13]     A: Because of the issue of capa, the
[14] manufacturing can be done in Bucheon, Korea
[15] and — in Bucheon, Korea and in the States.
[16]     MR. SCHERKENBACH: We can take a
[17] lunch break.
[18]     THE COURT: All right. We will
[19] recess until 1:15.
[20]     (The jury exited the courtroom at
[21] 12:30 p.m.)
[22]     (Whereupon a luncheon recess was
[23] taken:)
[24]     THE COURT: All right. The jury's

**Page 774**

[1] on its way in.
[2]     MR. MICLEAN: Your Honor, can we
[3] just have two minutes to set up?
[4]     THE COURT: I think they're on their
[5] way in, but go ahead. Take your time. I'll give
[6] you some time when they get here.
[7]     We've got to round them up.
[8]     (Jury entering the courtroom at 1:20
[9] p.m.)
[10]     THE COURT: All right. Be seated,
[11] please.
[12]     MR. SCHERKENBACH: Your Honor, I'm
[13] going to proceed with the witnesses, but before
[14] we do, the parties have agreed on a stipulation
[15] that is relevant to Mr. Troxel's testimony that
[16] I'd like to read into the record, if I may.
[17]     Ladies and gentlemen, the parties
[18] have agreed between themselves that between
[19] February 2004 and October 2005, Fairchild
[20] manufactured 2.73 million FSD210HD devices as the
[21] fabrication facility in Portland, Maine using the
[22] SDG4 process for a total revenue to Fairchild of
[23] $547,724.
[24]     Our next witness will be Mr. Rick

**Page 775**

[1] Troxel, who is our damages expert.
[2]     THE CLERK: Please state and spell
[3] your full name for the record.
[4]     THE WITNESS: Richard Troxel,
[5] T-R-O-X-E-L.
[6]     THE CLERK: Please place your left
[7] hand on the Bible and raise your right hand.
[8]     Do you solemnly swear that the
[9] testimony you are about to give to the Court and
[10] the jury in this case now pending will be the
[11] truth, the whole truth, and nothing but the truth
[12] so help you God?
[13]     THE WITNESS: I do.
[14]     RICHARD TROXEL,
[15] the witness herein, having first
[16] been duly sworn on oath, was
[17] examined and testified as follows:
[18]              DIRECT EXAMINATION
[19]              BY MR. MICLEAN:
[20]     Q: Good afternoon, Dr. Troxel.
[21]     A: Good afternoon.
[22]     Q: Dr. Troxel, where do you live?
[23]     A: I live at 205 Tom Fazio Trace in
[24] Hendersonville, North Carolina.

---

Power Integrations, Inc.  v.
Fairchild Semiconductor International, Inc.

Trial Volume 3
October 4, 2006

Page 880

[1]  Q: And you are the senior vice president and
[2] general manager of Fairchild's Analog Products
[3] Group, right?
[4]  A: Currently executive vice president. At
[5] the time of the deposition it was senior vice
[6] president.
[7]  Q: So you got a promotion?
[8]  A: In some ways, yes.
[9]  Q: Good for you.
[10]    You first joined Fairchild in
[11] September of 2003; is that right?
[12]  A: September of 2003.
[13]  Q: Your group, the Analog Products Group
[14] includes the Fairchild PowerSwitch products;
[15] right?
[16]  A: Yes.
[17]  Q: Those are often called FPS products?
[18]  A: Yes, Fairchild PowerSwitch.
[19]  Q: You understand that a subset of FPS
[20] products is at issue in this case?
[21]  A: Yes, I do.
[22]  Q: Specifically the green FPS products are at
[23] issue in this case?
[24]  A: Yes, I believe that is the case.

Page 881

[1]  Q: And the FPS products generally fall within
[2] Fairchild's power conversion business?
[3]  A: Yes. We refer to it as the power
[4] conversion business.
[5]  Q: And that's one of the businesses in your
[6] analog business group?
[7]  A: Yes.
[8]  Q: H.K. Kim in Korea runs the power
[9] conversion business in Korea?
[10]  A: Yes. He is the head of that.
[11]  Q: You agree that Fairchild competes with
[12] Power Integrations for sales with integrated
[13] power supply controller chips like Green FPS
[14] chips?
[15]  A: Yes we compete in the same markets along
[16] with other companies.
[17]  Q: Let me show you PX-14 on the screen.
[18]    This document is a presentation you
[19] and Mr. Kim gave in Portland to Fairchild
[20] management in 2004; correct?
[21]  A: It appears to be, yes.
[22]  Q: And we are looking here actually at the
[23] last page of the document. This page is entitled
[24] Power Conversion Project Number One, Green FPS,

Page 882

[1] right?
[2]  Q: Yes. This was one of about a dozen
[3] projects I think we were doing an overview on?
[4]  A: So this page is part of a larger form that
[5] you used to track the top 12 projects in your
[6] group at that time, right?
[7]  A: Yes, that's what we did.
[8]  Q: And you were the person who established
[9] the top 12, right?
[10]  A: Yes. At this time there were two of us
[11] co-managing this whole business and I was the
[12] technical person, so I was doing the R&D and I
[13] managed about two-thirds of the R&D projects.
[14] They were the higher priority projects.
[15]  Q: And you picked Green FPS as project one?
[16]  A: The numbers had no particular meaning but
[17] yes in fact it was labeled as Number one.
[18]  Q: This slide, it is a little hard to see.
[19] If we can zoom in, but just to understand the
[20] chart, this column on the left says what the
[21] project I did or name is; is that right?
[22]  A: Yes, that's what it says.
[23]  Q: This project is Green FPS?
[24]  A: Yes.

