# Exhibit I

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

## FORM 10-K

(Mark One)

☒ **Annual report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2005**

or

☐ **Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the transition period from _____ to _____**

Commission File Number 0-23441

# POWER INTEGRATIONS, INC.
### (Exact name of registrant as specified in its charter)

**DELAWARE**
(State or other jurisdiction
of Incorporation or organization)

**94-3065014**
(I.R.S. Employer
Identification No.)

**5245 Hellyer Avenue, San Jose, California**
(Address of principal executive offices)

**95138-1002**
(Zip code)

(408) 414-9200
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act: none

Securities registered pursuant to Section 12(g) of the Act:
Common Stock, $0.001 par value
(Title of Class)

Case No. 04-1371-JJF

**PX-387**

Date Entered: _____

By: _____

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  YES ☐  NO ☒

Indicate by check mark if the registrant is not required to file reports pursuant to section 13 or Section 15(d) of the Act.  YES ☐  NO ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  YES ☒  NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of accelerated filer and large accelerated filer in Rule 12b-2 of the Exchange Act:

Large accelerated filer ☐         Accelerated filer ☒         Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  YES ☐  NO ☒

The aggregate market value of registrant's voting and non-voting common stock held by nonaffiliates of registrant on June 30, 2006, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $333,759,321, based upon the closing sale price of the common stock as reported on the Nasdaq National Market. Shares of common stock held by each officer, director and holder of 5% or more of the outstanding common stock have been excluded in that such persons may be deemed



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09<br>88 | PAL jaslv0dc | 04-Mar-2007 22:20 EST | | 86507 FS 1 | 1* |
| FORM 10-K | | ■ | PAL | | | HTM IFV | 1C |
| | | | | | | Page 2 of 2 |

to be affiliates. This determination of affiliate status is not a conclusive determination for other purposes.

Outstanding shares of registrant's common stock, $0.001 par value, as of March 1, 2007: 28,657,897.



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.5.18 | PAL jaslv0dc | 04-Mar-2007 23:35 EST | 86507 TX 1 | 2* |
|---|---|---|---|---|---|---|
| FORM 10-K | | ■ PAL | | | HTM PMT | 1C |

Page 1 of 1

# TABLE OF CONTENTS

## PART I

| | | **Page** |
|---|---|---|
| ITEM 1. | BUSINESS | 4 |
| ITEM 1A. | RISK FACTORS | 13 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 19 |
| ITEM 2. | PROPERTIES | 20 |
| ITEM 3. | LEGAL PROCEEDINGS | 20 |
| ITEM 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 22 |

## PART II

| ITEM 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 23 |
|---|---|---|
| ITEM 6. | SELECTED FINANCIAL DATA | 24 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION | 26 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 56 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 57 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 57 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 58 |
| ITEM 9B. | OTHER INFORMATION | 63 |

## PART III

| ITEM 10. | DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT | 64 |
|---|---|---|
| ITEM 11. | EXECUTIVE COMPENSATION | 66 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 72 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 75 |
| ITEM 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 77 |

## PART IV

| ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 79 |
|---|---|---|
| SIGNATURES | | 125 |

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.8 PAL jaslv0dc | 04-Mar-2007 22:24 EST | 86507 TX 2 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |
| | | | | Page 1 of 1 | |

## EXPLANATORY NOTE REGARDING RESTATEMENT OF OUR CONSOLIDATED FINANCIAL STATEMENTS

This Annual Report on Form 10-K contains the restatement of our consolidated statements of income, stockholders' equity and cash flows for the years ended December 31, 2004 and 2003, consolidated balance sheet as of December 31, 2004, and selected consolidated financial data for the years ended December 31, 2004, 2003, 2002 and 2001, and for each of the seven quarters in the period ended September 30, 2005.

Based upon an investigation and determinations made by a Special Committee of our board of directors and management's undertaking of a separate review of historical stock option activity subsequent to the issuance of our Annual Report on Form 10-K for the fiscal year ended December 31, 2004, we identified errors in our company's accounting related to stock option compensation expenses in prior periods. We determined that corrections to the consolidated financial statements were required to reflect additional material charges for stock-based compensation expenses and related income and payroll tax effects.

Our consolidated retained earnings as of September 30, 2005 incorporates an aggregate of approximately $30.5 million in incremental stock-related compensation charges relating to fiscal years 1998 through the third quarter ended September 30, 2005. This charge is net of a $13.5 million tax benefit related to the restatement adjustments. This additional expense results from our determination, based upon the Special Committee's investigation and our management's subsequent reviews and analyses, that for accounting purposes, the dates initially used to measure compensation expense for various stock option grants (options to purchase an aggregate of 7,988,189 shares) to employees, executive officers and non-employee directors during the period could not be relied upon. We determined that the revised measurement dates for accounting purposes differed from the originally recorded measurement dates due primarily to (1) insufficient or incomplete corporate approvals, (2) grants that were determined to have been cancelled and repriced and (3) grants in which vesting was accelerated. These included annual grants to existing employees and officers, option grants to non-employee directors, and option grants made to new hires. Our board of directors has ratified each of the options granted, and we intend to honor each stock option granted pursuant to the terms of the applicable stock option plan and stock option agreement.

In those cases in which we previously used a measurement date that we determined could no longer be relied upon, we have developed and applied a methodology to remeasure those stock option grants and record the relevant charges. For more information on our restatement, including the methodology we adopted, see Item 7, "Management's Discussion of Financial Condition and Results of Operations—Restatement of Consolidated Financial Statements" and note 3 of notes to our consolidated financial statements appearing in Item 8 of this Annual Report on Form 10-K.

In addition to restatements for stock-based compensation, we recorded adjustments to correct other errors that occurred in the periods ended December 31, 2001 through the third quarter of 2005 which have been reflected in the restated consolidated financial statements. These restatements relate primarily to a correction to reduce our sales return reserve, which should have been recorded in 2001. The restatements, including the nature thereof, are further discussed in note 3 of notes to our accompanying consolidated financial statements appearing in Item 8 of this Annual Report on Form 10-K.

All financial information contained in this Annual Report on Form 10-K gives effect to the restatements of our consolidated financial statements as described above. We have not amended, and we do not intend to amend, our previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for each of the fiscal years and fiscal quarters of 1998 through 2004, and for the first nine months of the fiscal year ended December 31, 2005. Financial information included in reports previously filed or furnished by Power Integrations, Inc. for the periods from January 1, 1998 through September 30, 2005 should not be relied upon and are superseded by the information in this Annual Report on Form 10-K.



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 9.9 | AL jaslv0dc | 04-Mar-2007 22:25 EST | 86507 TX 3 | 1* |
| FORM 10-K | | ■ | PAL | | HTM IFV | 1C |

Page 1 of 1

Management has determined that we have a material weakness in our internal control over financial reporting relating to the implementation and administration of our stock option program, and the accounting for grants thereunder. As described in more detail in Item 9A of this Annual Report, based upon direction of a Special Committee of the board of directors, we have identified and are implementing several measures designed to remedy this material weakness.

### CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K includes a number of forward-looking statements that involve many risks and uncertainties. In some cases, forward-looking statements are indicated by the use of such words as "would", "could", "will", "may", "expect", "believe", "should", "anticipate", "outlook", "if", "future", "intend", "plan", "estimate", "predict", "potential", "targets", "seek" or "continue" and similar words and phrases, including the negatives of these terms, or other variations of such terms. These statements reflect our current views with respect to future events and our potential financial performance and are subject to risks and uncertainties that could cause our actual results and financial position to differ materially and adversely from what is projected or implied in any forward-looking statements included in this Form 10-K. These factors include, but are not limited to: our ability to maintain and establish strategic relationships; the risks inherent in the development and delivery of complex technologies; our ability to attract, retain and motivate qualified personnel; the emergence of new markets for our products and services, and our ability to compete in those markets based on timeliness, cost and market demand; and our limited financial resources. We make these forward looking statements based upon information available on the date of this Form 10-K, and we have no obligation (and expressly disclaim any such obligation) to update or alter any forward-looking statements, whether as a result of new information or otherwise. In evaluating these statements, you should specifically consider the risks described under Item 1A of Part I—"Risk Factors," Item 7 of Part II—"Management's Discussion and Analysis of Financial Condition and Results of Operation" and elsewhere in this Annual Report on Form 10-K.

3

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX08 8.8 | PAL jaslv0dc | 04-Mar-2007 22:26 EST | 86507 TX 4 | 1* |
| FORM 10-K | START PAGE | ■ PAL | | | HTM IFV | 1C |

## PART I

*TOPSwitch, TinySwitch, LinkSwitch, DPA-Switch, EcoSmart, and PI-Expert are trademarks of Power Integrations, Inc.*

### Item 1. Business

### Overview

We design, develop, manufacture and market proprietary, high-voltage, analog integrated circuits, commonly referred to as ICs. Our ICs are used in electronic power supplies, also known as switched-mode power supplies or switchers. Power supplies convert electricity from a high-voltage source, such as a wall socket, to the type of power needed by a given electronic device (such as a cellphone or a computer). This conversion entails, among other functions, reducing the voltage and, when necessary, converting alternating current to direct current (AC-DC). Switched-mode power supplies perform these functions using an array of electronic components, often including ICs such as ours. The vast majority of our ICs are used in AC-DC switchers, though we are now also targeting certain direct current to direct current (DC-DC) applications. Our focus is on applications that are sensitive to size, portability, energy efficiency and time-to-market, which are the primary benefits that our ICs provide. We generally target power-supply applications in the following markets for our ICs:

* the communications market;

* the consumer market;

* the computer market; and

* the industrial electronics markets.

We believe our patented TOPSwitch ICs, introduced in 1994, were the first highly integrated power conversion ICs to achieve widespread market acceptance. Since the introduction of TOPSwitch, we have introduced a number of other families of ICs that further improve upon the functionality and cost-effectiveness of TOPSwitch, and enable us to address a wider range of AC-DC applications. In June 2002, we further expanded our addressable market with the introduction of DPA-Switch, a highly integrated high-voltage DC-DC power conversion IC designed specifically for use in distributed power architectures. With our current portfolio of products we can address applications requiring up to 290 watts of power, in AC-DC applications, and up to 100 watts of power in DC-DC applications. Since introducing TOPSwitch in 1994, we have shipped approximately 1.7 billion ICs.

We were incorporated in California on March 25, 1988 and reincorporated in Delaware in December 1997. Our principal executive offices are located at 5245 Hellyer Avenue, San Jose, California 95138-1002, and our telephone number is (408) 414-9200. We maintain a website at *www.powerint.com.*

### Industry Background

Virtually every electronic device that plugs into a wall socket requires a power supply to convert the high-voltage alternating current provided by electric utilities into the low-voltage direct current required by most electronic devices. A power supply may be located inside a device, such as a DVD player or desktop computer, or it may be outside the device as in the case of a cellphone charger or an adapter for a cordless phone.

Until approximately 1970, virtually all AC-DC power supplies were in the form of linear transformers. These devices, consisting primarily of copper wire wound around an iron core, tend to be bulky and heavy, and typically waste a substantial amount of electricity. In the 1970s, the invention of high-voltage discrete semiconductors enabled the development of a new generation of power supplies known as switchers, which operate at much higher frequencies, allowing the use of smaller, more efficient transformers. Discrete switchers tend to be smaller, lighter-weight and more efficient than linear transformers, and are generally more cost-effective in higher-power applications (i.e., applications requiring more than about three watts of power).

4



Although discrete switchers offer advantages over linear transformers, over the years they have not kept pace with the technological advances made in the electronic devices they power. Discrete switchers require numerous components and involve a high level of design and manufacturing complexity, which results in time-to-market and development risks for new products. Further, some discrete switchers lack inherent safety and energy-efficiency features; adding these features may further increase the bill of materials and complexity of the power supply.

Early attempts to replace discrete switchers with IC-based switchers did not achieve widespread acceptance in the marketplace because these integrated switchers were not cost-effective. We addressed this opportunity in 1994 with TOPSwitch, the industry's first cost-effective high-voltage power conversion IC.

## Our Highly Integrated Solution

Our patented ICs integrate onto a single chip many of the functions otherwise performed by numerous discrete electronic components. In particular, our ICs combine a high-voltage power transistor, or MOSFET, with low-voltage control circuitry. Because of this integration, our TOPSwitch, TinySwitch, DPA-Switch and LinkSwitch products enable power supplies to have superior features and functionality at a total cost equal to or lower than that of discrete switchers and linear transformers. Our products offer the following key benefits to power supplies:

- *Fewer Components, Reduced Size and Enhanced Functionality*

  Our highly integrated ICs, used in combination with our patented power-supply design techniques, enable the design and production of switchers that use up to 70% fewer components compared to discrete switchers. For example, our ICs provide safety and reliability features such as thermal and short-circuit protection, while discrete switchers must include additional components (and therefore incur additional cost) to provide these functions. Switchers that incorporate our ICs are also smaller, lighter, and more portable than comparable power supplies built with linear transformers, which are still commonly used in many low-power applications.

- *Improved Efficiency*

  Our patented EcoSmart technology, included in all of our ICs introduced since 1998, improves the energy efficiency of electronic devices during both normal operation and standby modes. Compared to discrete switchers and linear transformers, our technology enables manufacturers to cost-effectively meet the growing demand for energy-efficient products, and to comply with increasingly stringent energy-efficiency requirements.

- *Reduced Time-to-Market*

  Our integrated circuits make power supply designs simpler and more suitable for high-volume manufacturing compared to discrete switchers. We also provide automated design tools and reference designs that reduce time-to-market and product development risk.

- *Wide Power Range and Scalability*

  Products in our current IC families can address a power range up to 290 watts in AC-DC applications, and up to 100 watts in DC-DC applications. Within each of our product families, the designer can scale up or down in power to address a wide range of designs with minimal design effort.

## Energy Efficiency

Linear transformers and many discrete switchers draw significantly more electricity than the amount needed by the devices they power. As a result, billions of dollars worth of electricity is wasted each year, and millions of tons of greenhouse gases are unnecessarily produced. Energy waste occurs during both normal operation of a device and in so-called "standby" mode, when the device is performing little or no useful function. For example,



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX02 9.6 | PAL jaslv0dc | 04-Mar-2007 22:28 EST | | 86507 TX 6 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

computers and printers waste energy while in standby or "sleep" mode. TVs and DVD players that are turned off by remote control consume energy while awaiting a remote control signal to turn them back on. A cell-phone charger left plugged into a wall socket continues to draw electricity even when not connected to the phone. Many typical household appliances, such as microwave ovens, dishwashers and washing machines, consume power when not in use. One study has estimated that standby power alone amounted to as much as ten percent of residential energy consumption in Organization for Economic Co-operation and Development, or OECD, countries.

As the number of electronic products in service grows, governments are taking action to promote cost-effective ways to conserve energy. For example, the Energy Star program and the European Union Code of Conduct encourage manufacturers of electronic devices such as home appliances, DVD players, computers and TVs to comply with energy-efficiency standards. In late 2004, the California Energy Commission introduced mandatory efficiency standards for external power supplies; similar standards have been adopted in several other U.S. states as well as Europe, China and Australia. In 2001, President Bush issued an executive order requiring that electronic products purchased by the Federal government consume less than one watt in standby mode. Numerous other countries around the world have also instituted energy-efficiency standards affecting a wide range of electronic devices.

Our EcoSmart technology, included in all of our ICs introduced since 1998, dramatically improves the efficiency of electronic devices, reducing waste in both operating and standby modes. We believe our EcoSmart technology allows manufacturers to meet all current and proposed worldwide energy-efficiency regulations.

## Products

Below is a brief description of our products:

* **TOPSwitch**

  TOPSwitch, our first commercially successful product, was introduced in 1994. We introduced the TOPSwitch-II family in 1997. The key benefits that the TOPSwitch family has brought to power supplies, compared to discrete switchers, are fewer components, reduced size, enhanced functionality and lower cost in many applications. Our TOPSwitch products integrate a pulse width modulation, or PWM, controller, a high-voltage MOSFET and a number of other electronic components.

  In March 2000 we introduced the TOPSwitch-FX family, which consists of six products. In November 2000 we introduced the TOPSwitch-GX family, consisting of 23 products. These product families incorporate the features offered in earlier TOPSwitch products as well as new features through additional user-configurable pins, which allow a higher level of design flexibility. TOPSwitch-GX utilizes our second-generation silicon technology, which enables devices that are more cost-effective than previous generations. Applications for TOPSwitch-FX and TOPSwitch-GX include set-top boxes, DVD players, desktop computers, LCD monitors, and printers. TOPSwitch-GX can be used in applications requiring up to 290 watts of power.

* **TinySwitch**

  We introduced the TinySwitch family in September 1998. We specifically designed TinySwitch topology to address applications below 10 watts. TinySwitch was the first family of ICs to incorporate our EcoSmart technology, which dramatically reduces energy waste in electronic products. EcoSmart technology has been included in all product families that we have introduced since 1998. In March 2001 we introduced the TinySwitch-II family, which consists of six products. This product line maintains the simplicity of the previous TinySwitch line while providing additional features that enable lower system cost. TinySwitch-II utilizes the same second-generation silicon technology found in TOPSwitch-GX. Applications for TinySwitch-II include adapters for portable equipment such as cell phones, PDAs, digital cameras, computer peripherals, and power tools, as well as power supplies found in PCs, audio/video equipment, home appliances and many other applications.

6



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 9.9 | PAL jaslv0dc | 04-Mar-2007 22:29 EST | | 86507 TX 7 | 1* |
| FORM 10-K | | ■ | PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 |

In February 2006 we introduced the third generation of the TinySwitch line, TinySwitch-III. The TinySwitch-III family consists of seven products and addresses power levels up to 28 watts. TinySwitch-III further improves upon the cost-effectiveness of previous generations, and includes new features that further enhance design flexibility and energy efficiency.

In March 2006 we introduced PeakSwitch, an extension of the TinySwitch family targeted at applications requiring a high peak-to-average power ratio, including printers and audio amplifiers. PeakSwitch supplies momentary bursts of peak power by automatically increasing the switching frequency of the IC's integrated MOSFET for several milliseconds before returning to continuous-mode operation. This approach allows the use of transformers, capacitors and other components sized for the power supply's average continuous power rather than its peak power level.

* *LinkSwitch*

We introduced the LinkSwitch family in September 2002. The LinkSwitch family consists of fifteen products, including the LinkSwitch-TN, LinkSwitch-XT and LinkSwitch-LP family extensions. Deriving its name from the phrase "linear-killer switch", LinkSwitch is the industry's first highly integrated high-voltage power conversion IC designed specifically to displace low-power (0 to 4 watts) linear transformers. Applications for LinkSwitch include low-power adapters and chargers for personal electronics such as cellphones, cordless phones, digital cameras, and MP3 players. LinkSwitch is also used in numerous consumer and industrial applications.

