Case 1:04-cv-01371-JJF    Document 581-6    Filed 10/26/2007    Page 1 of 50



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 8.8 | PAL jaslv0dc | 04-Mar-2007 22:27 EST | | 86507 TX 47 | 1* |
|---|---|---|---|---|---|---|---|
| FORM 10-K | | ■ PAL | | | | HTM IFV | 1C |

## Selected Quarterly Results of Operations

The following tables set forth certain data from our consolidated statements of income for each of the quarters in the years ended December 31, 2005 and 2004 as well as the percentage of our net revenues represented by each item. This information has been derived from our restated unaudited consolidated financial statements. See note 12 and note 3, "Selected Quarterly Information" and "Restatement of Consolidated Financial Statements," respectively, of the notes to consolidated financial statements for information on our restatement. We will not be amending our previously filed Quarterly Reports on Form 10-Q; however, we are including in this Form 10-K comparative information reflecting the restatement for the three quarters ended March 31, June 30, and September 30, 2005, and the four quarters in the year ended December 31, 2004.

The unaudited quarterly consolidated financial statements have been prepared on the same basis as the audited consolidated financial statements contained herein and include all adjustments that we consider necessary for a fair presentation of such information when read in conjunction with our annual audited consolidated financial statements and notes thereto appearing elsewhere in this report. The operating results for any quarter are not necessarily indicative of the results for any subsequent period or for the entire fiscal year.

| | Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Dec. 31, 2005 | Sept. 30, 2005 | June 30, 2005 | Mar. 31, 2005 | Dec. 31, 2004 | Sept. 30, 2004 | June 30, 2004 | Mar. 31, 2004 |
| | | As Restated (1) | As Restated (1) | As Restated (1) | As Restated (1) | As Restated (1) | As Restated (1) | As Restated (1) |
| | (unaudited) | | | | | | | |
| | (in thousands, except per share data) | | | | | | | |
| Net revenues | $37,875 | $36,543 | $34,241 | $34,412 | $33,598 | $32,946 | $35,944 | $34,165 |
| Cost of revenues | 18,984 | 18,487 | 17,616 | 17,892 | 17,478 | 17,238 | 19,520 | 17,620 |
| Gross profit | 18,891 | 18,056 | 16,625 | 16,520 | 16,120 | 15,708 | 16,424 | 16,545 |
| Operating expenses: | | | | | | | | |
|   Research and development | 4,358 | 4,273 | 4,141 | 4,339 | 4,104 | 3,931 | 3,237 | 4,168 |
|   Sales and marketing | 5,125 | 4,573 | 4,403 | 4,213 | 4,014 | 3,634 | 3,992 | 4,430 |
|   General and administrative | 5,134 | 4,248 | 3,180 | 3,103 | 2,290 | 2,241 | 1,858 | 1,580 |
|     Total operating expenses | 14,617 | 13,094 | 11,724 | 11,655 | 10,408 | 9,806 | 9,087 | 10,178 |
| Income from operations | 4,274 | 4,962 | 4,901 | 4,865 | 5,712 | 5,902 | 7,337 | 6,367 |
| Total other income | 791 | 924 | 797 | 637 | 310 | 326 | 453 | 231 |
| Income before provision for income taxes | 5,065 | 5,886 | 5,698 | 5,502 | 6,022 | 6,228 | 7,790 | 6,598 |
| Provision for income taxes | 3,719 | 616 | 660 | 1,458 | 2,081 | 457 | 1,967 | 1,633 |
| Net income | $ 1,346 | $ 5,270 | $ 5,038 | $ 4,044 | $ 3,941 | $ 5,771 | $ 5,823 | $ 4,965 |
| Earnings per share | | | | | | | | |
|   Basic | $ 0.05 | $ 0.18 | $ 0.17 | $ 0.14 | $ 0.13 | $ 0.19 | $ 0.19 | $ 0.16 |
|   Diluted | $ 0.04 | $ 0.17 | $ 0.16 | $ 0.13 | $ 0.12 | $ 0.18 | $ 0.18 | $ 0.15 |
| Shares used in per share calculation | | | | | | | | |
|   Basic | 29,460 | 29,478 | 29,423 | 29,919 | 30,886 | 30,912 | 30,785 | 30,622 |
|   Diluted | 30,760 | 30,849 | 30,835 | 30,966 | 31,934 | 31,972 | 32,372 | 32,481 |



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX08 9.6 PAL jaslv0dc | 04-Mar-2007 22:27 EST | 86507 TX 48 | 1* |
|---|---|---|---|---|---|
| FORM 10-K | | ■ PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 |

|  | Percentage of Total Net Revenues | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | Dec. 31, 2005 | Sept. 30, 2005 As Restated (1) | June 30, 2005 As Restated (1) | Mar. 31, 2005 As Restated (1) | Dec. 31, 2004 As Restated (1) | Sept. 30, 2004 As Restated (1) | June 30, 2004 As Restated (1) | Mar. 31, 2004 As Restated (1) |
| Net revenues | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of revenues | 50.1 | 50.6 | 51.4 | 52.0 | 52.0 | 52.3 | 54.3 | 51.6 |
| Gross profit | 49.9 | 49.4 | 48.6 | 48.0 | 48.0 | 47.7 | 45.7 | 48.4 |
| Operating expenses: | | | | | | | | |
| Research and development | 11.5 | 11.7 | 12.1 | 12.6 | 12.2 | 12.0 | 9.0 | 12.2 |
| Sales and marketing | 13.5 | 12.5 | 12.9 | 12.3 | 12.0 | 11.0 | 11.1 | 13.0 |
| General and administrative | 13.6 | 11.6 | 9.3 | 9.0 | 6.8 | 6.8 | 5.2 | 4.6 |
| Total operating expenses | 38.6 | 35.8 | 34.3 | 33.9 | 31.0 | 29.8 | 25.3 | 29.8 |
| Income from operations | 11.3 | 13.6 | 14.3 | 14.1 | 17.0 | 17.9 | 20.4 | 18.6 |
| Total other income | 2.1 | 2.5 | 2.3 | 1.9 | 0.9 | 1.0 | 1.3 | 0.7 |
| Income before provision for income taxes | 13.4 | 16.1 | 16.6 | 16.0 | 17.9 | 18.9 | 21.7 | 19.3 |
| Provision for income taxes | 9.8 | 1.7 | 1.9 | 4.2 | 6.2 | 1.4 | 5.5 | 4.8 |
| Net income | 3.6% | 14.4% | 14.7% | 11.8% | 11.7% | 17.5% | 16.2% | 14.5% |

(1) See note 12 and note 3, "Selected Quarterly Information" and "Restatement of Consolidated Financial Statements," respectively, of the notes to consolidated financial statements for a detailed analysis of our quarterly comparisons and for information on our restatement.

**Comparison of the Three Months Ended March 31, 2005 and 2004**

*Net revenues.* Net revenues for the three months ended March 31, 2005 were $34.4 million, an increase of 0.7% compared to $34.2 million in the three months ended March 31, 2004. The increase was primarily the result of a change to our method of calculating deferred income on sales to distributors, which caused us to recognize $1.1 million dollars in previously deferred revenue during the three months ended March 31, 2005. The amount of deferred revenue was not material to any of the individual prior periods in which it was earned. The impact of this adjustment was largely offset by lower sales into the communications end market, primarily for cellphone chargers.

Our net revenue mix by product family and by the end markets that we serve are as follows:

Revenue mix by product family for the three months ended March 31, 2005 compared to the three months ended March 31, 2004:

| Product Family | Three Months Ended March 31, 2005 | Three Months Ended March 31, 2004 |
|---|---|---|
| TinySwitch-I and -II | 56% | 53% |
| TopSwitch-FX and -GX | 27% | 27% |
| TopSwitch-I and -II | 13% | 17% |
| LinkSwitch and DPA -Switch | 4% | 3% |

48

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 9.6 | PAL jaslv0dc | 04-Mar-2007 22:27 EST | | 86507 TX 49 | 1* |
| FORM 10-K | | | ■ PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 |

Approximate revenue mix by end markets served for the three months ended March 31, 2005 compared to the three months ended March 31, 2004:

| End Market | Three Months Ended March 31, 2005 | Three Months Ended March 31, 2004 |
|---|---|---|
| Consumer | 31% | 31% |
| Communication | 30% | 35% |
| Computer | 24% | 18% |
| Industrial | 9% | 10% |
| Other | 6% | 6% |

International revenues, which are based on "ship to" customer locations, were $32.2 million in the first quarter of 2005 compared to $31.4 million for the same period in 2004, an increase of approximately $800,000. International revenues in the first quarter of 2005 represented 94% of net revenues compared to 92% in the comparable period of 2004. Although the power supplies using our products are designed and distributed to end markets worldwide, most of these power supplies are manufactured in Asia. Sales to this region were 79% and 77% of our net revenues for the three months ended March 31, 2005 and 2004, respectively.

Net product revenues for the first quarter of 2005 were 58% from distributors and 42% from original equipment manufacturers (OEMs) and power supply merchants, compared to 56% to distributors and 44% to OEMs and power supply merchants for the first quarter of 2004. In the three months ended March 31, 2005, two separate customers, both of whom are distributors, accounted for approximately 19% and 16% of net revenues. In the three months ended March 31, 2004, the same two distributors accounted for approximately 22% and 15% of net revenues, and one other customer, an OEM, accounted for approximately 13% of net revenues.

Customer demand for our products can change quickly and unexpectedly. Our customers perceive that our products are readily available and typically order only for their short-term needs. Our revenue levels are highly dependent on the amount of new orders that are received for which product can be delivered by us within the same period. Orders that are booked and shipped within the same period are called "turns business". Because of the uncertainty of customer demand, and the short lead-time environment and high turns business, it is difficult to predict future levels of revenues and profitability.

*Gross profit.* Gross profit was $16.5 million, or 48.0% of net revenues, for the three months ended March 31, 2005, and $16.5 million, or 48.4% of net revenues, for the three months ended March 31, 2004. The impact of declining average selling prices was largely offset by reduced unit costs resulting from our implementation of an improved process technology and from lower test costs resulting from test-time improvements and the ongoing migration of our testing operations to overseas sub-contractors. During the three months ended March 31, 2005 we recognized $0.6 million in previously deferred costs and $0.4 million in previously deferred gross profit as a result of the change in our method for calculating deferred income on sales to distributors.

*Research and development expenses.* Research and development expenses for the first quarter of 2005 were $4.3 million, or 12.6% of net revenues, compared to $4.2 million, or 12.2% of net revenues, for the same period in 2004.

*Sales and marketing expenses.* Sales and marketing expenses were $4.2 million, or 12.3% of net revenues, for the first quarter of 2005, compared to $4.4 million, or 13.0% of net revenues for the same period in 2004.

*General and administrative expenses.* For the quarter ended March 31, 2005, general and administrative expenses were $3.1 million or 9.0%, of our net revenues, compared to $1.6 million, or 4.6% of net revenues for the same period in 2004. The increase was due primarily to increased professional services fees incurred in our

49

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 | PAL jaslv0dc | 04-Mar-2007 22:27 EST | | 86507 TX 50 | 1* |
| FORM 10-K | | PAL | | | HTM IFV | 1C |

efforts to comply with the requirements of the Sarbanes-Oxley Act, as well as legal fees related to our patent-infringement lawsuits against System General Corporation and Fairchild Semiconductor, and stock-based compensation expense due to the remeasurement of certain stock option awards for which variable accounting applies.

*Other income, net.* Other income, net, for the first quarter of 2005 was $0.6 million compared to $0.2 million for the same period in 2004. The increase of $406,000 was primarily from increased interest income due to higher interest rates. The weighted average interest rate for our investment portfolio in the three months ended March 31, 2005 was 2.82% compared to 1.41% for the same period in 2004.

*Provision for income taxes.* Provision for income taxes represents federal, state and foreign taxes. The provision for income taxes was $1.5 million for the quarter ended March 31, 2005 compared to $1.6 million for the quarter ended March 31, 2004. Our estimated effective tax rate used for the three months ended March 31, 2005 and 2004 was 26% and 25% respectively. The difference between the statutory rate of 35% and our effective tax rate for the quarter ended March 31, 2005 and 2004 was due primarily to the favorable effects of research and development tax credits and international revenues subject to lower tax rates.

### Liquidity and Capital Resources

As of March 31, 2005, we had approximately $122.7 million in cash, cash equivalents and short-term and long-term investments, a decrease of approximately $11.9 million from December 31, 2004. We had working capital, defined as current assets less current liabilities, of approximately $125.5 million, a decrease of approximately $1.9 million from December 31, 2004.

In addition, under a revolving line of credit with Union Bank of California, we can borrow up to $10.0 million. A portion of the credit line was used to cover advances for commercial letters of credit and standby letters of credit, which we provide to Matsushita, prior to the shipment of wafers to us. We also provide letters of credit to our workers compensation insurance carrier as part of our insurance program. As of March 31, 2005, there were outstanding letters of credit totaling approximately $2.3 million. The balance of this credit line was unused and available as of March 31, 2005. Refer to the year-over-year liquidity section of this MD&A for more information on our line of credit.

Our operating activities generated cash of $6.5 million and $4.6 million in the three months ended March 31, 2005 and 2004, respectively. Cash generated in the first three months of 2005 was principally the result of net income in the amount of $4.0 million, depreciation and amortization of $1.7 million, a decrease in accounts receivable, and prepaid expenses and other current assets of $2.0 million and $1.2 million respectively, partially offset by an increase in inventory of $1.4 million and a decrease in accounts payable of $1.2 million. Cash generated in the first three months of 2004 was principally the result of net income in the amount of $5.0 million, depreciation and amortization of $1.8 million, a decrease in inventory of $1.8 million, partially offset by an increase in accounts receivable of $3.1 million, taxes payable and other accrued liabilities of $1.4 million, and a decrease in accounts payable of $1.7 million.

Our investing activities for the three months ended March 31, 2005 generated cash of $7.8 million. Our investing activities consisted of net proceeds from maturities of investments of $8.5 million and purchases of property and equipment of $0.6 million. Our investing activities for the three months ended March 31, 2004 resulted in $6.9 million use of cash. Our investing activities consisted primarily of a $6.1 million net purchase of investments, and purchases of property and equipment of $0.8 million.

Our financing activities for the three months ended March 31, 2005 was a use of $17.8 million of cash, which included the use of $20.2 million for the repurchase of approximately 1.1 million shares of our common stock, and receipts of $2.5 million from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan. Our cash provided by financing activities in the three months ended March 31, 2004 was $4.4 million, which was primarily receipts from the issuance of common



stock through the exercise of stock options and purchases through our employee stock purchase plan of $4.4 million. On October 20, 2004, we announced that our board of directors had authorized the repurchase of up to $40.0 million of our common stock. From the inception of the stock repurchase program in 2004 to March 31, 2005, a total of 1,660,000 shares were repurchased for approximately $31.9 million. We repurchased approximately 1.1 million shares for approximately $20.2 million during the three months ended March 31, 2005.

**Comparison of the Three Months Ended June 30, 2005 and 2004**

*Net revenues.* Net revenues for the three months ended June 30, 2005 were $34.2 million, a decrease of 4.7% compared to $35.9 million for the three months ended June 30, 2004. The decrease was the result of lower revenues from the communications, consumer and computer markets, partially offset by higher revenues from the industrial market. Higher sales of our TinySwitch-II and TOPSwitch-GX products were more than offset by lower sales from legacy products such as TOPSwitch-I and -II.

Our results for the quarter ended June 30, 2005 have been restated to reflect an adjustment to our reserve for sales returns. This adjustment decreased net revenues by $1.1 million compared to the results previously reported; refer to note 12 of the notes to consolidated financial statements for a detailed analysis of our quarterly comparisons related to our restatement.

Revenue mix by product family for the three months ended June 30, 2005 compared to the three months ended June 30, 2004, was as follows:

| Product Family | Three Months Ended June 30, 2005 | Three Months Ended June 30, 2004 |
|---|---|---|
| TinySwitch-I and -II | 58% | 52% |
| TopSwitch-FX and -GX | 27% | 28% |
| TopSwitch-I and -II | 12% | 17% |
| LinkSwitch and DPA-Switch | 3% | 3% |

Approximate revenue mix by end markets served for the three months ended June 30, 2005 compared to the three months ended June 30, 2004, was as follows:

| End Market | Three Months Ended June 30, 2005 | Three Months Ended June 30, 2004 |
|---|---|---|
| Consumer | 32% | 34% |
| Communication | 30% | 31% |
| Computer | 21% | 21% |
| Industrial | 10% | 8% |
| Other | 7% | 6% |

International revenues were $32.5 million in the second quarter of 2005 compared to $33.2 million for the same period in 2004, a decrease of $0.7 million, or approximately 2%. International sales represented 94.9% of net revenues compared to 92.3% in the three months ended June 30, 2005 and 2004, respectively. Although the power supplies using our products are designed and distributed to end markets worldwide, most of these power supplies are manufactured in Asia. Sales to this region were 79% and 77% of our net revenues for the three months ended June 30, 2005 and 2004, respectively.

For the second quarter of 2005, sales to distributors accounted for 60.7% of net revenues, while sales to OEMs and power supply merchants accounted for 39.3%, compared to 55.0% to distributors and 45.0% to OEMs

51



| **POWER INTEGRATIONS,** | RR Donnelley ProFile | LANFBU-MWS-CXOPAL jaslv0dc | 04-Mar-2007 22:27 EST | 86507 TX 52 | 1* |
| **FORM 10-K** | | PAL | | HTM IFV | 1C |

Page 1 of 1

and power supply merchants for the second quarter of 2004. In the three months ended June 30, 2005, two separate customers, both of who are distributors, accounted for approximately 20.5% and 18.4% of net revenues. In the three months ended June 30, 2004, the same two distributors accounted for approximately 18.6% and 18.0% of net revenues, and one OEM customer accounted for approximately 11.4% of net revenues.

