# Exhibit 1

PRETRIAL HEARING - 09/14/06                    1

1   IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF DELAWARE
2

3                                           COPY

4

    POWER INTEGRATIONS, INC.,
5   a Delaware corporation,

6       Plaintiff,

7

8

9                                   Civil Action
    v.                              No. 04-1371 JJF
10

11

12

    FAIRCHILD SEMICONDUCTOR
13  INTERNATIONAL, INC., a
    DELAWARE corporation, and
14  FAIRCHILD SEMICONDUCTOR
    CORPORATION, a Delaware
15  corporation,

16      Defendants.

17

18

    BEFORE:
19

20      HONORABLE JOSEPH J. FARNAN, J.

21

22              - - - - -

        SEPTEMBER  14, 2006
23      PRETRIAL CONFERENCE

24              - - - - -

1      understanding, of course, we are not

2      going to use his reports, his

3      testimony or anything like that.  I

4      want to make sure I don't get crossed

5      eyes with the order, if appropriate,

6      we would be allowed to use on

7      cross-examination actually the

8      physical devices.  I don't know if

9      that is going to develop, but I want

10     to make sure I understand your order

11     didn't prohibit us from doing that.

12           MR. GUY:  Your Honor, on the

13     2006 data, what they are attempting to

14     do and perhaps some guidance on the

15     motions in limine might be helpful.

16     What they are attempting to do yet

17     again is recast their damages report.

18     And we are now at a point where we are

19     less than three weeks to trial, we got

20     a damages report from them on August

21     8th, it was even entitled a summary

22     report.  They extended the damages

23     another year for future price erosion.

24     They changed a number of things.  And

1   the data they have -- it would be

2   improper for them to suggest the data

3   they have is wrong.  The data they

4   have, as of the end of discovery, is

5   correct and it is good data.  What

6   they want to do is have another

7   opportunity to yet again recap the

8   entire damages case.  One of the

9   points I would like to make to you is

10  that this is really a moving target,

11  and it is a very hard target to chase.

12  And every time another piece of

13  evidence comes in or we even ask for

14  something, say the restated earnings

15  or the restated financial statements,

16  we find ourselves in a posture where

17  we are suddenly responding to yet

18  another damages report.  So I think we

19  do have to cut it off.  And the close

20  of discovery was on damages type data

21  was December 31st, they were accurate

22  as of that time and we should proceed

23  to trial on that.  If there is a need

24  for accounting at a later time that

1    can occur and the Court certainly has

2    the power to do that.  I don't believe

3    it is appropriate to try and do that

4    kind of discovery this close to trial.

5         THE COURT:  I think you may be

6    right, but do you happen to have that?

7         MR. GUY:  I don't have it handy,

8    I have to go generate it.  And we

9    also, you know, there are certain

10   questions as to which products are in,

11   the 210HD, you know, that was a

12   product that there is no technical

13   damages report on that at all and it

14   just came in in the August case as a

15   new accused product.  And so, your

16   Honor, we really are trying to get

17   ready for trial, but we are really

18   chasing a moving target.  And so we

19   really ask if you would cut this off.

20   And I will deal with the Lum issue as

21   well.  The Lum issue there is they

22   lost the motion and they can't bring

23   in this unnamed expert who was

24   disclosed well after the close of

 1      evidence.   In close of discovery they
 2      bring in this damages expert.   What
 3      they are offering it for is some idea
 4      that there is a percentage of products
 5      that come in to the United States
 6      imported by third parties for which
 7      Fairchild is responsible.   And I just
 8      want to describe briefly for the Court
 9      the exactly the point here.   Fairchild
10      manufactures and designs these
11      products in Korea and Asia.   They are
12      sold to people that make the little
13      plug -- the little battery chargers.
14      The people who buy those battery
15      chargers may be cell phone companies,
16      they may be cell phone manufacturers
17      or they may be a contract manufacturer
18      who makes a cell phone for somebody
19      else.   At best Fairchild knows that it
20      is going to say an LG phone, but they
21      don't know the type of phone, they
22      don't know the model number of the
23      phone and the amazing thing is, your
24      Honor, is Power Integrations

# Exhibit 2

# FISH & RICHARDSON P.C.

500 Arguello Street
Suite 500
Redwood City, California
94063-1526

Telephone
650 839-5070

Facsimile
650 839-5071

Web Site
www.fr.com

Howard G. Pollack
650 839-5007

Email
pollack@fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

**VIA FACSIMILE & U.S. MAIL**

October 17, 2007

G. Hopkins Guy III
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025

Re:    Power Integrations Inc. v. Fairchild Semiconductor Int'l
        USDC-D. Del. - C.A. No. 04-1371-JJF

Dear Hop:

I am writing with respect to Fairchild's continued sales of the infringing products for the period of time since the jury found those products to infringe. Power Integrations asked for updated sales figures before trial, and Fairchild would not provide them at that time, but you acknowledged during the September 14, 2006 pretrial conference that an accounting would be proper for sales not reflected in the jury's damages award. *See* 9/14/2006 Pretrial Conference Tr. at 16:23-17:2. As such, we are prepared to submit a request for an accounting, and I am writing to obtain the updated sales information since October 11, 2006 for the parts adjudged to infringe. Please let us know by the close of business tomorrow whether you will provide the updated sales information; if not, we will ask the Court to order such production straightaway.

Sincerely,

Howard G. Pollack

50443685.doc

AUSTIN

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

10/17/2007 12:41 FAX 6508395071          FISH & RICHARDSON                    ✉ 001

```
************************
***  TX REPORT  ***
************************

TRANSMISSION OK

TX/RX NO                2111
CONNECTION TEL          #10256#000453531#6147401
CONNECTION ID
ST. TIME                10/17 12:40
USAGE T                 00'38
PGS. SENT               2
RESULT                  OK
```



# FISH & RICHARDSON P.C.

500 Arguello Street
Suite 500
Redwood City, California
94063-1526

Telephone
650 839-5070

Facsimile
650 839-5071

Web Site
www.fr.com

Date    October 17, 2007

To    G. Hopkins Guy, III
        Orrick, Herrington & Sutcliffe, LLP
        1000 Marsh Road
        Menlo Park, CA 94025
        Telephone: (650) 614-7452

Facsimile number    10256-00453531 / (650) 614-7401

From    Howard G. Pollack

Re    *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*
        USDC-D. Del. – C.A. No. 04-1371-JJF

Number of pages
including this page    2

Message    Please see attached.

