IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC.,      )    **REDACTED**
                              )    **PUBLIC VERSION**
           Plaintiff,    )
                              )
    v.                  )    C.A. No. 04-1371-JJF
                              )
FAIRCHILD SEMICONDUCTOR     )
INTERNATIONAL, INC., and FAIRCHILD   )
SEMICONDUCTOR CORPORATION,    )
                              )
          Defendants.   )

---

**DEFENDANTS FAIRCHILD SEMICONDUCTOR INTERNATIONAL,
INC. AND FAIRCHILD SEMICONDUCTOR CORPORATION'S
MOTION FOR REMITTER, JUDGMENT AS A MATTER OF LAW, OR,
IN THE ALTERNATIVE, NEW TRIAL CONCERNING DAMAGES**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

G. Hopkins Guy, III
Vickie L. Feeman
Bas de Blank
Gabriel M. Ramsey
Brian H. VanderZanden
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7400

Dated: December 3, 2007
186350.1

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  LEGAL STANDARDS ..................................................................................... 2

    A.   The Legal Standard for Judgment as a Matter of Law ............................. 2

    B.   The Legal Standard for Remittitur ............................................................ 3

    C.   The Legal Standard for a Motion for a New Trial .................................... 4

III. POWER INTEGRATIONS IS NOT ENTITLED TO "WORLDWIDE"
    DAMAGES ......................................................................................................... 4

    A.   "Worldwide" Damages Are Improper As a Matter of Law ..................... 4

    B.   Power Integrations Concedes That Its "Worldwide" Damages Occurred
        Outside the United States ........................................................................... 7

    C.   Power Integrations' Theory of "Worldwide" Damages Is Legally Wrong ........... 8

IV.  POWER INTEGRATIONS IS NOT ENTITLED TO SPECULATIVE
    DAMAGES ....................................................................................................... 10

    A.   There Is No Evidence That 18% of Fairchild's Products Are Actually
        Imported By Others Into the United States ............................................. 11

    B.   Fairchild Did Not Actively Induce Such Hypothetical Infringement ................. 14

        1.   There is no evidence of any underlying act of third party, direct
            infringement necessary for a finding of inducement by Fairchild .......... 14

        2.   Fairchild did not encourage direct infringement by another .................. 15

V.   POWER INTEGRATIONS' DAMAGES THEORIES ARE CONTRARY TO
    THE LAW AND THE EVIDENCE ............................................................... 16

    A.   Power Integrations Is Not Entitled to Lost Profits or Price Erosion .................. 16

        1.   Power Integrations' circular definition of "relevant market" is
            wrong ........................................................................................................ 16

        2.   Even under Power Integrations' definition of "relevant market",
            there are non-infringing alternatives ...................................................... 18

    B.   Power Integrations Is Not Entitled to "Future" Lost Profits or Price
        Erosion ..................................................................................................... 20

VI.  THE COURT SHOULD REDUCE POWER INTEGRATIONS' DAMAGES ............. 20

VII. CONCLUSION ................................................................................................. 21

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amstar Corp.* v. *Envirotech Corp.*,
823 F.2d 1538 (Fed. Cir. 1987)............................................................5

*Boesch* v. *Graff*,
133 U.S. 697 (1890)............................................................6

*Brown* v. *Duchesne*,
60 U.S. 183 (1856)............................................................5, 6

*Callaway Golf Co.,* v. *Slazenger*,
384 F. Supp. 2d 735 (D. Del. 2005)............................................................4

*DSU Med. Corp.* v. *JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006)............................................................14, 15, 16

*Daubert* v. *Merrell Dow Pharms.*,
509 U.S. 579 (1993)............................................................12, 13

*Dawn Equip. Co.* v. *Kentucky Farms, Inc.*,
140 F.3d 1009 (Fed. Cir. 1998)............................................................3

*Dean Foods Co.* v. *Consolidated Freightways*,
29 F. Supp. 2d 495 (N.D. Ill. 1998)............................................................13

*Deepsouth Packing Co.* v. *Laitram Corp.*,
406 U.S. 518 (1972)............................................................5, 6, 7, 10

*Dowagiac Mfg. Co.* v. *Minnesota Moline Plow Co.*,
235 U.S. 641 (1915)............................................................5, 6

*Dynacore Holdings Corp.* v. *U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004)............................................................9

*Grain Processing Corp.* v. *American Maize-Products Co.*,
185 F.3d 1341 (Fed. Cir. 1999)............................................................12, 17, 19

*Hewlett-Packard Co.* v. *Bausch & Lomb*,
909 F.2d 1464 (Fed. Cir. 1990)............................................................15

*IMX* v. *LendingTree, LLC*,
469 F. Supp. 2d 203 (D. Del. 2007)............................................................4

*IPPV Enterprises, LLC* v. *Echostar Comms. Corp.*,
   191 F. Supp. 2d 530 (D. Del. 2002) ................................................................3, 10, 20, 21

*Imagexpo, LLC* v. *Microsoft Corp.*,
   284 F. Supp. 2d 365 (E.D. Va. 2003) ........................................................................ 9

*Johns Hopkins Univ.* v. *Cellpro, Inc.*,
   152 F.3d 1342 (Fed. Cir. 1998) ................................................................................6

*Joy Tech. Inc.*, v. *Flakt, Inc.*,
   954 F. Supp. 796 (D. Del. 1996) ....................................................................16, 19

*Joy Tech. Inc.*, v. *Flakt, Inc.*,
   6 F.3d 770 (Fed. Cir. 1993) ....................................................................................14

*Lam, Inc.* v. *Johns-Manville Corp.*,
   718 F.2d 1056 (Fed. Cir. 1983) ..............................................................................16

*Micro Chem.* v. *Lextron, Inc.*,
   318 F.3d 1119 (Fed. Cir. 2003) ..............................................................................17

*Microsoft Corp.* v. *AT&T Corp.*,
   127 S. Ct. 1746 (2007) .............................................................................4, 5, 6, 10

*Montgomery County* v. *Microvote Corp.*,
   320 F.3d 440 (3d Cir. 2003) ............................................................................12, 13

*Oiness* v. *Walgreen Co.*,
   88 F.3d 1025 (Fed. Cir. 1996) ..........................................................................3, 20

*Panduit Corp.* v. *Stahlin Bros. Fibre Works*,
   575 F.2d 1152 (6th Cir. 1978) ................................................................................17

*Pannu* v. *Iolab Corp.*,
   155 F.3d 1344 (Fed. Cir. 1998) ..........................................................................2, 10

*Perkin-Elmer Corp.* v. *Computervision Corp.*,
   732 F.2d 888 (Fed. Cir. 1984) ..................................................................................2

*Rite-Hite Corp.* v. *Kelley Co., Inc.*,
   56 F.3d 1538 (Fed. Cir. 1995) ..................................................................................6

*Rotec Indus.* v. *Mitsubishi Corp.*,
   215 F.3d 1246 (Fed. Cir. 2000) ................................................................................5

*SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.,*
    926 F.2d 1161 (Fed. Cir. 1991)................................................................16, 19

*In re TMI Litig.,*
    193 F.3d 613 (3d Cir. 1999)...........................................................................13

*Trs. of Columbia Univ. v. Roche Diagnostics GmbH,*
    272 F. Supp. 2d 90 (D. Mass. 2002) ..............................................................6

*United States v. Jackson,*
    208 F.3d 633 (7th Cir. 2000) .........................................................................13

*Virginia Panel Corp. v. MAC Panel Co.,*
    133 F.3d 860 (Fed. Cir. 1997)..........................................................................7

*Wady v. Provident Life and Accident Ins. Co. of Am.,*
    216 F. Supp. 2d 1060 (C.D. Cal. 2002) ........................................................13

*Williamson v. Consolidated Rail Corp.,*
    926 F.2d 1344 (3d Cir. 1991)...........................................................................2

## FEDERAL STATUTES

35 U.S.C. §154..................................................................................................6

35 U.S.C. § 271 ........................................................................................*passim*

## RULES

Fed. R. Civ. P. 59(a) ........................................................................................4

## OTHER

*9A Wright & Miller*, Federal Practice & Procedure § 2524 at 249-266 (3d ed. 1995)....................3

## I.    **INTRODUCTION.**

The damages awarded by the jury are legally wrong and without evidentiary support. Over Fairchild's objections, Power Integrations sought – and was awarded – $33,981,781 in extra-territorial, "worldwide" damages based on infringement of United States patents. As a pure matter of law, Power Integrations cannot recover damages for "infringement" of a United States patent based on activity that occurs entirely outside of the United States. Power Integrations' witnesses concede that over $30 million of Power Integrations "worldwide" damages are not caused by any conduct, by any party, at any time within the United States. Thus, the jury's award is legally wrong and must be rejected.

Since the jury's damages award is improper, the question becomes what amount of damages (if any) can be supported by the admitted evidence. Perhaps recognizing the "worldwide" damages cannot be recovered, Power Integrations argued at trial that, in the alternative, it was entitled to roughly $7 million of damages due to "U.S. manufacture and sales." These damages are also unsupported by the evidence and must be rejected because they rely upon importation by third parties and not upon any alleged infringement by Fairchild.

While the undisputed evidence shows that Fairchild made, sold, and imported $765,724 worth of accused devices in the United States, Power Integrations speculated that 18% of the accused devices that were manufactured and sold outside of the United States were later imported into the United States by some unidentified party (not Fairchild). Thus, Power Integrations attributed 18% of its "worldwide" damages to "U.S. manufacture and sales", which it sought from Fairchild to achieve the unsupported $7 million damages figure.

Essentially, Power Integrations argues that Fairchild induced some unidentified third party to import the accused devices into the United States. While Power Integrations had the burden – and every opportunity – to collect and present proof of such third party importation and alleged infringement, if it existed, there is absolutely no direct evidence that any of the devices made and sold abroad are later imported into the United States, let alone that Fairchild actively induces this importation. Consequently, as a matter of law, Power Integrations cannot recover

1

damages from Fairchild for alleged "U.S. manufacture and sales" by unspecified third parties where no evidence of actual importation exists.

Moreover, Power Integrations was awarded damages for past and "future" lost profits and price erosion. Since the evidence demonstrates that there exist myriad non-infringing alternatives (including non-accused Fairchild devices), such damages are unsupportable.

Finally, Power Integrations cannot recover "worldwide" damages for alleged infringement of a United States patent. Thus, Power Integrations' damages must be reduced to the highest amount that the jury could have properly awarded based on Fairchild's activity within the United States. The parties stipulated that $765,724 worth of accused devices were made or imported into the United States by Fairchild. Applying the 15% royalty determined by the jury, the Court should reduce Power Integrations damages to $114,858.60.

## II.     LEGAL STANDARDS.

The Court has the power – indeed, the obligation – to reduce the damages to an amount that could be supported by the evidence. In the alternative, the Court should order a new trial on the issue of damages.

### A.     The Legal Standard for Judgment as a Matter of Law

To prevail on a motion for judgment as a matter of law following a jury trial, the moving party "'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings.'" *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (quoting *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984)). In assessing the sufficiency of the evidence, the Court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the light most favorable to him." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991), *reh'g en banc denied*, 1991 U.S. App. Lexis 16758 (3d Cir. 1991). The Court may not evaluate the credibility of the witnesses, may not weigh the evidence, and

may not substitute its view of the evidence for the jury's view. Rather, the Court must determine whether the evidence reasonably supports the jury's verdict. *See Dawn Equip. Co. v. Kentucky Farms, Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998); 9A *Wright & Miller*, Federal Practice & Procedure § 2524 at 249-266 (3d ed. 1995) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury properly could find a verdict for that party.").

Fairchild is entitled to judgment as a matter of law that Power Integrations cannot recover for alleged "infringement" of a United States patent that occurred entirely outside of the United States. Such extraterritorial damages are not permitted by the Patent Act (*See* 35 U.S.C. § 271) and contradict over a century and a half of Supreme Court precedent. As a matter of law, the manufacture and sale of devices outside the United States that are not later imported into the United States simply cannot infringe a U.S. patent or support an award of damages.

### B.    The Legal Standard for Remittitur.

The Court may "remit a verdict where in light of the evidence, the verdict is so unreasonably high that it would be unconscionable to permit it to stand." *IPPV Enter. LLC v. Echostar Comms. Corp.*, 191 F. Supp.2d 530, 572 (D. Del. 2002). A jury's damages award will not be upheld if it is "grossly excessive", "clearly not supported by the evidence", or "based on speculation or guess work." *See Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031 (Fed. Cir. 1996). In such cases, the Court should "remit the damage award to the highest amount the jury could 'properly have awarded based on the relevant evidence.'" *IPPV*, 191 F. Supp.2d at 573.

The jury's award of "worldwide" damages for the alleged infringement of a United States patent is so contrary to the law that it cannot stand. Similarly, the conjecture that Power Integrations presented to the jury – that 18% of the devices it admits are manufactured and sold abroad are later imported by unidentified third parties – is so speculative that it must be rejected. To determine the appropriate amount of damages, the Court should apply the 15% royalty rate determined by the jury to the $765,724 worth of accused devices that the parties agree were actually made, sold, or imported into the United States by Fairchild. Thus, the damages should

3

be reduced to $114,858.60.

### C.    The Legal Standard for a Motion for a New Trial.

In the alternative, the Court should order a new trial on the issue of damages. Under Federal Rule of Civil Procedure 59(a), a new trial may be granted "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a). The decision whether to grant a motion for a new trial lies within the discretion of the court, which need not make inferences in non-moving party's favor. *Callaway Golf Co.,* v. *Slazenger*, 384 F. Supp.2d 384 F. Supp. 2d 735, 739-40 (D. Del. 2005); *IMX v. LendingTree, LLC*, 469 F. Supp.2d 203, 208 (D. Del. 2007). Given the complexity of the patent issues and damages calculations, a new trial is particularly appropriate. "[W]here a trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors a verdict should be scrutinized more closely by the trial judge than is necessary where the litigation deals with material which is familiar and simple, the evidence relating to ordinary commercial practices." *IMX*, 469 F. Supp.2d at 208-09.

## III.    POWER INTEGRATIONS IS NOT ENTITLED TO "WORLDWIDE" DAMAGES.

The vast bulk of Power Integrations' damages – over $30 million of the $34 million awarded – is based on activity that Power Integrations concedes occurred entirely outside the United States. As a matter of law, such damages are improper and must be eliminated.

### A.    "Worldwide" Damages Are Improper As a Matter of Law.

Earlier this year, the Supreme Court reemphasized that "it is the general rule under United States patent law that no infringement occurs when a patented product is made and sold in another country." *Microsoft Corp. v. AT&T Corp.*, 127 S. Ct. 1746, 1750 (2007). In the *Microsoft* case, the Supreme Court considered 35 U.S.C. § 271(f) – the sole exception to this general rule. That exception does not apply since Power Integrations has never suggested that Fairchild manufactures a patented component within the United States for assembly abroad. *See* 35 U.S.C. § 271(f).

By law, a United States patent can only be infringed by activity within the United States:

> whoever without authority makes, uses, offers to sell, or sells any patented invention, ***within the United States***, or imports ***into the United States*** any patented invention during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271(a) (emphasis added). "The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law. The traditional understanding that our patent law 'operates only domestically and does not extend to foreign activities,' is embedded in the Patent Act itself, which provides that a patent confers exclusive rights in an invention within the United States." *Microsoft*, 127 S. Ct. at 1758; *see Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1546 (Fed. Cir. 1987) ("foreign manufacture and assembly" cannot infringe U.S. patent).

For over 150 years, the Supreme Court has consistently held that a patentee cannot recover damages for activity that occurs outside the United States. "The use of [a patented article] outside of the jurisdiction of the United States is not an infringement of his rights, ***and he has no claim to any compensation for the profit or advantage the party may derive from it***." *Brown v. Duchesne*, 60 U.S. 183, 195-196 (1856) (emphasis added). Indeed, Congress lacks the Constitutional power to regulate activity occurring entirely outside of the United States:

> The patent laws are authorized by that article in the Constitution which provides that Congress shall have power to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries. ***The power thus granted is domestic in its character, and necessarily confined within the limits of the United States.*** It confers no power on Congress to regulate commerce… which belong to a foreign nation….

*Brown*, 60 U.S. at 195.

The Supreme Court repeatedly has confirmed that "the right conferred by a patent under our law is confined to the United States and its Territories and ***infringement of this right cannot be predicated of acts wholly done in a foreign country***." *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 650 (1915) (emphasis added); *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 531 (1972) ("our patent system makes no claim to extraterritorial effect"); *Microsoft*, 127 S. Ct. at 1750. Thus, "extraterritorial activities… are irrelevant to the

case before us." *Rotec Indus. v. Mitsubishi Corp.*, 215 F.3d 1246, 1251 (Fed. Cir. 2000).

Ignoring over 150 of settled Supreme Court precedent, Power Integrations seeks damages based on "worldwide" infringement of a United States patent. Power Integrations appears to rely upon *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538 (Fed. Cir. 1995). As an initial matter, a decade old Federal Circuit case cannot overcome the weight of Supreme Court precedent holding that one cannot infringe a U.S. patent by making and selling a product abroad. *See e.g. Microsoft*, 127 S. Ct. at 1750; *Deepsouth*, 406 U.S. at 531; *Dowagiac*, 235 U.S. at 650; *Brown*, 60 U.S. at 199. Indeed, *Rite-Hite* does not suggest – let alone, hold – that such foreign sales can infringe a U.S. Patent. To the contrary, *Rite-Hite* dealt with purely domestic infringement and never made a finding that extraterritorial relief was available under a U.S. patent. *Rite-Hite*, 56 F.3d at 1546 ("notwithstanding the broad language of § 284, judicial relief cannot redress every conceivable harm that can be traced to an alleged wrongdoing."). Instead, there is a "background question whether the asserted injury is of the type for which the patentee may be compensated." *Id.* Foreign manufacture and sales does not satisfy this "background question" since, by definition, it cannot infringe a U.S. patent.

If Power Integrations desires to prevent "infringement" in foreign countries, "its remedy today lies in obtaining and enforcing foreign patents." *Microsoft*, 127 S. Ct. at 1759; *Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1367 (Fed. Cir. 1998) ("to the extent that Hopkins complains that CellPro's infringement has damaged its ability to service foreign markets, Hopkins must rely on foreign patent protection."); *Trs. of Columbia Univ. v. Roche Diagnostics GmbH*, 272 F. Supp. 2d 90, 119 (D. Mass. 2002) ("Damages for foreign acts should be sought in foreign courts."). The Supreme Court has been abundantly clear – Power Integrations cannot recover "worldwide" damages for alleged infringement of a United States patent:

> We note that what is at stake here is the right of American companies to compete with an American patent holder in foreign markets. ***Our patent system makes no claim to extraterritorial effect***; "these acts of Congress do not, and were not intended to, operate beyond the limits of the United States," *Brown v. Duchesne*, 19 How., at 195; and we correspondingly reject the claims of others to such control over our markets. Cf. *Boesch v. Graff*, 133 U.S. 697, 703 (1890). ***To the degree that the inventor needs protection in markets other than those of this***

*country, the wording of 35 U.S.C. §§ 154 and 271 reveals a congressional intent to have him seek it abroad through patents secured in countries where his goods are being used.* Respondent holds foreign patents; it does not adequately explain why it does not avail itself of them.

*Deepsouth*, 406 U.S. at 531. Indeed, it is misuse -- rendering a patent unenforceable -- even to seek extraterritorial or "worldwide" damages unrelated to infringement within the United States. *See Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868-69 (Fed. Cir. 1997).

