IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| POWER INTEGRATIONS, INC., a Delaware corporation,<br><br>       Plaintiff,<br><br>   v.<br><br>FAIRCHILD SEMICONDUCTOR INTERNATIONAL, INC., a Delaware corporation, and FAIRCHILD SEMICONDUCTOR CORPORATION, a Delaware corporation,<br><br>       Defendants. | C.A. No. 04-1371 JJF<br><br><br>PUBLIC VERSION |

**POWER INTEGRATION'S ANSWERING BRIEF IN OPPOSITION TO
FAIRCHILD'S POST-TRIAL BRIEF ASSERTING INEQUITABLE CONDUCT**

FISH & RICHARDSON P.C.
William J. Marsden, Jr. (#2247)
Kyle Wagner Compton (#4693)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Telephone: (302) 652-5070
Email: marsden@fr.com
Email: kcompton@fr.com

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Telephone: (617) 542-5070

Howard G. Pollack
Michael Headley
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070

ATTORNEYS FOR PLAINTIFF
POWER INTEGRATIONS, INC.

REDACTED                **TABLE OF CONTENTS**

**PAGE**

I.  **INTRODUCTION**.................................................................................. 1

II.  **LEGAL STANDARD** ........................................................................ 2

III.  **POWER INTEGRATIONS DID NOT COMMIT INEQUITABLE CONDUCT WITH RESPECT TO THE '876 PATENT.** .................................................. 4

    A.  Power Integrations Did Not Fail to Disclose Prior Art,

                                  .................................................. 4

        1. .......................................................... 5

        2. ................... 6

IV.  **POWER INTEGRATIONS DID NOT COMMIT INEQUITABLE CONDUCT WITH RESPECT TO THE '851 PATENT.** .................................................. 8

    A.  The Prosecution of the '851 Patent Shows that Power Integrations Did Not Make Any Misstatement or Mislead the Examiner. ................................................... 9

        1. The Examiner's Grant of Claim 1 and Rejection of Claim 29 ................... 9

        2. Power Integrations' Subsequent Amendments to Overcome the Examiner's Objections to Claim 29 Neither Misstated a Fact nor Misled the Examiner. ................................................ 11

    B.  Materiality of the SMP211 .............................................................. 14

        1. The SMP211 Is Not Material to Patentability Because It Does Not Teach or Suggest Anything About Frequency Jitter........................................... 15

        2. The SMP211's Features Were Well Known in the Prior Art, and Its Disclosure Would Have Been Merely Cumulative of What Was Already Before the PTO. ................................................. 16

    C.  Intent ................................................................................ 18

V.  **POWER INTEGRATIONS DID NOT COMMIT INEQUITABLE CONDUCT WITH RESPECT TO THE '366 PATENT.** .................................................. 19

    A.  Defining Soft-start and the Material Elements ...................................... 19

    B.  The SMP3 and SMP240/260 Are Not Material Prior Art.................................... 21

        1. The SMP3 Did Not Contain a Soft-start Feature at All. .......................... 21

        2. The SMP240/260 Are Not Material Prior Art Because They Have None of the Structures Required By the '366 Patent.............................................. 23

    C.  The Inventors Lacked the Necessary Intent to Deceive the PTO. ........................ 27

VI.  **POWER INTEGRATIONS DID NOT COMMIT INEQUITABLE CONDUCT WITH RESPECT TO THE '075 PATENT.** ............................................................... 29

    A.  Dr. Eklund Did Not Make Any Misstatement of Fact or Mislead the Examiner With Respect to the '075 patent. ........................................................... 29

    B.  Dr. Eklund Described the Relevant Art in the Specification. ............................... 30

    C.  The Art Fairchild Relies on Was Conventional. ..................................................... 32

    D.  Fairchild Has Put Forth No Evidence that Dr. Eklund Intended to Deceive the Patent Office. ......................................................................................................... 36

VII.  **CONCLUSION** ............................................................................................................ 38

## TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE**

*Allen Engineering Corp. v. Bartell Industrial, Inc.,*
299 F.3d 1336 (Fed. Cir. 2002)................................................................................36

*Allied Colloids Inc. v. American Cyanamid Co.,*
64 F.3d 1570 (Fed. Cir. 1995)..............................................................................2, 36

*Atlas Powder Co. v. Ireco, Inc.,*
190 F.3d 1342 (Fed. Cir. 1999)................................................................................7

*In re Carlson,*
983 F.2d 1032 (Fed. Cir. 1992)................................................................................7

*Dayco Products Inc. v. Total Containment, Inc.,*
329 F.3d 1358 (Fed. Cir. 2003).........................................................................2, 3, 4

*Eli Lilly and Co. v. Zenith Goldline Pharmaceuticals, Inc.,*
471 F.3d 1369 (Fed. Cir. 2006)................................................................................7

*Ethicon, Inc. v. Quigg,*
849 F.2d 1422 (Fed. Cir. 1988)..............................................................................14

*FMC Corp. v. Manitowoc Co., Inc.,*
835 F.2d 1411 (Fed. Cir. 1987)................................................................................2

*Halliburton Co. v. Schlumberger Tech. Corp.,*
925 F.2d 1435 (Fed. Cir. 1991)............................................................................2, 3

*Hoffmann-La Roche, Inc. v. Promega Corp.,*
323 F.3d 1354 (Fed. Cir. 2003).........................................................................11, 14

*Juicy Whip, Inc. v. Orange Bang, Inc.,*
292 F.3d 728 (Fed. Cir. 2002)................................................................................18

*Key Pharms. Inc. v. Hercon Laboratoriess Corp.,*
981 F. Supp. 299 (D. Del. 1997), *aff'd*, 161 F.3d 709 (Fed. Cir. 1998)........................4

*Kingsdown Medical Consultants, Ltd. v. Hollister Inc.,*
863 F.2d 867 (Fed. Cir. 1988)..................................................................................3

*Lummus Industries, Inc. v. D.M. & E. Corp.,*
862 F.2d 267 (Fed. Cir. 1988)................................................................................14

*McKesson Information Solutions, Inc. v. Bridge Medical, Inc.,*
487 F.3d 897 (Fed. Cir. 2007)................................................................................19

*Merck & Co. v. Teva Pharms. USA, Inc.,*
288 F. Supp. 2d 601 (D. Del. 2003)..........................................................................2

*Monon Corp. v. Stoughton Trailers, Inc.,*
239 F.3d 1253 (Fed. Cir. 2001)..............................................................................36

*Monsanto Co v. Mycogen Plant Science, Inc.*,
61 F. Supp. 2d 133 (D. Del. 1999)..................................................................3

*Rhenalu v. Alcoa Inc.*,
224 F. Supp. 2d 773 (D. Del. 2002)..................................................................4

*Ruiz v. A.B. Chance Co.*,
234 F.3d 654 (Fed. Cir. 2000)..................................................................3, 30

*Vandenberg v. Dairy Equipment Co.*,
740 F.2d 1560 (Fed. Cir. 1984)..................................................................3, 30

## STATUTES

MPEP § 2242 (8th ed., rev. 5, Aug. 2006)..................................................14

35 U.S.C. § 102(a) ..................................................................................4, 7

35 U.S.C. § 112..................................................................................11

37 C.F.R. § 1.56(b) (2003)..................................................................3

37 C.F.R. § 1.56(b) ..................................................................16

REDACTED

## I.    INTRODUCTION

Fairchild's post trial brief regarding inequitable conduct presents a boilerplate claim that is not supported by the requisite clear and convincing evidence. Several of Fairchild's theories are, in fact, frivolous on their face and show that Fairchild has brought them to put off still further enforcement of the jury's verdict. The Court should reject Fairchild's claims and, finally, allow Power Integrations the benefit of its statutory right to exclude, which has been intentionally flouted by Fairchild for years now.

With respect to the '876 patent, Fairchild asserts that the Court should *infer* an allegedly material public disclosure                                                                 , despite the uncontroverted testimony that no such disclosure took place until long after the '876 patent was filed. Fairchild's continued assertion of inequitable conduct in the face of the actual evidence is frivolous.

With respect to the '851 patent, Fairchild relies on only part of a statement by the Patent and Trademark Office ("PTO") regarding what was not shown in the art, asserting that Power Integrations' agreement with the entire, complete statement was an intentional attempt to mislead the PTO. Not only does this argument defy logic and ignore the plain meaning of the relevant statements, it further ignores that Power Integrations had *already disclosed* three separate references with the same conventional element (an oscillator that provides a maximum duty cycle signal) that Fairchild asserts the PTO was mislead into believing was missing from the art.

Fairchild takes a similar approach with the respect to the '366 patent, relying on an alleged failure to disclose devices that either did not have a soft-start function *at all* or had the same conventional soft start functionality which Power Integrations had already disclosed to the PTO. Fairchild can only make these arguments by distorting the record and ignoring all of the evidence contrary to its fanciful theories of fraud.

With respect to the '075 patent, Fairchild's argument likewise ignores the evidence, including (1) its own expert's concession that Dr. Eklund "certainly" described the key art in question in the background section of the '075 patent itself, and (2) that Mr. Beasom, who copied

Dr. Eklund's claim into his own patent, believed it unnecessary to cite during the prosecution of his own patent the art Fairchild now relies on, because he too believed it was well-known and conventional.

For these reasons, as explained more fully below, none of Fairchild's theories establishes that Power Integrations made any material misstatements or withheld any material information, or that Power Integrations intended in any way to deceive the PTO. Particularly considering Fairchild's high burden of proving inequitable conduct by clear and convincing evidence, the Court should reject Fairchild's charges of fraud and rule that the patents-in-suit are enforceable.

