IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC., a
Delaware corporation,

          Plaintiff,

    v.

FAIRCHILD SEMICONDUCTOR
INTERNATIONAL, INC., a Delaware
corporation, and FAIRCHILD
SEMICONDUCTOR CORPORATION, a
Delaware corporation,

        Defendants.

C.A. No. 04-1371 JJF

HIGHLY CONFIDENTIAL

FILED UNDER SEAL
PURSUANT TO COURT ORDER

**POWER INTEGRATIONS' PROPOSED FINDINGS OF FACTS
AND CONCLUSIONS OF LAW**

**FISH & RICHARDSON P.C.**
William J. Marsden, Jr. (#2247)
Kyle Wagner Compton (#4693)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Telephone: (302) 652-5070
Email: marsden@fr.com
Email: kcompton@fr.com

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Telephone: (617) 542-5070

Howard G. Pollack
Michael Headley
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070

Attorneys for Plaintiff
POWER INTEGRATIONS, INC.

## TABLE OF CONTENTS

**PAGE**

I.    FINDINGS OF FACT ...........................................................................1

    A.    Background ...........................................................................1

            i.    The Parties ...........................................................1

            ii.    The Patents-in-suit ...........................................1

            iii.    Procedural History ...........................................2

            iv.    Fairchild's Contentions Regarding Inequitable Conduct ...............2

    B.    The '876 Patent ...........................................................................3

    C.    The '851 Patent ...........................................................................6

            i.    Alleged Misstatement During Prosecution ...................6

            ii.    Allegation Regarding the SMP211 ...............................13

    D.    The '366 Patent ...........................................................................15

            i.    Allegation regarding the SMP3 ...................................15

            ii.    Allegation regarding the SMP240/260 ...................19

    E.    The '075 Patent ...........................................................................22

II.    CONCLUSIONS OF LAW ...............................................................24

    A.    '876 Patent ...........................................................................24

    B.    '851 Patent ...........................................................................25

    C.    '366 Patent ...........................................................................29

    D.    '075 Patent ...........................................................................32

# TABLE OF AUTHORITIES

**CASES**                                                                                               **PAGE**

*Akron Polymer Container Corp. v. Exxel Container, Inc.*,
   148 F.3d 1380 (Fed. Cir. 1998)................................................................27, 30, 31

*Allen Engineering Corp. v. Bartell Industrial, Inc.*,
   299 F.3d 1336 (Fed. Cir. 2002)................................................................26, 33

*Dayco Products, Inc. v. Total Containment Inc.*,
   329 F.3d 1358 (Fed. Cir. 2003)................................................................27, 28, 31, 32

*Ethicon, Inc. v. Quigg*,
   849 F.2d 1422 (Fed. Cir. 1988)................................................................25, 29

*Halliburton Co. v. Schlumberger Tech. Corp.*,
   925 F.2d 1435 (Fed. Cir. 1991)................................................................27, 31, 33

*Hebert v. Lisle Corp.*,
   99 F.3d 1109 (Fed. Cir. 1996)................................................................30

*Honeywell Intern. Inc. v. Universal Avionics Systems Corp.*,
   488 F.3d 982 (Fed. Cir. 2007)................................................................26

*Jazz Photo Corp. v. International Trade Commission*,
   264 F.3d 1094 (Fed. Cir. 2001)................................................................27

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
   292 F.3d 728 (Fed. Cir. 2002)................................................................26

*Key Pharm., Inc. v. Hercon Laboratoriess Corp.*,
   981 F. Supp. 299 (D. Del. 1997)................................................................26, 33

*Lifescan, Inc. v. Home Diagnostics, Inc.*,
   103 F. Supp. 2d 379 (D. Del. 2000)................................................................27

*Lummus Industries, Inc. v. D.M. & E Corp.*,
   862 F.2d 267 (Fed. Cir. 1988)................................................................25, 29

*Merck & Co. v. Teva Pharm. USA, Inc.*,
   288 F. Supp. 2d 601 (D. Del. 2003)................................................................28, 31, 34

*Mosaid Technologies Inc. v. Samsung Electronics Co.*,
   362 F. Supp. 2d 526 (D.N.J. 2005)................................................................25

*Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*,
   438 F.3d 1123 (Fed. Cir. 2006)................................................................28, 31, 33

**STATUTES**

MPEP § 2242 (8th ed., rev. 5, Aug. 2006)................................................................25, 29

I.    **FINDINGS OF FACT**

    A.    **Background**

        i.    **The Parties**

1.  Plaintiff Power Integrations, Inc. ("Power Integrations") is a Delaware corporation with its principal place of business in San Jose, California.

2.  Defendant Fairchild Semiconductor International, Inc. is a Delaware corporation having its principal place of business in Portland, Maine.

3.  Defendant Fairchild Semiconductor Corporation is a Delaware corporation having its principal place of business in Portland, Maine. Fairchild Semiconductor International, Inc. and Fairchild Semiconductor Corporation are referred to herein collectively as "Fairchild."

        ii.    **The Patents-in-suit**

4.  U.S. Patent No. 6,249,876 ("the '876 patent") is entitled "Frequency Jittering Control for Varying the Switching Frequency of a Power Supply" and was filed November 16, 1998. The '876 patent names Balu Balakrishnan, Alex Djenguerian and Leif Lund as its inventors and is assigned to Power Integrations. [PX-1.]

5.  U.S. Patent No. 6,107,851 ("the '851 patent") is entitled "Offline Converter with Integrated Softstart and Frequency Jitter" and was filed May 18, 1998. The '851 patent names Balu Balakrishnan, Alex Djenguerian and Leif Lund as its inventors and is assigned to Power Integrations. [PX-2.]

6.  U.S. Patent No. 6,229,366 ("the '366 patent") is entitled "Offline Converter with Integrated Softstart and Frequency Jitter" and was filed May 16, 2000 but is a divisional of, and claims priority to, the May 18, 1998 filing date of the '851 patent. The '366 patent also names Balu Balakrishnan, Alex Djenguerian and Leif Lund as its inventors and is assigned to Power Integrations. [PX-3.]

7. U.S. Patent No. 4,811,075 ("the '075 patent") is entitled "High Voltage MOS Transistors" and was filed April 24, 1987. The '075 patent names Klas H. Eklund as its inventor and is assigned to Power Integrations. [PX-4.]

   **iii.    Procedural History**

8. Power Integrations filed its complaint in this action on October 20, 2004, asserting that Fairchild willfully infringed one or more claims of each of the patents-in-suit. [D.I. 1.] In its amended answer, Fairchild asserted defenses of non-infringement, invalidity and unenforceability due to alleged inequitable conduct. [D.I. 198.]

9. After a first trial, on October 10, 2006, a jury returned the verdict that claim 1 of the '876 patent, claims 1 and 4 of the '851 patent, claims 9 and 14 of the '366 patent, and claims 1 and 5 of the '075 patent were willfully infringed by Fairchild's activities related to manufacturing and sales of power supply controller integrated circuits and awarded damages for that infringement. [D.I. 415.]

10. After a second trial, on September 21, 2007, a second jury returned the verdict that the asserted claims of the patents-in-suit were not invalid in view of the prior art presented by Fairchild at trial. [D.I. 555.]

