IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC., a
Delaware corporation,

    Plaintiff,

    v.

FAIRCHILD SEMICONDUCTOR
INTERNATIONAL, INC., a Delaware
corporation, and FAIRCHILD
SEMICONDUCTOR CORPORATION,  a
Delaware corporation,

    Defendants.

C.A. No. 04-1371 JJF

PUBLIC VERSION

## POWER INTEGRATIONS' BRIEF IN SUPPORT OF ITS MOTION FOR A DECLARATION THAT THIS CASE IS EXCEPTIONAL, TREBLE DAMAGES, AND ATTORNEYS' FEES

FISH & RICHARDSON P.C.
William J. Marsden, Jr. (#2247)
Kyle Wagner Compton (#4693)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE  19899-1114
Telephone: (302) 652-5070
Facsimile:  (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Telephone: (617) 542-5070
Facsimile:  (617) 542-8906

Howard G. Pollack
Michael R. Headley
Jonathan Lamberson
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Facsimile:  (650) 839-5071

DATED:  December 3, 2007
REDACTED:  December 10, 2007

## TABLE OF CONTENTS

PAGE

I.   INTRODUCTION .................................................................................................. 1

II.  NATURE AND STAGE OF THE PROCEEDINGS ........................................... 1

III. STATEMENT OF LAW ...................................................................................... 2

    A.  The Legal Standard for Enhanced Damages ................................................. 2

    B.  The Legal Standard For Exceptional Case ................................................... 3

IV.  ARGUMENT ...................................................................................................... 3

    A.  Fairchild Deliberately Reverse Engineered and Copied Power Integrations Patented Features ...................................................................... 4

    B.  Fairchild Had No Good Faith Belief That It Did Not Infringe Power Integrations' Patents ........... 9

    C.  Fairchild's Vexatious Litigation Tactics Weigh Strongly in Favor of Awarding Enhanced Damages and Attorneys' Fees ...................................... 11

    D.  Fairchild's Huge Corporate Size and Healthy Financial Situation Weigh in Favor of Enhanced Damages ..................................................................... 17

    E.  Since Both Juries Disagreed With Every Fairchild Contention, This Case Cannot Be Considered "Close" ........................................................................ 18

    F.  Fairchild's Continuous Infringement Throughout the Course of the Litigation Weighs in Favor of Awarding Enhanced Damages and Attorneys' Fees ........................................................................................... 19

    G.  Fairchild's Direct Competitive Role in the Marketplace Demonstrates Its Motivation to Harm Power Integrations .......................................................... 21

    H.  Fairchild's Shifting Positions and Affirmative Misrepresentations Demonstrate an Effort to Conceal Its Misconduct. .......................................... 22

V.   CONCLUSION ................................................................................................. 24

i

TABLE OF AUTHORITIES

PAGE

*Gillette Co. v. S.C. Johnson & Son, Inc.,*
    15 U.S.P.Q. 2d 1795 (D. Mass. 1990)
    *aff'd*, 919 F.2d 720 (Fed. Cir. 1990) ...................................................9

*J.P. Stevens Co. v. Lex Tex Ltd.,*
    822 F.2d 1047 (Fed. Cir. 1987)......................................................3

*Johns Hopkins University v. Cellpro, Inc.,*
    152 F.3d 1342 (Fed. Cir. 1998)......................................................2

*Johns Hopkins v. CellPro,*
    978 F. Supp. 184 (D. Del. 1997)...................................................10

*Jurgens v. CBK Ltd.,*
    80 F.3d 1566 (Fed. Cir. 1996)........................................................2

*Mahurkar v. C.R. Bard, Inc.,*
    79 F.3d 1572 (Fed. Cir. 1996)....................................................3, 4

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995)..........................................................3

*nCube Corp. v. Seachange International, Inc.,*
    313 F. Supp.2d 361 (D. Del. 2004)......................................2, 3, 9, 21

*Read Corp. v. Portec, Inc.,*
    970 F.2d 816 (Fed. Cir. 1992), *abrogated on other grounds by Markman v. Westview*
    *Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995)............................... passim

*Rite-Hite Corp. v. Kelley Co., Inc.,*
    819 F.2d 1120 (Fed. Cir. 1987).....................................................3

*S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.,*
    781 F.2d 198 (Fed. Cir. 1986).....................................................3, 4

*State Industrial v. Mor-Flo Industrial,*
    948 F.2d 1573 (Fed. Cir. 1991).....................................................2

**STATUTES**

35 U.S.C. § 284.......................................................................1, 2, 4

35 U.S.C. § 285.......................................................................1, 3, 4

Donald S. Chisum, *Chisum on Patents*, § 20.03[4][c][ii] (1999) ......................................3

## I.    INTRODUCTION

In view of Fairchild's willful infringement and improper conduct during the course of this case, as explained in detail below, Plaintiff Power Integrations, Inc. ("Power Integrations") respectfully requests that this Court: (1) find this case to be "exceptional" under 35 U.S.C. § 285, (2) award treble damages under 35 U.S.C. § 284, and (3) award Power Integrations its reasonable attorneys' fees and costs.

Two juries have been empanelled in this matter.  The first jury found that Defendants Fairchild Semiconductor International, Inc. and Fairchild Semiconductor Corporation (collectively "Fairchild") willfully infringed each and every one of Power Integrations' asserted claims.  The second jury determined that all of Power Integrations' asserted patents are valid.  Based on the jury's finding of willful infringement, as well as the evidence presented at both trials describing Fairchild's reverse engineering and copying of Power Integrations' patented inventions, Fairchild's deliberate infringement and ever-changing and contradictory defenses, and Fairchild's continuing failure to mitigate the damages caused by its infringement, Power Integrations asks that this Court award it enhanced damages.  Additionally, because of this conduct and also because of Fairchild's vexatious and improper litigation tactics and post-verdict willful infringement, Power Integrations asks that this Court find that this is an exceptional case that warrants the shifting of attorney's fees and full enhancement of treble damages.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

In October of 2006, Power Integrations and Fairchild tried the issues of infringement, damages, and willfulness to a jury.  That jury determined that Fairchild willfully infringed claim 1 of U.S. Patent No. 6,249,876 ("the '876 patent"), claims 1 and 4 of U.S. Patent No. 6,107,851 ("the '851 patent"), claims 9 and 14 of U.S. Patent No. 6,229,366 ("the '366 patent"), and claims 1 and 5 of U.S. Patent No. 4,811,075 ("the '075 patent").  [D.I. 415.]  The jury also determined that Power Integrations suffered actual

damages as a result of Fairchild's infringement. The jury awarded a total damages amount for lost profits, price erosion, and a reasonable royalty of $33,981,781. [*Id.*]

After several delays at Fairchild's request, in September of 2007, Power Integrations and Fairchild tried the issue of validity, and the jury determined that Fairchild failed to present clear and convincing evidence that any of the asserted claims of Power Integrations four asserted patents was invalid. [D.I. 555.]

