IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| POWER INTEGRATIONS, INC., a Delaware corporation, | |
| Plaintiff, | |
| v. | C.A. No. 04-1371-JJF |
| FAIRCHILD SEMICONDUCTOR INTERNATIONAL, INC., a Delaware corporation, and FAIRCHILD SEMICONDUCTOR CORPORATION, a Delaware corporation, | **REDACTED PUBLIC VERSION** |
| Defendants. | |

**FAIRCHILD'S ANSWERING BRIEF IN OPPOSITION TO POWER INTEGRATIONS' BRIEF IN SUPPORT OF ITS MOTION FOR A DECLARATION THAT THIS CASE IS EXCEPTIONAL, TREBLE DAMAGES, AND ATTORNEYS' FEES**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue
Wilmington, Delaware 19801
Telephone: 302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Of Counsel:*                                    *Attorneys for Defendants*

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
G. Hopkins Guy, III
Vickie L. Feeman
Bas de Blank
Gabriel M. Ramsey
Brian H. VanderZanden
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7400

Dated: December 21, 2007

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...............................................................................................1

II.   NATURE AND STAGE OF THE PROCEEDINGS .......................................2

III.  ENHANCED DAMAGES ARE NOT WARRANTED ....................................2

    A.  Fairchild Did Not Copy The Commercial Embodiments of Power
        Integrations' Patents-in-Suit ...................................................................3

        1.  To Enhance Damages Fairchild Must Have Copied the
            "Commercial Embodiment" Not Just the Patent ...........................3

        2.  Evidence Does Not Support Commercial Embodiment Copying.................4

        3.  PI Fails to Establish That Fairchild Copied Its Commercial
            Embodiments ...................................................................................7

    B.  Fairchild Had A Good Faith Belief That It Did Not Infringe Power
        Integrations' Patents and/or That The Patents Were Invalid ...................8

        1.  Fairchild Obtained the Advice of Competent Counsel Prior to Suit ...........8

        2.  Fairchild Obtained the Advice of Competent Counsel Once Power
            Integrations Sued ..........................................................................10

        3.  Fairchild Diligently Continued to Seek Opinion Counsel's
            Assurances As The Case Progressed ..........................................11

    C.  Fairchild Did Not Engage In Vexatious Litigation Tactics ...................13

        1.  Fairchild's Cooperation Throughout Litigation................................13

        2.  Trial Court Noted Parties' Need for Strong Advocacy....................14

    D.  Fairchild's Size and Financial Situation Do Not Weigh in Favor of
        Enhanced Damages ...............................................................................16

    E.  This Case Is "Close" Under Prevailing Legal Standards.......................17

        1.  '075 Patent ....................................................................................17

        2.  '876 Patent ....................................................................................20

        3.  '366 Patent ....................................................................................22

        4.  '851 Patent ....................................................................................23

        5.  Damages.........................................................................................24

    F.  Fairchild Took Immediate Remedial Action Upon Learning of the Lawsuit........25

    G.  Fairchild Had No Motive to Harm Power Integrations But Sought Merely
        To Fairly Compete ................................................................................27

    H.  Fairchild Never Attempted to Conceal Its Alleged "Misconduct" .......................28

IV.   NO ATTORNEYS' FEES ARE WARRANTED..............................................30

V.    CONCLUSION.................................................................................................32

## TABLE OF AUTHORITIES

### FEDERAL CASES

**Page**

*Apex Inc.* v. *Raritan Computer, Inc.*,
   325 F.3d 1364 (Fed. Cir. 2003)..................................................................23

*In Re Application of Ferens*,
   417 F.2d 1072 (C.C.P.A. 1969) ..................................................................7

*Applied Medical Resources Corp.* v. *United States Surgical Corp.*,
   967 F. Supp. 861 (E. D. Va. 1997) ........................................................17, 32

*Beatrice Foods Co.* v. *New England Printing and Lithographing Co.*,
   923 F.2d 1576 (Fed. Cir. 1991)...................................................................2

*Beckman Instruments, Inc.* v. *LKB Produkter AB*,
   892 F.2d 1547 (Fed. Cir.  1989).............................................................30, 31

*Brooktree Corporation* v. *Advanced Micro Devices, Inc.*,
   977 F.2d  1555, 1582 (N.D. Cal. 1992) ....................................................31, 32

*Brown* v. *Duchesne*,
   60 U.S. 183 (1856)..................................................................................25

*Comark Commc'n, Inc.* v. *Harris Corp.*,
   156 F.3d 1182 (Fed.Cir.1998)....................................................................13

*Datascope Corp.* v. *SMEC, Inc.*,
   879 F.2d 820 (Fed. Cir. 1989).....................................................................9

*Deepsouth Packing Co.* v. *Laitram Corp.*,
   406 U.S. 518 (1972)................................................................................25

*Del Mar Avionics, Inc.* v. *Quinton Instrument Co.*,
   836 F.2d 1320 (Fed. Cir. 1987)..................................................................31

*Delta-X Corp.* v. *Baker Hughes Production Tools, Inc.*,
   984 F.2d 410 (Fed Cir. 1993)...................................................................2, 7

*Dowagiac Mfg. Co.* v. *Minnesota Moline Plow Co.*,
   235 U.S. 641 (1915)............................................................................12, 25

*Graco, Inc.* v. *Binks Manufacturing Company*,
   60 F.3d 785 (Fed. Cir. 1995)......................................................11, 12, 13, 26

*Group One Ltd.* v. *Hallmark Cards, Inc.*,
   407 F.3d 1297 (Fed. Cir. 2005)....................................................................3

*Informatica Corp. v. Business Objects Data Integration*,
   489 F. Supp. 2d 1075 (N.D. Cal. 2007) ...................................................17, 28

*Interspiro USA, Inc.* v. *Figgie Intern, Inc.*,
   18 F.3d 927 (Fed. Cir. 1994)......................................................................31

## TABLE OF AUTHORITIES (cont)

*J.P. Stevens Company, Inc.* v. *Lex Tex Ltd., Inc.*,
822 F.2d 1047 (Fed. Cir. 1987)...........................................................................31

*Jurgens* v. *CBK, Ltd.*,
80 F.3d 1566 (Fed. Cir. 1996)...............................................................................2

*Kori Corp.* v. *Wilco Marsh Buggies & Draglines, Inc.*,
761 F.2d 649 (1985)......................................................................................9, 16

*Linear Tech. Corp.* v. *Impala Linear Corp.*,
379 F.3d 1311 (Fed. Cir. 2004)......................................................................22, 23

*Lucent Technologies, Inc.* v. *Newbridge Networks Corp.*,
168 F. Supp. 2d 269 (D. Del. 2001)....................................................................31

*Markman* v. *Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995).................................................................................2

*Microsoft Corp.* v. *AT&T Corp.*,
127 S. Ct. 1746 (2007).........................................................................................25

*Muniauction, Inc.* v. *Thomson Corp.*,
502 F. Supp. 2d 477 (W.D. Pa. 2007)..................................................................16

*NTP, Inc.* v. *Research In Motion, Ltd.*,
270 F. Supp. 2d 751 (E.D. Va. 2003) ..............................................................2, 16

*Ortho Pharm. Corp.* v. *Smith*,
959 F.2d 936 (Fed. Cir. 1992)............................................................................. 12

*Paper Converting Machine Co.* v. Magna-Graphics Corp.
745 F.2d 11, 223 (Fed. Cir. 1984).........................................................................2

*Phillips* v. *AWH Corp.*,
415 F.3d, 1303 (Fed.Cir. 2005)...........................................................................22

*Read Corp.* v. *Portec, Inc.*,
970 F.2d 816 (Fed. Cir. 1992)................................................................... *passim*

*Riles* v. *Shell Exploration and Production Co.*,
298 F.3d 1302 (Fed. Cir. 2002)...........................................................................17

*S.C. Johnson & Son, Inc.* v. *Carter-Wallace, Inc.*,
781 F.2d 198 (Fed. Cir. 1986).......................................................................31, 32

*In re Seagate*,
497 F.3d 1360 (Fed. Cir. 2007).............................................................................2

*Semitool, Inc.* v. *Novellus Sys.*,
44 Fed. Appx. 949, 956 (Fed. Cir., 2002)...........................................................23

*Shatterproof Glass Corp.* v. *Libby-Owens Ford Co.*,
758 F.2d 613 (Fed. Cir. 1985)...............................................................................3

## TABLE OF AUTHORITIES (cont)

*State Contracting & Engineering Corp.* v. *Condotte America, Inc.*,
346 F.3d 1057 (Fed. Cir. 2003).................................................................................2

*State Industries, Inc.* v. *A.O. Smith Corporation*,
751 F.2d 1226 (Fed. Cir. 1985).................................................................................28

*Tristrata Technology, Inc.* v. *ICN Pharmaceuticals, Inc.*,
314 F. Supp. 2d 356 (D. Del. 2004)...........................................................................15

## STATE CASES

*Baden Sports, Inc.* v. *Kabushiki Kaisha Molten*,
2007 WL 2790777 (W. D. Wash. 2007).....................................................................28

*Black & Decker Inc.* v. *Robert Bosch Tool Corporation*,
2006 WL 3359349 ...................................................................................16, 26, 28

*Itron, Inc.* v. *Benghiat*,
2003 WL 21402608 (D. Minn 2003) ..........................................................................3

*KSR International Co.*, v. *Teleflex, Inc.*
127 S. Ct. 1727 (2007) .......................................................................................15, 22

## FEDERAL STATUTES

35 U.S.C. 102(b)...............................................................................................10

35 U.S.C. § 271................................................................................................12

35 U.S.C. § 274................................................................................................11

35 U.S.C. § 284.................................................................................................2

35 U.S.C. § 285............................................................................................10, 17

Fed. R. Civ. Pro. 54(d)(2)(B)..................................................................................18

Fed. R. Civ. Pro. 59(b)........................................................................................1, 2

## I.    **INTRODUCTION**

There is no dispute that this case has a history of vigorous advocacy by both sides. Power Integrations, Inc. ("Power Integrations") sued Fairchild Semiconductor International, Inc. and Fairchild Semiconductor Corporation (collectively, "Fairchild") – with no prior warning or attempt to negotiate - for infringement of four patents.[1] Fairchild had previously investigated two of these patents, the '876 and '075 patents, and immediately upon being sued set out to investigate the remaining patents-in-suit. Believing that its products did not infringe and that the asserted claims were invalid – beliefs which were confirmed by independent counsel – Fairchild mounted an aggressive yet professional and responsible defense. As a testament to the closeness of the case, Power Integrations began the second trial on validity by admitting that the same invention of its '075 patent was contained in another prior art patent filed 15 months earlier.