Page 883

[1]  Q: And the value proposition is price
[2] competitiveness against PI, (FAB-less)?
[3]  A: Yes. And referring to the fact that
[4] Fairchild manufactures these products — we
[5] manufacture ourself where in this case Power
[6] Integrations is FAB-less.
[7]  Q: FAB-less meaning that it contracts with
[8] other corporations to manufacture its chips?
[9]  A: Yes.
[10]  Q: And there is a list of competitors there,
[11] a list of five companies?
[12]  A: Yes.
[13]  Q: And PI is listed first?
[14]  A: Yes, they happen to be first.
[15]  Q: And over here under: Why we will win
[16] first entry is price competitiveness against PI?
[17]  A: Yes. That's what the slide says.
[18]  Q: We are going to look at another — just
[19] for the record this is PX- 174. We are going to
[20] look at another page of this document it is
[21] actually page 28 in the physical document
[22] production number is 491016. This page lists top
[23] research and development strategies for the
[24] integrated circuit group at Fairchild; right?

*Power Integrations, Inc.   v.*
*Fairchild Semiconductor International, Inc.*

*Trial Volume 4*
*October 5, 2006*

*Hawkins Reporting Service*
*715 N King Street*
*Suite 3*
*Wilmington, DE  19801*
*(302) 658-6697*

*Original File 100506~1.TXT, 430 Pages*
*Min-U-Script® File ID: 1713435396*

**Word Index included with this Min-U-Script®**

Power Integrations, Inc.  v.
Fairchild Semiconductor International, Inc.

Trial Volume 4
October 5, 2006

Page 971

[1]     Q: Okay. Can you give us some idea
[2] of the breadth of products that your
[3] semiconductor products are used in?
[4]     A: Yes. We certainly have marketing
[5] charts on this.
[6]     We go everywhere from — from
[7] milliwatt-type solution for little power chips
[8] that go on the battery inside of a cell phone to
[9] greater than kilowatt power devices that go into
[10] train air-conditioning systems or Lincoln
[11] Electric welders, that sort of thing. So it's a
[12] whole spectrum of power.
[13]     MR. GUY: Could I have 403?
[14]             BY MR. GUY:
[15]     Q: So where are Fairchild's U.S.
[16] operations today?
[17]     A: Well, first of all, the company's
[18] incorporated in Delaware, as the chart shows
[19] you. And then we have three major manufacturing
[20] facilities in the United States. Manufacturing
[21] facilities in the semiconductor business are
[22] called fabs, wafer fabrication facilities.
[23]     They're in South Portland, Maine,
[24] West Jordan, Utah, which is right outside of

Page 972

[1] Salt Lake City and Mountain Top, Pennsylvania.
[2]     Q: Approximately, how many products
[3] does Fairchild have today?
[4]     A: We make about 20,000 standard
[5] products.
[6]     Q: I think on an earlier slide, it
[7] said 30,000 for 2005?
[8]     A: Yes.
[9]     Q: What happened there?
[10]     A: We've, over the last couple of
[11] years, really we've been doing what we call end
[12] of lifting products or discontinuing products,
[13] or where we have redundant product offerings as
[14] a result of acquisitions, where we've got two
[15] different part numbers, because of two different
[16] companies, we've combined them.
[17]     So the combined number is 10,000
[18] units less. It's 20,000.
[19]     Q: And how many products are,
[20] roughly, at issue here?
[21]     A: About 36.
[22]     Q: How many patents does Fairchild
[23] currently have that are — that haven't expired?
[24]     A: It's a rich portfolio. We have

Page 973

[1] about 740 patents in the United States. And
[2] 1,525 foreign patents.
[3]     Q: And how many employees worldwide?
[4]     A: We've got 9,000 employees
[5] worldwide.
[6]     Q: And how many are in the U.S.?
[7]     A: A little over 1,200.
[8]     Q: Now, was there a strategy involved
[9] in owning your own manufacturing facility?
[10]     A: Yes, absolutely. The — the
[11] secret sauce, if you will, in power devices is
[12] the process technology. And the feeling and the
[13] strategy of our company is to develop the
[14] process technology and build that in our fabs.
[15] We're not anxious to farm out, or subsidize, or
[16] subcontract that technology lest it get in the
[17] wrong hands.
[18]     So our strategy is to build as
[19] much product in our wafer fabs as is humanly
[20] possible.
[21]     MR. GUY: Could I have PD-25?
[22]             BY MR. GUY:
[23]     Q: Mr. Beaver, in the opening
[24] statement — PD-25 — in the opening statement,

Page 974

[1] Power Integrations used this graphic, and they
[2] said that or implied that Fairchild is a
[3] diversified company that grows by acquisition.
[4]     Is that the only way that
[5] Fairchild grows?
[6]     A: No. The statement's really only
[7] partially true.
[8]     Q: All right. How else does
[9] Fairchild achieve growth?
[10]     A: Well, of course, we grow
[11] internally by expanding upon the base business
[12] from 1997, which was around 300 and some odd
[13] million dollars, and today is almost a billion
[14] of our income or revenue. So that's internal
[15] growth.
[16]     And then we grow by acquisition as
[17] is shown in this chart.
[18]     Q: Let's go through those
[19] acquisitions. Can you point out the ones that
[20] are power companies?
[21]     A: Basically all of them are power
[22] companies.
[23]     Q: And how many other — how many of
[24] them are U.S. power companies?