* *DPA-Switch*

The DPA-Switch family, introduced in June 2002, consists of seven products. DPA-Switch is the first monolithic high-voltage power-conversion IC designed specifically for use in DC-DC converters and distributed power architectures. It is capable of supplying output power levels of up to 100 watts. DPA-Switch allows designers to eliminate up to 50 external components from the design of a typical discrete DC-DC converter, resulting in a shorter design cycle, smaller board size and higher reliability. Applications include Power-over-Ethernet devices such as voice-over-IP phones and security cameras, as well as network hubs, line cards, servers, digital PBX phones, DC-DC converter modules and industrial controls.

Revenue mix by product family for the years ended December 31, 2005, 2004 and 2003 was approximately as follows:

| Product Family | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| TinySwitch-I and -II | 57% | 54% | 51% |
| TopSwitch-FX and -GX | 27% | 28% | 27% |
| TopSwitch-I and -II | 11% | 15% | 20% |
| LinkSwitch and DPA-Switch | 5% | 3% | 2% |

## Markets and Customers

Our strategy is to target markets that can benefit the most from our highly integrated power conversion ICs. The following chart shows the primary applications of our products in power supplies in several major market categories.

| Market Category | Primary Applications |
| --- | --- |
| • *Communications* | Cell-phone chargers, cordless phones, broadband modems, power-over-Ethernet devices including voice-over-IP phones, other network and telecom gear |
| • *Consumer* | Set-top boxes for cable and satellite services, digital cameras, DVD players, LCD TVs, major appliances, personal care and small appliances, audio amplifiers |

7



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 5.5 | PAL jaslv0dc | 04-Mar-2007 22:30 EST | | 86507 TX 8 | 1* |
| --- | --- | --- | --- | --- | --- | --- | --- |
| FORM 10-K | | ■ | PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

| Market Category | Primary Applications |
| --- | --- |
| • *Computer* | Standby power for desktop PCs and servers, LCD monitors, multimedia audio, printers, removable media, LCD projectors, PDAs |
| • *Industrial Electronics* | Industrial controls, utility meters, motor controls, uninterruptible power supplies, emergency lighting, LED lighting |

Revenue by our end market categories for 2005 was approximately 30 percent consumer, 29 percent communications, 23 percent computer, 11 percent industrial electronics and 7 percent other markets.

## Sales, Distribution and Marketing

We sell our products to original equipment manufacturers, or OEMs, and merchant power supply manufacturers through a direct sales staff and through a worldwide network of independent sales representatives and distributors. We have sales offices in California, Georgia and Illinois, as well as in England, France, Germany, Italy, India, China, Japan, Korea, Singapore and Taiwan. Direct sales to OEMs and merchant power supply manufacturers represented approximately 40%, 44% and 39% of our net product revenues for 2005, 2004 and 2003, respectively, while sales through distributors accounted for approximately 60%, 56% and 61% for 2005, 2004 and 2003, respectively. All distributors are entitled to certain return privileges based on sales revenue and are protected from price reductions affecting their inventories. Our distributors are not subject to minimum purchase requirements and sales representatives and distributors can discontinue marketing any of our products at any time.

Our top ten customers, including distributors that resell to OEMs and merchant power supply manufacturers, accounted for 69%, 71% and 76% of our net revenues for 2005, 2004 and 2003, respectively. For 2005, Avnet (formerly Memec Electronic Components) and Synnex Technologies accounted for 19% and 18% of our net revenues, respectively. For 2004, Memec Electronic Components (now Avnet) and Synnex Technologies each accounted for 19% of our net revenues. In 2003, Memec (now Avnet) and Synnex Technologies accounted for 25% and 20% of our net revenues, respectively. In April 2006, we terminated our distributor relationship with Synnex Technologies. We have replaced this terminated relationship with other distribution relationships, and therefore do not believe that the termination of our distributor relationship with Synnex Technologies will have a material impact on our business. No other customers accounted for more than 10% of net revenues during 2005, 2004 and 2003. In 2005, 2004 and 2003, sales to customers in the United States accounted for approximately 6%, 6% and 5%, respectively, of our net revenues. See Note 2 "Summary of Significant Accounting Policies" to our notes to our consolidated financial statements regarding sales to customers located in foreign countries, and for data regarding long-lived assets in the U.S. and in foreign countries.

Because much of our manufacturing, and most of our customers, are located in foreign jurisdictions, we are subject to additional risks. Risks related to our foreign operations are set forth in Item 1A of this Annual Report on Form 10-K, and include: potential weaker intellectual property rights under foreign laws; the burden of complying with foreign laws; and foreign-currency exchange risk.

## Backlog

Our sales are primarily made pursuant to standard purchase orders. The quantity of products purchased by our customers as well as shipment schedules are subject to revisions that reflect changes in both the customers' requirements and in manufacturing availability. The semiconductor industry is characterized by short lead-time orders and quick delivery schedules. In light of industry practice and experience, we do not believe that backlog at any given time is a meaningful indicator of our ability to achieve any particular level of revenue or financial performance.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 5.8 | PAL jaslv0dc | 04-Mar-2007 22:31 EST | 86507 TX 9 | 1* |
| FORM 10-K | | ■ PAL | | | HTM IFV | 1C |
| | | | | | Page 1 of 1 |

Technology

- *High-Voltage Transistor Structure and Process Technology*—We have developed a patented silicon technology that uses a proprietary high-voltage MOS transistor structure and fabrication process. This technology enables us to integrate high-voltage n-channel transistors and industry-standard CMOS and bipolar control circuitry on the same monolithic IC. Both the IC device structure and the wafer fabrication process contribute to the cost-effectiveness of our high-voltage technology. In 2000, we introduced an improved high-voltage technology that further reduces the silicon area of our devices by using dual-conduction layers. In 2004, we made additional improvements to our integrated high-voltage technology to further shrink the silicon area of our ICs. Our high-voltage ICs are implemented on low-cost silicon wafers using standard 5V CMOS silicon processing techniques with a relatively large feature size of between 1.5 and 3 microns.

- *IC Design and System Technology*—Our IC designs combine complex control circuits and high-voltage transistors on the same monolithic IC. Our IC design technology takes advantage of our high-voltage process to minimize the die size of both the high-voltage device and control circuits and improve the performance of our ICs versus competing integrated technologies. We have also developed extensive expertise in the design of switching power supplies, resulting in innovative circuit topologies and design techniques that reduce component count and system cost, increase system performance, and improve energy efficiency compared to alternative approaches.

## Research and Development

Our research and development efforts are focused on improving our high-voltage device structures, wafer fabrication processes, analog circuit designs and system-level architectures. We seek to introduce new products to expand our addressable markets, further reduce the costs of our products, and improve the cost-effectiveness and functionality of our customers' power supplies. We have assembled a team of highly skilled engineers to meet our research and development goals. These engineers have expertise in high-voltage device structure and process technology, analog design, and power-supply systems architecture.

In 2005, 2004 and 2003, we incurred costs of $17.1 million, $15.4 million and $20.1 million, respectively, on research and development efforts, including expenses related to stock-based compensation (for information on our stock-based compensation expense see note 3 of the notes to consolidated financial statements attached hereto). We expect to continue to invest significant funds in research and development activities.

## Intellectual Property and Other Proprietary Rights

We use a combination of patents, trademarks, copyrights, trade secrets and confidentiality procedures to protect our intellectual property rights. As of December 31, 2005, we held 131 U.S. patents and had generally filed for or received foreign patent protection on these patents resulting in 82 foreign patents. The U.S. patents have expiration dates ranging from 2006 to 2024. We also hold trademarks in the U.S. and various other countries including Taiwan, Korea, Hong Kong, China, Europe, and Japan.

We regard as proprietary certain equipment, processes, information and knowledge that we have developed and used in the design and manufacture of our products. Our trade secrets include a high-volume production process that produces our patented high-voltage ICs. We attempt to protect our trade secrets and other proprietary information through non-disclosure agreements, proprietary information agreements with employees and consultants and other security measures.

We granted a perpetual, non-transferable license to Matsushita Electric Industrial Co, Ltd., or Matsushita, to use our semiconductor patents and other intellectual property for our current high-voltage technology under a Technology License Agreement. This license allows Matsushita to manufacture and design products for internal use and for sale or distribution to other Japanese companies and their subsidiaries in Asia. In exchange for its license rights, Matsushita has paid and will continue to pay royalties on products using the licensed technology during fixed periods.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX06 8.6 | PAL jaslv0dc | 04-Mar-2007 22:20 EST | 86507 TX 10 | 1* |
| FORM 10-K | | ■ PAL | | | HTM IFV | 1C |

Page 1 of 1

The Technology License Agreement with Matsushita expired in June 2005 and has not been renewed. As a result, Matsushita's right to use our technology does not include technology developed after June 2005. Matsushita may continue to sell products based on technology covered by the license agreement prior to its expiration, and will continue to pay us royalties on the sale of such products through June 2009. Matsushita may sell products based on technology covered by the Technology License Agreement without payment of royalties after June 2009.

**Manufacturing**

We contract with Matsushita, OKI Electric Industry, or OKI, and ZMD Analog Mixed Signal Services GmbH & CoKG, or ZMD, to manufacture our wafers in foundries located in Japan and Germany. Our products are assembled and packaged by independent subcontractors in China, Malaysia and the Philippines. We perform testing at our facility in San Jose, California, and through our packaging subcontractors in Asia. Our fabless manufacturing model enables us to focus on our engineering and design strengths, minimize fixed costs on capital expenditures and still have access to high-volume manufacturing capacity. Our products do not require leading-edge process geometries for them to be cost-effective, and thus we can use our foundries' older, low-cost facilities for wafer manufacturing. However, because of our highly sensitive process, we must interact closely with our foundries to achieve satisfactory yields. Although we generally utilize standard IC packages for assembly, some materials and aspects of assembly are specific to our products. We require our manufacturers to use a high-voltage molding compound that is difficult to process and is available from only one supplier. This compound and its required processes, together with the other non-standard materials and processes needed to assemble our products, require a more exacting level of process control than normally required for standard packages. As a result, we must be involved with our contractors on an active engineering basis to maintain and improve the process.

Our wafer supply agreements with Matsushita, OKI, and ZMD expire in June 2010, April 2008, and December 2009, respectively. Under the terms of our agreement with Matsushita, we establish, by mutual agreement, minimum production capacity to be made available by Matsushita for the production of our wafers, and we supply Matsushita with monthly orders and rolling six-month forecasts on a monthly basis. We also establish pricing by good faith agreement, subject to our right to most-favored pricing. Under the terms of the OKI agreement, OKI has agreed to reserve a specified amount of production capacity and to sell wafers to us at fixed prices, which are subject to periodic review jointly by OKI and us. Our agreements with both Matsushita and OKI provide for the purchase of wafers in Japanese yen. Both agreements allow for mutual sharing of the impact of the exchange rate fluctuation between Japanese yen and the U.S. dollar. Under the terms of the ZMD agreement, ZMD has agreed to reserve a specified amount of production capacity and to sell wafers to us at fixed prices, which are subject to periodic review jointly by ZMD and us. The agreement with ZMD also requires us to supply ZMD with rolling six-month forecasts on a monthly basis. Our purchases of wafers from ZMD are denominated in U.S. dollars.

Although certain aspects of our relationships with Matsushita, OKI, and ZMD are contractual, many important aspects of these relationships depend on their continued cooperation. We cannot assure that we will continue to work successfully with Matsushita, OKI, or ZMD in the future, that they will continue to provide us with sufficient capacity at their foundries to meet our needs, or that any of them will not seek an early termination of their wafer supply agreement with us. Our operating results would suffer in the event of a supply disruption with OKI, Matsushita, or ZMD and if we were unable to quickly qualify alternative manufacturing sources for existing or new products or if these sources were unable to produce wafers with acceptable manufacturing yields.

We typically receive shipments from our foundries approximately five to seven weeks after placing orders, and lead times for new products can be substantially longer. To provide sufficient time for assembly, testing and finishing, we typically need to receive wafers from Matsushita, OKI and ZMD four to six weeks before the desired ship date to our customers. As a result of these factors and the fact that customers' orders can be made

10



with little advance notice, we have only a limited ability to react to fluctuations in demand for our products. We carry a substantial amount of wafer and finished goods inventory to help offset these factors to better serve our markets and meet customer demand.

## Competition

Competing alternatives to our high-voltage ICs include other integrated and hybrid (i.e., single-package) products from companies such as Fairchild Semiconductor, STMicroelectronics, Infineon, ON Semiconductor and Sanken Electric Company, as well as discrete components such as PWM controllers and high-voltage bipolar transistors and MOSFETs, produced by a large number of vendors. For some applications, line-frequency transformers are also a competing alternative to designs utilizing our ICs.

We have historically observed highly competitive pricing for discrete components and competing integrated/hybrid products. While the pricing of our ICs is an important factor considered by our customers, we also compete against alternative products based on a variety of other factors. Most importantly, the highly integrated nature of our ICs enables power supply designs that utilize fewer total components than comparable discrete designs or designs using other integrated/hybrid products. This reduced component count provides a cost savings on the bill of materials for a power supply, but also enables power supplies to be designed more quickly and manufactured more efficiently than competing designs.

In addition to enabling a lower component count, we also compete on the basis of product functionality such as safety features and energy-efficiency features, and on the basis of the technical support we provide to our customers. Such support includes hands-on design assistance as well as a range of design tools and documentation such as software and reference designs. We also believe that our record of product quality and history of delivering products to our customers on a timely basis serve as additional competitive advantages.

## Warranty

We generally warrant that our products will substantially conform to the published specifications for 12 months from the date of shipment. Under the terms of our purchase orders, our liability is limited generally to either a credit equal to the purchase price or replacement of the defective part.

## Employees

As of December 31, 2005, we employed 342 full time personnel, consisting of 112 in manufacturing, 78 in research and development, 123 in sales, marketing and applications support, and 29 in finance and administration.

## Investor Information

We make available, free of charge, copies of our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act as soon as reasonably practicable after filing such material electronically or otherwise furnishing it to the SEC. You may obtain a free copy of these reports in the "investor info" section of our website, *www.powerint.com*. Our website address is provided solely for informational purposes. We do not intend, by this reference, that our website should be deemed to be part of this Annual Report. The reports filed with the SEC are also available at *www.sec.gov*. Please see "Explanatory Note Regarding Restatement Of Our Consolidated Financial Statements" above regarding our previous reports not being amended for the restatement of our financial statements, and that the financial information included in reports previously filed or furnished by Power Integrations for prior periods should not be relied upon, and are superseded by the information in this Annual Report on Form 10-K.

11

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX06 5.6 | PAL jaslv0dc | 04-Mar-2007 22:22 EST | 86507 TX 12 | 1* |
| FORM 10-K | | ■ PAL | | | HTM IFV | 1C |

Page 1 of 1

Our corporate governance guidelines, the charters of our board committees, and our code of business conduct and ethics (including code of ethics provisions that apply to our principal executive officer, principal financial officer, controller and senior financial officers) are available in the corporate governance section of our website at *www.powerint.com*. These items are also available in print to any stockholder who requests them by calling (408) 414-9200.

**Executive Officers of the Registrant**

As of January 1, 2007, our executive officers, who are appointed by and serve at the discretion of the board of directors, were as follows:

| Name | Position With Power Integrations | Age |
|---|---|---|
| Balu Balakrishnan | President and Chief Executive Officer | 52 |
| Derek Bell | Vice President, Engineering | 63 |
| Bruce Renouard | Vice President, Worldwide Sales | 46 |
| John Tomlin | Vice President, Operations | 59 |
| Rafael Torres(1) | Vice President, Finance and Administration, Chief Financial Officer and Secretary | 38 |
| Clifford J. Walker | Vice President, Corporate Development | 55 |

(1)   Rafael Torres joined Power Integrations on July 19, 2006

*Balu Balakrishnan* has served as president and chief executive officer and as a director of Power Integrations since January 2002. He served as president and chief operating officer from April 2001 to January 2002. From January 2000 to April 2001, he was vice president of engineering and strategic marketing. From September 1997 to January 2000, he was vice president of engineering and new business development. From September 1994 to September 1997, Mr. Balakrishnan served as vice president of engineering and marketing.

*Derek Bell* has served as our vice president of engineering and technology since April 2001. Previously Mr. Bell was the chief operations officer at Palmchip Corporation, an integration and software service company from August 2000 to January 2001. Mr. Bell was vice president of engineering for the professional services group at Synopsys, Inc. an electronic design automation company, during 1999 and 2000, vice president of strategic alliances at Cirrus Logic, Inc., a semiconductor company, from 1996 to 1999, vice president and general manager of the application specific product group at National Semiconductor Corporation, Inc. a semiconductor company, from 1995 to 1996 and served as president and chief executive officer of NovaSensor, a manufacturer of silicon sensors from 1990 to 1994. He also held various senior management positions at Signetics, a semiconductor company, from 1972 to 1990, most recently as group vice president.

*Bruce Renouard* has served as our vice president, worldwide sales since February 2002. Mr. Renouard joined our company in January 2002 as a member of the sales organization. From August 1999 to August 2001, he served as vice president, worldwide sales of Zoran Corporation, a provider of digital solutions in the multimedia and consumer electronics markets. Mr. Renouard held the position of director, worldwide market development from June 1997 to August 1999 for IDT/Centaur, an X 86 processor company. From January 1995 to June 1997, he served as national distribution sales manager for Cyrix Corp, a company specializing in Intel compatible processors.

*John Tomlin* has served as our vice president, operations since October 2001. From 1981 to 2001, Mr. Tomlin served in a variety of senior management positions in operations, service, logistics and marketing, most recently as vice president of worldwide operations at Quantum Corporation, a computer storage company.

*Rafael Torres* became our vice president, finance and administration, chief financial officer and secretary on July 19, 2006. From November 2000 to July 2006, Mr. Torres served as chief financial officer of PLX Technology, Inc., a leading supplier of PCI Express and other standard input/output interconnect silicon for the

12



| POWER INTEGRATIONS, | RR Donnelley ProFile | LAN FBU-MWS-CX0P PAL jaslv0dc | 04-Mar-2007 22:23 EST | 86507 TX 13 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |
| | | | | Page 1 of 1 | |

communications, server, storage, embedded-control and consumer industries. From May 1999 to November 2000, he held a senior management position at PLX Technology, Inc., a semiconductor device company. Prior to joining PLX, he served in financial management roles at OnCommand Corporation, a provider of on demand video services, and at Silicon Valley Group, a semiconductor equipment company. Mr. Torres is a Certified Public Accountant, and spent three years working in public accounting to obtain his certification.