*Gross profit.* Gross profit was $16.6 million, or 48.6% of net revenues, for the three months ended June 30, 2005, compared to $16.4 million, or 45.7% of net revenues, for the three months ended June 30, 2004. The increase in our gross profit for the three months ended June 30, 2005 was driven primarily by our ability to reduce product costs, principally through price reductions from our foundries, improvements to our manufacturing process, and the increased use of overseas subcontractors for the testing of our ICs. Also, in the second quarter of 2004, our gross profit was reduced as a result of lower unit production in the previous quarter, a step taken by us in order to achieve a desired reduction in our inventories.

*Research and development expenses.* Research and development expenses for the quarter ended June 30, 2005 was $4.1 million, or 12.1% of net revenues, compared to $3.2 million, or 9.0% of net revenues, in the three months ended June 30, 2004. The increase was driven primarily by the remeasurement of our stock-based compensation expense, due to variable accounting for outstanding stock options, which was a negligible amount in the three months ended June 30, 2004 and totaled $0.3 million for the three months ended June 30, 2005.

*Sales and marketing expenses.* Sales and marketing expenses were $4.4 million, or 12.9% of net revenues, for the second quarter of 2005, compared to $4.0 million, or 11.1% of net revenues for the same period in 2004.

*General and administrative expenses.* General and administrative expenses were $3.2 million, or 9.3% of net revenues, for the three months ended June 30, 2005, and $1.9 million, or 5.2% of net revenues, for the three months ended June 30, 2004. The increase was driven primarily by increased audit fees related to our efforts to comply with the Sarbanes-Oxley Act, as well as a significant increase in legal fees due to our patent-infringement litigation against Fairchild Semiconductor and System General Corp. (as described in Part I, Item 3 Legal Proceedings).

*Other income, net.* Other income, net, was $0.8 million for the second quarter of 2005, compared to $0.5 million for the same period in 2004. The increase was due primarily to an increase in our weighted average interest rate, which was 3.17% for the three months ended June 30, 2005 compared to 1.34% for the same period in 2004.

*Provision for income taxes.* The provision for income taxes for the quarter ended June 30, 2005 and 2004 was $0.7 million and $2.0 million, respectively. The difference between the statutory rate of 35% and our effective tax rate for the three months ended June 30, 2005 and 2004 was due primarily to lower tax rates applied to international revenues and the favorable effects of research and development tax credits.

*Liquidity and Capital Resources*

As of June 30, 2005, we had approximately $124.2 million in cash, cash equivalents and short-term and long-term investments, a decrease of approximately $10.4 million from December 31, 2004. As of June 30, 2005, we had working capital, defined as current assets less current liabilities, of approximately $126.8 million, a decrease of approximately $0.6 million from December 31, 2004.

In addition, under a revolving line of credit with Union Bank of California, we can borrow up to $10.0 million. A portion of this credit line is used to cover advances for commercial letters of credit and standby letters of credit, which we provide to Matsushita, prior to the shipment of wafers to us, and also to our workers compensation insurance carrier as part of our insurance program. As of June 30, 2005, there were outstanding letters of credit totaling approximately $2.2 million. The balance of this credit line was unused and available as of June 30, 2005. Refer to the year-over-year liquidity section of this MD&A for more information on our line of credit.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LAN/PBU-MWS-CX09 9.6 | PAL jaslv0dc | 04-Mar-2007 22:27 EST | | 86507 TX 53 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

Our operating activities generated cash of $15.1 million in the six months ended June 31, 2005. Cash generated in the first six months of 2005 was principally the result of net income in the amount of $9.1 million, depreciation and amortization of $3.2 million, stock-based compensation expense of $1.7 million, and a decrease in inventory of $1.4 million, partially offset by a decrease in accounts payable of $1.8 million. Cash generated in the first six months of 2004 was principally the result of net income in the amount of $10.8 million, depreciation and amortization of $3.5 million, a decrease in inventory of $3.3 million, and the tax benefit associated with employee stock plans of $1.4 million, partially offset by an increase in accounts receivable of $3.1 million.

Our investing activities for the six months ended June 30, 2005 generated cash of $6.8 million. Our investing activities consisted of net proceeds from maturities of investments of $8.5 million, and purchases of property and equipment of $1.7 million. Our investing activities for the six months ended June 30, 2004 resulted in the $19.4 million use of cash. Our investing activities consisted primarily of a $16.7 million net purchase of investments, and purchases of property and equipment of $2.8 million. Our financing activities for the six months ended June 30, 2005 included the use of $28.3 million for the repurchase of approximately 1.4 million shares of our common stock, and net proceeds from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan of $4.5 million. In the six months ended June 30, 2004, our financing activities were primarily receipts from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan of $5.6 million.

On October 20, 2004, we announced that our board of directors had authorized the repurchase of up to $40.0 million of our common stock. The board of directors directed that the repurchases be made pursuant to Rule 10b5-1 of the Exchange Act. From inception of the stock repurchase program in October 2004 through June 30, 2005, we had repurchased 2,033,270 shares for approximately $40.0 million, the total amount authorized by our board of directors. We repurchased 373,270 shares for approximately $8.1 million during the three months ended June 30, 2005. The repurchase program has no expiration date, and may be suspended or discontinued at any time.

**Comparison of the Three Months Ended September 30, 2005 and 2004**

*Net revenues.* Net revenues for the three months ended September 30, 2005 were $36.5 million, an increase of 10.9% compared to $32.9 million for the three months ended September 30, 2004. The increase was driven primarily by increased sales of our products into the computer and industrial markets. Sales of our TinySwitch-II, TOPSwitch-GX and LinkSwitch products all contributed to the year-over-year growth in net revenues.

Revenue mix by product family for the three months ended September 30, 2005 compared to the three months ended September 30, 2004, was as follows:

| Product Family | Three Months Ended Sept 30, 2005 | Three Months Ended Sept 30, 2004 |
|---|---|---|
| TinySwitch-I and -II | 53% | 53% |
| TopSwitch-FX and -GX | 31% | 31% |
| TopSwitch-I and -II | 10% | 14% |
| LinkSwitch and DPA-Switch | 6% | 2% |

Approximate revenue mix by end markets served for the three months ended September 30, 2005 compared to the three months ended September 30, 2004, was as follows:

| End Market | Three Months Ended Sept 30, 2005 | Three Months Ended Sept 30, 2004 |
|---|---|---|
| Consumer | 31% | 34% |
| Communication | 28% | 30% |
| Computer | 23% | 22% |
| Industrial | 11% | 8% |
| Other | 7% | 6% |



International revenues were $34.0 million in the third quarter of 2005 compared to $30.1 million for the same period in 2004, an increase of $3.9 million, or 13%. International sales represented 93% of net revenues compared to 91% in the three months ended September 30, 2005 and 2004, respectively. International revenues for the three months ended September 30, 2005 increased due to increased sales into the computer and industrial markets.

Although the power supplies using our products are distributed to end markets worldwide, most of these power supplies are manufactured in Asia. Sales to this region were 77% and 73% of our revenues for the three months ended September 30, 2005 and 2004, respectively. We expect international revenues to continue to account for a large portion of our net revenues.

Net product revenues for the third quarter of 2005 were divided 61.3% to distributors and 38.7% to OEMs and power supply merchants, compared to 54.4% to distributors and 45.6% to OEMs and power supply merchants for the third quarter of 2004. In the three months ended September 30, 2005, two separate customers, both of who are distributors, accounted for approximately 19.3% and 18.1% of our net revenues, respectively. In the three months ended September 30, 2004, the same two distributors accounted for approximately 15.5% and 17.4% of our net revenues, respectively. No other customers accounted for 10% or more of our net revenues in that period.

*Gross profit.* Gross profit is equal to net revenues less cost of revenues. Our cost of revenues consists primarily of costs associated with the purchase of wafers from our foundries (Matsushita, OKI and ZMD), the assembly and packaging of our products by sub-contractors, internal labor and overhead costs associated with the testing of both wafers and packaged components and testing of packaged components by sub-contractors. Gross profit was $18.1 million, or 49.4% of net revenues, for the three months ended September 30, 2005, compared to $15.7 million, or 47.7% of net revenues, for the three months ended September 30, 2004. The increase in gross profit percentage for the three months ended September 30, 2005 was driven primarily by our ability to reduce product costs, principally through price reductions from our foundries, improvements to our manufacturing process, and the increased use of overseas subcontractors for the testing of our ICs.

*Research and development expenses.* Research and development expenses for the third quarter of 2005 and 2004 were $4.3 million and $3.9 million, respectively. The third quarter of 2004 was lower than the same period in 2005 due to the reversal of a payroll tax liability, related to our restatement, for which the statute of limitations had expired.

*Sales and marketing expenses.* Sales and marketing expenses were $4.6 million, or 12.5% of net revenues, for the third quarter of 2005, compared to $3.6 million, or 11.0% of net revenues for the same period in 2004. In absolute dollars, sales and marketing expenses increased from the same period in 2004, primarily as a result of expanding our worldwide sales and applications engineering staff.

*General and administrative expenses.* For the quarters ended September 30, 2005 and 2004, general and administrative expenses were $4.2 million and $2.2 million, respectively, which represented 11.6% and 6.8% of our net revenues, respectively. The increase was due to higher legal fees driven by our patent-infringement litigation against Fairchild Semiconductor and System General Corp and due to increased fees for consulting and audit services related to compliance with the requirements of the Sarbanes-Oxley Act.

*Other income, net.* Other income, net, for the third quarter of 2005 was $0.9 million compared to $0.3 million for the same period in 2004. The increase in other income can be attributed to higher interest rates year-over-year.

*Provision for income taxes.* Our effective tax rate for the nine months ended September 30, 2005 was 16%. The decrease in the estimated effective tax rate for 2005 from approximately 19% through June 30, 2005 resulted in an effective tax rate of 10% for the three months ended September 30, 2005, due primarily to lower tax rates applied to international sales and the favorable effects of research and development tax credits. The tax provision

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 8.6 | PAL jashv0dc | 04-Mar-2007 22:27 EST | 86507 TX 55 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

for the three months ended September 30, 2004 was calculated using an annual effective income tax rate of 20%, which was adjusted for the favorable conclusion of certain tax contingencies in the third quarter of 2004, resulting in an effective tax rate of approximately 7% for the three-month period.

### Liquidity and Capital Resources

As of September 30, 2005, we had approximately $121.8 million in cash, cash equivalents and short-term and long-term investments, a decrease of approximately $12.7 million from December 31, 2004. As of September 30, 2005, we had working capital, defined as current assets less current liabilities, of approximately $127.4 million, which was flat when compared to December 31, 2004.

In addition, under a revolving line of credit with Union Bank of California, we can borrow up to $10.0 million. A portion of the credit line is used to cover advances for commercial letters of credit and standby letters of credit, which we provide to Matsushita, prior to the shipment of wafers by this foundry to us, and also to our workers compensation insurance carrier as part of our insurance program. As of September 30, 2005, there were outstanding letters of credit totaling approximately $2.1 million. The balance of this credit line was unused and available as of September 30, 2005. Refer to the year-over-year liquidity section of this MD&A for more information on our line of credit.

Our operating activities generated cash of $22.3 million in the nine months ended September 30, 2005. Cash generated in the first nine months of 2005 was principally the result of net income in the amount of $14.4 million depreciation and amortization of $4.7 million, and a decrease in inventory of $3.2 million, and stock-based compensation expense of $2.3 million, partially offset by an increase in accounts receivable of $2.4 million and a decrease in accounts payable of $1.9 million. Cash generated in the first nine months of 2004 was principally the result of net income in the amount of $16.6 million plus depreciation and amortization of $5.2 million, and an income tax benefit associated with our employee stock plan of $1.4 million.

Our investing activities for the nine months ended September 30, 2005 resulted in a $9.2 million use of cash, which was driven primarily by the issuance of a $10.0 million promissory note to a supplier (see note 11 of our consolidated financial statements), purchases of property and equipment totaling $2.6 million and the acquisition of technology for $1.1 million. These uses of cash were offset in part by net proceeds of $4.5 million from short-term and long-term investments. Investing activities for the nine months ended September 30, 2004, resulted in a $31.3 million use of cash, driven primarily by net purchases of investments of $26.8 million and purchases of property and equipment totaling $4.1 million.

Our financing activities for the nine months ended September 30, 2005 included the use of $28.3 million for the repurchase of approximately 1.4 million shares of our common stock, offset by net proceeds from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan of $7.0 million. In the nine months ended September 30, 2004, our financing activities were primarily receipts from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan of $7.9 million.

### Comparison of the Three Months Ended December 31, 2005 and 2004

*Net revenues.* Net revenues for the three months ended December 31, 2005 totaled $37.9 million, an increase of 13% from the same quarter of the prior year. Revenue growth was driven primarily by increased sales of our products to customers in the industrial and communications end markets.

*Sales and marketing expenses.* Sales and marketing expenses for the three months ended December 31, 2005 increased when compared to all prior quarters in 2005 and 2004. Sales and Marketing expenses increased due primarily to increased stock-based compensation expenses.



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 5.8 | PAL jaslv0dc | 04-Mar-2007 22:28 EST | 86507 TX 56 | 1* |
| FORM 10-K | | ■ PAL | | | HTM IFV | 1C |

Page 1 of 1

*General and administrative expenses.* General and administrative expenses for the quarter ended December 30, 2005 increased when compared to all prior quarters in 2005 and 2004. The increase was due to higher legal fees driven by our patent-infringement litigation against Fairchild Semiconductor and System General Corp, and due to stock-based compensation expenses.

*Provision for income taxes.* Provision for income taxes in the quarter ended December 31, 2005 increased 155% when compared to the same quarter of the prior year. The increase in income tax related primarily to a change in our estimates of historical profitability in foreign jurisdictions.

### Item 7A. Quantitative and Qualitative Disclosures About Market Risk.

*Interest Rate Risk.* Our exposure to market risk for changes in interest rates relate primarily to our investment portfolio. We consider cash invested in highly liquid financial instruments with a remaining maturity of three months or less at date of purchase to be cash equivalents. Investments in highly liquid financial instruments with maturities greater than three months but not longer than twelve months from the balance sheet date are classified as short-term investments. Investments in highly liquid financial instruments with maturities greater than twelve months from the balance sheet date are classified as long-term investments. We do not use derivative financial instruments in our investment portfolio to manage our interest rate risk, foreign currency risk, or for any other purpose. We invest in high-credit quality issuers and, by policy, limit the amount of credit exposure to any one issuer. As stated in our policy, we ensure the safety and preservation of our invested principal funds by limiting default risk, market risk and reinvestment risk. We mitigate default risk by investing in safe and high-credit quality securities and by constantly positioning our portfolio to respond appropriately to a significant reduction in a credit rating of any investment issuer, guarantor or depository. The portfolio includes only marketable securities with active secondary or resale markets to ensure portfolio liquidity. We do not hold any instruments for trading purposes. At December 31, 2005 we held primarily cash equivalents and short-term investments, with maturity dates of less than twelve months, and fixed interest rates. In the year ended December 31, 2004, we held cash equivalents, short-term investments and long-term investments. Our investments in 2004 has similar characteristics to the investments held at the end of the current year, and differed primarily as a result of our classification of auction rate securities as long-term in 2004. Auction rate securities usually have interest rate resets of less than 90 days, but for which the underlying maturity date is longer than 90 days. We held no auction rate securities at December 31, 2005.

56



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 8.8 | PAL jash0dc | 04-Mar-2007 22:28 EST | 86507 TX 57 | 1* |
| FORM 10-K | | ■ PAL | | | HTM IFV | 1C |

Page 1 of 1

The table below presents the carrying value and related weighted average interest rates for our investment portfolio at December 31, 2005 and 2004. Carrying value approximates fair market value at December 31, 2005 and 2004 (in thousands, except weighted average interest rates).

| | December 31, 2005 | | December 31, 2004 | |
| | Carrying Value | Weighted Average Interest Rate | Carrying Value As restated | Weighted Average Interest Rate As restated |
|---|---|---|---|---|
| Investment Securities Classified as Cash Equivalents: | | | | |
| Taxable securities | $ 86,037 | 4.37% | $ 89,408 | 2.42% |
| Tax exempt securities | 6 | 0.00% | — | 0.00% |
| Total | 86,043 | 4.37% | 89,408 | 2.42% |
| Investment Securities Classified as Short-term Investments: | | | | |
| U.S. government securities | 14,530 | 3.11% | 1,000 | 1.24% |
| U.S. corporate securities | 1,670 | 2.28% | 249 | 1.91% |
| Total | 16,200 | 3.03% | 1,249 | 1.37% |
| Investment Securities Classified as Long-term Investments: | | | | |
| U.S. corporate securities | — | — | 6,421 | 2.40% |
| U.S. government securities | 4,422 | 3.91% | 19,490 | 2.20% |
| Total | 4,422 | 3.91% | 25,911 | 2.35% |
| Total investment securities | $106,665 | 4.15% | $116,568 | 2.39% |

These securities are subject to market interest rate risk and will vary in value as market interest rates fluctuate. To minimize market risk as of December 31, 2005, our investments subject to market risk mature in less than one year, and therefore if market interest rates were to increase or decline by 10% from interest rates as of December 31, 2005, the increase or decline in the fair market value of our portfolio would not be material.