# Exhibit 3

Fairchild Semiconductor International, Inc. Presentations



## Fairchild Semiconductor Says Lawsuit is Not Over and it Expects to Ultimately Prevail Against Power Integrations

Business Editors/Technology Editors

SOUTH PORTLAND, Maine--(BUSINESS WIRE)--Oct. 10, 2006--Fairchild Semiconductor announced Tuesday that it continues to believe it will prevail in the patent infringement lawsuit brought against the company by Power Integrations, despite a jury verdict to the contrary in the first of three phases of trial in the case.

The company also said it will continue offering its full line of pulse-width modulation (PWM) products.

The company announced that it was disappointed by the jury's verdict in the first phase, but that it has yet to present all of its defenses to Power Integrations' claims. The company believes that Power Integrations' patent claims are invalid, and its invalidity defenses have yet to be heard by a jury.

The trial in the case has been divided into three phases. The first phase, held last week, was on infringement, the willfulness of any infringement, and damages. The second phase, scheduled to begin Dec. 4 before a different jury, will be on the validity of the Power Integrations patents being asserted. Unenforceability will be handled in a final phase before the court. Fairchild believes it has identified inventions and publications, known as prior art, that pre-date the Power Integrations patents and that Fairchild believes would invalidate the Power Integrations patents.

A jury in the first phase found Tuesday that Fairchild willfully infringed four patents asserted by Power Integrations and awarded approximately $34 million in damages. For Power Integrations to prevail in the case and receive a judgment and injunction against Fairchild, the patents found to be infringed must also be found to be valid and enforceable in the remaining phases of trial scheduled for December. Final resolution of the matter is not expected until 2007.

Special Note on Forward-Looking Statements:

This press release contains forward-looking statements that are based on management's assumptions and expectations and that involve risk and uncertainty. Forward-looking statements usually, but do not always, contain forward-looking terminology such as "we believe," "we expect," or "we anticipate," or refer to management's expectations about the future performance of Fairchild Semiconductor or the industries and markets we serve. Many factors could cause actual results to differ materially from those expressed in forward-looking statements. Although we believe we have invalidity defenses to the Power Integrations patents found to have been infringed by Fairchild products in this case, the results of litigation are difficult to predict and no assurances can be given that Fairchild will ultimately prevail in this case. Our intellectual property and other risk factors are discussed in the company's quarterly and annual reports filed with the Securities and Exchange Commission (SEC) and available at the Investor Relations section of Fairchild Semiconductor's web site at investor.fairchildsemi.com or the SEC's web site at www.sec.gov.

About Fairchild Semiconductor:

Fairchild Semiconductor (NYSE: FCS) is the leading global supplier of high-performance power products critical to today's leading electronic applications in the computing, communications, consumer, industrial and automotive segments. As The Power Franchise(R), Fairchild offers the industry's broadest portfolio of components that optimize system power. Fairchild's 9,000 employees design, manufacture and market power, analog & mixed signal, interface, logic, and optoelectronics products. Please contact us on the web at www.fairchildsemi.com.

CONTACT:
Corporate Communications -
Fairchild Semiconductor
Fran Harrison, 207-775-8576
Fran.harrison@fairchildsemi.com

Public Relations Firm -
CHEN PR
Barbara Ewen, 781-466-8282
bewen@chenpr.com

SOURCE:
Fairchild Semiconductor

# Exhibit 4

549

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC.,   ) Trial Volume III
                            )
           Plaintiff,       )
                            ) C.A. No. 04-1371-JJF
v.                          )
                            )
FAIRCHILD SEMICONDUCTOR     )
INTERNATIONAL, INC., and    )
FAIRCHILD SEMICONDUCTOR     )
CORPORATION,                )
                            )
           Defendants.      )


                 Wednesday, September 19, 2007
                 9:05 a.m.
                 Courtroom 4B


                 844 King Street
                 Wilmington, Delaware


BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
         United States District Court Judge




APPEARANCES:


         FISH & RICHARDSON
         BY:  WILLIAM J. MARSDEN, JR., ESQ.
         BY:  FRANK E. SCHERKENBACH, ESQ.
         BY:  HOWARD G. POLLACK, ESQ.
         BY:  MICHAEL R. HEADLEY, ESQ.


                 Counsel for the Plaintiff

550

1    APPEARANCES CONTINUED:

2

3

4            ASHBY & GEDDES
             BY:  JOHN G. DAY, ESQ.
5
                    -and-
6
             ORRICK, HERRINGTON & SUTCLIFFE, LLP
7            BY:  G. HOPKINS GUY, III, ESQ.
             BY:  WILLIAM L. ANTHONY, ESQ.
8            BY:  VICKIE FEEMAN, ESQ.
             BY:  BAS de BLANK, ESQ.
9            BY:  BRIAN VANDERZANDEN, ESQ.

10                      Counsel for the Defendants

11

12

13

14

15

16

17

18

19

20

21

22

23

24

632

1    market reconnaissance and make that value

2    judgment.

3         Q.   And to the extent that you

4    actually have the frequency modulation feature

5    in some of your green FPS products, there is

6    some customer demand for it; right?

7         A.   Well, I -- yes, I presume we don't

8    put needless features in, although I did mention

9    one example through this years strategic

10   process.  We took it out in one particular

11   example.

12        Q.   You also don't know based on your

13   own personal interaction with customers, whether

14   they want the SoftStart feature; right?

15        A.   No, I -- as I mentioned, I have

16   not visited customers on this product.

17        Q.   But again to the extent that some

18   of our products actually use the SoftStart

19   feature, would you agree that there is some

20   customer demands for the feature; right?

21        A.   Yes.  I described it as a

22   secondary, you know, feature value to being

23   green in the first place.  Yes.

24        Q.   Now, when you started at

1    Fairchild, you knew the green FPS products were

2    going to be a big part of your business; right?

3            A.    Well, I came to learn that the

4    expectations were high.  I had done a -- I think

5    actually -- I think it was in October of that

6    year.  I visited Europe.  It was my first visit

7    to a field sales.  It was a large meeting and

8    there was a lot of interest, yes.

9            Q.    Okay.  And in fact, when the

10   products were introduced in 2003, you though

11   that they would achieve some tens of millions of

12   dollars in revenue; is that right?