### B. Power Integrations Concedes That Its "Worldwide" Damages Occurred Outside the United States.

Power Integrations' damages expert, Richard Troxel, testified that Power Integrations' proposed damages were "*based on worldwide sales.*" [10/4/06 Troxel Trial Tr. 785:16-17]. As set forth in the verdict form, with the exception of the royalty rate, the jury accepted all of Power Integrations' damages arguments and theories.[1] Thus, there is no dispute that Power Integrations sought -- and was awarded -- "worldwide" damages for activities that occurred entirely outside of the United States.

Indeed, Mr. Troxel specifically distinguished his "worldwide" damages from the $7.4 million that was allegedly due to importation (by third parties, not Fairchild) into or activity within the United States. During cross-examination, Mr. Troxel conceded that this roughly $30 million difference was entirely unrelated to any potentially infringing activity (make, use, sell, offer sale or import) within the United States:

| Alleged Act | Power Integrations Concedes No Act in United States |
|---|---|
| Devices not "*made*" in the United States | Q. This $30 million of alleged damages are ***not related to parts that were manufactured in the United States***; is that correct?<br><br>A. That is -- yeah. Well, that's mathematically the way it would work out. That's correct.<br><br>[10/4/06 Troxel Trial Tr. 839:4-10] |
| Devices not "*used*" in the United States | Q. And this $30 million difference of alleged damages are ***not related to parts that were used in the United States***; is that correct?<br><br>A. That's right. These would be worldwide. These would be sales outside the U.S. |

---

[1]     Power Integrations had sought royalty rates of 30% for the '876 and '851 Patent, 20% for the '366 Patent, and 15% for the '075 Patent. [10/4/06 Troxel Trial Tr. 830:9-831:6]. The jury determined that the appropriate royalty rate was 15% for each patent. [DI 415].

| Alleged Act | Power Integrations Concedes Not in United States |
|---|---|
| | [10/4/06 Troxel Trial Tr. 839:12-17] |
| Devices not "**_sold_**" in the United States | Q.    And now this $30 million of alleged damages are **_not related to parts that were sold in the United States_**; is that correct?<br><br>A.    Not directly.  That's correct.  The total computation would not include -- would exclude the dollars of sales that remain in the U.S.<br><br>[10/4/06 Troxel Trial Tr. 839:19-840:1] |
| Devices not "**_offered for sale_**" in the United States | Q.    You **_never specifically quantified any damages caused by any offer for sale made by Fairchild in the United States_** in your expert report?<br><br>A.    That sounds like a legal interpretation.  I mean, my expert report says what it says, and that, to me – I'm assuming – I'm assuming infringement in the U.S., and that assuming infringement in the U.S., then I'm saying these are the – this is how they're hurt worldwide.  I didn't try to determine the reasons to how the infringement was found.<br><br>Q.    I'm sorry if my question wasn't clear.  All I'm saying is:  **_There's no specific number in your expert report where you say this is the amount of damages caused by Fairchild based on any offer for sale made in the United States_**.  There's no specific dollar number.  That's all I'm asking.<br><br>A.    Well, how could I split it out?  I mean, there's many things that are not in my report.<br><br>Q.    And that's –<br><br>A.    That's among them.  But it has nothing to do, of course, with the numbers that I did have in my report.<br><br>[10/4/06 Troxel Trial Tr. 838:1-839:1] |
| Devices not "**_imported_**" into the United States | Q.    This $30 million of alleged damages are also **_not related to parts that were imported into the United States by Fairchild_**; is that correct?<br><br>A.    That's correct.<br><br>* * *<br><br>Q.    And it's also true, isn't it, that this $30 million of alleged damages are **_not related to parts that were imported into the United States by anybody_**?<br><br>A.    What was the previous question?  Oh, you said imported by Fairchild.<br><br>Q.    By Fairchild previously.<br><br>A.    No.  That's correct.<br><br>[10/4/06 Troxel Trial Tr. 840:4-20] |

Since the activities upon which Mr. Troxel based his "worldwide" damages do not constitute infringement of a United States patent, these damages must be rejected. *See Microsoft*, 127 S. Ct. 1746 at 1750.

**C.    Power Integrations' Theory of "Worldwide" Damages Is Legally Wrong.**

While conceding that at least $30 million of its "worldwide" damage claims were based

on activities that occurred entirely outside the United States (and, thus, do not constitute infringement), Power Integrations still demands compensation. However, Power Integrations' arguments fail as a matter of law.

First, Power Integrations argues that Fairchild is liable for "worldwide" damages because Fairchild induced infringement by third parties. Power Integrations' expert, however, conceded that Power Integrations' "worldwide" damages are premised on activities without any connection to the United States. [10/4/06 Troxel Trial Tr. 838:1-840:8]. Indeed, Mr. Troxel specifically admitted that his "worldwide" damages were based on products that were not imported by Fairchild *or anyone else* into the United States. [10/4/06 Troxel Trial Tr. 840:13-20]. As a matter of law, there can be no liability (and, thus, no damages) for inducement without first proof of *individual, identified* underlying acts of direct infringement – in this case, evidence that the accused products were imported into the United States – and second proof that Fairchild actively aided in the importation of devices:

> A defendant's liability for indirect infringement must relate to the identified instances of direct infringement. Plaintiffs who identify *individual* acts of direct infringement must restrict their theories of vicarious liability--and tie their claims for damages or injunctive relief – to *the identified act.*

*Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274-76 (Fed. Cir. 2004) (original emphasis); *Imagexpo, LLC v. Microsoft Corp.*, 284 F. Supp. 2d 365, 369 (E.D. Va. 2003) ("In cases in which there is a question whether every sale leads to an instance of direct infringement, a patentee must... establish the connection between sales and direct infringement."). Since Power Integrations admits that at least $30 million of its "worldwide" damages do not result from any infringement in the United States, as a matter of law Fairchild cannot be liable for inducement.

Next, Power Integrations speculates that "worldwide" damages are appropriate because customers would not purchase Fairchild's products *anywhere* in the world if they could not be used in the United States. [10/4/06 Troxel Trial Tr. 809:22-810:16]. Even were this true, Power

Integrations' theory of damages is, again, legally wrong.[2] The Supreme Court has specifically rejected the suggestion that a U.S. patent entitles companies such as Power Integrations to a competitive advantage outside of the United States. The Patent Laws "obviously are intended to grant a patentee a monopoly only over the United States market; *they are not intended to grant a patentee the bonus of a favored position as a flagship company free of American competition in international commerce.*" *Deepsouth Packing*, 406 U.S. at 523 (emphasis added).

Power Integrations is no more entitled to damages for alleged "infringement" of a U.S. Patent that occurred in Korea than Power Integrations would be entitled to enforce a Korean patent in a United States court to govern activity within the United States. As the Supreme Court held, "Foreign conduct is generally the domain of foreign law, and in the area here involved, in particular, foreign law may embody different policy judgments about the relative rights of inventors, competitors, and the public in patented inventions." *Microsoft*, 127 S. Ct. at 1758.

Consequently, the Court must reject Power Integrations' claim for "worldwide" damages. Fairchild is entitled to judgment as a matter of law that Fairchild's foreign manufacture and sale of the accused devices cannot, as a matter of law, infringe Power Integrations' U.S. patents. *See Pannu*, 155 F.3d at 1348 (JMOL appropriate where "the legal conclusions implied [by] the jury's verdict cannot in law be supported by those findings.").

## IV.    POWER INTEGRATIONS IS NOT ENTITLED TO SPECULATIVE DAMAGES.

Since, as a matter of law, Power Integrations cannot recover "worldwide" damages, the Court must "remit the damage award to the highest amount the jury could 'properly have awarded based on the relevant evidence.'" *IPPV*, 191 F. Supp.2d at 573. Power Integrations will, no doubt, argue that it is entitled to damages for devices imported into the United States.

---

[2]    The evidence shows that Power Integrations does not even believe this to be the case. Power Integrations' attorneys took the exact opposite position before the International Trade Commission during the course of this litigation. [10/4/06 Troxel Trial Tr. 843:3-845:7]. In that case, Systems General argued what is now Power Integrations' position – that customers whose products are sold worldwide would cease buying power supply components if they could not be used in the United States. [*Id.* 843:8-17; Tab A (marked as DX516 on Fairchild's proposed exhibit list)]. Power Integrations dismissed this argument as "pure speculation" and that Power Integrations was not aware of any evidence to support this theory. [*Id.* 843:18-845:3; Tab B (marked as DX509 on Fairchild's proposed exhibit list)]. While the Court properly allowed testimony about these exhibits, it was error for the Court to have excluded the admission of these exhibits. [10/5/06 Trial Tr. 1122:21-1125:3].

Fairchild has admitted that it has manufactured in and imported into the United States $765,724 worth of the accused devices. Fairchild does not dispute that Power Integrations is potentially entitled to damages for this activity as to infringement of a valid U.S. patent. Power Integrations, however, demands more. Power Integrations speculates that vast quantities of other accused devices are also imported not by Fairchild, but by unidentified third parties. Since there is no evidence that any such devices were ever so imported (and since Power Integrations concedes that any such importation was done by parties other than Fairchild), the evidence does not support these "indirect importation" damages and they must be rejected.

Implicitly recognizing that its novel theory of "worldwide" damages was unsupportable, Power Integrations calculated alternative damages based on what it called "U.S. imports and sales". [10/4/06 Troxel Trial Tr. 786:4-17]. Essentially, Power Integrations speculated that 18% of the Fairchild devices manufactured and sold outside the United States are later imported into the United States by others (not Fairchild). Therefore, Power Integrations claims that it is entitled to 18% of its "worldwide" damages – or, $7,641,974.[3] The Court should reject Power Integrations' alternative damage calculation since Power Integrations' guess that 18% of Fairchild's foreign sales are later imported into the United States by unidentified third parties is factually unsupported.

A.    **There Is No Evidence That 18% of Fairchild's Products Are Actually Imported By Others Into the United States.**

The foundation of Power Integrations' alternative "U.S. imports and sales" damages is its assumption that 18% of the devices manufactured and sold by Fairchild *outside the United States* are at some later time imported into the United States by unspecified third parties. This 18% figure, however, was purely a guess by Power Integrations' damages expert and has no basis in any testimony or documents from actual third parties witnesses allegedly involved in such importation. Thus, these damages are not supported by the evidence and should be rejected.

---

[3]     This number must be further reduced due to the fact the jury rejected Power Integrations' demand for up to 30% royalty. [*Compare* 10/4/06 Troxel Trial Tr. 830:9-831:6 and DI 415].

"To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).

Mr. Troxel arrived at his 18% figure by combining two hearsay sources of information concerning the sales of Samsung cell phones in the third quarter of 2005 – one purporting to estimate Samsung's worldwide cell phone sales [DX528] and the other purporting to approximate Samsung's U.S. sales. [*See* Tabs C and D (marked as DX528 and DX527, respectively, on Fairchild's proposed exhibit list)]. These articles contain multiple layers of hearsay, since they are not even Samsung documents. Indeed, Mr. Troxel testified that he never knew the source of the information but assumed it was found on the Internet and provided to him. *Id.* 858:1-14. Consequently, the Court should have excluded any reliance upon these documents by Mr. Troxel. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 595 (1993); *see Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003) ("If the data underlying 'the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded.'").

Further, while the hearsay articles purport to describe importation of Samsung cell phones, ***Power Integrations admits that the accused devices are not used in Samsung cell phones***. [10/4/06 Troxel Trial Tr. 857:20-23]. Instead, the accused devices are used in some cell phone chargers, which may or may not be sold with the phone. This is a significant distinction as there is no evidence that the number of cell phones imported into the United States can be used as a proxy for the number of particular chargers sold in the United States that actually contain the accused Fairchild devices. Indeed, given the pending litigation, the more logical conclusion is that Samsung chargers containing the accused Fairchild devices would be sold outside the United States while those with Power Integrations' competing chips would be sold within the United States. Power Integrations, however, abandoned all efforts to get discovery from Samsung on this point.

12

Finally, even were this hearsay information reliable, it only purports to describe sales figures for the third quarter of 2005 (and no figures for 2004, the rest of 2005, or 2006). [10/4/06 Troxel Trial Tr. 858:15-18]. This is particularly important because the hearsay documents upon which Mr. Troxel relied specifically noted that the third quarter of 2005 had unusually high sales. [*See* DX527 ("This number represents ***solid incremental growth*** of seven percent from the second quarter of 2005 sales...." and "'The ***handset market was very robust*** in the third quarter'"); DX528 ("worldwide mobile phone shipments rose 19.1% year over year and increased sequentially 8.8% in 3Q05... Year-over-year ***growth increased substantially*** over the prior two quarters, signaling a balance against slower growth during the first half of the year.") (emphasis added)]. Despite this, Mr. Troxel relied upon this single quarter's worth of ***2005*** information to project future sales through ***2010***. *Id.* 858:19-859:6.

The Court should have granted Fairchild's Motion in Limine (D.I. 356) and precluded Mr. Troxel from speculating about such importation. *See In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999) (data not a proper basis for expert opinion where it is so unreliable that no reasonable expert could base opinion on it).[4] The Court must act as a gatekeeper and reject expert testimony where the underlying data is unreliable. *Daubert*, 509 U.S. at 595; *see Montgomery*, 320 F.3d at 448 ("If the data underlying 'the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded.'").

Fairchild carefully tracks its own activity and has admitted to manufacturing, selling, and importing $765,724 worth of the accused devices in the United States. If Power Integrations' finding of infringement is sustained, Fairchild should pay damages based on $765,724 of actual U.S. activities. Fairchild, however, can only be liable for damages as a result of infringement in the United States. Power Integrations is not entitled to damages that occurred outside of the

---

[4]      *See also Dean Foods Co. v. Consolidated Freightways*, 29 F. Supp. 2d 495, 496 (N.D. Ill. 1998) (rejecting evidence where witness "who reported the data did nothing more than report what appeared on her screen. Had she some personal knowledge of the machines and the market, the answer might be different."); *Wady v. Provident Life and Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060 (C.D. Cal. 2002) (excluding internet evidence on basis that it could not be authenticated); *United States v. Jackson*, 208 F.3d 633, 638 (7th Cir. 2000) (finding that evidence taken from the Internet lacked authentication where the proponent was unable to show that the information had been posted by the organizations to which she attributed it).

United States. Since there is no evidence upon which a reasonable jury could have found that additional quantities of the accused devices are imported into the United States by undisclosed third parties, Fairchild is entitled to judgment as a matter of law and damages must be limited the $765,724 of accused product that the parties agree were made or imported into the United States.

**B.   Fairchild Did Not Actively Induce Such Hypothetical Infringement.**

To prove inducement of infringement, Power Integrations must show two things. First, "the patentee always has the burden to show direct infringement for each instance of indirect infringement." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1303 (Fed. Cir. 2006). Second, Power Integrations must show that Fairchild's "actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *Id.*, 471 F.3d at 1304. As set forth in the Patent Act, such inducement must be "active":

> "Whoever *actively* induces infringement of a patent shall be liable as an infringer."

35 U.S.C. § 271(b) (emphasis added). As Power Integrations introduced no evidence on either point, Fairchild cannot be liable for inducement and is entitled to judgment as a matter of law.

**1.   There is no evidence of any underlying act of third party, direct infringement necessary for a finding of inducement by Fairchild.**

"Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement." *Joy Technologies v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed. Cir. 1993). There is absolutely no evidence that any third party infringed Power Integrations' patents by importing the accused Fairchild devices into the United States. Thus, Power Integrations has failed to meet its burden and Fairchild cannot be liable for such damages.

While Power Integrations speculates that third party importation of the Fairchild devices sold abroad "must have happened", Power Integrations had every opportunity and incentive to seek such actual proof were it to exist and in what quantity. Indeed, Power Integrations issued 10 subpoenas to third parties including Samsung, Dell, Sharp, and others. [10/4/06 Troxel Trial Tr. 857:2-13]. Power Integrations, however, abandoned all discovery regarding actual importation and, consequently, lacked any proof that the specific Fairchild devices found to have

infringed were imported into the United States. Realizing its utter lack of proof of actual importation, Power Integrations sought to resort to an undisclosed "expert" late in the case. This evidence was properly excluded at trial. DI 334.

Lacking proof of actual importation, Power Integrations then speculated that 18% of Fairchild devices sold abroad are imported into the United States. Power Integrations has accused 39 different Fairchild parts and there is no proof that any of these products – let alone, 18% of each device – are imported into the United States. Power Integrations is not entitled to speculative damages simply because Power Integrations chose to ignore evidence of actual importation in favor of a contrived importation rate unsupported by proof of importation of the accused products.

### 2.    Fairchild did not encourage direct infringement by another.

Even assuming that there were some evidence of third party direct infringement (there is not), "inducement requires evidence of culpable conduct, directed to *encouraging another's infringement*, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med.*, 471 F.3d at 1306 (emphasis added); *see also* 35 U.S.C. § 271(b). Once again, Power Integrations' proof falls short since there is no evidence of active inducement of any infringing activity (*i.e.*, encouraging a third party to import the accused products into the United States). Instead, Power Integrations argues that Fairchild "induced" infringement by offering routine indemnification as part of its sales contract (and then repeating that same indemnification in letters to customers).

"Cases have held that an indemnification agreement will generally not establish an intent to induce infringement." *Hewlett-Packard Co. v. Bausch & Lomb*, 909 F.2d 1464, 1470 (Fed. Cir. 1990). While there can be an exception to this general rule if the primary purpose of the indemnification "is to overcome the deterrent effect that the patent laws have on would-be infringers," there is no evidence of any such purpose in this case. *Id.* Power Integrations' witnesses concede that merely offering indemnification does not encourage illegal activity or the indemnified activity. [10/4/06 Renouard Trial Tr. 680:8-684:11]. Further, the indemnification is

15

not "directed to encouraging another's infringement." Thus, it does not constitute inducement. *DSU Med.*, 471 F.3d at 1306.

## V. POWER INTEGRATIONS' DAMAGES THEORIES ARE CONTRARY TO THE LAW AND THE EVIDENCE.

Power Integrations sought – and was awarded – damages for Power Integrations' past and future lost profits and price erosion. As a matter of law, Power Integrations is not entitled to such speculative damages. This is an independent basis for the Court to grant judgment as a matter of law, remit Power Integrations' damages, or order a new trial on the issue.

### A. Power Integrations Is Not Entitled to Lost Profits or Price Erosion.

Power Integrations sought – and the jury awarded – past and future damages for "lost profits" and "price erosion" caused by Fairchild's infringement of Power Integrations' 876 and '851 Patents. Such damages are only available when there is no acceptable, non-infringing alternative to the patented article.[5] *Joy Tech., Inc. v. Flakt, Inc.*, 954 F. Supp. 796, 803 (D. Del. 1996) (to recover lost profits measure of damages, patentee "must... prove an absence of acceptable, non-infringing substitutes for the patented product"); *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1165 (Fed. Cir. 1991) (lost profits damages unavailable if patentee fails to establish any of four elements, including "absence of an acceptable, non-infringing substitute for the patented product"); *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983) (price erosion is a form of lost profits damages). The evidence, including Power Integrations' own witnesses and documents, establishes the existence of non-infringing alternatives. Consequently, Power Integrations cannot recover for past or future lost profits or price erosion.

### 1. Power Integrations' circular definition of "relevant market" is wrong.

"When basing the alleged lost profits on lost sales, the patent owner has an initial burden to show a reasonable probability that he would have made the asserted sales 'but for' the

---

[5]    Indeed, Power Integrations did not seek such damages for the '075 or '366 patents because it conceded that such alternatives existed. [10/4/06 Troxel Trial Tr. 859:16-19 and 867:2-9].

infringement." *Grain Processing*, 185 F.3d at 1349. One way to meet this burden is to show that within the relevant market there are no acceptable non-infringing alternatives. *Micro Chem. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir. 2003). If such non-infringing alternatives exist, lost profits and price erosion are unavailable because there is no evidence that "but for" this infringement Power Integrations would have made additional sales. *See Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978).