## II.    LEGAL STANDARD

"To prove inequitable conduct in the prosecution of a patent, [the defendant] must have provided evidence of affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive.'" *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1362 (Fed. Cir. 2003) (citations omitted). "Both intent and materiality are questions of fact that must be proven by clear and convincing evidence." *Id.* "It was to mitigate the plague whereby every patentee's imperfections were promoted to 'inequitable conduct' that this court reaffirmed that both materiality and culpable intent must be established." *Allied Colloids Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1578 (Fed. Cir. 1995). Thus, Fairchild must provide "clear and convincing evidence, that material information was intentionally withheld for the purpose of misleading or deceiving the patent examiner." *Merck & Co. v. Teva Pharms. USA, Inc.*, 288 F. Supp. 2d 601, 631 (D. Del. 2003).

A claim of inequitable conduct is evaluated under a two-step analysis. First, "[t]he trial court must discern whether the withheld references satisfy a threshold level of materiality." *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1439 (Fed. Cir. 1991). Information that is cumulative to what was already provided to the Patent Office is not material. *Id.* at 1440 ("However, a patentee has no obligation to disclose an otherwise material reference if the reference is cumulative or less material than those already before the examiner."); *FMC*

2

*Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987) (defining information as not material "because it is less pertinent than or merely cumulative with prior art or information cited to or by the PTO"); 37 C.F.R. § 1.56(b) (2003) ("information is material to patentability when it is not cumulative to information already of record or being made of record in the application.").

Once a threshold level of materiality is proven, "the court must also determine whether the applicant's conduct satisfies a threshold showing of intent to mislead." *Halliburton*, 925 F.2d at 1439. "Materiality of an undisclosed reference does not presume an intent to deceive." *Id.* at 1442. Instead, "clear and convincing evidence must prove that an applicant had the specific intent to accomplish an act that an applicant ought not have performed, *viz.* misleading or deceiving the PTO.'" *Monsanto Co. v. Mycogen Plant Science, Inc.*, 61 F. Supp. 2d 133, 197 (D. Del. 1999). Proof of even gross negligence is insufficient to meet a defendant's burden. *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988). Deceptive intent also requires more than the intentional withholding of information. *Dayco Prods.*, 329 F.3d at 1367 ("However, inequitable conduct requires not intent to withhold, but rather intent to deceive. Intent to deceive cannot be inferred simply from the decision to withhold the reference where the reasons given for the withholding are plausible.").

If a patentee discloses or summarizes the prior art in the specification section of the patent, but fails to disclose the actual references to the PTO, the requisite intent to deceive cannot be found. *Vandenberg v. Dairy Equipment Co.*, 740 F.2d 1560, 1568 (Fed. Cir. 1984) ("Even though appellants did not disclose the PX-15 device as their own, they did describe it in column 1 of their patent application as prior art . . . This disclosure is inconsistent with intent to perpetrate fraud on the PTO."); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 670 (Fed. Cir. 2000). In *Ruiz*, the patentee did not disclose the use of a particular type of screw anchor as taught in the prior art, but the court determined that the "language in the specification combined with the references to . . . other materials in the patent file wrapper history" were sufficient and concluded that this disclosure meant there "was no evidence of intent to deceive." *Id.* If "either materiality

REDACTED

or intent is not found, then no further analysis need be performed and unenforceability must be denied." *Rhenalu v. Alcoa, Inc.*, 224 F. Supp. 2d 773, 806 (D. Del. 2002).

Even assuming Fairchild could prove the requisite levels of materiality and intent, which it cannot, this Court would then weigh "the materiality and intent in light of all the circumstances to determine whether the applicant's conduct is so culpable that the patent should be held unenforceable." *Dayco Prods.*, 329 F.3d at 1363. "This balancing test should attempt to quantify the amount of materiality and intent, and result in a finding of inequitable conduct where the two sum up to a sufficient level." *Key Pharms. Inc. v. Hercon Labs. Corp.*, 981 F. Supp. 299, 317 (D. Del. 1997), *aff'd*, 161 F.3d 709 (Fed. Cir. 1998).

## III.    POWER INTEGRATIONS DID NOT COMMIT INEQUITABLE CONDUCT WITH RESPECT TO THE '876 PATENT.

Fairchild's continued assertion of inequitable conduct with respect to the '876 patent is simply frivolous. This is especially true considering Fairchild was in possession of Power Integrations' Brief in Support of Its Motion for Entry of Judgment of No Inequitable Conduct Re U.S. Patent No. 6,249,876 [D.I. 574], and yet Fairchild did not refute, or even address, any of the facts as established therein. Instead, Fairchild asserts inequitable conduct due to an alleged public disclosure of the subject matter of the '851 patent despite the evidence confirming this alleged disclosure, *in fact, never occurred.*

### A.    Power Integrations Did Not Fail to Disclose Prior Art,

.

The sole basis Fairchild pleaded for inequitable conduct with respect to the '876 patent is that Power Integrations allegedly made a "public" disclosure of the invention of the '851 patent on September 2, 1997 and that the alleged disclosure would be prior art pursuant to 35 U.S.C. § 102(a). [D.I. 198 at ¶ 87.] Fairchild initially made this allegation of public disclosure "on information and belief" yet has failed to present a single piece of testimony or evidence to corroborate its claim.

4

Unable to prove that any September 2, 1997 public disclosure occurred,


, Fairchild has changed its contention in briefing the instant motion. Fairchild now claims that an alleged public disclosure of the '851 invention happened "in March of 1998." [*See* D.I. 585 at 34.] To support this new claim, Fairchild makes only two allegations


**REDACTED**


These arguments fail on their face, are premised on speculation and, in light of the actual direct evidence on point – which is discussed below, and which Fairchild does not address -- do not come close to meeting the clear and convincing standard.

> **1.     The Inventors' Uncontradicted Testimony Demonstrates No Public Disclosure Occurred**   .

Contrary to the unsupported inferences Fairchild draws from its two snippets of evidence, the uncontradicted testimony shows there was no public disclosure of the '851 invention

**REDACTED**

This reasonable and uncontested explanation directly refutes Fairchild's theory and the weak inferences on which it is based. Fairchild has identified *no evidence* in its Amended Answer or responses to Power Integrations' discovery requests, or in its opening brief in the instant Motion, to contradict Mr. Balakrishnan's sworn testimony.[1] In fact, Fairchild's entire argument rests on asking this Court to *infer* that an actual public disclosure took place in March 1998

. Given the uncontradicted testimony to the contrary and Fairchild's failure to provide *any* documents or testimony to confirm the inferences it argues, Fairchild cannot meet the clear and convincing evidence standard.

**2.**

Because as noted above Fairchild cannot offer evidence that *any* public disclosure occurred ,

. Because no *public*

---

[1] Indeed, Fairchild never even asked the other inventors, Mr. Lund and Mr. Djenguerian, about the alleged prior public disclosure of the '851 invention.

*disclosure* of the '851 invention, in fact, occurred until                    *after* the '876 application was filed—it is not possible for the '851 invention to be considered prior art.[2]

REDACTED

Power Integrations is aware of no evidence to contradict Mr. Balakrishnan's testimony, and Fairchild has not identified or offered any. Thus, there is simply no proof, let alone proof by "clear and convincing" evidence, that Power Integrations made a public disclosure of the '851 invention prior even to filing the application for the '876 patent, let alone prior to the date of invention. As such, the '851 invention is not "prior art," and the sole basis of Fairchild's inequitable conduct claim does not and never did exist. Accordingly, no grounds exists to support an inequitable conduct claim with respect to the '876 patent.

Putting aside this fatal failure of evidence, the inventors' alleged admission that the '851 invention was prior art to the '876 patent would still be insufficient to meet Fairchild's burden. Section 102(a) establishes the legal definition for anticipatory prior art. *See* 35 U.S.C. § 102(a) (making unpatentable any invention that "was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent"). To anticipate, the prior art must disclose and explain the entire invention to the public. *See, e.g., Eli Lilly and Co. v. Zenith Goldline Pharmaceuticals, Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006). Though anticipation is ultimately a question of fact, *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999), whether a reference qualifies as 102(a) prior art is a threshold question of law. *See In re Carlson*, 983 F.2d 1032, 1036-38 (Fed. Cir. 1992) (performing analysis of prior art references to determine if they qualify as § 102(a) prior art). Therefore, since what qualifies as "prior art" is a question of law, the inventors' opinion is not dispositive. *See Atlas Powder*, 190 F.3d at 1346. A lay inventor's description of something as "prior art" is of no consequence if the thing so described does not fall within one of the statutory prior art categories.

---

[2]   It should be noted that Fairchild has not provided any evidence, expert or otherwise, that even if an alleged prior public disclosure of the '851 invention had occurred, that such information would have been material to patentability of the '876 claims. Instead, Fairchild again relies entirely on the alleged "admission" by the inventors that the subject-matter was "prior art."

Finally, it is telling that Fairchild constructs its entire theory in a vacuum.  If Fairchild believed it had a meritorious case, it could have elicited testimony from the inventors on this issue at trial, but it did not.  Fairchild could also have elicited expert testimony with respect to the alleged inequitable conduct of the '876 patent, but it did not.[3]  Fairchild could have produced evidence to rebut the testimony provided in Power Integrations' motion demonstrating that the first public disclosure actually took place in February 1999 [D.I. 574], but it did not.  This sort of studied ignorance renders Fairchild's inequitable conduct argument as to the '876 patent frivolous.

## IV.     POWER INTEGRATIONS DID NOT COMMIT INEQUITABLE CONDUCT WITH RESPECT TO THE '851 PATENT.[4]

Fairchild attempts to manufacture an inequitable conduct argument on the '851 patent by incorrectly parsing and excerpting Power Integrations' prosecution statements.  At the same time, Fairchild ignores the prior art Power Integrations did disclose, as well as what Fairchild admits was commonly known to those of skill in the art.  Ultimately, Fairchild's entire contention is based on impugning the intelligence of the patent examiner – Fairchild contends that the '851 patent only issued because the examiner either was not aware of what Fairchild's expert, Dr. Horowitz, testified was common knowledge at the time, or lacked the intelligence to understand the content and implications of the cited prior art references before him.