    **iv.    Fairchild's Contentions Regarding Inequitable Conduct**

11. Now before the Court are Fairchild's contentions that the patents-in-suit should be held unenforceable due to alleged acts of inequitable conduct in the prosecution of the patents before the U.S. Patent and Trademark Office ("PTO"). Specifically Fairchild contends:

    A) That Power Integrations committed inequitable conduct with regard to the '876 patent because it failed to inform the PTO about an alleged public disclosure of the subject-matter described in Power Integrations' '851 patent that Fairchild contends occurred prior to the invention date of the

2

claimed invention of the '876 patent and that this alleged failure to disclose was made with the intent to deceive the PTO.

B) That Power Integrations committed inequitable conduct with regard to the '851 patent because it (1) made what Fairchild contends was a material misstatement to the PTO during prosecution concerning the prior art, or (2) failed to disclose what Fairchild contends was material information regarding Power Integrations' prior "SMP211" product, and that this alleged failure to disclose was made with the intent to deceive the PTO.

C)  That Power Integrations committed inequitable conduct with regard to the '366 patent because it failed to disclose to the PTO what Fairchild contends was material information regarding (1) Power Integrations' prior "SMP3" product or (2) Power Integrations prior "SMP240/260" products, and that this alleged failure to disclose was made with the intent to deceive the PTO.

D) That Dr. Klas Eklund committed inequitable conduct with regard to Power Integrations' '075 patent because he allegedly withheld art during prosecution, and that this alleged failure to disclose was made with the intent to deceive the PTO.

**B.**     **The '876 Patent**

REDACTED

REDACTED

14. In its briefing, Fairchild raised a new contention—that an alleged public disclosure of the '851 subject-matter occurred in "March of 1998." Although this contention was not plead with specificity in Fairchild's Amended Answer, the Court will address it.

15.

REDACTED

16. Fairchild has presented no evidence that any public disclosure in fact occurred . Fairchild has proffered no testimony from any witness testifying to such a disclosure and has provided no documentation of any kind confirming such a disclosure. Fairchild did not question either of Mr.

4

REDACTED

Balakrishnan's two co-inventors about the disclosure Fairchild now alleges. Fairchild instead asks the Court to infer such an event based on the fact that

.

17. In view of the un-contradicted testimony of Mr. Balakrishnan, which this Court finds credible, and the lack of any testimony or documents to support Fairchild's theory, the Court declines to infer

.

18. Fairchild also seeks to rely on a description of the subject matter of the '851 patent

It is not disputed that this description refers to the subject matter of the '851 patent. Nor is it disputed that substantially this same description is contained in the specification of the '876 patent.

19. Fairchild has not provided any testimony at all, expert or otherwise, that the description in the invention disclosure form would have been considered material to the claims of the '876 patent. Instead, Fairchild asks the Court to impute an adverse admission to Power Integrations based on

.

20. It is not disputed that the '876 invention disclosure form was prepared by the inventors of the '876 patent. Fairchild has offered no evidence that any of these inventors has had any legal training or any training regarding the legal standards for patentability or what constitutes "prior art" under the patent statute.

21.

Based on this testimony, which this Court finds credible, it is reasonable to conclude that the Power Integrations inventors were not referring to "prior art" in the legal sense, but in the sense of information the inventors themselves were

aware of as to their own prior work, regardless of whether such work had yet been made public. This conclusion is further supported by the testimony, cited above, that there was no public disclosure of the '851 patent's subject matter by Power Integrations

22. Accordingly, based on a review of the relevant documents and the testimony of Mr. Balakrishnan, the Court finds that it is not appropriate to infer a legal admission from the text of the '876 invention disclosure form that the '851 patent's subject matter is prior art to the '876 patent. Nor is it reasonable to infer that the Power Integrations inventors believed the '851 patent was prior art in a legal sense at the time they prepared the '876 invention disclosure form.

23. In view of all of the evidence in the record, including Mr. Balakrishnan's testimony, the Court's review of the invention disclosure forms, and the failure of Fairchild to provide any documents or testimony to confirm the inferences it argues, the Court finds that Fairchild has failed to meet its burden to establish that there was a public disclosure of the subject matter of the '851 patent before the invention by Power Integrations of the claimed subject matter of the '876 patent.

24. The Court further finds, based on all the evidence in the record, that the first public disclosure of the subject matter of the '851 patent did not occur       , after the '876 patent was filed.

25. Accordingly, because there was no public disclosure that constituted prior art to the claims of the '876 patent, the Court finds that there was no material information withheld from the PTO, and no misrepresentation made to the PTO, by Power Integrations during the prosecution of the '876 patent.

**C.    The '851 Patent**

    **i.    Alleged Misstatement During Prosecution**

26. The original application leading to the '851 patent contained two independent claims directed to the frequency variation feature; claims 1 and 29. [DX-106 at

FCS0000370, FCS0000377-78.]  These claims ultimately issued in the '851

patent as the two independent claims, 1 and 11, respectively.  [PX-2.]

27. Original claim 1 recited:

> 1.     A pulse width modulated switch comprising:
> a first terminal;
> a second terminal;
> a switch comprising a control input; said switch allowing a signal to be
> transmitted between said first terminal and said second terminal according to a
> drive signal provided at said control input;
> a frequency variation circuit that provides a frequency variation signal;
> an oscillator that provides an oscillation signal having a frequency range,
> said frequency of said oscillation signal varying within said frequency range
> according to said frequency variation signal, said oscillator further providing a
> maximum duty cycle signal comprising a first state and a second state; and
> a drive circuit that provides said drive signal when said maximum duty
> cycle signal is in the first state and a magnitude of said oscillation signal is below
> a variable threshold level.

[DX-106 at FCS0000370.]

28. After issuing a restriction requirement to which Power Integrations responded, the

examiner issued an office action on December 13, 1999.  [DX-106 at

FCS0000435-42.]  In the office action, the PTO examiner allowed original claim

1 as submitted.  The examiner further stated, under the heading "Allowable

Subject Matter", that "the prior art of record does not appear to disclose or

suggest a PWM switch comprising an oscillator for generating a maximum duty

cycle signal and a signal with a frequency range dependent on a frequency

variation circuit as recited in claim 1."  [DX-106 at FCS0000440.]

29. Original claim 29 recited:

> 29.     A regulation circuit comprising:
> a first terminal;
> a second terminal;
> a switch comprising a control input; said switch allowing a signal to be
> transmitted between said first terminal and said second terminal according to a
> drive signal provided at said control input;
> a frequency variation circuit that provides a frequency variation signal;

a drive circuit that provides said drive signal for a maximum time period of a time duration cycle;

wherein said time duration of said cycle varies according to said frequency variation signal.

[DX-106 at FCS0000377-78.]

30. In the December 13, 1999 office action, the examiner rejected original claim 29 on two bases. First, the examiner rejected the claim under 35 U.S.C. § 112 as indefinite, stating "in claim 29, the phrase 'that provides a drive signal for a maximum time period of a time duration signal' is not understood. If the drive signal were applied for the maximum period of the duration, the drive signal would always be applied." [DX-106 at FCS0000438.] Second, the examiner rejected claim 29 under 35 U.S.C. § 102(b) and stated "Applicant's Prior Art Fig. 1 shows a first terminal 95, a second terminal Com, a switch/drive circuit 90 and a frequency variation circuit 140 as recited in claim 29." [DX-106 at FCS0000439.] In the rejection in view of Figure 1, the examiner made no mention of the frequency variation signal or how such a signal was used to vary the time duration of the cycle. The obvious reason for this was because the examiner had already stated he did not understand the original language of the claim when making his rejection under § 112. The rejection based on Figure 1, however, cannot be read as an assertion by the examiner that the frequency variation circuit that provides a frequency variation signal was itself in the prior art, because he had already allowed claim 1 reciting that element over the disclosure of Figure 1.