## III.    STATEMENT OF LAW

### A.    The Legal Standard for Enhanced Damages

It is well-established that a jury's determination of willful infringement exposes the accused infringer to enhanced damages—35 U.S.C. § 284 grants the Court discretion to increase a damages award up to three times the amount determined by the jury in cases where willfulness is found. *See Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1364 (Fed. Cir. 1998); *nCube Corp. v. Seachange Int'l, Inc.*, 313 F. Supp.2d 361, 387 (D. Del. 2004). A finding of willful infringement does not require enhanced damages; it leaves that determination to the sound discretion of the trial court. *Hopkins*, 152 F.3d at 1365. Nevertheless, if a court does not enhance damages in light of a jury verdict of willful infringement, it must provide an explanation for refusing such enhancement. *Jurgens v. CBK Ltd.*, 80 F.3d 1566, 1572-73 (Fed. Cir. 1996).

The Court should approach its determination in a two-step process. *State Indus. v. Mor-Flo Indus.*, 948 F.2d 1573, 1576 (Fed. Cir. 1991). "First, the fact-finder must determine whether an infringer is guilty of conduct upon which increased damages may be based. If so, the Court then determines, exercising its sound discretion, whether, and to what extent, to increase the damages award given the totality of the circumstances." *Jurgens*, 80 F.3d at 1570. The second step requires the Court to consider factors including: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not

2

infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) remedial action taken by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992), *abrogated on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995). In performing this analysis, courts have pointed to the factors regarding the egregiousness of the infringer's conduct as being particularly relevant. *See Rite-Hite Corp. v. Kelley Co., Inc.*, 819 F.2d 1120, 1124-26 (Fed. Cir. 1987).

## B.     The Legal Standard For Exceptional Case

Courts have the power "in exceptional cases" to award "reasonable attorney's fees to the prevailing party." 35 U.S.C. § 285. The power to shift attorney's fees is solely within the discretion of the trial court. *Id. See also J.P. Stevens Co. v. Lex Tex Ltd.*, 822 F.2d 1047, 1050 (Fed. Cir. 1987). To determine if attorney's fees should be awarded, the Court must first determine that an exceptional case exists and then whether attorney's fees should be shifted. *J.P. Stevens*, 882 F.2d at 1050. A finding of willful infringement on its own is sufficient to meet the burden of the first step in the § 285 analysis and justify a determination that the case is exceptional. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996); *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 200 (Fed. Cir. 1986). In order to determine if the attorney's fee should be shifted in accordance with the second step of the § 285 analysis, the Court may consider the same factors listed above relevant to an enhanced damages award. *nCube*, 313 F. Supp.2d at 391 (citing Donald S. Chisum, *Chisum on Patents*, § 20.03[4][c][ii] (1999)).

## IV.     ARGUMENT

Fairchild's willful infringement, including particularly its continued willful infringement *after* a verdict finding that its products infringed all the asserted claims,

coupled with its conduct throughout this litigation, warrants awarding treble damages and attorneys' fees to Power Integrations.

As noted above, when considering whether to enhance damages, the first step is for the fact-finder to determine whether an infringer is guilty of conduct upon which increased damages may be based. The jury has made such a determination in this case – willfulness. [D.I. 415.] Similarly, in considering whether to award attorneys' fees, a finding of willful infringement is sufficient in and of itself to justify a determination that a case is exceptional. *See Mahurkar*, 79 F.3d at 1579; *S.C. Johnson & Son, Inc.*, 781 F.2d at 200. The questions facing the Court, therefore, are whether it should exercise its discretion under 35 U.S.C. § 285 to declare this case exceptional, how much it should enhance damages under § 284, and whether it should award attorneys fees under 35 U.S.C. § 285. In this case, all nine *Read* factors weigh heavily in favor of declaring this case exceptional and awarding both treble damages and attorneys' fees.

**A.    Fairchild Deliberately Reverse Engineered and Copied Power Integrations Patented Features**

The first *Read* factor considers, "whether the infringer deliberately copied the ideas or design of another." 970 F.2d at 827. In this case there is no dispute that Fairchild's engineers studied Power Integrations parts and patents, and the jury found that the patented features at issue in this case were incorporated into Fairchild's parts.

Before examining the testimony of Fairchild witnesses who actually designed and made the decision to sell the infringing products, the Court should consider Fairchild's Supplemental response to Power Integrations' Interrogatory No. 13. [Ex. A.][1] This interrogatory asked Fairchild to identify any Power Integrations materials that Fairchild "relied upon, referred to, or otherwise used" in developing its FPS products. [*Id.*] Fairchild responded:

---

[1]    All citations refer to the accompanying Declaration of Kyle Wagner Compton, unless noted otherwise.

**REDACTED**

[*Id.*]

If Fairchild

had

, perhaps this argument (though rejected by the jury) would have some

merit. The evidence, however, shows that Fairchild systematically studied *each and every one* of Power Integrations' asserted patents *while it was designing the accused products*, and that it purposefully chose to incorporate those patented features into its products because it needed them to compete with Power Integrations' patented products in the marketplace. There was no actual or attempted design around.

First, no matter what Fairchild argued at trial or argues in response to this motion, a jury has found that Fairchild willfully infringed each and every one of Power Integrations' asserted claims. [D.I. 415.] This finding establishes that Fairchild's products do include the patented features. This means that Fairchild's purported efforts to avoid the patents while designing its products, if they even took place, were all unsuccessful. The willfulness finding also establishes that Fairchild had no good faith basis for concluding that it did not infringe these patents. These findings alone weigh in favor of enhancing damages and awarding attorneys fees.

Second, Fairchild's documents and witnesses all confirm that Fairchild studied every single patented feature for all four accused patents. Mr. C.K. Jeon, who designed Fairchild's high voltage transistor structure and manufacturing process, was aware of the Power Integrations '075 patent and the detailed structures of the Power Integrations devices that incorporated the invention when designing Fairchild's process, but could not remember consulting an attorney or documenting any of his alleged conclusions about that patent. [D.I. 417 (Trial Tr. 10/3/06) at 562:17-567:1.] Similarly, Mr. K.O. Jang, designer of the Fairchild soft-start and frequency jitter features, testified about his reverse engineering of Power Integrations' chips, and his knowledge of the '876 patent while designing Fairchild's chips. [*Id.* at 585:8-594:20.] He too did not remember consulting an attorney during his analysis or documenting it in any way; in fact, he admitted that he never read the text of the '876 patent or the claims before deciding to incorporate the patented frequency jitter circuits into Fairchild's products. [*Id.*] Dr. H.S. Choi, who also designed functions for the Fairchild integrated circuits, stated during his deposition that

6

REDACTED

This evidence shows that the people designing the accused products were all aware of Power Integrations' asserted patents and parts while designing Fairchild's accused parts. This was not just for one part or one patent – it was for every patent and every accused product involved in this litigation. None of these people could remember consulting an attorney to allegedly "avoid" the patents. [*See, e.g.,* D.I. 417 (Trial Tr. 10/3/06) at 563:4-7; 566:22-567:1; 594:1-595:5; ] None could provide any documentation to support their alleged analysis of these patents. [*See, e.g., id.* at 565:2-18.] Despite this evidence, Fairchild's expert on "copying," Dr. Gu-Yeon Wei, ignored the testimony of the Fairchild engineers who designed the infringing parts in forming his opinion. [D.I. 419 (Trial Tr. 10/5/06) at 1166:5-1167:21.] This is more than mere coincidence, and the fact that each of the patented features was incorporated into Fairchild's parts confirms that these features were copied.