Despite Power Integrations' claims of misconduct, in over three years of litigation, Fairchild has not once incurred so much as a warning from the Court concerning any purported misconduct. Nor has Power Integrations or its counsel ever filed a single request for sanctions in this case. On the contrary, Fairchild produced dozens of witnesses for deposition, many outside the United States, provided over 1 million documents to Power Integrations, granted numerous extensions for requests of time to Power Integrations to produce documents and other matters to Fairchild, and generally cooperated with opposing counsel within the confines of the adversary system.

Ultimately, the juries disagreed with Fairchild's position, found willful infringement and awarded damages of over $33 million dollars. This damages award is far in excess of the damages figure presented by Fairchild at trial and far in excess of its actual U.S. activity. Despite this huge award, Power Integrations now asks the Court to award an additional $66 million in punitive damages, plus an unspecified amount in attorneys' fees and costs, to punish Fairchild for its infringement. Punitive damages are normally awarded, however, only in those cases where

---

[1] The patents-in-suit are: U.S. Patent No. 6,249,876 ("the '876 patent"); U.S. Patent No. 6,107,851 ("the '851 patent"); U.S. Patent No. 6,229,366 ("the '366 patent"); and U.S. Patent No. 4,811,075 ("the '075 patent").

the infringer's conduct is so egregious that punishment is necessary to deter such conduct from occurring in the future. Fairchild did not engage in egregious conduct so there is no need for punishment. As a result, and based on the totality of the circumstances as discussed below, Fairchild respectfully requests that the Court deny Power Integrations' requests to declare this case exceptional, treble damages and award attorneys' fees and costs.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

The issues of infringement, willfulness, damages and validity were tried to two juries, which concluded that Fairchild infringed the patents-in-suit and that Fairchild had failed to present clear and convincing evidence that the patents-in-suit were invalid. The first jury found willful infringement and damages in the amount of $33,981,781 were awarded to Power Integrations.

## III.    ENHANCED DAMAGES ARE NOT WARRANTED

A finding of willfulness does not mandate enhanced damages under 35 U.S.C. § 284. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992), *abrogated on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995). Instead, "[t]he paramount determination…is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Id.* This is consistent with the goal of an enhanced damages award, which is punitive rather than compensatory. *Beatrice Foods Co. v. New England Printing and Lithographing Co.*, 923 F.2d 1576, 1579 (Fed. Cir. 1991).

Enhanced damages punish a willful infringer and, therefore, require a finding of an increased level of culpability, akin to "bad faith infringement." *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1571 (Fed. Cir. 1996). Further, enhanced damages are generally inappropriate when, as here, the defendant presents a good faith defense and a substantial challenge to infringement. *State Contracting & Engineering Corp. v. Condotte America, Inc.*, 346 F.3d 1057,  (Fed. Cir. 2003), *quoting Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 20 (Fed. Cir. 1984); *see also, Delta-X Corp. v. Baker Hughes Production Tools, Inc.*, 984 F.2d 410, 413 (Fed Cir. 1993); *NTP, Inc. v. Research In Motion, Ltd.*, 270 F.Supp.2d 751, 758 (E.D. Va. 2003).

Further, any punitive damages award must be tempered by the Federal Circuit's recent decision in *In re Seagate*, 497 F.3d 1360 (Fed. Cir. 2007). There, the Federal Circuit elevated the prior negligence standard to a new and heightened standard – objective recklessness. This higher standard comports with Supreme Court precedent. *Id.* at 1371. This new standard must guide the Court here, so that only *objectively reckless* behavior by Fairchild, and not that which is merely negligent, should be punished.

In determining whether a defendant's conduct is so egregious as to warrant sanctions, courts generally consider nine factors. *Read Corp. v. Portec, Inc.*, 970 F.2d at 827-828. Power Integrations bears the burden of demonstrating by clear and convincing evidence that, under these factors, damages should be enhanced. *Shatterproof Glass Corp. v. Libby-Owens Ford Co.*, 758 F.2d 613, 628 (Fed. Cir. 1985).

PI requests a total award of over $100,000,000 – three times the amount of the jury's verdict – including a punitive damages award of more than $67 million. Such an increase is unconscionably punitive, especially in light of the Federal Circuit's caution that a finding of willful infringement does not mandate enhancement of damages. *Group One Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1308 (Fed. Cir. 2005). Here, as an evaluation of each of the *Read* factors establishes, an award of punitive damages against Fairchild is not justified.

### A.  Fairchild Did Not Copy The Commercial Embodiments of Power Integrations' Patents-in-Suit

#### 1.  To Enhance Damages Fairchild Must Have Copied the "Commercial Embodiment" Not Just the Patent

When examining the defendant's conduct to determine whether it was so egregious as to warrant sanctions, the Federal Circuit suggests the district court examine whether or not the defendant deliberately copied the ideas or design of another. *Read*, 970 F.2d at 827. To determine that Fairchild deliberately copied Power Integrations' "ideas or design," the Court may not rest upon a finding that Fairchild copied the elements of the patent claims. Rather, the Court must find that Fairchild copied the commercial embodiments of the patents-in-suit. *Id.*; *accord Itron, Inc. v. Benghiat*, 2003 WL 21402608, *8 (D. Minn 2003).

In evaluating this factor, the Federal Circuit in *Read* noted that the defendant had begun its design efforts by examining plaintiff's device. *Read*, 970 F.2d at 828. The Circuit Court acknowledged that the purpose for doing so was for the defendant to make its own competing device. *Id.* The record also established, however, that the defendant had made changes to the device deemed adequate by its counsel to avoid infringement. *Id.* The Court acknowledged that one of the benefits of the patent system is the incentive to create "design arounds," thereby creating new innovations. *Id.* As the *Read* court further explained,

> Of course, determining when a patented device has been "designed around" enough to avoid infringement is a difficult decision to make. One cannot know for certain that changes are sufficient to avoid infringement until a judge or a jury has made that determination.... The question which must first be answered here with respect to enhanced damages is whether Portec proceeded without a reasonable belief that it would not be held liable for infringement.

*Id.* The *Read* court concluded that the district court's characterization of the defendant's activity as "copying" was unwarranted. *Id.* Similarly, there is no evidence before this Court to support a finding that Fairchild copied the commercial embodiments of the patents-in-suit.

## 2.    Evidence Does Not Support Commercial Embodiment Copying

Fairchild's expert, Gu-Yeon Wei, testified to the differences between Power Integrations and Fairchild's frequency variation circuits. *See* Trial Transcript on 10/5/06 at 1153:14-1154:19. Dr. Wei further described the different ways in which Fairchild's accused products implement soft start functionality. *Id.* at 1159:22-1161:22. Based on these differences, Dr. Wei concluded that there was no evidence of copying in this case. *Id.* at 1162:11-1163:2.

Similarly, as was testified by Robert Conrad, an Executive Vice-President of Fairchild, before Power Integrations filed its lawsuit against Fairchild, Fairchild learned about some of Power Integrations' patents and made efforts to respond to them. *See* Trial Transcript on 10/6/06 at 1445:10-1447:2; Trial Transcript on 10/4/06 at 940:9-931:23. In particular, starting in approximately 1999, the engineering team investigated the development of devices that would compete with Power Integrations, but avoid its patents. *Id.* A team in Korea had identified eight different Power Integrations patents, concluded that there were two that they needed to look at

more closely—namely, the '075 Patent and U.S. Patent 5,258,636 (the "'636 Fingertip patent"). In the case of the '636 Fingertip patent, they generated nine different alternatives, one of which they deemed to not be acceptable. *Id*; PX 296 (translation) at FCS1330824-FCS1330825, FCS1330827-FCS1330833, attached as Exhibit C to Declaration of Bas de Blank. One of the eight design-around alternatives subsequently became Fairchild's own '512 patent, which was granted in 2002. *See id*; DX 534. Plainly, far from copying, Fairchild put significant effort into understanding and avoiding Power Integrations' patents, going so far as to create and patent its own work-around designs in the case of the '636 Fingertip patent. Power Integrations has never asserted the '636 Fingertip patent—proof of Fairchild's success at designing around this particular patent.

In the case of the '075 Patent, Fairchild's engineers analyzed the claims and initially determined that the patent could be avoided if the "P-Top Layer is Floated and NOT connected to the Substrate, so as to have no Reverse Bias applied," but determined that floating the P-Top would not work. PX 296 (translation) at FCS1330825, 1330826. Trial Transcript on 10/3/06 at 533:3-572:2.