*Clifford J. Walker* has served as our vice president, corporate development since June 1995. From September 1994 to June 1995, Mr. Walker served as vice president of Reach Software Corporation, a software company. From December 1993 to September 1994, Mr. Walker served as president of Morgan Walker International, a consulting company.

**Item 1A. Risk Factors**

*In addition to the other information in this report, the following factors should be considered carefully in evaluating our business before purchasing shares of our stock.*

*Our quarterly operating results are volatile and difficult to predict. If we fail to meet the expectations of public market analysts or investors, the market price of our common stock may decrease significantly.* Our net revenues and operating results have varied significantly in the past, are difficult to forecast, are subject to numerous factors both within and outside of our control, and may fluctuate significantly in the future. As a result, our quarterly operating results could fall below the expectations of public market analysts or investors. If that occurs, the price of our stock may decline.

Some of the factors that could affect our operating results include the following:

- the volume and timing of orders received from customers;
- competitive pressures on selling prices;
- the demand for our products declining in the major end markets we serve;
- the inability to adequately protect or enforce our intellectual property rights;
- the volume and timing of orders placed by us with our wafer foundries and assembly subcontractors;
- SEC and U.S Department of Justice investigations and stockholder litigation related to our recent internal investigation of our practices related to stock option grants and the related restatement of our consolidated financial statements;
- continued impact of recently enacted changes in securities laws and regulations, including potential risks resulting from our evaluation of internal controls under the Sarbanes-Oxley Act of 2002;
- expenses we are required to incur in connection with our litigation against Fairchild Semiconductor and System General Corporation;
- fluctuations in exchange rates, particularly the exchange rates between the U.S. dollar and the Japanese yen;
- we are being audited by the Internal Revenue Service which is asserting that we owe additional taxes relating to a number of items;
- the licensing of our intellectual property to one of our wafer foundries;
- the lengthy timing of our sales cycle;
- undetected defects and failures in meeting the exact specifications required by our products;
- reliance on international sales activities for a substantial portion of our net revenues;
- our ability to develop and bring to market new products and technologies on a timely basis;

13



- the ability of our products to penetrate additional markets;
- attraction and retention of qualified personnel in a competitive market;
- changes in environmental laws and regulations; and
- earthquakes, terrorists acts or other disasters.

*We do not have long-term contracts with any of our customers and if they fail to place, or if they cancel or reschedule orders for our products, our operating results and our business may suffer.* Our business is characterized by short-term customer orders and shipment schedules. Our customer base is highly concentrated, and a relatively small number of distributors, OEMs and merchant power supply manufacturers account for a significant portion of our revenues. Our top two customers, both distributors of electronic components, accounted for 37% and our top ten customers, including distributors that resell to OEMs and merchant power supply manufacturers, accounted for 69%, of our revenues for 2005. In April 2006, we terminated our distributor relationship with one of our top two distributors. We have replaced this terminated relationship with other distribution relationships, and therefore do not believe that the termination of this distributor relationship will have a material impact on our business. The ordering patterns of some of our existing large customers have been unpredictable in the past and we expect that customer-ordering patterns will continue to be unpredictable in the future. Not only does the volume of units ordered by particular customers vary substantially from period to period, but also purchase orders received from particular customers often vary substantially from early oral estimates provided by those customers for planning purposes. In addition, customer orders can be canceled or rescheduled without significant penalty to the customer. In the past we have experienced customer cancellations of substantial orders for reasons beyond our control, and significant cancellations could occur again at any time.

*Intense competition in the high-voltage power supply industry may lead to a decrease in the average selling price and reduced sales volume of our products.* The high-voltage power supply industry is intensely competitive and characterized by significant price sensitivity. Our products face competition from alternative technologies, such as linear transformers, discrete switcher power supplies, and other integrated and hybrid solutions. If the price of competing solutions decreases significantly, the cost effectiveness of our products will be adversely affected. If power requirements for applications in which our products are currently utilized go outside the cost-effective range of our products, some of these alternative technologies can be used more cost effectively. We cannot assure that our products will continue to compete favorably or that we will be successful in the face of increasing competition from new products and enhancements introduced by existing competitors or new companies entering this market. We believe our failure to compete successfully in the high-voltage power supply business, including our ability to introduce new products with higher average selling prices, would materially harm our operating results.

*If demand for our products declines in our major end markets, our net revenues will decrease.* Applications of our products in the consumer, communications and computer end markets, such as cellphone chargers, standby power supplies for PCs, and power supplies for home appliances account for a significant percentage of our net revenues. We expect that a significant level of our net revenues and operating results will continue to be dependent upon these applications in the near term. The demand for these products has been highly cyclical and has been impacted by economic downturns in the past. Any economic slowdown in the end markets that we serve could cause a slowdown in demand for our ICs. When our customers are not successful in maintaining high levels of demand for their products, their demand for our ICs decreases, which adversely affects our operating results. Any significant downturn in demand in these markets would cause our net revenues to decline and could cause the price of our stock to fall.

*If we are unable to adequately protect or enforce our intellectual property rights, we could lose market share, incur costly litigation expenses, suffer incremental price erosion or lose valuable assets, any of which could harm our operations and negatively impact our profitability.* Our success depends upon our ability to continue our technological innovation and protect our intellectual property, including patents, trade secrets, copyrights, and know-how. We are currently engaged in litigation to enforce our intellectual property rights, and

14



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 5.8 | PAL jaslv0dc | 04-Mar-2007 22:23 EST | | 86507 TX 15 | 1* |
| FORM 10-K | | PAL | | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

associated expenses have been, and are expected to remain, material and have adversely affected our operating results. We cannot assure that the steps we have taken to protect our intellectual property will be adequate to prevent misappropriation, or that others will not develop competitive technologies or products. From time to time we have received, and we may receive in the future, communications alleging possible infringement of patents or other intellectual property rights of others. Costly litigation may be necessary to enforce our intellectual property rights or to defend us against claimed infringement. The failure to obtain necessary licenses and other rights, and/or litigation arising out of infringement claims could cause us to lose market share and harm our business.

Additionally, the laws of some foreign countries in which our technology is or may in the future be licensed may not protect our intellectual property rights to the same extent as the laws of the United States, thus limiting the protections applicable to our technology.

*We depend on third-party suppliers to provide us with wafers for our products and if they fail to provide us sufficient wafers, our business may suffer.* We have supply arrangements for the production of wafers with Matsushita, OKI and ZMD. Our contracts with these suppliers expire in June 2010, April 2008, and December 2009 respectively. Although certain aspects of our relationships with Matsushita, OKI and ZMD are contractual, many important aspects of these relationships depend on their continued cooperation. We cannot assure that we will continue to work successfully with Matsushita, OKI or ZMD in the future, and that the wafer foundries' capacity will meet our needs. Additionally one or more of these wafer foundries could seek an early termination of our wafer supply agreements. Any serious disruption in the supply of wafers from OKI, Matsushita or ZMD could harm our business. We estimate that it would take 9 to 18 months from the time we identified an alternate manufacturing source to produce wafers with acceptable manufacturing yields in sufficient quantities to meet our needs.

Although we provide our foundries with rolling forecasts of our production requirements, their ability to provide wafers to us is ultimately limited by the available capacity of the wafer foundry. Any reduction in wafer foundry capacity available to us could require us to pay amounts in excess of contracted or anticipated amounts for wafer deliveries or require us to make other concessions to meet our customers' requirements. Any of these concessions could harm our business.

If our third-party suppliers and independent subcontractors do not produce our wafers and assemble our finished products at acceptable yields, our net revenues may decline. We depend on independent foundries to produce wafers, and independent subcontractors to assemble and test finished products, at acceptable yields and to deliver them to us in a timely manner. The failure of the foundries to supply us wafers at acceptable yields could prevent us from selling our products to our customers and would likely cause a decline in our net revenues. In addition, our IC assembly process requires our manufacturers to use a high-voltage molding compound that is difficult to process and available from only one vendor. This compound and its required processes, together with the other non-standard materials and processes needed to assemble our products, require a more exacting level of process control than normally required for standard packages. Unavailability of the sole source compound or problems with the assembly process can materially adversely affect yields, timely delivery and cost to manufacture. We may not be able to maintain acceptable yields in the future.

In addition, if prices for commodities used in our products increase significantly, raw materials costs of our suppliers would increase and could result in increased product costs our suppliers charge us. If we are not able to pass these costs on to our customers, this would have an adverse effect on our gross margins.

*We are subject to SEC and U.S. Department of Justice investigations and stockholder litigation related to our recent internal investigation of our practices related to stock option grants and the related restatement of our consolidated financial statements.* The SEC and the U.S. Department of Justice, or DOJ, are both conducting investigations related to our recent internal investigation of our practices related to stock option grants. In addition, three alleged shareholders of the Company have also filed derivative complaints in the United States District Court for the Northern District of California, and two alleged shareholders have filed derivative complaints in Superior Court of California, Santa Clara County, all purportedly on behalf of Power Integrations,

15



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 SE | PAL jaslv0dc | 04-Mar-2007 22:23 EST | 86507 TX 16 | 1* |
| FORM 10-K | | ■ | PAL | | HTM IFV | 1C |

Page 1 of 1

against certain of our current and former executive officers and directors in connection with our option granting practices alleging, among other things, breaches of fiduciary duties and in the federal court cases violations of Section 10(b) of the Securities Exchange Act of 1934. The shareholder derivative suits are discussed in more detail in Item 3 of this Annual Report on Form 10-K. The ongoing legal fees we are incurring in connection with these actions, and any fines that we may be required to pay in the event that the SEC or DOJ determine, as a result of their investigations, to bring any civil or other actions against us, or any attorneys' fees that we may be required to pay as a result of the derivative suits, would have an adverse effect on our operating results. Further, these actions require a significant amount of our senior management's attention, which detracts from their ability to manage our company's business.

*Our stock has been delisted from The NASDAQ Stock Market and there is no guarantee that we will be successful in relisting it.* Our common stock has been suspended from trading on the Nasdaq Global Market for noncompliance with the Nasdaq listing requirements, and currently trades on the Pink Sheets under the symbol "POWI.PK". Until we file all three of our Quarterly Reports on Form 10-Q for fiscal year 2006, and hold our 2005 annual meeting of stockholders, we will not regain compliance with the Nasdaq listing requirements. Even when we do regain compliance with the Nasdaq listing requirements, our common stock will not automatically begin trading on Nasdaq again. In order to have our common stock resume trading on the Nasdaq Global Market, we will need to reapply to Nasdaq to have our stock listed. The application process can be lengthy, and there is no assurance that Nasdaq will relist our common stock.

*Recently enacted changes in securities laws and regulations, including potential risk resulting from our evaluation of internal controls under the Sarbanes-Oxley Act of 2002 will continue to impact our results.* Complying with the requirements of the Sarbanes-Oxley Act of 2002, and Nasdaq's conditions for continued listing have imposed significant legal and financial compliance costs, and are expected to continue to impose significant costs and management burden on us. These new rules and regulations also may make it more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced coverage or incur substantially higher costs to obtain coverage. These rules and regulations could also make it more difficult for us to attract and retain qualified executive officers and members of our board of directors, particularly qualified members to serve on our audit committee.

Additionally, we cannot be sure that we will be able to successfully remediate the currently reported material weakness in our system of internal controls. Our efforts to comply with Section 404 of the Sarbanes-Oxley Act and the related regulations regarding our required assessment of our internal controls over financial reporting and our external auditors' audit of the assessment of our internal controls continues to require the commitment of significant financial and managerial resources.

Moreover, because these laws, regulations and standards promulgated by the Sarbanes-Oxley Act are subject to varying interpretations, their application in practice may evolve over time as new guidance becomes available. This evolution may result in continuing uncertainty regarding compliance matters and additional costs necessitated by ongoing revisions to our disclosure and governance practices.

*If we do not prevail in our litigation against Fairchild Semiconductor and System General, we will have expended significant financial resources and not achieved any benefit, and may also suffer the loss of proprietary rights.* We are in patent litigation with each of Fairchild Semiconductor and System General Corp. and the outcome of such litigation is uncertain. The next phase of the Fairchild suit will determine whether or not our patents at issue in the suit are valid. In addition, there is no assurance that we will be successful in obtaining financial damages or an injunction against all System General products that infringe our patents. We have incurred, and expect to continue to incur, significant legal costs in conducting these lawsuits. If we are not successful in these lawsuits, we will have incurred significant legal costs with no benefit, which could have a material adverse effect on our business. Further, if we are not successful in the Fairchild lawsuit, our patents at issue in the suit may be determined invalid and we will not receive any damages, including the $34 million the jury awarded us in October 2006, nor will we have the extent of the intellectual property protection we currently believe is provided by these patents. In addition, these lawsuits are diverting the efforts and attention of our

16



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX08 8.6 | PAL jaslv0dc | 04-Mar-2007 22:24 EST | | 86507 TX 17 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

management and technical personnel from normal business operations, which could have a material adverse effect on our business regardless of the outcome of these lawsuits.

*We are being audited by the Internal Revenue Service which is asserting that we owe additional taxes relating to a number of items, and if we are not successful in defending our position we may be obligated to pay additional taxes, as well as penalties and interest, and may also have a higher effective income tax rate in the future.* Our operations are subject to income and transaction taxes in the United States and in multiple foreign jurisdictions and to review or audit by IRS and state, local and foreign tax authorities. In connection with an IRS audit of our United States federal income tax returns for fiscal years 2002 and 2003, the IRS is asserting that we owe additional taxes relating to a number of items, the most significant of which is our research and development cost sharing arrangements with one of our subsidiaries. We disagree with the IRS's position; however, if we are not successful in defending our position, we could be required to pay additional taxes, penalties and interest for 2002 and 2003. In addition, if we are not successful in defending our position, we could incur additional charges in the future, which could be material. Resolution of this matter could take considerable time, possibly years.

We believe the IRS' position with respect to certain items for which it has proposed adjustments is inconsistent with applicable tax laws, and that we have meritorious defenses to our position with respect to these proposed adjustments. Accordingly, we intend to continue to challenge the IRS' position on these matters vigorously. While we believe the IRS' asserted position on these matters is not supported by applicable law, we may be required to make additional payments in order to resolve these matters. If the IRS determines that we owe additional taxes for these matters, our results of operations and financial condition would be materially and adversely affected.

*Fluctuations in exchange rates, particularly the exchange rates between the U.S. dollar and the Japanese yen, may impact our gross margin.* The contract prices to purchase wafers from Matsushita and OKI are denominated in Japanese yen. The agreements with both vendors allow for mutual sharing of the impact of the exchange rate fluctuation between Japanese yen and the U.S. dollar. Nevertheless, changes in the exchange rate between the U.S. dollar and the Japanese yen subject our gross profit and operating results to the potential for material fluctuations.

*Matsushita has licenses to our technology, which it may use to our detriment.* Pursuant to a Technology Agreement with Matsushita, which expired in June 2005, Matsushita has the perpetual right to manufacture and sell products that incorporate our technology to Japanese companies worldwide and to subsidiaries of Japanese companies located in Asia. Matsushita does not have rights to utilize technology developed by us after June 2005, when the agreement expired. According to the expired Technology Agreement, we will continue to receive royalties on Matsushita's sales through June 2009 at a reduced rate. Royalty revenue was less than 2% of total net revenues for the years ended December 31, 2005 and 2004. However, these royalties are substantially lower than the gross profit we receive on direct sales, and we cannot assure that Matsushita will not use the technology rights to continue to develop and market competing products.

*Because the sales cycle for our products can be lengthy, we may incur substantial expenses before we generate significant revenues, if any.* Our products are generally incorporated into a customer's products at the design stage. However, customer decisions to use our products, commonly referred to as design wins, can often require us to expend significant research and development and sales and marketing resources without any assurance of success. These significant research and development and sales and marketing resources often precede volume sales, if any, by a year or more. The value of any design win will largely depend upon the commercial success of the customer's product. We cannot assure that we will continue to achieve design wins or that any design win will result in future revenues. If a customer decides at the design stage not to incorporate our products into its product, we may not have another opportunity for a design win with respect to that product for many months or years.

*Our products must meet exacting specifications, and undetected defects and failures may occur which may cause customers to return or stop buying our products.* Our customers generally establish demanding

17

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 9.9 | PAL jaslv0dc | 04-Mar-2007 22:24 EST | 86507 TX 18 | 1* |
| FORM 10-K | | ■ PAL | | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

specifications for quality, performance and reliability, and our products must meet these specifications. ICs as complex as those we sell often encounter development delays and may contain undetected defects or failures when first introduced or after commencement of commercial shipments. We have from time to time in the past experienced product quality, performance or reliability problems. If defects and failures occur in our products, we could experience lost revenue, increased costs, including warranty expense and costs associated with customer support and customer expenses, delays in or cancellations or rescheduling of orders or shipments and product returns or discounts, any of which would harm our operating results.

*Our international sales activities account for a substantial portion of our net revenues, which subjects us to substantial risks.* Sales to customers outside of North America account for, and have accounted for a large portion of our net revenues, including approximately 93%, 92% and 93% of our net revenues for the years ended December 31, 2005, 2004 and 2003, respectively. If our international sales declined and we were unable to increase domestic sales, our revenues would decline and our operating results would be harmed. International sales involve a number of risks to us, including:

- potential insolvency of international distributors and representatives;

- reduced protection for intellectual property rights in some countries;

- the impact of recessionary environments in economies outside the United States;

- tariffs and other trade barriers and restrictions;

- the burdens of complying with a variety of foreign and applicable U.S. Federal and state laws; and

- foreign-currency exchange risk.

Our failure to adequately address these risks could reduce our international sales and materially adversely affect our operating results. Furthermore, because substantially all of our foreign sales are denominated in U.S. dollars, increases in the value of the dollar cause the price of our products in foreign markets to rise, making our products more expensive relative to competing products priced in local currencies.

*If our efforts to enhance existing products and introduce new products are not successful, we may not be able to generate demand for our products.* Our success depends in significant part upon our ability to develop new ICs for high-voltage power conversion for existing and new markets, to introduce these products in a timely manner and to have these products selected for design into products of leading manufacturers. New product introduction schedules are subject to the risks and uncertainties that typically accompany development and delivery of complex technologies to the market place, including product development delays and defects. If we fail to develop and sell new products in a timely manner, our net revenues could decline.