*Foreign Currency Exchange Risk.* We transact business in various foreign countries. Our primary foreign currency cash flows are in Asia and Western Europe. Currently, we do not employ a foreign currency hedge program utilizing foreign currency forward exchange contracts; however, the contract prices to purchase wafers from Matsushita and OKI are denominated in Japanese yen and both agreements allow for mutual sharing of the impact of the exchange rate fluctuation between Japanese yen and the U.S. dollar. Nevertheless, changes in the exchange rate between the U.S. dollar and the Japanese yen subject our gross profit and operating results to the potential for material fluctuations. We maintain a Japanese yen account with a U.S. bank for payments to our wafer suppliers in Japan.

**Item 8. Financial Statements and Supplementary Data.**

The Financial Statements and Supplementary Data required by this item are set forth at the pages indicated at Item 15(a).

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure.**

On June 16, 2005, we dismissed KPMG LLP as our independent registered public accountants. The decision to dismiss KPMG LLP was approved by the audit committee of our board of directors. On the same day, we engaged Deloitte & Touche LLP as independent registered public accountants to audit our financial statements. The decision to engage Deloitte & Touche LLP was approved by the audit committee of our board of directors. We did not, nor did anyone on our behalf, consult Deloitte & Touche LLP during our two most recent fiscal years and during the subsequent interim period prior to our engagement of Deloitte & Touche LLP regarding the



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX08 5.8 | PAL jashl0dc | 04-Mar-2007 22:28 EST | 86507 TX 58 | 1* |
| FORM 10-K | | ■ | PAL | | HTM IFV | 1C |

Page 1 of 1

application of accounting principles to a specified transaction (completed or proposed), the type of audit opinion that might be rendered on our financial statements, any matter being the subject of disagreement or "reportable event" or any other matter described in Item 304(a)(2) of Regulation S-K.

During the two fiscal years ended December 31, 2004, and the subsequent interim period through June 16, 2005, there were: (1) no disagreements with KPMG on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedures, which disagreements if not resolved to their satisfaction would have caused them to make reference in connection with their opinion to the subject matter of the disagreement, and (2) no reportable events. The audit reports of KPMG on the consolidated financial statements of Power Integrations, Inc. and subsidiaries as of and for the years ended December 31, 2004 and 2003 did not contain an adverse opinion or disclaimer of opinion, and were not qualified or modified as to uncertainty, audit scope or accounting principles. The audit report of KPMG on management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting as of December 31, 2004 did not contain an adverse opinion or disclaimer of opinion, and was not qualified or modified as to uncertainty, audit scope or accounting principles. For a further discussion on this matter, see our Form 8-K filed with the SEC on June 22, 2005.

## Item 9A. Controls and Procedures.

### Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15 (e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Disclosure controls and procedures under the Exchange Act mean the controls and other procedures that are designed to provide reasonable assurance that the information required to be disclosed by Power Integrations, Inc. ("Power Integrations") in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time period specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to provide reasonable assurance that information required to be disclosed by Power Integrations in the reports that it files or submits under the Exchange Act is accumulated and communicated to Power Integrations' management, including its chief executive officer and chief financial officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

Based on this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were not effective as of December 31, 2005, as a result of a material weakness that existed in our internal control over financial reporting as discussed below.

### Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f) and 15d-15(f). Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

It should be noted that any control system, no matter how well designed and operated, can provide only reasonable assurance to the tested objectives. The design of any control system is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote. The inherent limitations in any control system include the realities that judgments related to decision-making can be faulty, and that reduced effectiveness in controls can occur because of simple errors or mistakes. Due to the inherent limitations in a cost-effective control system, misstatements due to error may occur and may not be detected.

58



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 9.8 | PAL jaslv0dc | 04-Mar-2007 22:28 EST | 86507 TX 59 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

Based on our evaluation under the framework in *Internal Control—Integrated Framework*, our Chief Executive Officer and Chief Financial Officer concluded that our internal control over financial reporting was not effective as of December 31, 2005. A material weakness (described in the following paragraph) existed in our internal control over financial reporting, and therefore our internal control over financial reporting was not operating effectively as of such date, for the reasons discussed below. A material weakness is defined as a control deficiency, or combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

As of December 31, 2005, we did not have sufficient controls and procedures in place to prevent or detect a material misstatement in the consolidated financial statements and related disclosures from the application of Accounting Principles Board Opinion (APB) No. 25 *Accounting for Stock Issued to Employees* ("APB 25") and Financial Accounting Standard 123, *Accounting for Stock-Based Compensation*, as amended ("SFAS 123").

Specifically, in the course of our investigation of our stock option granting practices we determined that our controls were not adequate in ensuring that our stock option grants had a correctly recorded grant date, the first date on which the number of shares that an individual employee was entitled to receive and the exercise price were both known with finality. This included not having sufficient controls in place to ensure that option grants received the required corporate approvals. Moreover, we did not have sufficient controls in place to properly account for stock option grants that had modifications in key terms. This lack of internal controls and procedures led to an incorrect application of APB 25, which provides that compensation expense relative to our employee stock options should be measured based on the intrinsic value of stock options granted. We concluded that original measurement dates on certain stock option grants could not be relied upon for accounting purposes and that the appropriate charges for such stock option grants and for stock option grants where key terms were potentially modified had not been properly recorded. As a result we did not correctly account for stock-based compensation expense for certain stock option grants in our previously-issued consolidated financial statements. In connection with errors that resulted from this material weakness, we have recorded non-cash charges for stock-based compensation and the related payroll and income tax effects in prior periods, and we have restated our historical consolidated financial statements for each of the fiscal years ended 1998 through 2004, for each of the first three quarters of the year ended December 31, 2005, and for each of the four quarters of the year ended December 31, 2004. Additionally, subsequent to the filing of our Annual report on Form 10-K for the year ended December 31, 2004, we determined that, due to errors, certain changes in the assumptions used to calculate pro forma net income, and footnote disclosures under the provisions of SFAS 123 were required. Accordingly, we determined that our controls were not adequate to ensure that the assumptions were accurate. Those changes have been made and the resulting impact on our pro forma net income and footnote disclosures have been reflected in our consolidated financial statements as part of our restatement.

Our management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2005 has been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report which is included herein.

**Change in Internal Control Over Financial Reporting**

There has been no change in our internal control over financial reporting during the quarter ended December 31, 2005 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting; however, subsequent to December 31, 2005, we have taken several steps to strengthen our disclosure controls and procedures and internal control over financial reporting. These subsequent steps were taken to strengthen our processes related to granting stock options. Specifically, we have implemented the following internal control improvements:

- Improvements in disclosure controls and internal control over financial reporting

  - We held internal training sessions with our executives, finance, and human resources personnel to roll out the revised stock option granting policy and increase competency levels related to stock option granting.

59



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0<br>5.8 PAL jaslv0dc | 04-Mar-2007 22:28 EST | 86507 TX 60 | 1* |
| FORM 10-K | | ■ PAL | | HTM IFV | 1C |
| | | | | Page 1 of 1 | |

- Improvements in our stock option granting process and related controls to ensure our stock option grants have a correctly recorded grant date, the first day on which the number of shares and exercise price are known with finality

  - Our compensation committee refined and limited delegation of authority to a subcommittee to grant stock options, and eliminated the use of written consents by the compensation committee for the purpose of granting options to help avoid issues regarding timing of receipt of written consents.

  - We now require that all evergreen, new hire, promotional and retention stock options be granted either (i) by our stock option committee on a predetermined schedule, (ii) by our board of directors or (iii) at a meeting of our compensation committee.

  - In addition, all stock option grants to the executive staff must be made by the board of directors or our compensation committee.

  - We worked with our attorneys and board of directors to review and update our stock option granting policy, which included requirements for the timing of the authorization, pricing and vesting of stock option grants. In addition, we worked with a cross functional team including finance, human resources, and our external legal counsel to implement controls related to the revised stock option granting policy. This included the timing of the authorization, pricing and vesting of stock option grants.

Management is in the process of remediating this material weakness, and has taken steps to help ensure that all individuals involved in administering the process are now aware of the revised controls. Although these design changes have been implemented, management has not had the opportunity to evaluate the operating effectiveness of these revised controls.

60

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX03 5.6 | PAL jaslv0dc | 04-Mar-2007 22:28 EST | | 86507 TX 61 | 1* |
| FORM 10-K | | PAL | | | | HTM IFV | 1C |

Page 1 of 1

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of Power Integrations, Inc.:

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that Power Integrations, Inc. and subsidiaries (collectively the "Company") did not maintain effective internal control over financial reporting as of December 31, 2005, because of the effect of the material weakness identified in management's assessment, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The following material weakness has been identified and included in management's assessment: as of December 31, 2005, the Company did not have sufficient controls and procedures in place to prevent or detect a material misstatement in the consolidated financial statements and related disclosures from the application of Accounting Principles Board Opinion No. 25, "*Accounting for Stock Issued to Employees*" ("APB 25") and Statement of Financial Accounting Standards No. 123 "*Accounting for Stock-Based Compensation*", as amended ("SFAS 123"). These design deficiencies led to the incorrect application of APB 25 and SFAS 123 and resulted in material misstatements to the Company's consolidated financial statements which required correction. This material weakness was considered in determining the nature, timing, and extent of audit

61



| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUDSK141049 9.6.18 | PAL garcm0pa | 06-Mar-2007 13:36 EST | | 86507 TX 62 | 2* |
| FORM 10-K | | | PAL | | | HTM PMT | 1C |
| | | | | | | Page 1 of 1 | |

tests applied in our audit of the consolidated financial statements and consolidated financial statement schedule as of and for the year ended December 31, 2005, of the Company and this report does not affect our report on such consolidated financial statements and consolidated financial statement schedule.

In our opinion, management's assessment that the Company did not maintain effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also in our opinion, because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2005, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and consolidated financial statement schedule as of and for the year ended December 31, 2005, of the Company and our report dated March 6, 2007, expressed an unqualified opinion on those consolidated financial statements and consolidated financial statement schedule.

*/s/ DELOITTE & TOUCHE LLP*

San Jose, California
March 6, 2007

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 | PAL jaslv0dc | 04-Mar-2007 22:28 EST | | 86507 TX 63 | 1* |
| FORM 10-K | | PAL | | | | HTM IFV | 1C |

Page 1 of 1

## Item 9B. Other Information.

Outside Director Stock Options

The Power Integrations, Inc. 1997 Outside Directors Stock Option Plan (the "Plan") provides for the automatic grant of stock options to Power Integrations' outside directors, such that the grants require no independent action of the Board or any committee of the Board. The Plan provides that each outside director is granted a stock option to purchase 30,000 shares of Power Integrations common stock upon appointment as a member of the Board, and that each outside director is granted a stock option to purchase 10,000 shares of Power Integrations common stock at each anniversary of the date of appointment or, in the case of outside directors appointed prior to Power Integrations' initial public offering on December 12, 1997, the anniversary date of the initial public offering. The exercise price of each stock option grant is the fair market value of a share of common stock on the date of grant.

Power Integrations has determined that, as a result of administrative errors, certain grants under the Plan (referred to as the "Misdocumented Grants") to three of its outside directors, Messrs. Alan Bickell, Nicholas Brathwaite and Scott Brown, were documented as having been made on dates other than as set forth in the Plan. In nearly every case, the Misdocumented Grants were documented as having been made on the anniversary date of the initial public offering rather than the anniversary date of the appointment of each of the three directors, each of whom was appointed after the initial public offering. As a result in the error in the grant date, the erroneous documentation of these grants reflects higher exercise prices for eight of the affected grants, and lower exercise prices for the eight other affected grants, than the correct exercise price of the grants made pursuant to the terms of the Plan. Because the grants made under the Plan are automatic, Power Integrations has corrected the administrative errors in these documents so that they reflect the correct date of grant and the correct exercise price of the options as automatically granted pursuant to the Plan.

Although these corrections simply ensure that the documentation of these option grants now accurately reflect the terms of the Plan, each of Messrs. Bickell, Brathwaite and Brown believe it is important that they not be in a better position, or be perceived to be in a better position, as a result of the administrative errors or corrections. As a result, each of these directors agreed to amend the exercise price of those grants in which the corrected exercise price was lower than the exercise price as reflected in the erroneous documentation, so that, after the amendments to the options, each of the grants has an exercise price equal to the greater of the exercise price in the erroneous documentation and the corrected exercise price. Specifically, on February 20, 2007, each of Messrs. Bickell, Brathwaite and Brown entered into an option amendment increasing the exercise prices of the following options:

| Director | Date of Option | Number of Shares | Exercise Price in Erroneous Documentation | Correct Exercise Price | Amended Exercise Price |
|---|---|---|---|---|---|
| Alan Bickell | April 21, 2000 | 10,000 | $ 43.875 | $21.375 | $43.875 |
| | April 21, 2002 | 10,000 | $ 24.590 | $19.200 | $24.590 |
| | April 21, 2004 | 10,000 | $ 33.850 | $31.700 | $33.850 |
| Nicholas Brathwaite | January 31, 2002 | 10,000 | $ 24.590 | $18.100 | $24.590 |
| | January 31, 2004 | 10,000 | $ 33.850 | $29.500 | $33.850 |
| Scott Brown | July 15, 2000 | 10,000 | $ 43.875 | $24.500 | $43.875 |
| | July 15, 2002 | 10,000 | $ 24.590 | $17.790 | $24.590 |
| | July 15, 2004 | 10,000 | $ 33.850 | $22.740 | $33.850 |

In addition, on February 20, 2007, each of Messrs. Bickell, Brathwaite and Brown executed an Acknowledgement and Waiver confirming that the original documentation relating to the Misdocumented Grants has been superseded by the corrected agreements and amendments described above.

Only one of the directors who received Misdocumented Grants, Mr. Brathwaite, has exercised any of these grants. Mr. Brathwaite has delivered to Power Integrations the difference between: (a) the total exercise price, as corrected, of the Misdocumented Grants he exercised; and (b) the total exercise price reflected in the erroneous documentation, which he had previously paid to Power Integrations. The total amount of Mr. Brathwaite's additional payment to the Power Integrations was $78,290.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX02 9.8 | PAL jaslv0dc | 04-Mar-2007 22:28 EST | | 86507 TX 64 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |
| | | | | | | | Page 1 of 1 |

# PART III

**Item 10. Directors and Executive Officers of Power Integrations.**

The information required by this Item related to our executive officers is incorporated by reference to information set forth in Part I, Item 1 of this report under the heading "Executive Officers of the Registrant." As of January 1, 2007, our board of directors was as follows:

| Name | Position With Power Integrations | Director Since | Age |
|------|----------------------------------|----------------|-----|
| Alan D. Bickell(1)(2) | Director | 1999 | 70 |
| Balakrishnan S. Iyer(2)(3)(4) | Director | 2004 | 50 |
| R. Scott Brown(1) | Director | 1999 | 65 |
| Dr. James Fiebiger(3)(4) | Director | 2006 | 65 |
| Steven J. Sharp(3) | Director and Chairman of the Board | 1988 | 65 |
| Balu Balakrishnan | Director, President and Chief Executive Officer | 2002 | 52 |
| Nicholas E. Brathwaite(3) | Director | 2000 | 48 |
| E. Floyd Kvamme(1)(2) | Director | 1989 | 69 |

(1)  Member of the compensation committee
(2)  Member of the audit committee
(3)  Member of the nominating and corporate governance committee
(4)  Member of the special committee

*Alan D. Bickell* has served as a member of the board of directors since April 1999. Mr. Bickell spent more than 30 years with Hewlett-Packard Company, a computer-hardware company, serving as corporate senior vice president and managing director of geographic operations from 1992 until his retirement in 1996. Mr. Bickell is a member of the Board of Trustees of Menlo College and serves on the board of directors of the Peking University Educational Foundation (USA).

*Balakrishnan S. Iyer* has served as a member of the board of directors since February 2004. From October 1998 to June 2003, Mr. Iyer served as senior vice president and chief financial officer for Conexant Systems, Inc., a designer, developer and seller of semiconductor systems solutions for communications applications. From January 1997 to September 1998, Mr. Iyer served as senior vice president and chief financial officer for VLSI Technology, Inc., a semiconductor company. Mr. Iyer also serves on the board of directors of Conexant Systems, Inc., a semiconductor system solutions company, Invitrogen Corporation, a life science technology company, Qlogic Corporation, a storage networking solutions company, Skyworks Solutions, Inc., a wireless semiconductor company, and IHS Inc., a global provider of technical information, decision-support tools and related services.

*R. Scott Brown* has served as member of the board of directors since July 1999. Mr. Brown has been retired since May 1, 1999. From 1985 to May 1999, Mr. Brown served as senior vice president of worldwide sales and support for Xilinx, Inc., a designer and developer of complete programmable logic solutions for use by electronic equipment manufacturers.