13           A.    Well, I came to that conclusion

14   within six to nine months of that, you know,

15   kind of after early adoption.

16           Q.    Okay.

17           A.    Yes.

18           Q.    And, in fact, in the first two

19   years you sold about $60 million worth of green

20   FPS products; is that right?

21           A.    As I recall, yes, it grew to

22   around 30 million a year and kind of stayed

23   there.

24           Q.    And so what would the total be as

634

1    of today, you have been in the market for about

2    four years with the green FPS products, how much

3    have you sold?

4          A.   I don't know as a matter of fact,

5    but it would probably be somewhere in the range

6    of a hundred million dollars since introduced.

7          Q.   All right.  Now, also at the time

8    you joined Fairchild, you didn't know about any

9    efforts Fairchild had made prior to you joining

10   the company to study Power Integrations'

11   products; right?

12         A.   No, I wasn't there at the time,

13   and I didn't go over asking what kind of

14   benchmarking work people had done.

15         Q.   And as I understand it, it was at

16   least in part in connection with your

17   involvement in this case that you learned about

18   some of the activity that had happened

19   beforehand; right?

20         A.   Well, both as part of this case,

21   but also as a matter of business there, early in

22   2004, we had at least a couple of meetings where

23   I was aware of this group working on making sure

24   they actually did not infringe Power

# Exhibit 5

*Power Integrations, Inc.   v.*
*Fairchild Semiconductor International, Inc.*

*Trial Volume 3*
*October 4, 2006*

*Hawkins Reporting Service*
*715 N King Street*
*Suite 3*
*Wilmington, DE  19801*
*(302) 658-6697*

Original File 100406~1.TXT, 331 Pages
Min-U-Script® File ID: 0640525804

**Word Index included with this Min-U-Script®**

Page 780

[1] indeed, it's found that their patents are valid
[2] and infringed. And I was also asked then to
[3] review any reports issued by their experts, that
[4] is, Fairchild's experts and to comment on those,
[5] and as well as testimony by that expert.
[6]     Q: And did you prepare a report concerning
[7] your work in this case?
[8]     A: I did. I prepared a report in January of
[9] 2005. And then I supplemented that with a couple
[10] reports in the year as additional data became
[11] available.
[12]     Q: Can you generally give us a description of
[13] what documents you reviewed in connection with
[14] your work in this case?
[15]     A: Well, I reviewed a lot of documents in
[16] this case.
[17]     Q: You can feel free to refer to the monitor
[18] next to you, if that helps.
[19]     A: Certainly. I always prepare an exhibit to
[20] attach to my report wherein I list all the
[21] documents that I've considered, and other sources
[22] of information that I obtained during the course
[23] of my work.
[24]     As you see, this is Exhibit C to my

Page 781

[1] report. And there's 11 pages of documents and
[2] items I reviewed. It includes such things as
[3] court orders, filings, petitions by the parties.
[4] It would include analyst reports, research that I
[5] did, and internet sources to review matters
[6] related to the — to the hearings.
[7]     It was — it would include all the
[8] financial and marketing documents that both
[9] parties submitted in the — in the — during
[10] their production of documents.
[11]     I reviewed expert reports by Power
[12] Integrations' technical experts. I reviewed the
[13] expert report by Dr. Keeley in this matter, and
[14] probably some others that came along.
[15]     There was tens of thousands of
[16] documents literally that I ended up reviewing.
[17]     Q: About how many depositions?
[18]     A: Two depositions, I believe. Was there
[19] more? It seemed like more.
[20]     Q: Did you meet or discuss your work with any
[21] Power Integrations' employees?
[22]     A: Sure. I met — to start out my work, I
[23] met with both Mr. Renouard and Mr. Robert Lilear
[24] from Power Integrations.

Page 782

[1]     Q: Okay. Now, it's a lot of work.
[2]     Did you have any help doing it?
[3]     A: Yes, I did.
[4]     Q: And who was that with?
[5]     A: I worked with a consulting firm in — out
[6] of Washington D.C. who specialized in that sort
[7] of thing, specialized in economic and
[8] accounting-type of work in litigation work.
[9]     The name is LECG.
[10]     Q: And who do you work with there?
[11]     A: Well, in — particularly, I worked with
[12] Mr. Gregory Smith and his staff. I've worked
[13] with Mr. Smith on a number of different
[14] occasions.
[15]     Q: And what work did LECG do in connection
[16] with the work that you were doing?
[17]     A: I asked them to prepare exhibits for my
[18] report primarily, not all the exhibits. I
[19] prepared some individually myself.
[20]     I wanted them to keep track of all
[21] the exhibits wherein we dealt with costs and
[22] revenues, computation of profitability. And it
[23] was quite an involved task, particularly in this
[24] matter.

Page 783

[1]     Q: Do you have any financial association with
[2] LECG?
[3]     A: I'm on a — I receive a, oh, what do you
[4] call it, I guess a finder's fee, which is very
[5] common in this sort of thing. I've been offered
[6] the same arrangements with other firms.
[7]     But they — essentially, they were
[8] retained by Fish & Richardson and they sent their
[9] bills to Fish & Richardson. And they did not go
[10] through me.
[11]     Q: How did you find out about the nature of
[12] this action?
[13]     A: I was contacted by Fish & Richardson and
[14] ended up in — meeting with the attorneys and
[15] meeting with the Power Integrations personnel.
[16]     Q: What did you generally learn about the
[17] case before you started your work?
[18]     A: Well, I knew — knew it was a patent
[19] infringement matter. I knew that it involved
[20] power supply semiconductors.
[21]     I knew that it was against
[22] Fairchild's semiconductor. And I knew that it —
[23] that four patents were asserted by Power
[24] Integrations.