Power Integrations did not properly perform this *Panduit* analysis. Seeking to avoid the inevitable conclusion that the existence of non-infringing alternatives preclude damages for lost profits or price erosion, Power Integrations offered an admittedly "narrow" definition of the "relevant market". [10/4/06 Troxel Trial Tr. 797:23-799:1]. Specifically, Mr. Troxel stated that "the relevant market deals here with high-voltage analog, PWM integrated circuits that are sold in the switch mode power supply marketplace, *__and that offered this feature of frequency jitter__*." *Id.* By limiting the relevant market to devices that offer the patented feature, Mr. Troxel neatly avoided the great variety of non-infringing alternatives. Under Mr. Troxel's circular definition of relevant market, anything that infringes Power Integrations' patents is within the relevant market and anything that does not infringe (and, thus, could be a non-infringing alternative) would be excluded (because those devices would not have "this feature of frequency jitter").

While the definition of the relevant market should include the patented articles, it is not limited to such products. "The relevant market also includes other devices or substitutes similar in physical and functional characteristics to the patented invention." *Micro Chem.*, 318 F.3d at 1124.

**REDACTED**

17

**2.** **Even under Power Integrations' definition of "relevant market", there are non-infringing alternatives.**

The '851 and '876 Patents both relate to frequency jittering and Power Integrations claims that some of its own products practice the claims of these patents. Power Integrations admits, however, that there are non-infringing alternatives to these Power Integrations devices that practice the '851 and '876 Patents, which make their lost profit damages speculative, at best.

**REDACTED**

**REDACTED**

Because customers would

continue to purchase these non-infringing alternatives in lieu of Power Integrations' higher

priced devices, Power Integrations cannot recover damages for lost profits or lost sales:

> By the same token, a fair and accurate reconstruction of the "but for" market also
> must take into account, where relevant, alternative actions the infringer
> foreseeably would have undertaken had he not infringed. Without the infringing
> product, a rational would-be infringer is likely to offer an acceptable
> noninfringing alternative, if available, to compete with the patent owner rather
> than leave the market altogether. The competitor in the "but for" marketplace is
> hardly likely to surrender its complete market share when faced with a patent, if it
> can compete in some other lawful manner.

*Grain Processing*, 185 F.3d at 1350-1351. As the evidence shows there to be numerous non-

infringing alternatives to Power Integrations' patented articles, Power Integrations is not entitled

to damages for "lost profits" or "price erosion". *Joy Tech.*, 954 F. Supp. at 803; *SmithKline*, 926

F.2d at 1165.  Consequently, the Court must dismiss these damages and grant judgment as a matter of law.

**B.**     **Power Integrations Is Not Entitled to "Future" Lost Profits or Price Erosion.**

Power Integrations' claims of "future price erosion" and "future lost sales" must be rejected because of the existence of non-infringing alternatives.  Moreover, given the evidence in this case, such "future" damages are so inherently speculative that the jury's award must be remitted.  *Oiness*, 88 F.3d at 1031.

**REDACTED**

As a matter of law, damages must be based upon evidence, not conjecture.  *See Oiness*, 88 F.3d at 1031.  Consequently, Power Integrations' "future" damages must be rejected and the Court should grant judgment as a matter of law.

**VI.**     **THE COURT SHOULD REDUCE POWER INTEGRATIONS' DAMAGES.**

In determining the proper amount of damages on review, the Federal Circuit employs the "maximum recovery rule."  *IPPV*, 191 F. Supp.2d at 573.  This rule "requires [the] court to remit

the damage award to the highest amount the jury could 'properly have awarded based on the relevant evidence.'" *Id.*

In a calculated gamble, Power Integrations decided not to present any alternative damages theory based on actual U.S. sales, manufacturing, and importation by Fairchild. Indeed, Power Integrations' expert offered "no opinion" on the amount of damages if one were to consider only the Fairchild devices actually sold or manufactured by Fairchild in the United States. [10/4/06 Troxel Trial Tr. 856:20-857:1]. The parties, however, stipulated that Fairchild physically manufactured only $547,724 worth of accused products in the United States during the relevant period. [10/4/06 Trial Tr. 774:12-23]. Fairchild also admitted that it sold an additional $218,000 worth of accused products that were actually imported into the United States. [10/5/06 Keeley Trial Tr. 1269:10-1270:23]. The jury determined that a 15% royalty was reasonable. DI 415. Applying this 15% royalty rate to the admitted royalty base of $765,724, the Court must reduce Power Integrations damages to $114,858.60 – the highest amount of damages properly supported by the evidence.

Alternatively, the Court should order a new trial to determine the appropriate amount of damages. *IPPV*, 191 F. Supp.2d at 573. At such a trial, Power Integrations should be precluded from offering evidence or argument concerning activities outside the United States or speculative theories concerning future lost profits or price erosion.

## VII.    CONCLUSION.

As a matter of law, Power Integrations cannot recover damages for activity that occurred entirely outside of the United States. Therefore, Power Integrations' "worldwide" damages must be eliminated and Fairchild can only be held liable for damages relating to Fairchild's activity within the United States. The uncontested evidence shows that Fairchild has only manufactured, sold or imported $765,724 of accused products within the United States. Thus, Fairchild respectfully requests that the Court apply the 15% royalty determined by the jury and reduce Power Integrations damages to $114,858.60 or, in the alternative, conduct a new trial on the issue of damages.

ASHBY & GEDDES

/s/ John G. Day

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Of Counsel:*

*Attorneys for Defendants*

G. Hopkins Guy, III
Vickie L. Feeman
Bas de Blank
Gabriel M. Ramsey
Brian H. VanderZanden
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
(650) 614-7400

Dated: December 3, 2007
186350.1

# EXHIBIT A

PUBLIC VERSION

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, DC

In the Matter of

CERTAIN POWER SUPPLY
CONTROLLERS, AND PRODUCTS
CONTAINING SAME

Investigation No. 337-TA-541

RESPONDENT SYSTEM GENERAL CORPORATION'S BRIEF
ON REMEDY, BOND AND THE PUBLIC INTEREST



Case No. 04-1371-JJF
DEFT Exhibit No. DX 516
Date Entered _____
Signature _____

## TABLE OF CONTENTS

I.    INTRODUCTION ...............................................................................................1

II.   BACKGROUND ................................................................................................2

III.  ARGUMENT......................................................................................................3

    A.    The Appropriate Remedy...........................................................................3

        1.    A Limited Exclusion Order Against System General Corporation
            Limited to the Chips-in-Issue Is the Only Appropriate Remedy. ...........4

        2.    The Evidence Does Not Support Extending an Exclusion Order to
            Third-Party Products.............................................................................5

            a)    The chips-in-issue are an insignificant part of the value of
                  the downstream product. ............................................................9

            b)    The manufacturers of the downstream products were not
                  respondents in this investigation...............................................13

            c)    There is no evidence that Power Integrations would attain
                  any benefit from an order excluding downstream products...........15

            d)    The incremental detriment to System General would be
                  significant. ...............................................................................16

            e)    Third parties will bear a heavy burden. .....................................19

            f)    Most imported products subject to the proposed exclusion
                  order will not include the Chips-in-Issue.....................................24

            g)    The proposed order will be difficult for Customs to enforce........24

        3.    The Public Interest. .............................................................................25

    B.    System General Has No Domestic Inventory, So a Cease and Desist Order
        Is Inappropriate. .......................................................................................27

    C.    The Appropriate Bond Amount. ................................................................27

IV.   CONCLUSION ................................................................................................28

i

# TABLE OF AUTHORITIES

## CASES

*Certain Acid-Washed Denim Garments and Accessories*, Inv. No. 337-TA-324,
Opinion of the Commission, 1992 WL 813953 (1992) .................................................. 27

*Certain Audio Digital-To-Analog Converters and Products Containing Same*,
Inv. No. 337-TA-499, Commission Opinion (2005) ........................................... *passim*

*Certain Crystalline Cefradroxil Monohydrate*, Inv. No. 337-TA-293, Commission
Opinion on Remedy, the Public Interest and Bonding, USITC Pub. 2391 (June
1991) ........................................................................................................................... 27

*Certain Electrical Connectors and Products Containing Same*,
Inv. No. 337-TA-374, USITC Pub. No. 2981, Notice of Issuance of Limited
Exclusion Order and Cease and Desist Order and Termination of Investigation,
1996 ITC LEXIS 547, (July 1996) ....................................................................... 7, 8, 14

*Certain EPROM, EEPROM, Flash Memory, and Flash Microcontroller
Semiconductor Devices and Products Containing Same*, Inv. No. 337-TA-395,
Commission Opinion (December 11, 2000) ....................................................... 11, 13, 14, 24

*Certain Erasable Programmable Read-only Memories, Components Thereof,
Products Containing Such Memories, and Processes for Making Such Memories*,
Inv. No. 337-TA-276, USITC Pub. No. 2196, Comm'n Op. (May 1989) ............... 5, 7, 14, 25

*Certain Flash Memory Circuits And Products Containing Same*,
Inv. No. 337-TA-382 Comm'n Opinion (June 1997) ............................................. 10, 16

*Certain Integrated Circuit Telecommunication Chips and Products Containing
Same, Including Dialing Apparatus*,
Inv. No. 337-TA-337, USITC Pub. No. 2670 Commission Opinion on the Issues
Under Review and Remedy, the Public Interest, and Bonding (August 1997) ............... 7, 11

*Certain Microsphere Adhesives, Process for Making Same, and Products
Containing Same, Including Self-Stick Repositionable Notes*,
Inv. No. 337-TA-366, Comm'n Op. (1996).................................................................. 27

*Certain Neodymium-Iron-Boron Magnets*,
Inv. No. 337-TA-372, 1995 WL 1049833 (U.S.I.T.C.), Final Initial and
Recommended Determinations (December 11, 1995)............................................... 3

*Certain Video Graphics Display Controllers and Products Containing Same*,
Inv. No. 337-TA-412, 1999 ITC LEXIS 167.......................................................... 6

## TABLE OF AUTHORITIES
### (cont.)

*Hyundai Electronics Industries Co. v. U.S.I.T.C.,*
899 F.2d 1204 (Fed. Cir. 1990)........................................................................... 5, 7, 14

*Nickson Indus., Inc. v. Rol Mfg. Co., Ltd.,* 8

**STATUTES**

19 U.S.C. § 1337(e) ...................................................................................... 27

**REGULATIONS**

Commission Rule 210.50(a)(3).......................................................................... 27

## I.    INTRODUCTION

Under Commission Rule 210.50(4) and the Commission's Notice of Commission Decision Not to Review the Final Initial Determination Finding a Violation of Section 337 issued on June 30, 2006, Respondent System General Corporation ("System General"), submits this brief regarding the appropriate form of relief, the public interest, and the appropriate amount of bond. In addition, a proposed limited exclusion order is attached as Exhibit A.

In view of the Commission's determination not to review the Final Initial Determination, the proper relief is a limited exclusion order directed to (1) only System General's SG6840, SG6841, SG6841x3, SG6842, SG6842J, and SG6843 chips ("Chips-in-Issue") that the ID found were covered by claims 1, 3, 5, 6, and 6 of U.S. Patent 6,351,398, and claims 26 and 27 of U.S. Patent 6,538,908, and (2) specifically excluding from any order System General's SG6105, SG68501, SG68502, SG38xx, SG5841, SG5848, SG6842J w/HV Start, SG 6846, SG6846A, SG6848, SG6848x, SG6849, SG6850, SG69xx chips from such exclusion order. Complainant Power Integrations did not request nor offer any evidence supporting a cease and desist order, so no cease and desist order should issue.

System General requests that the Commission set any bond at no more than 5% of the value of the imported chip, or, in the alternative, by comparing the price of Power Integrations current sales price ▮▮▮▮ to the price of System General's "reconstructed" product (62¢).

Finally, the public interest is not served by issuing an exclusion order extending beyond the Chips-in-Issue. Although the Administrative Law Judge recommended also excluding LCD computer monitors, AC printer adapters, and sample/demonstration circuit boards containing the Chips-in-Issue, such an exclusion order would reward Power Integrations's failure to present any evidence supporting that broad remedy. Moreover, it would encourage other complainants litigating before the Commission to present nominal evidence of accused products entering the

1

United States via downstream products, then claim an entitlement to broad relief because it is "necessary" to provide them with effective relief, even though the complainant is the very cause of the evidentiary shortcomings and could easily have brought additional parties into the case. The Commission's exclusion orders have a wide impact on international trade, and public policy does not support disrupting that trade absent compelling, supporting evidence. Particularly in light of the Commission's acknowledgement that although six models of Systems General articles are excludable, almost three times as many models, including families of modules, are not subject to exclusion, the Commission must be very careful to ensure that any exclusion order is tailored as narrowly as possible to provide Power Integrations with the limited relief to which it is entitled without unjustifiably curtailing legitimate commerce.

## II.    BACKGROUND

On May 9, 2005, Power Integrations filed its Complaint under Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337. This investigation was instituted by notice published in the Federal Register on June 13, 2005. (70 Fed. Reg. 34149-50.)

Power Integrations's initial complaint asserted that eight System General products infringed 34 claims of four Power Integrations patents, including U.S. Patents 6,351,398 and 6,538,908. (*See, e.g.,* Order No. 2 at 1.) Through a series of motions, Power Integrations moved to terminate the investigation as to certain claims and to two of the four patents. (*See* Order Nos. 6, 7, 14, and 23.) After System General moved for summary determination of non-infringement for several of its products, Power Integrations moved to terminate the investigation as to most of those products. The Administrative Law Judge granted Power Integrations's motion, specifically identifying System General's SG6105, SG68501, SG68502, SG38xx, SG5841, SG5848, SG6842J w/HV Start, SG 6846, SG6846A, SG6848, SG6848x, SG6849, SG6850, SG69xx as no longer accused and ordering that they would not be covered by any remedial order that might

2

ultimately issue. (Order No. 13.) That Order was not reviewed by the Commission. (Notice of Decision Not to Review an Initial Determination Granting Complainant's Motion to Terminate the Investigation in Part (January 17, 2006).) Thus, only SG's SG6840, SG6841, SG6841x3, SG6842, SG6842J, and SG6843 stand accused of infringement.

The evidentiary hearing lasted from January 18, 2006, through January 24, 2006. The Administrative Law Judge issued his Final Initial and Recommended Determination on May 15, 2006. He found a violation Section 337 with respect to claims 1, 3, 5, 6, and 6 of U.S. Patent 6,351,398 and claims 26 and 27 of U.S. Patent 6,538,908 by the Chips-in-Issue. He also recommended issuance of a limited exclusion order directed to LCD computer monitors, AC printer adapters, and sample/demonstration circuit boards containing the Chips-in-Issue. He did not, however, recommend any cease any desist order, since SG has no inventory in the United States and Power Integrations did not seek a cease and desist order. And he recommended a bond of 38¢ per Chip-in-Issue or product containing same.

On June 30, 3006, the Commission issued its Notice of Commission Decision Not to Review the Final Initial Determination Finding a Violation of Section 337. Its Notice called for briefing on remedy, the public interest, and bonding.

## III.    ARGUMENT

### A.    The Appropriate Remedy.

The scope of an exclusion order should be commensurate with the supporting evidence— in this case, the Chips-in-Issue. *See e.g. Certain Neodymium-Iron-Boron Magnets*, Inv. No. 337-TA-372, 1995 WL 1049833 (U.S.I.T.C.), Final Initial and Recommended Determinations at *12-13 (December 11, 1995) ("*Magnets*") (declining to exclude certain downstream products due to lack of evidence of importation of allegedly infringing products). Since Power Integrations provided nothing more than hearsay, innuendo, and an identification of only a handful of

3

downstream products in the United States containing the Chips-in-Issue, the exclusion order

should not extend to the many downstream products Power Integrations seeks to exclude.

1.  **A Limited Exclusion Order Against System General Corporation
Limited to the Chips-in-Issue Is the Only Appropriate Remedy.**

Although Power Integrations repeatedly alleged that many end products contain System

General chips (*see, e.g.,* CX-4, at 3, ¶ 4.1; PI Post-Hg. Br. at 132), the record contains no reliable

evidence that a System General chip was imported in anything other than a handful of LCD

computer monitors and a couple of adapters. Consequently, any exclusion order should be

limited to the Chips-in-Issue.

Throughout the investigation, Power Integrations argued strenuously that System General

imports its chips into the United States. It took extensive discovery, and offered briefing with

extensive argument, documentation, and testimony supporting its contention. (CX-54C [CX-

119C] at Interrogatory Nos. 6, 7, 10, 11, 14, 19, 20, 41; JX-19C at designated portions of 30–33,

58–65, 78–81, 90–93, 106–121; JX-15C at designated portions of 90–93; JX-16C at designated

portions of 146–53, 158–65; JX-20C at designated portions of 62–65, 174–77; CX-55C at

Interrogatory No. 3 and 4; CX-49 at 11; *see also* Motion No. 541-8: Motion for Summary

Determination that Power Integrations has Satisfied the Importation Element in Providing a

Violation of Section 337(a)(1)(B) and supporting Memorandum.) The Administrative Law

Judge agreed, issuing an initial determination finding that System General met the importation

requirement of Section 337(a)(1)(B), a ruling the Commission did not review. (Order No. 11;

Notice of Decision Not to Review an Initial Determination Granting a Motion for Summary

Determination that the Importation Requirement Has Been Met (January 3, 2006).) Thus, an

exclusion order covering the Chips-in-Issue would provide effective and appropriate relief in

view of the evidentiary record.

4

2.    **The Evidence Does Not Support Extending an Exclusion Order to Third-Party Products.**

System General itself does not import or sell downstream commercial products containing its own chips. And there is little or no evidence concerning which other companies import the many products the Recommended Determination seeks to exclude, or that the products Power Integrations's identified are even imported at all. As such, this case is similar to *Certain Audio Digital-To-Analog Converters and Products Containing Same*, where the Commission denied downstream relief in part because there was "'little evidence of imports of any of most of the downstream product categories complainant seeks to have excluded,' *i.e.*, DVD players, DVD recorders, DVD receivers, personal video recorders, TV's, video game consoles, such as [   ], PC sound cards, and automobile audio receivers." *Audio Digital-To-Analog Converters*, Inv. No. 337-TA-499, Commission Opinion (2005) at 5 (Commission quoting ALJ's conclusions from ID).

Before issuing an exclusion order covering downstream products, the Commission has balanced:

> the complainant's interest in obtaining complete protection from all infringing imports by means of exclusion of downstream products against the inherent potential of [an] . . . exclusion order, when extended to downstream products, to disrupt legitimate trade in products which were not themselves the subject of a finding of violation of section 337.

*Certain Erasable Programmable Read-only Memories, Components Thereof, Products Containing Such Memories, and Processes for Making Such Memories*, Inv. No. 337-TA-276, USITC Pub. No. 2196, Commission Opinion at 125 (May 1989), *aff'd, Hyundai Elecs. Indus. Co. v. U.S. Int'l Trade Comm'n*, 899 F.2d 1204 (Fed. Cir. 1990).