Specifically, Fairchild's argument is that the examiner was under the impression, despite all of the evidence to the contrary, that no prior art reference showed an oscillator that generated a maximum duty cycle signal.  [*See* D.I. 585 at 21 ("Thus, the only issue is whether the prior art . . . also discloses an oscillator providing a maximum duty cycle signal.").]  Fairchild then claims that Power Integrations allegedly knew the examiner made a "mistake" in stating his belief that

---

[3]     Fairchild expert Dr. Horowitz acknowledged that he had no opinions with respect to inequitable conduct on the '876 patent.  D.I. 561 (Trial Tr. 9/24/07) at 160:22-161:2.

[4]     Because the '851 patent has a soft-start feature like that of the '366 patent, Fairchild seeks to import all of its inequitable conduct arguments with respect to the soft-start feature of the '366 patent to the '851 patent as well.  Power Integrations' explanation of why there is no inequitable conduct regarding the '366 patent as set forth in Section V, applies equally with respect to the soft-start feature of the '851 patent.

the claimed subject matter, which includes an oscillator with a maximum duty cycle signal, was not disclosed in the prior art, and intentionally failed to correct this mistaken impression. [*Id.* at 16.] Both prongs of Fairchild's argument are directly contrary to the facts of the case.

**A.    The Prosecution of the '851 Patent Shows that Power Integrations Did Not Make Any Misstatement or Mislead the Examiner.**

**1.    The Examiner's Grant of Claim 1 and Rejection of Claim 29**

The original '851 patent application consisted of two independent claims directed to the frequency jitter feature, claims 1 and 29 (which issued as claims 1 and 11 respectively). [DX-106 at FCS0000370, FCS0000377-78.] Claim 1 recites elements necessary to create a "pulse width modulated switch" and claim 29 teaches a particular type of "regulation circuit." [*Id.*] In addition to the different preambles of these two independent claims, claim 1 included several limitations that claim 29 did not: "An oscillator that provides an oscillation signal having a frequency range, said frequency of said oscillation signal varying within said frequency range according to said frequency variation signal, said oscillator further providing a maximum duty cycle signal comprising a first state and a second state." [*Id.*] Claim 1 concluded with a "drive circuit" limitation that referred back to the oscillator and its two signals. [*Id.*] In contrast, original claim 29 recited "a drive circuit that provides said drive signal for a maximum time period of a time duration cycle, wherein said time duration of said cycle varies according to said frequency variation signal." [*Id.* at FCS0000377-78.] Thus, in addition to the other differences between the claims, claim 1 required an oscillator to provide a maximum duty cycle signal while claim 29 did not.

The examiner reviewed over seventy prior art references before making the initial determination that claim 1 was patentable while claim 29 was not. [*See id.* at FCS0000410-13.] Among the references were two patents (U.S. 5,313,381 and 5,461,303) and one article (written by Pelly) which Fairchild's own expert could not dispute had oscillators with maximum duty cycle signals. [D.I. 561 (Trial Tr. 9/24/07) at 162:21-168:22.] After reviewing these references and all the other prior art of record, including the patent's own description of Figure 1, the

9

examiner allowed claim 1 reasoning that "[t]he prior Art of record does not appear to disclose or suggest a PWM switch comprising **an oscillator for generating a maximum duty cycle signal and a signal with a frequency range dependent on a frequency variation circuit**." [DX-106 at FCS0000440 (emphasis added).]

Fairchild now argues that the "oscillator for generating a maximum duty cycle signal" and "a signal with a frequency range dependent on a frequency variation circuit" are two separate and distinct limitations, neither of which (according to Fairchild) the examiner found in the prior art. But this argument ignores both the disclosure of the prior art and what the examiner actually said.

First, as noted above, the examiner had before him at least three prior art references that taught oscillators that generated multiple signals, including maximum duty cycle signals. [PX-394 ('381 patent); PX-395 ('303 patent); PX-19 (Pelly article); *see also* D.I. 561 (Trial Tr. 9/24/07) at 162:21-168:22.] In light of these disclosures, the examiner's grant of claim 1 cannot be read as suggesting that two separate and distinct limitations, one of which was an oscillator with a maximum duty cycle signal, were absent from the prior art.

Second, the language the examiner used in granting claim 1 belies Fairchild's gloss; when read as a whole, the examiner's statement makes perfect sense and is entirely correct given the prior art. Although an "oscillator for generating a maximum duty cycle signal" was well known in the art, an oscillator that both generated a maximum duty signal **and** a second signal, and did so "with a frequency range dependent on a frequency variation circuit" was novel and not obvious.[5]

Thus, Fairchild's only inequitable conduct argument with respect to the '851 patent is based on an erroneous and unsupportable interpretation of the examiner's language. Applying the only reasonable interpretation, Fairchild's inequitable conduct argument fails.

---

[5]   Indeed, the jury found this to be true even in view of the additional prior art asserted by Fairchild that was not before the examiner during prosecution.

    2.    **Power Integrations' Subsequent Amendments to Overcome the Examiner's Objections to Claim 29 Neither Misstated a Fact nor Misled the Examiner.**

In addition to mischaracterizing what the examiner said, Fairchild's argument mischaracterizes what Power Integrations said. Because Power Integrations' statements on which Fairchild relies were neither affirmative misrepresentations of fact nor misleading, and indeed can only be read as agreement with the examiner's own correct understanding, there is no inequitable conduct. *Hoffmann-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1359 (Fed. Cir. 2003) (unless an inventor makes a misstatement or misleads the PTO, there can be no basis for inequitable conduct).

When the examiner granted claim 1 and explained that the prior art did not teach the multiple limitations related to the signals produced by the oscillator, the examiner simultaneously rejected claim 29 as both indefinite and also as allegedly anticipated by Fig. 1 of the '851 patent.[6] [DX-106 at FCS0000438-39.] The examiner first rejected the claim under 35 U.S.C. § 112 as indefinite, stating "in claim 29, the phrase 'that provides a drive signal for a maximum time period of a time duration signal' is not understood. If the drive signal were applied for the maximum period of the duration, the drive signal would always be applied." [*Id.* at FCS0000438.] Fairchild ignores this indefiniteness rejection, but it is important in understanding the examiner's substantive rejection. That rejection, in relevant part, stated that "Applicant's Prior Art Fig. 1 shows . . . a frequency variation circuit 140 as recited in claim 29." [*Id.* at FCS0000435.] However, in his rejection based on Fig. 1, the examiner made no mention of the claimed frequency variation signal or how such a signal was used to vary the duration of the switching cycle in the Fig. 1 circuit. The reason is obvious – the examiner had already stated he did not understand the original language of the claim when making his section 112 rejection.

---

[6]    Fairchild argues that Power Integrations intentionally tried to deceive the PTO by not indicating that Figure 1 was prior art. Yet again, however, the evidence shows the opposite to be true—in the text of the submitted application, Power Integrations explicitly told the examiner that Figure 1 was prior art: "Referring to Fig. 1 *a known power supply* that attempts to minimize EMI and reduce startup stress *is depicted.*" *See* DX-106 at FCS0000350, lines 21-22 (emphasis added).

In response, Power Integrations amended claim 29 by copying the relevant language of

claim 1 as already allowed, substituting it for the final two clauses of the original claim 29 to

which the examiner had objected.  [DX-106 at FCS0000447.][7]  This amendment shows that

Power Integrations reevaluated the original language of claim 29 which the examiner had found

confusing and determined that both of the examiner's rejections could be overcome by adopting

the oscillator language the examiner had already said was patentable, in the context of claim 1,

with the other elements of claim 29.

**REDACTED**

Power Integrations then informed the examiner that it amended claim 29 to conform with

the language and limitations of allowed claim 1:

> Claim 29 as presently amended now expressly recites a regulation circuit that
> includes an oscillator that provides a maximum duty cycle signal and an
> oscillation signal having a frequency range that is varied according to a frequency
> variation signal.  The Applicants' Prior Art Figure 1 fails to disclose, teach, or
> suggest such limitations.  Accordingly the Applicants respectfully submit that the
> instant section 102 rejection has been overcome.

[DX-106 at FCS0000449.]  Fairchild bases its argument on the fact that Power Integrations used

the plural word "limitations" in its response to the examiner.  [*See* D.I. 585 at 20.]  In fact,

Fairchild states that "if *either* of these *affirmative representations* is false, Power Integrations

committed inequitable conduct." [*Id.* (emphasis added).]  Power Integrations disputes that its

---

[7]    Fairchild seems to be arguing that the Court should impute an admission that Power
Integrations agreed with the examiner's rejection of claim 29 as anticipated by Figure 1
because Power Integrations did not expressly argue to the contrary.  But no such admission
can be fairly imputed because the claim was also rejected for indefiniteness, and thus an
amendment to cure that rejection would have been necessary regardless.  The fact that Power
Integrations took the expedient step of overcoming both rejections with one amendment that
incorporated specific subject matter the examiner had already said was patentable does not
mean that Power Integrations believed at the time, or ever, that Figure 1 discloses a
frequency variation circuit or signal as claimed, or that the novelty of the invention had
anything to do with maximum duty cycle signals.  *See*

**REDACTED**

quoted statement regarding the oscillator contains multiple affirmative representations and, in any event, the statement was neither an affirmative misrepresentation of fact nor misleading.