31. In response to the December 13, 1999 office action, Power Integrations filed an amendment and response on March 20, 2000. [DX-106 at FCS0000444-50.] In this response, Power Integrations amended claim 29 to overcome both the examiner's rejections. Power Integrations amended the claim as follows (underlined material added; deleted material in brackets):

29. (Amended) A regulation circuit comprising:
a first terminal;
a second terminal;

a feedback terminal coupled to disable the regulation circuit:

a switch comprising a control input; said switch allowing a signal to be transmitted between said first terminal and said second terminal according to a drive signal provided at said control input;

a frequency variation circuit that provides a frequency variation signal;

an oscillator that provides an oscillation signal having a frequency range, said frequency of said oscillation signal varying within said frequency range according to said frequency variation signal, said oscillator further providing a maximum duty cycle signal comprising a first state and a second state; and

a drive circuit that provides said drive signal [for a maximum time period of a time duration cycle;] when said maximum duty cycle is in said first state and said regulation circuit is not disabled.

[wherein said time duration of said cycle varies according to said frequency variation signal.]

[DX-106 at FCS0000446-47.]

32. In addition to making the amendment, Power Integrations provided the following remarks:

35 U.S.C. § 112 Rejections

In the December 13, 1999 Office Action, claims 4-6, 9 and 29-37 were rejected under 35 U.S.C. § 112, second paragraph. The claims have been amended as suggested by the Office Action and the claim language identified as not being understood in the office action has been amended. Accordingly, the instant section 112 rejections are now moot.

35 U.S.C. §102 Rejections

In the December 13, 1999 Office Action, claims 29, 35 and 37 are rejected under 35 U.S.C. § 102 (b) as being anticipated by Applicants' Prior Art Figure 1. Claim 29 as presently amended now expressly recites a regulation circuit that includes an oscillator that provides a maximum duty cycle signal and an oscillation signal having a frequency range that is varied according to a frequency variation signal. The Applicants' Prior Art Figure 1 fails to disclose, teach or suggest such limitations. Accordingly, the Applicants respectfully submit that the instant section 102 rejection has been overcome.

[DX-106 at FCS0000449.]

33. In making the amendment to original claim 29, which thereafter issued as claim 11, Power Integrations replaced the "maximum time period of a time duration cycle" language that the examiner had not understood, with the oscillator and maximum duty cycle language from original claim 1 which the examiner had

already allowed. In making its remarks, Power Integrations simply quoted back to the examiner his own statement about the lack of disclosure in Figure 1.

34.

REDACTED

35. Fairchild alleges that this file history suggests that the PTO examiner allowed the claims because he was unaware of prior art showing oscillators that provided maximum duty cycle signals. In support of this argument, Fairchild suggests that the examiner's statement "the prior art of record does not appear to disclose or suggest a PWM switch comprising an oscillator for generating a maximum duty cycle signal and a signal with a frequency range dependent on a frequency variation circuit as recited in claim 1" was somehow "partially" incorrect because the first half of the sentence "an oscillator for generating a maximum duty cycle signal" was known in the prior art. The Court finds that such a reading of the examiner's statement is incorrect—both as a matter of grammar and logic. It is improper to interpret the examiner's statement as asserting that two independent features—an oscillator generating a maximum duty cycle signal on the one had and a signal with a frequency range dependent on a frequency variation signal on the other—were both, independently absent from the prior art. The phrase must be read as a whole, just as the limitations of the claim must be read as a whole and can only be reasonably understood as stating that the entire combination of elements (and the other claim elements of which they were part) was not found in the prior art.

36. This understanding of the examiner's statement is also the only reasonable interpretation in light of the other evidence in the record. Specifically, all the technical witnesses,

, and Fairchild's technical expert Dr. Horowitz, all

10

consistently testified that, at the time of the '851 prosecution, oscillators that generated maximum duty cycle signals were well known components of conventional pulse width modulation controllers. [D.I. 561 (Trial Tr. 9/24/07) at 162:23-163:10 (Dr. Horowitz agreeing that "an oscillator generating a maximum duty cycle signal was fairly conventional at the time [the '851] patent was filed"); D.I. 557 (Trial Tr. 9/19/07) at 738:7-10, 738:17-22, 740:22-741:3, 747:2-748:4, 810:14-18, 811:6-13, 816:4-5, 816:16-22 (Dr. Horowitz explaining in each case that the SMP211's oscillator generating a maximum duty cycle signal was well known in the prior art.);

REDACTED

In view of this testimony, and the legal authority that the patent examiner must be presumed to be a person of skill in the art, the Court finds that the patent examiner must have been aware that such oscillators were conventional in the art when he allowed the claims to issue.

37. In addition, as discussed in more detail below, the examiner had before him during prosecution several references that disclosed oscillators with maximum duty cycle signals in the context of PWM controllers. [*See, e.g.,* PX-19; PX-394; PX-395.] The examiner indicated that he had reviewed these references by checking them off on an information disclosure statement in August of 1999, before issuing his December 13, 1999 office action. [DX-106 at FCS0000410-13.] This is further support for the Court's conclusion that the examiner was aware of the conventional nature of oscillators providing maximum duty cycle signals and that such a limitation, in and of itself, would not have been considered relevant to patentability by a reasonable examiner at the time.

38.

REDACTED

39. During the claim construction portion of this case, the Court construed the claim terms "frequency variation circuit" and "frequency variation signal" and determined that these terms could not be construed so broadly as to read on the type of frequency change shown in Figure 1 of the '851 patent and described with reference to that figure in the text. [D.I. 231 at 34-37.] It would similarly not be reasonable to conclude that the patent examiner would have construed these limitations more broadly to read on the disclosed "Prior Art" of Figure 1.

40. The Court finds, that when read in its entirety, as it must be, the examiner's statement that "the prior art of record does not appear to disclose or suggest a PWM switch comprising an oscillator for generating a maximum duty cycle signal and a signal with a frequency range dependent on a frequency variation circuit as recited in claim 1", which prior art included Figure 1 of the '851 patent, is a correct statement. Indeed, Fairchild did not assert at trial that the prior art of record itself invalidated any of the claims of the '851 patent but, instead, relied on prior art that was not considered during prosecution.

41. The Court also finds that Power Integrations' remarks in response to the PTO regarding the teaching of Figure 1 did not include any misstatement of fact. Because these statements simply reflected the examiner's correct understanding of the prior art, they cannot be considered material to patentability.

42. In view of the foregoing, and particularly the testimony of Mr. Balakrishnan which this Court finds credible, the Court further finds that, at the time it made the statements to the PTO that Fairchild complains of, Power Integrations believed the statements to be true and correct. Therefore, in light of all of the record evidence, the Court finds no intent to deceive the PTO on the part of Power Integrations in making the statements.

**ii.     Allegation Regarding the SMP211**

43. The '851 patent includes Figure 1 that is labeled "Prior Art." The block in Figure 1 indicated with reference number 90, also includes a label below its bottom right corner that reads "SMP211." [PX-2 at Fig.1.]