For the '075 patent, Fairchild's interrogatory response does not even argue that its engineers did not include all of the claimed features in its devices, instead asserting that they relied on an alleged disclaimer in the file history that the patent did not cover DMOS devices. [Ex. A.] This Court has twice rejected the argument that the '075 does not apply to anything labeled as a "DMOS" device. [D.I. 231 at 6-9; D.I. 409.] Similarly, for the '851 patent, Fairchild did not even present an argument at trial that this patent was not infringed, instead arguing that Fairchild "practiced the prior art" – prior art that Fairchild's engineers never knew about or alleged that they relied on before this lawsuit. [D.I. 419 (Trial Tr. 10/5/06) at 1102:4-1103:1.][2] Thus, for both of these patents, there was never a genuine dispute that the claims were infringed, and Fairchild purposefully

---

[2]    Similarly, none of the thirteen opinions of counsel obtained by Fairchild ever concluded that the asserted independent claim of the '851 patent was not infringed.

put these features in its products and sold its products without regard for Power Integrations' intellectual property. This is textbook willful infringement, and it presents a clear case for enhanced damages.

Third, Fairchild's engineers testified that they included Power Integrations' patented features in the claimed products in order to make them competitive in the marketplace. In some cases, Fairchild's products would not work without practicing the patents. For example,

REDACTED

That effort failed because the proposed work-around was inferior in performance, so Fairchild grounded the P-top layer instead, using the design it knew would infringe the '075 patent.

With regard to the circuit patents, Mr. Jang testified in his deposition that he did not even attempt other methods of EMI reduction beyond the infringing "frequency scaling." [D.I. 558 (Trial Tr. 9/20/07) at 977:22-978:10.] Fairchild needed to copy these features to make the accused products work and to make them competitive in the marketplace. [D.I. 418 (Trial Tr. 10/4/06) at 647:2-648:11.] There can be no doubt that Fairchild copied the circuit inventions because its products adopted *both* patented features – integrated frequency jitter and integrated soft-start – *and linked them* by driving them with the same "frequency variation signal," a unique feature of the preferred embodiment of the patents. [D.I. 558 (Trial Tr. 9/20/07) at 1044:22-1046:1.] That use of Power Integrations' patented features simply cannot be a coincidence. [*Id.*]

Finally, there is evidence that Fairchild's copying went beyond the patents and products to include collateral material like Power Integrations' datasheets and demonstration materials. [D.I. 558 (Trial Tr. 09/20/07) at 997:21-999:8.] Mr. Jang even testified that Fairchild held a seminar on Power Integrations' circuit designs. [D.I. 417 (Trial Tr. 10/3/06) at 588:14-589:10.] This further reflects Fairchild's culture of copying

8

– studying Power Integrations' patents, reverse engineering its parts, and copying right down to the data sheets. All of this evidence weighs heavily in favor of trebling the damages awarded by the jury and awarding Power Integrations its attorney fees.

### B.    Fairchild Had No Good Faith Belief That It Did Not Infringe Power Integrations' Patents

The second *Read* factor looks to "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed." 970 F.2d at 827. Failure to rely on the informed opinions of competent counsel is a major factor in determining whether damages should be enhanced and attorneys fees awarded. *See nCube*, 313 F. Supp.2d at 391; *see also Gillette Co. v. S.C. Johnson & Son, Inc.*, 15 U.S.P.Q. 2d 1795, 1799 (D. Mass. 1990) ("[I]n a case in which an infringer does not act 'prudently' and 'reasonably' before engaging in infringing action, it is only 'fair' to allocate to the infringer the costs which the patent holder has to incur in order to seek redress.") *aff'd*, 919 F.2d 720 (Fed. Cir. 1990). As noted above, Fairchild's engineers were aware of Power Integrations' patents very early – in some cases from the date they were published. There is no dispute that Fairchild investigated all of Power Integrations' asserted patents, and belatedly obtained 12 different opinions of counsel during the course of this litigation, long after the decision to infringe had been made. The question is whether this investigation was conducted with diligence, and whether Fairchild, at the relevant times, had a "good-faith belief" that the patents were invalid or not infringed.

First, regarding diligence, all of Fairchild's opinions were obtained post-suit. As noted above, none of the individuals in Korea who actually designed Fairchild's circuits could recall ever consulting with an attorney, or obtaining any opinions about whether they infringed these patents at the time they were designing the Fairchild circuits. Mr. Conrad, who made the decision on behalf of Fairchild to continue selling the infringing products after this suit was initiated, admitted that all of Fairchild's benchmarking

activity took place before he joined the company, and that he was not aware of that activity – or even the interrogatory response in which Fairchild laid it all out – until his deposition. [D.I. 418 (Trial Tr. 10/4/06) at 887:10-888:7; *id.* at 894:2-19.] Fairchild's unreasonable delay in seeking legal advice about Power Integrations' patents until after designing and deciding to sell its products weighs in favor of enhancing damages in this case. *See Johns Hopkins v. CellPro*, 978 F. Supp. 184, 194-95 (D. Del. 1997) (finding willful infringement and enhancing damages, noting that opinion letters "were not prepared at a time when the CellPro board was considering whether to proceed with the apparently infringing work" but rather "after those business decisions had been made").

As to the reasonableness of relying on the opinions once they were belatedly obtained, Fairchild's opinion counsel testified that he was primarily a patent litigator who had written only a handful of opinions. [D.I. 420 (Trial Tr. 10/6/06) at 1411:19-1413:6.] His firm was simultaneously responsible for Fairchild's patent prosecution practice – a significant source of revenue – which puts the objectivity of the opinions in question. [D.I. 420 (Trial Tr. 10/6/06) at 1428:11-1429:7.] As to the substance of the letters, the contents were constantly changing. For example, the opinion letters on the '366 patent originally stated that the patents were allegedly invalid in view of a prior art, "TEA2262" device. [Ex. E (DX535).] Later, opinion counsel retracted that opinion, stating expressly that the asserted claims were not invalid over that reference in light of the Court's construction. [Ex. F (DX483) at FCS1693055.] Despite this clear admission, Fairchild's litigation counsel and expert continued to rely on this art, until they abandoned it on the eve of trial. [Ex. G (VanderZanden email of 9/17/07).] Fairchild's other opinion letters did not even consider the key references Fairchild relied upon at trial – for example, none of the letters on the '075 patent even mentions the Beasom patent that was the centerpiece of Fairchild's efforts to invalidate the '075 patent. [Exs. H-J (DX480, DX136, DX137).]