Further, Fairchild's engineers also "conducted a review of the File Wrapper for the purpose of obtaining a clear and accurate interpretation of the claim[s]. . ." and discovered that Power Integrations had disclaimed coverage of DMOS devices during prosecution. PX 296 (translation) at FCS1330828. Having determined, based on the express statements in the prosecution history, that the '075 Patent did not apply to DMOS products, Fairchild proceeded with development and production of its new DMOS devices. Trial Transcript on 10/3/06 at 558:4-566:21; Trial Transcript on 10/4/06 at 887:21-891:20; Trial Transcript on 10/6/06 at 1447:3-1456:2. During prosecution, Power Integrations attempted to distinguish over DMOS prior art by arguing that the '075 Patent:

> "provides for a pair of laterally spaced source and drain pockets within the substrate as is customary for conventional MOS transistors and *is thus, distinguished from DMOS devices* which require a higher threshold voltage."

- 5 -

[PX 8 at PIF00045 (emphasis add)]  Later, Power Integrations again distinguished over the DMOS prior art by stating the '075 invention:

> "Claim 19 further provides for a substrate having a surface, an insulating layer on the surface of the substrate covering at least that portion between the source contact pocket and the nearest surface-adjoining position of the extended drain, and a gate electrode on the insulating layer electrically isolated from the substrate region thereunder which forms a channel laterally between the source contact pocket and the nearest surface-adjoining position of the extended drain region. Thus, claim 19 is limited to a MOS or MOSFET structure, while Colak shows a D-MOS device.  The MOSFET structure has a lower threshold voltage than a D-MOS device (0.7 volts compared to two-four volts for the D-MOS device) and thus, is directly compatible with five volt logic.  D-MOS devices usually require an additional power supply of ten to fifteen volts for driving the gate.  The MOSFET structure has less on-resistance and thus, further reduces the total on-resistance of the combined structure (MOSFET plus double-sided JFET)."

PX 8 at PIF00057.

Simply put, Fairchild believed that it could not infringe the '075 patent since its products were all DMOS devices.  Trial Transcript on 10/4/06 at 919:10-920:2; Trial Transcript on 10/6/06 at 1447:3-1456:2.  This conclusion was also reached by independent opinion counsel. *See* DX 136 (Sidley Austin Opinion Letter dated May 6, 2005).  Again, far from copying, Fairchild put significant effort into understanding and avoiding Power Integrations' patents, even to the point of obtaining the '075 Patent prosecution history and relying on it.

Fairchild's expert, Peter Gwodz, also testified as to why the preferred embodiments of the '075 patent are not infringed by Fairchild. *See* Trial Transcript on 10/5/06 at 1216:11-19. While evidence did show that Fairchild analyzed the Power Integrations devices, that same analysis demonstrated Fairchild's belief that Power Integrations was producing a DMOS product and not a MOS device covered by the '075 Patent. *Id.* at 891:10-20; 919:10-920:2.  A side-by-side comparison of the proposed Fairchild device and the Power Integrations device shows that Fairchild referred to both as "LDMOS" or lateral DMOS devices.  PX 289 at FCS1329259. Neither appears as a copy or any figure in the '075 Patent.   Analysis of the file history of the '075 patent revealed what Fairchild believed was a statement that Power Integrations did not claim DMOS devices.

Had Fairchild "copied" Power Integrations' commercial embodiments, the Fairchild

devices would be substitutes – one would be able to replace the commercial Power Integrations products with the accused Fairchild products. Power Integrations' Vice-President of Sales, Bruce Renouard, commented this was not the case and confirmed that Fairchild does not make any drop-in replacements for or any identical copies of Power Integrations' products. *See* Trial Transcript on 10/4/06 at 704:10-18. This means that Fairchild's products are not pin compatible and one product cannot simply be plugged into the same socket. Electronically, the pins are different. This is further proof that Fairchild did not copy the commercial embodiments of Power Integrations' patents or the products would be interchangeable.

Robert Blauschild, Power Integrations' expert, never once testified that Fairchild copied the commercial embodiment of either the '876, '851 or the '366 circuit patents. Instead, he focused solely on whether Fairchild "copied" certain claim elements of each of the circuit patents. The Federal Circuit made clear in *Read*, however, that intentional copying requires a finding that "the commercial embodiment, not merely the elements of a patent claim," were copied. *Id.*

### 3.    PI Fails to Establish That Fairchild Copied Its Commercial Embodiments

PI points to one of Fairchild's interrogatory responses, as well as the testimony of its engineers, all of which state that Fairchild studied Power Integrations' patents and products. Fairchild disputes this evidence supports increased damages. To the contrary, it is insufficient to sustain Power Integrations' burden to establish that Fairchild copied the commercial embodiments of the patents-in-suit.

Nor is it improper for Fairchild to examine publicly available patents to investigate its competition and attempt to make better products. Indeed, this is the purpose of the United States patent system – to encourage attainment of previously unachievable results based on information contained within the public domain. *In Re Application of Ferens*, 417 F.2d 1072 (C.C.P.A. 1969). This purpose was specifically explained to the jury during the video presentation given by the Court. As presented to both juries, "[O]nce a patent is issued by the Government, it becomes

available for public inspection, and that way anyone who learns of the patent and is interested can read it, and understand exactly what the inventor has claimed to have invented." Trial Transcript on 10/2/06 at 110:5-10.

PI further complains that Fairchild studied Power Integrations' data sheets. As an initial matter, this is irrelevant since it is not evidence that Fairchild copied the commercial embodiments of the Power Integrations patents. Further, the testimony of Fairchild Executive Vice-President Robert Conrad sets forth the many differences between the Power Integrations and Fairchild datasheets. *See* Trial Transcript on 9/19/07 at 616:7-617:18.

The evidence and testimony submitted to the jury and before this Court supports a finding that Fairchild did not deliberately copy the commercial embodiments of Power Integrations' patents-in-suit. As a result, the first *Read* factor weighs against enhancing damages.

**B.    Fairchild Had A Good Faith Belief That It Did Not Infringe Power Integrations' Patents and/or That The Patents Were Invalid**

The second *Read* factor courts examine to determine whether the defendant's conduct is so egregious as to warrant sanctions, is whether the infringer investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, weighs against enhancement. *Read*, 970 F.2d at 827. The evidence before the Court unequivocally establishes that Fairchild investigated the scope of the patents-in-suit and formed a good faith belief that it either did not infringe Power Integrations' patents, that the patents were invalid, or both. Fairchild sought opinions from competent attorneys that indicated the asserted claims were invalid or not infringed. Fairchild had these opinions updated with each potentially significant development in the law or the case. The fact that the juries ultimately disagreed with these opinions is irrelevant (indeed, the Court would never reach this issue had the juries found the claims not infringed or the patents invalid). What matters is that at all times Fairchild had a reasonable and good faith belief in its defenses.

**1.    <u>Fairchild Obtained the Advice of Competent Counsel Prior to Suit</u>**

The formation of a good-faith belief normally entails obtaining the advice of legal

counsel. *Id.* at 828. "Cases where willful infringement is found despite the presence of an opinion of counsel generally involve situations where opinion of counsel was either ignored or found to be incompetent." *Id.* at 829; *see also, Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 828-829 (Fed. Cir. 1989); *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 656-57 (1985). This is not the case here.

The record establishes that, on its own accord and before notice of this lawsuit or any accusation of infringement, Fairchild searched the public domain, located the '876 patent, and retained independent legal counsel to determine whether Fairchild infringed the '876 patent and/or whether such patent was invalid. Fairchild hired highly-respected and experienced counsel, Sidley Austin Brown & Wood ("Sidley Austin"). Sidley Austin is a well-established, international law firm with over 1600 attorneys and offices in Asia, the United States and Europe. *See* Trial Transcript on 10/5/06 at 1289:12-23.

The specific attorneys at Sidley who worked with Fairchild were Robert Morrill and Philip Woo. Mr. Morrill obtained his law degree from Harvard University in 1963, where he graduated *cum laude. Id.* at 1290:7-11. He is a member of the California and Nevada State Bars, as well as a member of the Patent Bar, qualified to practice law before the U. S. Patent & Trademark Office. *Id.* at 16-24.

Mr. Woo obtained his undergraduate electrical engineering degree from Southern Methodist University. *See* Trial Transcript on 10/6/06 at 1419:21-23. He graduated in 1994 from the University of Southern California law school. *Id.* at 1420:4-7. Mr. Woo is also registered to practice before the Patent and Trademark Office since 1995. *Id.* at 1421:11-20. He has prosecuted hundreds of patent applications. *Id.*

In reaching their opinions, both Sidley Austin attorneys met with Fairchild, determined which patents were in issue, what the prior art was, studied the patents, looked at the prosecution history, and drafted their findings in letters to Fairchild. *Id.* at 1298:6-1299:4. This evidence alone is sufficient to deny punitive damages in this case.