In addition, we cannot be sure that we will be able to adjust to changing market demands as quickly and cost-effectively as necessary to compete successfully. Furthermore, we cannot assure that we will be able to introduce new products in a timely and cost-effective manner or in sufficient quantities to meet customer demand or that these products will achieve market acceptance. Our failure, or our customers' failure, to develop and introduce new products successfully and in a timely manner would harm our business. In addition, customers may defer or return orders for existing products in response to the introduction of new products. Although we maintain reserves for potential customer returns, we cannot assure that these reserves will be adequate.

*If our products do not penetrate additional markets, our business will not grow as we expect.* We believe that our future success depends in part upon our ability to penetrate additional markets for our products. We cannot assure that we will be able to overcome the marketing or technological challenges necessary to penetrate additional markets. To the extent that a competitor penetrates additional markets before we do, or takes market share from us in our existing markets, our net revenues and financial condition could be materially adversely affected.

*We must attract and retain qualified personnel to be successful and competition for qualified personnel is intense in our market.* Our success depends to a significant extent upon the continued service of our executive

18



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX02 8.6 | PAL jaslv0dc | 04-Mar-2007 22:24 EST | | 86507 TX 19 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

officers and other key management and technical personnel, and on our ability to continue to attract, retain and motivate qualified personnel, such as experienced analog design engineers and systems applications engineers. The competition for these employees is intense, particularly in Silicon Valley. The loss of the services of one or more of our engineers, executive officers or other key personnel could harm our business. In addition, if one or more of these individuals leaves our employ, and we are unable to quickly and efficiently replace those individuals with qualified personnel who can smoothly transition into their new roles, our business may suffer. We do not have long-term employment contracts with, and we do not have in place key person life insurance policies on, any of our employees.

*Changes in environmental laws and regulations may increase our costs related to obsolete products in our existing inventory.* Changing environmental regulations and the timetable to implement them continue to impact our customers' demand for our products. As a result there could be an increase in our inventory obsolescence costs for products manufactured prior to our customers' adoption of new regulations. Currently we have limited visibility into our customers' strategies to implement these changing environmental regulations into their business. The inability to accurately determine our customer's strategies could increase our inventory costs related to obsolescence.

*In the event of an earthquake, terrorist act or other disaster, our operations may be interrupted and our business would be harmed.* Our principal executive offices and operating facilities situated near San Francisco, California, and most of our major suppliers (wafer foundries and assembly houses), are located in areas that have been subject to severe earthquakes. Many of our suppliers are also susceptible to other disasters such as tropical storms, typhoons or tsunamis. In the event of a disaster, we or one or more of our major suppliers may be temporarily unable to continue operations and may suffer significant property damage. Any such interruption in our ability or that of our major suppliers to continue operations at our facilities could delay the development and shipment of our products.

Like other U.S. companies, our business and operating results are subject to uncertainties arising out of economic consequences of current and potential military actions or terrorist activities and associated political instability, and the impact of heightened security concerns on domestic and international travel and commerce. Such uncertainties could also lead to delays or cancellations of customer orders, a general decrease in corporate spending or our inability to effectively market and sell our products. Any of these results could substantially harm our business and results of operations, causing a decrease in our revenues.

*We have adopted anti-takeover measures which may make it more difficult for a third party to acquire us.* Our board of directors may issue up to 2,925,000 shares of preferred stock and determine the price, rights, preferences and privileges of those preferred shares without any further vote or action by the stockholders. The rights of the holders of common stock will be subject to, and may be adversely affected by, the rights of the holders of any preferred stock that may be issued in the future. The issuance of shares of preferred stock, while potentially providing flexibility in connection with possible acquisitions and for other corporate purposes, could make it more difficult for a third party to acquire a majority of our outstanding voting stock. We have no present intention to issue shares of preferred stock.

In addition, we have entered into a rights agreement, commonly referred to as a "Poison Pill," to guard against abusive hostile takeover tactics. Further, the anti-takeover provisions of Section 203 of the Delaware General Corporations Law apply to us. Our rights agreement and Section 203 of the Delaware General Corporations Law may discourage, delay or prevent a change in control of Power Integrations.

**Item 1B. Unresolved Staff Comments.**

Not applicable.

19



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 8.6 | PAL jashv0dc | 04-Mar-2007 22:24 EST | 86507 TX 20 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

## Item 2. Properties.

In October 2003, we purchased our principal executive, administrative, manufacturing and technical offices for approximately $30.0 million. These offices are located in San Jose, California in a 118,000 square foot facility. In addition to our facility in San Jose, we also lease sales offices in various countries around the world to accommodate our sales force.

## Item 3. Legal Proceedings.

On June 28, 2004, we filed a complaint for patent infringement in the U.S. District Court, Northern District of California, against System General Corporation, a Taiwanese company, and its U.S. subsidiary. Our complaint alleges that certain integrated circuits produced by System General infringed and continue to infringe certain of our patents. We seek, among other things, an order enjoining System General from infringing our patents and an award for damages resulting from the alleged infringement. On June 10, 2005, in response to the initiation of the ITC investigation, the District Court stayed all proceedings. Subsequent to the completion of the ITC proceedings, the District Court lifted the stay and has scheduled a case management conference. No other schedule has been set for the matter. On December 6, 2006, System General filed a notice of appeal of the ITC decision. In response, and by agreement of the parties, the District Court vacated the scheduled case management conference and, instead, renewed the stay of proceedings pending the outcome of the Federal Circuit appeal of the ITC determination.

On May 9, 2005, we filed a complaint with the U.S. International Trade Commission (ITC) under section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. section 1337, naming System General Corporation of Taiwan as the respondent. We filed a supplement to the complaint on May 24, 2005. We allege infringement by System General of the same patents raised in the action in the Northern District of California. The ITC instituted an investigation on June 8, 2005 in response to our complaint. By our complaint, we seek an order from the ITC excluding certain System General's pulse width modulation (PWM) chips and the products containing them, such as LCD monitors, from importation into the United States. We subsequently and voluntarily narrowed the number of patents and claims in suit, which proceeded to a hearing. The ITC hearing took place in January 2006. Post-hearing briefs were submitted and briefing concluded February 24, 2006. The Administrative Law Judge's (ALJ) initial determination was issued on May 15, 2006. The ALJ found all remaining asserted claims valid and infringed, and recommended the exclusion of the infringing products as well as certain downstream products that contain the infringing products. After further briefing, on June 30, 2006 the Commission decided not to review the initial determination on liability. On August 11, 2006 the Commission issued an order excluding from entry into the United States the infringing System General PWM chips, and any LCD computer monitors, AC printer adapters and sample/demonstration circuit boards containing an infringing System General chip. The order also set a bond of 38 cents per chip or downstream product containing such chips for temporary importation during the Presidential review period. The U.S. Customs Service is authorized to enforce the exclusion order and collect the bond during the review period. On October 11, 2006, the review period expired with no action by the President, and the ITC exclusion order is now in full effect. On December 6, 2006, System General filed a notice of appeal of the ITC decision. The appeal will be heard by the U.S. Court of Appeals for the Federal Circuit with briefing to occur in Q1 2007 and an oral argument thereafter.

On October 20, 2004, we filed a complaint for patent infringement in the U.S. District Court for the District of Delaware, against Fairchild Semiconductor International, Inc., a Delaware corporation, and Fairchild Semiconductor Corporation, a Delaware corporation (collectively, Fairchild). The complaint alleges that Fairchild produces certain integrated circuits that infringed and continue to infringe certain of our patents. We seek, among other things, an order enjoining Fairchild from infringing our patents and an award for damages resulting from the alleged infringement. On October 10, 2006, after a week-long trial, a jury returned a verdict in favor of Power Integrations finding all asserted claims of all four patents-in-suit to be willfully infringed by Fairchild and determining damages in the amount of $33,981,781. No benefits have been recorded in our consolidated financial statements as a result of our award for damages. The court has not yet set a schedule for post-trial motions on these issues. Power Integrations intends to request that the court enhance the damage award in view of the jury's

20

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152150 9.8.18 | PAL sarucOpa | 06-Mar-2007 16:55 EST | | 86507 TX 21 | 6* |
| FORM 10-K | | | PAL | | | HTM PMT | 1C |

Page 1 of 1

finding on willfulness. Fairchild has raised defenses contending that the asserted patents are invalid or unenforceable and the court has set a second trial on these issues that is scheduled to begin on June 4, 2007.

On April 11, 2006, Fairchild Semiconductor Corporation and Intersil Corporation filed a patent infringement lawsuit against us in the U.S. District Court for the Eastern District of Texas. The complaint asserts that we infringed on an old Intersil patent that Fairchild recently secured exclusive rights to assert against us, but Fairchild has not yet identified any of our specific products it believes infringes the patent. Fairchild's lawsuit is duplicative of a portion of our suit against Fairchild in Delaware, and we therefore believe the case should be transferred to Delaware and filed a motion to that effect. The Texas Court granted our motion to transfer the case to Delaware on March 6, 2007, and the case is in the process of being transferred to Delaware. We believe Fairchild's case should be stayed pending the outcome of the trial against Fairchild later this year, and if the suit is stayed there should not be any significant expense until after resolution of our lawsuit against Fairchild. Either way, we do not expect Fairchild's suit to have any impact on our lawsuit against Fairchild in Delaware.

On April 25, 2006, Kimberly Quaco, an alleged shareholder, filed a derivative complaint in the United States District Court for the Northern District of California, purportedly on behalf of us, against certain of our current and former executives and members of our board of directors relating to our historical stock option practices. On August 1, 2006, Kathryn L. Champlin, another alleged shareholder, filed a similar derivative complaint in the United States District Court for the Northern District of California purportedly on behalf of us. On September 21, 2006, Christopher Deboskey, another alleged shareholder, filed a similar derivative suit in the United States District Court for the Northern District of California purportedly on behalf of us. On November 30, 2006, Ms. Champlin voluntarily dismissed her suit. On December 18, 2006, the Court appointed Ms. Quaco's counsel as lead counsel and ordered that another purported shareholder, Mr. Geoffrey Wren, be substituted in as lead plaintiff. On January 17, 2007, the plaintiffs filed their consolidated complaint. The consolidated complaint alleges, among other things, that the defendants breached their fiduciary duties by improperly backdating stock option grants in violation of our shareholder-approved stock option plans, improperly recording and accounting for the backdated options, improperly taking tax deductions based on the backdated options, and disseminating false financial statements that improperly recorded the backdated option grants. The consolidated complaint asserts claims for, among other things, breach of fiduciary duty, unjust enrichment, and violations of Section 10(b) of the Securities Exchange Act of 1934. On February 9, 2007, the Court extended our response date to April 17, 2007.

On May 26, 2006, Stanley Banko, an alleged shareholder, filed a derivative complaint in the Superior Court of California, Santa Clara County, purportedly on behalf of us, against certain of our current and former executives and members of our board of directors relating to our historical stock option practices. On May 30, 2006, Joan Campbell, also an alleged shareholder, filed a derivative suit in the Superior Court of California, Santa Clara County, making the identical allegations asserted in the Banko lawsuit. On June 30, 2006, pursuant to a stipulation by the parties, the Court consolidated the two cases into a single proceeding and required plaintiffs to file an amended, consolidated complaint. Plaintiffs filed their consolidated complaint on August 14, 2006, in which plaintiffs named additional officers and former officers and KPMG LLP, our former auditor, as new defendants. The consolidated complaint alleges, among other things, that the defendants caused or allowed our executives to manipulate their stock option grant dates, that defendants improperly backdated stock option grants, and that costs associated with the stock option grants were not properly recorded in our financial statements. The complaint asserts claims for, among other things, insider trading, breach of fiduciary duty, gross mismanagement and unjust enrichment. On September 15, 2006, the Court stayed this action until January 19, 2007. On January 11, 2007, pursuant to a stipulation by the parties, the Court extended the stay until March 23, 2007.

On May 23, 2006, the U.S. Attorney's Office for the Northern District of California, or DOJ, issued a grand jury subpoena to us directing that we produce documents relating to the granting of stock options from 1995 through the present. On May 31, 2006, the staff of the Securities and Exchange Commission, or SEC, sent a letter to us directing us to take appropriate actions to preserve certain documents relating to our stock option practices. Since that time, the government has made a number of requests for us to voluntarily produce documents relating



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX08 8.6 | PAL jaslv0dc | 04-Mar-2007 22:24 EST | 86507 TX 22 | 1* |
| FORM 10-K | | ∎ | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

to, among other things, our stock option practices. In addition, the government has been conducting voluntary interviews of certain current and former officers and employees. We are cooperating fully with the SEC and the DOJ and intend to continue to do so.

The Internal Revenue Service ("IRS") is conducting an audit of our 2002 and 2003 tax returns. Throughout the course of 2005, the IRS issued a number of Notices of Proposed Adjustment to such returns. Among other things, the IRS has challenged several aspects of our research and development cost-sharing arrangement, which was put into place on November 1, 2003. While we have agreed to some of the adjustments proposed by the IRS, we dispute other such proposed adjustments. Additionally, we have not received all of the adjustments the IRS intends to propose with respect to our research and development cost-sharing arrangement.

There can be no assurance that we will prevail in our litigation with either System General or Fairchild. This litigation, whether or not determined in our favor or settled, will be costly and will divert the efforts and attention of our management and technical personnel from normal business operations, potentially causing a material adverse effect on our business, financial condition and operating results. In addition, we are unable to predict the outcome of the other legal proceedings described above. Adverse determinations in litigation could result in monetary losses, the loss of our proprietary rights, subject us to significant liabilities, require us to seek licenses from third parties or prevent us from licensing our technology, any of which could have a material adverse effect on our business, financial condition and operating results.

**Item 4. Submission of Matters to a Vote of Security Holders.**

None.

22



| POWER INTEGRATIONS, | RR Donnelley ProFile | LAN/BU-MWS-CX06 PAL jaslv0dc | 04-Mar-2007 22:24 EST | 86507 TX 23 | 1* |
| FORM 10-K | START PAGE | ■ PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 |

## PART II

### Item 5. Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities.

As of the date of the filing of this Annual Report on Form 10-K, our common stock trades on the Pink Sheets under the symbol "POWI.PK." Prior to August 2, 2006, and from October 30, 2006 to December 18, 2006, our common stock traded on the Nasdaq Global Market (formerly the Nasdaq National Market) under the symbol "POWI." The following table shows the high and low closing sale prices per share of our common stock as reported on the Nasdaq National Market for the periods indicated:

| | Price Range | |
| Year Ended December 31, 2005 | High | Low |
| --- | --- | --- |
| Fourth quarter | $24.06 | $19.13 |
| Third quarter | $23.42 | $21.08 |
| Second quarter | $24.64 | $19.67 |
| First quarter | $21.96 | $16.95 |

| Year Ended December 31, 2004 | High | Low |
| --- | --- | --- |
| Fourth quarter | $22.40 | $18.31 |
| Third quarter | $24.16 | $17.37 |
| Second quarter | $32.41 | $24.07 |
| First quarter | $34.90 | $27.22 |

On August 2, 2006, our common stock was suspended from trading on The NASDAQ Stock Market for noncompliance with the Nasdaq listing requirements. From that date until October 30, 2006, the date the suspension of the trading of our common stock was lifted, our common stock was traded on the Pink Sheets under the symbol "POWI.PK". On December 19, 2006, our common stock was again suspended from trading on Nasdaq for noncompliance with the Nasdaq listing requirements, and currently is traded on the Pink Sheets under the symbol "POWI.PK". Until we regain compliance with the Nasdaq listing requirements, we will not be able to reapply to have our common stock listed for trading on Nasdaq.

As of January 1, 2007, there were approximately 78 stockholders of record. Because brokers and other institutions on behalf of stockholders hold many of our shares, we are unable to estimate the total number of stockholders represented by these record holders.

We have not paid any cash dividends on our capital stock and do not anticipate paying any cash dividends in the foreseeable future.

On October 20, 2004, we announced that our board of directors had authorized the repurchase of up to $40.0 million of our common stock. From inception of the stock repurchase program in October 2004 through June 30, 2005, we repurchased 2,033,270 shares for approximately $40.0 million. On October 19, 2005, we announced that our board of directors had authorized a second stock repurchase program of up to $25.0 million of our common stock. There is no expiration date of this program. From inception of the second stock repurchase plan to December 31, 2005, we purchased a total of 249,500 shares for a total of approximately $5.3 million.

| Period | Total Number of Shares Purchased | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Dollar Value of Shares that May Yet be Repurchased Under the Plans or Programs ($000) |
| --- | --- | --- | --- | --- |
| October 1 to October 31, 2005 | 10,000 | $  21.026 | 10,000 | $   24,790 |
| November 1 to November 30, 2005 | 209,500 | $  21.133 | 209,500 | $   20,362 |
| December 1 to December 31, 2005 | 30,000 | $  23.554 | 30,000 | $   19,656 |
| Total | 249,500 | | 249,500 | |

23



### Item 6. Selected Financial Data.

The following selected consolidated financial data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operation" and the consolidated financial statements and the notes thereto included elsewhere in this Form 10-K to fully understand factors that may affect the comparability of the information presented below. The information presented in the following tables has been adjusted to reflect the restatement of our consolidated financial results which is more fully described in the "Explanatory Note Regarding Restatement of Our Consolidated Financial Statements" immediately preceding Part I of this Form 10-K and in note 3 "Restatement of Consolidated Financial Statements" in the notes to the consolidated financial statements. We derived the selected consolidated financial data as of December 31, 2005 and 2004 and for the years ended December 31, 2005, 2004 and 2003 from our audited consolidated financial statements, and accompanying notes, in this report on Form 10-K. The consolidated statements of income data for the years ended December 31, 2004 and 2003, and the consolidated balance sheet data as of December 31, 2004 have been restated in connection with the restatements discussed in note 3 of the notes to the consolidated financial statements. The consolidated statements of income data for the years ended December 31, 2002 and 2001, and the consolidated balance sheet data as of December 31, 2003, 2002 and 2001 have been restated below as discussed in footnote 2.