*Dr. James Fiebiger* became a member of the board of directors in March 2006. Dr. Fiebiger is currently a consultant to the semiconductor and the electronic design automation industries. From December 1999 to October 2004, he served as chairman and chief executive officer of Lovoltech Inc., a fabless semiconductor company. Dr. Fiebiger served as vice chairman of GateField Corporation, a fabless semiconductor company, from February 1999 until the company was sold to Actel Corporation in November 2000. He served as GateField Corporation's president and chief executive officer from June 1996 until February 1999. From October 1993 to June 1996, he was chairman and managing director of Thunderbird Technologies, Inc., a semiconductor technology licensing company. From December 1987 to September 1993 he was president and chief operating officer at VLSI Technology, Inc., a semiconductor company. From August 1981 to August 1985 he was senior corporate vice president and assistant general manager of Motorola, Inc. Semiconductor Products Sector, the



| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152159 9.6.18 | PAL soeus0pa | 05-Mar-2007 19:24 EST | | 86507 TX 65 | 2* |
|---|---|---|---|---|---|---|---|
| FORM 10-K | | ■ | PAL | | | HTM PMT | 1C |

Page 1 of 1

semiconductor business of Motorola, a wireless and broadband communications company. Dr. Fiebiger is a member of the board of directors of Qlogic Corporation, an electronics company, Mentor Graphics Corporation, an electronic design automation company, Actel Corporation, a semiconductor company, and Pixelworks, Inc., a fabless semiconductor company.

*Steven J. Sharp* has served as a member of the board of directors since our inception in 1988, and was elected non-executive chairman of the board in May 2006. Mr. Sharp has served as chairman of the board of directors of TriQuint Semiconductor, Inc., a manufacturer of electronic components for the communications industry, since 1992. He joined TriQuint Semiconductor, Inc. as president, chief executive officer and director in September 1991. Mr. Sharp served as president and chief executive officer of TriQuint Semiconductor, Inc. until July 2002. Prior to TriQuint Semiconductor, Inc., Mr. Sharp was associated with various venture capital and startup semiconductor firms. He helped start Crystal Semiconductor (now Cirrus Logic, Inc.), Gazelle Microcircuits, Inc. (now TriQuint Semiconductor, Inc.), Megatest Corporation (now Teradyne, Inc.) and Volterra Semiconductor Corporation. He also founded Silicon Architects (now Synopsys, Inc.). Mr. Sharp also serves on the boards of several private companies and charitable organizations.

*Balu Balakrishnan* has served as president and chief executive officer and as a director of Power Integrations since January 2002. He served as president and chief operating officer from April 2001 to January 2002. From January 2000 to April 2001, he was vice president of engineering and strategic marketing. From September 1997 to January 2000, he was vice president of engineering and new business development. From September 1994 to September 1997, Mr. Balakrishnan served as vice president of engineering and marketing.

*Nicholas E. Brathwaite* has served as a member of the board of directors since January 2000. Mr. Brathwaite has served as chief technology officer of Flextronics International Ltd., an electronics company, since 2000. In 1995 Flextronics International Ltd. acquired nChip, Inc., a multi-chip module company, where Mr. Brathwaite held the position of vice president and general manager of operations from 1992 to 1996. As a founding member of nChip, Inc., Mr. Brathwaite was responsible for all manufacturing and operational activities including wafer fabrication, wafer test, and module assembly. Before joining nChip, Inc., Mr. Brathwaite spent six years with Intel Corporation, a microprocessor company, in various engineering management positions in technology development and manufacturing. He is also a member of the board of directors of Photon Dynamics, Inc., a yield management solutions company for the flat panel display market.

*E. Floyd Kvamme* has served as a member of the board of directors since September 1989. Mr. Kvamme is partner emeritus of Kleiner Perkins Caufield & Byers, a venture capital company. Mr. Kvamme also serves on the boards of National Semiconductor Corporation, a semiconductor company, Harmonic Inc., a broadband optical networking and digital video systems company, and two private companies.

The board of directors has determined that, other than Balu Balakrishnan, our president and chief executive officer, each member of the board of directors is an "independent director" as defined in the listing standards for The NASDAQ Stock Market, Inc. and applicable SEC rules.

### Audit Committee

Since April 19, 2004, the members of the audit committee of the board of directors have been Alan D. Bickell, Balakrishnan S. Iyer and E. Floyd Kvamme. Each member of the audit committee is "independent" for purposes of The NASDAQ Stock Market, Inc. and SEC rules as they apply to audit committee members. The board of directors has determined that Mr. Alan D. Bickell is an audit committee financial expert, as defined in the SEC rules.

### Policy on Stockholder Recommendations of Directors Nominees

The nominating and corporate governance committee will consider director candidates recommended by stockholders. The nominating and corporate governance committee does not intend to alter the manner in which it evaluates candidates based on whether the candidate was recommended by a stockholder or not.



Stockholders who wish to recommend individuals for consideration by the nominating and corporate governance committee to become nominees for election to the Board may do so by delivering a written recommendation to the nominating and corporate governance committee at the following address: 5245 Hellyer Avenue, San Jose, CA 95038 by January 1 of the year in which such director is to be elected. Submissions must include the full name of the proposed nominee, a description of the proposed nominee's business experience for at least the previous five years, complete biographical information, a description of the proposed nominee's qualifications as a director and a representation that the nominating stockholder is a beneficial or record owner of our stock. Any such submission must be accompanied by the written consent of the proposed nominee to be named as a nominee and to serve as a director if elected.

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934 requires our executive officers, directors and persons who beneficially own more than 10% of our common stock to file initial reports of ownership and reports of changes in ownership with the SEC. These persons are required by SEC regulations to furnish us with copies of all Section 16(a) forms that they file.

Based solely on review of the forms furnished to us, we believe that all filing requirements applicable to the executive officers, directors and persons who beneficially own more than 10% of our common stock were complied with in 2005, except as follows: one report covering one transaction by Mr. Balakrishnan was filed late, and one report was filed late with an error in it by Mr. Brown, and the error was later corrected.

### Code of Business Conduct and Ethics

The board of directors has adopted a code of business conduct and ethics and a policy for reporting violations and complaints, both of which apply to all of our employees, officers and directors. Any substantive amendment or waiver of the code of business conduct and ethics may be made only by our board of directors upon the recommendation of the audit committee, and will be disclosed on our website. In addition, disclosure of any waiver of the code of business conduct and ethics for directors and executive officers will also be made by the filing of a Form 8-K with the SEC. The code of business conduct and ethics is available on our website at www.powerint.com. Copies will also be provided without charge upon request. Requests should be directed in writing to Power Integrations, Inc. 5245 Hellyer Avenue, San Jose, California 95138; Attention: Investor Relations.

### Item 11. Executive Compensation.

#### Compensation of Directors

Each of our board members, in 2005, with the exception of our one employee director, Balu Balakrishnan, received $5,000 per quarter to serve as a member of our board of directors. In addition, the chairman of our audit committee, compensation committee and nominating committee received $5,000, $1,875, and $1,250 per quarter respectively, to serve as chairpersons of these committees. Our non-employee board members received compensation to attend board meetings via phone or in person of $750 and $1,500 respectively. The members of our audit, compensation and nominating committees received additional compensation for committee meeting attendance via phone or in person of $500 and $1,000 respectively. Non-employee directors are reimbursed for all reasonable travel and related expenses incurred in connection with attending board and committee meetings.

Additionally, directors who are not employees of Power Integrations each receive options to purchase shares of common stock under the 1997 Outside Directors Stock Option Plan (the "Directors Plan"). The Directors Plan provides for the automatic grant of nonstatutory stock options to our nonemployee directors over their period of service on the board of directors. The Directors Plan provides that each future nonemployee director of Power Integrations will be granted an option to purchase 30,000 shares of common stock on the date on which such individual first becomes a nonemployee director of Power Integrations (the "Initial Grant"). Thereafter, each

66



nonemployee director who has served on the board of directors continuously for 12 months will be granted an additional option to purchase 10,000 shares of common stock (an "Annual Grant"). Subject to an optionee's continuous service with Power Integrations, approximately 1/3rd of an Initial Grant will become exercisable one year after the date of grant and 1/36th of the Initial Grant will become exercisable monthly thereafter. Each Annual Grant will become exercisable in twelve equal monthly installments beginning in the 25th month after the date of grant, subject to the optionee's continuous service. The exercise price per share of all options granted under the Directors Plan is equal to the fair market value of a share of common stock on the date of grant. Options granted under the Directors Plan have a maximum term of ten years after the date of grant, subject to earlier termination upon an optionee's cessation of service. In the event of certain changes in control of Power Integrations, all options outstanding under the Directors Plan will become immediately vested and exercisable in full.

Mr. Earhart, who left the board of directors as of May of 2006, waived his right to receive a fee and grant of stock options as compensation for his services in 2005 as a director. Mr. Balakrishnan, our chief executive officer and president, is not separately compensated for his services as a member of the board of directors.

*Executive Compensation*

The following table presents summary information for the years ended December 31, 2005, 2004 and 2003, concerning the compensation earned by our chief executive officer and the other four most highly compensated executive officers during 2005.

### Summary Compensation Table

| Name and principal position | Year | Salary | Bonus | Other Annual Compensation[3] | No. of securities underlying options | All other Compensation[1] |
|---|---|---|---|---|---|---|
| | | | | **Annual Compensation** | **Long-term compensation awards** | |
| Balu Balakrishnan | 2005 | $347,500 | $217,332(2) | $   3,000 | 200,000 | $   5,963 |
| President and Chief Executive Officer | 2004 | $339,769 | $110,833(2) | $   3,000 | 200,000 | $   6,830 |
| | 2003 | $324,846 | $273,333(2) | $   3,000 | 300,000 | $   1,380 |
| Derek Bell | 2005 | $242,500 | $ 86,000 | $   3,000 | 45,000 | $   1,683 |
| Vice President, Engineering | 2004 | $234,885 | $ 40,000 | $   3,000 | 45,000 | $   1,260 |
| | 2003 | $227,423 | $100,000 | $   3,000 | 45,000 | $   1,242 |
| Bruce Renouard | 2005 | $232,500 | $ 86,000 | $ 35,117 | 45,000 | $   1,618 |
| Vice President, Worldwide Sales | 2004 | $224,885 | $ 40,000 | $   3,000 | 45,000 | $   1,205 |
| | 2003 | $217,423 | $100,000 | $   3,000 | 45,000 | $   1,187 |
| John Tomlin | 2005 | $242,500 | $ 86,000 | $   3,000 | 45,000 | $   1,683 |
| Vice President, Operations | 2004 | $232,288 | $ 40,000 | $   3,000 | 50,000 | $   1,260 |
| | 2003 | $227,423 | $100,000 | $   3,000 | 45,000 | $   1,242 |
| Clifford J. Walker | 2005 | $226,250 | $ 86,000 | $   3,000 | 50,000 | $   6,237 |
| Vice President, Corporate Development | 2004 | $214,885 | $ 40,000 | $   3,000 | 45,000 | $ 11,991 |
| | 2003 | $207,423 | $100,000 | $   3,000 | 45,000 | $     883 |

(1)  Represents premiums for life insurance for all executives, fees related to tax preparation services for Mr. Balakrishnan for 2004 and 2005, and vacation cash out hours in 2004 and 2005 for Mr. Walker, allowed by Power Integrations for all employees in January.

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUGSK14104S 9.6.18 PAL garcm0pa | 05-Mar-2007 19:26 EST | 86507 TX 68 | 2* |
| FORM 10-K | | PAL | | HTM PMT | 1C |
| | | | | Page 1 of 1 | |

(2) Includes $2,332 that was paid to Mr. Balakrishnan in 2005 with respect to his work on patents that were assigned to Power Integrations in 2005, $10,833 that was paid to Mr. Balakrishnan in 2004 with respect to his work on patents that were assigned to Power Integrations in 2004, and $23,333 in 2003 with respect to his work on patents that were assigned to Power Integrations in 2003.

(3) Includes 401(k) employer contribution for all executives and reimbursement to Mr. Renouard for taxes paid to a foreign country in 2005.

*Option Grants in Last Fiscal Year*

The following table provides certain information concerning options to purchase our common stock granted during the year ended December 31, 2005 to the persons named in the Summary Compensation Table:

| Name | Number of Securities Underlying Options Granted[1] (#) | % of Total Options Granted to Employees in Fiscal Year[2] (%) | Exercise Price Per Share[3] ($) | Expiration Date | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term[4] ($) 5% | 10% |
|---|---|---|---|---|---|---|
| Balu Balakrishnan | 200,000 | 13.44% | $ 17.18 | 1/23/2015 | $2,160,882 | $5,476,099 |
| Derek Bell | 45,000 | 3.02% | $ 17.18 | 1/23/2015 | $ 486,198 | $1,232,122 |
| Bruce Renouard | 45,000 | 3.02% | $ 17.18 | 1/23/2015 | $ 486,198 | $1,232,122 |
| John Tomlin | 45,000 | 3.02% | $ 17.18 | 1/23/2015 | $ 486,198 | $1,232,122 |
| Clifford J. Walker | 50,000 | 3.36% | $ 17.18 | 1/23/2015 | $ 540,220 | $1,369,025 |

(1) Options granted in 2005 are immediately exercisable and vest fully within four years from the grant date subject to the optionee's continued employment or service with Power Integrations. Such options vest at the rate of 1/8 on the six-month anniversary of the date of grant and 1/48 monthly thereafter. Power Integrations has a right to repurchase shares issued upon the exercise of unvested options until such shares become vested. Under the terms of the 1997 Stock Option Plan, the administrator retains the discretion, subject to the 1997 Stock Option Plan limits, to modify the terms of outstanding options and to reprice outstanding options. The options generally have a maximum term of 10 years, subject to earlier termination in certain situations related to cessation of employment or service.

(2) Based on options to purchase an aggregate of 1,487,849 shares that were granted to employees in 2005.

(3) All options were granted at an exercise price equal to the fair market value of our stock on the date of grant, which was the closing price of our common stock as reported on the Nasdaq National Market (now the Nasdaq Global Market) on January 24, 2005.

(4) Potential realizable values are net of exercise price, but before taxes associated with exercise. Amounts represent hypothetical gains that could be achieved for the respective options if exercised at the end of the option term. The assumed 5% and 10% rates of stock price appreciation are provided in accordance with rules of the SEC and do not represent our estimate or projection of the future common stock price. Actual gains, if any, on stock option exercises are dependent on the future performance of the common stock, overall market conditions and the option holders' continued employment through the vesting period. This table does not take into account any appreciation in the price of the common stock from the date of grant to date. The amounts reflected in this table may not necessarily be achieved.



| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUDSK141049PAL garcm0pa | 05-Mar-2007 19:27 EST | 86507 TX 69 | 2* |
| FORM 10-K | | ■ PAL | | HTM PMT | 1C |
| | | | | | Page 1 of 1 |

The following table provides certain information concerning exercises of options to purchase our common stock during the year ended December 31, 2005, and unexercised options held as of December 31, 2005, by the persons named in the Summary Compensation Table above:

### Aggregated Option Exercises In Fiscal 2005 And Fiscal 2005 Year—End Values

| Name | Shares Acquired on Exercise (#) | Value Realized[2] ($) | Number of Securities Underlying Unexercised Options at 12/31/05 (#) Exercisable[3] | Value of Unexercised in-the-Money Options at 12/31/05[1] ($) Exercisable[3] |
|---|---|---|---|---|
| Balu Balakrishnan | — | — | 1,333,000 | $ 9,663,134 |
| Derek Bell | 5,000 | $ 47,007 | 267,000 | $ 2,007,970 |
| Bruce Renouard | — | — | 235,000 | $ 1,470,050 |
| John Tomlin | 22,800 | $164,035 | 265,450 | $ 1,233,813 |
| Clifford J. Walker | — | — | 270,000 | $ 1,860,825 |

(1) Calculated on the basis of the fair market value of the underlying securities as of December 31, 2005 of $23.81 per share, as reported as the closing price on the Nasdaq National Market, minus the aggregate exercise price.

(2) Based on (a) the fair market value of our common stock at the time each option was exercised and the underlying stock was sold, less (b) the aggregate exercise price.

(3) The options in the table above were immediately exercisable in full as of December 31, 2005, but shares purchased on exercise of unvested options are subject to a repurchase right in favor of Power Integrations lapsing ratably over 50 months for the 1998 Nonstatutory Stock Option Plan or 48 months for the 1997 Stock Option Plan and entitles Power Integrations to repurchase unvested shares at their original issuance price.

*Employment Contracts and Termination of Employment and Change of Control Arrangements*

*Chief Executive Officer Benefits Agreement.* As of April 25, 2002, Power Integrations entered into a chief executive officer benefits agreement with Balu Balakrishnan (the "CEO Benefits Agreement"). The form of the agreement was approved by the compensation committee on April 18, 2002. The CEO Benefits Agreement provides for certain benefits, including:

- acceleration of vesting upon a change of control of Power Integrations,

- severance benefits in the event of termination of employment by Power Integrations without cause on or within 18 months after a change of control or resignation by the chief executive officer for good reason within 18 months after a change of control,

- severance benefits in the event of termination of employment by Power Integrations without cause or resignation by the chief executive officer for good reason, and

- retirement benefits.

A change of control is defined in the CEO Benefits Agreement as an acquisition by any person of a beneficial ownership of 50% or more of Power Integrations' voting stock, certain mergers or other business combinations involving Power Integrations, the sale of more than 50% of Power Integrations' assets, liquidation of Power Integrations, or a change in the majority of the incumbent members of the board of directors (except changes in the board of directors' composition approved by a majority of the directors).

Upon a change of control, 50% of Mr. Balakrishnan's then-unvested shares will vest, but if an acquiring company does not assume the options, 100% of Mr. Balakrishnan's then-unvested shares will vest.



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX02 9.9 AL jaslv0dc | 04-Mar-2007 22:29 EST | | 86507 TX 70 | 1* |
| FORM 10-K | | PAL | | | HTM IFV | 1C |

Page 1 of 1

Mr. Balakrishnan is entitled to severance benefits in the event that he is terminated without cause on or within 18 months after a change of control or in the event that he resigns for good reason within 18 months after a change of control. "Cause" includes, among other acts, a material act of theft, dishonesty, fraud, falsification of records, improper disclosure of confidential information, or an intentional act by an executive causing harm to the reputation of Power Integrations, and "good reason" includes, among other acts, a material decrease in an executive's compensation or benefits following a change of control, a demotion or material reduction in responsibility level, or relocation of more than 50 miles from executive's current work place or a material adverse change in working conditions or established working hours which persist for a period of six months.