Power Integrations, Inc.   v.                                              Trial Volume 3
Fairchild Semiconductor International, Inc.                               October 4, 2006

Page 784

[1]    Q: Have you been asked to assume infringement
[2] in this matter?
[3]    A: I always have to assume infringement. My
[4] work really depends — damages won't occur unless
[5] there's infringement, so I have to assume
[6] infringement.
[7]    And that's always the case,
[8] regardless of whether I'm working with the
[9] defendant or with the plaintiff.
[10]    Q: So that's not unusual in this case?
[11]    A: Oh, not at all. It's — it happens in
[12] every case.
[13]    Q: So is that a way of saying that the patent
[14] damages expert doesn't usually deal with
[15] liability issues?
[16]    A: Exactly. I have no opinion on —
[17] concerning liability.
[18]    I'm not a technical expert in this
[19] field. I'm not an attorney.
[20]    I am — my role is a narrow one, and
[21] that's the computation of damages assuming
[22] infringement.
[23]    Q: Have you determined damages caused to
[24] Power Integrations as a result of infringement in

Page 786

[1]    And many decisions have been
[2] rendered dealing with those types of damages, so
[3] there's nothing new here.
[4]    Q: And you're aware that Fairchild disputes
[5] whether Power Integrations should collect damages
[6] for infringement using a worldwide sales measure
[7] of damages?
[8]    A: Yes. I'm aware of that.
[9]    Q: And what have you done to address that
[10] issue?
[11]    A: Well, I've created this second column
[12] here, which is called U.S. Imports Sales and
[13] Manufacturing. And that's based on taking a —
[14] computing a percentage of the — of these amounts
[15] based on the end products using the Fairchild
[16] parts that come into the United States.
[17]    And the total of that is $7,641,974.
[18]    Q: Okay. I would like the chance to go
[19] through your calculations, Mr. Troxel. So why
[20] don't we turn there.
[21]    Initially, you've indicated that
[22] lost profits, Power Integrations lost profits
[23] because of lost sales. What are lost profits?
[24]    A: Well, lost profits — I have a

Page 785

[1] this case?
[2]    A: Yes, I have.
[3]    Q: What have you determined?
[4]    A: Well, I've determined that there is really
[5] four areas of damages. There's a lost profits
[6] from lost sales. And that's a total of
[7] $14,981,828.
[8]    I determined that there's past price
[9] erosion that has occurred. And I've established
[10] a value there of 1,952,893.
[11]    I believe that future price erosion
[12] is appropriate in this matter, and that total is
[13] $13,018,379. And then reasonable royalty, on all
[14] the sales by Fairchild that are not included as
[15] lost profits, and that total is $8,057,362.
[16]    So a total — then the total damages
[17] is, based on worldwide sales is $38,010,462.
[18]    Q: Are these new damage theories, the ones
[19] that you've mentioned there, are those new damage
[20] theories in this case?
[21]    A: Well, not at all. They're not peculiar to
[22] this case at all. They are dealt with in —
[23] extensively in literature. There's a lot of case
[24] law that describes these four types of damages.

Page 787

[1] demonstrative in which I explain that very
[2] question.
[3]    Lost profits from lost sales, in my
[4] mind, represents the profits that Power
[5] Integrations lost because Fairchild sold an
[6] infringing product that Power Integrations would
[7] otherwise have sold.
[8]    Q: And what are your calculations with regard
[9] to lost profits?
[10]    A: I have — based on the calculations
[11] before, I have determined that there's a total
[12] amount of lost profits from lost sales of
[13] $14,981,828 in lost profits from lost sales.
[14]    Q: And are those connected to certain patents
[15] in this case that may be alleged to be infringed?
[16]    A: Yes. That assumes in all four patents —
[17] I am sorry, that the two patents, '851 and '876
[18] are infringed.
[19]    They relate — those are the only
[20] two patents in which lost profits from lost sales
[21] are asserted. The other two patents I have
[22] calculated a reasonable royalty only on.
[23]    Q: How did you know which Fairchild chips
[24] were accused of infringing Power Integrations'

Page 792

[1] out — kick Power Integrations out of that
[2] market, because Fairchild says they have the same
[3] performance, and they are cost competitive.
[4]     And I thought that was — this is,
[5] of course, a Fairchild document that relates
[6] between those two companies, and demonstrated to
[7] me any way that there was head-to-head
[8] competition.
[9]     Q: Okay. In regards to Fairchild documents
[10] that deal with lost sales to Fairchild, did you
[11] review PX-211?
[12]     A: Yes. This — this also shows the
[13] situation, a similar situation.
[14]     What it does is to stress the
[15] Successful Win Story against PI, which
[16] demonstrates to me that they, that Fairchild was
[17] successful in their strategy to take business
[18] away. Because you see out here, those scales —
[19] the scale here is indicating Power Integrations
[20] is the solid bar, and Fairchild is the colored,
[21] lightly colored bar.
[22]     And out here in Q4, 2004, Power
[23] Integrations doesn't appear. And they have
[24] indicated, therefore, that these products,

Page 793

[1] charger, adapter DVD standby or set-top box,
[2] excuse me, LCD monitor, and all of these
[3] customers, that they have made the sales of
[4] these — of these products, Fairchild products
[5] replacing the Power Integrations' products.
[6]     Q: And that specifically references Dongyang
[7] working for Samsung cell phone chargers?
[8]     A: Yes. Under chargers, adapters, it says
[9] Dongyang, who the end customer is identified as
[10] Samsung cell phone. Salom, who the end customer
[11] is Motorola cell phone. And Leader whose end
[12] product is Sony cell phone.
[13]     Then it goes on to identify Hiteker
[14] and Samsung Sunkorea for LCD monitors.
[15]     Q: I'd like to turn now to the calculation of
[16] your lost sales damages. Were all lost sales
[17] that Power Integrations attributed to Fairchild
[18] in maybe your discussions with Mr. Renouard or
[19] others included in your cost — your lost profit
[20] calculations?
[21]     A: No. As I said before, I included nine
[22] customers out of the 43 that were identified
[23] originally on that spreadsheet in this. And
[24] undoubtedly, one could reason that there might

Page 794

[1] have been more. But as I said, we had this very
[2] severe set of standards that we had set up ahead
[3] of time.
[4]     When I say "we", I mean Mr. Smith
[5] and with whom I was working with. Set up these
[6] standards. And that's what the people did as
[7] they reviewed all these documents.
[8]     Q: Can you identify those nine customers of
[9] all the customers that they lost sales to you?
[10]     A: Yeah. This was a — this is a first page
[11] really of one — an exhibit from my report. And
[12] what it shows is that it says, this is a
[13] calculation of lost profits from lost sales for
[14] October 20, 2004. This is through December 2005.
[15]     And this is the Power Integrations'
[16] part that was lost. This is the Fairchild part
[17] that replaced it. And then I've identified the
[18] company, and this is LG, Microsoft,
[19] Samsung/Dongyang, Lite-On, Samsung, SPI, let's
[20] see, oh, Hepro, Powernet.
[21]     That's about it, I think. Oh, I'm
[22] sorry. All right, Sunkorea. And I think that
[23] should add up to nine if I counted correct.
[24]     Q: So we've got LG, Microsoft, Dongyang,