Because of the serious risk to disrupting trade, the party seeking exclusion of downstream products bears a heavy burden and must present particularized evidence demonstrating the need

5

for a downstream remedy encumbering third parties. *See, e.g., Certain Video Graphics Display Controllers and Products Containing Same*, Inv. No. 337-TA-412, 1999 ITC LEXIS 167, at 9 (denying complainant's request to exclude third-party downstream products based on the fact that complainant did not provide adequate evidence of several EPROM factors). Although Power Integrations wants to exclude potentially tens of millions of products, which are worth hundreds times more than the value of the Chips-in-Issue, under the theory that they *might* include a Chip-in-Issue, its record is, at best, scant.[1] Power Integrations inspected twenty-three products, and only found six that contained the Chips-in-Issue. (CX-1143–CX-1148, CX-1155–CX-1168, RPX-2 [RDX-188].) In addition, Power Integrations only deposed a handful of third-party witnesses with little if any knowledge of System General's chips, and who provided a few summary documents of dubious evidentiary value because they involved triple and quadruple hearsay. (CX-1143–CX-1148, CX-1155–CX-1168, CX-1172–CX-1174, CX-1177–CX-1180, RRX-27–RRX-32, RPX-2 [RDX-188].) That threadbare record cannot support a remedial order disrupting a large volume of international trade and excluding third-party downstream products from entry into the United States.

In past cases, the Commission has required an application of its *EPROMs* factors in evaluating downstream relief. These factors require that evidence on a number of factors be in the record so that a reasoned decision can be made, such as:

- the value of the infringing articles compared to the value of the downstream products

---

[1]     LCD monitors, of the type that may contain System General chips, are imported into the United States under HTS code 8471.60.45. As the attached exhibit demonstrates, in 2005 imports of monitors in this category (which may also include plasma monitors for computers) were approximately 30.5 million units worth $7.3 billion. (Exhibit B.) This does not capture the printer adapters Power Integrations also wishes to exclude. To place literally Billions of dollars of annual imports under watch based on the import of five models of ▮▮▮▮▮ chips is not only shocking but utterly unjustified on the record developed by Power Integrations.

in which they are incorporated;

- the identity of the manufacturer of the downstream products (*i.e.*, are the downstream products manufactured by the party found to have committed the unfair act, or by third parties);

- the incremental value to complainant of the exclusion of downstream products;

- the incremental detriment to respondents of such exclusion;

- the burdens imposed on third parties resulting from exclusion of downstream products;

- the availability of alternative downstream products that do not contain the infringing articles;

- the likelihood that imported downstream products actually contain the infringing articles and are thereby subject to exclusion;

- the opportunity for evasion of an exclusion order that does not include downstream products; and

- the enforceability of an order by Customs.

(the "*EPROMs*" factors) *Hyundai*, 899 F.2d at 1209, 14 U.S.P.Q.2d at 1400-1401; *EPROMs* at 125; *Certain Integrated Circuit Telecommunication Chips and Products Containing Same, Including Dialing Apparatus*, Inv. No. 337-TA-337, USITC Pub. No. 2670 Commission Opinion on the Issues Under Review and Remedy, the Public Interest, and Bonding at 24 (August 1997), and *Certain Electrical Connectors and Products Containing Same*, Inv. No. 337-TA-374, Pub. No. 2981, Commission Opinion. at 11 (July 1996) ("*Connectors*"). The Recommended Determination improperly expands and rewrites many of these factors in order to support its recommended remedy.

7

Not only does the Commission impose a heavy burden on the party seeking to exclude downstream products, but the Commission itself proceeds very cautiously on the issue when third-party manufacturers are involved. As noted above, in *Connectors* the Commission recognized the United States Trade Representative's concerns regarding downstream exclusion orders:

> orders affecting companies that import downstream products containing infringing components, but are not manufacturing infringing product itself, must be crafted in the narrowest manner that can result in an effective order. Moreover, this issue must be addressed in a factual manner with appropriate support for the conclusion that the order presents the narrowest effective remedy.

*Id.* at 7 n.8, citing Letter from Michael Kantor, U.S. Trade Representative, to Don E. Newquist, Chairman, U.S.I.T.C. (September 8, 1993).

Thus, not only was Power Integrations required to present sufficient evidence regarding the factors enumerated by the Commission with respect to each of the downstream products, but Power Integrations was also required to demonstrate that a downstream exclusion order can be crafted such that it presents the narrowest effective remedy. If Power Integrations's grab at an overbroad remedial order is endorsed by the Commission, the consequence will be that the myriad third-party manufacturers and importers of up to 30.5 million computer monitors (and countless additional printer adapters) will be swept up in a Commission remedial order that has no bearing whatsoever on their products. The Commission has placed the burden on the complainant in this area for a reason, and that reason is to prevent just such a disruption to innocent third-parties engaged in legitimate trade.

a)    The chips-in-issue are an insignificant part of the value of the downstream product.

It is undisputed that the value of the Chips-in-Issue is a miniscule part of the overall value of the downstream products that could be excluded. Of all the *EPROMs* factors, this is the most significant, and it weighs heavily against an exclusion order covering downstream products.

System General's PWM controller chips sell for between ████████ (CX-62C, at 2–3, Int. No. 92; *see also* CX-61C, at 2 and Appx. A & B, Int. No. 91; http://www.bankofcanada.ca/en/rates/exchform.html last viewed 2/10/06.) Although Power Integrations purchased an array of downstream products, including at least 14 adapters, 8 monitors, and 1 HD receiver (RDX-188; CDX-250; CX-1143 through CX-1148, CX-1155 through CX-1168), it only found four monitors and two adapters containing a Chip-in-Issue. (CX-1143 through CX-1148.) The four monitors ranged in price from $279 to $529. (CX-1145; CX-1146; CX-1147; and CX-1148.) The Chips-in-Issue constituted at most ███% of the overall value of the cheaper monitors, and as little as ███% of the value of the more expensive monitors. (CX-1145; CX-1146; CX-1147; and CX-1148; CX-62C, at 2–3, Int. No. 92.)

Further, there is no evidence in the record at all of the price of any adapter containing a Chip-in-Issue. Although Power Integrations bought fourteen adapters, it could find only two with a System General chip, and it provided the price for neither. (RDX-188 [RPX-2]; Renouard, Tr. at 720–40; CX-1143 through CX-1148; CX-1155 through CX-1168.) One was a Sony adapter, but Power Integrations's evidence does not indicate the price of that adapter. (Renouard, Tr. 724–25; CX-1143; CX-1156.)[2] The other was a Kodak adapter that accompanied a Kodak

---

[2]    Although Bruce Renouard guessed what the price might have been, he testified that he did not have "any specific recollection" of the price. (Renouard, Tr. at 725.) Power Integrations clearly had that information in its possession and could have produced it if it wanted to. Power Integrations should not be rewarded for its sloppy evidentiary presentation.

Easy Share Printer Dock—a larger product used to print photographs. The evidence does not show the total price for the printer dock, let alone the adapter by itself. Instead, Power Integrations submitted an invoice for the purchase of two items that totaled $322.49. (CX-1164C.)

To the extent any comparison is possible, the value of the Chip-in-Issue differs by orders of magnitude, not merely degrees, from the value of the potentially excluded downstream product. When the value of the Chips-in-Issue does not even approach a meager ▇% of the value of the downstream product, the Commission should not issue an exclusion order covering that downstream product.

Similar comparisons in other investigations have led to findings denying downstream product relief.[3] For example, in *Audio Digital-to-Analog Converters*, the Judge recommended against a downstream product order where the value of an infringing chip was tenths of one percent of the value of the downstream product. *Certain Audio Digital-to-Analog Converters and Products Containing Same*, Inv. No. 337-TA-499, Final Initial and Recommended Determination at 127 (June 12, 2005). In *Flash Memory Circuits*, the Commission concluded that a flash memory chip was not shown to be a relatively large component of the value of downstream products such as digital cameras. *Certain Flash Memory Circuits and Products Containing Same*, 337-TA-382, Commission Opinion on the Issues Under Review and on Remedy, the Public Interest, and Bonding at 35 (June 26, 1997). Likewise, the value of the flash memory chips involved in the *EEPROMs* investigation was "quite small" compared to the $200

---

[3]    Since the financial information used to make this calculation is usually confidential, it is difficult to determine the exact prices of the products involved or the resulting percentages from the public decisions in other investigations.

10

downstream computer motherboards. *Certain EPROM, EEPROM, Flash Memory, and Flash Microcontroller Semiconductor Devices and Products Containing Same,* Inv. No. 337-TA-395, Commission Opinion at 82 (December 11, 2000).[4]

The Commission has occasionally considered the technical, rather than monetary, value of a accused part to the downstream product. *See Certain Integrated Circuit Telecommunication Chips and Products Containing Same Including Dialing Apparatus,* Inv. No. 337-TA-337, Commission Opinion on the Issues Under Review and on Remedy, the Public Interest, and Bonding, 1993 WL 13033517, *19 (Westlaw pagination) The Chips-in-Issue, however, are likewise technically insignificant to the downstream products Power Integrations seeks to exclude. The Chips-in-Issue relate only to the basic power supply of the more complex downstream products and have little to do with the final operation of the downstream product. For example, the downstream computer monitors combine many functions and features far beyond the mere supply of power, most notably the LCD display and its associated control circuitry. The Chips-in-Issue are no more important to the operation of an LCD monitor or a power adapter than a basic resistor, capacitor, or power plug. (Renouard, Tr. at 718–19.)

The Recommended Determination and Power Integrations skip over the monetary and technical unimportance of SG's chips by pointing to the fact that if one removed the chip, the product would no longer work. (ID/RD at 143; PI Post-Hg. Br. at 141; Renouard, Tr. at 718–19.) That logic trivializes this factor because it would render virtually every component essential to the downstream product, even the power cord, because electronic devices typically do not carry spare components that are unimportant to those devices' operation.

---

[4] Flash memory chips are far more expensive and significant than the tiny and inexpensive power supply controller chips involved here.

11

The Recommended Determination also mischaracterizes the holding of *Certain Integrated Circuit Telecommunication Chips and Products Containing Same Including Dialing Apparatus*, Inv. No. 337-TA-337 (ID/RD at 143), and suggests that this factor was met based on a finding that the accused component was "vital" to the operation of the downstream product. But in *Telecommunications Chips* the parties specifically agreed the accused product was vital both to the ability to manufacture and produce low-end telephones—the downstream products— and to the operation of the downstream product. *Telecommunication Chips*, Commission Opinion on the Issues Under Review and on Remedy, the Public Interest, and Bonding, 1993 WL 13033517, *19 (Westlaw pagination). The present record, however, contains no evidence that the Chips-in-Issue are either relevant to the "ability to manufacture and produce" any of the downstream products or "vital" to their operation any more than a basic resistor or power plug.

Bruce Renouard, Power Integrations' vice-president of sales and only witness on this matter, refused to go farther than suggesting the chips are important to the "power supply" contained in the downstream products, which is a sub-component of the downstream products. (Renouard, Tr. 718.) The relevant question, however, is not whether the "component" is important, but whether the "patented technology" is essential to the downstream product. *See, e.g., EEPROMs*, Commission Opinion at 85 (rejecting argument that patented EPROMs were "essential to the performance of the downstream products" because "the patented Silicon Signature technology of the '903 patent is not essential to the performance of the downstream products listed by Atmel."); *see also Audio Digital-to-Analog Converters*, Final Initial and Recommended Determination at 127 (noting that the patented technology is not essential to the end product because the end product may not use the features of the asserted patents). Indeed, the many System General chips that were withdrawn from the scope of the investigation could be

12.

used in many of those downstream products, as could the chips of other companies. (Renouard, Tr. 743-51; RX-299C; CRX-26 at PI0058598.) Thus, there is no record evidence that the "patented technology" is essential to the operation of the downstream products that would be excluded.

Because Power Integrations cannot show that the Chips-in-Issue are a substantial part of the downstream products that would ultimately be excluded—regardless of how one determines relative value—this *EPROMs* factor weighs heavily against Power Integrations's request for broad downstream product relief.

        b)      **The manufacturers of the downstream products were not respondents in this investigation.**

System General is not the manufacturer of any of the downstream products that would be affected. Power Integrations, however, knew the identity of the manufacturer of each downstream product it purchased with a Chip-in-Issue—Dell, HP, Envision, Kodak, and Sony (*see* CX-4, at ¶ 15–16; RX-339; RX-340; RX-341; RX-342)—and chose not to include them in this investigation, thereby depriving them of the chance to defend or present reliable evidence from which a reasoned decision on remedy could be based. This factor weighs against the proposed downstream product remedy.

The Recommended Determination overcomes this shortcoming by rewriting and improperly expanding that *EPROMs* factor to consider merely whether it is possible to identify the downstream manufacturer. (ID/RD at 143–44.) That, however, is relevant to determining whether a general exclusion order is appropriate, and not whether a limited exclusion order should encompass third-party downstream products. That is, the inability to determine the source of a product would support a request for a general exclusion. (19 U.S.C. § 1337(d)(2).) It

13

is not a corollary that the ability to determine the source of a product supports a request for a limited exclusion order. Yet this is the Recommended Determination's finding.

As the Commission noted, one of the factors to consider in determining whether to provide downstream product relief is "the identity of the manufacturer of the downstream products, (*i.e.*, are the downstream products manufactured by the party *found to have committed the unfair act*, or by third parties) . . . ." *Certain Erasable Programmable Read-Only Memories, Components Thereof, Products Containing Such Memories, and Processes for Making Such Memories*, Inv. No. 337-TA-276, USITC Pub. No. 2196, Commission Opinion at 125 (May 1989) (emphasis added), *aff'd, Hyundai Elecs. Indus. Co. v. U.S. Int'l Trade Comm'n*, 899 F.2d 1204 (Fed. Cir. 1990). In *EPROMs*, the Commission noted that all the downstream products sought to be excluded were manufactured by a respondent, Hyundai. *Id.* at 127.

Although a complainant is not required to name downstream product manufacturers as respondents (ID/RD at 143–44), failure to do will weigh against a broad exclusion order affect those third-parties' products. *See, e.g., EEPROMs*, Commission Opinion at 82-83 (noting that approximately 550 non-respondent electronics manufacturers, seller, and purchasers would be affected by a limited exclusion order covering all downstream products identified by the complainant, such as CD players and personal computers); *Connectors*, at 7 n.8, citing Letter from Michael Kantor, U.S. Trade Representative, to Don E. Newquist, Chairman, U.S.I.T.C. (September 8, 1993). The Recommended Determination's expansive finding that the mere ability to identify the source of a product weighs in favor of a downstream product order turns the requirement on its head. Power Integrations knew who was importing the products that would be excluded but chose, for unknown strategic reasons, to proceed only against System General, which it knew did not import those sorts of products. Power Integrations should be

14

penalized, not rewarded, for its litigation strategy that shielded the true targets of their claims from participation in the case.

c)    There is no evidence that Power Integrations would attain any benefit from an order excluding downstream products.

The record Power Integrations created does not demonstrate it would significantly benefit from an order excluding downstream products. Specifically, Power Integrations has not shown that exclusion of downstream products containing one of the six Chips-in-Issue will result in customers turning instead to Power Integrations's parts. Indeed, it is just as likely that purchasers will turn to other System General parts that were withdrawn from the scope of the investigation or to other competitors' parts. Power Integrations even points out that there are "at least 12 competitors in the market who could also supply PWM controllers for downstream products to be imported to the United States," only one of which is Power Integrations. (PI Post-Hg. Br. at 145.) *See, e.g., EEPROMs*, Commission Opinion at 83 (rejecting downstream product order where complainant Atmel provided "no evidence that U.S. manufacturers would buy devices from Atmel if they could not purchase respondents' or intervenor's devices.")

The Recommended Determination ignores this evidentiary gap by solely considering the evidence of importation of the Chips-in-Issue. The quantity of Chips-in-Issue being imported is irrelevant to whether they come into the United States through downstream products and whether third-parties would turn to Power Integrations's products instead. Although Power Integrations claims that "millions of downstream products containing the infringing System General PWM controller chips have been and are being imported into the United States" (PI Post-Hg. Br. at 132), it could find only four LCD monitors and two adapters with Chips-in-Issue. At a minimum, there are, as Power Integrations acknowledges, 11 competitors other than System General whose chips may be in those millions of imports. The Commission has even rejected downstream relief

15

where there was only one alternative source of non-infringing goods other than the complainant because multiple sources of components make enforcement more difficult. *Flash Memory Circuits*, Commission Opinion at 33-34. Power Integrations does not even appear to consider System General a competitor in the United States. (Renouard, Tr. 740–51; RX-299C at PI0039494, PI0039495, PI0039509, PI0039515, PI0039527, PI0039541 (referring to the SG684X), PI0039559, PI0039560; CRX-26, at PI0058598.)

Finally, other than the four monitors and two adapters, Power Integrations has not proven that any of the other products it seeks to exclude have been imported or even incorporated Chips-in-Issue. "[T]he Commission will not simply assume the existence of such imports," and "a 'general awareness that some other downstream products containing accused [chips] have been sold in the United States' is an insufficient basis to extent coverage of the limited exclusion order" to a wide variety of downstream products. *Audio Digital-to-Analog Converters*, Commission Opinion at 21-22.

The Recommended Determinations conclusory finding aside, this factor weighs strongly against any exclusion order extending to third-party downstream products

d)     **The incremental detriment to System General would be significant.**

System General will be disproportionately harmed by an order directed to downstream products. System General sells its products overseas, and many, if not most, of its chips are destined for foreign markets. (Lin, Tr. 1205–06.) An expanded exclusion order would likely stop downstream product manufacturers from purchasing System General chips even for products destined for foreign markets where Power Integrations's U.S. patents have no effect. More critically, the expansive net that Power Integrations would have the Commission cast is likely to sweep in downstream products that contain the fourteen models of System General products that

16

the Commission *has expressly directed may be imported.* (Order No. 13; Notice of Decision Not to Review an Initial Determination Granting Complainant's Motion to Terminate the Investigation in Part (January 17, 2006).) While such products may only be detained for inspection by Customs to determine whether they are admissible or excludable, the delays associated with such systemic delays could also cause System General's customers to look elsewhere. The sum total of these disruptions, both with respect to excludable products destined for markets other than the United States and with respect to admissible products subject to unnecessary scrutiny, would grant Power Integrations a windfall it does not deserve in this particular proceeding, which seeks only to remedy harms caused by limited unfair imports of six System General models into the United States.

System General also has no way to target its products for foreign markets. System General sells the majority of its products to distributors, which, in turn, sell System General's chips to roughly 300 customers, which, in turn, incorporate System General's chips into power supplies to be sold to other companies. (Lin, Tr. 1206–09; RPX-3 [RDX-209]; JX-19C, at 28.) System General's chips and the power supplies containing them can be sold anywhere in the world. (Lin, Tr. 1208.) Only the subset of these products that may enter the U.S. are subject to exclusion, and Power Integrations' requested relief should reach no further.

It is clear that many are not sold in the United States. Indeed, the very point of System General's design is to make its chips usable in any market, offering the power supply manufacturer a flexibility that, in turn, makes it unimportant to guess the final destination of the product. (Lin, Tr. 1206–09; RPX-3 [RDX-209]; JX-19C, at 28.) Power supply manufacturers may choose to avoid System General chips altogether merely out of convenience, damaging System General's sales in foreign markets as opposed to merely providing Power Integrations a

17

remedy in the United States. The result may be to harm System General's ability to sell its products in all markets, not simply the U.S. market allegedly protected by the patents-at-issue.

Moreover, some of System General's parts were withdrawn from the scope of this investigation, and some of the products in which those parts are used are not destined for the United States. An exclusion order against a limited number of System General parts destined for the United States should not be permitted to devastate the many sales that do not implicate either the patents-at-issue or the U.S. market. Yet that is the risk. The Commission has recognized that a downstream product order can have such an impact, since there is a risk that all of System General's parts might be considered subject to the order. *Audio Digital-to-Analog Converters,* Commission Opinion at 20 (noting that respondent manufactured non-infringing chips and did not manufacture downstream products, so downstream product order "would be a further detriment . . . because imports containing Wolfson's non-infringing audio DACs might be perceived as subject to the order.").