As discussed above, the examiner had three prior art references that all disclosed oscillators that generated multiple timing signals including a maximum duty cycle signal. [PX-19; PX-394, PX-395; *see also* DX-106 at FCS0000410-13.] Given that Power Integrations itself submitted this art, it is unreasonable to conclude that its subsequent explanation for the claim 29 amendments at issue would be that an oscillator with a maximum duty cycle signal *per se* was, in and of itself, novel. Instead, Power Integrations' statement that the prior art did not "disclose, teach, or suggest such limitations" refers to the same multiple limitations in amended claim 29 the examiner referenced when allowing claim 1—(1) that the oscillator provides a maximum duty cycle and (2) also provides an oscillation signal where (3) the frequency range of the oscillator, and thus its output signals, is varied according to a frequency variation signal. Power Integrations simply agreed with the examiner, and Fairchild never disputes the fact, that **in combination** these multiple limitations were not present in the prior art. In fact, Fairchild's own circuit expert, Dr. Horowitz, confirmed as much by contending only that the asserted claims were allegedly obvious in view of the SMP211 and other prior art not before the examiner or known to Power Integrations during prosecution. [*See* D.I. 557 (Trial Tr. 9/19/07) at 740-742 (foregoing an anticipation theory and instead arguing that the patent was allegedly obvious in light of Martin and the SMP211).[8]]

In light of the examiner's grant of claim 1, the prior art, and Power Integrations' amendment and response, it is apparent that both the examiner and Power Integrations understood that it was *the combination* of features of a single oscillator generating multiple signals whose frequency varied in a range based on a frequency variation signal, together with the other recited elements, that was novel and non-obvious. Thus, Power Integrations neither made an affirmative misstatement of fact nor misled the examiner.

---

[8]    The jury rejected this contention as well.

REDACTED

As such, Fairchild cannot meet its burden to prove by clear and convincing evidence that Power Integrations committed inequitable conduct based on its statements during prosecution of the '851 patent. *See Hoffmann-La Roche*, 323 F.3d at 1359.

### B.  Materiality of the SMP211

Fairchild also makes a related but alternate argument that, even if Power Integrations' prosecution statement was not intentionally misleading, the failure to disclose the datasheet or other details of the oscillator of the SMP211 was allegedly material to patentability.[9]  First, the SMP211's internal features were not material to any of the claims because the SMP211 did not itself relate to or disclose frequency jitter.  Second, even if the SMP211 might otherwise have been material, there was no need for Power Integrations to cite it because the features Fairchild asserts as relevant were well known in the prior art.  Disclosure would, therefore, have been merely cumulative to what was already in front of the examiner.[10]

---

[9]  As a preliminary matter, Fairchild contends that the materiality of the SMP211 has been established merely based on the fact that the PTO has granted re-examination of the '851 patent.  *See* D.I. 585 at 23.  Fairchild states that "the Patent Office determined that the SMP211 was not cumulative of the art that was previously considered by the Patent Office during initial examination of the patent."  *Id.*  Fairchild distorts the actual reason for the grant of reexamination—the PTO instead indicated the SMP211 was not "cumulative to any *written discussion on the record.*"  DX 601 at 9 (emphasis added).

[10]  Fairchild contends that the grant of reexamination is sufficient to establish the materiality element of an inequitable conduct claim.  However, the mere grant of reexamination is not sufficient to conclude the evidence is material; the materiality determination remains for the finder of fact.  *See Lummus Industries, Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 273 (Fed. Cir. 1988) (holding that even a rejection of claims after reexamination does not establish per se high materiality for a finding of inequitable conduct).  This is particularly true because of the different standards with respect to granting a reexamination and a finding of inequitable conduct.  A materiality finding for inequitable conduct purposes requires clear and convincing evidence, while the grant of reexamination is almost automatic and requires only that "a substantial *likelihood* that a *reasonable* examiner would *consider* the prior art . . . *important* in deciding whether or not the claim is patentable."  USPTO, MPEP § 2242 (8th ed., rev. 5, Aug. 2006) (emphasis added); *see also Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1427 (Fed. Cir. 1988).

1.      **The SMP211 Is Not Material to Patentability Because It Does Not Teach or Suggest Anything About Frequency Jitter.**

The '851 patent is titled "offline converter with integrated softstart and frequency jitter" [PX2], and the patent relates to "frequency jittering to reduce EMI." [D.I. 557 (Trial Tr. 9/19/07) at 880:3-4.] Each and every claim incorporates the frequency jitter feature in the "frequency variation" elements. The SMP211 has absolutely nothing to do with frequency jitter. Instead, the SMP211 is nothing more than a conventional pulse width modulation controller chip, which, at the time of the '851 patent prosecution, was well known in the prior art. [D.I. 557 (Trial Tr. 9/19/07) at 737:15-738:22, 855:21-23.]

Fairchild argues that the SMP211, despite having no feature relevant to the claimed frequency jitter, was material to patentability in view of the examiner's actions because it included an oscillator with a maximum duty cycle signal.[11] [*See* D.I. 585 at 22.] Under Fairchild's argument, the examiner would have found material *any* prior art that showed or taught an oscillator with a maximum duty cycle, regardless of the context. Quite the contrary, as noted above, admitted by Fairchild's own expert, and explained in greater detail below, such art was well known and illustrated by multiple references which the examiner had before him.

The SMP211 does not contain each and every element of any of the original application claims, including original claim 29, and Fairchild does not argue otherwise.[12] In fact, the examiner had other references that disclosed the exact same oscillator as the SMP211 and never made a rejection of the independent claims based on obviousness at any time. Moreover, Mr. Balakrishnan's uncontested testimony revealed that the SMP211 would not have worked properly for frequency jitter, even in *combination* with other circuits. In fact, such a combination

---

[11]  Apparently, Fairchild's argument boils down to the assertion that Power Integrations acted inequitably by adding the label "SMP211" to Figure 1 of the patent but not disclosing the SMP211 data sheet. However, as Dr. Horowitz stated, how the SMP211 worked was well known in the prior art (essentially nothing more than a conventional Pulse Width Modulator). D.I. 557 (Trial Tr. 9/19/07) at 738:7-9. Presumably, had Power Integrations instead created a black box in Figure 1 and labeled it "conventional pulse width modulator," Fairchild would have no argument for inequitable conduct based on the SMP211.

[12]  Fairchild's own expert did not rely on the SMP211 as anticipatory prior art, instead arguing that the '851 patent was allegedly an obvious combination of the SMP211 and the Martin reference. *See* D.I. 557 (Trial Tr. 9/19/07) at 740-742.

15

would have the same significant drawbacks and problems that are recited in the background of the '851 patent, which the patent ultimately solved. [D.I. 557 (Trial Tr. 9/19/07) at 881:17-885:13.] The fact that the SMP211 even if modified would have caused the same problems the patent overcomes, regardless of whether or not its oscillator had a maximum duty cycle signal, also makes disclosure of the internal details of the SMP211 irrelevant.

> **2.    The SMP211's Features Were Well Known in the Prior Art, and Its Disclosure Would Have Been Merely Cumulative of What Was Already Before the PTO.**

A reference is only material to patentability if it is not cumulative of other references already before the PTO. 37 C.F.R. § 1.56(b). Even if this Court finds that the SMP211's oscillator with a maximum duty cycle signal might have been otherwise material to the claims, its disclosure would have been cumulative of other references before the examiner. As noted above, Power Integrations disclosed at least three pieces of prior art showing oscillators with maximum duty cycle signals; two of those were Power Integrations' own prior patents, and they show *the exact same* oscillator structure as that used by the SMP211. [*Compare* DX-76 at FCS1685479 (showing datasheet of SMP211) *with* PX-394 ('381 patent) at Fig. 3 (element 98) *and* PX-395 ('303 patent) at Fig. 2 (element 46).] Moreover, Fairchild's expert admitted that oscillators that generated maximum duty cycle signals like that incorporated in the SMP211 were well known in the art at the time. [D.I. 557 (Trial Tr. 9/19/07) at 738:7-10, 738:17-22, 740:22-741:3, 747:2-748:4, 810:14-18, 811:6-13, 816:4-5, 816:16-22; D.I. 561 (Trial Tr. 9/24/07) at 162:23-163:10; *see also* Ex. B (Blauschild Tr. 3/12/07) at 263:6-12.]

The relevant portions of the block diagram of the SMP211 and Figure 3 of the '381 patent are reproduced below, with highlighting, for the purposes of comparison: (*see also* D.I. 561 (Trial Tr. 9/24/07) at 165:11-168:22 (Dr. Horowitz unable to deny the three oscillator signals were the same in both diagrams.); DX-119 (SMP211 schematics referring to the oscillator signals as "S" and "T".))



**SMP211 Datasheet**                                                    **'381 Patent**

Moreover, Power Integrations also disclosed an article by Pelly *et al.* from 1983, and

Figure 4 of the Pelly article also shows an oscillator with a maximum duty cycle signal. Again,

Dr. Horowitz could not deny this was the case. [PX-19 at PIF08770; D.I. 561 (Trial Tr. 9/24/07)

at 163:20-165:9.] The examiner initialed each of these prior art references. [*See* DX-106 at

FCS0000410-13.] Because all three of these references showed an oscillator with a maximum

duty cycle signal, disclosure of the SMP211's datasheet to show the same thing would have been

cumulative and unnecessary.

Moreover, even if Power Integrations had *not* disclosed the three prior art references, the

examiner would have been aware of oscillators having maximum duty cycle signals because they

were well known in the prior art. Dr. Horowitz, stated in cross examination that "[o]ne of skill in

the art at the time knew about techniques such as what was practiced in the SMP211." [D.I. 557

(Trial Tr. 9/19/07) at 810:14-18.] And, during direct examination, Dr. Horowitz agreed that the

SMP211 was nothing more than an example of something well known in the prior art. [D.I. 557

(Trial Tr. 9/19/07) at 737:15-738:9 ("[A]s a prior art example that just shows the typical way of

doing them. We have the SMP211.").] Given the extensive testimony regarding the ubiquitous

understanding in the prior art of oscillators that generated a maximum duty cycle signal, and the

disclosure of the same in two prior Power Integrations patents as well as the Pelly article from

more than fifteen years prior to the filing of the '851 patent, any failure to disclose the SMP211

cannot be considered material, because its disclosure would have been merely cumulative to the

other art of record.

C.    **Intent**

Finally, even if this Court were to determine that Power Integrations made a factual misstatement during prosecution or that the SMP211 was material and not cumulative, there is simply no evidence of an intent to deceive the PTO.