44. It is undisputed that the reference to "SMP211" refers to a prior product of Power Integrations by that name. This product is described in DX-76 which is of record before the Court. It is also undisputed that the SMP211 and the information describing it was available to the public prior to the filing of the application leading to the '851 patent. It is also undisputed that the SMP211, which Fairchild's expert described as an example of a "conventional" PWM controller, included as one of its components an oscillator that generated a maximum duty cycle signal.

45. As noted above, all the technical witnesses testified consistently that oscillators that generated maximum duty cycle signals were conventional in the art as of the time of the prosecution of the '851 patent. [*See* citations *supra* at ¶ 36.] The Court finds that oscillators with maximum duty cycle signals were conventional at the relevant time. The Court further finds that the examiner who allowed the

13

claims of the '851 patent would have been aware of the conventional nature of these circuit components.

46. As noted above, the Court finds that the existence of an oscillator with a maximum duty cycle signal, *per se*, was not material to the patentability of the claims of the '851 patent. Accordingly, the Court finds that the datasheet of the SMP211 showing that it contained such an oscillator was also not material to patentability of the claims.

47. Even if the details of the SMP211, and specifically that it included an oscillator with a maximum duty cycle signal, were material to the claims, the examiner was already aware of such prior art technology. In addition to the basic knowledge of a person of ordinary skill, the examiner had before him during prosecution at least 3 references that disclosed such oscillators. [PX-19; PX-394; PX-395.]

48. During trial, Fairchild's expert was unable to dispute that the Pelly article [PX-19 at PIF08770], U.S. Patent No. 5,313,381 [PX-394 at Fig. 3], and U.S. Patent No. 5,461,303 [PX-395 at Fig. 2] all disclosed PWM controller devices which incorporated an oscillator with a maximum duty cycle signal. [D.I. 561 (Trial Tr. 9/24/07) at 163:20-165:9 (stating that he could not dispute that the Pelly article labeled PX-19 had a maximum duty signal cycle), 165:11-167:10 (discussing the '381 patent and its maximum duty signal cycle), 167:11-168:22 (discussing the '303 patent and its maximum duty signal cycle).]

49. The '381 patent and the '303 patent are earlier patents of Power Integrations that were cited to the PTO during prosecution of the '851 patent. The Court finds that the oscillator shown in these two patents is substantially identical to the oscillator contained in the SMP211. [*Compare* PX-394 at Fig. 3 and PX-395 at Fig. 2 *with* DX-76 at Fig. 3]

50. The Court finds that the information about the SMP211 as shown for example in DX-76, would have been merely cumulative of the prior art already before the examiner during prosecution of the '851 patent.

51. During trial, Mr. Balakrishnan testified that he did not believe the PTO examiner allowed the claims of the '851 patent because the examiner was unaware that the SMP211 contained an oscillator with a maximum duty cycle signal. [D.I. 557 (Trial Tr. 9/19/07) at 883:14-18.]

REDACTED

52. The Court finds, in view of all the record evidence, including Mr. Balakrishnan's testimony, the fact that by putting the indication "SMP211" in the patent figure itself allowing the examiner to locate the data sheet if he so chose, and the fact that Power Integrations cited at least three references having substantially the same disclosure as the SMP211, that Power Integrations had no intent to deceive the PTO when it failed to provide a copy of the SMP211 datasheet during prosecution of the '851 patent.

**D.    The '366 Patent**

**i.    Allegation regarding the SMP3**

53. The '366 patent is a divisional of the '851 patent and, as such, includes the same disclosure in its specification. [PX-3.] Rather than focusing on the "frequency variation" feature, however, the independent claims of the '366 patent are focused on the disclosed "soft start" functionality and all claim a "soft start circuit." [*See, e.g.,* PX-3 at claim 1.]

54. During the claim construction phase of this case, Fairchild asserted that the claim term "soft start circuit" must be construed broadly to encompass any circuit structures capable of performing a soft start function. Based on the specification, however, the Court concluded that such construction was incorrect, and in fact, would not be a reasonable construction because it would cause the claim to read on the very same prior art disclosed in Figure 1 of the '366 patent and expressly distinguished from the invention in the text of the patent. Accordingly, the Court

concluded that the claimed "soft start circuit" was a "means-plus-function" element subject to interpretation under 35 U.S.C. § 112(6). [D.I. 231 at 28-34.] The Court further concluded that the structure corresponding to the claimed soft start circuit was shown in, for example, Figure 3, and the accompanying text. [*Id.* at 32-34.] In light of arguments at trial, however, the Court believes that it would be useful to note, and is apparently undisputed, that this structure includes the three circuit components inside the box labeled "soft start" in Figure 3.

55. Consistent with its decision on claim construction, the Court finds that its construction of "soft start circuit" as subject to application of 35 U.S.C. § 112(6) is the broadest reasonable construction in light of the intrinsic record and that no reasonable examiner would have construed the term as Fairchild suggested because such a construction would have made the claim unpatentable in view of the admitted prior art discussed in the figure and text of the patent itself.

56. Fairchild asserts that another prior Power Integrations product, designated "SMP3," would have been material to the patentability of the claims of the '366 patent. It is undisputed that the SMP3, as described for example in datasheets such as DX-77, was available to the public prior to the prosecution of the '366 patent. There is also no dispute that the datasheet for the SMP3 was not disclosed to the PTO during prosecution of the '366 patent.

57. It is undisputed that the SMP3 datasheet does not mention a soft start function and has no disclosure or suggestion that the SMP3 had such a feature. As such, the SMP3 datasheet could not have been material to the patentability of the claims of the '366 patent.

REDACTED

REDACTED

59. Power Integrations' circuit expert, Mr. Blauschild, also reviewed the internal circuit schematics and came to the conclusion that the product was not capable of performing a soft start function. [Blauschild Rebuttal Report at ¶ 62.]

60. Fairchild's own expert, Dr. Horowitz, also admitted that the circuit as shown in the detailed circuit schematics would not be able to perform a soft start function. [D.I. 561 (Trial Tr. 9/24/07) at 176:20-177:7.] Dr. Horowitz hypothesized that it might be possible to modify the circuit to perform some sort of soft start function, but had no knowledge of any such modification ever having been made. [*Id.* at 175:8-176:19; D.I. 557 (Trial Tr. 9/19/07) at 826:14-20.]

61. In view of all of the evidence directly relevant to the actual functioning of the SMP3, the Court finds that the SMP3 product, as available to the public and sold, did not incorporate a soft start function at all and, therefore, could not have been material to the patentability of the claims of the '366 patent.

62. Instead of providing evidence directly about the actual circuit of the SMP3 itself, Fairchild relies on an article written by a third party allegedly describing the SMP3. [DX-17.] Mr. Balakrishnan and Mr. Blauschild both explained, however, that the description of the SMP3 in the "Goodenough" article, was mistaken in its description of the operation of the SMP3 as including a soft start function. [Blauschild Rebuttal Rpt. at ¶¶ 62, 65; Balakrishnan Tr. 11/23/05 at 547-587.] In view of the evidence noted above, the statement in the Goodenough article, DX-17, is insufficient to support the conclusion that the SMP3, in fact, was capable of performing a soft start function.

63. As noted above, the broadest reasonable construction of the claimed soft start circuit of the '366 patent requires that the circuit perform the recited function using the structures disclosed in the specification or their equivalents. Fairchild

presented no testimony, from its expert Dr. Horowitz, or any other source, that the circuit of the SMP3 that Dr. Horowitz identified as a soft start circuit, included any of the specific structures required by the claims. Power Integrations' expert, Mr. Blauschild, affirmatively explained that the circuit identified by Dr. Horowitz included none of the required structures. [Blauschild Rebuttal Rpt. at ¶ 77.]