10

Some of Fairchild's letters opined only on infringement, others solely on validity; some switched back and forth, with contentions added and dropped in different letters. [*See* Exs. E-F, H-J; *see also* DX159-160, DX480-483, DX535-538 (all admitted into evidence 10/5/06 or 10/6/06).]  As noted above, none of the opinions on the '851 patent ever concluded there was no infringement, and none of the letters relied on the prior art asserted by Fairchild at trial to argue invalidity.[3]  This glaring inconsistency demonstrates that Fairchild had no good-faith basis for relying on its opinions or for believing it did not infringe.  Fairchild was looking for any excuse to continue selling its infringing products, and did not stop to consider the content or the quality of the advice it was being given.  It also did not obtain opinion letters early enough for them to have any real relevance – they were all obtained years after Fairchild knew about the patents and embarked on its campaign of infringement, and only after being sued by Power Integrations.  This is not good-faith reliance, and the Court should enhance damages appropriately.

### C.    Fairchild's Vexatious Litigation Tactics Weigh Strongly in Favor of Awarding Enhanced Damages and Attorneys' Fees

The third *Read* factor examines, "the infringer's behavior as a party to the litigation."  970 F.2d at 827.  Although all litigation is contentious, Fairchild repeatedly pursued a strategy of delay and obfuscation, presenting improper, inconsistent and inflammatory arguments to the Court and to the jury, and even ignoring this Court's clear orders.  Some of the more egregious examples of this conduct include the following:

Improper and Prejudicial Behavior at Trial:

- Fairchild repeatedly attributed improper motivations to Power Integrations, without any evidence.  In its initial opening statement during the first trial, Fairchild insinuated without any evidence that this lawsuit was filed because Power Integrations had a drop in earnings.  [D.I. 416 (Trial Tr. 10/2/06) at 199:21-200:15; *id.* D.I. 417 (Trial Tr. 10/3/06) at 340:10-342:5.]  In its closing argument in the first trial, Fairchild changed

---

[3]    Opinion counsel asserted that the '851 patent was invalid in view of the TEA2262, but for a different reason than the one first asserted, and later dropped, by Fairchild's expert.  On the other hand, opinion counsel made no mention of the Martin patent that was the basis of Fairchild's invalidity presentation with respect to the '851 patent at trial.

its story and stated that Power Integrations was using the suit as leverage to get acquired by Fairchild, implicitly accusing Power Integrations' CEO, Mr. Balakrishnan, of lying about it. [D.I. 420 (Trial Tr. 10/6/06) at 1585:15-23; *id.* at 1589:7-17.] In fact, none of these allegations was true; as Fairchild knew, it was investment bankers at Bank of America, not Power Integrations, who initiated contact with both companies to discuss a possible acquisition – a deal which never went beyond an initial meeting set up by the bankers, and which was irrelevant to this suit.

- In its closing statement in the second trial, Fairchild accused Power Integrations and its attorneys of "lying" and distorting the evidence, asserting that Power Integrations' team had represented to the jury that a document was from 1985 when in fact it was from 1986. [D.I. 559 (Trial Tr. 9/21/07) at 1551:22-1553:23.] In reality, Dr. Eklund clearly testified on direct that the simulation in question was from 1986, as the document was labeled. [D.I. 558 (Trial Tr. 9/20/07) at 1143:3-13; Ex. K (PX48) at KE1362-64.] Fairchild undoubtedly knew this based on its receipt of the daily trial transcript the night before it argued to the jury *on rebuttal*, when Power Integrations had no opportunity to correct the falsehood, that Power Integrations tried to mislead the jury during Dr. Eklund's testimony.

- Fairchild argued legal points to the jury even after contrary rulings from the Court. The Court clearly ruled before opening statements in the validity trial that it would not give an instruction about any "diminished" presumption of validity based on the Supreme Court's *KSR* decision. [Ex. BB (Trial Tr. 9/17/07) at 92:1-6 ("I don't agree with the diminished presumption, so this is coming out.")] Fairchild chose to argue the point in its opening statement anyway, despite the fact that the Court disagreed with Fairchild's reading of the law. [*Id.* at 100:17-23.] In closing, when Power Integrations pointed out that Fairchild's argument about a "diminished" presumption was not supported by the law and was not in the jury instructions [D.I. 559 (Trial Tr. 9/21/07) at 1513:3-22], Fairchild improperly told the jury on rebuttal that its quotation came from "Supreme Court law," implying that the jury had to follow Fairchild's incorrect reading of *KSR* notwithstanding the Court's contrary ruling, and further implying that Power Integrations was misrepresenting the law. [*See id.* at 1554:4-20.]

- During the *Markman* briefing, Fairchild argued that the '075 patent disclaimed coverage of all "DMOS" devices. The Court rejected this argument, and before trial instructed Fairchild that it could only present DMOS as a defense to willfulness, not as a defense to infringement. [D.I. 416 (Trial Tr. 10/2/06) at 71:20-80:1.] Fairchild ignored the Court's instruction and argued that it did not infringe because its device was a DMOS device. [*Id.* at 189:22-190:10; D.I. 419 (Trial Tr. 10/5/06) at

12

1189:16-1206:2.]  Power Integrations was forced to ask for a curative instruction to remedy this improper argument.  [*Id.* at 1325:15-1329:8.]

- Fairchild had no non-infringement argument for claim 1 of the '851 patent.  Instead of conceding infringement, however, Fairchild argued to the first jury that it could not infringe because the patent was allegedly invalid.  [D.I. 419 (Trial Tr. 10/5/06) at 1102:9-1103:1; *id.* at 1144:20-24; D.I. 420 (Trial Tr. 10/6/06) at 1594:1-20; *id.* at 1597:8-10.]  Fairchild presented this argument despite the fact that the Court had specifically instructed Fairchild that validity was not an issue that should be raised in the context of infringement in the first trial – as the Court stated, it was a defense only to <u>willfulness</u>.  [D.I. 416 (Trial Tr. 10/2/06) at 91:20-92:10.][4]

- Fairchild successfully moved *in limine* to preclude any reference to Power Integrations' litigation with System General [D.I. 384 at 9 (granting Fairchild motion *in limine* number 12)], then raised the issue itself during trial, affirmatively arguing that System General provided a non-infringing alternative to the patents in suit.  [D.I. 418 (Trial Tr. 10/4/06) at 689:8-690:8.]  But Fairchild knew, and prevented the jury from hearing by its motion, that Power Integrations had sued System General for patent infringement and obtained a judgment from the ITC that System General infringed Power Integrations' patents.[5]

- Fairchild told the jury about the alleged back-dating of stock options by Power Integrations, despite the Court's clear ruling that any reference to this issue should be excluded from trial.  [D.I. 420 (Trial Tr. 10/6/06) at 1587:3-20; D.I. 384 at 15 (granting Power Integrations' motion *in limine*).]