The initial opinion letter, which addressed the '876 patent, was issued to Fairchild on

March 9, 2004, over seven (7) months before Power Integrations initiated this action and prior to any notice of infringement by PI. *See* DX 180. In the initial letter, counsel concluded that Claim 1 of the '876 patent was invalid under the Wang reference. 1392:17-1393:11. The Wang reference was not provided to the patent examiner. *Id.* The letter states that the Wang reference was prior art, and that it anticipated and invalidated Claim 1. *Id.*

Fairchild's reviews were made more difficult by Power Integrations' deliberate decision not to mark its products with any specific Power Integrations patent numbers. *See* Trial Tr. On 10/3/06 at 327:3-332:23; Balakrishnan Deposition at 184:18-206:20, 386:2-388:24, attached to the Declaration of Bas de Blank as Exhibit B. Thus, Fairchild's efforts to identify relevant Power Integrations patents to avoid them and obtain legal competent advice regarding the scope of the '876 patent occurred despite Power Integrations' failure to mark.

### 2.    Fairchild Obtained the Advice of Competent Counsel OncePower IntegrationsSued

PI served Fairchild with its complaint alleging infringement of the '876 patent, as well as three additional patents, on October 20, 2004. *See* Power Integrations' Complaint. This suit was filed with no prior notice or warning to Fairchild. Despite its surprise, Fairchild immediately sought the independent advice of its outside attorneys. The invoices supplied by opinion counsel and produced to Power Integrations prove that on October 22, 2004 – just two days after the filing of this action – Sidley Austin began its review of all Power Integrations' asserted patents. *See* Declaration of Bas de Blank in Support of Fairchild's Answering Brief, Exhibit A.

In rendering its opinions, counsel spent hundreds of hours studying the prior art references, reviewing the developments that existed in the field before the patent application and studying the client's products. *See* Trial Transcript on 10/5/06 at 1302:20-1303:15. Separate opinion letters were issued on each of the patents-in-suit. *See* DX 136 (May 6, 2005 Opinion Letter re '075); DX 535 (June 28, 2005 Opinion Letter re '366); DX 159 (May 20, 2005 Opinion Letter re '876); and DX 160 (June 21, 2005 Opinion Letter re '851).

With respect to the '075 patent, counsel informed Fairchild that Power Integrations had

represented to the patent examiner, in at least two places, that "DMOS" integrated circuits were not covered by the patent. DX 136. Power Integrations did this to avoid prior art cited by the Examiner, specifically the Colak reference. *Id.* As a result, counsel opined that DMOS devices had been disclaimed in the prosecution and were not covered by the claims. *Id.* Counsel further opined that Fairchild had certain other structures present. *Id.* This opinion independently confirmed the position taken in 1999 when the engineers obtained and reviewed the '075 prosecution history and concluded the '075 patent did not claim DMOS devices.

With respect to the '851 patent, opinion counsel informed Fairchild that Claim 1 of the patent was anticipated by a reference called the TEA2262. DX 160. Counsel further opined that all of the other claims were not infringed by the Fairchild device. *Id.* Counsel also concluded that the '366 patent was anticipated by the TEA2262 reference. DX 535.

Counsels' opinion letters are thorough and well-reasoned. They are neither conclusory nor terse. To the contrary, they contain detailed analysis of both non-infringement or invalidity, depending on the circumstances found to be applicable by opinion counsel. As such, they constitute competent opinions on which Fairchild had every right to rely. As the Federal Circuit held in *Graco, Inc. v. Binks Manufacturing Company*, 60 F.3d 785, 793 (Fed. Cir. 1995),

> We see no basis for a conclusion that Binks could not have reasonably relied on Juettner's conclusion of noninfringement. The opinion was neither conclusory nor terse. To the contrary, the opinion provided a detailed infringement analysis. The conclusion appears well-supported and believable. That the district court disagreed with Juettner and concluded Binks did infringe does not render Juettner, or his opinion, incompetent.

Further, as noted by the *Read* court, nothing in the letters obtained by Sidley Austin would alert Fairchild to reject the opinions as incorrect. *Accord, Read,* 970 F.2d at 830 ("The most important consideration, however, is that nothing in Valiquet's letter would alert a client to reject the letter as an obviously bad opinion.").

### 3. Fairchild Diligently Continued to Seek Opinion Counsel's Assurances As The Case Progressed

Despite the fact that it had already obtained the opinion of independent counsel with respect to each and every Power Integrations patent it was accused of infringing, Fairchild did

not cease its good faith and diligence. Rather, when further developments occurred, Fairchild went back to Sidley Austin to obtain further review. Specifically, when the Federal Circuit issued the *Philips* decision changing how claims should be construed, counsel re-visited all of their prior opinions and issued four more opinions, one for each of the patents-in-suit. *See* DX DX 137 (Sept. 26, 2005 Opinion Letter re '075); DX 536 (Sept. 22, 2005 Opinion Letter re '876); DX 537 (Sept. 22, 2005 Opinion Letter re '851); and DX 538 (Sept. 22, 2005 Opinion Letter re '366).

 Like the first letters, these opinions were thorough and well-reasoned. The Federal Circuit has made it clear that the fact that counsel's opinion turned out to be incorrect does not render such opinion incompetent. *See, e.g., Ortho Pharmaceutical Corporation*, 959 F.2d at 944 ("While an opinion of counsel letter is an important factor in determining the willfulness of infringement, its importance does not depend upon its legal correctness. Indeed, the question arises only where counsel was wrong."). Rather, the relevant inquiry focuses on the thoroughness of counsel's opinion in light of all relevant factors. *Id.* These factors include defendant's intent and reasonable beliefs. *Id.*

 Yet another round of opinions, this time the result of the Court's claim construction, was sought by Fairchild. *See* DX 480 (June 6, 2006 Opinion Letter re '075); DX 481 (June 6, 2006 Opinion Letter re '851); DX 482 (June 6, 2006 Opinion Letter re '876); and DX 483 (June 6, 2006 Opinion Letter re '366). These additional reviews were undertaken at significant expense to Fairchild. Nonetheless, despite the time and substantial effort involved, Fairchild ensured that its opinion counsel had all relevant information so that an adequate and proper infringement and validity assessment could be made. All tolled, Fairchild obtained 13 opinions before and during this litigation which contained hundreds of pages of analysis and took into consideration the changing rulings and law of the case.

 While Power Integrations characterizes opinion counsel's letters as "inconsistent," the record is clear that both Fairchild and counsel diligently sought to re-evaluate the non-infringement and invalidity conclusions based upon changes in the law and rulings issued by the Court. Far from exhibiting a lack of good-faith, these actions demonstrate Fairchild's continuing

- 12 -

concern regarding Power Integrations' intellectual property rights. *Accord, Graco*, 60 F.3d at

794, noting that "[T]he nature, timing, and number of the contacts between Binks, Poly-Craft,

and their counsel clearly shows that they were, from the start, concerned with acknowledging

Graco's intellectual property and respecting its patent rights in both patents that were relevant."

Fairchild has no doubts that, had it ignored developments within this case, including the claim

construction and changes in the caselaw, and failed to apprise its opinion counsel of such

changes, Power Integrations would argue it lacked a good-faith belief in the validity of the non-

infringement and invalidity opinions it obtained.

     The record is devoid of any evidence establishing that Fairchild lacked a reasonable

belief in the opinions it obtained from Sidley Austin. Indeed, the fact that Fairchild obtained

opinion letters from independent counsel rather than its litigation counsel further serves to

support the reasonableness of its beliefs and actions. *See, e.g., Comark Commc'n, Inc. v. Harris

Corp.*, 156 F.3d 1182, 1191 (Fed.Cir.1998) (primary purpose in obtaining patent opinion letter

from independent patent counsel is to "ensure that it acts with due diligence in avoiding activities

which infringe the patent rights of others").

     Based on the evidence and testimony submitted to the jury and before this Court,

Fairchild respectfully submits that the evidence supports a finding that it investigated the scope

of the patents-in-suit and formed a good-faith belief that such patents were either invalid or not

infringed. As a result, the second *Read* factor weighs against enhancing damages in this instance.

## C.    **Fairchild Did Not Engage In Vexatious Litigation Tactics**

     The third factor the Court should examine in its determination as to whether to impose

sanctions based on egregious misconduct is the infringer's behavior as a party to the litigation.

*Read*, 970 F.2d at 827. The record before the Court is clear that Fairchild did not engage in

vexatious litigation tactics. To the contrary, Fairchild cooperated with Power Integrations from

the outset of this litigation and continues to do so through today.

### 1.    **<u>Fairchild's Cooperation Throughout Litigation</u>**

From the moment this lawsuit was filed, despite the fact that Fairchild was caught by

surprise regarding Power Integrations' accusations, Fairchild has consistently cooperated with PI. Fairchild began by accepting service of process on behalf of Fairchild Korea, thereby obviating the necessity for Power Integrations to jump through the often complicated procedural hoops necessary to comply with the Hague Convention.

Following service, Fairchild immediately began investigating each and every one of Power Integrations' claims. To this end, it requested that Power Integrations identify as soon as possible the claims that are allegedly infringed, as well as the identity of the accused products. *See* Declaration of Bas de Blank. To expedite discovery, Fairchild dispatched a legal team to Korea to collect relevant documents and other materials. *See* Declaration of Vickie Feeman. An Orrick partner, as well as two Korean-speaking associates, a paralegal, and a computer technician traveled to Korea less than four months after Power Integrations' complaint was filed to ensure responsive information was collected and preserved. Fairchild then coordinated initial discovery with Power Integrations. *Id.*

Additionally, rather than require Power Integrations to serve letters rogatory and seek government permission to depose Fairchild employees in foreign countries, Fairchild voluntarily produced foreign witnesses for depositions, even though they were employees of a subsidiary that was never sued. *Id.* Similarly, all of the documents – and there were over 1 million produced to Power Integrations– were provided by Fairchild to Power Integrations without requiring Power Integrations to comply with the Hague Convention governing discovery from foreign non-parties.