We have not amended our previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for the periods affected by the restatement. The financial information that has been previously filed or otherwise reported for these periods is superseded by the information in this Annual Report on Form 10-K, and the financial statements and related financial information contained in those previously filed reports should no longer be relied upon.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2004 As Restated (1) | 2003 As Restated (1) | 2002 As Restated (2) | 2001 As Restated (2) |
| | | (in thousands, except per share data) | | | |
| **Consolidated Statements of Income:** | | | | | |
| Net revenues | $143,071 | $136,653 | $125,682 | $107,468 | $ 96,124 |
| Cost of revenues | 72,979 | 71,856 | 63,496 | 60,877 | 52,807 |
| Gross profit | 70,092 | 64,797 | 62,186 | 46,591 | 43,317 |
| Operating expenses: | | | | | |
|   Research and development | 17,111 | 15,440 | 20,107 | 16,764 | 17,652 |
|   Sales and marketing | 18,314 | 16,070 | 17,166 | 16,849 | 16,328 |
|   General and administrative | 15,665 | 7,969 | 10,868 | 10,153 | 8,781 |
|     Total operating expenses | 51,090 | 39,479 | 48,141 | 43,766 | 42,761 |
| Income from operations | 19,002 | 25,318 | 14,045 | 2,825 | 556 |
| Total other income | 3,149 | 1,320 | 903 | 1,558 | 1,618 |
| Income before provision for income taxes | 22,151 | 26,638 | 14,948 | 4,383 | 2,174 |
| Provision for income taxes | 6,453 | 6,138 | 3,511 | 274 | 1,835 |
| Net income | $ 15,698 | $ 20,500 | $ 11,437 | $ 4,109 | $ 339 |
| Earnings per share: | | | | | |
|   Basic | $ 0.53 | $ 0.67 | $ 0.39 | $ 0.14 | $ 0.01 |
|   Diluted | $ 0.51 | $ 0.64 | $ 0.36 | $ 0.14 | $ 0.01 |
| Shares used in per share calculation: | | | | | |
|   Basic | 29,568 | 30,802 | 29,473 | 28,362 | 27,714 |
|   Diluted | 30,843 | 32,229 | 31,488 | 29,340 | 28,561 |

24



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 5.6 | PAL jaslv0dc | 04-Mar-2007 22:24 EST | 86507 TX 25 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 |

| Consolidated Balance Sheet Data: | 2005 | 2004 As Restated (1) | December 31, 2003 As Restated (2) (in thousands) | 2002 As Restated (2) | 2001 As Restated (2) |
|---|---|---|---|---|---|
| Cash, cash equivalents and short-term investments. | $126,079 | $108,645 | $ 97,005 | $109,400 | $ 76,865 |
| Working capital | $132,813 | $127,424 | $115,485 | $118,648 | $100,170 |
| Total assets | $236,921 | $241,016 | $217,438 | $169,525 | $140,507 |
| Long-term liabilities and capitalized lease obligations, net of current portion | $ — | $ — | $ — | $ 766 | $ 716 |
| Stockholders' equity. | $209,359 | $215,756 | $194,554 | $146,311 | $126,436 |

(1) See the explanatory note on page 1 of this Form 10-K, "Restatement of Consolidated Financial Statements" in Part II, Item 7, and note 3, "Restatement of Consolidated Financial Statements," of the notes to consolidated financial statements.

(2) The selected consolidated financial data as of December 31, 2003, 2002 and 2001, and for the years ended December 31, 2002 and 2001 have been adjusted to reflect the restatements described in note 3, "Restatement of Consolidated Financial Statements," of the notes to consolidated financial statements. The cumulative after tax impact of all restatement adjustments related to years prior to 2001 totaled $11.0 million, which is reflected as an adjustment to retained earnings at December 31, 2000.

The table below reflects the impact of the restatement adjustments on our 2002 and 2001 consolidated income statement and 2003, 2002 and 2001 balance sheet data.

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2002 | | | 2001 | | |
| Consolidated Statements of Income: | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| | | | (in thousands, except per share data) | | | |
| Net revenues | $ 108,184 | $ (716) | $107,468 | $ 94,095 | $ 2,029 | $ 96,124 |
| Cost of revenues | 60,723 | 154 | 60,877 | 51,252 | 1,555 | 52,807 |
| Gross profit | 47,461 | (870) | 46,591 | 42,843 | 474 | 43,317 |
| Operating expenses: | | | | | | |
| Research and development | 14,705 | 2,059 | 16,764 | 14,471 | 3,181 | 17,652 |
| Sales and marketing | 14,537 | 2,312 | 16,849 | 14,485 | 1,843 | 16,328 |
| General and administrative | 6,203 | 3,950 | 10,153 | 5,980 | 2,801 | 8,781 |
| Total operating expenses | 35,445 | 8,321 | 43,766 | 34,936 | 7,825 | 42,761 |
| Income from operations | 12,016 | (9,191) | 2,825 | 7,907 | (7,351) | 556 |
| Total other income | 1,666 | (108) | 1,558 | 1,749 | (131) | 1,618 |
| Income before provision for income taxes | 13,682 | (9,299) | 4,383 | 9,656 | (7,482) | 2,174 |
| Provision for income taxes | 4,104 | (3,830) | 274 | 2,930 | (1,095) | 1,835 |
| Net income | $ 9,578 | $ (5,469) | $ 4,109 | $ 6,726 | $ (6,387) | $ 339 |
| Earnings per share: | | | | | | |
| Basic | $ 0.34 | $ (0.20) | $ 0.14 | $ 0.24 | $ (0.23) | $ 0.01 |
| Diluted | $ 0.32 | $ (0.18) | $ 0.14 | $ 0.23 | $ (0.22) | $ 0.01 |
| Shares used in per share calculation: | | | | | | |
| Basic | 28,362 | — | 28,362 | 27,714 | — | 27,714 |
| Diluted | 29,503 | (163) | 29,340 | 28,991 | (430) | 28,561 |

25



POWER INTEGRATIONS,    RR Donnelley ProFile    LANFBU-MWS-CX09 5.8    PAL jaslv0dc    04-Mar-2007 22:24 EST    86507 TX 26    1*
FORM 10-K                                   ■ PAL                                              HTM IFV    1C
                                                                                              Page 1 of 1

|  | December 31, | | | | | |
|  | 2003 | | | 2002 | | |
|  | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
|  | | | (in thousands) | | | |
| **Consolidated Balance Sheet Data:** | | | | | | |
| Cash, cash equivalents and short-term investments. | $ 115,320 | $ (18,315) | $ 97,005 | $ 109,400 | $ — | $109,400 |
| Working capital | $ 135,676 | $ (20,191) | $115,485 | $ 118,697 | $ (49) | $118,648 |
| Total assets | $ 211,162 | $ 6,276 | $217,438 | $ 161,694 | $ 7,831 | $169,525 |
| Long-term liabilities and capitalized lease obligations, net of current portion | $ — | $ — | $ — | $ 766 | $ — | $ 766 |
| Stockholders' equity. | $ 190,718 | $ 3,836 | $194,554 | $ 140,633 | $ 5,678 | $146,311 |

|  | December 31, | | |
|  | 2001 | | |
|  | As Previously Reported | Adjustments | As Restated |
|  | | (in thousands) | |
| **Consolidated Balance Sheet Data:** | | | |
| Cash, cash equivalents and short-term investments. | $ 76,865 | $ — | $ 76,865 |
| Working capital | $ 100,836 | $ (666) | $100,170 |
| Total assets | $ 135,665 | $ 4,842 | $140,507 |
| Long-term liabilities and capitalized lease obligations, net of current portion | $ 716 | $ — | $ 716 |
| Stockholders' equity. | $ 123,302 | $ 3,134 | $126,436 |

See the impact of the restatement adjustments on our 2004 and 2003 consolidated statements of income and our 2004 consolidated balance sheet data in note 3 of the accompanying notes to consolidated financial statements.

### Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operation.

*The following discussion and analysis of our financial condition and results of our operations, which gives effect to the restatement discussed in note 3 to the consolidated financial statements, should be read in conjunction with the consolidated financial statements and the notes to those statements included elsewhere in this Annual Report on Form 10-K. This discussion contains forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those contained in these forward-looking statements due to a number of factors, including those discussed in Part I, Item 1A—"Risk Factors" and elsewhere in this report.*

### Restatement of Consolidated Financial Statements

*Background*

We announced on March 13, 2006 that a Special Committee of the board of directors was conducting an internal investigation of our practices related to stock option grants to officers, directors and employees, and related matters. The Special Committee was comprised of disinterested members of our board of directors and was assisted by independent outside legal counsel and accounting experts.

In a Form 8-K filed on May 9, 2006, we disclosed that the Special Committee had reached a preliminary conclusion that the actual dates of measurement for certain past stock option grants differed from the recorded grant dates for such awards, and that, accordingly, we expected to record additional material non-cash charges for stock-based compensation expenses in prior periods. On the same Form 8-K, we announced that we may need to



restate our historical financial statements for each of the fiscal years 1999 through 2004, and for the first three quarters of the fiscal year ended December 31, 2005 and that the Audit Committee of the Board of Directors had concluded that the financial statements for these prior periods and any related reports of its independent registered public accounting firm should no longer be relied upon. In early May 2006, we accepted the resignations of Howard Earhart, our Chairman of the Board and former Chief Executive Officer, and of John Cobb, our Chief Financial Officer.

On May 24, 2006, the Special Committee advised our board of directors of its final conclusion that, among other things, the recorded grant dates for certain option grants should not be relied upon. After receiving the Special Committee's conclusions and consistent with those conclusions, we reviewed stock option grants during the period from 1998 through June 2006. The restated consolidated financial statements contained in this Form 10-K reflect corrections resulting from those reviews.

We have incurred substantial expenses related to our special investigation and subsequent internal investigation, which began in early 2006. In addition, we are the subject of several derivative actions filed against certain of our current and former directors and officers as well as investigations launched by the U.S. Attorney's Office for the Northern District of California and the staff of the Securities and Exchange Commission regarding our past stock option granting practices, as more fully described in Item 3, "Legal Proceedings." We have incurred approximately $11.2 million in costs for legal fees, external audit firm fees, audit committee fees, and external consulting fees in the twelve months ended December 31, 2006, and expect to incur significant additional fees related to the special investigation and financial statement restatements until we are current with all delinquent filings.

In addition to restatements for stock-based compensation charges and the related income and payroll tax effects, we recorded adjustments to correct other errors that occurred in the periods ended December 31, 2001 through the third quarter of 2005, which have been reflected in the restated consolidated financial statements.

*Restatement Adjustments*

Our restated consolidated financial statements contained in this Form 10-K incorporate stock-based compensation expense, payroll tax expense and other accounting adjustments, including the income tax impacts related to the restatement adjustments. The restatement adjustments result in a $30.5 million reduction of retained earnings as of September 30, 2005. This amount includes an increase in our previously reported consolidated net income of approximately $0.1 million for the year ended December 31, 2004, and reductions in our consolidated net income of approximately $6.6 million for the year ended December 31, 2003 and $1.1 million for the three quarters ended September 30, 2005. The total restatement impact for the years ended December 31, 1998 through December 31, 2002, of $22.9 million, has been reflected as a prior period adjustment to retained earnings as of January 1, 2003.

The total unamortized stock-based compensation was approximately $0.7 million at December 31, 2005.

27



The table below presents the (increase) decrease to net income impact of the individual restatement adjustments, and are explained in further detail following the table (in thousands):

| | Nine Months Ended September 30, 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|---|---|---|
| **STOCK COMPENSATION:** | | | | | | | | |
| New hire non-officer stock option grants accounted for as being made prior to the terms being fixed | $ 154 | $ 264 | $ 411 | $ 542 | $ 506 | $ 556 | $ 431 | $ — |
| Stock option grants with insufficient or incomplete corporate approvals | 1,704 | 3,053 | 4,992 | 7,978 | 6,429 | 6,127 | 4,175 | 24 |
| Stock option grants cancelled and repriced | 389 | (2,067) | 4,422 | (107) | 1,418 | — | — | — |
| Accelerated vesting and other matters related to stock-based compensation | 27 | 38 | 63 | (49) | (171) | 171 | 1,567 | — |
| Total stock compensation expense | 2,274 | 1,288 | 9,888 | 8,364 | 8,182 | 6,854 | 6,173 | 24 |
| **PAYROLL TAXES, INTEREST AND PENALTIES** | (226) | (1,289) | 254 | 574 | 172 | 1,468 | 68 | — |
| Total stock compensation related adjustments | 2,048 | (1) | 10,142 | 8,938 | 8,354 | 8,322 | 6,241 | 24 |
| **OTHER MISCELLANEOUS ACCOUNTING ADJUSTMENTS:** | | | | | | | | |
| Correction of sales returns reserve | 520 | (14) | 14 | 348 | (872) | | | |
| Correction of period of charge for cost of wafers used in engineering | (108) | 108 | — | — | — | — | — | — |
| Correction of expected life of tooling for depreciation purposes | (64) | — | — | — | — | — | — | — |
| Record unfunded post-employment health benefits obligation | — | 13 | 14 | 12 | — | — | — | — |
| Total Other Miscellaneous Accounting Adjustments | 348 | 107 | 28 | 360 | (872) | — | — | — |
| Total adjustments to income before income tax | 2,396 | 106 | 10,170 | 9,298 | 7,482 | 8,322 | 6,241 | 24 |
| **INCOME TAX BENEFIT** | 1,301 | 239 | 3,522 | 3,829 | 1,095 | 2,033 | 1,515 | 12 |
| Total decrease (increase) to net income | $ 1,095 | $ (133) | $ 6,648 | $5,469 | $6,387 | $6,289 | $4,726 | $ 12 |
| **(DECREASE) INCREASE IN DILUTED EARNINGS PER SHARE** | $ (0.04) | $ 0.00 | $ (0.21) | $(0.19) | $(0.22) | $(0.22) | $(0.17) | $0.00 |

28



*Stock Compensation*—These adjustments are from our determination, based upon the Special Committee's investigation and our subsequent reviews and analyses, that the initially recorded measurement dates for various categories of option grants could not be relied upon. These categories included the following:

- *New hire non-officer stock option grants accounted for as being made prior to the terms being fixed.* Our practice was to set the exercise price of new hire non-officer awards based upon the fair value of our stock on the employee's hire date or the last day of the month of the employee's first month of employment, whichever was lower. Because this determination was made at the end of the month of hire, the last day of the month of the employee's first month of employment was determined to be the first date when the number of shares and the price of each grant were known with finality. Grants accounted for as being made before the last day of the month of the employee's first month of employment, which represented options to purchase an aggregate of 1,214,550 shares, were accounted for as fixed awards under Accounting Principles Board Opinion (APB) No. 25 Accounting for Stock Issued to Employees, or APB 25.

- *Stock option grants with insufficient or incomplete corporate approvals.* We determined that for certain stock option grants the number of shares and the exercise price were not known with finality at the original measurement date. We determined that the original recorded grant date could not be relied on because there was correspondence or other evidence that indicated that not all required corporate approvals had been obtained, including the finalization of the number of stock options allocated and the related exercise price. We adopted a methodology to remeasure these option grants to a revised measurement date, as described below, and accounted for these grants, which represented options to purchase an aggregate of 6,358,639 shares, as fixed awards under APB 25.

- *Stock option grants determined to have been cancelled and repriced.* We determined that the terms of stock option grants to purchase an aggregate of 415,000 shares may have been communicated to employees and that those terms were subsequently modified. We concluded that such modifications constitute repricings and, therefore, these stock option grants should have been accounted for as variable awards for accounting purposes.

- *Accelerated vesting and other matters related to stock-based compensation.* Accelerated vesting consists primarily of the acceleration of stock option vesting, with respect to options to purchase an aggregate of 341,174 shares, upon termination of a few employees prior to 2001, which resulted in stock-based compensation expense which had not been previously recorded. The other matters relate primarily to the impact of the capitalization in inventory of stock-based compensation in 2001 through 2005.

*Payroll taxes, interest and penalties*—In connection with the stock-based compensation adjustments, we determined that certain options previously classified as Incentive Stock Option, or ISO, grants were determined to have been granted with an exercise price below the fair market value of our stock on the revised measurement date (see discussion under "Accounting Considerations" below). Under U.S. tax regulations, ISOs may not be granted with an exercise price less than the fair market value on the date of grant, and therefore these grants might not qualify for ISO tax treatment. We refer to these stock options as the "Affected ISOs." The potential disqualification of ISO status exposes us to additional payroll related withholding taxes on the exercise of these Affected ISOs granted to U.S. employees, and penalties and interest for failing to properly withhold taxes on exercise of those options. The payroll tax, interest and penalty expenses were recorded in the periods in which the underlying stock options were exercised. Then, in subsequent periods in which the liabilities were legally extinguished due to statutes of limitations, the expenses were reversed, and recognized as a reduction in the related functional expense category in our consolidated statements of income. The fluctuations in the restatement adjustments in the table above are the result of: (1) the timing of stock option exercises, and (2) the reversals of expenses previously recorded due to the expiration of statutes of limitations. The net tax liability at December 31, 2005 for this potential disqualification of ISO tax treatment for option awards totaled $1.1 million.

Management is considering possible ways to address the impact that Section 409A of the Internal Revenue Code may have as a result of the exercise price of stock options being less than the fair market value of our



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 8.6 | PAL jaslv0dc | 04-Mar-2007 22:25 EST | 86507 TX 30 · 1* |
| FORM 10-K | | ■ | PAL | | HTM IFV    1C |

Page 1 of 1

common stock on the revised measurement date. Section 409A imposes significant additional taxes to our employees on stock options granted with an exercise price lower than the fair market value on the date of grant that vest after December 31, 2004. The Internal Revenue Service has issued transition rules under Section 409A that allows for a correction, or cure, for options subject to Section 409A. We have allowed our current and former executive officers to amend their options to effect such a cure. We may offer the other holders of outstanding options the opportunity to effect a cure of all affected stock options. In connection with this cure, we may make cash bonus payments in an aggregate amount of up to $1.0 million in 2008 to our non-officer employees.

*Other miscellaneous accounting adjustments*—In addition to stock-based compensation charges, we recorded adjustments that occurred in the periods ended December 31, 2001 through the third quarter of 2005 that had not been previously reflected in our consolidated financial statements. These restatements relate primarily to a correction of our sales return reserve, which should have been reduced in 2001. In addition, we also corrected the period of charge for certain wafers used in engineering, corrected the expected life of tooling for depreciation purposes and recorded an unfunded post-employment health benefit obligation.

Further, we corrected the classification of the balance of auction rate securities (for which interest rates reset in less than 90 days, but for which the underlying maturity date is longer than 90 days), and callable securities (for which interest rates reset from 90 days to 1 year, but for which the underlying maturity date exceeds 1 year) from cash and cash equivalents or short-term investments to long-term investments, as of December 31, 2004 and 2003. We also corrected the consolidated statements of cash flows for the effects of the aforementioned restatements as well as to correct for the non-cash effects of property and equipment purchases recorded, but not yet paid for, at each period end.

*Income tax benefit*—We reviewed the income tax effect of the stock-based compensation charges, and we believe that the proper income tax accounting for U.S. stock options under generally accepted accounting principles depends, in part, on the tax distinction of the stock options as either ISOs or non-qualified stock options, or NSOs. Although some of the Affected ISOs were originally intended to be ISOs, we noted that, under U.S. tax regulations, ISOs may not be granted with an exercise price less than the fair market value on the date of grant. Because of the potential impact of the measurement date changes on the qualified status of Affected ISOs, we have determined that all Affected ISOs might not be qualified ISOs under the regulations, and therefore should be accounted for as if they were NSOs for income tax accounting purposes.