Such severance benefits include a lump-sum cash payment equal to twelve months of his highest annual salary plus targeted annual incentive bonus, acceleration of 100% of all his then-outstanding stock options, extension of the post-termination stock option exercise period to one year, and continued medical and dental coverage under the Power Integrations health plans for twelve months at Power Integrations' expense.

In addition, Mr. Balakrishnan is entitled to severance benefits in the event of termination of employment by Power Integrations without cause or resignation by Mr. Balakrishnan for good reason. Such severance benefits include a lump-sum cash payment equal to twelve months of his highest annual salary plus targeted annual incentive bonus, acceleration of 50% of all his then-unvested stock options, and continued medical and dental coverage under the Power Integrations health plans for twelve months at Power Integrations' expense.

Mr. Balakrishnan is entitled to retirement benefits if he has served Power Integrations for 15 years, and has achieved an age of 50, or has served Power Integrations for 10 years and has achieved an age of 55, and is not employed elsewhere, full time, or otherwise engaged in competition with Power Integrations. Mr. Balakrishnan is entitled to the extension of his post-termination stock option exercise period for vested options for the term of the option and medical and dental benefits for his dependents at Power Integrations' expense until he achieves the age of 65; thereafter, participation in the health plans would be at Mr. Balakrishnan's expense. These retirement benefits will also become available if Mr. Balakrishnan's employment terminates due to death or disability.

The post-termination exercise period for Mr. Balakrishnan's vested stock options will be extended only if such extension does not require Power Integrations to incur a compensation expense for financial statement purposes.

If any of the payments and benefits provided under the CEO Benefits Agreement in connection with a change of control (the "Payments") would result in a "parachute payment" under Section 280G of the Internal Revenue Code of 1986, as amended, the amount of such Payments will be either (i) the full amount of the Payments or (ii) a reduced amount which would result in no portion of the Payments being subject to excise tax (as defined in the CEO Benefits Agreement), whichever amount provides the greatest amount of benefit to the chief executive officer.

*Executive Officer Benefits Agreements.* As of April 25, 2002, Power Integrations entered into executive officer benefits agreements with Derek Bell, vice president, engineering, Bruce Renouard, vice president, worldwide sales, John Tomlin, vice president, operations, and Clifford J. Walker, vice president, corporate development (the "Executive Officer Benefits Agreements"). The form of executive officer benefits agreement was approved by the compensation committee on April 18, 2002. The Executive Officer Benefits Agreements provide for certain benefits, including:

- acceleration of vesting upon a change of control of Power Integrations,

- severance benefits in the event of termination of employment by Power Integrations without cause on or within 18 months after a change of control or resignation by the executive officer for good reason within 18 months after a change of control,

- severance benefits in the event of termination of employment by Power Integrations without cause or resignation by the executive officer for good reason, and

- retirement benefits.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 AL jaslv0dc | 04-Mar-2007 22:29 EST | 86507 TX 71 | 1* |
|---|---|---|---|---|---|
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

A change of control is defined in the Executive Officer Benefits Agreements as an acquisition by any person of a beneficial ownership of 50% or more of Power Integrations' voting stock, certain mergers or other business combinations involving Power Integrations, the sale of more than 50% of Power Integrations' assets, liquidation of Power Integrations, or a change in the majority of the incumbent members of the board of directors (except changes in the board of directors' composition approved by a majority of the directors).

Upon a change of control, 25% of the executive officer's then-unvested shares will vest, but if an acquiring company does not assume the options, 50% of the executive 's then-unvested shares will vest.

Each executive officer is entitled to severance benefits in the event that he is terminated without cause on or within 18 months after a change of control or in the event that he resigns for good reason within 18 months after a change of control. "Cause" includes, among other acts, a material act of theft, dishonesty, fraud, falsification of records, improper disclosure of confidential information, or an intentional act by an executive causing harm to the reputation of Power Integrations, and "good reason" includes, among other acts, a material decrease in an executive's compensation or benefits following a change of control, a demotion or material reduction in responsibility level, or relocation of more than 50 miles from executive's current work place or a material adverse change in working conditions or established working hours which persist for a period of six months.

Such severance benefits include a lump-sum cash payment equal to six months of the executive officer's highest annual salary plus 50% of the executive officer's targeted annual incentive bonus, vesting of 50% of his then-unvested shares, extension of the post-termination stock option exercise period to one year, and continued medical and dental coverage under the Power Integrations health plans for six months at Power Integrations' expense.

In addition, each executive officer is entitled to severance benefits in the event of termination of employment by Power Integrations without cause or resignation by such executive officer for good reason. Such severance benefits include a lump-sum cash payment equal to six months of the executive officer's highest annual salary plus 50% of the executive officer's targeted annual incentive bonus, and continued medical and dental coverage under the Power Integrations health plans for six months at Power Integrations' expense.

Each executive officer is entitled to retirement benefits if he has served Power Integrations for 15 years, and has achieved an age of 50, or has served Power Integrations for 10 years and has achieved an age of 55, and is not employed elsewhere, full time, or otherwise engaged in competition with Power Integrations. The executive officer is entitled to the extension of his post-termination stock option exercise period for vested options for the earlier of the term of the option and five years and medical and dental benefits for his dependents at Power Integrations' expense until he achieves the age of 65; thereafter, participation in the health plans would be at the executive officer's expense. These retirement benefits will also become available if the executive officer was eligible for such benefits and his employment terminates due to death or disability.

The post-termination exercise period for an executive officer's vested stock options will be extended only if such extension does not require Power Integrations to incur a compensation expense for financial statement purposes.

If any of the payments and benefits provided under the Executive Officer Benefits Agreements in connection with a change of control (the "Payments") would result in a "parachute payment" under Section 280G of the Internal Revenue Code of 1986, as amended, the amount of such Payments will be either (i) the full amount of the Payments or (ii) a reduced amount which would result in no portion of the Payments being subject to excise tax (as defined in the Executive Officer Benefits Agreements), whichever amount provides the greatest amount of benefit to the executive officer.



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX01 SS | PAL jaslv0dc | 04-Mar-2007 22:29 EST | | 86507 TX 72 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

*Stock option agreements.* On January 24, 2005, the compensation and equity award committee granted Mr. Balakrishnan options to purchase 200,000 shares of common stock, each of Messrs. Bell, Renouard and Tomlin options to purchase 45,000 shares of common stock and Mr. Walker options to purchase 50,000 shares of common stock. Each grant is subject to a stock option agreement with terms pertaining to acceleration of vesting and extension of post termination exercise periods as described in the CEO Benefits Agreement and the Executive Officer Benefits Agreements described above.

### Compensation Committee Interlocks and Insider Participation

During 2005, Power Integrations' compensation committee consisted of Mr. Kvamme, Mr. Brown and Mr. Bickell. None of the current members of the compensation committee is or was an officer or employee of Power Integrations or its subsidiaries. None of Power Integrations' executive officers serves as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving as a member of Power Integrations' board of directors or compensation committee.

## Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.

The following table sets forth certain information, as of December 31, 2006, with respect to the beneficial ownership of Power Integrations' common stock by:

- each person known by Power Integrations to be the beneficial owner of more than 5% of Power Integrations common stock,

- each executive officer named in the Summary Compensation Table,

- each director and director nominee of Power Integrations, and

- all executive officers and directors of Power Integrations as a group.

The address for each executive officer, director and director nominee named below is Power Integrations principal executive offices located at 5245 Hellyer Avenue, San Jose, California, 95138.

| | Beneficial Ownership | |
| | Number of Shares[2] | Percent of Total[3] |
|---|---|---|
| **Beneficial Owners[1]** | | |
| **5% Stockholders** | | |
| Wasatch Advisors, Inc.[4] | 4,041,376 | 14.10% |
| 150 Social Hall Avenue Suite 400 | | |
| Salt Lake City, UT 84111 | | |
| Franklin Resources, Inc. and affiliates[5] | 2,536,049 | 8.85% |
| One Franklin Parkway | | |
| San Mateo, CA 94403 | | |
| Lord, Abbett & Co. LLC[6] | 1,817,315 | 6.34% |
| 90 Hudson Street | | |
| Jersey City, NJ 07302 | | |
| FMR Corp.[7] | 2,370,000 | 8.27% |
| 82 Devonshire Street | | |
| Boston, MA 02109 | | |



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0P 8.8 | AL jaslv0dc | 04-Mar-2007 22:29 EST | 86507 TX 73 | 1* |
| FORM 10-K | | PAL | | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

| Beneficial Owners (1) | Beneficial Ownership | |
| --- | --- | --- |
| | Number of Shares(2) | Percent of Total(3) |
| **Executive officers and directors** | | |
| Balu Balakrishnan(8) | 1,701,848 | 5.65% |
| Derek Bell(9) | 297,292 | 1.03% |
| Bruce Renouard(10) | 254,347 | * |
| John Tomlin(11) | 294,642 | 1.02% |
| Clifford J. Walker(12) | 302,961 | 1.05% |
| Alan D. Bickell(13) | 94,333 | * |
| Nicholas E. Brathwaite(14) | 60,833 | * |
| R. Scott Brown(15) | 95,833 | * |
| Balakrishnan S. Iyer(16) | 30,000 | * |
| E. Floyd Kvamme(17) | 239,306 | * |
| Steven J. Sharp(18) | 76,666 | * |
| Dr. James Fiebiger | — | * |
| All executive officers and directors as a group (13 persons)(19) | 3,598,061 | 11.30% |

\*    Less than 1%

(1)  Power Integrations believes that the persons named in the table have sole voting and dispositive power with respect to all shares of common stock shown as beneficially owned by them, subject to community property laws (where applicable) and to the information contained in the footnotes to this table.

(2)  A person is deemed to be the beneficial owner of securities that can be acquired by such person within 60 days upon the exercise of options to purchase common stock. Options to purchase common stock of Power Integrations held by executive officers are immediately exercisable but are subject to vesting. Options to purchase common stock that are exercised prior to full vesting are subject to repurchase by us until the common stock so purchased becomes fully vested. Options to purchase common stock granted to our directors are not immediately exercisable.

(3)  Percentages are based on 28,657,897 shares of common stock outstanding on December 31, 2006, provided that any additional shares of common stock that a stockholder has the right to acquire within 60 days after December 31, 2006, or March 1, 2007, are deemed to be outstanding for the purposes of calculating that stockholder's percentage of beneficial ownership.

(4)  Based on a Form 13F filed with the SEC on February 14, 2007, as of December 31, 2006, Wasatch Advisors, Inc. held 4,041,376 shares.

(5)  Based on a Form 13G filed with the SEC on February 5, 2007, as of December 31, 2006, covering ownership by Franklin Advisers, Inc., Franklin Templeton Portfolio Advisors, Inc. and Franklin Templeton Investments (Asia) Limited, Franklin Advisers, Inc. had sole power to dispose of (or direct the disposition of) 1,583,800 shares and vote (or direct the vote of) 1,545,400 shares, Franklin Templeton Portfolio Advisors, Inc. had sole power to dispose of (or direct the disposition of) and vote (or direct the vote of) 951,719 shares and Franklin Templeton Investments (Asia) Limited had sole power to dispose of (or direct the disposition of) and vote (or direct the vote of) 530 shares.

(6)  Based on a Form 13G filed with the SEC on February 14, 2007, as of December 29, 2006, Lord, Abbett & Co. LLC had sole power to dispose of (or direct the disposition of) 1,817,315 shares and vote (or direct the vote of) 1,530,715 shares.

(7)  Based on a Form 13G filed with the SEC on February 14, 2007, as of December 31, 2006, the reported shares are beneficially owned by Fidelity Management and Research Company ("Fidelity"), a wholly owned subsidiary of FMR Corp. and an investment advisor, as a result of acting as investment advisor to various investment companies. Edward C. Johnson 3d and FMR Corp., through FMR's control of Fidelity and the funds, each had the sole power to dispose of (or direct the disposition of) 2,370,000 shares and the sole power to vote (or direct the vote of) 0 shares.

(8)  Consists of 237,104 shares held by the Balu and Mohini Balakrishnan Family Trust Dated 6-9-1993, of which Mr. Balakrishnan is a trustee, and 1,464,744 shares of common stock issuable upon exercise of options, of which 280,834 shares are unvested as of March 1, 2007 (see footnote 2).



(9) Includes 292,483 shares of common stock issuable upon exercise of options, of which 62,813 shares are unvested as of March 1, 2007 (see footnote 2).

(10) Includes 253,032 shares of common stock issuable upon exercise of options, of which 62,813 shares are unvested as of March 1, 2007 (see footnote 2).

(11) Consists of 7,192 shares held by Mr. Tomlin and his spouse in a joint account and 287,450 shares of common stock issuable upon exercise of options, of which 64,063 shares are unvested as of March 1, 2007 (see footnote 2).

(12) Includes 293,009 shares of common stock issuable upon exercise of options, of which 65,209 shares are unvested as of March 1, 2007 (see footnote 2).

(13) Includes 93,333 shares of common stock issuable upon exercise of options exercisable within 60 days after December 31, 2006.

(14) Includes 56,667 shares of common stock issuable upon exercise of options exercisable within 60 days after December 31, 2006.

(15) Includes 90,833 shares of common stock issuable upon exercise of options exercisable within 60 days after December 31, 2006.

(16) Consists of 30,000 shares of common stock issuable upon exercise of options exercisable within 60 days after December 31, 2006.

(17) Includes 106,666 shares of common stock issuable upon exercise of options exercisable within 60 days after December 31, 2006.

(18) Consists of 76,666 shares of common stock issuable upon exercise of options exercisable within 60 days after December 31, 2006.

(19) Consists of (i) shares held by Messrs. Balakrishnan, Bell, Renouard, Tomlin, Walker, Bickell, Brathwaite, Brown, Iyer, Kvamme and Sharp and Dr. Fiebiger, including the shares described in notes 8 through 18 above, and (ii) 150,000 shares of common stock issuable upon the exercise of options held by Mr. Rafael Torres, an executive officer who is not named in the Summary Compensation Table, 128,125 of which options are unvested as of March 1, 2007.

*Equity Compensation Plan Information*

The following table provides information about Power Integrations' common stock that may be issued upon the exercise of options and rights under all of the existing equity compensation plans as of December 31, 2005, including the Power Integrations 1988 Stock Option Plan, the Power Integrations 1997 Stock Option Plan, the Power Integrations 1997 Outside Directors Stock Option Plan, the Power Integrations 1997 Employee Stock Purchase Plan and the Power Integrations 1998 Nonstatutory Stock Option Plan.

| Plan category | Number Of Securities To Be Issued Upon Exercise Of Outstanding Options And Rights (a) (#) | Weighted Average Exercise Price Of Outstanding Options And Rights (b) ($) | Number Of Securities Remaining Available For Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected In Column (a)) (c) (#) |
| --- | --- | --- | --- |
| Equity compensation plans approved by security holders | 28,211 (1) | $ 0.76 | — |
| | 6,767,538 (2) | $ 18.78 | 3,571,875 |
| | 475,834 (3) | $ 23.43 | 226,668 |
| | N/A (4) | $ N/A | 473,092 |
| Equity compensation plans not approved by security holders | 298,271 (5) | $ 19.33 | — |
| Total | 7,569,854 | $ 19.02 | 4,271,635 |

(1) Issued under the Power Integrations 1988 Stock Option Plan.

(2) Issued under the Power Integrations 1997 Stock Option Plan. The number of shares reserved for issuance under the 1997 Stock Option Plan is subject to an automatic increase on January 1, 2007 by a number of shares equal to 3.5% of the issued and outstanding common stock on December 31, 2006.

74

(3)  Issued under the Power Integrations 1997 Outside Directors Stock Option Plan.
(4)  Issued under the Power Integrations 1997 Employee Stock Purchase Plan.
(5)  Issued under the Power Integrations 1998 Nonstatutory Stock Option Plan.

Although the principal features of the 1998 Nonstatutory Stock Option Plan, also referred to as the 1998 Plan, are summarized below, the summary is qualified in its entirety by the full text of the 1998 Plan. Stockholder approval of the 1998 Plan was not required. A copy of the 1998 Plan can be found as filed on May 12, 2003 with the Securities and Exchange Commission in our Quarterly Report on Form 10-Q.

*Material Features of the 1998 Plan*

We have reserved a maximum of 1,000,000 shares of Common Stock for issuance under the 1998 Plan. The 1998 Plan permits the grant of nonstatutory stock options to employees and consultants with exercise prices equal to no less than 85% of the fair market value of our Common Stock on the date of grant. Options granted under the 1998 Plan generally vest at the rate of 1/4 of the shares on the first anniversary of the date of grant and 1/48 of the shares monthly thereafter. In general, the maximum term of options is 10 years, subject early termination upon an optionee's cessation of employment or service. An option will generally remain exercisable for three months following termination for any reason other than death or disability, and six months if termination is due to death or disability. The board of directors may amend or terminate the 1998 Plan at any time.