Page 795

[1] Lite-On, Samsung, SPI, Hiteker, Hepro and
[2] Sunkorea?
[3]     A: That sounds about right.
[4]     Q: Why did you limit your analysis to these
[5] nine customers only?
[6]     A: Well, again, it's because we wanted to be
[7] conservative. I wanted to be certain that there
[8] was head-to-head competition.
[9]     And I wanted to be certain that
[10] these — that, indeed, there was — it would be
[11] little — there would be little question of —
[12] that Fairchild had taken this business away from
[13] PI.
[14]     Q: What factors did you evaluate for lost
[15] profits? How did you evaluate it?
[16]     A: Well, there's four factors, I guess you
[17] would say, or four conditions that, or tests that
[18] are often applied in computing lost profits. The
[19] first one would be demand, that you have to
[20] establish that there is a demand for the patented
[21] feature.
[22]     And then, secondly, you would have
[23] to look and see if there's any non-competing
[24] alternatives. I mean, after all, if — the

Page 796

[1] question there is if the — if the infringing
[2] product had not been in the marketplace, who
[3] would have bought those products?
[4]     And if there's a lot of people
[5] around, let's say, it's a non-infringing
[6] alternative, then it's more difficult to
[7] demonstrate lost profits. When there's only one
[8] person around in the marketplace, than it's much
[9] easier to identify.
[10]     This is sort of — well, I guess, an
[11] example might be to think about, oh, a market
[12] like the camera market. We all — all know that
[13] the camera market would encompass many different
[14] types of cameras and we all know that roll film
[15] is one type of camera. That many would be in
[16] there.
[17]     Another one would be a digital
[18] camera. If my kids were taking pictures of my
[19] grandchildren, I want them to send it to me on
[20] the internet that afternoon, they'd obviously
[21] have to buy a digital camera.
[22]     And so for them to — the kids going
[23] out to do the shopping, that's the relevant
[24] market to them. And the other products would be

Page 798

[1] demand?
[2]     A: Yes. The issue there is: Was there
[3] demand for the patented feature? In order to
[4] evaluate that, it seemed to me you needed to set
[5] up the very definitive narrow market in which
[6] you're looking.
[7]     And so what I defined is what I call
[8] the relevant market in this case. And the
[9] relevant market deals here with high-voltage
[10] analog, PWM integrated circuits that are sold in
[11] the switch mode power supply marketplace, and
[12] that offered this feature of frequency jitter.
[13]     Now, anybody who's going to buy in
[14] that market wants a chip with frequency
[15] jittering. Anybody else is in a different
[16] market. And so I defined — I needed that
[17] definition in order to define what I called the
[18] reasonable — the, excuse me, relevant market,
[19] and then did my evaluation against that relevant
[20] market.
[21]     So that is how I evaluated demand.
[22] And in this case, I think there's a great number
[23] of documents that I reviewed that demonstrated
[24] clearly that there was a demand for that

Page 797

[1] not acceptable substitutes. A roll film wouldn't
[2] be an acceptable substitute.
[3]     So it's a question of what the buyer
[4] is looking for and whether or not there's
[5] somebody else that could offer an acceptable
[6] non-infringing alternative.
[7]     The third criteria — criterion that
[8] would be evaluated in looking at lost profits
[9] would be capacity. Did the patent owner have a
[10] sufficient capacity to have produced the claimed
[11] lost sales?
[12]     And then fourthly, it deals with
[13] computation of the damages. Was the — is there
[14] enough data, enough information available from
[15] which to calculate the lost profits of lost
[16] sales?
[17]     Q: And did you — I assume you used all those
[18] factors in calculating your lost profits from
[19] lost sales?
[20]     A: I did. In every case within which I look
[21] at lost profits, I always use those as my
[22] standard.
[23]     Q: Can you provide me with that analysis of
[24] those four factors starting with the first,

Page 799

[1] particular feature.
[2]     Q: Mr. Troxel, let me show you Exhibit PX-233
[3] at 562318. And is that one such document you
[4] reviewed in your analysis?
[5]     A: Yes, it is. It's a Fairchild
[6] Specifications document for the FSD200. And as
[7] you see, they mention the features. One of the
[8] features is an internal start-up switch and
[9] SoftStart, which is, of course, covered by the
[10] patent by — on the '851 patent.
[11]     And also it mentions frequency
[12] modulation for EMI as being a feature of this
[13] Fairchild product. And that, of course, is the
[14] technology that's covered by the '876 and '851
[15] patents.
[16]     Q: Previously you said that — I just want to
[17] make sure, the '876 and '851 were the jitter
[18] patents, so —
[19]     A: Yes, that's correct. Both of those
[20] covered the frequency jittering.
[21]     Q: How did you evaluate — let me back up and
[22] just ask: Did you also talk to Mr. Renouard
[23] about market conditions about demand?
[24]     A: Oh, yes, certainly. We wanted — I wanted

Page 800

[1] to understand the market conditions and
[2] understand as much as I could about it. And so I
[3] talked to Mr. Renouard, and he helped identify
[4] and layout the market conditions for me.
[5]    Q: Did you also review Mr. Engelbrechten's
[6] deposition?
[7]    A: I did, Mr. Engelbrechten. Also —
[8] Engelbrechten, excuse me, pointed out the fact
[9] that there was a considerable demand for this
[10] product. In fact, he acquired this Samsung
[11] subsidiary in order to acquire this particular
[12] technology, and that this was a product that's
[13] greatly in demand.
[14]    The international standards, I think
[15] he referred to, indicated how important that was
[16] becoming for the power supply market.
[17]    Q: How did you evaluate the second factor,
[18] which was the acceptable non-infringing
[19] alternatives, whether there was any substitutes
[20] for patented technology?
[21]    A: Excuse me. The second factor asks if
[22] there are acceptable non-infringing alternatives,
[23] and I looked at a number of documents trying to
[24] find where there might be identified any other

Page 801

[1] acceptable non-infringing substitutes.
[2]    And the bottom line was that nobody
[3] else really was offering the jittering features.
[4] Nobody else was except Fairchild and Power
[5] Integrations.
[6]    So that I could not — I didn't find
[7] where there would be any non-infringing
[8] alternative that might become available to a
[9] buyer in that marketplace.
[10]    Q: Was there any issue about demand, Power
[11] Integrations' ability to meet that demand or
[12] capacity?
[13]    A: No. That's the third factor. The third
[14] factor is: Did Power Integrations have the
[15] capacity to have produced and then to sell the
[16] claimed lost sales?
[17]    And the answer is, no, there would
[18] have been no problem. They had the fab contracts
[19] that they had provided for something, like, 40 to
[20] 50-percent additional capacity if they needed it.
[21] And remember, there what 00 what's being claimed
[22] here in lost profits, it's only about two percent
[23] of the total sales of Power Integrations during
[24] that period of time.