The Recommended Determination suggests that a Certification procedure should eliminate these inherent problems, but it does not indicate how. The Certification procedure is designed to assist Customs determine whether certain products are contained in the downstream products. While Customs is vested with the discretion to enforce such a certification procedure, the Commission makes Customs' task far more difficult when it casts an undifferentiated net across a broad class of downstream products and provides Customs with no guidance about which products are subject to certification in the first place. There is no explanatory analysis of how a Certification procedure would minimize the serious detriment to System General nor is there any record evidence supporting such a conclusion. Given the many millions of products that are potentially subject to certification and the tremendous burden on Customs associated

with requiring certification of all these products simply to identify a few particular models of circuit that may be imbedded within them, this factor also weighs strongly against excluding third-party downstream products, as it is System General, not Power Integrations, that will feel the public's wrath for the disruption in legitimate trade.

e)    **Third parties will bear a heavy burden.**

Even with a certification provision, the burdens on third-party downstream product manufacturers are especially high. Where a large number of importers and products are at issue, even a certification provision does not mitigate the negative effect an exclusion order will naturally have on third parties. *Audio Digital-to-Analog Converters, supra* at 20. In considering a similar request, the Commission noted that "[g]iven the large number of third party manufacturers that produce DVD players, CD players, TVs, PC sound cards, car audio systems or MP3 players, the identification of individual products containing the accused DACs on a unit-by-unit basis would be burdensome and overly intrude on legitimate trade." *Id.*

Although the Recommended Determination recognizes there is a burden on third parties, it suggests a certification provision will alleviate that burden. A certification provision in this case, however, may require third parties to track additional information up and down their complex supply chains to gather the necessary information to make such a certification. None of the downstream manufacturers or importers Power Integrations contacted ever bought a single chip from System General. (CX-1172C; RRX-28 at 12; CX-1178C at 16.) Those importers buy final products from other manufacturers, who themselves may buy power supplies from other manufacturers. (CX-1179, at Exhibit Page 12; RRX-27 at 12.) For example, Dell buys from Foxconn (CX-1179, at Exhibit Page 12), and Kodak buys from ModusLink who buys from Sirtec (RRX-27 at 12).

19

In addition, many importers have multiple manufacturers of a particular model who use multiple different suppliers and would be forced to contact the particular manufacturer in the hopes of determining whether a particular product (or shipment of products) waiting to be imported contained a Chip-in-Issue and whether a certification was necessary and appropriate. (RRX-27C, at 13.)  For some importers, it would be unduly burdensome and costly to determine whether a Chip-in-Issue were in a particular product without engaging in an investigation through their suppliers.  (RRX-30C, at 29.)  Indeed, Power Integrations deposed a Kodak witness who tried to inspect his own product to determine whether a Chips-in-Issue was present and could not do so even though he had the product in his hands.  (CX-1177, at 7 and RRX-27, at 8.)

Mr. Padula, who testified at deposition for Kodak, had no personal knowledge whatsoever of whether, or to what extent, System General Chips-in-Issue appeared in adapters for Kodak products.  In fact, ███████████ (CX-1172C.)  Instead, Mr. Padula spoke to a Nathan Nearman at one of their adapter suppliers, ModusLink, to find out if ModusLink even used a System General chip.  Nobody at ModusLink knew the answer, so somebody there in turn contacted one of their suppliers, Sirtec.  (CX-1177 at 6-7; RRX-27 at 12.)  Eventually, an unknown person at Sirtec allegedly told an unknown person at ModusLink who allegedly told someone at Kodak that there were unidentified System General chips in some Kodak adapters.  (CX-1177 and RRX-27 at 7 and 12.)[5]  Mr. Padula also purported to provide information about Kodak sales, but he had no personal knowledge of those sales.  Instead, he relied on a different Kodak employee—Brian Voorheis—who in turn relied on some unknown Kodak documents to provide the information.  (CX-1177 at 8-12 and 15.)  Kodak, however, never produced those

---

[5]    Kodak uses suppliers for adapters other than ModusLink. (RRX-27 at 13.)

documents. (RRX-27 at 14.) During Mr. Padula's deposition, he referred to an exhibit where he apparently got the sales information, which was actually a letter from a totally different person, a Kodak paralegal, to counsel for Power Integrations. (CX-1172C.) In short, the only testimony Mr. Padula gave based on his personal knowledge, and not multiple hearsay, was his testimony that x he could not determine which System General part was in the Kodak adapters he had. (CX-1177 and RRX-27 at 7-8.)

Power Integrations also deposed Envision, whose representative ███████████
████████████████████████ (CRX-5C.) The Envision witness, Mr. Yuh, specifically testified ████████████████████████████████████████
████████████████████████████████████████
████████████████[6] (CX-1178C at 16; see also CX-1178C at 22 (█████
████████████████████████████████████████
███████████.) ████████████████████████
████████████████[7]

---

[6]    Mr. Yuh also testified that ████████████████████████
████████████████████(CX-1178C at 8 and 31-33; RRX-30C at 32-33.) (CX-1178C and RRX-30C at 32-33.)

[7]    Power Integrations's evidence about how many Envision and AOC monitors contain System General parts or even which parts they contain is hopelessly muddled. Power Integrations claims that ████████████████████████████████
████████████(PI Post-Hg. Br. at 139.) In fact, Mr. Yuh testified that █████████(CX-1178C at 10.) ████████████████
████████████████████████████████████████
████████████(CX-1178C at 14-15; RRX-30C at 28-29; RRX-31; RRX-32.) Finally, Mr. Yuh was told ████████████████████████████
████████████████████████████

(continued on next page)

Finally, Power Integrations also deposed two Dell witnesses, Mr. Khor and Mr. Khoo who were in Thailand during their deposition and provided testimony based on second and third-hand information never placed in the record. Mr. Khor testified that certain System General products appeared in at least some versions of some Dell monitor products, but he had no personal information to support his testimony. (RRX-28 at 16-17.) Instead, other people at Dell reviewed documents and databases and provided him the information. (CX-1179 at 3-4; RRX-28 at 15.)[8] That information was then transferred to a new document that was created solely for purposes of this litigation, not a genuine business record. (RRX-28 at 15; CX-1173C; CX-1179 at 3-4.) Mr. Khor then read off sales figures from another document that he asked Mr. Khoo to prepare. (CX-1179 at 6.) Mr. Khoo testified that he derived the sales information from other records at Dell. (CX-1180 at 2-3.)

Both of the exhibits the Dell witnesses used to testify, CX-1173 and CX-1174, were summary documents created solely for purposes of this litigation, yet Dell did not provide any of the supporting documents or data, in violation of Federal Rules of Evidence 1004 and 1006. To make matters worse, Mr. Khoo then provided further testimony about purported U.S. sales by reading from other documents he had with him in the deposition room in Thailand, even though those documents were never produced or made a part of the record. (RRX-29 at 16-17.) Mr. Khoo did not have other information before him that would have put the testimony of the Dell witnesses in context, such as the total sales of Dell monitors as distinguished from the sales of

---

(continued from previous page)
████████ (CRX-5C; CX-1178C at 13-14.) Thus, the accuracy of the information regarding the Envision monitors should be questioned.

[8]    Mr. Khor testified that the information was contained in the bills of materials, records kept at Dell in both electronic and paper form, but those records were not produced and System General could not review them or challenge their accuracy. (CX-1179 and RRX-28 at 11-12.)

Dell monitors that supposedly have System General chips in them. (RRX-29 at 17.) Further, although Dell keeps monthly sales reports, inventory reports, and import reports, those were never produced. (RRX-29 at 17-18.)[9]

As demonstrated by the witnesses from Kodak, Envision, and Dell, determining whether downstream products contain infringing devices can be tremendously challenging. Requiring these third parties to engage in such an attenuated chain of investigation to gather such information for every shipment from other third parties will have a tremendously disruptive and chilling effect on commerce given the many third parties and products involved.

Moreover, Power Integrations terminated this investigation with respect to several System General products that service the same consumer applications as the Chips-in-Issue. (CX-54C at, Int. No. 11 [see translation at CX-119C at 7].) Thus, merely excluding categories of products would improperly capture products that Power Integrations chose to insulate from any possible remedy. (Order No. 13; Notice of Decision Not to Review an Initial Determination Granting Complainant's Motion to Terminate the Investigation in Part (January 17, 2006); Tr. at 1768–69.) An importer would need to know not only that a System General chip was present, but which System General chip. That can be extremely burdensome not only to System General but to the many users downstream, particularly here where there are multiple manufacturing layers between the importer and the original manufacturing of the power supply. (CX-1177, at 7 and RRX-27, at 8; Renouard, Tr. 788–89.)

---

[9]     Even with all the infirmities in the evidence, the picture is still not as simple as Power Integrations suggests. Dell does not buy power supply controllers directly, or even power supplies. It merely buys completed monitors manufactured by others. (RRX-28 at 12.) Further, Dell has multiple monitor suppliers for most of its models. (RRX-28 at 11-14.)

23

This factor also weighs against issuing an exclusion order encompassing third-party downstream products.

> f)  **Most imported products subject to the proposed exclusion order will not include the Chips-in-Issue.**

As noted above, there is no evidence that many of the imported products subject to the proposed exclusion order will contain a Chip-in-Issue. Indeed, Power Integrations has not presented any evidence of System General chips in downstream products other than two Dell monitors, one HP monitor, one Envision monitor, an adapter for a Kodak printer dock, and a Sony adapter. As the Commission has noted in considering whether downstream products will contain the infringing articles, "the Commission will not simply assume the existence of such imports." *Audio Digital-to-Analog Converters, supra* at 21; *see also EEPROMs, supra* at 83. A "general awareness" that some downstream products containing the accused chips were sold in the United States "is an insufficient basis to extend the coverage of the limited exclusion order" to a wide variety of downstream products. *Audio Digital-to-Analog Converters, supra* at 20-21. This factor also weighs against extending an exclusion order to include downstream products.

> g)  **The proposed order will be difficult for Customs to enforce.**

Finally, it is beyond debate that Customs will have a difficult time enforcing an order that, as imagined by the Recommended Determination or Power Integrations, could literally encompass tens of millions of imports, even though Power Integrations admitted few will contain System General chips. (Renouard, Tr. 783–84.) As shown by the ITC's own import data, in 2005 alone, up to approximately 30.5 Million monitor units worth $7.3 billion were imported into the United States, to say nothing of additional potentially excluded printer adapters. (Exhibit B.) The only response is a proposed certification provision (ID/RD at 146.) But the Commission has noted that, when faced with a large number of imports, certification still

24

"presents a compliance burden for Customs as well as third party exporters and importers." *Audio Digital-to-Analog Converters*, *supra* at 23; *EPROMs*, *supra* at 127. More than a compliance burden, asking Customs to require certification on upwards of 30 million imported units a year, based on the scant evidentiary record developed by Power Integrations, is unfathomable.

The undisputed evidence shows that it is difficult for an individual to identify a Chip-in-Issue, and importers likely do not know which PWM controller chip is in their product and are consequently unable to certify whether or not it contains a Chip-in-Issue absent a rigorous and presumably costly investigation of their supply chain. Indeed, when Power Integrations's vice-president of sales, Bruce Renouard tried to locate and determine the chip each contained at the evidentiary hearing, after admitting he had previously inspected Power Integrations's physical exhibits, still required a flashlight and magnifying glass. (Renouard, Tr. 788–89.) A United States Customs agent attempting to locate and determine whether a product contained an excluded chip would have an even more difficult challenge. Power Integrations's proposal also presumes the importer is able to make a certification, which merely shifts the burden to an ignorant third party to obtain the necessary information for each and every shipment.

3.      **The Public Interest.**

An exclusion order from the International Trade Commission can be an extremely powerful remedy having significant effects on international trade and relations, which is why complainants are required to present reliable, substantive evidence before the Commission should enter one. *EPROMs*, Inv. No. 337-TA-276, USITC Pub. No. 2196, Comm'n Op. at 125 (May 1989). Power Integrations has created a uniquely feeble record in support of its request for broad relief that may impact billions of dollars in annual trade, but claims—without support—that broad relief is necessary for effective relief.

25

Granting broad relief on the present record would only reward Power Integrations for its owns failings and encourage other potential complainants to do likewise. Power Integrations did not depose, much less request subpoenas to, a single customer of System General, although System General identified each of its customers early in the investigation. The depositions it did take have inherent evidentiary flaws, which Power Integrations never sought to rectify—*e.g.*, Power Integrations never requested the underlying documents for the summary data prepared for the litigation but instead argued that the summary data was good enough. Power Integrations only inspected 23 downstream products and found 6 that contained the Chips-in-Issue. It provided no cost information for the two adapters it presented that included a Chip-at-Issue. It proclaims broadly that 50% of the LCD computer monitors it inspected contained a Chip-in-Issue, but 4 out of 8 products is not statistically significant when Power Integrations is seeking to exclude potentially tens of millions of imports and disrupt the trade of unknown numbers of third-party companies. And instead of creating a useful, reliable record that would allow the Commission to craft an appropriate remedy, Power Integrations supplied a few rumors and some guesswork.

Complainants must make the same evidentiary proofs justifying a broad remedy as proving a violation of Section 337. If the remedy is the ultimate goal, in view of its impact on global trade, it must be moved up the ladder of importance and treated on evidentiary par with violation. Complainants should reap what they sow, and not be rewarded for their omissions. Power Integrations sowed a wasteland of evidentiary support for excluding third-party downstream products, and its harvest should reflect that.

B.  **System General Has No Domestic Inventory, So a Cease and Desist Order Is Inappropriate.**

A cease and desist order is inappropriate unless a respondent has commercially significant inventory in the U.S. *Certain Crystalline Cefradroxil Monohydrate*, Inv. No. 337-TA-293, Commission Opinion on Remedy, the Public Interest and Bonding at 37-42, USITC Pub. 2391 (June 1991).  System General has no inventory in the United States. (Lin, Tr. 1205.) Moreover, Power Integrations clearly stated that it does not seek a cease and desist order. (Tr. 1769.)  Thus, no cease and desist order should issue.

C.  **The Appropriate Bond Amount.**

The bond to be imposed during the 60-day Presidential review period must be "sufficient to protect the complainant from any injury." 19 U.S.C. § 1337(e); Commission Rule 210.50(a)(3).  The purpose is to offset a respondent's supposed competitive advantage from continued imports and sales of infringing products during the review period. *Certain Audio Digital-to-Analog Converters, supra* at 25.  Often the Commission attempts to set the bond to eliminate any sales price differences between the patented domestic product and the infringing product. *Certain Microsphere Adhesives, Process for Making Same, and Products Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, Comm. Op. at 24 (1996). In the absence of reliable price information, the Commission looks to other methods to set the bond, such as a reasonable royalty rate. *Certain Acid-Washed Denim Garments and Accessories*, Inv. No. 337-TA-324, Opinion of the Commission, 1992 WL 813953 at 22 (1992) (bond set at royalty rate of 3.75% of entered value).

The Chips-in-Issue are power supply controller chips, while Power Integrations's domestic industry products are power supply controller chips combined with a power MOSFET. As a result, the prices of System General and Power Integrations chips cannot be directly

27

compared. (Renouard, Tr. 767.) Consequently, a reasonable royalty analysis is appropriate.

██████████████████████████████████████████████████████████

██ (CX-4, ¶ 11.1; RX-304C at 11.) Moreover, as the Commission has recently noted,

reasonable royalties in the semiconductor field are generally in the 0.75% to 5% range. *Audio*

*Digital-to-Analog Converters*, *supra* at 8 and 28 (setting a 5% bond for chips used in "DVD

players, CD players, TVs, PC sound cards, car audio systems and MP3 players"). System

General submits that the bond should be set at no more than 5% of the entered value of an

imported chip. *Nickson Indus., Inc. v. Rol Mfg. Co., Ltd.*, 847 F.2d 795, 798, (Fed. Cir. 1988).

The Recommended Determination recommends a bond of 38¢ per the value of the

importer product (ID/RD at 148–49), which is ████████████ the most expensive of the

Chips-in-Issue. This was determined by comparing the complainant's hypothetical monopoly

price with the respondent's actual sales price. There is, however, no Commission precedent for

such analysis. If there is to be a price comparison, it should be between Power Integrations's

current price, ████ (Renouard, Tr. at 689), and the proposed System General "constructed" price

of 62¢ (Renouard, Tr. at 174–76).

The better assessment of the patents' value, and therefore the harm Power Integrations

would suffer during the Presidential review period, however, is ██████████████████

████████ no more than 5%.

IV.    CONCLUSION

As set forth above, the evidence presented only supports excluding the Chips-in-Issue.

No cease and desist order should issue. And a bond of no more than 5% of the imported Chip-

in-issue should be set during the Presidential Review period.

28

Respectfully submitted,

Dated:  July 10, 2006

E. Niemeyer

Smith R. Brittingham IV
E. Robert Yoches
Elizabeth A. Niemeyer
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER L.L.P.
901 New York Avenue, N.W.
Washington, DC 20001-4413
(202) 408-4000
(202) 408-4400 fax

John R. Alison
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER L.L.P.
12D, No. 167 Dun Hua North Road
Taipei, Taiwan, R.O.C.
011-886-2-2712-7001
011-886-2-2712-7080 fax

David F. Foster
Alexander D. Chinoy
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street NW Suite 900
Washington, D.C. 20005

Attorneys for Respondent
SYSTEM GENERAL CORPORATION

29

**Exhibit A**

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

In the Matter of

CERTAIN POWER SUPPLY
CONTROLLERS, AND PRODUCTS
CONTAINING SAME

Investigation No. 337-TA-541

RESPONDENT SYSTEM GENERAL CORPORATION'S
PROPOSED EXCLUSION ORDER

The Commission, having determined that there is a violation of section 337 of the Tariff

Act of 1930 (19 U.S.C. § 1337) in the unlawful importation and sale of certain power supply

controller chips and having considered the issues of remedy, the public interest, and bonding,

hereby ORDERS that:

1.      Power supply controller chips that infringe claims 1, 3, 5, 6, and 6 of U.S. Patent

6,351,398, and claims 26 and 27 of U.S. Patent 6,538,908—including System General's SG6840,

SG6841, SG6841x3, SG6842, SG6842J, and SG6843 chips—and manufactured by or on behalf

of System General Corporation or any of its affiliated companies, parents, subsidiaries, licensees,

or other related business entities, or their successors or assigns including those chips are

excluded from entry for consumption into the United States and entry for consumption from a

foreign-trade zone for the remaining term of the patents except under license of the patent owner

or as provided by law.

2.      Power supply controller chips including those chips described in paragraph 1 of this

Order are entitled to entry for consumption into the United States and entry for consumption

from a foreign-trade zone under bond in the amount of %5 of the value of the imported chip, pursuant to subsection (j) of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337(j), and the Presidential Memorandum for the United States Trade Representative of July 21, 2005 (70 *Fed. Reg.* 43251), from the day after this Order is received by the United States Trade Representative until such time as the United States Trade Representative notifies the Commission that he approves or disapproves this action but, in any event, not later than sixty (60) days after the date of receipt of this action.

3.    When the U.S. Bureau of Customs and Border Protection (Customs) is unable to determine by inspection whether power supply controller chips including those chips fall within the scope of this Order, it may, in its discretion, accept a certification, under procedures specified and deemed necessary by Customs, from persons seeking to import said power supply controller chips including those chips that they are familiar with the terms of this Order, that they have made appropriate inquiry, and thereupon state that, to the best of their knowledge and belief, the products being imported are not excluded from entry under paragraph 1 of this Order. At its discretion, Customs may require persons who have provided the certification described in this paragraph to furnish such records or analyses as are necessary to substantiate the certification.

4.    In accordance with 19 U.S.C. § 1337(a)(1), the provisions of this Order shall not apply to Power supply controller chips including those chips described in paragraph 1 of this Order or similar products or any product containing same that are imported by and for the use of the United States, imported for, and to be used for, the United States with the authorization or consent of the Government.