At trial, Mr. Balakrishnan's testimony revealed that he did not believe claim 29 was rejected because the examiner failed to appreciate there could be an oscillator with a maximum duty cycle signal in Figure 1 of the patent.  [D.I. 557 (Trial Tr. 9/19/07) at 883:14-18.]

This testimony belies any intent to deceive.  *See Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 745 (Fed. Cir. 2002) ("Whether the statements in the Bowers declaration were false or misleading is irrelevant to our inquiry, however, because Orange Bang failed to present any evidence that the Strattons knew or considered the Bowers declaration to contain anything untrue or that the declaration was submitted with any intent to mislead the examiner.").

REDACTED

Thus, the citation to the designation "SMP211" in Figure 1 would have allowed the examiner to find additional detail if it was considered important.  This

testimony, and Power Integrations' disclosure of other prior art during prosecution and in the patent itself, is likewise contrary to finding an intent to deceive.[13]

Because Power Integrations did not make a misstatement to the PTO, because the SMP211 was not material to patentability or was at best cumulative of other references before the examiner, and because Power Integrations had no intent to deceive, Fairchild cannot meet its burden to establish by clear and convincing evidence any inequitable conduct with regard to the prosecution of the '851 patent.

## V.  POWER INTEGRATIONS DID NOT COMMIT INEQUITABLE CONDUCT WITH RESPECT TO THE '366 PATENT.

Fairchild's inequitable conduct argument with respect to the '366 patent is frivolous with respect to the SMP3 and outright misleading with respect to the SMP240/260. None of the SMP family of devices is material to the '366 patent and therefore cannot form the basis of an inequitable conduct claim. Moreover, even if this Court determines that the references are material, Power Integrations lacked the requisite intent to mislead the examiner.

### A.    Defining Soft-start and the Material Elements

As an initial matter, Fairchild's inequitable conduct argument is premised on the same incorrect construction of the claims it pressed earlier in the case and that this Court has already rejected. The Court should reject Fairchild's attempt to read the "soft start circuit" limitation unreasonably broadly here for the same reasons the Court rejected that position during the claim construction stage of the case.

Because "soft-start" functionality in general was well known in the prior art, it is critical to identify the novel features of the '366 patent to understand what would be material and what would be either irrelevant or merely cumulative of art already before the examiner. The materiality of any reference is judged by the reasonable examiner standard. *McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*, 487 F.3d 897, 913 (Fed. Cir. 2007). Thus,

---

[13]   Fairchild never asked the other inventors, Mr. Lund and Mr. Djenguerian, anything about the relevant exchanges during prosecution. No intent to deceive has been alleged as to them, nor is there any evidence to suggest such an intent.

materiality encompasses only that "information that a reasonable examiner would substantially likely consider important in deciding whether to allow an application to issue as a patent." *Id.* (citation omitted)

Power Integrations is not claiming that soft-start functionality *per se* was novel. Indeed, Power Integrations introduced evidence at trial that soft-start functionality, in general, was well known in the prior art. [D.I. 558 (Trial Tr. 9/20/07) at 1048:4-1051:3 (Mr. Blauschild discussing soft-start functionality and the conventional approach).] Moreover, during prosecution, Power Integrations disclosed prior art references, including Figure 1 of the patent itself and the Pelly article, describing the conventional way of performing soft-start. [*Id.* at 1048:22-1050:18; PX-19.] The '366 patent differed from the prior art by describing and claiming a novel and non-obvious structure for a soft-start circuit that had advantages over the conventional methodology. Specifically, the claimed invention comprised a novel "soft-start circuit" that incorporated an AND gate, latch, and soft start comparator independent of the feedback path, and which allowed for efficient integration with the other controller circuitry on a single chip. [*See id.* at 1052:12-1053:18.] Thus, a reasonable examiner would find material only prior art references that disclosed a structure for performing the claimed soft-start function that was substantially similar to the disclosed structure.

Fairchild's proposed definition of material prior art—essentially any reference where soft start functionality was present—is overly broad and encompasses considerable immaterial information. A *reasonable* examiner would have applied the same means- plus-function construction (with its required structures) that this Court applied. Any other construction would not have been reasonable because, as this Court noted, a broader construction would have read directly on the well-known conventional prior art methods of performing soft-start disclosed in the background section and Figure 1 of the patent. Power Integrations' reliance on this Court's construction does not apply hindsight to the patent prosecution process. Instead, it acknowledges that the Court's construction is the "broadest *reasonable* construction" and the only construction a *reasonable* examiner would have applied.

REDACTED

Fairchild also attempts to confuse the issues by avoiding a clear and proper definition of the term soft-start circuit. Throughout the deposition questioning it seeks to rely upon here, Fairchild used the term "soft-start" and "soft-start circuit" without defining the terminology or type of soft-start to which it was referring. To simplify the issue, Power Integrations will use the terms "conventional soft-start" to refer to the soft-start of the prior art and "'366 soft-start" to refer to the soft-start circuit of the patent.

**B.     The SMP3 and SMP240/260 Are Not Material Prior Art.**

**1.     The SMP3 Did Not Contain a Soft-start Feature at All.**

Fairchild's own brief in support of the instant motion amply demonstrates why the SMP3 cannot be considered material prior art: it did not have even conventional soft-start, let alone a structure remotely like the claimed invention. Fairchild first lists all of the features that the SMP3 and the '366 patent have in common: "[t]he SMP3 includes the first and second terminals, switch, oscillator, and drive circuit claimed in the '366 patent." [*See* D.I. 585 at 31.] Then, because Fairchild cannot point to anything in the device itself to show it had even conventional soft-start, Fairchild relies on a *description* of the SMP3 in a "published article" to assert that it allegedly had such a feature.[14] [*See id.*] Fairchild presents no evidence, from the SMP3 device itself, the schematics, or the inventors, to prove that the SMP3 in fact contained any sort of soft start.

Fairchild's own expert admitted that the only way to get the SMP3 to do an effective soft-start function would be to open the chip up and physically modify it. [D.I. 561 (Trial Tr. 9/24/07) at 175:8-176:19.] Moreover, Dr. Horowitz agreed that the actual *datasheets* to the SMP3 did not disclose soft-start. [*Id.* at 176:20-177:7.] Additionally, Dr. Horowitz testified that

---

[14]     The article was published by a third party (Mr. Goodenough) who was not, and never had been, an employee of Power Integrations. *See* Balakrishnan Tr. 11/17/05 at 70:19-71:4. Fairchild produced no evidence to demonstrate that Goodenough had the technical expertise to determine if the SMP3 actually performed a "soft-start" or that Goodenough had any access to the chip itself or the details of its circuits.

even if the SMP3 had a type of soft-start, it would not have functioned the same way or in the same manner as the '366 patent's soft-start circuit. [*Id.* at 177:8-15 (explaining that the soft-start would work by limiting the feedback error amplifier as opposed to using a separate comparator as required by the '366 patent).] Mr. Blauschild, Power Integrations' expert, reviewed the hypothesized soft start method of the SMP3 in his rebuttal report and concluded that the SMP3 did not perform even a conventional soft-start; at best, the SMP3 had a delay circuit. [Ex. A (Blauschild Rebuttal Report) at ¶ 62.] Mr. Blauschild further stated that if the SMP3 had performed some version of soft-start functionality (as opposed to a mere delay circuit) it would have done so by "limit[ing] the error-amplified output in the feedback loop" (the same language used by Dr. Horowitz). [*Id.* at ¶ 65.] Mr. Blauschild then added that this hypothetical implementation of soft-start was identical to "conventional" soft-start. [*Id.* at ¶ 65.] Thus, the only evidence Fairchild can rely upon is the third-party publication, which its own expert implicitly acknowledges to be wrong in the critical respect. And even taking the article's erroneous statement at face value, at *most,* it suggests the SMP3 used conventional soft-start. As such, it would not have been material to a reasonable examiner because it would have been cumulative of Figure 1 and the Pelly reference. [D.I. 558 (Trial Tr. 9/20/07) at 1048:22-1050:18; PX-19.]

Fairchild also fails to provide any testimonial evidence from the inventors to show that the SMP3 had any sort of soft start. None of the inventors believed that the SMP3 contained even a conventional soft-start.


**REDACTED**

**REDACTED**

And yet, somehow, from this complete dearth of evidence, Fairchild concludes that not only did the SMP3 contain soft-start, but that it also allegedly contained '366 soft-start functionality and therefore was highly material. Fairchild's conclusions lack any evidentiary support and, in fact, are contradicted by the circuit itself and Fairchild's own expert testimony. Even if the facts hint at a potential method of performing some form of a soft-start, the SMP3 certainly contained none of the required structures of the '366 patent (latch, AND gate, and independent soft start comparator).[15]  As such, the SMP3 would not have been material to a reasonable examiner, and Power Integrations' failure to disclose the SMP3 cannot form the basis of an inequitable conduct charge.

> **2.**  **The SMP240/260 Are Not Material Prior Art Because They Have None of the Structures Required By the '366 Patent.**
>
> **a.**  **Fairchild's Alleged Affirmative Proof of Materiality Is a Distortion of the Record; the Actual Facts Fail to Demonstrate Materiality.**

The cornerstone of Fairchild's materiality argument with respect to the SMP240/260 is the deposition testimony of Mr. Lund.  [*See* D.I. 585 at 29-31 (showing element table with Lund deposition testimony and no other evidence).]  Fairchild's chart is not only deceptive, at times it completely distorts Mr. Lund's testimony.  Prior to asking each of the questions listed in Fairchild's chart, Fairchild's counsel failed to indicate to Mr. Lund that he was seeking comparisons with the claim language of the '366 patent.  Before each answer, Power Integrations

---

[15]  Fairchild presented no evidence at trial or in its brief that the SMP3 contained any of the required structures of the '366 patent.

objected to the form of the question and that the questions were vague and ambiguous because Fairchild never defined the terms it asked Mr. Lund about. For example, as discussed above, soft-start circuits in general were well known in the prior art and thus, when Fairchild asked Mr. Lund about the "internal soft-start of the SMP240/260", Mr. Lund replied based on the fact that the SMP240/260 admittedly (and irrelevantly) had conventional soft-start. Mr. Lund never agreed that the SMP240/260 contained a soft-start circuit that was the same as or even remotely like the claimed invention of the '366 patent.