64. During trial, Mr. Blauschild and Mr. Balakrishnan described the prior art, "conventional" implementation of a soft start function as involving a circuit that modifies the feedback signal of the power supply to bring about a slow ramp up of switch pulses at power up. [D.I. 557 (Trial Tr. 9/19/07) at 890:16-893:21 (testimony of Mr. Balakrishnan); D.I. 558 (Trial Tr. 9/20/07) at 1048:9-1049:3, 1054:18-1055:13 (testimony of Mr. Blauschild).] A form of this conventional method is disclosed in Figure 1 of the '366 patent and distinguished in the text as different from the claimed soft start circuit. [PX-3 at PIF00219, PIF002228, PIF002230.] Mr. Balakrishnan testified to the advantage of the patented circuit over the conventional prior art. [D.I. 557 (Trial Tr. 9/19/07) at 892:9-14.]

65. Mr. Blauschild also testified during trial that such conventional soft start functionality was also discussed in another prior art reference of record before the PTO during prosecution, the "Pelly article." [D.I. 558 (Trial Tr. 9/20/07) at 1049:22-1050:18; PX-19.] Mr. Blauschild testified as to the significance of having a second, independent, soft start comparator in the soft start circuit structure as distinguishing over and improving upon the prior art conventional method. [D.I. 558 (Trial Tr. 9/20/07) at 1051:21-1054:5.]

66. Dr. Horowitz also admitted that, if the SMP3 if fact performed a feedback function as he hypothesized, that function would be performed by modifying the feedback signal using an external capacitor. [D.I. 561 (Trial Tr. 9/24/07) at 177:8-15.] In other words, even if the SMP3 were modified as Dr. Horowitz suggested to perform a soft start function, the implementation would be the same as what Mr. Blauschild and Mr. Balakrishnan described as "conventional."

67. The Court further finds that the SMP3 would not have been material to patentability of the '366 patent, even if it could be considered to have embodied or disclosed something about a soft start function, because any such disclosure or function, including the statement in the Goodenough article, would have been cumulative of prior art already before the PTO, including specifically the Pelly article, PX-19.

68.

REDACTED

69. The Court further finds that, in light of all the evidence, including the evidence of the actual function and operation of the SMP3, its internal circuits, and Power Integrations' knowledge of them at the relevant time, that there was no intent to deceive the PTO on the part of Power Integrations by not providing information concerning the SMP3, including DX-76 or DX-17, to the PTO.

**ii.    Allegation regarding the SMP240/260**

70. Fairchild asserts that another prior Power Integrations product, designated "SMP240" or "SMP260," would have been material to the patentability of the claims of the '366 patent. It is undisputed that the SMP240/260, as described for example in datasheets such as DX-70, was available to the public prior to the prosecution of the '366 patent. There is also no dispute that the datasheet for the SMP240/260 was not disclosed to the PTO during prosecution of the '366 patent.

71. During trial, Power Integrations expert, Mr. Blauschild, testified that the SMP240/260 performed a soft start function by modifying the feedback signal of

the controller.  [D.I. 558 (Trial Tr. 9/20/07) at 1048:9-1050:18, 1054:6-1057:21.]
Mr. Blauschild testified that such a methodology was similar to the conventional
method shown, for example, in the Pelly article.  [*Id.*]

72. Mr. Blauschild further testified that the circuit in the SMP240/260 responsible for
performing soft start contained none of the structures disclosed in the
specification of the '366 patent and was not equivalent.  [*Id.* at 1055:21-1056:16.]

73. Fairchild's expert, Dr. Horowitz, also failed to identify during his testimony any
specific structures in the SMP240/260 that were allegedly the same or equivalent
to the disclosed structures for the '366 patent soft start circuit.

74. Mr. Balakrishnan also testified as to his knowledge of the SMP240/260 and how
it was both conventional in its approach to soft start and different from the
invention of the '366 patent.  [*Id.* at 902:19-903:10.]

75. Rather than address any of this evidence, Fairchild attempts to establish the
materiality of the SMP240/260 by quoting from the deposition testimony of one
of the inventors, Leif Lund, who was also a principal designer on the
SMP240/260.  Fairchild asserts that this testimony amounts to admissions by
Power Integrations that all the elements of at least claim 1 of the '366 patent were
present in the SMP240/260.  Fairchild's selective quotation of the deposition
record, however, is insufficient to support such an admission.  Indeed, the
questions Fairchild seeks to rely upon were objected to by Power Integrations'
counsel as vague and ambiguous in their use of claim terminology.  The Court
agrees.  Because Fairchild never asked the witness whether certain elements, *as
described and claimed in the '366 patent*, were present in the SMP240/260, but
rather appeared to ask more generic questions of the inventor, the answers cannot
constitute the admissions Fairchild seeks.


REDACTED


20

REDACTED

Accordingly, the Court finds that Mr. Lund's testimony does not constitute an admission and cannot support Fairchild's burden of establishing materiality.

76. During trial, on cross-examination of Fairchild's expert, Power Integrations showed Dr. Horowitz a Power Integrations patent, U.S. Patent 5,245,526, that was in front of the PTO during prosecution of the '366 patent. [Trial Tr. 9/19/07 at 848:16-850:13.] Although, after reviewing the patent over a break, Dr. Horowitz testified that the patent did not disclose the entire circuit of the SMP260, he did admit that the patent described the internal circuitry of the SMP260 device, including the "summing junction" that formed part of what he identified as the "soft start circuit" of the device. [*Id.* at 860:20-861:1, 862:5-23.]

77. In view of all of the evidence concerning the actual circuitry of the SMP240/260 and how it compared to the prior art that was in front of the PTO during prosecution, the Court finds that the SMP240/260 was not material to the patentability and was merely cumulative of other prior art of record.

78.

REDACTED

79.

80.

REDACTED

81. In view of all the evidence of record, the Court finds that Fairchild has failed to establish that the failure to disclose the SMP240/260 or its datasheet to the PTO during prosecution of the '366 patent was done with any intent to deceive the PTO.

E.    **The '075 Patent**

82. Dr. Klas Eklund filed for his first U.S. Patent on April 24, 1987. That application matured into U.S. Patent No. 4,811,075, which issued on March 7, 1989.

83. Fairchild does not contend that Dr. Eklund made any material misrepresentations during the course of prosecuting the '075 patent, and the Court finds that Dr. Eklund did not make made any misrepresentations or misleading statements during the prosecution of his first U.S. Patent, the '075 patent.

84. In the background section of the '075 patent, Dr. Eklund explained the state of the art and summarized the prior art. Specifically, at column 1, lines 15-50, Dr. Eklund's patent explains the prior art and its significant limitations. As Dr. Eklund testified at trial, this description included an averaging of the performance characteristics of the art in his possession at that time, which provided a base line against which to demonstrate the significant improvements of the claimed invention. [D.I. 560 (Trial Tr. 9/21/07) at 5:21-6:1, 7:14-21, 13:12-20, 16:13-17:5, 18:2-9, 19:8-14, 25:19-26:15.] Dr. Eklund further testified that he believed this description disclosed the art he had in his possession at that time, including

specifically the Wakaumi, Ludikhuize, and other references he surveyed when he
first began his work on what ultimately became the '075 patent.