- Fairchild continually refused to reveal its true contentions for both non-infringement and invalidity.  For example, Power Integrations did not learn until during Dr. Horowitz's testimony on the third day of the invalidity trial that Fairchild had dropped all but one of its anticipation arguments for the three circuit patents.  [D.I. 557 (Trial Tr. 9/19/07) at 835:9-836:18.]  Fairchild also added new invalidity defenses during trial, such as Fairchild's argument that Dr. Eklund allegedly "abandoned" his invention.  [DI 524 at 43 (Fairchild proposed jury instruction).]

---

[4]  Also, at the time Fairchild made these arguments to the jury, it had no opinion of counsel or expert report that asserted that the claims were invalid in view of the Martin reference that Fairchild relied for its arguments.

[5]  The Federal Circuit recently summarily affirmed the ITC's determination that System General's chips infringe Power Integrations' patents.  Ex. L (Federal Circuit's Rule 36 affirmance).  Notably, Fairchild purchased System General earlier this year.  Ex. M (Fairchild press release re purchasing System General).

- Fairchild gamed the Court's bifurcation order, arguing one theory to the jury for infringement and the exact opposite for validity. Specifically, Dr. Horowitz argued that the Fairchild parts did not infringe the '876 patent allegedly because they had a structure "like a ROM" between the counter and the DAC. [D.I. 419 (Trial Tr. 10/5/06) at 1102:9-1103:1; *id.* at 1144:20-24; D.I. 420 (Trial Tr. 10/6/06) at 1594:1-20; *id.* at 1597:8-10.) At the validity trial, however, Dr. Horowitz relied on prior art that showed a ROM between the counter and the DAC. [D.I. 557 (Trial Tr. 9/19/07) at 829:4-21.] Similarly, in the first trial, Dr. Horowitz asserted that the claimed soft start circuit of the '366 patent required the latch, AND-gate, and comparator structures shown in the patent figures [D.I. 419 (Trial Tr. 10/5/06) at 1086-88], yet he argued in the second trial that prior art having none of those structures allegedly invalidated the claims. [D.I. 557 (Trial Tr. 9/19/07) at 845:10-14.]

- Fairchild continuously changed its claim construction positions, originally agreeing that certain elements were means-plus-function terms and then later deciding that they were not means plus function. [Ex. N (de Blank letter of 12/9/05).] This behavior continued *during trial*, where Fairchild raised new claim construction arguments in front of the jury. For example, Fairchild's circuit expert argued that the Court's construction requiring the "frequency variation signal" to be "internal" did not mean that it had to be generated inside an integrated circuit. [D.I. 557 (Trial Tr. 9/19/07) at 815:4-9.] This was directly contrary to the entire course of briefing and argument on this term during claim construction. [*See* D.I. 231 at 33.] On the '075 patent, despite the fact that Fairchild's own opinion counsel stated that the claims of the '075 patent required a surface adjoining layer at multiple positions on both sides of the drain [Ex. I (DX136) at FCS1413653], Fairchild's expert argued for the first time at the validity trial that the claim read on a structure with a surface adjoining layer on only one side of the drain. [D.I. 556 (Trial Tr. 9/18/07) at 543:17-544:22.]

- Fairchild continually went beyond the scope of its expert reports at trial. For example, during his direct testimony, Dr. Peter Gwozdz stated for the first time at trial that the Beasom documents disclosed a structure with an "infinite" number of surface adjoining positions, even though those positions existed on only one side of the drain, and even though this construction would ignore the plain meaning of the claim language in the '075 patent. [D.I. 556 (Trial Tr. 9/18/07) at 492:8-19.] Dr. Gwozdz later waffled on this point, arguing that the Beasom notebooks disclosed one, three and even an infinite number of surface adjoining positions, but none of these arguments about the Beasom notebook disclosing "multiple" surface adjoining positions appears in any of Dr. Gwozdz's expert reports.

14

Improper Discovery and Pre-Trial Abuses:

- Fairchild stated in response to discovery that it never manufactured any accused products in the United States. [Ex. O (Fairchild Response to Interrogatory No. 8 ("Since none of the Accused Products are or have ever been manufactured in the United States, the amount of devices manufactured is irrelevant")).] During the deposition of H.K. Kim, though – a deposition Power Integrations had to move to compel because Fairchild repeatedly represented Mr. Kim was beyond its control and had no responsive knowledge – Power Integrations learned that Fairchild had manufactured 2.73 million accused products in Portland, Maine. Fairchild was eventually forced to supplement its interrogatory response to admit to this U.S. manufacturing. [Ex. P (Fairchild's Third Supplemental Response to Interrogatory No. 8).] Even then, however, Fairchild filed a motion to exclude the evidence of its U.S. manufacturing on the ruse that it was never "accused" or at issue, forcing the Court and Power Integrations to expend significant time and effort on products Fairchild certainly knew were at issue. The Court rejected Fairchild's efforts to hide its U.S. manufacturing of the FSD210HD parts [D.I. 384 at 6-7 (denying Fairchild motion *in limine* number 9)], and later, during the validity trial, Power Integrations learned for the first time that Fairchild was in fact significantly expanding this U.S. manufacturing of the infringing products. [D.I. 557 (Trial Tr. 9/19/07) at 605:23-606:16.] Indeed, during closing arguments in the validity trial, Fairchild played up its U.S. manufacturing, noting that Fairchild was "a fierce U.S. competitor" that has "done everything they can to protect their U.S. fabs." [*Id.* at 1546:10-20.]

- Fairchild continually attempted to block Power Integrations' efforts to obtain relevant discovery. For example, Fairchild originally argued that it did not need to produce witnesses employed in Korea. [Ex. Q (de Blank letter of 7/7/05).] Fairchild also contacted its customers – customers that Power Integrations had subpoenaed – and informed them that they had no responsive documents before they had even conducted a search. [Ex. R (Kim e-mail of 12/16/05).]