Fairchild's cooperation continues today. Federal Rule of Civil Procedure 59(b) provides that motions for a new trial and judgments as a matter of law may be filed as late as 10 days after entry of judgment. Judgment has not yet been entered in this case, however, at the request of Power Integrations, Fairchild agreed to file all its motions post-trial motions by December 3, 2007. As a result, the parties are in the midst of post-trial briefing.

### 2.   Trial Court Noted Parties' Need for Strong Advocacy

Fairchild has never once been admonished by the Court for any alleged misconduct. Nor

did Power Integrations ever seek sanctions as a result of any purported misconduct on the part of Fairchild. To the contrary, the Court commented at the start of trial that the parties appeared to be cooperating – they were. *See* Trial Transcript on 10/2/06 at 105:23-106:6 (Court states, "This trial is going to go well. I'm sensing that you're coming together. It's kind of like you're able to talk with each other, and it's going to be good. After this case is over, if you want to make that application, you understand the record says you can do that.")

During one of the pretrial hearings, the Court acknowledged the need for strong advocacy in the litigation process, remarking to Fairchild's counsel, "[I]n the legal profession it's always fair to punch back." *See* Trial Transcript on 5/31/06 at 47: 3-5. In response to the comment of Fairchild's counsel that he "just wanted to make sure" it was alright to punch back, the Court continued, "[H]ow would we maintain the adversary system if we didn't punch back? It would just collapse. We'd have lawyers with low blood pressure or something. Which one do you want to punch back with?" *Id.* at 47:15-25.

Similarly, during a hearing prior to the start of the validity trial in which the parties had been arguing the effect of the *KSR* decision, the Court explained its view concerning litigation and law reform.

> Mr. Guy:      As you probably noticed, there has been a few changes in the law.
>
> The Court:    I'm on to it. I like it. I used to – as a public defender used to love to be in the law reform. I like pushing the edge once you get a little principle, see how far you can apply it. I often tell the story when I was a young public defender I went to a meeting and they told us that they didn't like the way we got cut off at suppression hearings on a constitution question on the Fourth Amendment having to stay within the four corners of the search warrant, and a very experienced lawyer in that office had all us younger public defenders going in and every time we had a suppression we made an objection and that case essentially became States versus Weeks in the Supreme Court, so I get it, I like it. And as a young lawyer I got a chance to get exposed to how you actually get that done. So I'm impressed. I would push that case as far as I could if I had an invalidity case.

Hearing Transcript on 9/12/07 at 39:2-24.

In assessing the alleged misconduct of counsel and denying a motion to enhance damages in another case, this Court noted that the pretrial motions filed by defendant therein were not

frivolous and commented that, had any misconduct occurred during trial, other sanctions to deter such behavior were available, if needed. *See Tristrata Technology, Inc. v. ICN Pharmaceuticals, Inc.*, 314 F.Supp.2d 356, 361 (D. Del. 2004). Other districts courts have likewise noted the need for zealous representation in the realm of patent litigation. "Counsel had a duty to zealously represent his clients. Patent trials are expensive, lengthy, and high risk endeavors. We cannot fault defendants, and their counsel, for their aggressive conduct at trial." *Muniauction, Inc. v. Thomson Corp.*, 502 F.Supp.2d 477, 486 (W.D. Pa. 2007). Similarly, the district court in Illinois stated, "[D]espite the parties' differences in this matter, Bosch's and Black & Decker's actions show that counsel rigorously advocated on behalf of their clients and assisted the Court in this matter. Put differently, Bosch's actions did not exceed the permissible bounds of zealous advocacy or reasonable litigation tactics." *Black & Decker Inc.*, 2006 WL, *5 (citations omitted).

Power Integrations contends Fairchild engaged in "vexatious litigation" and discusses what it contends are "egregious examples" of such tactics. As shown in the Appendix attached here, none of these so-called examples amount to any misconduct whatsoever.

Based on the evidence and testimony submitted to the jury and before this Court, Fairchild respectfully submits that the evidence supports a finding that it and its counsel acted professionally during the litigation. As a result, the third *Read* factor weighs against enhancing damages in this instance.

### D.    Fairchild's Size and Financial Situation Do Not Weigh in Favor of Enhanced Damages

The fourth factor courts examine in their assessment concerning whether to award punitive damages is the defendant's size and financial condition. *Read*, 970 F.2d at 827. While there is no dispute that Fairchild is a large company, courts have held that punitive damages should not be awarded if they would unduly prejudice the defendant's non-infringing business. *See, e.g., NTP, Inc.*, 270 F.Supp.2d at 758; *Kori Corp.*, 561 F. Supp. at 533.

In this case, the evidence presented shows that an award of even $10 million in punitive damages would be significant.                **REDACTED**

**REDACTED**                Robert Conrad Declaration at ¶ 5.

**REDACTED**

*Id.* Thus, it does not constitute infringement. 35 U.S.C. § 271.

Power Integrations' award of $33 million is already almost 5 times greater than all of Fairchild's profits for these products. If trebled, Power Integrations' damages would be almost 14 times Fairchild's worldwide (non-infringing) profits. Therefore, a comparison between the amount of profits earned from infringing sales with the over $67 million dollars in punitive damages that Power Integrations seeks via this motion for enhancement clearly demonstrates the severe prejudice that Fairchild would suffer if the Court were to enhance damages in this case.

Further, in reviewing the totality of facts and circumstances, the Court may consider the size of the damages award when determining whether to enhance damages. *Riles v. Shell Exploration and Production Co.*, 298 F.3d 1302, 1314 (Fed. Cir. 2002); *Informatica Corp. v. Business Objects Data Integration*, 489 F.Supp.2d 1075, 1085 (N.D. Cal. 2007). Here, the jury awarded a huge sum, over $30 million dollars, representing close to 100% of the damages sought by plaintiff and far in excess of the damages calculated by Fairchild's expert. Based on the evidence and testimony submitted to the jury and before this Court, Fairchild respectfully submits that the evidence supports a finding that neither its size nor financial condition weighs in favor of enhancing damages in this instance.

**E.    This Case Is "Close" Under Prevailing Legal Standards**

The fifth factor courts examine in determining whether to enhance damages based upon a finding of willfulness is the closeness of the case. *Read,* 970 F.2d at 827. Although the jury decided against Fairchild in this case, this result is not determinative of whether the questions were closely balanced and hotly contested. *Informatica*, 489 F.Supp.2d at 1085, citing to *Applied Medical Resources Corp. v. United States Surgical Corp.*, 967 F.Supp. 861, 865 (E. D. Va. 1997). In addition, the Federal Circuit has held that enhanced damages are not appropriate if the defendant, as Fairchild did, presents a "meritorious good faith defense and a substantial challenge to infringement." *Delta-X Corp.,* 984 F.2d at 413. "A case is close if it was 'hard-

- 17 -

fought' or the jury could have found for the defendant on the issues of infringement, validity, and willfulness, and could have awarded substantially less damages." *Riles*, 298 F.3d at 1314.

The record before the Court supports the finding that this case was close from the outset. Indeed, Power Integrations did not even seek summary judgment on any of the patents presented at trial, implicitly acknowledging the existence of numerous factual disputes surrounding each of the four patents-in-suit. A brief review of Fairchild's arguments concerning each patent-in-suit demonstrates the closeness of this case.

### 1.     '075 Patent

With respect to the '075 patent, the issues of non-infringement and invalidity were a "close case." First, regarding non-infringement, there was a clear waiver of claim scope during the prosecution history, in which Power Integrations disclaimed coverage of DMOS devices.[2] This fact alone renders infringement a "close case," given that the accused Fairchild devices were all DMOS devices.

During claim construction, the Court deferred the question of prosecution history estoppel and whether DMOS devices were disavowed or could be infringing until a later point in the case. DI 231 at pp. 6-9. After the Court's ruling, Power Integrations dropped all assertions of infringement of the '075 Patent under the doctrine of equivalents before trial. *See* DI 408 at p. 2; DI 409. It was not until the next to the last day of the infringement trial that the Court issued a supplemental claim construction order, finding that not "all" DMOS devices had been disclaimed during prosecution. DI 409 ("In the Court's view, Plaintiff's statements were only relevant to distinguish the type of DMOS device shown in Colak, and not all DMOS devices."). There can be no better evidence that the DMOS issue was "close" than Power Integrations' actions in this regard.

Further, the validity of the '075 Patent is an extremely "close case." Indeed, at the start of the invalidity trial, Power Integrations admitted that every element of Claim 1 of the '075

---

[2] While Power Integrations disputed the ultimate scope of that waiver—whether the wavier created only an estoppel of the doctrine of equivalents or was a disavowal of claim coverage for literal infringement as well - Power Integrations did not deny that a waiver existed.

Patent was contained in Mr. Beasom's earlier U.S. Patent No. 4,823,173 ("'173 Patent"), filed 15 months earlier. 9/17/07 Power Integrations Opening Statement 148:22-149:1 ("[w]hen you talk about the P-Top patent, the '075 patent, I'll tell you right now the evidence will show Mr. Beasom did have the same idea as Dr. Eklund. No question about it."). Fairchild had always believed that the Beasom '173 Patent anticipated the '075 Patent. Power Integrations refused to concede that the Beasom patent anticipated until trial. This is dispositive of the closeness of the case regarding invalidity of the '075 Patent.