We have recorded a net income tax benefit of approximately $13.5 million in connection with the stock-based compensation related expense and other restatement adjustments during the period from fiscal year 1998 to September 30, 2005. This tax benefit has resulted in an increase of our deferred tax assets for all U.S. affected stock options prior to the exercise or forfeiture of the related options. We recorded no tax benefit or deferred tax asset for affected stock options granted to non-U.S. employees because we determined that we could not receive tax benefits outside of the U.S. Further, we limited the deferred tax assets recorded for affected stock options granted to certain highly paid officers to reflect estimated limitations on tax deductibility under Internal Revenue Code Section 162(m). Upon exercise or forfeiture of the underlying options, the excess or deficiency in deferred tax assets are written-off to either expense or paid-in capital in the period of exercise or forfeiture.

Partially offsetting the income tax benefit on restatement adjustments described above, we also recorded an income tax expense of approximately $692,000 during fiscal year 2003 to correct for an error in the determination of the effect of a cost sharing arrangement with one of our subsidiaries. The correction of such error was originally recorded by us in the quarter ended June 30, 2005. Accordingly, the restatement also resulted in a reduction of the tax provision for the nine-month period ended September 30, 2005.

Further, we recorded restatements aggregating approximately $1.2 million to record additional indirect tax benefits resulting from the exercise of certain stock options in 2002 and 2003. Although these entries had no impact on our consolidated statements of income, they decreased income taxes payable and increased additional paid-in capital in our consolidated balance sheet as of January 1, 2004.

30



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 5.8 | PAL jaslv0dc | 04-Mar-2007 22:25 EST | 86507 TX 31 | 1* |
| FORM 10-K | | ■ | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

Our board of directors has ratified each of the options granted, and we intend to honor each stock option granted pursuant to the terms of the applicable stock option plan and stock option agreement.

*Accounting Considerations—Stock-Based Compensation*

We originally accounted for all employee, officer and director stock option grants as fixed grants under APB 25, using a measurement date of the recorded grant date. We issued all grants with an exercise price equal to the fair market value of our common stock on the recorded grant date, and therefore originally recorded no stock-based compensation expense.

As a result of the Special Committee findings, and our own further review of our stock option granting practices, we determined that the measurement dates for certain stock option grants differed from the recorded grant dates for such grants. In some instances, we were only able to locate sufficient evidence to identify the measurement date described in APB 25, the first date on which both the number of shares that an individual employee was entitled to receive and the exercise price were known, within a range of possible dates. As a result, we developed a methodology to establish the revised measurement date primarily by using communication dates as our estimate of the first date on which both the number of shares that an individual employee was entitled to receive and the exercise price were known with finality. Using the methodology described below we concluded that it was appropriate to revise the measurement dates for these grants based upon our findings, and we refer to these revised measurement dates as the "Deemed Measurement Dates". We calculated stock-based compensation expense under APB 25 based upon the intrinsic value as of the Deemed Measurement Dates of stock option awards determined to be "fixed" under APB 25 and the vesting provisions of the underlying options. We calculated the intrinsic value on the Deemed Measurement Date as the closing price of our common stock on such date as reported on the Nasdaq National Market, now the Nasdaq Global Market, less the exercise price per share of common stock as stated in the underlying stock option agreement, multiplied by the number of shares subject to such stock option award. We recognize these amounts as compensation expense over the vesting period of the underlying options (generally four years). We also determined that variable accounting treatment was appropriate under APB 25 for certain stock option grants to three officers for which evidence was obtained that the terms of the options may have been communicated to those officers and that those terms were subsequently modified (stock option grants cancelled and repriced). When variable accounting is applied to stock option grants, we remeasure, and report in our consolidated statement of income, the intrinsic value of the options at the end of each reporting period until the options are exercised, cancelled or expire unexercised.

The methodology we used to determine the Deemed Measurement Dates associated with prior stock option grants was as follows:

*New Hire Non-Officer Employee Stock Options*—We determined the Deemed Measurement Date for each of these grants to be the last day of the month of the employee's first month of employment. Our practice was to set the exercise price of these awards at the end of the month of hire, and therefore we determined that the last day of the month of the employee's first month of employment was the first date when the number of shares and the price of each grant were known with finality.

*All Other Stock Options*—We determined the Deemed Measurement Date for each stock option grant, other than grants of new hire non-officer employee options, to be the Approval Date for the stock option, provided the Approval Date criteria set forth below were met. If the criteria for use of the Approval Date were not met, then we used the Communication Date, as defined below, as the Deemed Measurement Date for the stock option.

- "Approval Date"—The Approval Date was the date of approval set forth in executed minutes or a fully-executed consent of the board of directors, compensation committee or stock option committee documenting the grant of the stock option. However, we generally only used the Approval Date as the Deemed Measurement Date if both:

   (1) there was documentary evidence that the allocation of the shares had been finalized, and the written consent, if applicable, was executed, on that date ; and

31



(2) the Communication Date for the stock option was within 30 days of the date of approval set forth in the documentary evidence.

- "Communication Date"—We define the "Communication Date" as the date we determined the key terms of the option (both the number of shares and the exercise price) had initially been communicated to the optionee. In the absence of specific documentary evidence of initial communication, we generally determined the Communication Date to be the earliest of:

(1) the date the employee record of the grant of the stock option was added to the stock option database application, or the latest recordation date in the case of a group of grants, which we refer to as the "Record Add Date";

(2) the optionee manual signature date on the stock option agreement, or the earliest optionee manual signature date in the case of a group of grants, which we refer to as the "Stock Option Agreement Date"; and

(3) for officers and directors, the date that a Form 3 or 4 was filed with the SEC with respect to the grant, which we refer to as the "Form 3/4 Date".

However, we did not consider the Record Add Date in our determination if the Stock Option Agreement Date was more than 30 days after the Record Add Date in the case of individual grants and grants to groups of less than five, or more than 10 days after the Record Add Date in the case of grants to groups of five or more. We made the distinction regarding small and large groups because we would expect to see at least one agreement returned to us within 10 days with larger groups of optionees; but with small groups, the probability of seeing an agreement returned to us within 10 days was less likely.

When applying this methodology to groups of grants, we generally determined the Communication Date for the group to be the latest Record Add Date, the earliest Stock Option Agreement Date or Form 3/4 Dates, as we determined that, under our stock option grant process, the terms of stock options were communicated concurrently to each member of a group. We excluded a limited number of options, or "Outliers", from the determination of the latest Record Add Date and the earliest Stock Option Agreement Date for a group of grants when, based upon available evidence, we considered the Outlier dates as not reliable as to the date that the terms of the stock option grants were communicated to the group. This methodology, and the determination of which stock option grants should be considered Outliers, as described above, involves judgment.

As stated above, using this methodology, we recorded an aggregate pre-tax charge for stock compensation related adjustments of $44.1 million relating to fiscal year 1998 to September 30, 2005. If we had consistently used either the latest Record Add Date or the earliest Stock Option Agreement Date as the revised measurement date for all stock option grants other than new hire non-officer employee options (and excluded Outliers, consistent with the application of our methodology), the aggregate pre-tax stock-based compensation charges relating to fiscal year 1998 through September 30, 2005 would have been $38.8 million using the latest Record Add Date, or $44.7 million using the earliest Stock Option Agreement Date Alternatively, for groups of grants, if we would have used the highest or lowest trading prices of our common stock between the last date of documentary evidence (which was otherwise deemed unreliable) before the revised measurement date and the revised measurement date, as a measurement date could have occurred on any date between those two dates, the aggregate pre-tax stock-based compensation charges relating to the same periods would have been $40.9 million if we had used the lowest price and $49.9 million if we had used the highest price.

*Outside Director Automatic Stock Option Grants*

Our 1997 Outside Directors Stock Option Plan provides for the automatic grant of stock options to our outside directors, such that the grants require no independent action of the Board or any committee of the Board. The Outside Directors Plan provides that each outside director is granted a stock option to purchase 30,000 shares of Power Integrations, Inc. common stock upon appointment as a member of the Board, and that each

32



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09<br>56 | PAL jaslv0dc | 04-Mar-2007 22:25 EST | | 86507 TX 33 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

outside director is granted a stock option to purchase 10,000 shares of our common stock at each anniversary of the date of appointment or, in the case of outside directors appointed prior to our initial public offering, the anniversary date of the initial public offering. The exercise price of each stock option grant is the fair market value of a share of common stock on the date of grant.

We have determined that, as a result of administrative errors, a total of 16 grants representing options to purchase 180,000 shares under the Outside Directors Plan collectively to three of our outside directors were documented as having been made on dates other than as set forth in the Outside Directors Plan. We have corrected the documentation of these grants to reflect the correct dates and exercise prices, as automatically established under the Outside Directors Plan. Because these actions were corrections of administrative errors in the documentation, rather than changing any of the terms of the stock option grants as automatically granted, we determined that there was no accounting charge to be recognized in connection with these corrections, as the correct measurement date was the date of grant as automatically established by the Outside Directors Plan, and the exercise price was the fair market value of our common stock on the correct measurement date.

Subsequent to the correction of the documentation of these grants, the three outside directors have agreed to increase the exercise prices of certain of such grants to purchase 80,000 shares. Further, the only director who exercised a misdocumented grant has reimbursed us for the difference between the aggregate exercise price as misdocumented and as corrected. A more detailed description of the correction of the administrative errors in these grants is set forth in Item 9B. Other Information, in this Annual Report on Form 10-K.

*Related Proceedings*

Beginning on or about April 25, 2006, several derivative actions were filed against certain of our current and former directors and officers. These derivative lawsuits were filed in: (1) the United States District Court for the Northern District of California, including complaints by alleged shareholders Kimberly Quaco, Kathryn L. Champlin and Christopher Deboskey, and (2) the California Superior Court, Santa Clara County, including complaints by alleged shareholders Stanley Banko and Joan Campbell. The complaints allege that, among other things, the defendants breached their fiduciary duties by improperly backdating grants to our executives in violation of our shareholder-approved stock option plans and improperly recorded and accounted for those options, improperly took tax deductions based on the backdated stock options, and disseminated false financial statements that improperly recorded the backdated option grants. The complaints also assert unjust enrichment, and violations of Section 10(b) of the Securities Exchange Act of 1934. These cases are further discussed in note 9, "Legal Proceedings," of the notes to consolidated financial statements.

On May 23, 2006, the U.S. Attorney's Office for the Northern District of California ("DOJ") issued a grand jury subpoena to us directing that we produce documents relating to the granting of stock options from 1995 through the present. On May 31, 2006, the staff of the Securities & Exchange Commission ("SEC") sent a letter to us directing us to take appropriate actions to preserve certain documents relating to our stock option practices. Since that time, the government has made a number of requests for us to voluntarily produce documents relating to, among other things, our stock option practices. In addition, the government has been conducting voluntary interviews of certain current and former officers and employees. We are cooperating fully with the SEC and the DOJ and intend to continue to do so.

On June 19, 2006, we received a demand letter pursuant to section 16(b) of the Securities Exchange Act of 1934 from an attorney purporting to represent an unnamed shareholder. The letter demands that we bring a lawsuit against certain of our current and former officers and directors to recover short-swing profits allegedly earned by the officers and directors in violation of section 16(b) when they allegedly acquired options to purchase our stock within six months of corresponding sales of our stock at higher prices. The letter states that if we do not take action against the individuals within 60 days, the unnamed shareholder will file a lawsuit.

We are unable to predict the outcome of the legal proceedings described above. If an adverse decision is reached against us in any of these proceedings, it could have a material adverse effect on our financial position or results of operations.

33



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0P AL jaslv0dc | 04-Mar-2007 22:25 EST | 86507 TX 34 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

*Effect on our Nasdaq Listing*

Our common stock has been suspended from trading on The NASDAQ Stock Market for noncompliance with the Nasdaq listing requirements, and currently trades on the Pink Sheets under the symbol "POWI.PK". Until we file all three of our Quarterly Reports on Form 10-Q for fiscal year 2006, and hold our 2005 annual meeting of stockholders, we will not regain compliance with the Nasdaq listing requirements. Even when we do regain compliance with the Nasdaq listing requirements, we will be required to reapply to have our common stock listed on the Nasdaq Global Market. The application process can be lengthy process, and there is no assurance that Nasdaq will relist our common stock.

**Business Overview**

We design, develop, manufacture and market proprietary, high-voltage analog ICs for use primarily in electronic power supplies, also known as switched-mode power supplies or switchers. Our ICs are used in AC-DC and DC-DC power supplies in a wide variety of electronic products, primarily in the consumer, communications, computer and industrial electronics markets. Accelerating the penetration of our ICs into this addressable market is our primary strategic objective.

Our ICs are purchased primarily by merchant power supply manufacturers who sell power supplies to OEMs, and, in some cases, by OEMs who design and build their own power supplies. (In 2005, approximately 60% of our sales to these end customers were made through distributors of electronic components.) Power supplies may be designed with our monolithic ICs, which combine a high-voltage transistor with low-voltage control circuitry, or with a number of competing alternatives. These alternatives include other monolithic and hybrid ICs, PWM controller ICs paired with discrete transistors, and legacy technologies that do not utilize ICs, such as line-frequency transformers and self-oscillating switchers using discrete components.

Our sales process involves significant effort to have our customers design their power supplies to include our ICs as components. Competition for these "design wins" at our end customers is intense, as the power-supply industry is extremely price-sensitive. We attempt to differentiate our offerings from competing alternatives through innovation aimed at helping our customers minimize the total cost of their power supplies while meeting the performance specifications demanded by their end customers. Much of this innovation is embodied in the features and functionality of our ICs, as well as in various power-supply-design techniques developed by us for use by our customers. Further, we attempt to minimize the cost of producing our ICs through continuous improvement of our proprietary manufacturing process as well as seeking other manufacturing efficiencies.

We employ a variety of methods for marketing and selling our products in an effort to accelerate the penetration of our addressable markets. We employ a staff of sales personnel and field applications engineers around the world, and have increased the size of this staff considerably over the past several years. In order to assist our customers in designing power supplies with our ICs, we offer a wide range of technical documentation as well as design-support tools and services. These include PI Expert design software, which we offer free of charge, and our transformer sample service. We also continue to introduce more advanced products that make our solutions more cost-effective and easier for designers to use.

We believe that the increasing importance of energy-efficiency as a design criterion for power supplies could help accelerate the rate of adoption of our technology by the power-supply industry, and represents an important opportunity for us to increase the penetration rate of our products. This trend is predominantly the result of the emergence of energy-efficiency standards that encourage, or in some cases mandate, the design of more energy-efficient electronic products. Power supplies built with legacy technologies such as line frequency transformers are often unable to meet such standards cost-effectively. Most notably, the California Energy Commission has introduced mandatory standards governing the energy efficiency of virtually all external power supplies; these standards are scheduled to take effect in 2007. Other U.S. states, as well as Australia, have adopted virtually identical mandatory standards scheduled to take effect in 2007 and 2008.

34



Our net revenues were $143.1 million, $136.7 million and $125.7 million in 2005, 2004 and 2003, respectively. The growth of revenue in each of these years reflects primarily the increased penetration of our products into our addressable market. However, we believe that our revenue growth in 2004 and 2005 was negatively impacted by unfair competition from products that we believe infringed several of our patents, and that in the absence of the infringing products, we would have grown our revenues more rapidly in each of those years. We have taken action against these allegedly infringing products by undertaking litigation against two of our competitors, Fairchild Semiconductor and System General Corp., as we have described in Part I, Item 3 of this Annual Report.

Our top ten customers, including distributors that resell to OEMs and merchant power supply manufacturers, accounted for 69%, 71% and 76% of our net revenues for 2005, 2004 and 2003, respectively. Our two largest customers, both of which are distributors of electronic components, collectively accounted for 37%, 38% and 45% of our net revenues, respectively for the years 2005, 2004 and 2003. In 2005, 2004 and 2003, international sales comprised 93%, 92% and 93%, respectively, of our net revenues.

Our gross profit, defined as net revenues less cost of revenues, was $70.1 million, or 49.0% of net revenues, in 2005, compared to $64.8 million, or 47.4% of net revenues, in 2004 and $62.2 million, or 49.5% of net revenues, in 2003. Because our industry is intensely price-sensitive, our gross profit margin is subject to change based on the relative pricing of solutions that compete with ours. Also, because we purchase a large percentage of our wafers from foundries located in Japan, our gross margin is influenced by fluctuations in the exchange rate between the U.S. dollar and the Japanese yen. All else being equal, a 10% change in the value of the U.S. dollar compared to the Japanese yen would result in a corresponding change in our gross profit margin of approximately one percentage point.

In recent years we have employed a number of tactics in an effort to maintain or, when possible, improve our gross profit margin. These include reducing the cost of producing our ICs through the implementation of more advanced manufacturing processes, the migration of our testing operations to offshore sub-contractors, and the negotiation of more favorable prices from our suppliers. We also seek to increase the value of our products to our customers through the inclusion of more advanced features and functionality. Finally, we have made an effort to market our products to smaller, less price-sensitive customers. Through this combination of methods, we have generally succeeded in maintaining a relatively stable gross profit margin in the recent past. We expect this trend to continue in 2006, though the implementation of SFAS 123R (as described below in the section entitled "Recently Issued Accounting Pronouncements") will have some negative impact on our gross margin.

Total operating expenses in 2005, 2004 and 2003 were $51.1 million, $39.5 million and $48.1 million, respectively. The increase in operating expenses in 2005 was driven largely by the cost of our patent litigation against Fairchild Semiconductor and System General Corp., by increases in headcount, and by higher stock-based compensation associated with certain stock option grants. For 2006, we expect our operating expenses to increase significantly due to the implementation of SFAS 123R, our internal investigation of our historical practices for granting stock options, the costs associated with the related restatement of our financial statements, and the cost associated with our ongoing patent litigation. We also expect increased expenses for research and development and sales and marketing due to the addition of headcount in those areas.

Our quarterly and annual operating results are volatile and difficult to predict. Our business is characterized by short-term orders and short customer lead times, and a high percentage of our revenue comes from "turns business," or orders booked and shipped within the same period. Customers typically can cancel or reschedule orders without significant penalty. We plan our production and inventory levels based on internal forecasts of customer demand, which is highly unpredictable and can fluctuate substantially. As a result, our quarterly and annual operating results may fluctuate significantly in the future.