## Item 13. Certain Relationships and Related Transactions.

*Director Option Amendments*

Certain grants to three of our outside directors, Messrs. Alan Bickell, Nicholas Brathwaite and Scott Brown, were misdocumented with an original grant date and an exercise price that differed from the terms of the original grants (the "Misdocumented Grants"). The directors have agreed with us to modify several of the Misdocumented Grants to increase the exercise price of those grants. These grants were misdocumented with a higher exercise price than originally granted, and we have corrected this misdocumentation. However, these three directors believe that it is important that they not be in a better position, or be perceived to be in a better position, as a result of the administrative errors or corrections, and have agreed to amend those options which had a higher misdocumented exercise price so that the higher misdocumented exercise price will be the actual exercise price. These amendments are described in further detail in Item 9B. Other Information, which description is incorporated by reference here.

Only one of the directors who received Misdocumented Grants, Mr. Brathwaite, has exercised any of these grants. Mr. Brathwaite has delivered to Power Integrations the difference between: (a) the total exercise price, as corrected, of the Misdocumented Grants he exercised; and (b) the total exercise price reflected in the erroneous documentation, which he had previously paid to Power Integrations. The total amount of Mr. Brathwaite's additional payment to the Power Integrations was $78,290.

*Officer Stock Option Amendments for Section 409A Cure*

Section 409A of the Internal Revenue Code imposes significant additional taxes on stock options granted with an exercise price lower than the fair market value on the date of grant, which we refer to as "discounted options," that vest after December 31, 2004. As a result of the revision in the measurement date of the grant of stock options, as described in Item 7 of Part II—"Management's Discussion and Analysis of Financial Condition and Results of Operation—Restatement of Consolidated Financial Statements" in December 2006, Power Integrations has offered to its current and former officers to amend their stock options to effect a cure permissible under Section 409A. This cure can be effected either by increasing the exercise price to the revised measurement date, or by limiting the time period in which exercises can be made to a specific calendar year.

In December 2006, the following executive officers of Power Integrations agreed to amend some of the outstanding unexercised stock options held by them that have vested or will vest after December 31, 2004 by

75



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0P 9.6 | PAL jaslv0dc | 04-Mar-2007 22:30 EST | | 86507 TX 76 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

increasing the options' exercise prices as set forth below. Modified exercise prices are equal to the closing price on the Nasdaq Global Market of our common stock on the date determined to be the revised measurement date under our methodology used for restating our financial statements. These option amendments are as follows:

| Optionee | Number of Unexercised Shares | Original Exercise Price | Modified Exercise Price |
|---|---|---|---|
| Balu Balakrishnan | 156,251 | $ 17.75 | $ 18.95 |
| Derek Bell | 23,438 | $ 17.75 | $ 18.95 |
| Bruce Renouard | 23,438 | $ 17.75 | $ 18.95 |
| John Tomlin | 19,401 | $ 17.75 | $ 18.95 |
| Clifford Walker | 23,438 | $ 17.75 | $ 18.95 |

In December 2006, the following executive officers of Power Integrations have agreed to amend certain outstanding unexercised stock options held by them by modifying such options' exercise period. These option amendments are as follows:

| Optionee | Number of Unexercised Shares | Exercise Price | Calendar Year Elected for Exercise Period |
|---|---|---|---|
| Balu Balakrishnan | 15,861 | $ 12.10 | 2007 |
| Balu Balakrishnan | 15,390 | $ 12.10 | 2008 |
| Balu Balakrishnan | 26,968 | $ 14.82 | 2007 |
| Balu Balakrishnan | 31,366 | $ 14.82 | 2008 |
| Derek Bell | 8,685 | $ 12.10 | 2007 |
| Derek Bell | 8,684 | $ 12.10 | 2008 |
| Derek Bell | 5,834 | $ 14.82 | 2007 |
| Derek Bell | 5,833 | $ 14.82 | 2008 |
| Bruce Renouard | 21,782 | $ 14.82 | 2007 |
| Bruce Renouard | 20,000 | $ 14.82 | 2008 |
| Bruce Renouard | 1,968 | $ 14.82 | 2009 |
| John Tomlin | 5,811 | $ 14.82 | 2007 |
| John Tomlin | 18,459 | $ 18.60 | 2007 |
| John Tomlin | 18,000 | $ 18.60 | 2008 |
| Clifford Walker | 3,646 | $ 12.10 | 2007 |
| Clifford Walker | 1,968 | $ 14.82 | 2007 |
| Clifford Walker | 6,991 | $ 14.82 | 2008 |
| Clifford Walker | 10,000 | $ 14.82 | 2009 |

*Other Matters*

We have entered into indemnification agreements with each of our executive officers and directors. Such indemnification agreements require us to indemnify these individuals to the fullest extent permitted by law. We also intend to execute these agreements with our future directors and officers.

During the fiscal years ended December 31, 2005 and 2004, there was not, nor is there currently proposed any reportable transaction or series of reportable transactions involving any executive officer, director, director nominee, holder of more than 5% of any class of voting securities of Power Integrations or any immediate family member of the foregoing and Power Integrations, except as discussed above.

Information regarding executive officer benefits agreements with certain executive officers and the chief executive officer benefits agreement is set forth in Item 11 of Part III under the heading "Employment Contracts and Termination of Employment and Change of Control Agreements."



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 9.6 | PAL jaslv0dc | 04-Mar-2007 22:30 EST | 86507 TX 77 | 1* |
| FORM 10-K | | ■ | PAL | | HTM IFV | 1C |

Page 1 of 1

### Item 14. Principal Accountant Fees and Services.

On June 16, 2005, Deloitte & Touche LLP, was appointed as our independent registered public accounting firm. The following table sets forth the aggregate fees billed to Power Integrations for the fiscal years ended December 31, 2005 and 2004, by Deloitte & Touche LLP, the member firms of Deloitte Touche Tohmatsu, and their respective affiliates, or Deloitte, our current independent registered public accounting firm.

| | Fiscal 2005 | Fiscal 2004 |
|---|---|---|
| Audit Fees[1] | $ 654,000 | $ — |
| Audit–Related Fees[2] | 1,959,000 | — |
| Tax Fees | — | — |
| All Other Fees | — | — |

(1) Audit fees consist of fees billed for professional services rendered for the audit of our consolidated annual financial statements and review of the interim consolidated financial statements included in quarterly reports and services that are normally provided by Deloitte & Touche LLP in connection with statutory and regulatory filings or engagements. Audit fees for 2005 and 2004 include fees for professional services rendered for the audits of (i) management's assessment of the effectiveness of internal control over financial reporting and (ii) the effectiveness of internal control over financial reporting.

(2) Audit-related fees are primarily related to the restatement of our consolidated financial statements.

We did not engage Deloitte to provide advice regarding financial information systems design and implementation during 2005 and 2004.

### Termination of KPMG LLP

On June 16, 2005, Power Integrations terminated KPMG LLP (KPMG) as our independent registered public accountants. The decision to terminate KPMG was approved by the audit committee of our board of directors. This event was disclosed in our Form 8-K filed on June 22, 2005.

The following table sets forth the aggregate fees billed to Power Integrations for the fiscal years ended December 31, 2005 and 2004 by KPMG LLP, our former independent registered public accounting firm.

| | Fiscal 2005 | Fiscal 2004 |
|---|---|---|
| Audit Fees[1] | $ 65,000 | $790,000 |
| Audit–Related Fees[2] | 550,000 | — |
| Tax Fees | — | — |
| All Other Fees | — | — |

(1) Audit Fees consist of fees billed for professional services rendered for the audit of our consolidated annual financial statements and review of the interim consolidated financial statements included in quarterly reports and services that are normally provided by KPMG LLP in connection with statutory and regulatory filings or engagements. Audit fees for 2004 include fees for professional services rendered for the audits of (i) management's assessment of the effectiveness of internal control over financial reporting and (ii) the effectiveness of internal control over financial reporting.

(2) Audit-related fees are primarily related to the restatement of our consolidated financial statements.

We did not engage KPMG LLP to provide advice regarding financial information systems design and implementation during 2005 or 2004.

### Pre-Approval Policies and Procedures

All the fees for 2005 and 2004 described above were pre-approved by the Audit Committee.



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX10 | PAL jaslv0dc | 04-Mar-2007 22:30 EST | 86507 TX 78 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

The audit committee has a policy to approve in advance the engagement of the independent registered public accounting firm for all audit services and non-audit services, based on independence, qualifications and, if applicable, performance, and approve the fees and other terms of any such engagement; provided, however, that the audit committee may establish pre-approval policies and procedures for any engagement to render such services, provided that such polices and procedures (a) are detailed as to particular services, (b) do not involve delegation to management of the audit committee's responsibilities and (c) provide that, at its next scheduled meeting, the audit committee is informed as to each such service for which the independent auditor is engaged pursuant to such policies and procedures. In addition, the audit committee may delegate to one or more members of the committee the authority to grant pre-approvals for such audit and non-audit services, provided that (1) the decisions of such member(s) to grant any such pre-approval shall be presented to the audit committee at its next scheduled meeting and (2) the audit committee has established policies and procedures for such pre-approval of services consistent with the requirements of clauses (a) and (b) above.

78



| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152150 9.6.18 | PAL soeus0pa | 05-Mar-2007 20:50 EST | 86507 TX 79 | 2* |
| FORM 10-K | START PAGE | | PAL | | HTM PMT | 1C |
| | | | | | Page 1 of 1 | |

## PART IV

**Item 15. Exhibits and Financial Statement Schedules.**

(a) The following documents are filed as part of this Form:

1. Financial Statements

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm—Deloitte & Touche LLP | 80 |
| Report of Independent Registered Public Accounting Firm—KPMG LLP | 81 |
| Consolidated Balance Sheets | 82 |
| Consolidated Statements of Income | 83 |
| Consolidated Statements of Stockholders' Equity | 84 |
| Consolidated Statements of Cash Flows | 85 |
| Notes to Consolidated Financial Statements | 86 |

2. Financial Statement Schedules

All other schedules, except Schedule II, Valuation and Qualifying Accounts, are omitted because they are not applicable or the required information is shown in the Consolidated Financial Statements or Notes thereto.

3. Exhibits

See Index to Exhibits at the end of this Report, which is incorporated by reference here. The Exhibits listed in the accompanying Index to Exhibits are filed as part of this report.

79



| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUDSK14I04Sb.s.16 PAL garcm0pa | 06-Mar-2007 13:37 EST | 86507 TX 80 | 2* |
| FORM 10-K | | ■ PAL | | HTM PMT | 1C |
| | | | | Page 1 of 1 | |

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of Power Integrations, Inc.:

We have audited the accompanying consolidated balance sheet of Power Integrations, Inc. and its subsidiaries (collectively the "Company") as of December 31, 2005, and the related consolidated statements of income, stockholders' equity, and cash flows for the year then ended. Our audit also included the consolidated financial statement schedule for the year ended December 31, 2005 listed in Item 15(a)(2). These consolidated financial statements and consolidated financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on the consolidated financial statements and consolidated financial statement schedule based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, such 2005 consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2005 and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such consolidated financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 6, 2007 expressed an unqualified opinion on management's assessment of the effectiveness of the Company's internal control over financial reporting and an adverse opinion on the effectiveness of the Company's internal control over financial reporting because of a material weakness.

*/s/ DELOITTE & TOUCHE LLP*

San Jose, California
March 6, 2007

80



| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC15216? 9.6.18 | PAL sarucOpa | 08-Mar-2007 15:11 EST | | 86507 TX 81 | 5* |
| FORM 10-K | | | PAL | | | HTM PMT | 1C |

Page 1 of 1

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders
Power Integrations, Inc.:

We have audited the accompanying consolidated balance sheet of Power Integrations, Inc. and subsidiaries (the Company) as of December 31, 2004, and the related consolidated statements of income, stockholders' equity and cash flows for each of the years in the two-year period ended December 31, 2004. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule for the two years ended December 31, 2004 as listed in the index of Item 15. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Power Integrations, Inc. and subsidiaries as of December 31, 2004, and the results of their operations and their cash flows for each of the years in the two-year period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 3 to the accompanying consolidated financial statements, the consolidated balance sheet as of December 31, 2004 and the related consolidated statements of income, stockholders' equity and cash flows for each of the years in the two-year period ended December 31, 2004 have been restated.

/s/ KPMG LLP

Mountain View, California
March 15, 2005, except as to Note 3,
    which is as of March 8, 2007.

81



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX07 5.8 | PAL jaslvOdc | 04-Mar-2007 22:31 EST | 86507 TX 82 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
### CONSOLIDATED BALANCE SHEETS
### (In thousands, except share and par value amounts)

|  | December 31, | |
|---|---|---|
|  | 2005 | 2004 As restated (1) |
| **ASSETS** | | |
| CURRENT ASSETS: | | |
| Cash and cash equivalents | $109,879 | $107,396 |
| Short-term investments | 16,200 | 1,249 |
| Accounts receivable, net of allowances of $469 and $382, respectively | 13,488 | 12,750 |
| Inventories | 17,929 | 25,473 |
| Deferred tax assets | 1,551 | 3,216 |
| Prepaid expenses and other current assets | 1,328 | 2,600 |
| Total current assets | 160,375 | 152,684 |
| PROPERTY AND EQUIPMENT, net | 48,890 | 51,718 |
| INVESTMENTS | 4,422 | 25,911 |
| DEFERRED TAX ASSETS | 9,221 | 7,530 |
| OTHER ASSETS | 14,013 | 3,173 |
|  | $236,921 | $241,016 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| CURRENT LIABILITIES: | | |
| Accounts payable | $ 5,410 | $ 8,744 |
| Accrued payroll and related expenses | 7,038 | 5,824 |
| Taxes payable | 10,277 | 6,643 |
| Deferred income on sales to distributors | 3,479 | 3,058 |
| Other accrued liabilities | 1,358 | 991 |
| Total current liabilities | 27,562 | 25,260 |
| COMMITMENTS AND CONTINGENCIES (NOTES 5 and 9) | | |
| STOCKHOLDERS' EQUITY: | | |
| Preferred Stock, $0.001 par value | | |
| Authorized—3,000,000 shares | | |
| Outstanding—None | — | — |
| Common Stock, $0.001 par value | | |
| Authorized—140,000,000 shares | | |
| Outstanding—29,366,720 and 30,491,967, respectively | 29 | 30 |
| Additional paid-in capital | 134,196 | 158,613 |
| Deferred compensation | (746) | (3,076) |
| Accumulated translation adjustment | (121) | (114) |
| Retained earnings | 76,001 | 60,303 |
| Total stockholders' equity | 209,359 | 215,756 |
|  | $236,921 | $241,016 |

(1)  See Note 3, "Restatement of Consolidated Financial Statements," of the accompanying notes to consolidated financial statements.

See accompanying notes to consolidated financial statements.

82



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX08 5.6 | PAL jaslv0dc | 04-Mar-2007 22:31 EST | | 86507 TX 83 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

## POWER INTEGRATIONS, INC.
### CONSOLIDATED STATEMENTS OF INCOME
#### (In thousands, except per share amounts)

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2005** | **2004**<br>As restated<br>(1) | **2003**<br>As restated<br>(1) |
| NET REVENUES | $143,071 | $136,653 | $125,682 |
| COST OF REVENUES | 72,979 | 71,856 | 63,496 |
| GROSS PROFIT | 70,092 | 64,797 | 62,186 |
| OPERATING EXPENSES: | | | |
|   Research and development | 17,111 | 15,440 | 20,107 |
|   Sales and marketing | 18,314 | 16,070 | 17,166 |
|   General and administrative | 15,665 | 7,969 | 10,868 |
|     Total operating expenses | 51,090 | 39,479 | 48,141 |
| INCOME FROM OPERATIONS | 19,002 | 25,318 | 14,045 |
| OTHER INCOME (EXPENSE): | | | |
|   Interest income | 3,820 | 1,809 | 1,520 |
|   Interest expense | (218) | 265 | (106) |
|   Other, net | (453) | (754) | (511) |
|     Total other income | 3,149 | 1,320 | 903 |
| INCOME BEFORE PROVISION FOR INCOME TAXES | 22,151 | 26,638 | 14,948 |
| PROVISION FOR INCOME TAXES | 6,453 | 6,138 | 3,511 |
| NET INCOME | $ 15,698 | $ 20,500 | $ 11,437 |
| EARNINGS PER SHARE: | | | |
|   Basic | $ 0.53 | $ 0.67 | $ 0.39 |
|   Diluted | $ 0.51 | $ 0.64 | $ 0.36 |
| SHARES USED IN PER SHARE CALCULATION: | | | |
|   Basic | 29,568 | 30,802 | 29,473 |
|   Diluted | 30,843 | 32,229 | 31,488 |

(1)  See Note 3, "Restatement of Consolidated Financial Statements," of the accompanying notes to consolidated financial statements.

See accompanying notes to consolidated financial statements.