Page 802

[1]    So a two-percent increase in their
[2] production in sales is not going to require any
[3] particular additional people, or additional sales
[4] force, or additional issues in marketing or
[5] selling costs.
[6]    Q: So let me turn to the fourth factor, which
[7] is actual calculation of lost profits. And I
[8] want to ask you as a premise question: Over what
[9] period of time did you calculate damages that
[10] you're giving an opinion on in this case?
[11]    A: All my damages were calculated from
[12] October 20th, 2004 through 2000 and — well,
[13] actually through the date of trial, through
[14] October 20th. I use October 20th, which is when
[15] I estimated the trial would be, and proved to be
[16] much more efficient then I had given credit for.
[17]    Q: Did you have sales data for that entire
[18] period of time?
[19]    A: No, I did not. The sales — sales and
[20] cost data — in fact, all of the information
[21] related to sales and costs went only through the
[22] fall of 2005. I understand — and I expected to
[23] update my report before the trial, and I
[24] understand that Power Integrations offered to

Page 803

[1] exchange data for 2006 with Fairchild, but
[2] Fairchild refused to provide the data.
[3]    Q: Did you see any data for the FSD210HD
[4] parts manufactured in the United States?
[5]    A: Yes, I did. And I've listed this — this
[6] is Appendix 12 from my — from a supplemental
[7] report that I wrote. And this indicates that
[8] there was this FSD210HD statement data, and this
[9] indicates that this was sold — this was, excuse
[10] me, manufactured in Korea, which is $37,926.
[11]    And then in the U.S., there was
[12] 2,943,000 manufactured in the U.S. from this
[13] period of time — during this period of time.
[14]    Q: So the FSDH — excuse me. FSD210 was
[15] provided in the joint statements?
[16]    A: Yes. This is the way that it was provided
[17] to us in this Fairchild document.
[18]    Q: Okay. Let me show you some charts now and
[19] ask you if these are the worksheet that you used
[20] to calculate damages on lost sales.
[21]    A: It is. That's the — that's the same
[22] chart that we saw before, and this is — there
[23] are five pages here. And I used — this is the
[24] source, then, of my computation for lost profits

Page 804

[1] from lost sales.

[2]    Q: And can you just explain how you
[3] calculated that loss using these documents?

[4]    A: Well, there is an example of one of these,
[5] which if I can have up on the board, I think it
[6] would be easier to work with, then trying to go
[7] through that stack of documents.

[8]    I've selected here the Samsung
[9] Dongyang sales. This is the Fairchild part, the
[10] FSD210HD part. The Power Integrations' part that
[11] was replaced was the SC1009PN. And what I have
[12] done is when you compute lost profits, nothing
[13] complicated here, you will look at sales that you
[14] would have made.

[15]    You look at what the costs would
[16] have been for those sales. And the difference
[17] in it is the profit that you would have made had
[18] you made those sales. That's all that I did
[19] here.

[20]    I did this — this is exemplified
[21] here in those columns. This shows that 2004 —
[22] it's attacking me. The 2004 period of time,
[23] which is from October 20th, again, 2004 forward
[24] until the December 31, 2004.

Page 805

[1]    And then there's Q1, Q2, and out
[2] there is Q3 and Q4 for 2005. And the first row
[3] here represents the number of units that were
[4] sold by Fairchild of that particular FSD210HD to
[5] Samsung Dongyang.

[6]    And I multiplied that then by the 27
[7] cents a part that Power Integrations would have
[8] sold it at had they had the business. And then
[9] the third line — third row here is the revenue,
[10] therefore, that Power Integrations lost because
[11] they didn't make those sales themselves.

[12]    And I then subtracted the cost from
[13] that, which was, excuse me, 16 cents in 2004.
[14] Went down to ten cents in Q1 of 2005. And then
[15] calculated the total cost that would have been
[16] incurred by Power Integrations had they made
[17] those parts and sold them.

[18]    And then, in addition, I added on
[19] other cost factors, commission and bonus
[20] representing the additional costs that they would
[21] have for commissions that they might make on
[22] those sales, and any bonus they would be paid for
[23] the profitability that would have been associated
[24] with the sale. So that came up then with the

Page 806

[1] lost profit figure in this third row. And the
[2] total — total lost profits figure up through
[3] January — excuse me, up through December 31 of
[4] 2005 is $5,284,461.

[5]    Now, I wanted to bring this up in
[6] the course of the date of trial as I said. So I
[7] estimated based on what the 2005 figures were. I
[8] estimated what January 1, 2006 through October
[9] 20, 2006 would be.

[10]    And I estimated that at 3 million,
[11] 6. So the total then for Dongyang and the 210HD
[12] would be $8,890,264. This bottom row, then,
[13] represents the portion that I set up.

[14]    If you recall the second column on
[15] that first page we had, this represents the
[16] portion of the sales, proportionate sales that I
[17] said might have been made in the U.S. based on
[18] the end product sales, which is 18 percent.

[19]    Q: All right. The 2005, 2004 point of sales
[20] files we saw earlier today with Mr. Renouard at
[21] PX-102 are these the sale spreadsheets that you
[22] used to calculate average sale prices?

[23]    A: Yes. That's correct.

[24]    Q: Okay. Now, I want to make it very clear:

Page 807

[1] You do not intend to provide any testimony today
[2] based on average sale prices based on pre-lawsuit
[3] data, pre-October 20, 2004?

[4]    A: That is not my intention.

[5]    Q: So what did you calculate the average
[6] sales price to be for the SC1009 as of October
[7] 20, 2004 on your example?

[8]    A: Well, for the period between 2004, it was
[9] 24 cents. Figure — just 27 cents I think was
[10] the number that was on that page.

[11]    Q: Did you rely on anything else?