5.    In accordance with Order No. 13 and the January 17, 2006 Notice of Decision Not to Review an Initial Determination Granting Complainant's Motion to Terminate the Investigation

in Part, System General's SG6105, SG68501, SG68502, SG38xx, SG5841, SG5848, SG6842J

w/HV Start, SG6846, SG6846A, SG6848, SG6848x, SG6849, SG6850, SG69xx chips and

similar products and any product containing same shall not be excluded from entry for

consumption into the United States or entry for consumption from a foreign-trade zone for the

remaining term of the patents.

6.      The Commission may modify this Order in accordance with the procedures described in

Rule 210.76 of the Commission's Rules of Practice and Procedure, 19 C.F.R. § 210.76.

7.      The Secretary shall serve copies of this Order upon each party of record in this

investigation and upon the Department of Health and Human Services, the Department of

Justice, the Federal Trade Commission, and Customs.

8.      Notice of this Order shall be published in the *Federal Register*.


By Order of the Commission


_____
Marilyn R. Abbott
Secretary


Issued: _____

**Exhibit B**

**HTS - 84716045: Display units for ADP machines, with a non-color cathode-ray tube or non-CRT display type nesoi, not entered with the rest of a system**

**Customs Value by Customs Value**

**For ALL Countries**

**U.S. Imports For Consumption**

**Annual Data**

*In Actual Dollars*

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | | | | | | | | | | |
| Customs Value where quantities are collected in number | | | | | | | | | | |
| TOTAL | 535,310,232 | 969,243,667 | 678,613,017 | 1,684,673,706 | 2,734,087,301 | 2,629,194,896 | 4,465,209,492 | 5,848,525,797 | 7,532,461,181 | 7,295,472,528 |
| Total | 535,310,232 | 969,243,667 | 678,613,817 | 1,684,673,706 | 2,734,087,301 | 2,629,194,896 | 4,465,209,492 | 5,848,525,797 | 7,532,461,181 | 7,295,472,528 |

**HTS - 84716045: Display units for ADP machines, with a non-color cathode-ray tube or non-CRT display type nesoi, not entered with the rest of a system**

**First Unit of Quantity by Customs Value**

**For ALL Countries**

**U.S. Imports For Consumption**

**Annual Data**

| TOTAL | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Percent Change 2004 - 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | *In Actual Units of Quantity* | | | | | | |
| First Unit of Quantity where quantities are collected in number | | | | | | | | | | | |
| TOTAL | 1,368,732 | 1,883,833 | 1,834,615 | 3,359,063 | 5,200,539 | 7,003,222 | 11,948,438 | 18,198,746 | 22,731,567 | 30,580,574 | 34.4% |

Sources: Data on this site have been compiled from tariff and trade data from the U.S. Department of Commerce and the U.S. International Trade Commission.

Report

## HOW TO PRINT WIDE REPORTS

Choice 1) Print in "landscape". In the Netscape browser, this is done by going to "file", "print", "properties", and clicking on "landscape".

Choice 2) Select a smaller font for your report. Choices are on the page just before the report.

## HOW TO SAVE YOUR REPORT TO A SPREADSHEET

There are two methods:

**Method 1:**
To generate a text tab delimitated file to import into Lotus, Excel or Other Desktop tools press the "Download File" button. This will generate the file and allow you to download the file to your PC. (Caution all values and quantities will be in single units)

Select a Delimiter:

- Tab
- Comma (,)
- Colon (:)
- Semicolon (;)
- Space ( )

[ Download File ]

**Method 2:**
(Works best with the more current versions of the spreadsheet programs.)
(Values will be as seen on screen)

Report

1.) Save the file as a text file (Note—the saved file MUST have .txt at the end of the filename, such as fruit.txt)

2.) Go to Lotus 97 or Excel 4.0

3.) "Open" the saved .txt file.

4.) For Lotus:
Under "parsing options", select "Automatically parse based on file layout", hit "OK"

For Excel:
Under "Original data type", select "fixed width", Hit "next. Move break lines so they are just to the right of each column of data, hit "enter" then finish".

5.) Sort results to remove blank rows if desired.

| | |
|---|---|
| User Name | JPW/JPW/JPW |
| List Name | HTS08-IMP ----- |
| Country List | ALL Countries |
| Display Data Field | CONS_FIR_UNIT_QUANT |
| Aggregation Level | HTS0 |
| Display Description | NO |
| Time-Line | Annual |
| Current Month | 04 |
| Current Year | 2006 |
| Current QTR | 01 |

7/10/2006

7/10/2006

Report

Scale In

Return To Query Design Page

Return to Main Menu

Certain Power Supply Controllers
and Products Containing Same

Inv. No. 337-TA-541

## CERTIFICATE OF SERVICE

I, Christopher Jason, hereby certify that on July 10, 2006, a copy of the forgoing
document was filed and served as indicated:

The Honorable Marilyn R. Abbott, Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, D.C. 20436
**(Original and 12 Copies)**

☐ Via First Class Mail
☒ Via Hand Delivery
☐ Via Overnight Courier
☐ Via Facsimile
☐ Via Electronic mail

The Honorable Paul J. Luckern
Administrative Law Judge
U.S. International Trade Commission
500 E Street, S.W., Room 317
Washington, D.C. 20436
**(2 Copies)**

☐ Via First Class Mail
☒ Via Hand Delivery
☐ Via Overnight Courier
☐ Via Facsimile
☐ Via Electronic mail

Rett Snotherly, Esq.
Office of Unfair Import Investigations
U.S. International Trade Commission
500 E Street, S.W., Room 401-O
Washington, D.C. 20436
Tel:   (202) 205-2599
Fax:  (202) 205-2158

☐ Via First Class Mail
☒ Via Hand Delivery
☐ Via Overnight Courier
☐ Via Facsimile
☐ Via Electronic mail

Michelle Walters, Esq.
Office of the General Counsel
U.S. International Trade Commission
500 E Street, S.W., Room 707-F
Washington, D.C. 20436
Tel:   (202) 708-5468
Fax:  (202) 205-2158

☐ Via First Class Mail
☒ Via Hand Delivery
☐ Via Overnight Courier
☐ Via Facsimile
☐ Via Electronic mail

*Counsel for Power Integrations, Inc.:*

Frank E. Scherkenback, Esq.
Peter J. Kirk, Esq.
Fish & Richardson, P.C.
225 Franklin Street
Boston, MA  02110
Tel:  (617) 542-5070
Fax:  (617) 542-8906

☐ Via First Class Mail
☐ Via Hand Delivery
☒ Via Overnight Courier
☐ Via Facsimile
☐ Via Electronic mail

Howard G. Pollack, Esq.
Tamara Fraizer, Esq.
Fish & Richardson, P.C.
500 Arguello Street, Suite 500
Redwood City, CA  94063
Tel:  (650) 839-5070
Fax: (650) 839-5071

- [ ] Via First Class Mail
- [ ] Via Hand Delivery
- [x] Via Overnight Courier
- [ ] Via Facsimile
- [ ] Via Electronic mail

Evelyn G. Heilbrunn, Esq.
Malan F. Rampton, Esq.
Fish & Richardson, P.C.
1425 K Street, NW, Suite 1100
Washington, DC  20005
Tel: (202) 783-5070
Fax: (202) 783-2331

- [ ] Via First Class Mail
- [x] Via Hand Delivery
- [ ] Via Overnight Courier
- [ ] Via Facsimile
- [ ] Via Electronic mail

FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

**Certain Power Supply Controllers**
**and Products Containing Same**

Inv. No. 337-TA-541

## CERTIFICATE OF SERVICE

I, Christopher Jason, hereby certify that on July 28, 2006, a copy of the forgoing document was filed and served as indicated:

The Honorable Marilyn R. Abbott, Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, D.C. 20436
**(Original and 12 Copies)**

☐ Via First Class Mail
☒ Via Hand Delivery
☐ Via Overnight Courier
☐ Via Facsimile
☐ Via Electronic mail

The Honorable Paul J. Luckern
Administrative Law Judge
U.S. International Trade Commission
500 E Street, S.W., Room 317
Washington, D.C. 20436
**(2 Copies)**

☐ Via First Class Mail
☒ Via Hand Delivery
☐ Via Overnight Courier
☐ Via Facsimile
☐ Via Electronic mail

Rett Snotherly, Esq.
Office of Unfair Import Investigations
U.S. International Trade Commission
500 E Street, S.W., Room 401-O
Washington, D.C. 20436
Tel: (202) 205-2599
Fax: (202) 205-2158

☐ Via First Class Mail
☒ Via Hand Delivery
☐ Via Overnight Courier
☐ Via Facsimile
☐ Via Electronic mail

Michelle Walters, Esq.
Office of the General Counsel
U.S. International Trade Commission
500 E Street, S.W., Room 707-F
Washington, D.C. 20436
Tel: (202) 708-5468
Fax: (202) 205-2158

☐ Via First Class Mail
☒ Via Hand Delivery
☐ Via Overnight Courier
☐ Via Facsimile
☐ Via Electronic mail

*Counsel for Power Integrations, Inc.:*

Frank E. Scherkenback, Esq.
Peter J. Kirk, Esq.
Fish & Richardson, P.C.
225 Franklin Street
Boston, MA 02110
Tel: (617) 542-5070
Fax: (617) 542-8906

☐ Via First Class Mail
☐ Via Hand Delivery
☒ Via Overnight Courier
☐ Via Facsimile
☐ Via Electronic mail

Howard G. Pollack, Esq.
Tamara Fraizer, Esq.
Fish & Richardson, P.C.
500 Arguello Street, Suite 500
Redwood City, CA  94063
Tel:  (650) 839-5070
Fax: (650) 839-5071

☐ Via First Class Mail
☐ Via Hand Delivery
☒ Via Overnight Courier
☐ Via Facsimile
☐ Via Electronic mail

Evelyn G. Heilbrunn, Esq.
Malan F. Rampton, Esq.
Fish & Richardson, P.C.
1425 K Street, NW, Suite 1100
Washington, DC  20005
Tel:  (202) 783-5070
Fax: (202) 783-2331

☐ Via First Class Mail
☒ Via Hand Delivery
☐ Via Overnight Courier
☐ Via Facsimile
☐ Via Electronic mail

*Chris Jaso*

FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

# EXHIBIT B

PUBLIC VERSION

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### WASHINGTON, D.C. 20436

In the Matter of

**CERTAIN POWER SUPPLY
CONTROLLERS AND PRODUCTS
CONTAINING SAME**

Inv. No. 337-TA-541

**COMPLAINANT POWER INTEGRATIONS, INC.'S
REPLY TO RESPONDENT SYSTEM GENERAL CORPORATION'S
BRIEF ON REMEDY, BOND AND THE PUBLIC INTEREST**

Case No. 04-1371-JJF
DEFT Exhibit No. DX_509
Date Entered _____
Signature _____



FCS1693169

PUBLIC VERSION

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | REMEDY | | 4 |
| | A. | Exclusion of Downstream Products Is Necessary and Justified | 4 |
| | B. | The Evidence and Analysis of the EPROMs Factors Overwhelmingly Favors Exclusion of Downstream Products | 7 |
| | | 1. The value of the infringing articles compared to the value of the downstream products in which they are incorporated | 8 |
| | | 2. The identity of the manufacturer of the downstream products, i.e., whether it can be determined that the downstream products are manufactured by the respondent or by a third party | 10 |
| | | 3. The incremental value to the complainant of the exclusion of downstream products | 11 |
| | | 4. The incremental detriment to respondents of exclusion of such products | 12 |
| | | 5. The burdens imposed on third parties resulting from exclusion of downstream products | 13 |
| | | 6. The availability of alternative downstream products that do not contain the infringing articles | 16 |
| | | 7. The likelihood that the downstream products actually contain the infringing articles and are thereby subject to exclusion | 16 |
| | | 8. The opportunity for evasion of an exclusion order that does not include downstream products | 17 |
| | C. | The Public Interest Favors Issuance of an Exclusion Order | 17 |
| III. | BONDING | | 18 |
| IV. | CONCLUSION | | 19 |

FCS1693170

PUBLIC VERSION

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Certain Audio Digital-To-Analog Converters and Products Containing Same,*
Inv. No. 337-TA-499, Comm'n Op. (March 3, 2005) .................... 6, 8, 11, 13, 14, 16, 17

*Certain Display Controllers and Products Containing Same,* Inv. No. 337-TA-
481; *Certain Display Controllers With Upscaling Functionality and Products
Containing Same,* Inv. No. 337-TA-491 (Consolidated), Comm'n Op. at 59-60
(U.S. I.T.C. February 4, 2005) ....................................................................... 9

*Certain Electrical Connectors and Products Containing Same,* Inv. No. 337-
TA-374, Pub'n. No. 2981, Comm'n Op. at 7 n.8 [sic, 13 n.17] (U.S. I.T.C. July
1998) ................................................................................................................. 6, 7

*Certain Neodymium-Iron-Boron Magnets,* Inv. No. 337-TA-372, Pub'n No.
2964, Comm'n Op. at 12 (U.S. I.T.C. April 29, 1996) .................................. 5, 18

*Certain Neodymium-Iron-Boron Magnets, Magnet Alloys, and Articles
Containing the Same, Certain Audio Digital-To-Analog Converters and
Products Containing Same, Certain Video Graphics Display Controllers and
Products Containing Same, and EPROM, EEPROM, Flash Memory, and
Flash Microcontroller Semiconductor Devices and Products Containing Same.* ........ 2

*Certain Neodymium-Iron-Boron Magnets, Magnet Alloys, and Articles
Containing the Same,* Inv. No. 337-TA-372, Pub'n No. 2964, Final Initial and
Recommended Determinations (U.S. I.T.C. Dec. 11, 1995) ................................ 5

*Certain Sortation Systems, Parts Thereof, and Products Containing Same,* Inv.
No. 337-TA-460, Pub. No. 3588, Comm'n Op. at 21 (U.S. I.T.C. February 19,
2003) ................................................................................................................. 19

*Certain Video Graphics Display Controllers and Products Containing Same,*
Inv. No. 337-TA-412, Recommended Determination on Remedy and Bonding
(U.S. I.T.C. May 19, 1999) ............................................................................... 7

*Erasable Programmable Read-Only Memories, Components Thereof, Products
Containing Such Memories, and Processes for Making Such Memories,* Inv.
No. 337-TA-276, Pub. No. 2196, Comm'n Op. at 127 (U.S. I.T.C. May 1989) ........ 9

*Flash Memory Circuits and Products Containing Same* ("Flash Memory"),
Inv. No. 337-TA-382, Comm'n Op. at 35 (June 26, 1997) ................................. 8

*Flash Memory, and Flash Microcontroller Semiconductor Devices and
Products Containing Same,* Inv. No. 337-TA-395, Comm'n Op. at 85 (U.S.
I.T.C. December 11, 2000) ................................................................................. 9

FCS1693171

PUBLIC VERSION

## TABLE OF AUTHORITIES (cont'd)

Page(s)

*Variable Speed Turbines*, Inv. No. 337-TA-376, Comm'n Op. at 36 (U.S. I.T.C. September 23, 1996)..................................................................... 18

*Viscofan, S.A. v. U.S. Int'l Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986) ................. 7

**Statutes**

19 U.S.C. § 1337(j)(3............................................................................................

Fed. R. Evid. 1006 ........................................................................................ 19

Fed. R. Evid. 803(6)...................................................................................... 15

Fed. R. Evid. 807 ......................................................................................... 15

S. Rep. 93-1298, 93d Cong., 2d Sess. 198, reprinted at 1974 U.S.C.C.A.N. 7186, 7331 (1974)............................................................................... 15, 19

FCS1603470

PUBLIC VERSION

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### WASHINGTON, D.C. 20436

In the Matter of

**CERTAIN POWER SUPPLY
CONTROLLERS AND PRODUCTS
CONTAINING SAME**

Inv. No. 337-TA-541

## COMPLAINANT POWER INTEGRATIONS, INC.'S
## REPLY TO RESPONDENT SYSTEM GENERAL CORPORATION'S
## BRIEF ON REMEDY, BOND AND THE PUBLIC INTEREST

Pursuant to the U.S. International Trade Commission's ("Commission") notice of June 30, 2006, Complainant Power Integrations, Inc. ("Power Integrations") respectfully provides this reply to Respondent System General Corporation's ("SG") brief on remedy, bond and the public interest filed July 10, 2006.

### I.    INTRODUCTION

SG's plea to the Commission on remedy, bond, and the public interest must be rejected. SG is apparently an unapologetic infringer, now trying to take further advantage of its illegal acts by wrapping itself in the cloth of "public interest" while espousing exaggerated burdens of enforcement and discounting the indisputable evidence.

In particular, SG's assertions that Power Integrations did not present "any" evidence to support exclusion of downstream products[1] are demonstrably wrong, and were properly rejected by both the OUII Staff and the Administrative Law Judge ("ALJ"). Reliable evidence from several third parties shows that ███████ of infringing chips have already been imported into the

---

[1] SG's argument that Power Integrations should have brought additional parties into the case is also wrong and was rejected by the ALJ. There is no such requirement and, in any event, several third parties produced reliable evidence despite not being named in this investigation.

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

FCS1693173

PUBLIC VERSION

United States in LCD computer monitors, as well as in AC printer adapters, while only a hundred or so have been imported directly.  SG's focus on the relatively small number of *models of downstream products*, either presented as physical evidence at trial or shown by third parties to contain those ▮▮▮▮ of infringing chips, reveals only part of the story.  The fact that only a limited number of models of Dell and Envision LCD computer monitors and Kodak AC printer adapters account for the importation of ▮▮▮▮ of the infringing chips actually portends even more importation, since the physical evidence establishes importation of other models by HP and Sony as well, and since SG's own documents and testimony indicate the use of the infringing chips in LCD monitors and AC printer adapters of a number of additional large companies.

These facts are consistent with SG's own claim to now service, with the infringing chips, more than 40% of the worldwide market for LCD monitor applications alone.  And it is these facts—not innuendo and not speculation—that clearly distinguish this case from the cases upon which SG tries to rely, including *Certain Neodymium-Iron-Boron Magnets, Magnet Alloys, and Articles Containing the Same, Certain Audio Digital-To-Analog Converters and Products Containing Same, Certain Video Graphics Display Controllers and Products Containing Same, and EPROM, EEPROM, Flash Memory, and Flash Microcontroller Semiconductor Devices and Products Containing Same*.  As the ALJ found, full consideration of the specific facts in this case in light of the *EPROMs* factors compels issuance of an exclusion order that extends to particular downstream products.

SG's parade of alleged horrible impacts on third parties and the public interest if downstream products were excluded is a sideshow, as these fears both ignore the evidence and are almost entirely addressed by the proposed certification provision.  Indeed, SG acknowledges that there are alternative sources of both power supply controller chips and some downstream

2

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

FCS1693174

PUBLIC VERSION

products currently using them. Thus, the public will have other options for purchasing chips of the type at issue, as well as downstream products incorporating those chips, and third parties will do exactly what they should do when faced with an exclusion order covering specific downstream products and a certification provision—switch to a legitimate source, such as Power Integrations' own chips. On the other hand, without the exclusion of downstream products, Power Integrations will have effectively no remedy for SG's infringement of its patent rights.

As Power Integrations established at trial, SG has captured a large market share by luring away Power Integrations' customers with its cheap, infringing chips. It is hypocritical for SG to now disavow the success of its infringing chips, to assert in the face of overwhelming evidence to the contrary that there is no way to know whether imported LCD monitors contain its chips, and, yet further, to claim that any bond should be based on Power Integrations' price as already eroded by SG's infringing activities. SG's request to limit any exclusion order to the infringing chips themselves and to set such a minimal bond should be rejected. The Commission should adopt the remedy recommended by the ALJ,[2] and supported by the Staff[3] and Power Integrations, excluding the infringing power supply controller chips as well as the LCD monitors and AC printer adapters that contain them, and setting the bond in this matter at a fair thirty-eight cents per infringing item.