Fairchild's chart especially distorts Mr. Lund's testimony with respect to two key elements: (1) the type of soft-start circuitry the SMP240/260 used and (2) the oscillator with maximum duty cycle signal. First, contrary to the chart's indication that Mr. Lund agreed the SMP240/260 soft-start feature worked the same way as the claimed elements of the '366 patent, Mr. Lund's actual testimony on that question is directly contrary.


**REDACTED**


Thus, Fairchild must distort Mr. Lund's actual testimony, which does not support Fairchild's contention.

Second, Fairchild also mischaracterizes Mr. Lund's testimony with respect to the existence in the SMP240/260 of an internal oscillator that provides a maximum duty cycle signal. [*See* D.I. 585 at 30.]

**REDACTED**

Fairchild's attempt to show otherwise is disingenuous and a distortion of the record evidence.[16]

      **b.    The Evidence Presented at Trial Demonstrates That the SMP240/260 Had None of the Necessary Features and Thus Would Not Have Been Material.**

Power Integrations could simply point to Fairchild's failure to present any affirmative evidence of its own that the SMP240/260 would have been material to a reasonable examiner. However, the record is replete with evidence, in Power Integrations' favor, that also shows a reasonable examiner would not have found the SMP240/260 to be material.

As discussed above, the only material prior art would be art which shows a structure substantially similar to the unique structures of the '366 patent—the AND gate, latch, and independent soft-start comparator. At trial, Dr. Horowitz agreed that there was nothing in the SMP260 that was identical to the latch and AND gate shown in the patents. [D.I. 557 (Trial Tr. 9/19/07) at 845:10-14.] Moreover, Dr. Horowitz admitted that the SMP260 had only a single comparator, not multiple comparators as required by the '366 patent. [*Id.* at 846:9-20.] Even during direct examination, Fairchild did not present any testimony where Dr. Horowitz identified

---

[16]  Fairchild's brief offers no other testimony or evidence of any other person to show either feature existed in the SMP240/260. Without Mr. Lund's testimony to "confirm" the existence of the claimed elements in the SMP240/260, Fairchild cannot even establish a prima facie case of materiality.

any specific structures of the SMP260 that corresponded to the claimed structures. [*See id.* at 845:14-846:8.]

On the other hand, Mr. Blauschild affirmatively stated that the SMP260 did not have *any* of the structures corresponding to the '366 soft-start circuit. [D.I. 558 (Trial Tr. 9/20/07) at 1055:21-1056:16.] Mr. Blauschild agreed with Dr. Horowitz that the SMP260 only had a single comparator as opposed to having the required two. [*Id.* at 1055:14-23 ("Notice that there is only one comparator and that's the PWM comparator. It doesn't have a soft-start comparator. So this is pretty different.").] Moreover, Mr. Blauschild explained that the SMP260 used a conventional soft-start involving a single ramp circuit and not the AND gate or the latch shown in the '366 circuit. [*Id.* at 1056:3-5.] He further testified that, to the extent it was relevant at all, the SMP240/260 was not materially different from other prior art before the examiner, including the Pelly article, which showed conventional soft-start implemented by modifying the feedback signal. [*Id.* at 1048:9-1050:18, 1054:6-1057:21.]

In addition to Mr. Blauschild's testimony, Mr. Balakrishnan also testified, without cross-examination by Fairchild, that the SMP240/260 did not have *any* of the structures of the '366 soft-start circuit. [D.I. 557 (Trial Tr. 9/19/07) at 902:22-903:19.] In particular, Mr. Balakrishnan emphasized that the SMP240/260 did not have the second independent soft-start comparator, or latch/AND gate required by the '366 patent. [*Id.* at 903:11-17.] Mr. Balakrishnan also testified that the absence of these three features was because the SMP240/260 performed conventional soft-start. [*Id.* at 903:18-22.]

Thus, Fairchild presents absolutely no evidence that the SMP240/260 possessed any of the necessary structures of the '366 soft-start circuit. Its expert provided no evidence of structures that performed the '366 soft-start; he instead admitted that certain key structural elements of the '366 soft-start circuit were absent from the SMP240/260. Power Integrations' evidence showed that the SMP260 performed conventional soft-start and had none of the required structures. Fairchild neither questioned nor challenged Power Integrations' trial witnesses on these assertions on cross-examination.

26

Fairchild therefore cannot prove by clear and convincing evidence that the SMP240/260 would have been material to a reasonable examiner. Thus, Power Integrations did not act inequitably with respect to the SMP240/260.

### C.     The Inventors Lacked the Necessary Intent to Deceive the PTO.

Even if this Court finds that the SMP3 or the SMP240/260 were material prior art, the inventors lacked the requisite intent necessary for a finding of inequitable conduct.

As explained above, none of the inventors believed at the time of prosecution that the SMP3 included any type of soft start circuit. Mr. Balakrishnan and Mr. Djenguerian both testified that the SMP3 had no soft start functionality, and, as explained above, Mr. Balakrishnan's understanding was refreshed by his detailed review of the product's circuit schematics. Because the inventors either did not know of the SMP3, or believed at all relevant times that the product had no soft start functionality at all, Fairchild cannot establish any intent in the failure to disclose the SMP3.

Fairchild's first argument with respect to intent on the SMP240/260 is that "Mr. Lund knew the devices disclosed every element of claim 1 of the '366 patent." This conclusory statement not only lacks support but is directly contradicted by the evidence, as explained above.

**REDACTED**

Given that Mr. Lund *actually* believed the SMP240/260 did *not* disclose every element of claim

27

1 and that he believed it was "*unrelated*" to the '366 patent, and in view of his recollections of his knowledge at the time of prosecution, Fairchild has not shown by clear and convincing evidence that Mr. Lund *intended* to deceive the examiner.

Fairchild's second argument with respect to intent was that because Mr. Balakrishnan "must have known" that the SMP240/260 contained internal soft-start features, he intentionally failed to disclose them to get as broad a claim as possible. The evidence, however, shows that


REDACTED


Mr. Balakrishnan also explained at trial that, in his view, the SMP240/260 was significantly different from the invention of the '366 patent. On this record, Fairchild cannot clearly and convincingly prove that Mr. Balakrishnan affirmatively sought to deceive the PTO.[17]

Fairchild next argues that Power Integrations "failed to provide *any* information about the internal soft-start circuits . . . but rather only provided information about *external* soft-start circuits." [*See* D.I. 585 at 33 (bold, underline, and italics in original).] But Fairchild's contention is beside the point. As explained above, Power Integrations and its inventors disclosed several examples of what they believed to be conventional soft start, and expressly distinguished them in the patent itself. And as Fairchild conceded, the PTO had before it a Power Integrations patent, the '526 patent, that described the internal circuits of the SMP240/260, including the summing junction circuit Dr. Horowitz relied upon in forming his opinions. [D.I. 557 (Trial Tr. 9/19/07) at 848:16-853:6; *see also* D.I. 560 (Trial Tr. 9/21/07) at

---

[17]

101:4-17 (Mr. Balakrishnan explaining during cross-examination that the '526 disclosed the circuitry of the SMP240).] Thus, directly contrary to Fairchild's argument, Power Integrations did in fact disclose the circuitry of which it was aware at the time that it believed to be material to patentability.

**REDACTED**

In addition, Power Integrations was correct in disclosing during the prosecution of the '366 patent the same art that was of record in the related '851 prosecution, even though much of that was unrelated to the soft start feature itself, because the '366 patent claims aspects of both frequency jitter and soft start. Fairchild simply cannot twist this record into an intention to "hide" the prior art in this case.

Because neither the SMP3 nor the SMP240/260 is material to the '366 soft-start claimed inventions and because the inventors had no intent to deceive the PTO, the '366 patent is not unenforceable due to inequitable conduct.

## VI.    POWER INTEGRATIONS DID NOT COMMIT INEQUITABLE CONDUCT WITH RESPECT TO THE '075 PATENT.

### A.    Dr. Eklund Did Not Make Any Misstatement of Fact or Mislead the Examiner With Respect to the '075 patent.

With respect to the '075 patent, this is not a case where an inventor allegedly misled the patent office or made any misstatements—Fairchild has no evidence that Dr. Klas Eklund made any misrepresentation or misleading statement during the prosecution of his '075 patent at all. Instead, Fairchild's charge of inequitable conduct hinges on the fact that Dr. Eklund did not dump a stack of references addressing conventional process technology on the Patent Office. Fairchild's argument fails for several reasons set forth in greater detail below, most notably that Dr. Eklund explicitly described the relevant art in the background section of the patent. In the face of that disclosure (and Fairchild's expert's concession of what it teaches), Fairchild must resort to dissecting Dr. Eklund's invention in a way that ignores his inventive contribution, and

29

relying on insinuations that do not rise to the clear and convincing evidence necessary to render an issued patent unenforceable.[18]

### B.     Dr. Eklund Described the Relevant Art in the Specification.

Dr. Eklund explained the state of the art and summarized it in the background section of the patent. Dr. Eklund does not dispute that he knew about and had copies of the art Fairchild now relies upon when he invented the technology of the '075 patent, including the Wakaumi and Ludikhuize references Fairchild emphasizes so heavily. As Dr. Eklund explained, though, he disclosed the relevant teachings of the art, including those two references, in the background section of the specification to his patent. Specifically, at column 1, lines 15-50, Dr. Eklund's patent explains the prior art and its significant limitations. As Dr. Eklund testified at trial, this description included an averaging of the performance characteristics of the art in his possession at that time, which provided a base line against which to demonstrate the significant improvements of the claimed invention. [D.I. 560 (Trial Tr. 9/21/07) at 5:21-6:1, 7:14-21, 13:12-20, 16:13-17:5, 18:2-9, 19:8-14, 25:19-26:15.]