85. Fairchild's process technology expert, Dr. Peter Gwozdz, admitted at trial that Dr.
Eklund's description in the background of the patent "certainly" disclosed the
structure of conventional high voltage MOS transistors like Wakaumi and the
other references identified in Dr. Eklund's initial market survey. [D.I. 556 (Trial
Tr. 9/18/07) at 541:16-542:21.]

86. At trial, Fairchild relied extensively on the testimony of an alleged prior inventor
of the technology of the '075 patent, Mr. James Beasom, who copied Dr.
Eklund's claim into a later patent application verbatim. There is no dispute that
Mr. Beasom knew about the Wakaumi and Ludikhuize papers during the
prosecution of his patents, as he presented at the IEDM conferences during the
sessions when these papers were presented in 1982 and 1983. [D.I. 556 (Trial Tr.
9/18/07) at 298:8-304:19.] Nevertheless, Mr. Beasom did not submit the
Wakaumi or Ludikhuize articles (or any articles, IEDM or otherwise) to the patent
office during the prosecution of his patents. [*Id.*] When asked about this art at
trial, Mr. Beasom admitted the references did not disclose the invention [*id.*], and
Mr. Beasom also confirmed that an extended drain region going both ways from
the drain was "quite common" in the art. [D.I. 556 (Trial Tr. 9/18/07) at 304:20-
306:4.] Mr. Beasom also admitted that he would not submit references disclosing
such common structures when applying for patents. [D.I. 556 (Trial Tr. 9/18/07)
at 306:5-16.] The Court credits Mr. Beasom's testimony and finds that the
Wakaumi and Ludikhuize references taught conventional high voltage MOS
technology, were not material, and had no bearing on the '075 patent.

87. Despite the evidence from Fairchild expert Dr. Gwozdz and its alleged prior
inventor James Beasom, Fairchild contends that Dr. Eklund committed
inequitable conduct by not submitting the prior art articles described above during
the course of prosecuting the '075 patent. In view of the evidence of Dr. Eklund's
disclosure in the background of the patent, and the testimony of Dr. Eklund, Dr.

Gwozdz, and James Beasom, the Court finds that Dr. Eklund did not withhold any material, non-cumulative art during the prosecution of the '075 patent.

88. Fairchild did not present any persuasive evidence that Dr. Eklund intended to deceive the patent office during the course of prosecuting the '075 patent, much less the sort of clear and convincing evidence necessary to render the patent unenforceable. Fairchild did not identify any misstatement to support a finding of intent, and Fairchild can point to no evidence – beyond the contentions with respect to the disclosed prior art addressed above – to demonstrate an intent to deceive. Instead, Fairchild makes a number of unsupported charges on unrelated issues such as Dr. Eklund's compensation, communications with potential investors, and deposition testimony in this case. The Court finds that Fairchild's arguments do not evidence an intent to mislead the patent office.

## II.    CONCLUSIONS OF LAW

### A.    '876 Patent

1. In light of the applicable legal standards governing materiality, the Court finds that, because there was no public disclosure of the subject-matter of the '851 patent prior to the invention of the claims of the '876 patent, there was no "prior art" to disclose and, therefore, no failure by Power Integrations to disclose material information to the patent office.

2. The Court concludes that Fairchild has failed to meet its burden of proof on the essential materiality element and, accordingly, the Court need not reach the issue of intent. *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("In view of our holding that a public use bar is not supportable on the evidence that was adduced, the failure to tell the examiner about this purported bar can not be deemed material and culpable." (internal quotations and citation omitted)).

3. Therefore, Fairchild's claim that Power Integrations committed inequitable conduct in the prosecution of the '876 patent has not been established; the '876 patent is enforceable.

**B.     '851 Patent**

4.   The doctrine of "infectious unenforceability," whereby closely related patents are invalidated on the ground of inequitable conduct committed in the prosecution of one of the related patents, applies in the reverse, and demonstrated lack of inequitable conduct on one patent necessarily means that the same type of inequitable conduct must be rejected with respect to the closely related patents. *Mosaid Technologies Inc. v. Samsung Electronics Co.*, 362 F. Supp. 2d 526, 555 (D.N.J. 2005) (holding that the lack of inequitable conduct on one patent meant that infectious unenforceability was "perforce rejected").  Thus, the Court concludes that a finding of no inequitable conduct on the '851 patent with respect to frequency variation will apply to the same subject matter in the '366 patent. Similarly, the Court concludes that a determination of no inequitable conduct on the '366 patent's soft-start claims will preclude a finding of inequitable conduct on the '851 soft-start circuit.

5.   The mere grant of reexamination is insufficient to establish the materiality of a reference.  *See Lummus Industries, Inc. v. D.M. & E Corp.*, 862 F.2d 267, 273 (Fed. Cir. 1988) (holding that even a rejection of claims after reexamination does not establish per se high materiality for a finding of inequitable conduct).  Since none of the claims of the '851 patent have been rejected on the basis of the undisclosed referenced, the Court declines to find materiality from the mere grant of reexamination.

6.   The Court's conclusion that reexamination is insufficient to support a materiality determination is further confirmed by the different standards of materiality for granting a reexamination and for finding inequitable conduct.  Grants of reexamination are almost automatic and requires only "a substantial *likelihood* that a *reasonable* examiner would *consider* the prior art . . . *important* in deciding whether or not the claim is patentable."  U.S. PTO, MPEP § 2242 (8th ed., rev. 5, Aug. 2006) (emphasis added); *see also Ethicon, Inc. v. Quigg*, 849 F.2d 1422,

1427 (Fed. Cir. 1988). On the other hand, a materiality finding for inequitable conduct requires clear and convincing evidence.

7.  In order to breach the duty of candor, the patentee must either: (1) make "an affirmative misrepresentations of material facts;" (2) fail "to disclose material information;" or (3) submit "false material information." *See Honeywell Intern. Inc. v. Universal Avionics Systems Corp.*, 488 F.3d 982, 999 (Fed. Cir. 2007). Because the Court concludes that Power Integrations' statements regarding amended claim 29 (issued claim 11) were factually correct, they cannot be considered either "an affirmative misrepresentation" or a submission of "false material information." Furthermore, because Power Integrations' statement was an accurate statement of the state of the prior art when considered as a whole, rather than dissected into discrete clauses as Fairchild suggests, it cannot be considered an affirmative misrepresentation. As such, Power Integrations' statements during prosecution do not constitute any of the types of actions which are required to show a violation of the duty of candor. Therefore, the Court concludes that Power Integrations' statement with respect to amended claim 29 was not material to patentability and was not misleading.

8.  The Court finds no evidence of any intent by Power Integrations to deceive the PTO. In light of their context, the nature of Power Integrations' statements support a strong inference that Power Integrations did not intend to deceive the Patent Office, and acted in good faith. *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 745 (Fed. Cir. 2002) ("Whether the statements in the Bowers declaration were false or misleading is irrelevant to our inquiry, however, because Orange Bang failed to present any evidence that the Strattons knew or considered the Bowers declaration to contain anything untrue or that the declaration was submitted with any intent to mislead the examiner."); *Key Pharm., Inc. v. Hercon Labs. Corp.*, 981 F. Supp. 299, 317 (D. Del. 1997) (finding insufficient intent where "[claimant] produced no evidence that suggests that [applicant] did not believe that he had appropriately brought the Kokais to the attention of the PTO by submitting the abstracts"); *Allen Engineering Corp. v. Bartell Indus., Inc.*, 299

F.3d 1336, 1351 (Fed. Cir. 2002) (rejecting inequitable conduct because claimant "has provided no direct evidence that [applicant] withheld information about the [prototype] with an intent to deceive the PTO").