- Fairchild and Intersil worked together[6] to withhold key materials related to James Beasom's conception and reduction to practice of his '173 patent until **after** the conclusion of the first trial. [Ex. S (VanderZanden letter of 10/17/06).] These materials included prototype wafers, photographs, and

---

[6]   Fairchild claims to have a joint defense agreement with Intersil related to the Beasom patents and the offensive case the two filed against Power Integrations, and the two share counsel in their offensive case. Fairchild also shares local counsel with Intersil in this matter, who successfully quashed Power Integrations' subpoena to Intersil. As such, Fairchild's repeated efforts to distance itself from Intersil with respect to the production of materials regarding Mr. Beasom's work are not credible.

test-chips that became the centerpiece of Fairchild's invalidity argument. Fairchild also first produced Mr. Beasom's critical invention disclosure forms after Mr. Beasom was deposed in January 2006 – documents that showed that Mr. Beasom added key features after Dr. Eklund had already invented and documented his '075 technology. [Ex. T (VanderZanden letter of 4/24/06).] Fairchild turned over all of these materials long after the close of discovery.

- Fairchild argued strenuously that the Court should limit the scope of Power Integrations infringement contentions to 4 claims, and the Court eventually set the limit at 7. [D.I. 291 (Fairchild's Motion to Compel Pared Down Infringement Contentions).] Later, when the Court similarly limited Fairchild to 7 prior art references, Fairchild objected and filed a motion requesting additional references but not identifying what additional art it wanted to raise. [D.I. 389.] Fairchild also continually changed the specific invalidity contentions it intended to raise at trial, dropping some on the eve of the validity trial, all the while continuing to serve section 282 notices listing over a hundred references. [*See* D.I. 422; D.I. 515.]

- Fairchild filed 7 motions for summary judgment and 19 motions *in limine* before the first trial alone, and more generally attempted to bury Power Integrations in paper. Those 19 motions *in limine*, for example, included 60 pages of briefing and 66 exhibits, all of which were sent to Power Integrations after the deadline for filing, at 4 a.m. on the Saturday of Labor Day weekend. [D.I. 356.] Fairchild similarly dumped more than 800,000 pages of production documents, many of them in Korean, on Power Integrations in the final days of discovery. [Exs. U-V (Schultz letters of 6/28/05 and 6/29/05).]

Other Relevant Conduct:

- Fairchild obtained a "hunting license" from Intersil – a license whose sole purpose was to allow Fairchild to sue Power Integrations in the Eastern District of Texas, "to fight back." [Ex. W (Fairchild press release); D.I. 557 (Trial Tr. 9/19/07) at 657:1-23.] Fairchild has continued to pursue that case despite the fact that the priority of invention has now been determined in favor of Power Integrations' inventor, Dr. Klas Eklund.

- Fairchild attempted to hide its continued infringement by renumbering its parts and refusing to provide discovery on these new parts, even though they contain the exact same patented features as the existing products. [Ex. X (Headley e-mail of 11/18/05).] Fairchild has continued to tell potential customers that these "new" parts are "not subject to Power

## REDACTED

Integrations' patents" despite knowing that they contain substantially identical circuits to those found to infringe.[7]

- Fairchild has continued to delay the resolution of this matter by asserting multiple baseless inequitable conduct charges, including a particularly frivolous contention regarding Power Integrations' '876 patent. Because Fairchild refused to move forward with briefing on these contentions, thus delaying Power Integrations' ability to obtain an injunction against Fairchild's continued infringement, Power Integrations filed an affirmative motion seeking a determination that there was no inequitable conduct during prosecution of the '876 patent. [*See* D.I. 574.] As pointed out in Power Integrations' motion, Fairchild's theory regarding the '876 patent would require the Court to infer an allegedly material public disclosure                    , despite the uncontroverted testimony that no such disclosure took place until <u>after</u> the '876 patent was filed. [*See id.*] Even though Power Integrations filed its Motion more than a week before Fairchild filed its own briefing regarding inequitable conduct [*see* D.I. 585], Fairchild did not refute, or even address, the facts established in Power Integrations' brief. Instead, Fairchild re-asserted the same baseless charge of inequitable conduct with respect to the '876 patent [*id.*], forcing Power Integrations to respond with further briefing. [D.I. 603-605.]

These are just some examples of the vexatious and improper litigation tactics Fairchild pursued in this case. This Court should look at the totality of the circumstances – at all of the actions taken by Fairchild over the preceding three years, and most notably at the actions taken during trial where Fairchild repeatedly ignored Court orders – and it should conclude that treble damages and attorneys' fees are appropriate because of the vexatious tactics pursued by the defendants in this case.

### D.    Fairchild's Huge Corporate Size and Healthy Financial Situation Weigh in Favor of Enhanced Damages

The next *Read* factor examines "the infringer's size and financial condition." 970 F.2d at 827. Fairchild's witnesses consistently testified that Fairchild is a large and financially sound company that makes many millions of dollars off of these infringing products. For example, Robert Conrad, Fairchild's Executive Vice President of Analog Products, testified that Fairchild currently sells $30,000,000 of infringing FPS products

---

[7]    *See* D.I. 564-568 (Power Integrations' Motion for Entry of a Permanent Injunction

17

per year. [D.I. 418 (Trial Tr. 10/4/06) at 935:17-20; D.I. 557 (Trial Tr. 9/19/07) at 633:21-23.] According to Mr. Conrad, the infringing sales through September 19, 2007, counting only from the date the complaint was filed, total more than $100 million. [D.I. 557 (Trial Tr. 9/19/07) at 634:4-6.] Tom Beaver, executive vice president of sales and marketing at Fairchild, testified that Fairchild sells over 20,000 different products [D.I. 419 (Trial Tr. 10/5/06) at 972:4-5] and has 9,000 employees worldwide [*id.* at 973:4-5], with total annual revenues of over $1.5 billion dollars. [*Id.* at 977:6-8.]

Fairchild cannot plead financial hardship, and Mr. Beaver noted that the infringing parts are only a small percentage of Fairchild's total sales. [*Id.* at 976:19-977:15.] The damages award in this case is also only a fraction of the total revenues Fairchild has obtained from those products. Fairchild is indisputably one of the largest players in the intensely-competitive power supply chip market, and this factor weighs in favor of awarding both enhanced damages and attorneys' fees.

### E. Since Both Juries Disagreed With Every Fairchild Contention, This Case Cannot Be Considered "Close"

The next *Read* factor looks at the "closeness of the case." 970 F.2d at 827. While this factor is subjective, all of the evidence indicates that this case was never "close."

First, it is significant that Fairchild lost nearly every contention that it made. Fairchild lost every non-infringement contention, every invalidity contention, and every willfulness contention tried to the jury, for each and every one of Power Integrations' asserted patents and patent claims. If there was any merit to Fairchild's case whatsoever, one would assume that Fairchild might have prevailed as to a single contention. In reality, Fairchild failed to convince not one but two *different* juries, in trials almost a year apart, that any part of its case had merit. Fairchild, in fact, had very little in substance to say about why it did not infringe these patents or why they were invalid.