The only way that Power Integrations could overcome its admission that the Beasom patent anticipated was to show that Dr. Eklund invented Claim 1 of the '075 Patent before the filing date of Mr. Beasom's '173 Patent. This required Power Integrations to prove the substance of the invention in Dr. Eklund's notes, the dating of those notes, and that these facts were corroborated by independent evidence, other than Dr. Eklund himself. Each of these issues was close and only fully developed after a trial and the testimony of multiple witnesses. Yet, before and during that process, the Beasom patent was at all times anticipatory prior art, as Power Integrations finally admitted.

Furthermore, at trial, Power Integrations failed to present legally sufficient evidence corroborating any invention date prior to the filing of the Beasom '173 Patent. *See* DI 616 at pp. 4-16 (setting forth in detail Power Integrations' failure to corroborate Eklund's prior invention). The testimony of Dr. Eklund—the inventor of the '075 Patent—was legally insufficient to alone establish prior conception or reduction to practice without some independent corroboration. *Id.* Power Integrations failed to show any single document or any witness corroborating Dr. Eklund's conception prior to the '173 Patent. *Id.* Neither set of Dr. Eklund's notes relied upon by Power Integrations independently showed all elements of Claim 1 of the '075 Patent, and thus did not corroborate Dr. Eklund's conception of Claim 1 prior to the '173 Patent filing date. *Id.* Power Integrations did not provide any independent corroborating evidence that Dr. Eklund's notes, which were made months apart and do not refer to each other, were meant to be read together, in order to establish conception. *Id.* Further, Power Integrations did not produced any

- 19 -

documents, prototypes, devices or independent witnesses corroborating that Dr. Eklund reduced all elements of Claim 1 to practice at any time prior to the filing of the '173 Patent. *Id.* In other words, given the severe paucity of legally cognizable evidence of Eklund's invention prior to Beasom, there can be no doubt that invalidity of the '075 Patent was a close case. Moreover, Power Integrations contended that Mr. Beasom's earliest notes, which clearly predated Dr. Eklund's work, purportedly lacked only two minor portions of the claim elements. *Id.* at pp. 17-21. Again, the issue was very close.

Finally, the prior art Ludikhuize article, in combination with Mr. Beasom's work renders the '075 Patent obvious. DI 616 at pp. 22-25. Indeed, Power Integrations' own inventor Dr. Eklund has admitted that the P-TOP is the primary inventive element of the '075 Patent and that the P-TOP disclosed in the prior art Ludikhuize article is "very similar" to the '075 Patent. *See* DI 585 at pp. 7-9; *see also* DI 626 at pp. 2-7. This fact alone demonstrates that the issue of obviousness is a close case. Likewise, given Dr. Eklund's own admission that it was well known in the art to combine high and low voltage devices on the same chip, and many articles disclosing such a combination, the issue of whether it would be obvious to combine the device of Claim 1 on the same chip as a low voltage device (as claimed in Claim 5) was also an extremely close question. DI 616 at pp. 25-27. In sum, each critical issue of non-infringement and invalidity of the '075 Patent was very close, weighing against imposition of increased damages.

## 2.    '876 Patent

The question of infringement and invalidity of the '876 Patent was particularly close. Indeed, it was so close that the two different juries came to essentially opposite conclusions.[3] Claim 1 – the only asserted claim of the '876 Patent – requires a digital circuit that causes the frequency to vary within a predetermined range. D.I. 232. This is accomplished by coupling together three elements – an oscillator to a counter to a digital to analog converter (which, in turn, is coupled back to the oscillator.

---

[3] The fact that the different juries reached inconsistently decided essentially the same issue is part of the basis for Fairchild's pending motion for new trial. D.I. 615.

The accused Fairchild devices include an additional circuit element connected between the counter and the DAC. Power Integrations does not dispute that this element is present. *See* 10/3/06 Blauschild Trial Tr. at 476:10-23. The issue is whether this intervening circuit element "decouples" the counter and digital to analog converter (or "DAC") in a way contrary to that which is required by the claim. If so, the Fairchild devices do not infringe. This is a particularly close question because Power Integrations has taken the position that similar intervening circuit elements between the counter and DAC "decouples" these elements in a way that precludes practicing the claim. *See* 10/3/06 Blauschild Trial Tr. at 516:9-20.

The question of the invalidity of claim 1 of the '876 Patent was also close. Fairchild presented the jury with the Martin Patent. There is no dispute that the Martin Patent is prior art. Therefore, the parties agreed that claim 1 of the '876 Patent would be invalid if the Martin Patent described the required oscillator, counter and DAC in the claimed configuration.

During cross-examination, Mr. Blauschild, Power Integrations' expert, admitted that the Martin Patent contained all of the required circuit elements. 9/20/07 Blauschild Trial Tr. at 1073:8-24. Moreover, Mr. Blauschild agreed that the prior art Martin Patent showed that the DAC was coupled to the oscillator, which, in turn, was coupled to the counter. *Id.* at 1073:17-21 and 1074:1-6.

Notwithstanding these admissions, Power Integrations argued that claim 1 was not invalid because there was a "ROM" between the counter and DAC. 9/20/07 Blauschild Trial Tr. at 1062:14-1063:14. That "ROM", however, served the independent purpose of "signature reduction" and was not necessary for the reduction in electromagnetic interference. 9/19/07 Horowitz Trial Tr. at 712:14-713:4. Mr. Blauschild agreed that if the ROM were removed and the counter was directly connected to the DAC, the prior art Martin patent would "show every element of Claim 1 of Power Integrations' '876 Patent" (and, thus, invalidate) claim 1 of the '876 Patent. *Id.* at 1077:4-11.

Thus, ***the only question is whether one of ordinary skill in the art would understand that he or she could remove the ROM shown in the figure of the Martin Patent and connect***

- 21 -

*the counter and DAC*. The answer is unequivocally "yes". Mr. Blauschild testified that such a person would have a bachelor or masters degree in electrical engineering. In addition, they would have three to seven years experience designing such analog circuits. In fact, they would be specifically familiar with these "basic components" of an oscillator, counter, and DAC. 9/20/07 Blauschild Trial Tr. at 1077:24-1079:4. Clearly, such a person had the skill and would have understood that he or she could remove the ROM (which was not required for reduction of electromagnetic interference) and connect the counter to the DAC if signature reduction were not also required. Thus, claim 1 of the '876 Patent should have been found invalid as obvious. *KSR International Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1740 (2007) ("If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability").

The close questions of infringement and invalidity are set forth in further detail in Fairchild's pending motion for judgment as a matter of law. D.I. 614. The closeness of the invalidity question was independently confirmed by the Patent Office when it decided to reexamine the validity of claim 1 of the '876 Patent in light of the prior art Martin Patent.

### 3.   '366 Patent

The only allegedly novel element of the '366 patent is the "soft start circuit". Power Integrations admits that were this element given its plain meaning, the claims would be invalid. D.I. 605, ¶ 54. Thus, a key question as to the validity of the '366 Patent boils down to the construction of this term.

The Court construed the "soft start circuit" element as a means-plus-function type term. [D.I. 232]. This construction, however, was a close question. As an initial matter, the soft start circuit element did not use "means for" language. Thus, there is a presumption that it is not a means-plus-function term (and, consequently, that the claims are invalid as Power Integrations concedes they would be). *Phillips v. AWH Corp.*, 415 F.3d 1303, 1311 (Fed. Cir. 2005). To rebut this presumption the burden was on Power Integrations to prove "that the claim fails to 'recite sufficiently definite structure' or recites 'a function without reciting sufficient structure for performing that function.'" *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320

(Fed. Cir. 2004).

"In deciding whether [the] presumption has been rebutted, the focus remains on whether the claim as properly construed recites sufficiently definite structure to avoid the ambit of § 112, P 6." *Semitool, Inc. v. Novellus Sys.*, 44 Fed. Appx. 949, 956 (Fed. Cir., 2002). Here, the claims of the '366 Patent provide sufficient structure to preclude application of § 112, ¶ 6. Indeed, the Federal Circuit specifically held that "when the structure-connoting term "circuit" is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112, ¶ 6 presumptively will not apply." *Linear*, 379 F.3d at 1320. "The term 'circuit' with an appropriate identifier such as 'interface,' 'programming' and 'logic,' certainly identifies some structural meaning to one of ordinary skill in the art." *See Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1371-72 (Fed. Cir. 2003).

The closeness of this claim construction question is highlighted by the fact that the same Power Integrations inventors have an earlier patent that expressly claims a "soft start means" (rather than a "soft start circuit"). DX 1000. Thus, Power Integrations knew how to draft a means-plus-function soft start element when and if it meant to claim one. The fact that Power Integrations did not do so here is further evidence that the term was not understood or intended to be means-plus-function.

Even given the Court's claim construction, the invalidity of the '366 patent presented a close question. Mr. Lund, an inventor of the '366 Patent, designed an earlier, Power Integrations prior art device – the SMP240/260. This device incorporated a fully internal, integrated soft start circuit. 9/19/07 Lund Trial Tr. at 669:11-16. Mr. Lund testified that this prior art (which was withheld from the Patent Office) met every element of claims of the '366 Patent.[4] *Id.* at 670:17-671:23 and 677:4-20. Indeed, now that it has been provided with this prior art, the Patent Office is reexamining the validity of the claims of the '366 Patent.

---

[4]　　Power Integrations' inequitable conduct presents an additional close case in this matter. *See* D.I. 585 and 626.