## Critical Accounting Policies and Estimates

The preparation of financial statements and related disclosures in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that

35



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 ¾ | PAL jaslv0dc | 04-Mar-2007 22:25 EST | 86507 TX 36 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. On an ongoing basis, we evaluate our estimates, including those listed below. We base our estimates on historical facts and various other assumptions that we believe to be reasonable at the time the estimates are made. Actual results could differ from those estimates.

Our critical accounting policies are as follows:

- revenue recognition;
- stock-based compensation;
- estimating sales returns and allowances;
- estimating distributor pricing credits;
- estimating allowance for doubtful accounts;
- estimating write-downs for excess and obsolete inventory; and
- income taxes.

Our critical accounting policies are both important to the portrayal of our financial condition and results of operations, and require us to make judgments and estimates about matters that are inherently uncertain. A brief description of these critical accounting policies is set forth below. For more information regarding our accounting policies, see note 2 "Summary of Significant Accounting Policies" in the notes to the consolidated financial statements.

### Revenue recognition

Product revenues consist of sales to OEMs, merchant power supply manufacturers and distributors. Shipping terms to our international OEMs and merchant power supply manufacturers from our facility in California are delivered at frontier, which is commonly referred to as DAF. As such, title to the product passes to the customer when the shipment reaches the destination country and revenue is recognized upon the arrival of our product in that country. Beginning in December 2005, shipping terms to our international OEMs and merchant power supply manufacturers shipped from our facility outside of the United States are EX Works (EXW), meaning title to the product transfers to our customer upon shipment from our foreign warehouse. Shipments to North American OEMs and merchant power supply manufacturers are FOB-point of origin, meaning that revenue is recognized upon shipment, which is when title is passed to the customer.

Historically, approximately 50% to 60% of our total sales have been made to distributors pursuant to agreements that allow certain rights of return on our products held by these distributors. As a result, we defer the recognition of revenue and the costs of revenues derived from sales to distributors until such distributors resell our products to their customers. We determine the amounts to defer based on the level of actual inventory on hand at our distributors as well as inventory that is in transit to them. The gross profit that is deferred as a result of this policy is reflected as "deferred income on sales to distributors" in the consolidated balance sheets.

### Stock-based compensation

We have elected to follow Accounting Principles Board Opinion (APB) No. 25, *Accounting for Stock Issued to Employees*, and related interpretations, in accounting for employee stock options rather than the alternative fair value method allowed for by SFAS No. 123, *Accounting for Stock-Based Compensation*. APB No. 25 provides that compensation expense relative to our employee stock options is measured based on the intrinsic value of stock options granted. For grants determined to be "fixed" under APB 25, we recognize compensation expense in our statement of income using the straight-line method over the vesting period based upon the difference between the exercise price of our employee stock option grants and the market price of the underlying common stock on the measurement date of the option. We do not recognize compensation expense in our consolidated income



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0P 5.6 | PAL jaslv0dc | 04-Mar-2007 22:26 EST | 86507 TX 37 | 1* |
| FORM 10-K | | ■ | PAL | | HTM IFV | 1C |

Page 1 of 1

statement for fixed awards when the exercise price of our employee stock option grants equals the market price of the underlying common stock on the measurement date of the option. The measurement date is the date when the number of shares and exercise price are known with finality. For grants determined to be "variable" under APB 25, we remeasure, and report in our statement of income, the intrinsic value of the options at the end of each reporting period until the options are exercised, cancelled or expire unexercised. As a result of the application of APB 25 and restatement of our consolidated financial statements, as described in "Restatement of Consolidated Financial Statements" above, we have incurred pre-tax stock-based compensation expense of $3.1 million, $1.3 million and $9.9 million, in 2005, 2004 and 2003, respectively. See the explanatory note on page 1 of this Form 10-K, "Restatement of Consolidated Financial Statements" in Part II, Item 7, and note 3, "Restatement of Consolidated Financial Statements," of the notes to consolidated financial statements.

### Estimating sales returns and allowances

Net revenue consists of product revenue reduced by estimated sales returns and allowances. To estimate sales returns and allowances, we analyze, both when we initially establish the reserve, and then each quarter when we review the adequacy of the reserve, the following factors: historical returns, current economic trends, levels of inventories of our products held by our customers, and changes in customer demand and acceptance of our products. This reserve represents a reserve of the gross margin on estimated future returns and is reflected as a reduction to accounts receivable in the consolidated balance sheets. Increases to the reserve are recorded as a reduction to net revenue equal to the expected customer credit memo and a corresponding credit is made to cost of revenues equal to the estimated cost of the product to be returned. The net difference, or gross margin, is recorded as an addition to the reserve. Because the reserve for sales returns and allowances is based on our judgments and estimates, particularly as to future customer demand and acceptance of our products, our reserves may not be adequate to cover actual sales returns and other allowances. If our reserves are not adequate, our future net revenues and cost of revenues could be adversely affected.

### Estimating distributor pricing credits

Historically, approximately 50% to 60% of our total sales have been made to distributors. Frequently, distributors need a cost lower than the standard distribution price to win business. In these circumstances, the distributor submits a request to us for a lower "sell-in" price on a specific end-customer transaction or a series of transactions. After the distributor ships product to its customer under an approved transaction, the distributor submits a "ship & debit" claim to us to adjust its cost from the standard price to the approved lower price. After verification by us, a credit memo is issued to the distributor to adjust the sell-in price from the standard distribution price to the approved lower price. We maintain a reserve for these credits that appears as a reduction to accounts receivable in our consolidated balance sheets. Any increase in the reserve results in a corresponding reduction in our net revenues. To establish the adequacy of our reserves, we analyze historical ship and debit amounts and levels of inventory in the distributor channels. If our reserves are not adequate, our net revenues could be adversely affected.

From time to time we reduce our distribution list prices. We give our distributors protection against these price declines in the form of credits on products they hold in inventory. These credits are referred to as "price protection." Since we do not recognize revenue until the distributor sells the product to its customers, we generally do not need to provide reserves for price protection. However, in rare instances we must consider price protection in the analysis of reserve requirements, as there may be a timing gap between a price decline and the issuance of price protection credits. If a price protection reserve is required, we will maintain a reserve for these credits that appears as a reduction to accounts receivable in our consolidated balance sheets. Any increase in the reserve results in a corresponding reduction in our net revenues. We analyze distribution price declines and levels of inventory in the distributor channels in determining the reserve levels required. If our reserves are not adequate, our net revenues could be adversely affected.

37



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.6 | PAL jaslv0dc | 04-Mar-2007 22:26 EST | | 86507 TX 38 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

### Estimating allowance for doubtful accounts

We maintain an allowance for losses we may incur as a result of our customers' inability to make required payments. Any increase in the allowance for doubtful accounts results in a corresponding increase in our general and administrative expenses. In establishing this allowance, and in evaluating the adequacy of the allowance each quarter, we analyze historical bad debts, customer concentrations, customer credit-worthiness, current economic trends and changes in our customer payment terms. If the financial condition of one or more of our customers deteriorates, resulting in their inability to make payments, or if we otherwise underestimate the losses we incur as a result of our customers' inability to pay us, we could be required to increase our allowance for doubtful accounts which could adversely affect our operating results.

### Estimating write-downs for excess and obsolete inventory

When evaluating the adequacy of our valuation adjustments for excess and obsolete inventory, we identify excess and obsolete products and also analyze historical usage, forecasted production based on demand forecasts, current economic trends, and historical write-offs. This write-down is reflected as a reduction to inventory in the consolidated balance sheets, and an increase in cost of revenues. If actual market conditions are less favorable than our assumptions, we may be required to take additional write-downs, which could adversely impact our cost of revenues and operating results.

### Income taxes

We recognize Federal, state and foreign current tax liabilities or assets based on our estimate of taxes payable or refundable in the current fiscal year by tax authorities. We also recognize Federal, state and foreign deferred tax liabilities or assets for our estimate of future tax effects attributable to temporary differences and carry-forwards, and we record a valuation allowance to reduce any deferred tax assets by the amount of any tax benefits that, based on available evidence and judgment, are not expected to be realized. We limit the deferred tax assets recognized related to certain of our highly-paid officers to amounts that we estimate will be deductible in future periods based upon the provisions of the Internal Revenue Code Section 162(m). As of December 31, 2005, no valuation allowance had been recorded. We believe it is more likely than not that forecasted income will be sufficient to fully recover our deferred tax assets. In the event that all or part of the net deferred tax assets are determined not to be realizable in the future, a valuation allowance would be recorded in the period such determination is made. In addition, the calculation of tax liabilities involves significant judgment in estimating the impact of uncertainties in the application of complex tax laws. Resolution of these uncertainties in a manner inconsistent with our expectations could have a material impact on our results of operations and financial position.

38

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC15215B 9.6.18 | PAL soeus0pa | 05-Mar-2007 20:56 EST | | 86507 TX 39 | 2* |
| FORM 10-K | | | PAL | | | HTM PMT | 1C |
| | | | | | | Page 1 of 1 | |

## Results of Operations

The following table sets forth certain operating data in dollars, as a percentage of total net revenues and increase (decrease) over prior periods for the periods indicated (in thousands).

| | Amount | | | Percent of Net Revenues | | | Increase (Decrease) | |
| | 2005 | 2004 As Restated (1) | 2003 As Restated (1) | 2005 | 2004 As Restated (1) | 2003 As Restated (1) | 2005 vs. 2004 | 2004 vs. 2003 As Restated (1) |
|---|---|---|---|---|---|---|---|---|
| Total net revenues | $143,071 | $136,653 | $125,682 | 100.0% | 100.0% | 100.0% | $ 6,418 | $ 10,971 |
| Cost of revenues | 72,979 | 71,856 | 63,496 | 51.0 | 52.6 | 50.5 | 1,123 | 8,360 |
| Gross profit | 70,092 | 64,797 | 62,186 | 49.0 | 47.4 | 49.5 | 5,295 | 2,611 |
| Operating expenses: | | | | | | | | |
|   Research and development | 17,111 | 15,440 | 20,107 | 12.0 | 11.3 | 16.0 | 1,671 | (4,667) |
|   Sales and marketing | 18,314 | 16,070 | 17,166 | 12.8 | 11.8 | 13.7 | 2,244 | (1,096) |
|   General and administrative | 15,665 | 7,969 | 10,868 | 10.9 | 5.8 | 8.6 | 7,696 | (2,899) |
|     Total operating expenses | 51,090 | 39,479 | 48,141 | 35.7 | 28.9 | 38.3 | 11,611 | (8,662) |
| Income from operations | 19,002 | 25,318 | 14,045 | 13.3 | 18.5 | 11.2 | (6,316) | 11,273 |
| Total other income | 3,149 | 1,320 | 903 | 2.2 | 1.0 | 0.7 | 1,829 | 417 |
| Income before provision for income taxes | 22,151 | 26,638 | 14,948 | 15.5 | 19.5 | 11.9 | (4,487) | 11,690 |
| Provision for income taxes | 6,453 | 6,138 | 3,511 | 4.5 | 4.5 | 2.8 | 315 | 2,627 |
| Net income | $ 15,698 | $ 20,500 | $ 11,437 | 11.0% | 15.0% | 9.1% | $(4,802) | $ 9,063 |

(1) See note 3, "Restatement of Consolidated Financial Statements," of the notes to consolidated financial statements for information on our restatement.

## Comparison of Years Ended December 31, 2005 and 2004

*Net revenues.* Net revenues consist of revenues from product sales, which are calculated net of returns and allowances, plus license fees and royalties. Net revenues increased 4.7% to $143.1 million in 2005 compared to $136.7 million in 2004, driven primarily by increased penetration of our products into our end markets. The increase was driven primarily by increased penetration in the industrial market, including such applications as utility meters, external adapters, uninterruptible power supplies and lighting applications. The increase also resulted from increased penetration in the computer market, including applications such as personal digital assistants, LCD monitors and other computer peripherals. Revenues from our other two major end markets, consumer and communications, did not contribute to our growth in 2005 compared to 2004.

Our revenue growth in 2005 was primarily driven by increased sales of our TinySwitch-II, TOPSwitch-GX and LinkSwitch product families, partially offset by lower revenues from legacy products that are generally no longer available for use in new power supply designs.

In the twelve months ended December 31, 2005, our net revenue included an adjustment to deferred income on sales to distributors as a result of a change in estimate, which increased our net revenue by approximately $1.1 million, and increased our net income after tax by approximately $0.4 million, or $0.01 per diluted share.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LAN-BU-MWS-CX99 5S | PAL jaslv0dc | 04-Mar-2007 22:26 EST | 86507 TX 40 | 1* |
| FORM 10-K | | ■ | PAL | | HTM IFV | 1C |

Page 1 of 1

Our net revenue mix by product family and by the end markets that we serve in 2005 and 2004 are as follows:

| | Year Ended December 31, | |
| Product Family | 2005 | 2004 |
|---|---|---|
| TinySwitch-I and -II | 57% | 54% |
| TopSwitch-FX and -GX | 27% | 28% |
| TopSwitch-I and -II | 11% | 15% |
| LinkSwitch and DPA-Switch | 5% | 3% |

| | Year Ended December 31, | |
| End Market | 2005 | 2004 |
|---|---|---|
| Consumer | 30% | 33% |
| Communication | 29% | 31% |
| Computer | 23% | 22% |
| Industrial | 11% | 8% |
| Other | 7% | 6% |

International revenues were $133.6 million in 2005 compared to $125.8 million in 2004, representing approximately 93% and 92% of net revenues in those respective periods. Although the power supplies using our products are designed and distributed worldwide, most of these power supplies are manufactured by our customers in Asia. As a result, sales to this region were 79% and 78% of our net revenues for 2005 and 2004, respectively. We expect international sales to continue to account for a large portion of our net revenues.

Net product revenues for 2005 were divided 60% to distributors and 40% to OEMs and merchant power supply manufacturers, compared to 56% to distributors and 44% to OEMs and merchant power supply manufacturers in 2004. In 2005, two customers, both of whom are distributors, accounted for approximately 19% and 18% of net revenues. In April 2006, we terminated our distributor relationship with our distributor that accounted for 18% of net revenues in 2005. We have replaced this terminated relationship with other distribution relationships, and therefore do not believe that the termination of this distributor relationship will have a material impact to our business. In 2004 the same two customers each accounted for approximately 19% of net revenues each.

Customer demand for our products can change quickly and unexpectedly. Our customers perceive that our products are readily available and typically order only for their short-term needs. Our revenue levels are highly dependent on the amount of new orders that we receive for which product can be delivered by us within the same period. Orders that are booked and shipped within the same period are called "turns business." Because of the uncertainty of customer demand, and the short lead-time environment and high turns business, it is difficult to predict future levels of revenues and profitability.

*Gross profit.* Gross profit is equal to net revenues less cost of revenues. Our cost of revenues consists primarily of costs associated with the purchase of wafers from our contracted foundries, the assembly and packaging of our products by sub-contractors, internal labor and overhead associated with product testing performed in our own facility, and testing of packaged components performed by sub-contractors. Gross profit was $70.1 million, or 49.0% of net revenues, in 2005, compared to $64.8 million, or 47.4% of net revenues, in 2004. The increase in our gross margin percentage was due primarily to cost reductions, mainly in the areas of wafer prices and product improvements. We expect our gross margin to improve in 2006 as a result of further cost reductions, a more favorable pricing environment for our products, and increased penetration into smaller, less price-sensitive customers. We expect these factors to be partially offset by stock-based compensation costs related to the implementation of SFAS No. 123R in the first quarter of 2006.

*Research and development expenses.* Research and development expenses (R&D expenses) consist primarily of employee-related expenses (including stock-based compensation) and expensed material and facility

40



costs associated with the development of new processes and new products. We also record R&D expenses for prototype wafers related to new products until such products are released to production. R&D expenses were $17.1 million, or 12.0% of net revenues in 2005, compared to $15.4 million, or 11.3% of net revenues, in 2004. The increase was due primarily to higher stock-based compensation expenses driven by the remeasurement of certain stock option grants. Total stock-based compensation and related expenses included in R&D expenses for 2005 was $0.9 million, compared to a benefit of $(0.8) million in 2004. This increase was primarily the result of fluctuations in the value of certain stock options for which variable accounting applies. The value of stock option grants subject to variable accounting varies significantly as a result of changes in the market value of our common stock; see note 3 of the notes to consolidated financial statements for a further explanation. We expect research and development expenses to increase in 2006, primarily as a result of our implementation of SFAS No. 123R in the first quarter of 2006.

*Sales and marketing expenses.* Sales and marketing expenses consist primarily of employee-related expenses (including stock-based compensation), commissions to sales representatives, and facilities expenses, including expenses associated with our regional sales and support offices. Sales and marketing expenses were $18.3 million, or 12.8% of net revenues, in 2005, compared to $16.1 million, or approximately 11.8% of net revenues, in 2004. The increase was primarily due to an increase in headcount in sales and field applications engineering, as we have expanded our sales staff. We expect sales and marketing expenses to increase in 2006 due to growth in marketing and sales headcount as well as advertising and marketing collateral associated with the launch of several new products in 2006. We also expect our sales and marketing expenses to increase due to the implementation of SFAS No. 123R in the first quarter of 2006.

*General and administrative expenses.* General and administrative expenses (G&A expenses) consist primarily of employee-related expenses, including stock-based compensation, for administration, finance, human resources and general management, as well as consulting, professional services, legal and auditing expenses. G&A expenses were $15.7 million, or 10.9% of net revenues, in 2005, compared to $8.0 million, or 5.8% of net revenues, in 2004. The increase was due primarily to an increase in legal fees for patent litigation, higher stock-based compensation expense and higher headcount. Expenses associated with our patent-infringement litigation against Fairchild Semiconductor and System General Corporation, as described in Part I, Item 3 Legal Proceedings, were $5.5 million in 2005 and $400,000 in 2004. Stock-based compensation for 2005 increased to $1.1 million in 2005 compared to a benefit of $(0.1) million in 2004, primarily as a result of fluctuations in the value of certain stock options for which variable accounting applies. We expect G&A expenses to increase in 2006 due to the implementation of SFAS No. 123R in the first quarter of 2006, the costs of our continuing patent litigation, and the costs associated with our internal investigation into our historical stock option granting practices and the related restatement of our financial statements.

*Total other income.* In 2005, total other income was $3.1 million, an increase of $1.8 million over the prior year. Interest income, which consists primarily of income earned on short-term and long-term investments, grew primarily due to an increase in our average interest rate from 2.4% at December 31, 2004 to 4.1% at December 31, 2005.

*Provision for income taxes.* Provision for income taxes for 2005 and 2004 represents Federal, state and foreign taxes. The provision for income taxes was $6.5 million for 2005 compared to $6.1 million for 2004. Our effective tax rate for 2005 was approximately 29% compared to approximately 23% in 2004. The increase in the effective tax rate in 2005 compared to 2004 was primarily due to a change in our estimates of profitability in foreign jurisdictions.