83



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX06 8.6 | PAL jaslv0dc | 04-Mar-2007 22:31 EST | 86507 TX 84 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
### (In thousands)

| | Common Stock | | Additional Paid-In Capital | Deferred Compensation | Accumulated Translation Adjustment | Retained Earnings | Total Stockholders' Equity |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | | | | | |
| **BALANCE AT DECEMBER 31, 2002** | | | | | | | |
| As reported | 28,628 | $ 28 | $ 89,473 | $ — | $ (117) | $ 51,249 | $ 140,633 |
| Adjustment to opening stockholders' equity (1) | | | 40,062 | (11,501) | — | (22,883) | 5,678 |
| **BALANCE AT DECEMBER 31, 2002** | | | | | | | |
| As Restated (1) | 28,628 | 28 | 129,535 | (11,501) | (117) | 28,366 | 146,311 |
| Issuance of common stock under employee stock option plan | 1,621 | 2 | 21,601 | | | | 21,603 |
| Issuance of common stock under employee stock purchase plan | 159 | | 1,949 | | | | 1,949 |
| Excess income tax benefits from employee stock option exercises (1) | — | — | 3,297 | | | | 3,297 |
| Stock-based compensation expense for variable awards (1) | — | — | 4,554 | (132) | | | 4,422 |
| Stock-based compensation expense for fixed awards (1) | — | — | 907 | (772) | | | 135 |
| Amortization of deferred stock-based compensation (1) | — | — | — | 5,404 | | | 5,404 |
| Translation adjustment | — | — | — | — | (4) | | (4) |
| Net income, as restated (1) | — | — | — | — | — | 11,437 | 11,437 |
| **BALANCE AT DECEMBER 31, 2003** | | | | | | | |
| As Restated (1) | 30,408 | 30 | 161,843 | (7,001) | (121) | 39,803 | 194,554 |
| Issuance of common stock under employee stock option plan | 492 | | 6,805 | | | | 6,805 |
| Repurchase of common stock | (590) | | (11,799) | | | | (11,799) |
| Issuance of common stock under employee stock purchase plan | 182 | | 2,294 | | | | 2,294 |
| Excess income tax benefits from employee stock option exercises (1) | — | — | 2,108 | | | | 2,108 |
| Stock-based compensation expense for variable awards (1) | — | — | (2,558) | 491 | | | (2,067) |
| Stock-based compensation expense for fixed awards (1) | — | — | (80) | 117 | | | 37 |
| Amortization of deferred stock-based compensation (1) | — | — | — | 3,317 | | | 3,317 |
| Translation adjustment | — | — | — | — | 7 | | 7 |
| Net income, as restated (1) | — | — | — | — | — | 20,500 | 20,500 |
| **BALANCE AT DECEMBER 31, 2004** | | | | | | | |
| As Restated (1) | 30,492 | 30 | 158,613 | (3,076) | (114) | 60,303 | 215,756 |
| Issuance of common stock under employee stock option plan | 414 | | 5,467 | | | | 5,467 |
| Repurchase of common stock | (1,692) | (1) | (33,661) | | | | (33,662) |
| Issuance of common stock under employee stock purchase plan | 153 | | 2,407 | | | | 2,407 |
| Excess income tax benefits from employee stock option exercises | — | — | 646 | | | | 646 |
| Stock-based compensation expense for variable awards | — | — | 744 | 16 | | | 760 |
| Stock-based compensation expense for fixed awards | — | — | (20) | 27 | | | 7 |
| Amortization of deferred stock-based compensation | — | — | — | 2,287 | | | 2,287 |
| Translation adjustment | — | — | — | — | (7) | | (7) |
| Net income | — | — | — | — | — | 15,698 | 15,698 |
| **BALANCE AT DECEMBER 31, 2005** | 29,367 | $ 29 | $ 134,196 | $ (746) | $ (121) | $ 76,001 | $ 209,359 |

(1)  See Note 3, "Restatement of Consolidated Financial Statements," of the accompanying notes to consolidated financial statements.

See accompanying notes to consolidated financial statements.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 9.8 | PAL jaslv0dc | 04-Mar-2007 22:31 EST | | 86507 TX 85 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
### CONSOLIDATED STATEMENTS OF CASH FLOWS
**(In thousands)**

| | Year Ended December 31, | | |
| --- | ---: | ---: | ---: |
| | **2005** | **2004** As restated (1) | **2003** As restated (1) |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net income | $ 15,698 | $ 20,500 | $ 11,437 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 6,264 | 6,880 | 6,846 |
| Stock-based compensation expense | 3,118 | 1,288 | 9,888 |
| Deferred income taxes | (24) | 737 | 1,664 |
| Deferred rent | — | — | (725) |
| Provision for accounts receivable and other allowances | 593 | 445 | 704 |
| Tax benefit associated with employee stock plans | 646 | 2,108 | 3,297 |
| Stock compensation to non-employees | 7 | 37 | 135 |
| Change in operating assets and liabilities: | | | |
| Accounts receivable | (1,331) | (2,360) | (2,492) |
| Inventories | 7,473 | (2,241) | (8,085) |
| Prepaid expenses and other assets | 1,121 | 295 | (2,909) |
| Accounts payable | (3,170) | 396 | 1,719 |
| Taxes payable and other accrued liabilities | 5,208 | 1,501 | 507 |
| Deferred income on sales to distributors | 421 | 493 | (153) |
| Net cash provided by operating activities | 36,024 | 30,079 | 21,833 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Purchases of property and equipment | (3,190) | (6,363) | (37,815) |
| Acquisition of technology patents/licenses | (1,101) | (1,740) | (1,419) |
| Note to supplier | (10,000) | — | — |
| Purchases of available-for-sale investments | — | (45,775) | (18,765) |
| Proceeds from sales of available-for-sale investments | 11,200 | 52,890 | 450 |
| Purchases of held-to-maturity investments | (7,806) | (30,183) | (6,210) |
| Proceeds from sales of held-to-maturity investments | 3,144 | 19,182 | 33,126 |
| Net cash used in investing activities | (7,753) | (11,989) | (30,633) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Net proceeds from issuance of common stock | 7,874 | 9,101 | 23,554 |
| Repurchase of common stock | (33,662) | (11,799) | — |
| Principal payments under capitalized lease obligations | — | (41) | (233) |
| Net cash (used in) provided by financing activities | (25,788) | (2,739) | 23,321 |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 2,483 | 15,351 | 14,521 |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD | 107,396 | 92,045 | 77,524 |
| CASH AND CASH EQUIVALENTS AT END OF PERIOD | $109,879 | $107,396 | $ 92,045 |
| **SUPPLEMENTAL DISCLOSURE OF NON-CASH INVESTING AND FINANCING ACTIVITIES:** | | | |
| Unpaid property and equipment | $ (165) | $ 32 | $ (1,447) |
| Deferred stock compensation | $ 717 | $ (2,677) | $ 5,325 |
| **SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION:** | | | |
| Cash paid for interest | $ — | $ — | $ 7 |
| Cash paid for income taxes, net | $ 1,385 | $ (157) | $ 406 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," of the accompanying notes to consolidated financial statements.

See accompanying notes to consolidated financial statements.

85



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0P/S/6 PAL jaslv0dc | 04-Mar-2007 22:31 EST | 86507 TX 86 | 1* |
| FORM 10-K | | ■ PAL | | HTM IFV | 1C |

Page 1 of 1

# POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### DECEMBER 31, 2005

## 1. THE COMPANY:

Power Integrations, Inc. (the "Company"), which was incorporated in California on March 25, 1988 and reincorporated in Delaware in December 1997, designs, develops, manufactures and markets proprietary, high-voltage, analog integrated circuits for use primarily in AC-DC and DC-DC power conversion in the following major markets: consumer, communications, computer and industrial electronics.

The Company is subject to a number of risks including, among others, the volume and timing of orders received from customers, competitive pressures on selling prices, the demand for its products declining in the major end markets it serves, SEC and U.S Department of Justice investigations and stockholder litigation related to the Company's recent internal investigation (see notes 3 and 9), recently enacted changes in securities laws and regulations, including the Sarbanes-Oxley Act of 2002, the inability to adequately protect or enforce its intellectual property rights, expenses it is required to incur in connection with its litigation against Fairchild Semiconductor and System General Corporation, the volume and timing of orders placed by it with its wafer foundries and assembly subcontractors, fluctuations in the exchange rate between the U.S. dollar and the Japanese yen, the licensing of its intellectual property to one of its wafer foundries, the lengthy timing of its sales cycle, undetected defects and failures in meeting the exact specifications required by its products, reliance on its international sales activities which account for a substantial portion of net revenues, its ability to develop and bring to market new products and technologies on a timely basis, the ability of its products to penetrate additional markets, attraction and retention of qualified personnel in a competitive market, changes in environmental laws and regulations, the adoption of anti-takeover measures, the volatility of the future trading price of its common stock and earthquakes, terrorist acts or other disasters.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES:

*Principles of Consolidation*

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries after elimination of all intercompany transactions and balances.

*Reclassifications*

In the accompanying consolidated balance sheet as of December 31, 2004, the Company has reclassified the balance of auction rate securities (for which interest rates reset in less than 90 days, but for which the underlying maturity date is longer than 90 days) and callable securities (for which interest rates reset between 90 days and 1 year, but for which the underlying maturity date exceeds 1 year) from cash and cash equivalents or short-term investments to long-term investments. For details on this reclassification See Note 3, "Restatement of Consolidated Financial Statements," The Company had no auction rate securities at December 31, 2005.

*Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. On an ongoing basis, the Company evaluates its estimates, including those related to revenue recognition and allowances for receivables and inventories. These estimates are based on historical facts and various other assumptions that the Company believes to be reasonable at the time the estimates are made.

86



## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

*Foreign Currency Translation*

The functional currencies of the Company's subsidiaries are the local currencies. Accordingly, all assets and liabilities are translated into U.S. dollars at the current exchange rates as of the applicable balance sheet date. Revenues and expenses are translated at the average exchange rate prevailing during the period. Cumulative gains and losses from the translation of the foreign subsidiaries' financial statements have been included in stockholders' equity.

*Cash and Cash Equivalents and Investments*

The Company considers cash invested in highly liquid financial instruments with a remaining maturity of three months or less at date of purchase to be cash equivalents. Investments in highly liquid financial instruments with maturities greater than three months but not longer than twelve months from the balance sheet date are classified as short-term investments. Investments in highly liquid financial instruments with maturities greater than twelve months from the balance sheet date are classified as long-term investments. As of December 31, 2005 and 2004, the Company's short-term and long-term investments consisted of U.S. government backed securities, municipal bonds, corporate commercial paper and other high quality commercial securities, which were valued using the amortized cost method, which approximates fair market value. All investments were classified as held-to-maturity, except auction rate securities which were classified as available-for-sale.

The table below summarizes the carrying value of the Company's investments by major security type (in thousands):

| | December 31, | |
| | 2005 | 2004 |
| --- | --- | --- |
| | | As restated |
| Cash Equivalents: | | |
| Taxable securities | $ 86,037 | $ 89,408 |
| Tax-exempt securities | 6 | — |
| Total cash equivalents | 86,043 | 89,408 |
| Short-term Investments: | | |
| U.S. corporate securities | 1,670 | 249 |
| U.S. government securities | 14,530 | 1,000 |
| Total short-term investments | 16,200 | 1,249 |
| Investments, matures in excess of 1 year | 4,422 | 25,911 |
| Total investment securities | $106,665 | $116,568 |

*Inventories*

Inventories (which consist of costs associated with the purchases of wafers from offshore foundries and of packaged components from several offshore assembly manufacturers, as well as internal labor and overhead associated with the testing of both wafers and packaged components) are stated at the lower of cost (first in, first-out) or market. Provisions, when required, are made to reduce excess and obsolete inventories to their estimated net realizable values. Inventories consist of the following (in thousands):

| | December 31, | |
| | 2005 | 2004 |
| --- | --- | --- |
| | | As restated |
| Raw materials | $ 1,683 | $ 1,391 |
| Work-in-process | 6,431 | 7,288 |
| Finished goods | 9,815 | 16,794 |
| | $17,929 | $ 25,473 |

87



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX02 5.8 PAL jaslv0dc | 04-Mar-2007 22:31 EST | 86507 TX 88 | 1* |
| FORM 10-K | | ■ PAL | | HTM IFV | 1C |

Page 1 of 1

# POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

*Property and Equipment*

Property and equipment consist of the following (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2005 | 2004 |
| | | As restated |
| Land | $ 16,453 | $ 16,453 |
| Building and improvements | 25,049 | 24,872 |
| Machinery and equipment | 41,130 | 38,833 |
| Office furniture and equipment | 13,249 | 13,012 |
| | 95,881 | 93,170 |
| Accumulated depreciation | (46,991) | (41,452) |
| | $ 48,890 | $ 51,718 |

Depreciation and amortization of property and equipment are provided using the straight-line method over the following useful lives:

| | |
| --- | --- |
| Building and improvements | 4-40 years or life of lease agreement, if shorter |
| Machinery and equipment | 2-5 years |
| Office furniture and equipment | 4 years |

Total fixed assets located in the United States at December 31, 2005, 2004 and 2003 was approximately 85%, 87% and 91%, of total long-lived assets, respectively. Of the total long-lived assets located in foreign countries, there was no specific country that held a material amount.

*Impairment of Long-Lived Assets*

In accordance with Statement of Financial Accounting Standards No. 144, Accounting for the Impairment or Disposal of Long-Lived Assets, long-lived assets, such as property and equipment, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to estimate undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized in the amount by which the carrying amount of the asset exceeds the fair value of the asset. Assets to be disposed of would be separately presented in the balance sheet and reported at the lower of the carrying amount or fair value less costs to sell, and would no longer be depreciated. The assets and liabilities of a disposed group classified as held for sale would be presented separately in the appropriate asset and liability sections of the balance sheet. Currently the Company has no impairment of long-lived assets nor any assets held for disposal.

*Earnings Per Share*

Basic earnings per share are calculated by dividing net income by the weighted average shares of common stock outstanding during the period. Diluted earnings per share are calculated by dividing net income by the weighted average shares of common stock and dilutive common equivalent shares outstanding during the period. Dilutive common equivalent shares included in the diluted calculation consist of dilutive shares issuable upon the exercise of outstanding common stock options and warrants computed using the treasury stock method.



## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

A summary of the earnings per share calculation is as follows (in thousands, except per share amounts):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 As restated | 2003 As restated |
| Basic earnings per share: | | | |
| Net income | $15,698 | $ 20,500 | $ 11,437 |
| Weighted average common shares | 29,568 | 30,802 | 29,473 |
| Basic earnings per share | $ 0.53 | $ 0.67 | $ 0.39 |
| Diluted earnings per share: | | | |
| Net income | $15,698 | $ 20,500 | $ 11,437 |
| Weighted average common shares | 29,568 | 30,802 | 29,473 |
| Effect of dilutive securities: | | | |
| Stock options | 1,264 | 1,386 | 1,962 |
| Employee stock purchase plan | 11 | 41 | 53 |
| Diluted weighted average common shares | 30,843 | 32,229 | 31,488 |
| Diluted earnings per share | $ 0.51 | $ 0.64 | $ 0.36 |

Options to purchase 1,969,496, 1,639,142 and 314,619 shares of Company's common stock outstanding for the years ended December 31, 2005, 2004 and 2003, respectively, were not included in the computation of diluted earnings per share. This was due to the exercise prices of the options to purchase shares of the Company's common stock being greater than the average market price of the Company's common stock during those periods, and therefore, their effect would have been antidilutive.

*Comprehensive Income*

Comprehensive income for the Company consists of net income plus the effect of foreign currency translation adjustments and unrealized gains / losses on available for sale securities, net of income taxes, which is not material for each of the three years ended December 31, 2005. Accordingly, comprehensive income closely approximates actual net income.

*Segment Reporting*

The Company is organized and operates as one business segment, the design, development, manufacture and marketing of proprietary, high-voltage, analog integrated circuits for use primarily in the AC-DC and DC-DC power conversion markets. The Company's chief operating decision maker, the Chief Executive Officer, reviews financial information presented on a consolidated basis for purposes of making operating decisions and assessing financial performance.

*Revenue Recognition, Significant Customers*

Product revenues consist of sales to OEMs, merchant power supply manufacturers and distributors. Shipping terms to international OEMs and merchant power supply manufacturers from the Company's facility in California are delivered at frontier, which is commonly referred to as DAF. As such, title to the product passes to the customer when the shipment reaches the destination country, and revenue is recognized upon the arrival of the Company's product in that country. Beginning in December 2005, shipping terms to the Company's

89

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0P 5.0 | PAL jaslv0dc | 04-Mar-2007 22:32 EST | 86507 TX 90 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

international OEMs and merchant power supply manufacturers shipped from the Company's facility outside of the United States are EX Works (EXW), meaning that title to the product transfers to the customer upon shipment from the Company's foreign warehouse. Shipments to North American OEMs and merchant power supply manufacturers are FOB-point of origin meaning revenue is recognized upon shipment, when the title is passed to the customer.

Sales to distributors are made under terms allowing certain rights of return and protection against subsequent price declines on the Company's products held by the distributors. As a result of these rights, the Company defers the recognition of revenue and the costs of revenues derived from sales to distributors until such distributors resell the Company's products to their customers. The Company determines the amounts to defer based on the level of actual inventory on hand at its distributors as well as inventory that is in transit to its distributors. The gross profit that is deferred as a result of this policy is reflected as "deferred income on sales to distributors" in the accompanying consolidated balance sheets.

Net revenue is reduced by estimated sales returns and allowances. The Company analyzes the following factors: historical returns, current economic trends, levels of inventories of the Company's products held by its customers, and changes in customer demand and acceptance of the Company's products and uses this information to review and determine the adequacy of the reserve. This reserve represents a reserve of the gross margin on estimated future returns and is reflected as a reduction to accounts receivable in the accompanying consolidated balance sheets. Increases to the reserve are recorded as a reduction to net revenue equal to the expected customer credit memo and a corresponding credit is made to cost of revenues equal to the estimated cost of the returned product. The net difference, or gross margin, is recorded as an addition to the reserve.