[12]    A: Well, there were — I had to get the cost
[13] figures. And there were a couple other documents
[14] that I needed, then, in order to calculate the
[15] costs.

[16]    Then at a document that showed the
[17] total dollars of cost for these — for the parts
[18] of Power Integrations. And then I had a document
[19] that showed the total units. And so I calculated
[20] from that the unit cost that applied on that
[21] document.

[22]    Q: Okay. And after you extrapolated the '06
[23] numbers, what total did you come up with for the
[24] lost profits from lost sales of the FSD210HD, the

# Exhibit 6

## Power Integrations Damages

| DAMAGES | WORLDWIDE SALES | U.S. IMPORTS SALES & MANUFACTURING |
|---|---|---|
| Lost Profits from Lost Sales | $14,981,828 | $3,093,952 |
| Past Price Erosion | $1,952,893 | $351,521 |
| Future Price Erosion | $13,018,379 | $2,343,308 |
| Reasonable Royalty | $8,057,362 | $1,853,193 |
| Totals | $38,010,462 | $7,641,974 |

PD680

**REMAINDER OF EXHIBIT REDACTED**

# Exhibit 7

1

1           IN THE UNITED STATES DISTRICT COURT

2           IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

4    POWER INTEGRATIONS, INC.,        :        CIVIL ACTION
                                      :
5              Plaintiff             :
                                      :
6              vs.                    :
                                      :
7    FAIRCHILD SEMICONDUCTOR          :
     INTERNATIONAL, INC. and          :
8    FAIRCHILD SEMICONDUCTOR          :
     CORPORATION,                     :
9                                     :
               Defendants            :        NO. 04-1371 (JJF)

10                       - - -

11
                            Wilmington, Delaware
12                          Thursday, November 30, 2006
                            11:07 o'clock, a.m.
13                          ***  Telephone Conference

14                       - - -

15   BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.

16                       - - -

17   APPEARANCES:

18          FISH & RICHARDSON, P.C.
            BY:  WILLIAM J. MARSDEN, JR., ESQ.
19
20                    -and-

21

22

23

24                    Valerie J. Gunning
                      Official Court Reporter
25

2

1   APPEARANCES (Continued):

2
        FISH & RICHARDSON, P.C.
3       BY:  HOWARD G. POLLACK, ESQ. and
             MICHAEL HEADLEY, ESQ.
4            (Silicon Valley, California)

5
             Counsel for Plaintiff
6

7       ASHBY & GEDDES
        BY:  STEVEN J. BALICK, ESQ.
8

9                 -and-

10
        ORRICK, HERRINGTON & SUTCLIFFE LLP
11      BY:  G. HOPKINS GUY, III, ESQ. and
             VICKI FEEMAN, ESQ.
12           (Silicon Valley, California)

13
             Counsel for Defendants
14

15                    - - -

16

17

18

19

20

21

22

23

24

25

1   combine test, and their lack of understanding as to what, in

2   fact, the Federal Circuit does -- does require in its law

3   with regard to a motivation to combine.

4         We do not believe, even if obviousness is an

5   issue with one or more of the patents, that the motivation to

6   combine issue is one that needs to be addressed in this

7   trial.

8         And while Dr. Horowitz, it's true, did not

9   describe a motivation to combine in any of his expert

10  reports, we don't believe it's necessary to go there for us

11  as a patentee to defend the validity of these patents,

12  because even if they are combined, the references don't teach

13  the claim limitations, and therefore we, as we said in our

14  letter, do not intend to bring up the motivation to combine

15  as a requirement and are okay with that portion of the

16  obviousness jury instruction being removed.

17        Therefore, even if obviousness is at issue, we

18  don't believe the KSR case should affect it.

19        Whether the Supreme Court will deal with the

20  obviousness standard more broadly and restate the law is

21  speculation at this point, including the fact that if they do

22  radically change the standard for obviousness, whether, in

23  fact, they will make that retroactive, as no one has.  No one

24  has even commented on that, whether, in fact, they would say

25  the last 20 years of granted patents all need to be

11

1   reexamined.  I tend to doubt that that would be the outcome

2   and very well they may rule that even though we are changing

3   the standard, that the old standard applies to all issued

4   patents that were granted under that standard.

5           We don't know.  It's speculation to say one way

6   or the other.

7           On the issue of staying the trial and a delay,

8   your Honor, I wanted to raise the point that, as we've said

9   in several discussions with you, delay is tremendously

10  harmful to Power Integrations, especially now that the

11  accused products have been found to infringe, that Fairchild

12  has been found to willfully infringe.

13          Your Honor should know that that has not

14  deterred them.  They are still selling these infringing

15  products in the marketplace, causing continued irreparable

16  harm to my client, and any delay just simply makes it

17  worse.

18          We don't think a delay is appropriate and

19  we think that we should go forward with our trial next

20  week.

21          The last point I want to make on that is,

22  if your Honor is even considering postponing this trial,

23  Power Integrations respectfully requests that the Court

24  grant a preliminary injunction in this matter to prevent

25  continued irreparable harm.  And we would welcome the

12

1    opportunity, since all the witnesses are in town and all

2    the lawyers are here, to make a showing for why that should

3    be granted pending any delay in the trial, and we would be

4    happy to have a hearing on that on Monday and present

5    whatever evidence your Honor would want to hear on it, but we

6    think that we can show that they are not reasonably likely to

7    prevail on their validity contentions and that an injunction

8    should be granted pending any delay in a full trial on the

9    merits.

10           MR. GUY:  Your Honor, if I may respond?

11           THE COURT:  Yes.

12           MR. GUY:  Your Honor, we're not interested in

13   delay.  We are certainly here, prepared to try the case.  At

14   the same time, trying the case and then trying it again is an

15   enormous burden and should not be -- should be avoided, if at

16   all possible.

17           The point that motivation to combine is somehow

18   not in this case is simply wrong.  If that is the case, it's

19   not here, then all of our evidence and all of our contentions

20   are proper and everything should come in.

21           So I -- three days ago, they were arguing to

22   exclude evidence on that basis and now they are arguing that

23   it's not in the case.  So that is just completely

24   disingenuous.

25           The other point, your Honor -- sorry.  Someone

13

1  spilled a cup of coffee.  It wasn't me.