---

[2] The ALJ's recommended determination on remedy and bonding was included as part of the Final Initial Recommended Determinations, dated May 15, 2006 (hereinafter "Recommended Determination").
[3] See Brief of the Office of Unfair Import Investigations of Remedy, the Public Interest, and Bonding dated July 14, 2006 (hereinafter "Staff Remedy Br.") at 1, 2.

3

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

FCS1693175

PUBLIC VERSION

## II.     REMEDY

A limited exclusion order that encompasses downstream LCD computer monitors and AC printer adapters is necessary to provide proper relief to Complainant Power Integrations and is not contrary to the public interest.

### A.     Exclusion of Downstream Products is Necessary and Justified

An exclusion order limited to the infringing SG power supply controller chips is *not*, as SG argues, an appropriate remedy. Respondent System General Corporation's Brief on Remedy, Bond and the Public Interest ("SG Remedy Br.") at 4. SG says that mere exclusion of the chips themselves is appropriate because (a) the importation requirement was satisfied and (b) all evidence—other than the four LCD monitors and two AC printer adapters that were physically brought to the hearing in this matter—is "unreliable." This argument fails both factually and logically.

As detailed in Complainant Power Integrations, Inc.'s Brief on Remedy, the Public Interest, and Bonding ("PI Remedy Br."), there is reliable evidence that the infringing SG power supply controller chips are imported into the United States *by the* ███ in LCD monitors, including in ████████████████ and ████████████████████████ ██████████. *Id.* at 7-8. They are also imported *by the* ███ in ████████████████ ████████████████. *Id.* The infringing SG chips are also undeniably imported in at least one model of LCD monitor by Hewlett-Packard and one model of printer adapter by Sony. *Id.* In addition, there is extensive evidence from SG of the use of the infringing power supply controller chips in the LCD monitors and AC printer adapters of numerous other downstream users well-known to American consumers. *Id.* at 8-10. SG itself admits to now having more than 40% of the worldwide LCD monitor market,[4] a third of which is in the United

---

[4] SG estimated in 2000 that it had gained 40% of the worldwide LCD monitor market, and ████████████████████████████████████ PI Remedy Br. *Id.* at 10. Power Integrations recently estimated that SG has 60-65% of the worldwide market. *Id.* at 3.

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

FCS1693176

PUBLIC VERSION

States. *Id.* at 10; *see also id.* at 3. Taken together, these facts clearly establish widespread use of the infringing SG power supply controller chips in LCD monitors and AC printer adapters imported into the United States, and substantiate a remedy of exclusion of these downstream products.

The finding of the ALJ and the Commission that the importation requirement was satisfied does not change this assessment. Indeed, the facts relating to importation—which show that direct imports of the chips are minimal at best—further highlight the need for an exclusion order that encompasses these downstream products. *See* PI Remedy Br. at 16 (noting that only a handful of the infringing power supply controller chips were shown to have been shipped directly into the United States by SG, and only about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮.

The cases upon which SG relies do not require a different result.

SG's reliance on *Certain Neodymium-Iron-Boron Magnets, Magnet Alloys, and Articles Containing the Same,* Inv. No. 337-TA-372, Pub'n No. 2964, Final Initial and Recommended Determinations (U.S. I.T.C. Dec. 11, 1995) ("*Magnets ID*") ignores both the evidence in this case and the consideration of important additional factors in that case. In the *Magnets ID*, the ALJ found that "proof of *one instance* of a downstream product containing an infringing magnet, *in light of the other factors considered,* was insufficient evidence to issue an order covering every disk drive and headphone containing Chinese manufactured NdFeB magnets." *Id.* at 29 (emphasis added). The other factors included evidence of widespread use and direct importation of the magnets themselves by the respondents (thus making exclusion of the infringing products themselves an effective remedy), and a decision not to recommend a certification procedure due to a lack of marking and concerns about evasion. *Id.* at 21-22, 23-25; *Certain Neodymium-Iron-Boron Magnets,* Inv. No. 337-TA-372, Pub'n No. 2964, Comm'n Op. at 12 (U.S. I.T.C. April 29, 1996) ("*Magnets Op.*") (issuing a general exclusion order that did not exclude downstream products or require certification because testing by Customs of the directly

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

PUBLIC VERSION

imported unmarked magnets would be more effective than certification). Here, in contrast, there is evidence of numerous "instances" of downstream products accounting for importation of ▋▋▋ of infringing products, evidence of essentially no direct importation of the infringing products, and recommendation by the ALJ and the Staff that a certification provision would be appropriate. PI Remedy Br. at 8, 16; Recommended Determination at 140-141; Staff Remedy Br. at 4-5.

SG's reliance on *Certain Audio Digital-To-Analog Converters and Products Containing Same*, Inv. No. 337-TA-499, Comm'n Op. (March 3, 2005) ("*Audio DACs*") is similarly misplaced. In *Audio DACs*, the Commission declined to exclude a broad array of downstream electronics products—including DVD players, CD players, TVs, PC sound cards, car audio systems, and MP3 players—because there was insufficient evidence that large segments of these imported products were likely to contain the infringing products. *Id.* at 16; *see also id.* at 5. In particular, there was no evidence of importation of the accused products in most of the categories of downstream products (TVs, PC sound cards, car audio systems or MP3 players) and evidence of only a "small volume" of imports in another (DVD players). *Id.* 20, 22. In addition, there was no evidence that the accused products were imported predominantly as components of downstream products. *Id.* at 5, 20. In this case, in contrast, Power Integrations seeks an exclusion order that is narrowly tailored to two specific downstream products, for which it established importation of the infringing chips in highly significant quantities, and the infringing SG parts are imported almost exclusively as components of the downstream products. PI Remedy Br. at 8, 16; Recommended Determination at 140-141.

The evidence in this case, therefore, viewed in light of these prior holdings, is more than sufficient for the Commission to find that exclusion of the specified downstream products is appropriate. SG's warning that the Commission must proceed cautiously, SG Remedy Br. at 7-8 citing *Certain Electrical Connectors and Products Containing Same*, Inv. No. 337-TA-374, Pub'n. No. 2981, Comm'n Op. at 7 n.8 [sic, 13 n.17] (U.S. I.T.C. July 1998) ("*Connectors*"), is

6

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

PUBLIC VERSION

simply overstated. In *Connectors*, the Commission granted an exclusion order prohibiting entry of motherboards containing the infringing parts, but not all downstream products that may contain the infringing parts. *Id.* The Commission was cognizant of concerns that exclusion orders be crafted "in the narrowest manner possible" and so devised an order that excluded the bulk, though not all, of the imports; it refused, however, to further narrow its order because of concerns about enforcement. *Id.* Thus, *Connectors* demonstrates that the Commission is entitled to exercise its judgment in deciding the proper scope for an exclusion order. *See also Viscofan, S.A. v. U.S. Int'l Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986) (the Commission has broad discretion in selecting the form, scope, and extent of a particular remedy).

SG's further warning that Power Integrations "bears a heavy burden" is also exaggerated. SG cites *Certain Video Graphics Display Controllers and Products Containing Same*, Inv. No. 337-TA-412, Recommended Determination on Remedy and Bonding (U.S. I.T.C. May 19, 1999) ("*Video Graphics RD*") for this purported premise, SG Remedy Br. at 5-6, but this recommended determination makes no such statement. In the *Video Graphics RD*, the ALJ refused to recommend an exclusion order extending to downstream products because the complainant "omit[ted] any showing on several of the *EPROMs* factors." *Id.* at 6. Here, as discussed in Power Integrations' initial submission on remedy and below, Complainant has addressed each of the *EPROMs* factors and has shown that each of them favors exclusion of the indicated downstream products. PI Remedy Br. at 12-22; *see also* discussion *infra* at Section II.B.

**B.**   **The Evidence and Analysis of the *EPROMs* Factors Overwhelmingly Favors Exclusion of Downstream Products**

Power Integrations discussed each of the *EPROMs* factors in its brief on remedy. PI Remedy Br. 12-22. Power Integrations refers to that discussion and addresses here only those points raised by SG and not previously addressed.

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

FCS1603170

1.   **The value of the infringing articles compared to the value of the downstream products in which they are incorporated**

As it has noted previously, Power Integrations does not dispute that the price of the accused chips is small compared to the market price of the end product;[5] rather, it disputes SG's argument that this ratio is dispositive in the assessment of the first *EPROMs* factor or the determination to exclude downstream products. PI Remedy Br. at 13-14. SG cites cases where the value of the infringing part was small compared to the price of the downstream product and where downstream products were not excluded, SG Remedy Br. at 10, but these cases do not require the conclusion that SG urges and are readily distinguished from the circumstances here.

For example, in *Flash Memory Circuits and Products Containing Same* ("*Flash Memory*"), SG Remedy Br. at 10, there was no evidence regarding the value of the infringing chips to downstream applications, only to flash cards used in the downstream applications. Inv. No. 337-TA-382, Comm's Op. at 35 (June 26, 1997). Furthermore, the Commission declined to exclude downstream products primarily because the ALJ had not considered any of the *EPROMs* factors and the late-submitted evidence was not sufficient to do an adequate assessment. *Id.* That is not the case here, where substantial evidence was timely presented and fully assessed under the *EPROMs* factors.

In *Digital-to-Analog Converters and Products Containing Same* ("*Audio DACs*"), the ALJ and the parties acknowledged that the price of the accused part was less than one percent of the price of the downstream product. Inv. No. 337-TA-499, Final Initial and Recommended Determination at 127 (June 12, 2005). However, in assessing the first *EPROMs* factor, the ALJ in *Audio DACs* also found that the patented technology was *not* essential to the end product. That is not true here, where the ALJ found the patented chips to be vital and critical components

---

[5] SG also asserts that the price of the adapters is not known. However, Mr. Renouard testified that the Sony adapter that contained the infringing SG chip cost forty to fifty dollars. Renouard, Tr. at 725:3-9. The prices of other printer adapters were shown to be just under forty dollars. CX-1168C ( ▮▮▮▮ ); CX-1155C ( ▮▮▮▮ ). Assuming that the infringing SG chips sell for ▮▮▮▮ , the ratio of the price of the chip to the price of the adapter is therefore about ▮▮▮ .

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

FCS1693180

PUBLIC VERSION

of the downstream products, sufficiently important to warrant exclusion of the downstream products. Recommended Determination at 142-143.

SG's assertion that the relevant question is not importance but, rather, whether the patented technology is "essential" to the downstream product, overstates the rule. It is true that, in *EPROM, EEPROM, Flash Memory, and Flash Microcontroller Semiconductor Devices and Products Containing Same,* Inv. No. 337-TA-395, Comm'n Op. at 85 (U.S. I.T.C. December 11, 2000) ("*EPROMs II*"), the Commission refused to exclude downstream products where the patented technology was not "essential" to the downstream product. However, the Commission has also and more recently indicated that the first *EPROMs* factor weighs in favor of a broad exclusion order when, more generally, "the importance of the accused product to the operation of the downstream product is considered." *Certain Display Controllers and Products Containing Same,* Inv. No. 337-TA-481; *Certain Display Controllers With Upscaling Functionality and Products Containing Same,* Inv. No. 337-TA-491 (Consolidated), Comm'n Op. at 59-60 (U.S. I.T.C. February 4, 2005) ("*Display Controllers*"); *see also Erasable Programmable Read-Only Memories, Components Thereof, Products Containing Such Memories, and Processes for Making Such Memories,* Inv. No. 337-TA-276, Pub. No. 2196, Comm'n Op. at 127 (U.S. I.T.C. May 1989) ("*EPROMs*") (excluding downstream products where the accused product was "vital" for the downstream product).

For all of these reasons, the fact that the price of the patented technology is small compared to the price of the downstream LCD monitor and printer adapter product does not preclude exclusion of downstream products. Rather, where, as here, the patented technology is found to be important, vital, and critical for the downstream product, the first *EPROMs* factor favors exclusion of downstream products. *See* PI Remedy Br. at 14.

---

9

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

PUBLIC VERSION

with sales in Taiwan and other countries and continuing today to compete in this market, there is every reason to believe that many of the sales that were previously made by SG of its infringing chips will, if and only if downstream products are excluded, be made by Power Integrations instead. PI Remedy Br. at 22-23. This is particularly true where many of SG's customers formerly were customers of Power Integrations. PI Remedy Br. at 5; Cf. CPX-10, CX-165 and Renouard, Tr. at 681:17-683:23 & CRX-3C at PI0041259, PI0041265; see also, e.g., RX-320 and Renouard, Tr. at 752:4-753:15.

SG's assertion that Power Integrations does not consider SG a competitor in the United States is a red herring. There is no dispute that SG does not sell directly to customers in the United States; rather, it sells directly and through its distributors to Asian power supply manufacturers or consumer product manufacturers, who then sell downstream products for importation into the United States. See PI Remedy Br. at 3-4. Power Integrations sells to many of those same power supply manufactures for incorporation in the same downstream applications. PI Remedy Br. at 5; Renouard, Tr. at 685:13-20. Thus, in every meaningful sense of the word, SG and Power Integrations are clearly competitors.

For all of these reasons, the third *EPROMs* factor clearly favors exclusion of downstream products.

4. **The incremental detriment to respondents of exclusion of such products**

SG complains that the proposed exclusion of downstream products would "sweep in" downstream products that contain some SG products that are expressly not to be excluded here. But it cites no evidence to support these claims, and Power Integrations is not aware of any. In any event, a certification provision as recommended by the ALJ and the Staff would effectively address these concerns. A certification provision is readily implemented here, where the products to be excluded have been identified by numeric designation (e.g. SG6841) and certain of those that are not to be excluded have similarly been identified. A certification provision would permit importers to provide documentation identifying those models of downstream

12

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

FCS1693182

PUBLIC VERSION

products that do not contain the infringing SG chips. This does not, as SG suggests, require separate analysis of millions of products; rather, it requires an analysis of the typically handful of models that the manufacturer imports. *See* PI Remedy Br. at 7-8 (discussing the handful of models imported by each of Dell and Kodak, which account for importation of ███ of actual products containing ███ of infringing SG chips). Such a provision will avoid the delays and disruptions of which SG also complains.

SG further complains, as it has before, that it has no way to target its products for foreign markets and that customers who sell products worldwide will cease entirely to purchase the infringing SG chips if an exclusion order includes downstream products. But again, SG cites no evidence to substantiate its purported concerns and Power Integrations is not aware of any. As was noted previously by Power Integrations, SG need only advise its customers which products can and cannot be imported into the United States. *See* PI Remedy Br. at 18. Whether power supply manufacturers choose to avoid SG chips "altogether merely out of convenience," SG Remedy Br. 17, is pure speculation and is not a proper basis to deny Power Integrations an effective remedy.

SG's complaint that the very point of its design is to "offer[] the power supply manufacturer [] flexibility," SG Remedy Br. at 17, rings decidedly hollow. That is also the very point of Power Integrations' infringed patented technology, which should be protected as proposed by the ALJ, with an exclusion order that encompasses downstream products.

5.    **The burdens imposed on third parties resulting from exclusion of downstream products**

As discussed above in Section II.B.4, a certification provision will alleviate much of the potential burden on third parties of the exclusion of downstream products. SG cites *Audio DACs*, SG Remedy Br. at 19, for the proposition that a certification provision does not mitigate this burden where a large number of importers and products are at issue. But in *Audio DACs*, complainants sought exclusion of a very wide variety of downstream products, including DVD players, CD players, TVs, PC sound cards, car audio systems, and MP3 players. *Audio DACs* at

13

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

FCS1602122

PUBLIC VERSION

20. Here, in contrast—and despite evidence that the infringing SG chips are used in a similarly wide array of downstream products—complainant seeks exclusion of only two very specific types of products, LCD computer monitors and AC printer adapters, that contain specifically identified SG chips.

The Commission in *Audio DACs* also found, in evaluating the fifth *EPROMs* factor, that such a broad exclusion order would be "significantly disproportionate" to the incremental benefit to complainant, in part because the respondent had ceased manufacturing the infringing products. Here, in contrast, SG continues to manufacture and sell the infringing SG chips and is actually gaining market share. PI Remedy Br. at 3.

SG further suggests that the burden on importers is heavy because they do not purchase directly from SG and therefore cannot readily determine which SG chips are in their products. But the evidence presented in this investigation clearly indicates otherwise. *See* PI Remedy Br. at 7-8, 18. For example, SG says that it would be unduly burdensome and costly to determine whether a particular product contains an infringing SG chip, citing the deposition testimony of Envision Peripherals. SG Remedy Br. at 20. But Envision Peripherals testified that ████████████

████████████ [6] CX-1178C at 30. Similarly, SG notes that "many importers have multiple manufacturers of a particular model who use multiple different suppliers," citing the testimony of Kodak. But Kodak merely testified that its supplier, ModusLink, has many suppliers and that Kodak buys adapters from other suppliers; it did not indicate that anyone other than Sirtec makes the adapters that are sold with the Kodak's EasyShare printer dock. [7] CX-1177C at 5-7. On this

---

[6] The evidence from Envision Peripherals is not "hopelessly muddled" as SG claims. SG Remedy Br. at 21, fn.7. Envision Peripherals ████████████████████████████ CRX-5C; CX-1178C at 13-16, ████████████████████████████ CX-1178C at 15.

[7] Rather, Kodak testified that it contacted its supplier, ModusLink, who contacted Sirtec, the manufacturer of the adapters that Kodak sells, who indicated that those products do contain the SG chips; Kodak then confirmed this by inspection. CX-1178C at 5-7.

14

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

FCS1693184

PUBLIC VERSION

same point, Envision Peripherals ███████████████████████████
███████████. CX-1178C at 33-34.

SG's criticism of this and other testimony and documents from third parties as unreliable
second-hand information from people without personal knowledge, i.e., hearsay, is not well-
founded. The third party evidence in this investigation was provided in response to subpoenas of
Dell, Kodak, and Envision Peripherals. Mr. Jack Padula testified on behalf of Kodak; he is
Kodak's Worldwide Commodity Manager. CX-1177C at 5. ██████████████ testified on
behalf of Envision Peripherals; ██████████████
███████. CX-1178C at 5-6. Mssrs. Andrew Khor and Joseph Khoo testified on behalf of
Dell; they are Dell's Regional Director for Display Engineering, CX-1179C at 2, and Global
Commodity Manager, CX-1180C at 2, respectively. Each of these witnesses was properly
prepared to testify on particular topics, and in some instances obtained information from other
individuals in order to do so.

There is no reason—and SG did not identify any—to think that their testimony was
unreliable. Indeed, the identification by these witnesses of their own products as containing what
were, at the time, potentially infringing SG devices, is testimony that was decidedly against their
interest and therefore bears the earmark of reliability. In addition, the testimony of these third
party witnesses about their company's products and sales qualifies as an exception to the rule
against hearsay because their testimony reflected records of regularly conducted business
activity, Fed. R. Evid. 803(6), and was material, more probative on the issue of downstream
products than any other evidence, and submitted in the interests of justice. Fed. R. Evid. 807.
The documents that these parties provided (CX-1173C, CX-1174C, CX-1172C, and CRX-5C)
also qualify as summary charts that are admissible in place of the original underlying data. Fed.
R. Evid. 1006. For all of these reasons, the testimony and documents of Dell, Kodak, and
Envision Peripherals are reliable and should be given full weight and consideration. *See also* PI
Remedy Br. at 15.

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

FCS16931RF

PUBLIC VERSION

6.  The availability of alternative downstream products that do not contain the infringing articles

SG does not address the sixth *EPROMs* factor.