The Court need not take Power Integrations' or Dr. Eklund's word that this background section was sufficient to disclose the prior art structures in question—Fairchild's expert Dr. Peter Gwozdz admitted that Dr. Eklund's description "certainly" disclosed the structure of conventional high voltage MOS transistors like the kind on which Fairchild now bases its argument. [D.I. 556 (Trial Tr. 9/18/07) at 542:13-21.] Thus, though it may not be apparent to the untrained eye that Dr. Eklund's description in the background discloses the structures now at issue, that fact is not truly in dispute. The disclosure also belies any inference that Dr. Eklund intended to deceived the patent office by withholding these references. *See Ruiz*, 234 F.3d at 670; *see also Vandenberg*, 740 F.2d at 1568-69.

---

[18]  Fairchild suggests in one of its argument subheadings that the Wakaumi reference provides a basis for finding that Dr. Eklund made an affirmative misrepresentation during prosecution, *see* D.I. 585 at 12, subheading III(D)(3), but, as explained below, Fairchild's own expert concedes that Dr. Eklund "certainly" disclosed conventional devices with extended drain regions in the specification of the '075 patent. The Court should therefore reject Fairchild's insinuation that Dr. Eklund made any misrepresentations on this issue during prosecution.

Perhaps most importantly, but overlooked entirely in Fairchild's brief, is the fact that James Beasom—who copied Dr. Eklund's claim into a later patent application verbatim—knew about the same art Fairchild relies on here, but did not cite it during prosecution of his own patent – not even by describing it, as Dr. Eklund did, in his patent specification – and does not believe it taught his invention. There is no dispute that Mr. Beasom knew about the art in question during the prosecution of his patents—Mr. Beasom presented at the IEDM conferences during the very sessions when the Wakaumi and Ludikhuize papers were presented in 1982 and 1983. [D.I. 556 (Trial Tr. 9/18/07) at 298:8-304:19.] Nevertheless, Mr. Beasom did not submit the Wakaumi or Ludikhuize articles (or any articles, IEDM or otherwise) to the patent office during the prosecution of his patents. [*Id.*] When asked about these references at trial, Mr. Beasom admitted the references did not disclose his invention [*id.*], and Mr. Beasom also confirmed that an extended drain region going both ways from the drain, as described in the references in question, was "quite common" in the art. [*Id.* at 304:20-306:4.] Mr. Beasom also admitted that he would not submit references disclosing such common structures when applying for patents. [*Id.* at 306:5-16.] Because Fairchild offered Mr. Beasom as a witness and relied heavily on his testimony at trial, Mr. Beasom's testimony—and Fairchild's complete silence as to his evaluation of the art as conventional—is perhaps most telling of the fact that the references Fairchild accuses Dr. Eklund of hiding were not material and had no bearing on the '075 patent.

Mr. Beasom's and Dr. Gwozdz's admissions regarding the conventional nature of the art and the disclosure in the background of the '075 patent should have ended the inquiry, and it certainly disposes of the bulk of Fairchild's arguments. But Fairchild has plowed ahead with its conspiracy theories and insinuations of fraudulent intent, so Power Integrations must debunk those regrettable accusations below. Before addressing the details of those arguments, though, it is worth reiterating that Fairchild must both (1) ignore the disclosure in the specification and (2) dissect Dr. Eklund's invention out of existence, to suggest the patented technology was in fact disclosed in the art. As the Court is well aware, though, the jury rejected Fairchild's efforts to separate the whole of Dr. Eklund's invention from its parts. Despite Fairchild's efforts to slice

31

and dice the prior art, Fairchild could not find a single anticipatory public reference, and the jury rejected Fairchild's claim that the '075 patent was obvious in view of the prior art.

C.     **The Art Fairchild Relies on Was Conventional.**

The art Fairchild raises in its brief does not come close to teaching the invention of the '075 patent, and Fairchild's arguments do not demonstrate a case for rendering the '075 patent unenforceable.  Contrary to Fairchild's assertion, the art in question teaches only that which was well-known as set forth in the patent's background section, and the articles would not have changed the examiner's evaluation of Dr. Eklund's claims.  The heart of Dr. Eklund's invention lies in its novel combination of elements—in particular the extended drain extending laterally each way from the drain to surface adjoining positions, in conjunction with the surface adjoining later on top of the extended drain region on each side of the drain (the latter of which is often referred to as the "PTOP").  These elements together allowed a combination of high and low voltage MOS devices on the same chip with at least a 2-3X improvement over the prior technologies.  There is no dispute that the notion of a top layer, or an extended drain region, or efforts to integrate high and low voltage MOS devices were present in the prior art to varying degrees, but nobody thought of the way to combine the key elements as claimed—much less suggested such a combination—before Dr. Eklund's invention.  The only way for Fairchild to argue that the invention was taught in the prior art in any material way—a contention the jury rejected—is to misrepresent the claimed invention, the art, or both.  The Court should reject Fairchild's efforts to rewrite history in this manner.

First, Fairchild relies heavily on the suggestion that the Wakaumi reference was material to patentability and renders the '075 patent unenforceable, but Fairchild's own expert conceded at trial that Wakaumi showed a typical example of prior art MOS transistors.  [D.I. 556 (Trial Tr. 9/18/07) at 541:16-542:21.]  Indeed, as noted above, when asked about the specific disclosure in the background section of the '075 patent in the context of Wakaumi, Fairchild's expert conceded that Dr. Eklund "certainly" told the Patent Office about a structure like Wakaumi.  [*Id.* at 542:13-21.]  This alone establishes that Wakaumi provides no basis for a finding of

32

inequitable conduct. And, as noted above, Mr. Beasom concurred with the view that Wakaumi

was conventional, and he did not disclose it to the PTO when seeking his own patent on the same

high-voltage structure. [*Id.* at 299:20-302:9; DX-67 ('719 patent).]

Moreover, the evidence shows that Wakaumi is significantly different from the '075

invention technically, and it therefore would not have added to the examiner's evaluation of Dr.

Eklund's invention. As Power Integrations' expert explained at trial,

> Take the Wakaumi references here, it doesn't have a top drain. It doesn't have a
> top layer with extended drain. It's not a – it doesn't show symmetrical drain, it
> doesn't have optimized high voltage and low voltage MOS transistors, high
> voltage transistors is very, very poor. In fact, you may have seen earlier where
> Dr. Eklund used this to show how superior his invention was with respect to this.
> This does have an extra shield in the process. In fact, the whole paper has got
> nothing to do with Dr. Eklund's ideas.

[D.I. 559 (Trial Tr. 9/21/07) at 1387:24-1388:12.] Even Fairchild now admits that

Wakaumi is missing two of the key parts of Dr. Eklund's invention—"the 'P-TOP' and

extension of the drain 'each way' (as opposed to one way) from the drain contact

pocket." [D.I. 585 at 11.] Fairchild cannot credibly argue that Wakaumi—showing a

device its own expert concedes was disclosed in the background of the '075 patent—

renders the patent unenforceable.

Fairchild's focus on the Ludikhuize reference is equally unavailing. First and foremost,

Ludikhuize was among the prior art summarized and disclosed in the background section of the

patent, as addressed above with respect to the Wakaumi reference. [D.I. 560 (Trial Tr. 9/21/07)

at 17:22-18:9 and 30:4-11.] Moreover, Fairchild's own expert conceded that Ludikhuize

describes fundamentally different bipolar process technology than that of the '075 patent (and

that of Wakaumi and Beasom). [D.I. 557 (Trial Tr. 9/19/07) at 563:22-564:6.] When asked

about Dr. Eklund's invention, Fairchild's fact witnesses also conceded it did not involve bipolar

technology. [D.I. 556 (Trial Tr. 9/18/07) at 340:8-19.][19] These points are significant, and they

---

[19]   Fairchild also suggests some impropriety in Dr. Eklund's disclosure of the Ludikhuize
       reference during the subsequent prosecution of a later patent, the '298 patent, *see* D.I. 585 at
       10, but Fairchild misrepresents the nature of Dr. Eklund's inventions and the art in doing so.

belie Fairchild's efforts to paint the Ludikhuize reference as being virtually identical to the '075 invention but for the extended drain region going both ways to surface adjoining positions.

Beyond the fundamental difference from the process technology of the '075 patent, Ludikhuize also lacks the claimed extended drain region extending laterally both ways to surface adjoining positions, and Fairchild can only suggest that Ludikhuize teaches the limitation by misquoting Ludikhuize or the '075 patent. Fairchild also ignores the fact that Ludikhuize has a deep isolation diffusion at one end, which is shown at the right side of the diagram copied into Fairchild's brief at page 7. That additional diffusion not only reflects a fundamentally different structural composition from the '075 technology, it also precludes an extended drain region extending each way to surface adjoining positions. Dr. Eklund explained that the structural difference was "key." [D.I. 560 (Trial Tr. 9/21/07) at 46:20-48:10.]

Fairchild also asserts without support that Dr. Eklund "got the idea" for a PTOP from Ludikhuize and that Dr. Eklund admitted that Ludikhuize disclosed the claimed extended drain region extending laterally both ways to surface adjoining positions, but Fairchild can only rely on its own proposed findings of fact to support these overreaching statements. [D.I. 585 at 8.] The truth of the matter is that not even Fairchild's own expert would opine that Ludikhuize taught the claimed invention of the '075 patent; indeed, as noted above, Fairchild's expert admitted on cross-examination that Ludikhuize related to fundamentally different process technology (the older bipolar technology).