9.  In light of the applicable legal standards governing materiality and Power Integrations' disclosure of prior art with identical teachings, the Court also concludes that the SMP211 datasheet was not material to the claims presented in the '366 application. *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1110 (Fed. Cir. 2001) ("The ALJ found that the subject matter contained in these references was before the patent examiner in a cited Netherlands patent and Japanese publication.  References cumulative to cited references do not raise issues of withholding of material prior art."); *Dayco Products, Inc. v. Total Containment Inc.*, 329 F.3d 1358, 1367 (holding that "prior art or information was not material . . . because it is less pertinent than or merely cumulative with prior art or information cited to or by the PTO"); *Lifescan, Inc. v. Home Diagnostics, Inc.*, 103 F. Supp. 2d 379, 384 (D. Del. 2000) ("[A]n otherwise material reference need not be disclosed if it is cumulative or less material than other references already disclosed.").

10.  The Court finds that there is no evidence that, in failing to submit the SMP211 datasheet, Power Integrations intended to deceive the Patent Office.  The fact that Power Integrations disclosed references that render the SMP211 datasheet cumulative, and the fact that Power Integrations labeled its Figure with "SMP211", thereby providing the examiner the ability to find the datasheet if he so chose, demonstrates Power Integrations' good faith and lack of deceptive intent. *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1384 (Fed. Cir. 1998) ("Our confidence in [finding intent] is undermined, however, when we afford weight to the inference running contrary to deceitful intent that must be drawn from Container's disclosure of the Katz application to the Venus application's examiner."); *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1442 (Fed. Cir. 1991) (finding no inequitable conduct, even though applicant was aware of withheld reference and noting that "a mere

showing that references having some degree of materiality were not disclosed does not establish inequitable conduct"); *Dayco Products Inc. v. Total Containment Inc.*, 329 F.3d 1358, 1367 (Fed. Cir. 2003) ("However, inequitable conduct requires not intent to withhold, but rather intent to deceive. Intent to deceive cannot be inferred simply from the decision to withhold the reference where the reasons given for the withholding are plausible.").

11. Even if there were threshold showings of materiality and intent, the balance of materiality and intent with the additional factor of Power Integrations' good faith and reasonable belief in its disclosure of all relevant prior art leads this Court to conclude that Power Integrations' conduct was not of sufficient culpability as to render the '851 patent unenforceable. *See Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*, 438 F.3d 1123, 1128-1129 (Fed. Cir. 2006) (reversing inequitable conduct finding because balancing of a low level of materiality combined with a low level of intent offset by evidence of good faith could not support district courts holding).

12. The Court further finds that even if the alleged instances of inequitable conduct were combined, there is no evidence of any type of pattern from which to infer that Power Integrations acted with deceptive intent. To the contrary, Power Integrations' multiple disclosures in compliance with its duty of candor and good faith lead to the conclusion that it acted with good faith. Fairchild has not shown with clear and convincing evidence that Power Integrations was so culpable that the '851 patent must be held unenforceable. *Merck & Co. v. Teva Pharm. USA, Inc.*, 288 F. Supp. 2d 601, 631 (D. Del. 2003) ( "[Claimants] must prove, by clear and convincing evidence, that material information was intentionally withheld for the purpose of the misleading or deceiving the examiner.").

13. Therefore, Fairchild's claim that the Power Integrations committed inequitable conduct in the prosecution of the '851 patent has not been established; the '851 patent is enforceable.

C.　　'366 Patent

14. The mere grant of reexamination is insufficient to establish the materiality of a reference. *See Lummus Industries, Inc. v. D.M. & E Corp.*, 862 F.2d 267, 273 (Fed. Cir. 1988) (holding that even a rejection of claims after reexamination does not establish per se high materiality for a finding of inequitable conduct). Since none of the claims of the '366 patent have been rejected on the basis of the undisclosed referenced, the Court declines to find materiality from the mere grant of reexamination.

15. The Court's conclusion that reexamination is insufficient to support a materiality determination is further confirmed by the different standards of materiality for granting a reexamination and for finding inequitable conduct. Grants of reexamination are almost automatic and requires only "a substantial *likelihood* that a *reasonable* examiner would *consider* the prior art . . . *important* in deciding whether or not the claim is patentable." USPTO, MPEP § 2242 (8th ed., rev. 5, Aug. 2006) (emphasis added); *see also Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1427 (Fed. Cir. 1988). On the other hand, a materiality finding for inequitable conduct requires clear and convincing evidence.

16. In light of the applicable legal standards governing materiality, and that the only claim construction a reasonable examiner would employ for the '366 patent soft start circuit would be one based on means plus function, the Court concludes that because the SMP3 did perform a soft start function and did not contain any of the structures required by the teachings of the '366 patent, the SMP3 is not material prior art. The Court further concludes that the SMP3 would also not have been material because it was cumulative of the Pelly article already disclosed the PTO.

17. Similarly, the Court concludes that the SMP240/260 was not material prior because it too contained none of the required structures of the '366 patent. Moreover, the Court concludes that the SMP240/260 was not material because it was cumulative of references already before the PTO, including the Pelly article and the '526 patent. 37 C.F.R. § 1.56(b) (2003) ("information is material to

patentability when it is not cumulative to information already of record or being made of record in the application.").

18. Because none of the reference relied upon by Fairchild are material, the Court concludes that Fairchild has failed to meet its burden of proof on the essential materiality element. *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("'In view of our holding that a public use bar is not supportable on the evidence that was adduced, the failure to tell the examiner about this purported bar can not be deemed material and culpable.'")

19. The Court further concludes that there is no evidence that, in failing to submit the SMP3 datasheet, Power Integrations intended to deceive the Patent Office.  The fact that the '366 patent taught a new method of performing soft start and the fact that the SMP3 did not perform even a conventional prior art method of soft start, demonstrates Power Integrations' lack of intent to even *withhold* prior art (let alone intent to deceive the PTO) as the inventors' had a good faith and reasonable basis to believe, and correctly so, that the SMP3 was not material.  Further, Power Integrations had disclosed multiple references that would have rendered the SMP3 cumulative, even if it had contained a soft start feature. *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1384 (Fed. Cir. 1998) ("Our confidence in [finding intent] is undermined, however, when we afford weight to the inference running contrary to deceitful intent that must be drawn from Container's disclosure of the Katz application to the Venus application's examiner.")

20. The Court additionally concludes that there is insufficient evidence to support the inference that, in failing to submit the SMP240/260 datasheet, Power Integrations intended to deceive the Patent Office.  The fact that Power Integrations disclosed references that render the SMP240/260 datasheet cumulative, the inventor's credible testimony as to their lack of recollection of the SMP240/260 soft start feature at the relevant time and their belief of the differences between the SMP240/260 and their claimed '366 invention, demonstrates Power Integrations'

good faith and lack of deceptive intent. *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1384 (Fed. Cir. 1998); *Halliburton*, 925 F.2d at 1442 (holding no inequitable conduct, even though applicant was aware of withheld reference, "a mere showing that references having some degree of materiality were not disclosed does not establish inequitable conduct"); *Dayco Products Inc. v. Total Containment Inc.*, 329 F.3d 1358, 1367 (Fed. Cir. 2003) ("However, inequitable conduct requires not intent to withhold, but rather intent to deceive. Intent to deceive cannot be inferred simply from the decision to withhold the reference where the reasons given for the withholding are plausible.").