---

and supporting papers).

Fairchild's own opinion letters—in particular their internal inconsistency and their inconsistency with Fairchild's expert opinions and trial contentions—also show that this was not a close case. For example, Fairchild's lawyers correctly opined that the TEA2262 data sheet did not anticipate the Power Integrations '366 patent. [Ex. F (DX483) at FCS1693055.] Despite this clear statement, Fairchild continued to argue that the TEA2262 was an anticipating reference until the day before the invalidity trial was set to begin. [Ex. G (VanderZanden e-mail of 9/17/07).] Fairchild trial counsel should have realized that contention was without merit, as indicated by Fairchild's outside opinion counsel. Fairchild also raised invalidity positions at trial as to the '851, '876 and '075 patents that were entirely absent from their opinion letters. As noted above, Fairchild and its experts argued positions at trial regarding the '075 patent that were directly contrary to its opinion letters.

Further, as noted above, Fairchild had no non-infringement position for claim 1 of the '851 patent, and no colorable anticipation argument for any of the circuit patents. Fairchild's only real non-infringement argument for the '075 patent was a disclaimer argument that had been rejected by the Court as early as the claim construction stage. Fairchild also abandoned its written description and enablement defenses during the course of the validity trial. This entire sequence of events demonstrates that Fairchild had little reason to believe that these patents were not infringed, and it had even less reason to believe that any claim of any Power Integrations patent was invalid. Because this case simply was not close, this factor weighs in favor of awarding both enhanced damages and attorneys' fees.

**F.     Fairchild's Continuous Infringement Throughout the Course of the Litigation Weighs in Favor of Awarding Enhanced Damages and Attorneys' Fees**

The next two *Read* factors examine "the duration of the infringer's misconduct" and any "remedial action taken by the infringer." 970 F.2d at 827. In this case, Fairchild

has done nothing to abate its infringement, and has in fact expanded its manufacturing of infringing parts in the United States and continually increased its overall sales volume.

Robert Conrad, Fairchild's Executive Vice President of its Analog Products Group, testified that Fairchild currently sells $30,000,000 of infringing FPS products per year. [D.I. 557 (Trial Tr. 9/19/07) at 633:21-23.] The total sales through the validity trial exceeded $100 million, and Mr. Conrad testified that Fairchild is now moving this manufacturing from Asia to the United States. [D.I. 557 (Trial Tr. 9/19/07) at 634:4-6; 606:11-16 ("[W]e are moving the next generation of the products that we're talking about here, our power conversion products from some subcontractors in Asia as well as another factory that we have in Asia to the Maine site.").] Power Integrations also learned after the first trial that Fairchild anticipated shipping 50,000,000 infringing FSD210 chips to Samsung alone in 2007. [D.I. 567 (Renouard Decl.) at ¶ 2 and Exhibit A.] All of this activity has occurred even after the first jury found that Fairchild willfully infringed Power Integrations' patents.

After both jury trials, Fairchild issued press releases steadfastly asserting that it would continue to sell products that had been found to infringe valid patents. [Exs. Y-Z (Fairchild press releases).] Fairchild essentially proclaimed to the marketplace that it did not care about these patents, or patent rights more generally. Furthermore, Power Integrations discovered that Fairchild continued selling infringing parts with different part numbers, claiming to its customers that these parts were not subject to the lawsuit despite the fact that they contained the exact same infringing features. [*See* D.I. 568 (Blauschild Decl.); D.I. 567 (Renouard Decl.).] Fairchild has done nothing to abate its infringement throughout the three year course of this litigation, even after receiving adverse jury verdicts in both trials.

## REDACTED

This Court must set

an example: even though patent cases take a long time to resolve, an accused infringer must still take corrective actions after they have been found willful infringers by a jury. This factor weighs strongly in favor of awarding both enhanced damages and attorneys' fees.

**G.      Fairchild's Direct Competitive Role in the Marketplace Demonstrates Its Motivation to Harm Power Integrations**

The next *Read* factor looks to "the infringer's motivation for harm." 970 F.2d at 827. In this case, like so many others, the motivation is not difficult to discern: Fairchild's witnesses testified that they sell $30,000,000 in infringing FPS parts each and every year. [D.I. 418 (Trial Tr. 10/4/06) at 935:17-20; D.I. 557 (Trial Tr. 9/19/07) at 633:21-23.] These sales have now topped the $100 million mark [D.I. 557 (Trial Tr. 9/19/07) at 634:4-6], and Fairchild has indicated that it intends to keep selling these products even after both juries found against it. [Exs. Y-Z.] By its press releases, Fairchild has made its motivations painfully obvious: it intends to continue selling infringing products unless and until this Court forces it to stop, because Fairchild believes its ill-gotten profits are untouchable. They certainly exceed the cost to Fairchild of paying lawyers to drag the process out. As explained during trial and in Power Integrations' Motion for Entry of a Permanent injunction [D.I. 564-68], the damages awarded by the jury are not adequate to compensate completely for the infringement, the complete scope of which Fairchild made every effort to conceal during the course of this dispute.

Furthermore, Fairchild is a direct competitor to Power Integrations, yet another factor that the Court should consider when determining whether to enhance damages and award fees. *See nCube*, 313 F. Supp.2d at 390-91. Mr. Renouard, Power Integrations' Vice President of Sales, testified that at the time of the infringement, Power Integrations and Fairchild were the only two competitors authorized to compete for the important Samsung Wireless business. [D.I. 417 (Trial Tr. 10/3/06) at 608:19-610:18.] Mr. Troxel,

Power Integrations' damages expert, also outlined the markets where Power Integrations and Fairchild compete head to head. [D.I. 418 (Trial Tr. 10/4/06) at 789:3-795:13.] Fairchild's own witnesses agree that Power Integrations is one of their main competitors [D.I. 418 (Trial Tr. 10/4/06) at 881:11-16; D.I. 419 (Trial Tr. 10/5/06) at 986:9-19], and Fairchild's documents show extraordinary efforts to analyze Power Integrations and its products. [*See, e.g.,* Ex. AA (PX255, describing a Fairchild seminar on Power Integrations' circuits).] Fairchild is also Power Integrations' most effective competitor to date precisely because Fairchild copied Power Integrations' patented features and offered them to Power Integrations' customers at cut-rate prices. This factor weighs strongly in favor of enhancing damages and awarding attorneys' fees in this case.

### H.    Fairchild's Shifting Positions and Affirmative Misrepresentations Demonstrate an Effort to Conceal Its Misconduct.

The final *Read* factor is whether the infringer attempted to conceal its misconduct. 970 F.2d at 827. By continuously shifting its non-infringement and invalidity contentions, and by suppressing the evidence of U.S. manufacturing and seeking to thwart Power Integrations' efforts to uncover the full scope of its activities, Fairchild repeatedly sought to hide the fact that it was infringing Power Integrations' patents.