### 4. '851 Patent

Liability with respect to the '851 Patent was also close. During prosecution, the Patent Office determined (and Power Integrations never disputed) that the admitted prior art included the claimed terminals, switch, drive circuit, and frequency variation circuit and rejected the claims as invalid:

### *Claim Rejections-35 U.S.C. § 102*

5.      Claims 29, 35 & 37 are rejected under 35 U.S.C. 102(b) as being anticipated by Applicants' Prior Art Fig. 1.

Applicants' Prior Art Fig. 1 shows a first terminal 95, a second terminal Com, a switch/drive circuit 90 and a frequency variation circuit 140 as recited in claim 29.

Further shown in a rectifier 10, a capacitor 15, a first winding 35 and a second winding 45 as recited in claim 35.

Further shown is a feedback terminal (Error Amplifier In) are recited in claim 37.

DX 106 ('851 Pros. Hist.) at FCS0000439. Power Integrations amended its claims and added an oscillator element that the Examiner believed to be novel. DX 106 ('851 Pros. Hist.) at FCS0000440 and 449. Consequently, the Examiner allowed the claims.

During trial, however, Power Integrations admitted that the oscillator element – the only element not found by the Examiner in the admitted prior art – was, in fact, well known. *See* D.I. 603, p. 16. Indeed, such an oscillator was disclosed in Power Integrations' prior art SMP211 device, which Power Integrations withheld from the Patent Office.[5] Instead, Power Integrations argued that the prior art lacked the "frequency variation signal" element that was generated by the "frequency variation circuit" that the Examiner had expressly determined was present in the prior art. DX 106 ('851 Pros. Hist.) at FCS0000439.

Given the prosecution history of the '851 Patent and Power Integrations' admissions, the validity of these claims was extremely close. Indeed, the Patent Office agreed that the prior art upon which Fairchild relied presented a "substantial new question" as to the patentability of the claims of the '851 Patent and instituted a reexamination of that patent. DX 601, pp. 8-9.

---

[5]    Power Integrations' inequitable conduct presents an additional close case in this matter. *See* D.I. 585 and 626.

### 5.  Damages

Power Integrations was awarded $33,981,781 in damages.  Power Integrations' own damages expert admits that over $30 million of the damages sought by Power Integrations were for "worldwide" activity and not related to any manufacture, use, sale, or offer sale within the United States or importation into the United States by Fairchild *or anyone else*.  10/4/06 Troxel Trial Tr. 838:1-8440:20.  As set forth more fully in Fairchild's pending post-trial brief on the issue of damages, such damages fail as a matter of law.[6]  D.I. 613.

This very year, the Supreme Court repeated the "general rule" that "under United States patent law that no infringement occurs when a patented product is made and sold in another country." *Microsoft Corp. v. AT&T Corp.*, 127 S. Ct. 1746, 1750 (2007).  This follows over 150 years of clear Supreme Court precedent repeatedly holding that such extraterritorial, world wide damages are improper.

- **In 1856** – "The use of [a patented article] outside of the jurisdiction of the United States is not an infringement of his rights, *and he has no claim to any compensation for the profit or advantage the party may derive from it*." *Brown v. Duchesne*, 60 U.S. 183, 195-196 (1856) (emphasis added); *also* "The patent laws are authorized by that article in the Constitution which provides that Congress shall have power to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries.  *The power thus granted is domestic in its character, and necessarily confined within the limits of the United States.*  It confers no power on Congress to regulate commerce... which belong to a foreign nation...." *Brown*, 60 U.S. at 195 (emphasis added).

- **In 1915** – "the right conferred by a patent under our law is confined to the United States and its Territories and *infringement of this right cannot be predicated of acts wholly done in a foreign country*." *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 650 (1915) (emphasis added).

- **In 1972** – "our patent system makes no claim to extraterritorial effect." *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 531 (1972).

- **In 2007** – "The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law.  The traditional understanding that our patent law 'operates only domestically and does not extend to foreign activities,' is embedded in the Patent Act itself, which provides that a

---

[6]     Power Integrations deliberated decision to seek "worldwide" sales when it knows that there is no legal basis for such a recovery is only the latest example of Power Integrations' overreaching on damages issues.  Power Integrations previously sought pre-filing damages despite the fact that Power Integrations admitted that it failed to mark its products or otherwise provide Fairchild with the required notice.  35 U.S.C. § 274.  The Court properly granted Fairchild's motion for summary judgment and precluded such damages.  D.I. 265.

patent confers exclusive rights in an invention within the United States."
*Microsoft*, 127 S. Ct. at 1758.

Thus, strictly speaking, the question of damages was not a "close" issue – the law is clear that Power Integrations cannot recover extraterritorial "worldwide" damages for infringement of a United States patent. 35 U.S.C. § 271. Power Integrations' refusal to recognize this simple and controlling legal principal, however, required Fairchild zealously to litigate this case.

### F.     Fairchild Took Immediate Remedial Action Upon Learning of the Lawsuit

The sixth and seventh *Read* factors assess the duration of the defendant's misconduct and the remedial action taken by the defendant. *Read*, 970 F.2d at 827. Power Integrations argues that these factors favor enhancement based on its contention that Fairchild "has done nothing to abate its infringement and has in fact expanded its manufacturing of infringing parts in the United States and continually increased its overall sales volume." *See* Moving Brief at pp. 19-20. This statement is false on several grounds.

First, within two days after being served with Power Integrations' infringement complaint, Fairchild took remedial action by retaining outside patent counsel to examine and review all four patents-in-suit.[7] *See, e.g.,* Sidley Austin Invoices, FCS 1693293-3358; Sidley Austin Opinion Letters, DX 136-137, 159-60, 180, 480-83, 536-58. As discussed above, independent counsel conducted its review and opined to Fairchild that either its products were not infringing or that the patents were invalid. Fairchild was justified in relying upon this advice. *Graco*, 60 F.3d at 793.

Fairchild did not end its remedial action upon receipt of the initial opinion letters. Instead, in a good-faith effort to ensure that it received the very best advice, Fairchild sought two additional rounds of opinion letters. The first round was sought based on a new Federal Circuit decision and the second round was obtained after the Court issued its claim construction ruling. Based on these letters, in which Sidley Austin repeatedly determined that the claims were invalid

---

[7] Fairchild requested review of *all* patents-in-suit, despite the fact that it had already obtained an opinion letter before being sued by Power Integrations concerning the '876 patent.

or not infringed, Fairchild harbored a good-faith belief that no further remedial measures were necessary. Indeed, taking further remedial measures would be antithetical to such belief. *See, e.g., Black & Decker Inc. v. Robert Bosch Tool Corporation,* 2006 WL 3359349, *10 (noting that defendant makes a good point that taking any remedial measures would have been antithetical to its good-faith belief of non-infringement and invalidity but finding factor weighs in favor of enhancement since defendant took no remedial steps *after* the jury returned an infringement verdict).

Following the infringement verdict, Fairchild engaged in numerous remedial measures, without even waiting for its chance to prove the claims invalid. These remedial actions included: a) designating the accused products as "not recommended as design in" products on Fairchild's website; b) notifying customers that if the patents-in-suit were not found invalid, Fairchild could no longer sell the infringing products in the United States; and c) recommending that customers transition to Fairchild's new non-infringing Green FPS e-series. These remedial steps are discussed in the accompanying Declaration of Robert Conrad, an Executive Vice President of Fairchild. *See also*, Exhibit A to the Conrad Declaration (exemplar letter to customer setting forth strong recommendation that customers replace accused green FPS products, even outside the United States).

Fairchild took additional remedial action after the second jury found that the asserted claims were not invalid, without waiting for entry of judgment or a decision on its post-trial briefs or the issue of inequitable conduct. These remedial actions included: a) apprising customers that Fairchild will no longer make, use or sell in the United States, or offer to sell in the United States, any of the products found to infringe Power Integrations' patents-in-suit; b) removing datasheets for the accused Green FPS products that were found to infringe from Fairchild's U.S. website; c) ensuring that the accused products were neither sold nor manufactured in the United States or imported into the United States by Fairchild; d) advising customers that they must ensure that no infringing devices are imported into the United States and Fairchild will not indemnify any customers if imports occur despite Fairchild's contrary

instructions; and e) continuing to encourage all customers to switch to the new Green FPS products.

Based on the evidence and testimony submitted to the jury and before this Court, Fairchild respectfully submits that the evidence supports a finding that it took significant remedial measures in this action. As a result, the sixth and seventh *Read* factors weigh against enhancing damages in this instance.

### G.    Fairchild Had No Motive to Harm Power Integrations But Sought Merely To Fairly Compete

The eighth factor examined by courts in their determination whether to assess punitive damages is the defendant's motivation for harm. *Read,* 970 F.2d at 827. Courts that have reviewed this factor have found that evidence indicative of a desire to compete fairly, increase one's market share, and earn a profit do not suffice to establish a motive to harm. *See, e.g., Informatica*, 489 F.Supp.2d at 1085 ("aggressive attempts to compete are not, by themselves, evidence of bad faith, and did not succeed in eliminating plaintiff's market dominance"); *Baden Sports, Inc. v. Kabushiki Kaisha Molten*, 2007 WL 2790777 (W. D. Wash. 2007) (evidence that defendant hoped to increase its own market share does not indicate that Molten intended to harm plaintiff specifically); *Black & Decker*, 2006 WL, *10 (evidence that inventor contacted about his patents does not show motive to harm but, instead, reflects defendant's recognition of plaintiff's success and defendant's desire to compete in the relevant market).