**Comparison of Years Ended December 31, 2004 and 2003**

*Net revenues.* Net revenues were $136.7 million in 2004, an increase of 8.7% compared to $125.7 million in 2003. The increase in our revenues was driven primarily by increased penetration of our ICs into our addressable markets, particularly the consumer and industrial markets. The increase in consumer revenues were driven

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANF8U-MWS-CX09 5.6 | PAL jaslv0dc | 04-Mar-2007 22:26 EST | 86507 TX 42 | 1* |
| FORM 10-K | | ■ | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

primarily by an increase in sales of our products for home appliances, set-top boxes and DVD players. Revenues from the industrial market grew as we increased our penetration in a variety of applications, including control and metering applications as well as uninterruptible power supplies. Revenues from the computer market contributed modestly to our growth, while communications revenues declined driven primarily by lower revenues related to cellphone chargers. In particular, this decrease was a result of our loss of a portion of Samsung's cellphone charger business.

Our net revenue mix by product family and by the end markets that we serve in 2004 and 2003 are as follows:

| | Year Ended December 31, | |
|---|---|---|
| Product Family | 2004 | 2003 |
| TinySwitch-I and -II | 54% | 51% |
| TopSwitch-FX and -GX | 28% | 27% |
| TopSwitch-I and -II | 15% | 20% |
| LinkSwitch and DPA-Switch | 3% | 2% |

| | Year Ended December 31, | |
|---|---|---|
| End Market | 2004 | 2003 |
| Consumer | 33% | 28% |
| Communication | 31% | 36% |
| Computer | 22% | 22% |
| Industrial | 8% | 8% |
| Other | 6% | 6% |

Our revenue growth in 2004 was driven primarily by higher sales of our TinySwitch-II and TOPSwitch-GX products, partially offset by lower sales from legacy products such as TOPSwitch-I and -II.

International revenues were $125.8 million in 2004 compared to $117.4 million in 2003, representing approximately 92% and 93% of net revenues in those respective periods. Although the power supplies using our products are designed and distributed worldwide, most of these power supplies are manufactured in Asia. Sales to this region were 78% and 81% of our net revenues for 2004 and 2003, respectively.

Direct revenues for 2004 were divided 56% to distributors and 44% to OEMs and merchant power supply manufacturers, compared to 61% to distributors and 39% to OEMs and merchant power supply manufacturers for 2003. In 2004, two customers, both of whom are distributors, each accounted for approximately 19% of net revenues. In 2003, the same two customers accounted for approximately 25% and 20% of net revenues.

*Gross profit.* Gross profit was $64.8 million, or 47.4% of net revenues, in 2004, compared to $62.2 million, or 49.5% of net revenues, in 2003. The decline in gross margin was due primarily to higher wafer costs caused by the strengthening of the Japanese yen compared to the dollar.

*Research and development expenses.* Research and development expenses (R&D expenses) were $15.4 million, or 11.3% of net revenues, in 2004, compared to $20.1 million, or 16.0% of net revenues, in 2003. The decrease in R&D expenses was primarily due to lower stock-based compensation expenses due to the remeasurement of certain stock option grants. Total stock-based compensation expense for 2004 was a benefit of $(0.8) million compared to an expense of $3.7 million in 2003. The decrease was primarily due to the cancellation of certain fixed option grants in 2004, certain grants becoming fully vested in early 2004 and throughout 2003, the revaluation of certain stock options subject to variable accounting, and payroll-tax reversals on stock-based compensation due to the expiration of a statute of limitations in 2004.

*Sales and marketing expenses.* Sales and marketing expenses were $16.1 million, or 11.8% of net revenues, in 2004, compared to $17.2 million, or 13.7% of net revenues, in 2003. The decrease in sales and marketing

42



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANF6U-MWS-CX09 5.8 | PAL jaslv0dc | 04-Mar-2007 22:26 EST | 86507 TX 43 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-K | | ■ PAL | | | HTM IFV | 1C |

expenses was primarily due to lower stock-based compensation expense due to the remeasurement of certain stock option grants. Total stock-based compensation expense for 2004 was $0.8 million compared to $1.7 million in 2003. The decrease was primarily due to the cancellation of certain fixed option grants and due to certain option grants becoming fully vested in early 2004 and throughout 2003 (and therefore generating lower expenses in 2004).

*General and administrative expenses.* General and administrative expenses (G&A expenses) were $8.0 million, or 5.8% of net revenues, in 2004, compared to $10.9 million, or 8.6% of net revenues, in 2003. The decrease in G&A expenses was primarily to due to a decrease in stock-based compensation expenses. Total stock-based compensation expense for 2004 was a benefit of $(0.1) million compared to an expense of $4.0 million in 2003. The decrease was primarily due to the cancellation of certain fixed option grants, certain grants becoming fully vested in early 2004 and throughout 2003, and the revaluation of option grants subject to variable accounting. The decrease was partially offset by an increase in consulting and auditing expenses and other costs related to compliance activities resulting from the Sarbanes-Oxley Act of 2002.

*Total other income.* Total other income was $1.3 million in 2004 and $0.9 million in 2003. The increase was due primarily to increases in cash and investments and slightly higher interest rates. The increase was also partially due to the reversal in 2004 of interest expense recorded in prior periods related to payroll tax on stock-based compensation. The reversal was due to the expiration of the statute of limitations.

*Provision for income taxes.* Provision for income taxes for 2004 and 2003 represents Federal, state and foreign taxes. The provision for income taxes was $6.1 million for 2004 compared to $3.5 million for 2003. Our effective tax rate for 2004 and 2003 was approximately 23%. The difference between the statutory rate of 35% and our effective tax rate for 2004 and 2003 was due primarily to the beneficial impact of lower income tax rates on international sales, Federal tax-exempt investments, and in 2004, a benefit of $1.1 million resulting from a reduction in our estimated income-tax liabilities due to the favorable conclusion of certain tax contingencies.

**Liquidity and Capital Resources**

Since our initial public offering of common stock in December 1997, our principal source of funding has been cash from our operations.

As of December 31, 2005, we had approximately $130.5 million in cash, cash equivalents, short-term and long-term investments. In addition, under a revolving line of credit agreement with Union Bank of California, which expired on October 1, 2006, we could borrow up to $10.0 million. A portion of this credit line was used to cover advances for commercial letters of credit and standby letters of credit, which we provide to Matsushita prior to their shipment of silicon wafers to us. We have also provided letters of credit to our workers compensation insurance carrier as part of our insurance program. As of December 31, 2005, there were outstanding letters of credit totaling approximately $641,000. The balance of this credit line was unused and available at December 31, 2005. On October 26, 2006, we entered into a security agreement with the Union Bank of California, whereby we agreed to maintain $1.3 million in an interest bearing certificate of deposit with the bank. The purpose of this agreement is to secure commercial letters of credit and standby letters of credit up to the deposit amount. This agreement remains in effect until cancellation of our letters of credit. As of December 31, 2005, we had no outstanding capital equipment leases.

As of December 31, 2005, 2004 and 2003 we had working capital, defined as current assets less current liabilities, of approximately $132.8 million, $127.4 million and $115.5 million, respectively. Our operating activities generated $36.0 million, $30.1 million and $21.8 million in the years ended December 31, 2005, 2004 and 2003, respectively. Cash provided by operating activities in the year ended December 31, 2005 was principally the result of net income of $15.7 million, depreciation and amortization of $6.3 million, a decrease in inventories of $7.5 million due to decreased purchases of raw material components, and an increase in taxes payable and other accrued liabilities of $5.2 million, primarily due to an increase in income taxes related to lower income in lower tax rate foreign jurisdictions. Cash provided by operating activities in the year ended·



December 31, 2004 was principally the result of net income in the amount of $20.5 million, depreciation and amortization of $6.9 million and tax benefits associated with employee stock option exercises of $2.1 million. Cash provided by operating activities in the year ended December 31, 2003 was principally the result of net income in the amount of $11.4 million, depreciation and amortization of $6.8 million and stock-based compensation expense of $9.9 million, which resulted from the remeasurement of certain stock option grants, as discussed in this Annual Report. Cash provided by operating activities was partially offset by an increase in inventories totaling $8.1 million. This increase was partially the result of lower-than-expected sales in late 2003 following our loss of a portion of the cellphone-charger business at a major customer.

Our investing activities for the year ended December 31, 2005 resulted in a $7.8 million use of cash, which was driven primarily by the issuance of a $10.0 million promissory note to a supplier, as described in note 11 of our consolidated financial statements, purchases of property and equipment totaling $3.2 million and the acquisition of technology for $1.1 million. These uses of cash were offset in part by net proceeds of $6.5 million from short-term and long-term investments. Investing activities for the year ended December 31, 2004, resulted in a $12.0 million use of cash, driven by purchases of property and equipment totaling $6.4 million, net purchases of investments of $3.9 million, and the acquisition of technology for $1.7 million. Investing activities for the year ended December 31, 2003, resulted in a $30.6 million use of cash, driven by purchases of property and equipment totaling $37.8 million, including the purchase of our San Jose headquarters facilities for approximately $30 million, and the acquisition of technology for $1.4 million, offset in part by net proceeds of $8.6 million of short term and long term investments.

Our financing activities in 2005 resulted in a net use of cash totaling $25.8 million. We used $33.7 million, for the repurchase of approximately 1.7 million shares of our common stock, including fees and commissions. This use of cash was partially offset by receipts of $7.9 million from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan. In 2004 our financing activities resulted in a net use of cash totaling $2.7 million. We used $11.8 million for the repurchase of 590,000 shares of our common stock, including fees and commissions. This use of cash was largely offset by receipts of $9.1 million from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan. In 2003 our financing activities consisted almost exclusively of receipts of $23.6 million from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan.

On October 20, 2004, we announced that our board of directors had authorized the repurchase of up to $40.0 million of our common stock. From inception of the stock repurchase program in October 2004 through June 30, 2005, we repurchased 2,033,270 shares for approximately $40.0 million. On October 19, 2005, we announced that our board of directors had authorized a second stock repurchase program of up to $25.0 million of our common stock. From inception of the second stock repurchase plan through December 31, 2005, we had purchased a total of 249,500 shares for a total of approximately $5.3 million.

During 2005, a significant portion of our cash flow was generated by our operations. If our operating results deteriorate in future periods as a result of a decrease in customer demand or pricing pressures from our customers or our competitors, our ability to generate positive cash flow from operations may be jeopardized. In that case, we may be forced to use our cash, cash equivalents and short-term investments to fund our operations. We believe that cash generated from operations, together with existing sources of liquidity, will satisfy our projected working capital and other cash requirements for at least the next 12 months.

**Off-Balance Sheet Arrangements**

As of December 31, 2005 and 2004, we did not have any off-balance sheet arrangements or relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purposes entities, which are typically established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 3.8 | PAL jaslv0dc | 04-Mar-2007 22:26 EST | 86507 TX 45 | 1* |
| FORM 10-K | | ■ PAL | | | HTM IFV | 1C |

Page 1 of 1

**Contractual Obligations**

As of December 31, 2005, we had the following contractual obligations and commitments (in thousands):

| | | Payments due by period | | | |
| | Total | Less than 1 Year | 1-3 Years | 4-5 Years | Over 5 Years |
|---|---|---|---|---|---|
| Purchase obligations | $7,919 | $ 7,919 | $— | $— | $— |
| Operating lease obligations | 1,136 | 433 | 651 | 52 | — |
| Total | $9,055 | $ 8,352 | $651 | $ 52 | $— |

**Recently Issued Accounting Pronouncements**

In December 2004, the Financial Accounting Standards Board, or FASB, issued FASB Staff Position (FSP) No. 109-1 (FAS 109-1), *Application of FASB Statement No. 109, Accounting for Income Taxes, to the Tax Deduction on Qualified Production Activities Provided by the American Jobs Creation Act of 2004* (the AJCA). The AJCA introduces a special 9% tax deduction on qualified production activities. FAS 109-1 clarifies that this tax deduction should be accounted for as a special tax deduction in accordance with Statement of Financial Accounting Standards SFAS No. 109. We will not be repatriating foreign earnings for the purpose of applying SFAS No. 109, and therefore the act will not have a material impact on our financial statements.

In December 2004, the FASB issued SFAS No. 123 (revised 2004) *Share-Based Payment* (SFAS 123(R)), which replaces SFAS No. 123 *Accounting for Stock-Based Compensation* (SFAS 123) and supersedes APB Opinion No. 25 *Accounting for Stock Issued to Employees*. The pro forma disclosures previously permitted under SFAS 123 no longer will be permitted. In March 2005, the SEC also issued Staff Accounting Bulletin 107 (SAB 107), *Share-Based Payment*, which expresses views of the SEC staff regarding the application of SFAS No. 123(R). Among other things, SAB 107 provides interpretive guidance related to the interaction between SFAS No. 123(R) and certain SEC rules and regulations, as well as the SEC staff's views regarding the valuation of share-based payment arrangements for public companies. We are required to adopt SFAS 123(R), beginning January 1, 2006. We have elected to use the modified-prospective method to transition to FAS 123(R). Under this method compensation expense shall be recorded for all unvested stock options and restricted stock at the beginning of the first quarter of adoption of SFAS 123(R). We expect to use the Black-Scholes valuation approach to determine fair value and to recognize the corresponding expense using the single option approach. Further we expect that the adoption of SFAS 123(R) will have a material impact on our consolidated results of operations and earnings per share.

In March 2005, the FASB issued FSP No. 46(R)-5, *Implicit Variable Interests under FASB Interpretation No. 46 (revised December 2003), Consolidation of Variable Interest Entities* (FSP 46(R)-5), which provides guidance for a reporting enterprise on whether it holds an implicit variable interest in a variable interest entity (VIE) or potential VIE when specific conditions exist. FSP 46 (R)-5 became applicable for us in the quarter ended June 30, 2005. FSP 46(R) had no impact on our consolidated results of operations and financial condition as of December 31, 2005.

In March 2005, the FASB issued FASB interpretation No. 47 (FIN 47), *Accounting for Conditional Asset Retirement Obligations, an interpretation of FASB Statement No. 143* (FIN 47), which requires an entity to recognize a liability for the fair value of a conditional asset retirement obligation when incurred if the liability's fair value can be reasonably estimated. FIN 47 is effective for fiscal years ending after December 15, 2005. We have adopted FIN 47 in the current year, and the adoption of this standard did not have a material impact on our consolidated results of operations.

In May 2005, the FASB issued SFAS No. 154, *Accounting Changes and Error Corrections* (SFAS 154) that replaces Accounting Principles Board Opinions No. 20 *Accounting Changes* and SFAS No. 3, *Reporting Accounting Changes in Interim Financial Statements—An Amendment of APB Opinion No. 28*. SFAS 154

45



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANF8U-MWS-CX0P<br>8.8 | PAL jaslv0dc | 04-Mar-2007 22:26 EST | | 86507 TX 46 | 1* |
| FORM 10-K | | | PAL | | | HTMIFV | 1C |

provides guidance on the accounting for and reporting of accounting changes and error corrections. It establishes retrospective application, or the latest practicable date, as the required method for reporting a change in accounting principle and the reporting of a correction of an error. We have adopted this pronouncement as of January 1, 2006 for error corrections made on or after the date of adoption, and additional disclosures are included in note 3 of notes to the consolidated financial statements.

In November 2005, the FASB issued FSP FAS 115-1 and FAS 124-1, *The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments* (FSP 115-1), which provides guidance on determining when investments in certain debt and equity securities are considered impaired, whether that impairment is other-than-temporary, and on measuring such impairment loss. FSP 115-1 also includes accounting considerations subsequent to the recognition of an other-than temporary impairment and requires certain disclosures about unrealized losses that have not been recognized as other-than-temporary impairments. FSP 115-1 is required to be adopted by us in the first quarter of fiscal 2006, and such adoption is not anticipated to have a material effect on our consolidated financial statements.

In July 2006, the FASB issued FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes—an Interpretation of SFAS 109* (FIN 48). FIN 48 prescribes a comprehensive model for recognizing, measuring, presenting and disclosing in the financial statements tax positions taken or expected to be taken on a tax return, including a decision whether to file or not to file in a particular jurisdiction. FIN 48 is effective for us beginning in the first quarter of 2007. If there are changes in net assets as a result of application of FIN 48, these will be accounted for as an adjustment to retained earnings. We are currently assessing the impact of FIN 48 on our consolidated financial position and results of operations.

In July 2006, the FASB issued EITF Issue No. 06-3, *How Taxes Collected from Customers and Remitted to Governmental Authorities Should be Presented in the Income Statement (that is, Gross versus Net Presentation)* (EITF 06-3). The adoption of EITF 06-3 did not have an impact on our consolidated financial position and results of operations. Our accounting policy has been to present the above-mentioned taxes on a net basis, excluded from revenues.

In September 2006, the SEC issued Staff Accounting Bulletin No. 108 (SAB 108), which provides interpretive guidance on how the effects of the carryover or reversal of prior year misstatements should be considered in quantifying a current year misstatement. The guidance is applicable for our fiscal year 2007. We currently do not believe that the adoption of SAB 108 will have a material impact on our consolidated financial position and results of operation.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157, *Fair Value Measurements* (SFAS 157). SFAS 157 establishes a framework for measuring fair value and expands disclosures about fair value measurements. The changes to current practice resulting from the application of SFAS 157 relate to the definition of fair value, the methods used to measure fair value, and the expanded disclosures about fair value measurements. SFAS 157 is effective for fiscal years beginning after November 15, 2007 and interim periods within those fiscal years. We are currently in the process of evaluating the impact that the adoption of SFAS 157 will have on our consolidated financial position and results of operation.

In September 2006, the FASB issued SFAS No. 158, *Employers Accounting for Defined Benefit Pension and Other Postretirement Plans—an amendment of FASB Statements No. 87, 88, 106, and 132(R)*, (SFAS 158). SFAS 158 requires an employer to recognize the over-funded or under-funded status of a defined benefit postretirement plan (other than a multiemployer plan) as an asset or liability in its statement of financial position to recognize changes in that funded status in the year in which the changes occur through comprehensive income of a business entity or changes in unrestricted net assets of a not-for-profit organization. The provisions of SFAS 158 require an employer with publicly traded equity securities to recognize the funded status of a defined benefit postretirement plan and to provide the required disclosures as of the end of the fiscal year ending after December 15, 2006. We do not believe that the adoption of the provisions of SFAS No. 158 will materially impact our consolidated financial position and results of operation.

46