Approximately 50% to 60% of the Company's sales are made to distributors. Frequently, distributors need to sell at a price lower than the standard distribution price in order to win business. In these circumstances, the distributor submits a request to the Company for a lower "sell-in" price on a specific end-customer transaction or a series of transactions. After the distributor ships product to its customer under an approved transaction, the distributor submits a "ship & debit" claim to the Company to adjust its cost from the standard price to the approved lower price. After verification by the Company, a credit memo is issued to the distributor to adjust the sell-in price from the standard distribution price to the approved lower price. The Company maintains a reserve for these credits that appears as a reduction to accounts receivable in the Company's accompanying consolidated balance sheets. Any increase in the reserve results in a corresponding reduction in the Company's net revenues. To establish the adequacy of its reserves, the Company analyzes historical ship and debit payments and levels of inventory in the distributor channels.

From time to time the Company will reduce the distribution list price. As a result, the Company gives distributors protection, in the form of credits, against price declines on products they hold. The credits are referred to as "price protection." Since the Company does not recognize revenue until the distributor sells the product to its customers, the Company generally does not need to provide reserves for price protection. However, in rare instances the Company must consider price protection in the analysis of reserve requirements, as there may be a timing gap between a price decline and the issuance of price protection credits. If a price protection reserve is required, the Company will maintain a reserve for these credits that appears as a reduction to accounts receivable in the Company's accompanying consolidated balance sheets. Any increase in the reserve results in a corresponding reduction in the Company's net revenues. The Company analyzes distribution price declines and levels of inventory in the distributor channels in determining the reserve levels required.

For the years ended December 31, 2005, 2004 and 2003, the Company's top ten customers, including distributors that resell to OEMs and merchant power supply manufacturers, accounted for approximately 69%, 71% and 76% of net revenues, respectively.



## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The following distribution customers accounted for more than 10% of total net revenues:

| Customer | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| Avnet (formerly Memec) | 19% | 19% | 25% |
| Synnex Technologies | 18% | 19% | 20% |

*Export Sales*

The Company markets its products in North America and in foreign countries through its sales personnel and a worldwide network of independent sales representatives and distributors. As a percentage of total net revenues, export sales, which consist of domestic and foreign sales to distributors and direct customers in foreign countries, are comprised of the following:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 As restated | 2003 As restated |
| Taiwan | 27% | 25% | 26% |
| Hong Kong/China | 24% | 26% | 30% |
| Korea | 20% | 19% | 19% |
| Western Europe | 10% | 9% | 7% |
| Germany | 4% | 5% | 5% |
| Japan | 5% | 4% | 3% |
| Singapore | 3% | 2% | 2% |
| Other | — % | 2% | 1% |
| Total export sales | 93% | 92% | 93% |

The remainder of the Company's sales are primarily to customers within North America.

*Product Sales*

Sales of TOPSwitch and TinySwitch products accounted for 95%, 97% and 98% of total net revenues in 2005, 2004 and 2003, respectively. TOPSwitch products include TOPSwitch, TOPSwitch II, TOPSwitch-FX, and TOPSwitch-GX. TinySwitch products include TinySwitch and TinySwitch II.

Revenue mix by product family is comprised of the following:

| Product Family | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| TinySwitch-I and -II | 57% | 54% | 51% |
| TopSwitch-FX and -GX | 27% | 28% | 27% |
| TopSwitch-I and -II | 11% | 15% | 20% |
| LinkSwitch and DPA-Switch | 5% | 3% | 2% |



| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152159 9.6.18 | PAL soeus0pa | 06-Mar-2007 21:39 EST | | 86507 TX 92 | 2* |
| FORM 10-K | | ■ | PAL | | | HTM PMT | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Revenue mix by end markets served is comprised of the following:

| End Market | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| Consumer | 30% | 33% | 28% |
| Communications | 29% | 31% | 36% |
| Computer | 23% | 22% | 22% |
| Industrial | 11% | 8% | 8% |
| Other | 7% | 6% | 6% |

### Foreign Currency Risk

The Company does not currently employ a foreign currency hedge program utilizing foreign currency forward exchange contracts. The Company maintains a Japanese yen bank account with a U.S. bank for payments to suppliers and for cash receipts from Japanese suppliers and customers denominated in yen. For the years ended December 31, 2005, 2004 and 2003, the Company realized a foreign exchange transaction loss of approximately $167,000, $336,000 and $194,000, respectively. These amounts are included in "other income (expense)" in the accompanying consolidated statements of income.

### Warranty

The Company generally warrants that its products will substantially conform to the published specifications for 12 months from the date of shipment. The Company's liability is limited to either a credit equal to the purchase price or replacement of the defective part. Returns under warranty have historically been immaterial, and as a result, the Company does not record a specific warranty reserve. Actual future returns could be different than the returns allowance established.

### Advertising

Advertising costs are expensed as incurred. Advertising costs amounted to $0.8 million, $0.6 million, and $0.6 million, in 2005, 2004 and 2003, respectively.

### Research and Development

Research and development costs are expensed as incurred.

### Income Taxes

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX08 9.6 | PAL jaslv0dc | 04-Mar-2007 22:32 EST | | 86507 TX 93 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

## POWER INTEGRATIONS, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

*Stock-Based Compensation*

The Company has elected to follow Accounting Principles Board Opinion (APB) No. 25, *Accounting for Stock Issued to Employees*, and related interpretations, in accounting for employee stock options rather than the alternative fair value method allowed by SFAS No. 123, *Accounting for Stock-Based Compensation*. APB No. 25 provides that compensation expense relative to the Company's employee stock options is measured based on the intrinsic value of stock options granted. For grants determined to be "fixed" under APB 25, the Company recognizes compensation expense in its statement of income using the straight-line method over the vesting period based upon the difference between the exercise price of the Company's employee stock option grants and the market price of the underlying common stock on the measurement date of the option. No compensation expense is recognized in the Company's consolidated income statement for fixed awards when the exercise price of the Company's employee stock option grants equals the market price of the underlying common stock on the measurement date of the option. The measurement date is the date when the number of shares and exercise price are known with finality. For grants determined to be "variable" under APB 25, the Company remeasures, and reports in its statement of income, the intrinsic value of the options at the end of each reporting period until the options are exercised, cancelled or expire unexercised.

Under SFAS No. 123, the fair value of stock options at the date of grant is recognized in earnings over the vesting period of the options. Had compensation expense been determined under a fair value method consistent with SFAS No. 123 and related interpretations, the Company's net income would have been decreased to the following pro forma amounts (in thousands, except per share information).

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 As restated (1) | 2003 As restated (1) |
| Net income, as reported | $ 15,698 | $ 20,500 | $ 11,437 |
| Add stock-based employee compensation expense included in reported net income, net of tax | 2,383 | 619 | 5,732 |
| Deduct total stock-based employee compensation expense determined under fair-value-based method for all awards, net of tax | (18,487) | (20,119) | (20,843) |
| Pro forma net income (loss) | $ (406) | $ 999 | $ (3,674) |
| Basic earnings per share: | | | |
| As reported | $ 0.53 | $ 0.67 | $ 0.39 |
| Pro forma | $ (0.01) | $ 0.03 | $ (0.12) |
| Diluted earnings per share: | | | |
| As reported | $ 0.51 | $ 0.64 | $ 0.36 |
| Pro forma | $ (0.01) | $ 0.03 | $ (0.12) |

(1) The pro forma amounts in the years ended December 31, 2004 and 2003 have been restated to reflect a correction in the assumptions regarding the Company's expected life of stock options. The expected life of 5.2 years and 4.9 years previously reported in 2004 and 2003, respectively, is now 6.03 years for both 2004 and 2003. In relation to the correction of the expected life the Company made corresponding changes to the weighted average volatility and the risk-free interest rates. In addition, the Company has corrected the measurement date of some of its option grants as a result of its special investigation. See Note 3, "Restatement of Consolidated Financial Statements."



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 5.6 | PAL jaslv0dc | 04-Mar-2007 22:32 EST | 86507 TX 94 | 1* |
| FORM 10-K | | PAL | | | HTM IFV | 1C |

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The fair value of stock options granted is established on the date of the grant using the Black-Scholes option-pricing model with the following weighted average assumptions:

| | Year Ended December 31, | | |
| | 2005 | 2004 | 2003 |
| --- | --- | --- | --- |
| | | As restated | As restated |
| Risk-free interest rates | 2.98%–4.49% | 1.20%–4.39% | 1.13%–4.18% |
| Expected volatility rates | 59%–85% | 77%–92% | 89%–97% |
| Expected dividend yield As reported | — | — | — |
| Expected life of stock options (years) | 6.03 | 6.03 | 6.03 |
| Weighted-average grant date fair value of options granted | $13.17 | $19.29 | $15.77 |

The fair value of employees' stock purchase rights under the Company's employee stock purchase plan was estimated using the Black-Scholes model with the following weighted average assumptions:

| | Year Ended December 31, | | |
| | 2005 | 2004 | 2003 |
| --- | --- | --- | --- |
| | | As restated | As restated |
| Risk-free interest rates | 3.19% | 2.14% | 1.32% |
| Expected volatility rates | 47% | 53% | 74% |
| Expected dividend yield | | | |
| Expected life (years) | 1.0 | 1.0 | 1.0 |
| Weighted-average estimated fair value of purchase rights | $8.94 | $ 8.33 | $ 11.66 |

### Fair Value of Financial Instruments

The estimated fair value of the Company's note to its supplier was approximately $9.9 million at December 31, 2005. The fair value was estimated using a pricing model incorporating current market rates. The note had a carrying cost of $10.0 million at December 31, 2005.

The carrying value of cash, cash equivalents, investments (excluding the Company's note to its supplier), accounts receivable, accounts payable and accrued liabilities approximate their fair values as of December 31, 2005 and 2004, because of the relatively short maturity of these instruments.

### Concentration of Credit Risk

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash investments and trade receivables. The Company has cash investment policies that limit cash investments to low risk investments. With respect to trade receivables, the Company performs ongoing credit evaluations of its customers' financial condition and requires letters of credit whenever deemed necessary. Additionally, the Company establishes an allowance for doubtful accounts based upon factors surrounding the credit risk of specific customers, historical trends related to past losses and other relevant information. Account balances are charged off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote. The Company does not have any off-balance sheet credit exposure related to its customers. As of December 31, 2005 and 2004, approximately 69% and 82% of accounts receivable, respectively, were concentrated with ten customers. The Company had two distribution customers that represented 18% and 11% of accounts receivable as of December 31, 2005, and the same two customers represented 26% and 29% of accounts receivable as of December 31, 2004.

94



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 58 PAL jaslv0dc | 04-Mar-2007 22:32 EST | 86507 TX 95 | 1* |
|---|---|---|---|---|---|
| FORM 10-K | | PAL | | HTM IFV | 1C |
| | | | | Page 1 of 1 | |

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

*Concentration in the Available Sources of Supply of High-Voltage Molding Compound*

The integrated circuit assembly process requires the Company's manufacturers to use a high-voltage molding compound available from only one vendor, which is difficult to process. This compound and its required processes, together with the other non-standard materials and processes needed to assemble its products, require a more exacting level of process control than normally required for standard packages. Unavailability of the sole source compound or problems with the assembly process can materially adversely affect yields and cost to manufacture.

*Indemnifications*

The Company sells products to its distributors under contracts, collectively referred to as Distributor Sales Agreements (DSA). Each DSA contains the relevant terms of the contractual arrangement with the distributor, and generally includes certain provisions for indemnifying the distributor against losses, expenses, and liabilities from damages that may be awarded against the distributor in the event the Company's hardware is found to infringe upon a patent, copyright, trademark, or other proprietary right of a third party (Customer Indemnification). The DSA generally limits the scope of and remedies for the Customer Indemnification obligations in a variety of industry-standard respects, including, but not limited to, limitations based on time and geography, and a right to replace an infringing product. The Company also, from time to time, has granted a specific indemnification to individual customers.

The Company believes its internal development processes and other policies and practices limit its exposure related to such indemnifications. In addition, the Company requires its employees to sign a proprietary information and inventions agreement, which assigns the rights to its employees' development work to the Company. To date, the Company has not had to reimburse any of its distributors or customers for any losses related to these indemnifications and no material claims were outstanding as of December 31, 2005. For several reasons, including the lack of prior indemnification claims and the lack of a monetary liability limit for certain infringement cases, the Company cannot determine the maximum amount of potential future payments, if any, related to such indemnifications.

*Recently Issued Accounting Pronouncements*

In December 2004, the Financial Accounting Standards Board, or FASB, issued FASB Staff Position (FSP) No.109-1 (FAS 109-1), *Application of FASB Statement No.109, Accounting for Income Taxes, to the Tax Deduction on Qualified Production Activities Provided by the American Jobs Creation Act of 2004* (the AJCA). The AJCA introduces a special 9% tax deduction on qualified production activities. FAS 109-1 clarifies that this tax deduction should be accounted for as a special tax deduction in accordance with SFAS 109. The Company will not be repatriating foreign earnings for the purpose of applying SFAS No. 109, *Accounting for Income Taxes*, and therefore the act will not have a material impact on its consolidated financial statements.

In December 2004, the FASB issued SFAS No. 123 (revised 2004) *Share-Based Payment* (SFAS 123(R)), which replaces SFAS No. 123 *Accounting for Stock-Based Compensation* (SFAS 123) and supersedes APB Opinion No. 25 *Accounting for Stock Issued to Employees*. The pro forma disclosures previously permitted under SFAS 123 no longer will be permitted. In March 2005, the SEC also issued Staff Accounting Bulletin 107 (SAB 107), *Share-Based Payment*, which expresses views of the SEC staff regarding the application of SFAS No. 123(R). Among other things, SAB 107 provides interpretive guidance related to the interaction between SFAS No. 123(R) and certain SEC rules and regulations, as well as the SEC staff's views regarding the valuation of share-based payment arrangements for public companies. The Company is required to adopt SFAS 123(R), beginning January 1, 2006. The Company has elected to use the modified-prospective method to transition to

95



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0PAL jaslv0dc | 04-Mar-2007 22:32 EST | 86507 TX 96 | 1* |
|---|---|---|---|---|---|
| FORM 10-K | | PAL | | HTM IFV | 1C |
| | | | | Page 1 of 1 | |

## POWER INTEGRATIONS, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

SFAS 123(R). Under this method compensation expense shall be recorded for all unvested stock options and restricted stock at the beginning of the first quarter of adoption of SFAS 123(R). The Company expects to use the Black-Scholes valuation approach to determine fair value and to recognize the corresponding expense using the single option approach. Further, the Company expects that the adoption of SFAS 123(R) will have a material impact on its consolidated results of operations and earnings per share.

In March 2005, the FASB issued FSP No. 46(R)-5, *Implicit Variable Interests under FASB Interpretation No. 46 (revised December 2003), Consolidation of Variable Interest Entities* (FSP 46(R)-5), which provides guidance for a reporting enterprise on whether it holds an implicit variable interest in a variable interest entity (VIE) or potential VIE when specific conditions exist. FSP 46 (R)-5 became applicable to the Company in the quarter ended June 30, 2005. FSP 46(R) had no impact on the Company's consolidated results of operations and financial condition as of December 31, 2005.

In March 2005, the FASB issued FIN 47, *Accounting for Conditional Asset Retirement Obligations, an interpretation of FASB Statement No. 143* (FIN 47), which requires an entity to recognize a liability for the fair value of a conditional asset retirement obligation when incurred if the liability's fair value can be reasonably estimated. FIN 47 is effective for fiscal years ending after December 15, 2005. The Company has adopted FIN 47 in the current year, and the adoption of this standard did not have a material impact on the Company.

In May 2005, the FASB issued SFAS No. 154, *Accounting Changes and Error Corrections* (SFAS 154) that replaces Accounting Principles Board Opinions No. 20 *Accounting Changes* and SFAS No. 3, *Reporting Accounting Changes in Interim Financial Statements—An Amendment of APB Opinion No. 28*. SFAS 154 provides guidance on the accounting for and reporting of accounting changes and error corrections. It establishes retrospective application, or the latest practicable date, as the required method for reporting a change in accounting principle and the reporting of a correction of an error. The Company has adopted this pronouncement as of January 1, 2006 for error corrections made on or after the date of adoption, and additional disclosures are included in note 3 of notes to the consolidated financial statements.

In November 2005, the FASB issued FSP FAS 115-1 and FAS 124-1, *The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments* (FSP 115-1), which provides guidance on determining when investments in certain debt and equity securities are considered impaired, whether that impairment is other-than-temporary, and on measuring such impairment loss. FSP 115-1 also includes accounting considerations subsequent to the recognition of an other-than temporary impairment and requires certain disclosures about unrealized losses that have not been recognized as other-than-temporary impairments. FSP 115-1 is required to be adopted by the Company in the first quarter of fiscal 2006, and such adoption is not anticipated to have a material effect on the Company's consolidated financial statements.

In July 2006, the FASB issued FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes – an interpretation of SFAS 109* (FIN 48). FIN 48 prescribes a comprehensive model for recognizing, measuring, presenting and disclosing in the financial statements tax positions taken or expected to be taken on a tax return, including a decision whether to file or not to file in a particular jurisdiction. FIN 48 is effective for the Company beginning in the first quarter of 2007. If there are changes in net assets as a result of application of FIN 48, these will be accounted for as an adjustment to retained earnings. The Company is currently assessing the impact of FIN 48 on its consolidated financial position and results of operations.

In July 2006, the FASB issued EITF Issue No. 06-3, *How Taxes Collected from Customers and Remitted to Governmental Authorities Should be Presented in the Income Statement (that is, Gross versus Net Presentation)* (EITF 06-3). The adoption of EITF 06-3 did not have an impact on the Company's consolidated financial position and results of operations. The Company's accounting policy has been to present the above-mentioned taxes on a net basis, excluded from revenues.