2        As far as responding to this idea of a grant of a

3  preliminary injunction, your Honor, there are serious issues

4  that go to the validity of these patents as we have raised

5  and we're about to try that.  And they have not made a

6  showing and certainly have not or even tried to leading

7  up to this to show that these patents are likely to succeed

8  on that point.

9        I point out that they knew about the -- claim

10 that they knew about alleged infringement of Fairchild a year

11 or so before, and they sat on their rights and did nothing,

12 so the need or the emergency that they now claim exists over

13 a delay that would probably stretch no more than four or five

14 months, perhaps, would -- is simply not there.

15        THE COURT:  Can you address the idea that any

16 decision wouldn't be retroactive?

17        MR. GUY:  Sure.

18        The decision -- I don't have a rule number

19 right in front of me, but there is certainly federal --

20 certainly, the Federal Rules provide that a change in the

21 law would allow us to go in and ask for a new trial or ask

22 for any remedy appropriate with what the change in law would

23 be.

24        I don't have the rules directly in front of me.

25 But as long as there is -- there is no final nonappealable

14

1    order of a Court, we would be able to raise that issue on a

2    change of the law.

3            The issue here is whether the statute which has

4    been existing for many, many years has been, in fact,

5    interpreted incorrectly by a Court-imposed restriction on

6    that statute, called the teaching, suggestion, motivation to

7    combine.

8            So the question is:  We have the same statute

9    here today before us, your Honor.  The question is its

10   interpretation.  And in that situation, we would be able to

11   raise it on appeal before the Federal Circuit.  And, of

12   course, the Supreme Court decision is a final, final order,

13   and that would change it.

14           So I think that at that point, we would have new

15   law that we would be able to bring into the case and then

16   there would be absolutely no doubt that it would have an

17   effect on all pending cases.

18           The suggestion that you go back and go back 20

19   years and then relitigate everything is simply wrong, because

20   in those cases where the judgment has been made final, they

21   would not be reopened.

22           So it really is going to affect pending cases

23   that are before the Courts, that have not yet received a

24   final nonappealable order, and I think that that is well

25   settled.

15

1        We can brief that issue, if you'd like, your

2   Honor, but I believe that that is well settled and that

3   the decision of the Supreme Court would be binding upon --

4   depending on the timing, it would be binding on the -- on

5   this Court if it came out during the pendency and prior

6   to a final judgment by the District Court, and it certainly

7   would be binding and would be citeable in the Federal

8   Circuit.

9        THE COURT:  All right.

10       MR. POLLACK:  Your Honor, one point on this issue

11  that we are being disingenuous.

12       I think that -- I think if you look at our

13  papers with regard to the issue of obviousness, the lack

14  of motivation to buy isn't the basis for exclusion.  The

15  basis for exclusion is the contention wasn't identified

16  at all, and that's our argument, to say that we said

17  yes.

18       Even further, it's more difficult if you

19  allow it in, because not only did they not identify it, he

20  didn't provide any analysis of, among other things,

21  motivation to combine.  It's true, we said that, but the

22  basis for the exclusion is the lack of an identification

23  of any contention whatsoever.  And so I just did not

24  want to leave that as -- if I agreed with Mr. Guy's

25  characterization.

16

1        On the issue of the fact that we delayed before

2    suit or that we have not made any showing of a likelihood to

3    succeed, on the latter, that's what we're asking for, if you

4    are considering delaying, and with regard to the timing of

5    the filing of suit, that was at a time when Power

6    Integrations was not sure that Fairchild infringed, and that

7    question has been answered.  And so the irreparable harm is

8    clear on that score, and I think that's really all I have to

9    say on those issues, your Honor.

10        Thank you for the opportunity.

11        MR. GUY:  Your Honor, one last cite, if I may

12    provide it to the Court.

13        The joint pretrial order in this case, dated

14    September 1, 2006, Power Integrations filed an exhibit

15    entitled "Power Integrations' Statement of Issues of Fact

16    Remaining to be Litigated and Expected Proof," and under

17    Roman Numeral I(C), "Validity of Power Integrations' Patent,

18    Section," it says,"Where Fairchild is relying on a

19    combination of references to assert invalidity under 35

20    U.S.C., Section 103, whether there is a suggestion to combine

21    the references."

22        So they directly state in the pretrial

23    conference, the joint report, that that was an issue,

24    that is an issue in this case, and it was an issue to

25    be tried.

1          Going back to the preliminary injunction issue

2    just briefly, their reasons for delay are clear.  We can

3    provide the Court in briefing, if the Court asks for it,

4    although I don't think we need to have a full-blown

5    preliminary injunction hearing, but we can provide the

6    Court that a year before, they had reports on our reverse

7    engineering, and that -- we have testimony to go along with

8    that.

9          So their delay of over a year bringing the

10   lawsuit would alone guide the Court in denying any

11   preliminary injunction that there's an emergency right now

12   that needs to be addressed.

13          So I don't need that we need to go through

14   a full-blown preliminary injunction hearing.  That would

15   basically be trying the case on validity itself.  I think

16   that's basically what it boils down to.

17          So we can short-circuit that and create a record

18   very easily that there was a delay and of more than a year,

19   about a year, I believe, and we can show the Court that

20   evidence.

21          Thank you, your Honor.

22          THE COURT:  I don't think anybody is interested

23   in not going to trial next week.  Certainly, you know, we

24   would like to do it in a way that does not have to be

25   undone.

18

1          We have two bad examples in the federal system

2     right now.   On the criminal side, we have the Booker case,

3     which required the Court of Appeals to send back, I don't

4     know how many, but a lot of sentencing cases.   And we have in

5     the employment discrimination area, the Supreme Court

6     changing the standard for First Amendment whistleblowers

7     after cases were tried and kind of influx, and they pretty

8     much revamped the standard and said if it's part of your job,

9     you don't have a claim.

10         And two of us got caught in that after spending

11    six, ten days with juries.

12         Is there any possibility that, on the validity

13    questions, that there would be a jury trial waiver?

14         MR. POLLACK:   I'm not sure I understand your

15    question, your Honor.

16         THE COURT:   Are you willing to waive a jury trial

17    on the validity issue?   See, I think this decision is going

18    to come down in the first quarter of 2007 and everything you

19    can read says that they have heightened interest in settling

20    this area.

21         A nonjury trial allows the trial to go

22    forward and the application of the legal principles and

23    the decision to be delayed until the Supreme Court issues

24    its decision.

25         A jury trial, as you know, requires you to go