7.  The likelihood that the downstream products actually contain the infringing articles and are thereby subject to exclusion

SG's assertion that "most imported products subject to the proposed exclusion order will not include the [infringing SG chips]" is wishful thinking, at best. The evidence clearly indicates otherwise. *See* PI Remedy Br. at 7-10. SG simply ignores all of the testimony and documents from Dell, Kodak, and Envision, as well as its own testimony and its own documents, and boldly asserts that Power Integrations "has not presented any evidence of System General chips in downstream products other than two Dell monitors, one HP monitor, one Envision monitor, an adapter for a Kodak printer dock, and a Sony adapter". These six products, each of which contained an infringing SG chip, are but the tip of the iceberg, as shown by the evidence in its totality. *See* PI Remedy Br. at 7-10.

SG further cites *Audio DACs* for the proposition that the Commission will not assume the existence of imports and that a "general awareness" of downstream products containing the accused chips is not enough to warrant exclusion of downstream products, implying that the circumstances of that case exist here. But the situation in *Audio DACs* was quite different than the situation here. As noted above, in *Audio DACs*, the Commission was concerned because complainants sought exclusion of a variety of widely distributed products, but, for many of them (including TVs, PC sound cards, car audio receivers, and MP3 players), it had presented no evidence whatsoever of importation. *Audio DACs* at 22. In addition, it had presented no evidence of importation of a significant volume of any downstream product containing the infringing part. *Id.* Here, in contrast, the ALJ and Power Integrations seek exclusion of just the two specific types of products for which importation was demonstrated by physical evidence and for which there was also evidence of importation of a significant volume of those products. *See* PI Remedy Br. at 7-8.

16

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

PUBLIC VERSION

8.    **The opportunity for evasion of an exclusion order that does not include downstream products**

It is not, as SG asserts, "beyond debate that Customs will have a difficult time" enforcing the recommended exclusion order. Indeed, the ALJ found that "if a certification provision is included with the exclusion order giving discretion to the CBP in drafting the certification provision then only a reasonable burden would be placed on CBP to enforce the order." Recommended Determination at 146.

SG again cites *Audio DACs* for the proposition that a certification procedure presents a compliance burden when large numbers of imports are involved. But as noted previously, the Commission in *Audio DACs* was considering an exclusion order encompassing numerous distinct categories of products. *Audio DACs* at 20, 23. Here, in contrast, the exclusion order would apply to only two specific types of products.

SG also presents new import data to show that over 30 million monitors were imported in 2005. This number appears to include more than LCD computer monitors. For example, it may include LCD TV monitors. In any event, even the importation of millions of LCD computer monitors does not counsel against an exclusion order that encompasses LCD computer monitors. The evidence presented by Dell alone, CX-1174C & CX-1180C at 4-18, accounts for ███████ ███████████████████████████████████████████████████████████ Moreover, these imports are for ███████████████████████████ Certification of such limited numbers of models of products is entirely feasible, as demonstrated by ████████████████████ ████████████████████████████ and would thus significantly reduce the burden of enforcement on Customs.

C.    **The Public Interest Favors Issuance of an Exclusion Order**

Power Integrations has presented reliable, substantive evidence to support the recommended exclusion of downstream LCD computer monitors and AC printer adapters. SG's suggestion that Power Integrations is to blame for what it characterizes as a "feeble record," and therefore does not merit a remedy of exclusion of downstream products for SG's infringement, is

17

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

PUBLIC VERSION

not supported by the facts or the law. The record here is solid, and it fully supports the recommended exclusion order.

The law also strongly supports protection and enforcement of Power Integrations' patent rights. *See* PI Remedy Br. at 23; *Magnets Op.* at 14-15 (finding similarly with respect to NdFeB magnets). SG's power supply controller chips are simply not the type of products to raise public interest concerns. *See Variable Speed Turbines*, Inv. No. 337-TA-376, Comm'n Op. at 36 (U.S. I.T.C. September 23, 1996); Staff Remedy Br. at 7 (submitting that entry of a limited exclusion order would not be contrary to the public interest). For all of these reasons—and SG's rhetoric notwithstanding—an exclusion order that encompasses the specified downstream products is both appropriate and necessary.

## III.    BONDING

Power Integrations requests, in accordance with the recommendation of the ALJ and the Staff, that a bond during the Presidential review period be set in the amount of thirty-eight cents ($0.38) per infringing article or product containing the same. Recommended Determination at 148-149; Staff Remedy Br. at 8-10; *see* PI Remedy Br. at 24-26.

In its submission to the Commission on remedy, SG makes a new proposal for the calculation of a bond based on price differentials. SG Remedy Br. at 28. SG proposes that any price comparison should use Power Integrations' current price of ████████████████—not ████████████ price at which it sold its product prior to the infringing activities of SG. That is, SG asks the Commission to use the price of Power Integrations' products *as already eroded by SG's infringing activity* in calculating the competitive harm from SG. This proposal improperly assumes away the competitive harm.

The absurdity of the proposal is evident from the calculations. Whereas the ALJ and Power Integrations' proposed calculation is the pre-erosion Power Integrations price of ████ ████████ minus the SG constructed price of ████████████████, resulting in thirty-eight cents ($0.38), SG's proposed calculation is the eroded price of ████████████████ minus

18

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

PUBLIC VERSION

████████████████—i.e.—████████████ There is no precedent for such a method or result. Indeed, the use of SG's proposal would be contrary to statute, as it would effectively require that the Commission set a bond of zero.

The amount of the bond is "to be sufficient to protect the complainant from any injury" during the pendency of the Presidential review period. 19 U.S.C. § 1337(j)(3). The legislative history of that statute further explains that

> In determining the amount of the bond, the Commission shall determine, to the extent possible, the amount which would offset any competitive advantage resulting from the unfair method of competition or unfair act enjoyed by persons benefiting from the importation of the article. S. Rep. 93-1298, 93d Cong., 2d Sess. 198, reprinted at 1974 U.S.C.C.A.N. 7186, 7331 (1974).

A bond of zero is inadequate to protect Power Integrations from the injury of continued imports of the infringing SG chips. Accordingly, the Commission should reject SG's proposal and adopt the recommendation of the ALJ of thirty-eight cents ($0.38) per infringing item.

In the event that the Commission finds that it lacks adequate evidence or appropriate methodology with which to calculate a price differential, Power Integrations respectfully requests that the Commission set a 100% bond. *See Certain Sortation Systems, Parts Thereof, and Products Containing Same*, Inv. No. 337-TA-460, Pub. No. 3588, Comm'n Op. at 21 (U.S. I.T.C. February 19, 2003).

## IV. CONCLUSION

For all of the reasons discussed above and in Power Integrations, Inc.'s Brief on Remedy, the Public Interest, and Bonding filed July 10, 2006, the ALJ's recommended determination on remedy and bonding should be adopted by the Commission.

MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

FCS1693189

PUBLIC VERSION

Respectfully submitted,

FISH & RICHARDSON P.C.

Dated:  July 19, 2006

By: _____
Frank Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA  02110-2804
Telephone:  (617) 542-5070
Facsimile:    (617) 542-8906

Howard G. Pollack
Tamara Fraizer
S. Kameron Parvin
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Facsimile:   (650) 839-5071

Evelyn G. Hellbrunn
William Sekyi
Fish & Richardson P.C.
1425 K Street, N.W.
Washington, DC  20005
Telephone:  (202) 783-5070
Facsimile:    (202) 783-2331

Attorneys for Complainant
POWER INTEGRATIONS, INC.

20
MAY CONTAIN CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER

FCS1693190

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the following document, COMPLAINANT POWER INTEGRATION, INC.'S REPLY TO RESPONDENT SYSTEM GENERAL CORPORATION'S BRIEF ON REMEDY, BOND AND THE PUBLIC INTEREST (PUBLIC VERSION), has been served on this 1st day of August 2006, as indicated, on the following:

The Honorable Marilyn R. Abbott
Secretary                                              **Via Hand Delivery**
U.S. International Trade Commission
500 E Street, S.W., Room 112-A
Washington, D.C. 20436                                 **Original & Twelve Copies**

The Honorable Paul Luckern
Administrative Law Judge                               **Via Hand Delivery**
U.S. International Trade Commission
500 E Street S.W., Room 317-A
Washington, DC 20436

Everette V. Snotherly
Office of Unfair Import Investigations                 **Via Hand Delivery**
U.S. International Trade Commission
500 E Street, S.W., Room 401-O
Washington, D.C. 20436

Michelle Walters
Office of the General Counsel                          **Via Hand Delivery**
U.S. International Trade Commission
500 E Street, S.W., Room 707-F
Washington, D.C. 20436

Smith R. Brittingham IV
E. Robert Yoches                                       Counsel for Respondents System-
Thomas L. Jarvis                                       General Corporation
Elizabeth A. Niemeyer
Finnegan, Henderson, Farabow, Garrett & Dunner LLP
901 New York Avenue, NW
Washington, DC 20001                                   **Via Hand Delivery & E-mail**

Roger D. Taylor
Douglas S. Weinstein
Finnegan, Henderson, Farabow, Garrett & Dunner LLP
3200 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA 30308

Counsel for Respondents System-
General Corporation

**Via E-mail**

Sturgis M. Sobin
Miller and Chevalier Chartered
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C., 20005

Counsel for Respondents System-
General Corporation

**Via Hand Delivery & E-mail**

Adjoa K. Afful

# EXHIBIT C

Register | Login

contact | help | cart | edit prof

**IDC**
*Analyze the Future*

Analyst Finder | Event Finder | Table & Figure Finder | Forecast Finder

Search: [          ] go All languages    Advanced Search

| HOME | RESEARCH | PRODUCTS & SERVICES | EVENTS | ANALYSTS | IDC STORE | ABOUT IDC | MY IDC |

About IDC | Management | Worldwide Offices | Careers at IDC | Press Home

## IDC - Press Release

..................................................................

**Related Links**

Press FAQ

Contact Press Relations

### Worldwide Mobile Phone Market Breaks 200 Million Unit Mark in 3Q05, According to IDC

20 Oct 2005

**FRAMINGHAM, Mass., October 20, 2005 —** New product introductions, portfolio refreshes, and exciting new form factors helped spur growth in the worldwide mobile phone market during the third quarter of 2005. According to IDC's Worldwide Quarterly Mobile Phone Tracker, worldwide mobile phone shipments rose 19.1% year over year and increased sequentially 8.8% in 3Q05 to reach 208.3 million units. Year-over-year growth increased substantially over the prior two quarters, signaling a balance against slower growth during the first half of the year. Each of the top 5 vendors within the industry reached all-time-high shipment levels and maintained the same rankings from the previous quarter.

"Last year, quarterly mobile phone shipments didn't reach 200 million units until the end of the fourth quarter when vendors were keeping the channels' shelves stocked for the holiday rush. As vendors announced new products earlier this year and accelerated their time to market, we've already reached this milestone," said Ramon Llamas, research analyst for IDC's Mobile Devices team.

The extensive introduction of new devices from a number of vendors in markets worldwide to fit the full spectrum of market segments fueled healthy growth in 3Q and ensured comprehensive early visibility and availability of devices for 4Q to meet the seasonal increase in demand and spending. As in previous quarters, Western Europe was a leading region with regard to new device launches.

"The dominance of the handset subsidy model and 12-month upgrade cycles in Western Europe combined with the introduction of a number of highly publicized, multimedia-oriented high-end handsets to drive demand in a.mature market that is witnessing saturation of subscriber growth," said Andrew Brown, program manager, European Mobile Devices, IDC.

However, despite sustained growth in the region fueled by the volume of new device releases quarter on quarter, IDC emphasizes the challenge facing vendors.

"As the mobile phone market becomes increasingly segmented in Western Europe, vendors are under pressure to expand their portfolios in order to comprehensively fulfill market demands with regard to air interface, form factor, technical specifications, multimedia capability, software, and ASP. Although new handsets will



Case No. 04-1371-JJF
DEFT Exhibit No. DX_528
Date Entered _____
Signature _____

substantially assist market volume growth, the challenge for vendors is to meet differing segment requirements without over-extending the portfolio and adversely affecting margins," said Geoff Blaber, research analyst for European Mobile Devices, IDC.

**Vendor Highlights**                                                           more

- **Nokia.** With shipments of 66.6 million units worldwide representing year-on-year growth of 29.6% and an increase in market share to 32%, the Finnish vendor reinforced its dominance of the mobile phone market, buoyed by particularly strong growth in China and Asia/Pacific and despite a year-on-year shipment decline in North America. Nokia's Series 60 multimedia-oriented devices such as the 6630 and 6680 continued to enjoy solid demand, the 6680 becoming the world's best-selling WCDMA device. However, despite growth of the high-end segment, ASPs declined slightly both sequentially and year on year due to strong volume growth in emerging markets.
- **Motorola.** Touting itself as the company of "wickedly cool products," Motorola finished the quarter as the clear number 2 vendor in the industry, claiming leadership in the Americas and gaining ground in Europe and developing markets. Like Nokia, much of Motorola's shipments focused on growth within developing regions, thanks to its ultra-low-priced phones. Helping to propel the brand is the continued success of the RAZR series, and other impressive devices, most recently its iTunes ROKR phone and a series of other devices built on the RAZR platform.
- **Samsung.** After a slow second quarter, Samsung picked up the pace with increased shipments to Europe, North America, and its home country of Korea. Samsung delivered on its promise to improve revenues and profits this quarter via the introduction of high-end and premium devices featuring EV-DO and W-CDMA, DMB, and Bluetooth. Recent announcements after the close of the quarter highlight Samsung's commitment to even more high-end devices, as a device designed in conjunction with Bang & Olufsen is expected to hit the market in early 2006.
- **LG Electronics.** Holding steady in the number 4 position is LG Electronics. The company improved its CDMA and GSM lineups with new phones, particularly in the U.S. and Korea, but also faced a decrease in WCDMA and other high-end phones, resulting in a slight decrease in average selling prices. Finally, whereas only 300,000 units separated LG Electronics from Sony Ericsson in 2Q05, the difference grew to 1.6 million units during the third quarter.
- **Sony Ericsson.** Rounding out the top 5 vendors is Sony Ericsson. In addition to the introduction of several Walkman-branded phones, the company rolled out several mid-tier and entry-level phones to balance its portfolio. High-end devices still rule the company's portfolio as the company's average selling price rose from the previous quarter.

**Top 5 Vendors, Worldwide Mobile Phone Shipments and Market Share**   more

(Unit shipments are in millions)

| Rank | Vendor | 3Q05 Shipments | 3Q05 Market Share | 3Q04 Shipments | 3Q04 Market Share | Growth |
|------|--------|---------------|-------------------|----------------|-------------------|--------|
| 1 | Nokia | 66.6 | 32.0% | 51.4 | 29.4% | 29.6% |
| 2 | Motorola | 38.7 | 18.6% | 23.3 | 13.3% | 66.1% |
| 3 | Samsung | 26.8 | 12.9% | 22.7 | 13.0% | 18.1% |
| 4 | LG Electronics | 15.5 | 7.4% | 11.8 | 6.7% | 31.4% |
| 5 | Sony Ericsson | 13.8 | 6.6% | 10.7 | 6.1% | 29.0% |
|   | Others | 46.9 | 22.5% | 55.0 | 31.4% | -14.7% |
|   | Total | 208.3 | 100.0% | 174.9 | 100.0% | 19.1% |

To purchase this document, please contact your local IDC office or visit www.idc.com.

**Contact**

For more information, contact:

Michael Shirer
press@idc.com
(508) 935-4200

Ramon Llamas
rllamas@idc.com
(508) 935-4736

---

**IDC Regions:** Asia/Pacific | Middle East and Africa | Central and Eastern Europe
Western Europe | Japan | Canada | Latin America | North America

**IDC Companies:** Energy Insights | Financial Insights | Government Insights | Health Industry Insights | Manufacturing Insights



About IDC | Contact IDC | Privacy Policy | Site Index | Reprints | Worldwide Offices | **Objectivity**
Copyright 2006 IDC. Reproduction is forbidden unless authorized. All rights reserved. Trademarks | Terms of Use

XML

# EXHIBIT D

FOR RELEASE OCTOBER 24, 2005

**FOR MORE INFORMATION:**

Lee Graham
(212) 333-4983
leegraham@leegraham.biz

The NPD Group, Inc.
900 West Shore Road
Port Washington, NY 11050

# The NPD Group: U.S. Mobile Phone Sales Reached 31.6 Million Units in Third Quarter 2005

**PORT WASHINGTON, NEW YORK,** October 26, 2005 – According to The NPD Group, the leader in market information for the wireless industry, mobile phone sales to consumers in the U.S. reached 31.6 million units in the third quarter of 2005. This number represents solid incremental growth of seven percent from the second quarter 2005 sales volume of 29.6 million units and an increase of more than 30 percent compared to sales during the same period in 2004. NPD estimates total third quarter 2005 consumer sales of slightly more than $2 billion.

"The handset market was very robust in the third quarter," said Neil Strother, research director for mobile devices at The NPD Group. "These numbers reflect strong replacement demand among consumers, coupled with more limited growth from new subscribers."

According to NPD's Mobile Phone Track, Motorola continued its leadership in the U.S. market during the third quarter, boasting three of the top five best-selling models, including its popular RAZR device at Cingular Wireless and T-Mobile. During the third quarter, Motorola's demonstrated strength was due in part to a significant gain in share within the Verizon Wireless handset portfolio. The battle continues to be intense among LG, Nokia, and Samsung for the number two market position.

NPD reports that manufacturers' third quarter 2005 unit sales and market shares were as follows:

| Company | 3Q 2005 Unit Sales (in thousands) | 3Q 2005 Market Share |
|---|---|---|
| Motorola | 9,458 | 30% |
| LG | 5,077 | 16% |
| Nokia | 5,032 | 16% |
| Samsung | 4,883 | 16% |
| Sanyo | 1,522 | 5% |
| Kyocera | 1,378 | 4% |
| Sony Ericsson | 1,150 | 4% |
| UTStarcom/Audiovox | 952 | 3% |
| Siemens/BenQ | 506 | 2% |
| Others | 1,625 | 5% |
| **Total** | **31,583** | **100%** |

The top-selling handset models during third quarter 2005 were the following:

Case No. 04-1371-JJF
DEFT Exhibit No. DX 527
Date Entered _____
Signature _____

| Rank | Manufacturer | Model |
|---|---|---|
| 1 | Motorola | RAZR V3 |
| 2 | Nokia | 6010 |
| 3 | Motorola | V551 |
| 4 | LG | VX6100 |
| 5 | Motorola | V180 |



8/25/2006

In the GSM market, Motorola had the leading share with 39 percent, followed by Nokia with 22 percent and Samsung with 14 percent. During third quarter, LG was the leader in CDMA handsets with a 27 percent market share, with Samsung and Motorola tied in second place at 18 percent.

*Methodology: The NPD Group's Mobile Phone Track information service compiles and analyzes mobile device sales data based on more than 150,000 completed online consumer research surveys each month. Surveys are based on a nationally-balanced and demographically-representative sample, and results are projected to represent the entire population of U.S. consumers.*

**About The NPD Group, Inc.**
Since 1967 The NPD Group has provided reliable and comprehensive consumer and retail information for a wide range of industries. Today more than 1,400 manufacturers and retailers rely on NPD to help them better understand their customers, product categories, distribution channels and competition in order to help guide their business. Information from The NPD Group is available for the following major vertical sectors: apparel, appliances, automotive, beauty, consumer electronics, food and beverage, foodservice, footwear, home improvement, housewares, imaging, information technology, music, software, travel, toys, video games, and wireless. For more information visit www.npd.com.

The NPD Group - 900 West Shore Road - Port Washington, NY 11050 - www.npd.com