Power Integrations' expert Mr. Michael Shields summed up the differences between Dr. Eklund's work and Ludikhuize succinctly:

> [Ludikhuize] does have a P-TOP region in one area. Is it is not symmetrical. The extended drain does not have a surface in multiple positions. It doesn't have low voltage MOS devices at all. In fact, it says the low voltage transistors are bipolar transistors which are nothing like MOS transistors. It's a very expensive bipolar process. It's a very different process.

---

In fact, both Ludikhuize and the later '298 patent were explicitly directed to specific DMOS implementations, as noted in the titles of both. The fact that Ludikhuize was considered relevant to a different invention is totally beside the point and has no bearing on the '075 patent, an invention that was itself distinguished in the text of the later '298 patent.

[D.I. 559 (Trial Tr. 9/21/07) at 1388:13-23.] And, as explained above, Mr. Beasom concurred with the understanding that Ludikhuize did not disclose the '075 invention; in fact, he did not think it relevant enough to disclose during prosecution of his own patents. [D.I. 596 (Trial Tr. 9/18/07) at 298:8-306:16.] Given this evidence, to the extent the Court finds it was not already disclosed in the background of the '075 patent, Ludikhuize is also not material to the patentability of the '075 patent.

In addition to the Wakaumi and Ludikhuize references, Fairchild takes general issue with a market survey Dr. Eklund did to evaluate the commercial landscape before investing the time necessary to develop his invention. [D.I. 585 at 6-7, 11-12.] Fairchild's efforts to parse the invention out of existence with those references are unpersuasive, though, as they instead show that the features in question were either already disclosed in the background section or well known in the art, as explained above in the context of Wakaumi and Ludikhuize. For example, Fairchild focuses on a number of references that showed an extended drain [D.I. 585 at 11-12], but there was nothing special about a reference with an extended drain *per se*. Indeed, Fairchild's expert conceded at trial that Dr. Eklund certainly disclosed structures with an extended drain like that of Wakaumi and other conventional MOS devices. [D.I. 556 (Trial Tr. 9/18/07) at 542:13-21.] It defies logic for Fairchild to suggest that everyone in the industry knew about extended drains but that Dr. Eklund committed inequitable conduct by not explaining this well known feature to the PTO examiner.

Fairchild's reliance on statements in the prosecution history regarding the claimed extended drain region extending each way to surface adjoining positions is equally misleading and overreaching. Fairchild suggests that Dr. Eklund's response to rejections during prosecution in light of the Colak reference somehow mislead the patent office regarding the claimed extended drain region [D.I. 585 at 8-10], but the charge makes no sense. First, as noted above, Fairchild's expert concedes that Dr. Eklund "certainly" disclosed the structure of the Wakaumi reference, and other conventional MOS references with an extended drain region, in the

background section of the specification.  [D.I. 556 (Trial Tr. 9/18/07) at 542:8-21.]  Second, the

Colak reference was fundamentally different from the invention of the '075 patent, and Dr.

Eklund's claim was allowed when he made clear he was not claiming the structure of Colak.

Moreover, as also noted above, the suggestion that the patentability of Dr. Eklund's invention

turned on the disclosure of any form of extended drain with a surface adjoining position is

implausible, particularly given that others in the field (including Mr. Beasom) did not believe

such art to be an impediment to patentability.

### D.    Fairchild Has Put Forth No Evidence that Dr. Eklund Intended to Deceive the Patent Office.

Given the lack of any showing of material omissions or misrepresentations, the Court

need not reach the issue of intent.  If it does, the Court will see that Fairchild also fails on the

issue of intent, because all the evidence suggests Dr. Eklund prosecuted the '075 patent—his

very first U.S. Patent—in good faith.

As a predicate matter, the Court should reject Fairchild's efforts to collapse the two-part

inquiry by relying solely on the materiality of the alleged omissions, an approach the Federal

Circuit has repeatedly rejected.  *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336,

1352 (Fed. Cir. 2002) ("[M]ateriality does not presume intent, which is a separate and essential

component of inequitable conduct."); *Allied Colloids Inc.*, 64 F.3d at 1578 ("It was to mitigate

the plague whereby every patentee's imperfections were promoted to 'inequitable conduct' that

this court reaffirmed that both materiality and culpable intent must be established."); *Monon

Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1262-63 (Fed. Cir. 2001) ("Stoughton, in effect

argues that, on this evidence, the finder of fact was *required* to infer deceptive intent. We cannot

agree." (emphasis in original)).

Here, Dr. Eklund provided the PTO with information concerning the art he was aware of,

and Fairchild's expert confirmed that the disclosure "certainly" disclosed the conventional

structures of the art.  [D.I. 556 (Trial Tr. 9/18/07) at 541:16-542:13-21.]  Fairchild fails to

identify any misstatement to support a finding of intent to deceive the patent office, and Fairchild

can point to no other evidence that clearly and convincingly demonstrates an intent to deceive. Instead, Fairchild makes a number of unsupported charges on unrelated issues such as Dr. Eklund's compensation, or by selectively quoting testimony and mischaracterizing a number of events entirely unrelated to prosecution. For example, Fairchild relies on a letter from Tom Schatzel to potential investors concerning the lack of a "patent search," but it identifies nothing misleading about the letter. Instead, Fairchild takes exception to the letter's failure to explicitly address prior art articles, but those articles (and the fact that those in the technical community believed Dr. Eklund's invention presented a 2-3X improvement over the conventional technology of the articles) have already been addressed above in detail. These unrelated issues, including the charges regarding Dr. Eklund's compensation for the years of work he put into building Power Integrations and Dr. Eklund's work with Mr. Schatzel to attract investors and prosecute the patents, are in no way indicative of deceptive intent.

Fairchild also suggests that Dr. Eklund lied during his deposition in a way that supports a finding of inequitable conduct, but the contention is both absurd and irrelevant.[20] First, Fairchild's argument that Dr. Eklund tried to hide his knowledge of Wakaumi and Ludikhuize during prosecution is belied by that fact that Dr. Eklund has always admitted he had the references and discussed them in the earliest invention notes and review of the art. Fairchild also ignores the fact that Dr. Eklund's initial survey of the art had been misfiled with other non-related work papers at the time of his initial deposition, was turned over as soon as it surfaced, and, as explained during a further deposition and at trial, its contents were included with the materials described in the background section of the patent. This "evidence" simply does not support a finding that Dr. Eklund intended to deceive the patent office.

Further evidence of the lack of credibility in Fairchild's assertion of inequitable conduct rests with Mr. Beasom, the person who independently developed the same technology shortly

---

[20]   Fairchild provides no citation for the proposition that a single statement taken out of context in a deposition provides support for a finding of inequitable conduct, as it asserts at page 15 of its brief. Although Fairchild is incorrect in its characterization of Dr. Eklund's position based on the few lines of testimony it quotes from one of the multiple days he testified during this case, the lack of authority also undercuts Fairchild's argument on this point.

after Dr. Eklund and who claimed an invention identical to claim 1 of the '075 patent in claim 8 of his '719 patent. Despite having full knowledge of Mr. Beasom's view of these references' lack of bearing on the invention and not having submitted them to the patent office during the prosecution of his own patent, Fairchild accuses Dr. Eklund of gross misconduct—intentionally deceiving the patent office—for not submitting these self-same articles. Fairchild has also sued Power Integrations for infringement of claim 8 of Mr. Beasom's '719 patent—the claim copied verbatim from Dr. Eklund's '075 patent. Fairchild must therefore believe Mr. Beasom was justified in not disclosing the prior art, or its assertion of Mr. Beasom's patent is in bad faith. This glaring inconsistency confirms that Fairchild's charge of inequitable conduct is mere posturing, is contradicted by the relevant evidence, and must be rejected.

Because the references Fairchild complains of describe nothing but conventional process technologies, are at best cumulative, and were adequately disclosed by Dr. Eklund in the specification of the '075 patent, and because Dr. Eklund had no intent to deceive the PTO, the '075 patent is not unenforceable due to inequitable conduct.

## VII.    CONCLUSION

For all the above reasons, Power Integrations requests that the Court enter judgment for Power Integrations and against Fairchild on the claims of inequitable conduct.

Dated:  November 28, 2007          FISH & RICHARDSON P.C.


By:  _____
     William J. Marsden, Jr. (#2247)
     Kyle Wagner Compton (#4693)
     919 N. Market Street, Suite 1100
     P.O. Box 1114
     Wilmington, DE  19899-1114
     Telephone: (302) 652-5070
     Email:  marsden@fr.com
     Email:  kcompton@fr.com

     Frank E. Scherkenbach
     225 Franklin Street
     Boston, MA 02110-2804
     Telephone: (617) 542-5070

     Howard G. Pollack
     Michael Headley
     500 Arguello Street, Suite 500
     Redwood City, CA 94063
     Telephone: (650) 839-5070

**ATTORNEYS FOR PLAINTIFF**
**POWER INTEGRATIONS, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2007, I electronically filed with the Clerk of Court the PUBLIC VERSION of POWER INTEGRATION'S ANSWERING BRIEF IN OPPOSITION TO FAIRCHILD'S POST-TRIAL BRIEF ASSERTING INEQUITABLE CONDUCT using CM/ECF which will send electronic notification of such filing(s) to the following counsel.

**BY HAND DELIVERY**
Steven J. Balick
John G. Day
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P. O. Box 1150
Wilmington, DE 19899

Attorneys for Defendants
FAIRCHILD SEMICONDUCTOR
INTERNATIONAL, INC. and
FAIRCHILD SEMICONDUCTOR
CORPORATION, and third party
INTERSIL CORPORATION

**BY E-MAIL AND FEDERAL EXPRESS**
G. Hopkins Guy, III
Bas de Blank
Orrick, Herrington & Sutcliffe, LLP
1000 Marsh Road
Menlo Park, CA  94025

Attorneys for Defendants
FAIRCHILD SEMICONDUCTOR
INTERNATIONAL, INC. and
FAIRCHILD SEMICONDUCTOR
CORPORATION

_/s/ William J. Marsden, Jr._
          William J. Marsden, Jr.