21. Even if there were threshold showings of materiality and intent, the balance of materiality and intent with the additional factor of Power Integrations' good faith and reasonable belief in its disclosure of all relevant prior art, leads this Court to conclude that Power Integrations' conduct was not of sufficient culpability as to render the '366 patent unenforceable. *See Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*, 438 F.3d 1123, 1128-1129 (Fed. Cir. 2006) (reversing inequitable conduct finding because balancing of a low level of materiality combined with a low level of intent offset by evidence of good faith could not support district courts holding).

22. The Court further finds that even if the alleged instances of inequitable conduct were combined, there is no evidence of any type of pattern from which to infer that Power Integrations acted with deceptive intent. To the contrary, Power Integrations' multiple disclosures in compliance with its duty of candor and good faith lead to the conclusion that it acted with good faith. Fairchild has not shown with clear and convincing evidence that Power Integrations was so culpable that the '366 patent must be held unenforceable. *Merck & Co. v. Teva Pharm. USA, Inc.*, 288 F. Supp. 2d 601, 631 (D. Del. 2003) ( "[Claimants] must prove, by clear and convincing evidence, that material information was intentionally withheld for the purpose of the misleading or deceiving the examiner.").

23. Therefore, Fairchild's claim that the Power Integrations committed inequitable conduct in the prosecution of the '366 patent has not been established; the '366 patent is enforceable.

24. Further, the Court concludes that its ruling of no inequitable conduct on the '851 patent applies to the common subject matter in the '366 patent, and therefore finds no inequitable conduct by Power Integrations in failing to disclose the SMP211 during prosecution of the '851 or '366 patent. Similarly, the Court concludes that its determination of no inequitable conduct on the '366 patent claims applies to the common subject matter in the '851 patent and finds no inequitable conduct by Power Integrations in failing to disclose the SMP3 or SMP240/260 during prosecution of the '851or '366 patent.

**D.     '075 Patent**

25. The Court concludes that Dr. Klas Eklund did not make any material misstatements during the course of the prosecution of the '075 patent.

26. The Court finds no failure by Dr. Klas Eklund to disclose material, non-cumulative information to the patent office during the prosecution of the '075 patent. Dr. Eklund disclosed the relevant teachings of the prior art he was aware of, including those two primary references Fairchild relies upon (Wakaumi and Ludikhuize) and an average of the characteristics of other prior art high voltage MOS transistors, in the background section of the specification to his patent. Fairchild's expert recognized that the description in the background "certainly" disclosed the known prior art structures.

27. The Court concludes that the evidence is insufficient to support the inference that Dr. Eklund intended to deceive the Patent Office when he submitted a description of the art rather than submitting the articles identified in his initial marketplace survey, particularly when viewed in light of Dr. Eklund's testimony that he believed he properly disclosed the art in the background section. *Dayco Products Inc. v. Total Containment Inc.*, 329 F.3d 1358, 1367 (Fed. Cir. 2003) ("However,

inequitable conduct requires not intent to withhold, but rather intent to deceive. Intent to deceive cannot be inferred simply from the decision to withhold the reference where the reasons given for the withholding are plausible."); *Halliburton*, 925 F.2d at 1442 (finding no inequitable conduct, even though applicant was aware of withheld reference, and noting that "a mere showing that references having some degree of materiality were not disclosed does not establish inequitable conduct"). In light of the admissions by Fairchild's expert and Fairchild fact witness James Beasom regarding the lack of materiality of the withheld prior art, the evidence supports a strong inference that Dr. Eklund did not intend to deceive the Patent Office, and acted in good faith. *Allen Engineering Corp. v. Bartell Indus.*, Inc., 299 F.3d 1336, 1351 (Fed. Cir. 2002) (rejecting inequitable conduct because claimant "has provided no direct evidence that [applicant] withheld information about the [prototype] with an intent to deceive the PTO"); *Key Pharm., Inc. v. Hercon Labs. Corp.*, 981 F. Supp. 299, 317 (D. Del. 1997) (finding insufficient intent where "[claimant] produced no evidence that suggests that [applicant] did not believe that he had appropriately brought the Kokais to the attention of the PTO by submitting the abstracts."); 37 C.F.R. § 1.56(b) (2003) ("information is material to patentability when it is not cumulative to information already of record or being made of record in the application.").

28. Even if there were threshold showings of materiality and intent, the balance of materiality and intent with the additional factor of Power Integrations' good faith and reasonable belief in its disclosure of all relevant prior art, leads this Court to conclude that Power Integrations' conduct was not of sufficient culpability as to render the '075 patent unenforceable. *See Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1128-1129 (Fed. Cir. 2006) (reversing inequitable conduct finding because balancing of a low level of materiality combined with a low level of intent offset by evidence of good faith could not support district courts holding).

33

29. The Court further finds that even if the alleged instances of inequitable conduct were combined, there is no evidence of any type of pattern from which to infer that Power Integrations acted with deceptive intent. Fairchild has not shown with clear and convincing evidence that Power Integrations was so culpable that the '075 patent must be held unenforceable. *Merck & Co. v. Teva Pharm. USA, Inc.*, 288 F. Supp. 2d 601, 631 (D. Del. 2003) ( "[Claimants] must prove, by clear and convincing evidence, that material information was intentionally withheld for the purpose of the misleading or deceiving the examiner.").

30. Therefore, Fairchild's claim that the Power Integrations committed inequitable conduct in the prosecution of the '075 patent has not been established; the '075 patent is enforceable.

Dated: November 21, 2007          FISH & RICHARDSON P.C.

By: _____
William J. Marsden, Jr. (#2247)
Kyle Wagner Compton (#4693)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Telephone: (302) 652-5070
Email: marsden@fr.com

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Telephone: (617) 542-5070

Howard G. Pollack
Michael Headley
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070

**ATTORNEYS FOR PLAINTIFF
POWER INTEGRATIONS, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2007, I electronically filed with the Clerk of Court

PUBLIC VERSION of POWER INTEGRATIONS' PROPOSED FINDINGS OF FACTS AND

CONCLUSIONS OF LAW using CM/ECF which will send electronic notification of such

filing(s) to the following counsel.  In addition, the filing will also be sent via the manner

indicated:

| | |
|---|---|
| John G. Day, Esquire<br>Steven J. Balick, Esq.<br>Ashby & Geddes<br>500 Delaware Avenue, 8th Floor<br>P.O. Box 1150<br>Wilmington, DE 19899 | Attorneys for Defendants<br>FAIRCHILD SEMICONDUCTOR<br>INTERNATIONAL, INC. and<br>FAIRCHILD SEMICONDUCTOR<br>CORPORATION |
| G. Hopkins Guy, III<br>Bas de Blank<br>Orrick, Herrington & Sutcliffe, LLP<br>1000 Marsh Road<br>Menlo Park, CA  94025 | Attorneys for Defendants<br>FAIRCHILD SEMICONDUCTOR<br>INTERNATIONAL, INC. and<br>FAIRCHILD SEMICONDUCTOR<br>CORPORATION |

*/s/ William J. Marsden, Jr.*
William J. Marsden, Jr.

80052204.doc