First, as mentioned above, Fairchild concealed its significant U.S. manufacturing of an accused product, the FSD210HD. Through the close of fact discovery, Fairchild maintained that it did not manufacture any accused products in the United States. [Ex. O (Fairchild First Response to Interrogatory No. 8).] Power Integrations tried several times to get a deposition of Mr. H.K. Kim, the Fairchild Vice President responsible for the power conversion product line, to investigate this claim. In fact, Power Integrations had to move to compel a deposition of Mr. Kim. [Ex. B (Hearing Tr. 2/2/06) at 27:5-31:5.] After questioning Mr. Kim about Fairchild's U.S. manufacturing, it was evident that Fairchild had begun to manufacture parts in Portland, Maine. Power Integrations sent letters to Fairchild demanding that it identify the extent of this U.S. manufacturing, and

Fairchild eventually supplemented its interrogatory response to indicate that 2,730,000 FDS210HD were manufactured in the United States between October of 2005 and March of 2006. [Ex. P (Fairchild's Third Supplemental Response to Interrogatory No. 8).] This supplementation came only four months before trial, after months of denials from Fairchild, and when caught, Fairchild sought to exclude the FSD210HD parts from the case with the ridiculous argument that it had never been accused. [D.I. 356 at 40-44 (Fairchild motion *in limine*).] The Court saw through Fairchild's efforts to avoid liability by hiding the activity and by masking infringement with "new" part numbers and suffixes. [D.I. 384 at 6-7 (denying Fairchild motion *in limine* number 9).]

Furthermore, Fairchild admitted during the second trial that it has now moved even more manufacturing of accused products to the United States, activity never disclosed by any Fairchild witness before the infringement trial. Throughout the first trial, Fairchild and its witnesses repeated over and over again that they did not make accused parts in the United States, arguing that this case involved entirely foreign activity not covered by U.S. laws. [*See, e.g.,* D.I. 416 (Trial Tr. 10/2/06) at 170:6-10.] During the second trial, however, Robert Conrad testified that Fairchild was moving the manufacture of its accused products from Asia to Portland, Maine. [D.I. 557 (Trial Tr. 9/19/07) at 606:11-16 ("[W]e are moving the next generation of the products that we're talking about here, our power conversion products from some subcontractors in Asia as well as another factory that we have in Asia to the Maine site.").] Fairchild's efforts to conceal its U.S. infringement before and even during the first trial justify enhanced damages and awarding Power Integrations fees and costs.

Finally, Fairchild has continued its campaign to conceal its misconduct from Power Integrations and the Court by offering "new" products that have different part numbers but, from all the available evidence, contain the same infringing circuits as the products shown at trial to infringe. Fairchild refuses to produce schematics that would show conclusively whether the products are identical with respect to the relevant

circuitry, yet Fairchild has at the same time asserted that these "replacement" products are not subject to Power Integrations' infringement claims and moved to strike Power Integrations' reliance on its expert's review of the publicly available documents. Fairchild's refusal to produce the relevant evidence and its attempt to suppress Power Integrations' reliance on the public documents [*see* D.I. 593 (Fairchild motion to strike)] strongly suggest Fairchild has not modified its "new" parts to remove the infringing features and, instead, is once again hiding the truth while banking on not getting caught. Because Fairchild's efforts to continue its infringement and mislead the Court and the public continue to this day, the Court should award Power Integrations treble damages and fees and costs.[8]

## V.   CONCLUSION

This is not a case where only one or two of the *Read* factors are present – in every case, and for every factor, Fairchild has conducted itself in a way that compels an award of treble damages and attorneys' fees. Fairchild deliberately copied Power Integrations patented circuits, Fairchild knew about Power Integrations' patents when it copied these circuits, Fairchild engaged in vexatious litigation tactics in an effort to conceal its infringement and delay resolution, Fairchild unreasonably relied on twelve different ever-shifting opinion letters obtained long after the infringing products were first designed and sold, Fairchild raised self-contradictory contentions at each stage of the case, and Fairchild did nothing to abate its continuing infringement even after adverse jury verdicts. Because these factors all favor trebling damages and awarding Power Integrations' attorneys' fees, Power Integrations respectfully submits that the Court should grant Power Integrations' motion.

---

[8]   Power Integrations will provide the amount of its fees and costs to the Court and to Fairchild if and when the Court determines it is appropriate for the parties to do so, and it will similarly submit the detailed supporting documentation for its fees and costs to the Court for *in camera* inspection when the Court is ready to review those materials.

Dated:  December 3, 2007                 FISH & RICHARDSON P.C.


                                         By:  /s/ Kyle Wagner Compton
                                              William J. Marsden, Jr. (#2247)
                                              Kyle W. Compton (#4693)
                                              919 N. Market Street, Suite 1100
                                              P.O. Box 1114
                                              Wilmington, DE  19899-1114
                                              Telephone: (302) 652-5070
                                              Facsimile:  (302) 652-0607

                                              Frank E. Scherkenbach
                                              225 Franklin Street
                                              Boston, MA 02110-2804
                                              Telephone: (617) 542-5070
                                              Facsimile:  (617) 542-8906

                                              Howard G. Pollack
                                              Michael R. Headley
                                              Jonathan Lamberson
                                              500 Arguello Street, Suite 500
                                              Redwood City, CA 94063
                                              Telephone: (650) 839-5070
                                              Facsimile:  (650) 839-5071

                                         Attorneys for Plaintiff
                                         POWER INTEGRATIONS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2007, I electronically filed with the Clerk of

Court the **PUBLIC VERSION OF POWER INTEGRATIONS INC.'S POST-TRIAL**

**MOTION FOR A DECLARATION THAT THIS CASE IS EXCEPTIONAL, TREBLE**

**DAMAGES, AND ATTORNEYS' FEES** which will send electronic notification of such

filing(s) to the following counsel:


**BY EMAIL**                                    Attorneys for Defendants
Steven J. Balick                               FAIRCHILD SEMICONDUCTOR
John G. Day                                     INTERNATIONAL, INC. and
Ashby & Geddes                                 FAIRCHILD SEMICONDUCTOR
500 Delaware Avenue, 8th Floor                 CORPORATION, and third party
P. O. Box 1150                                  INTERSIL CORPORATION
Wilmington, DE 19899



**BY E-MAIL**                                   Attorneys for Defendants
G. Hopkins Guy, III                            FAIRCHILD SEMICONDUCTOR
Bas de Blank                                    INTERNATIONAL, INC. and
Orrick, Herrington & Sutcliffe, LLP            FAIRCHILD SEMICONDUCTOR
1000 Marsh Road                                 CORPORATION
Menlo Park, CA  94025



                                  */s/ Kyle Wagner Compton*
                                 Kyle Wagner Compton