The record before the Court consists solely of Fairchild's testimony concerning its desire to make profitable products and compete fairly with Power Integrations and others in the relevant market. The cases cited herein found such "evidence" insufficient to establish motive to harm. Power Integrations fails to provide any contrary authority, or any caselaw whatsoever to support its position that punitive damages in excess of $67 million should be imposed on Fairchild merely because Fairchild sought to compete with Power Integrations. In a similar context, when reviewing and overturning a finding of "willfulness," the Federal Circuit noted:

> Conduct such as Smith's, involving keeping track of a competitor's products and designing new and possibly better or cheaper functional equivalents is the stuff of

- 28 -

which competition is made and is supposed to benefit the consumer. One of the benefits of a patent system is its so-called "negative incentive" to "design-around" a competitor's products, even when they are patented, thus bringing a steady flow of innovations to the marketplace.

It should not be discouraged by punitive damage awards except in cases where conduct is so obnoxious as clearly to call for them. The world of competition is full of "fair fights," of which this suit seems to be one.

*State Industries, Inc. v. A.O. Smith Corporation,* 751 F.2d 1226, 1235-1236 (Fed. Cir. 1985).

In short, no evidence exists to support a finding that Fairchild intended anything other than to compete against Power Integrations and other companies in this market, increase its own market share, and, hopefully, earn a profit. Based on the evidence and testimony submitted to the jury and before this Court, there is no evidence to support a finding that it exhibited any motive to harm Power Integrations. As a result, the eighth *Read* factor weighs against enhancing damages in this instance.

### H.      Fairchild Never Attempted to Conceal Its Alleged "Misconduct"

The ninth and last factor courts examine when assessing if it should award punitive damages is whether the defendant attempted to conceal its misconduct. *Read,* 970 F.2d at 827. The record before the Court is devoid of any concealment by Fairchild. Instead, Fairchild advertised its accused products and sold them without restriction. Courts focusing on this factor have found no concealment in cases such as this, where infringing products were openly sold and advertised. *See, e.g., Black & Decker,* 2006 WL *10. As Power Integrations has complained, Fairchild's infringing products were readily available and, as noted by PI, in most cases sold less expensively than Power Integrations' products. Prior to the complaint, Power Integrations was able to obtain Fairchild products, over a year before filing suit, reverse engineer and analyze them, and make its own assessment of those products. Clearly, no concealment occurred.

Instead of focusing on the *Read* factor (whether Fairchild sought to hide its infringing products) Power Integrations' brief complains that Fairchild's attorneys concealed discovery during litigation. This is simply not true. Throughout this litigation, Fairchild truthfully provided discovery concerning its accused products to Power Integrations, including information concerning the research and reverse-engineering of products, as well as the design of Fairchild's

products. Power Integrations does not dispute this. Instead, Power Integrations argues that Fairchild engaged in litigation misconduct by failing to apprise Power Integrations that, for a limited time period between October 2005 and March 2006, the FS210HD was manufactured in the United States. This argument fails to establish either concealment or misconduct on the part of Fairchild.

As set forth above, Fairchild was mistaken in its good-faith belief that *none* of the accused products had been manufactured in the United States. It turns out that Fairchild manufactured FS210HD in Maine during a brief five (5) month period. Trial Tr. 10/6/06 at 1456:16-1457:9. Nonetheless, Fairchild did not *hide* information concerning this product. Rather, Fairchild had provided Power Integrations with its sales information concerning this product in August 2005. *See* Second Supplement Response to Interrogatory No. 8.

Fairchild did not learn of the U.S. manufacture of the FS210HD until the deposition of Mr. Kim. It is true that Fairchild initially opposed this deposition. This was not in an attempt to conceal its manufacture of the FS210HD (of which its attorneys were unaware) but because Mr. Kim is a Korean national, the parties had long since completed depositions in Korea, and discovery was closed.

Once the Court ordered that Mr. Kim could be deposed, Fairchild immediately cooperated with Power Integrations and sought to schedule this deposition. It was Power Integrations (not Fairchild) who at that time refused to take it.

Once it was discovered that the FS210HD had been manufactured in the United States for a short period of time, Fairchild investigated this new fact and provided its Third Supplemental Response to Interrogatory No. 8 to Power Integrations. There was no effort to conceal either Mr. Kim or manufacturing in the United States.

Nor is Fairchild moving manufacturing of the infringing products to the United States, as claimed by PI. As set forth in the Declaration of Robert Conrad, Executive Vice-President of Fairchild, none of the Fairchild products found to infringe the Power Integrations patents are manufactured in the United States. *Id.* Fairchild does not have any plans to move such

- 30 -

manufacturing to the United States. *Id.*

The evidence and testimony submitted to the jury and before this Court proves that Fairchild never attempted to conceal the sales of any of its infringing products. To the contrary, such products were readily available for sale on its website and via other avenues. As a result, the last *Read* factor weighs against enhancing damages in this instance.

## IV.    NO ATTORNEYS' FEES ARE WARRANTED

PI also requests, in addition to the $33 million in damages already awarded by the jury and on top of its request for additional punitive damages of $67 million, that Fairchild pay an undisclosed amount in attorneys' fees and costs pursuant to 35 U.S.C. § 285. An award of attorneys' fees is discretionary but is not entered simply because there has been a finding of willful infringement. *See, e.g., Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1329 (Fed. Cir. 1987); *Brooktree Corporation v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1582 (N.D. Cal. 1992); *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986). Rather, the purpose behind § 285 is two-fold: to penalize infringement and to prevent "gross injustice" caused by litigation in bad faith. *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1552 (Fed. Cir. 1989). To this end, the Federal Circuit has cautioned that an award of attorneys' fees should be made only "where it would be *grossly unjust* that the winner be left to bear the burden of his own counsel fees which prevailing litigants normally bear." *J.P. Stevens Company, Inc. v. Lex Tex Ltd., Inc.*, 822 F.2d 1047, 1052 (Fed. Cir. 1987).

As an initial matter, Power Integrations' motion is procedurally improper. Fed. R. Civ. Pro. 54(d)(2)(B) requires that a motion seeking attorneys' fees "must state the amount or provide a fair estimate of the amount sought." *Accord, Lucent Technologies, Inc. v. Newbridge Networks Corp.*, 168 F.Supp.2d 269, 276 (D. Del. 2001). Power Integrations' motion for fees fails to state a specific amount, or provide any estimate thereof, thereby precluding Fairchild from presenting its arguments concerning the reasonableness of any fees. Thus, the Court should deny Power

- 31 -

Integrations' motion for an award of fees and costs.[8]

If the Court is inclined to review Power Integrations' motion for an award of fees and costs, it must engage in a two-step inquiry. *See Interspiro USA, Inc. v. Figgie Intern, Inc.*, 18 F.3d 927, 933 (Fed. Cir. 1994). First, the Court must determine whether there is clear and convincing evidence that the case is exceptional *Id.* Second, the Court must determine whether an award to the prevailing party is warranted. *Id.* Although a finding of willful infringement meets the criteria of "exceptional case," the Federal Circuit has held that fee-shifting does not necessarily follow. *Brooktree Corporation*, 977 F.2d at 1582; *S.C. Johnson & Son, Inc.*, 781 F.2d at 201.

There is no reason to award attorneys' fees. At all times, Fairchild acted in good faith and both Fairchild and its attorneys conducted themselves at all times in a professional manner. Power Integrations has presented no evidence to warrant an award of attorneys' fees:

> The parties were both sophisticated participants in the surgical products market, and were well represented by talented, expensive counsel that ably presented many hotly contested issues of law and fact. While [the defendant] lost on the questions of invalidity and non-infringement at trial, its conduct during the litigation was neither frivolous nor vexatious. And while [the defendant] is a good deal larger than [plaintiff], the facts of this case do not support a contention that [defendant] used its greater resources to abuse the patent and litigation process or subjugate a smaller rival.

*Applied Medical Resources*, 967 F.Supp. at 866.

This case presented several contested issues, as discussed herein and throughout the litigation. It represents the culmination of several hard-fought battles between two sophisticated competitors. As with all battles, one party emerged victorious and the other did not. Nonetheless, the winner -Power Integrations– would suffer no injustice absent an award of attorneys' fees. Fairchild submits this case does not warrant an award of fees and costs.

## V.     CONCLUSION

From the outset, this case was hard-fought and zealously advocated by both parties. Two juries ultimately sided with Power Integrations and against Fairchild. Nonetheless, as

---

[8] In the event the Court permits Power Integrations to supplement its motion and submit its fees and costs, Fairchild respectfully requests leave to file a supplemental brief addressing the reasonableness of such fees and costs.

emphasized by the Federal Circuit in *Read* and numerous additional opinions discussed herein, a finding of willful infringement does not mandate the enhancement of damages. A careful review of each and every factor assessed by the trial court to determine the infringer's culpability in this case leads to the conclusion that damages should not be enhanced to punish Fairchild. Fairchild respectfully requests, therefore, that the Court deny Power Integrations' motion that this case be declared exceptional, that damages be trebled and that an award of attorneys' fees and costs be made to Power Integrations.

ASHBY & GEDDES

*/s/ Lauren E. Maguire*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendants*
*Fairchild Semiconductor International, Inc. and*
*Fairchild Semiconductor Corporation*

*Of Counsel:*

ORRICK, HERRINGTON & SUTCLIFFE LLP
G. Hopkins Guy, III
Vickie L. Feeman
Bas de Blank
Gabriel M. Ramsey
Brian H. VanderZanden
1000 Marsh Road
Menlo Park, CA  94025
(650) 614-7400

Dated:  December 21, 2007

186866.1