## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| POWER INTEGRATIONS, INC., | ) | **REDACTED** |
| | ) | **PUBLIC VERSION** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1371-JJF |
| | ) | |
| FAIRCHILD SEMICONDUCTOR | ) | |
| INTERNATIONAL, INC., and FAIRCHILD | ) | |
| SEMICONDUCTOR CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX TO FAIRCHILD'S ANSWERING BRIEF IN OPPOSITION
TO POWER INTEGRATIONS' BRIEF IN SUPPORT OF ITS MOTION
FOR A DECLARATION THAT THIS CASE IS EXCEPTIONAL, TREBLE
DAMAGES, AND ATTORNEYS' FEES**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

G. Hopkins Guy, III
Vickie L. Feeman
Bas de Blank
Brian H. VanderZanden
ORRICK, HERRINGTON & STUCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7400

Dated: December 21, 2007
186865.1

In its Motion for a Declaration that this Case is Exceptional, Treble Damages, and Attorneys' Fees, Power Integrations includes over six pages of single spaced, bullet points that Power Integrations claims are "some of the more egregious examples of" Fairchild's conduct. [D.I. 611, pp. 11-17]. Far from proving Fairchild' misconduct, these examples – the worst that Power Integrations could identify in over three years of litigation – underscore that Fairchild has acted appropriately throughout this case. To provide the Court with the context of each supposed dispute, Fairchild reproduces Power Integrations' allegations verbatim and responds to each, below.

## I.    Fairchild Did Not Engage in Improper or Prejudicial Behavior at Trial:

**A.    Power Integrations' Allegation:**    Fairchild repeatedly attributed improper motivations to Power Integrations, without any evidence. In its initial opening statement during the first trial, Fairchild insinuated without any evidence that this lawsuit was filed because Power Integrations had a drop in earnings. [D.I. 416 (Trial Tr. 10/2/06) at 199:21-200:15; id. D.I. 417 (Trial Tr. 10/3/06) at 340:10-342:5.] In its closing argument in the first trial, Fairchild changed its story and stated that Power Integrations was using the suit as leverage to get acquired by Fairchild, implicitly accusing Power Integrations' CEO, Mr. Balakrishnan, of lying about it. [D.I. 420 (Trial Tr. 10/6/06) at 1585:15-23; id. at 1589:7-17.]

**REDACTED**

**Fairchild's Response:**    Fairchild's opening statement and closing arguments were proper and supported by the evidence. Power Integrations did not object at the time and offers no evidence now to contradict the evidence Fairchild provided at trial. In each case for which Power Integrations complains, the evidence shows that Fairchild's attorneys acted appropriately.

Throughout trial, Power Integrations argued that it brought the case because of damage caused by Fairchild's infringement. To rebut this allegation, Fairchild provided evidence that Power Integrations had long since learned of Fairchild's alleged infringement but choose to sue without notice not because of these damages but, instead, to distract from a drop in its earnings. Rather than "insinuate[ing this] without any evidence, " Fairchild properly outlined this argument during its opening statement.:

> Also, the evidence will show that Power Integrations launched the lawsuit. They didn't even send a letter, not a phone call, no notice whatsoever, they just sued Fairchild out of the blue, just launch the lawsuit. And the way Fairchild found out by the lawsuit was this press release right here.

> Now, what else happened on that day? Well, they were announcing a decrease in earnings. They were reporting bad news to [stock] market.

> So on the damages summary, again, we have overreaching again and again, $3 million of sales – $3 million in a damages claim outside of the United States. Lost profits and erosion that completely ignore all other [excuses]. Price erosion out to 2010, again, speculative and royalty rates claiming 30 percent are royalty rates three, four and five percent.

[D.I. 416 (Trial Tr. 10/2/06) at 199:21-200:15]. True to its word, Power Integrations CEO, Balu Balakrishnan, confirmed that Power Integrations delayed filing suit for years and then sued without any sort of prior notice or discussion with Fairchild:

A1

Q.    Then I'd like to, if I can – when did you first – you talked about Fairchild's infringement.  When did you first believe that Fairchild infringed?

A.    When I looked at the data sheet and then looked at the features, I suspected at that point that there could be infringement, because they had very similar features.  And then once it was reverse engineered, you know, then that confirmed to us that that might be true.

Q.    And that occurred in 2002, didn't it?

A.    My recollection is it is 2003.

Q.    January of 2003?

A.    Again, my recollection is when we found out that Fairchild offered the integrated products, we got some devices, and we suspected them.  Then we reverse engineered to make sure that they do infringe.

Q.    So you used reverse engineering to determine patent issues; is that correct?

A.    That's correct.

Q.    All right.  And you learned at least as of 2003, January or February of 2003; isn't that right?

A.    Again, I don't recall the exact time, but my recollection is sometime in the third quarter.  But, again, it's a long time ago.  But that's when we realized that there was an infringement issue.  Sometime in the third quarter of 2003 is what I remember, but I could be wrong.

Q.    Okay.  Now, the lawsuit was not filed until October of 2004; is that correct?

A.    That's right.

Q.    And in that intervening year, did you send a letter to Fairchild asking them to stop?

A.    No.

Q.    Did you pick up the phone and talk to Mr. Thompson?

A.    No.

Q.    Did you do anything to notify Fairchild that you believed you had an issue?

A.    No.

Q.    In fact, the thing you did was you filed a lawsuit without ever giving Fairchild any notice; is that right?

A.    That's right.

[D.I. 417 (Balakrishnan Trial Tr. 10/3/06) at 338:8-340:7].  Similarly, Mr. Balakrishnan confirmed that Power Integrations choose to file suit on the exact same day that it issued a press release announcing disappointing earnings:

Q.    Yes.  On the same day that you issued your third quarter financial results for 2004, you also filed a lawsuit against Fairchild and issued a press release regarding that lawsuit?

A.    That's right.

[*Id.* at 341:13-17]; *see* DX-366. This testimony was made without objection and DX-366 was admitted into evidence. [D.I. 418 Trial Tr. 10/4/06 at 728:23-729:3]. Therefore, Fairchild properly admitted evidence proving precisely what it said it would prove in its opening statement.

Power Integrations also accuses Fairchild of "changing its story" in its closing argument. While Fairchild's closing was properly based on the evidence admitted at trial, Fairchild did not depart from rebutting Power Integrations' claim of damages. For instance, in the portions cited by Power Integrations, Fairchild continued to argue that Power Integrations was motivation in filing suit were matters others other than the alleged damages:

> Now, what I'm going to suggest to you is all of this overreaching, all of this inflation, and exaggeration that you've seen in this case, all these huge numbers is because Power Integrations wants you to give them a big overreaching award. And they want to use that. They want to use it to get acquired. They want to use it to get bought. They want to use it as a stick in a negotiation.

> &ast; &ast; &ast;

> It's just part of a negotiation. You may not know that. You're part of a negotiation, ladies and gentlemen. Part of an acquisition strategy. Be very careful. Make sure if you think for a second there's infringement here, think again. The motive is clear, if PI can convince a jury to give an overreaching award, then maybe it will force an acquisition. PI hopes for one.

[D.I. 420 (Trial Tr. 10/6/06) at 1585:15-23; id. at 1589:7-17.] Once again, Fairchild's argument that Power Integrations was interested in being acquired was supported by evidence from Power Integrations' own witnesses and made without any objection from Power Integrations' attorneys:

> Q.    Have you had discussions with other companies regarding the potential sale or merger of your company with someone else?

> A.    Well, we are a public company, so we – as a company we are always open to acquisitions and mergers if they are beneficial to the investor.

> Q.    In fact did you have a discussion with Fairchild in 2005 regarding a situation in which Fairchild would acquire your company?

> A.    We have had discussions with a number of companies.

> Q.    In fact, you used an investment banker, Bank of America; is that correct?

> A.    I don't remember which investment banker, but we frequently talk to investment bankers regarding acquisitions and mergers.

> Q.    And, in fact, you met with the chairman of Fairchild, did you not, regarding a potential merger in July of 2005; is that correct?

> A.    Chairman? I'm not sure --

> Q.    CEO?

> A.    CEO.

> Q.    Mark Thompson?

> A.    Yes.

> Q.    You met with him?

> A.    Yes.

> Q.    And discussed a potential merger of your two companies; is that right?

A.    Well, he discussed with me, yes.

Q.    You talked about having Fairchild acquire your company; isn't that correct?

A.    He actually offered that and we were open to it.

* * *

Q.    Mr. Balakrishnan, did that discussion occur after the lawsuit had started?

A.    The discussion with the CEO occurred after the lawsuit started.

[D.I. 417 (Balakrishnan Trial Tr. 10/3/06) at 323:11-324:19 and 326:1-4].

The record is clear – Fairchild properly sought to rebut Power Integrations' claim of damages by pointing to evidence (from Power Integrations' own witnesses and documents) that proved that Power Integrations had other motivations for bringing suit. Fairchild was absolutely entitled to outline this evidence for the jury during its opening statement and properly argued its significance during its closing. Power Integrations agreed to the admission of these exhibits and never objected to Fairchild's arguments.

**B.    Power Integrations' Allegation:**    In its closing statement in the second trial, Fairchild accused Power Integrations and its attorneys of "lying" and distorting the evidence, asserting that Power Integrations' team had represented to the jury that a document was from 1985 when in fact it was from 1986. [D.I. 559 (Trial Tr. 9/21/07) at 1551:22-1553:23.] In reality, Dr. Eklund clearly testified on direct that the simulation in question was from 1986, as the document was labeled. [D.I. 558 (Trial Tr. 9/20/07) at 1143:3-13; Ex. K (PX48) at KE1362-64.] Fairchild undoubtedly knew this based on its receipt of the daily trial transcript the night before it argued to the jury on rebuttal, when Power Integrations had no opportunity to correct the falsehood, that Power Integrations tried to mislead the jury during Dr. Eklund's testimony.

**Fairchild's Response:**    Power Integrations' attempt to obfuscate the misrepresentation made by Dr. Eklund during his testimony must be rejected. The issue concerns when Dr. Eklund's notes first showed a MOS structure without the "D prime drain." The D prime drain was a secondary drain that prevented the extended drain region from reaching a "surface adjoining position," as required in the '075 Patent Claim 1. In other words, the presence of the D prime drain feature in Dr. Eklund's notes and simulations meant that such materials do not show or demonstrate conception of the patented invention. Power Integrations correctly points out that the simulation in question was from 1986. [D.I. 558 (Trial Tr. 9/20/07) at 1143:3-13; Ex. K (PX48) at KE1362-64] What it fails to tell the Court is that during cross-examination, Dr. Eklund attempted to mislead the jury into believing that that the simulation was purportedly from *1985* (i.e. prior to the filing of Mr. Beasom's admittedly anticipatory '173 patent). [D.I. 558 (Trial Tr. 9/20/07) at 1183:13-1185:19]

Q.    What document did you show the jury that had the -- that lacked the D prime drain before 19 -- January 1986?

A.    It was the simulation of the p-channel device, which was simulated both with and without this D prime drain.

Q.    Sir, you did not simulate an entire device, did you?

A.    That was an entire device.

Q.    You did not -- you simulated a pinch resistor; isn't that correct?

A.    No, in that one, it was the complete one.

*Q.    But that was in 1986?*

*A.    No.  No.  There was here **as shown for the year before** simulation of a p-channel device with and without this D prime drain.  D prime drain, yes.*

[*Id.* (emphasis added)].  Thus, Dr Eklund testified direcly that he simulated a complete device in 1985.  This was false.  The exhibit he referred to, PX48, contained a date of 1986, not 1985.

**C.    Power Integrations' Allegation:**    Fairchild argued legal points to the jury even after contrary rulings from the Court.  The Court clearly ruled before opening statements in the validity trial that it would not give an instruction about any "diminished" presumption of validity based on the Supreme Court's KSR decision.  [Ex. BB (Trial Tr. 9/17/07) at 92:1-6 ("I don't agree with the diminished presumption, so this is coming out.")]  Fairchild chose to argue the point in its opening statement anyway, despite the fact that the Court disagreed with Fairchild's reading of the law.  [Id. at 100:17-23.]  In closing, when Power Integrations pointed out that Fairchild's argument about a "diminished" presumption was not supported by the law and was not in the jury instructions [D.I. 559 (Trial Tr. 9/21/07) at 1513:3-22], Fairchild improperly told the jury on rebuttal that its quotation came from "Supreme Court law," implying that the jury had to follow Fairchild's incorrect reading of KSR notwithstanding the Court's contrary ruling, and further implying that Power Integrations was misrepresenting the law.  [See id. at 1554:4-20.]

**Fairchild's Response:**    Fairchild never intended to – and does not believe that it did – violate any order from the Court.  As the Court will recall, the parties disputed the appropriate preliminary instruction to be provided to the jury and submitted competing proposals.  *See* D.I. 523 and 524.  As Power Integrations stated, the dispute boiled down to two issues – (i) whether there would be any reference to the infringement verdict and (ii) whether the burden of proving invalidity was diminished with respect to art not before the Examiner.  [D.I. 538 9/12/07 Pretrial Conf. at 17:13-18:13].  Fairchild submitted a brief on both points.

The night before the trial was to begin, the Court contacted Fairchild's local counsel and indicated that it would give Fairchild's proposed instruction.  Thus, Fairchild prepared its opening on the assumption that the Court agreed that the burden of proving invalidity was diminished.

Immediately before giving the preliminary instruction, the Court called a sidebar and acknowledged that "I think we had a little confusion in my office in this case." [D.I. 555 9/17/07 Trial Tr. at 91:11-19].  The Court explained that while it would give Fairchild's proposed instruction and not refer to the finding of infringement, the Court did not agree with the diminished presumption and would not give that portion of the instruction.  [*Id.* at 92:1-6].

In response to the Court's new ruling, Fairchild's counsel confirmed that while the Court would not, itself, give a preliminary instruction on the presumption of validity, Fairchild could still raise the point in its opening:

> The Court:    So it's Fairchild versus Power Integrations.  The instruction I am going to give to the jury is I'm taking – I don't agree with the diminished presumption, so this is coming out.  But it is Fairchild's proposal.
>
> Mr. Scherkenbach:    Okay.
>
> Mr. Guy:    Okay.
>
> Mr. Scherkenbach:    Okay.  So it's going to stop it there.
>
> Mr. Guy:    ***That's the instruction.  We can certainly raise that in opening?***

The Court:    ***Oh, yeah.***  I just wanted to show you what I was going to read, so you wouldn't get caught by surprise, because I think there was some communication about who was the plaintiff, who was the defendant.

[D.I. 555 9/17/07 Trial Tr. at 92:1-17 (emphasis added)]. Almost immediately thereafter, Fairchild began its opening statement and briefly alluded to the diminishment in the presumption of validity during its opening statement. [*See id.* at 100:17-23].

At all times, Fairchild believed – and still believes – that it was following both the letter and spirit of the Court's order. Indeed, Power Integrations did not object a single time during Fairchild's opening statement. If, however, Fairchild misunderstood the Court's intention in the rush to begin its opening statement, Fairchild apologizes but this does not warrant what is, in effect, a sanction of over $66 million (caused by trebling the jury's award of roughly $33 million).

In its closing argument, Power Integrations repeatedly berated Fairchild for indicating that the presumption of validity is diminished with respect to prior art that was not considered by the Examiner:

> As presumption of validity. They now acknowledge that there is a presumption, and it's still in place. In the opening -- this was a slide from Fairchild's opening where they told you the presumption of validity is much diminished where the prior art is not considered. Much diminished.
>
> That's wrong. They told you that you in opening. That's wrong.
>
> You're not going to see a jury instruction on that, because that's not correct. They tried to tell you that any way. You're going to get an instruction that there is a presumption, and that the burden of proving invalidity is by clear and convincing evidence.

[D.I. 559 9/21/07 Trial Tr. 1513:3-17]. Power Integrations argument was, at best, disingenuous since its lead attorney had conceded to Fairchild and the Court (but not the jury) that the presumption of invalidity was "easier to overcome" and that Fairchild should be permitted to argue this to the jury:

> Mr. Scherkenbach:    The presumption exist [sic], the question is how easy it is to overcome the presumption. You're familiar with this, the Federal Circuit has addressed this question. There is law to the effect that if the art the challenger relies on was not, in fact, considered, it's easier to overcome the presumption, that's true, fine. ***And they can make that showing to the jury.***

[D.I. 538, 9/12/07 Pretrial Conf. at 26:6-14].

Thus, it appears as if Power Integrations was seeking to confuse the jury into believing that Fairchild was mischaracterizing the law when, to the contrary, Power Integrations had agreed that the jury should be instructed that the presumption of validity was easier to overcome. In response, Fairchild properly informed the jury that it had not made up this law and was not seeking to mislead the jury in any fashion:

> They began, by the way, with a slide about the presumption of validity. They said that I had misrepresented you something. It was in quotes. It began, however. I'll try to get it here as quickly as we can.

> That statement, ladies and gentlemen, was verbatim out of a United States Supreme Court case. I didn't make up the law. I didn't try to deceive you at all.
>
> There was a dispute as to whether we could use it or not. That dispute has now been resolved.
>
> But what I told you in the opening was verbatim out of a United States Supreme Court case, the KSR case. One of the witnesses mentioned it even. It was decided in the last six months.

[9/21/07 Trial Tr. at 1554:4-20]. Power Integrations did not object to Fairchild's argument at the time and did not seek (let alone, receive) a curative instruction.

Thus, the record shows that at all times Fairchild scrupulously endeavored to abide by the Court's orders.

**D.    Power Integrations' Allegation:**    During the Markman briefing, Fairchild argued that the '075 patent disclaimed coverage of all "DMOS" devices. The Court rejected this argument, and before trial instructed Fairchild that it could only present DMOS as a defense to willfulness, not as a defense to infringement. [D.I. 416 (Trial Tr. 10/2/06) at 71:20-80:1.] Fairchild ignored the Court's instruction and argued that it did not infringe because its device was a DMOS device. [Id. at 189:22-190:10; D.I. 419 (Trial Tr. 10/5/06) at 1189:16-1206:2.] Power Integrations was forced to ask for a curative instruction to remedy this improper argument. [Id. at 1325:15-1329:8.]

**Fairchild's Response:**    Power Integrations completely mischaracterizes both what happened during the Markman proceeding and what happened at trial. First, during the claim construction proceeding, the Court refused to decide as a matter of claim construction the effect of Power Integrations' disclaimer of DMOS devices during prosecution. Rather, the Court deferred the issue "until such time as the Court is presented with the equivalence and/or estoppel issues involving this term." [D.I. 231 at p. 7-9]

At the outset of the trial, Power Integrations expressed concern that the DMOS issue would be presented by Fairchild as a matter of claim construction. The Court determined that the DMOS issue could not be presented in a matter that would "unmake and remake" claim construction. However, the Court indicated that if the DMOS issue was *not* offered to change claim construction, but was instead just offered "against the issue of willful infringement or against the issue of infringement principle," the issue would be properly presented:

> The Court:    You understand what the plaintiff says. It doesn't matter what your witness may have drawn from the prosecution history, if the testimony is exclusively gauging claim construction. That's the point they make. And in other words, your witnesses can't unmake and remake what they would like the claimed construction to be by virtue of their laboring to the patent office. Because the claim construction is what the order says.
>
> Mr. Guy:    But your Honor.
>
> The Court:    Wait a second. Of course, I have no idea. And this is the problem in patent trials, particularly patent jury trials, how you are going to try to use the evidence in the context of this case. *And plaintiff thinks you are going to try to use it to remake claim construction, you say not really, we are just going to offer it against the issue of willful infringement or against the issue of infringement principle.*

A7

Here is the ruling. I don't know what you are going to do with the evidence, so it could be relevant it couldn't be relevant. Good lawyers like you are, you being plural, take risks in litigation. Here's what I can tell you that I will do after I hear the presentation of the evidence. *If it was used to reconstrue or reargue or change my claim construction, there will be a new trial, after I hear the whole case. If it is used in the pure attempt that you are arguing now that it is going to be used, you may get by with it if it is correctly presented.*

So there is some danger here and it is hard for me to decide the issue as presented in this vacuum of a pretrial argument. I can tell you one thing, your witnesses and yourself are not to argue claim construction or touch on it in any way. Neither side is allowed to use the claim construction proffered by the other side in cross-examining witnesses or arguing to the jury as if that never occurred. *There is only one claim construction in the case and we have that down. So I'm going to let you utilize the evidence, because you have indicated a purpose that at least on your present argument doesn't seem to violate claim construction at the province of the Court*. But the record will prove up whether you did or didn't and if you cross the line, and I have had it happen two times, I don't know why lawyers do it, I have had to retry a case. It gets expensive and I make the other side pay for that, and I don't think Mr. Scherkenbach comes cheaply.

I understand your argument in good faith, so I'm going to take it in good faith. If you cross the line the record will show that and we will have to deal with that. So that's my resolution. You can use it.

[77:13-80:1 (emphasis added)].

At trial, Fairchild did not attempt to argue to jury a claim construction based on the DMOS issue. Power Integrations does not even contend that Fairchild reargued claim construction to the jury. Rather, Fairchild argued, as was contemplated by the parties and the Court, that Power Integrations' disclaimer of DMOS estopped it from asserting that Fairchild's DMOS devices literally infringed, and Fairchild further argued that its own determination that DMOS devices could not infringe, based on the disclaimer, prevented a finding of willful infringement. Fairchild very carefully presented this issue in compliance with the Court's direction at the outset of trial.

**E.    Power Integrations' Allegation:**    Fairchild had no non-infringement argument for claim 1 of the '851 patent. Instead of conceding infringement, however, Fairchild argued to the first jury that it could not infringe because the patent was allegedly invalid. [D.I. 419 (Trial Tr. 10/5/06) at 1102:9-1103:1; id. at 1144:20-24; D.I. 420 (Trial Tr. 10/6/06) at 1594:1-20; id. at 1597:8-10.] Fairchild presented this argument despite the fact that the Court had specifically instructed Fairchild that validity was not an issue that should be raised in the context of infringement in the first trial – as the Court stated, it was a defense only to <u>willfulness</u>. [D.I. 416 (Trial Tr. 10/2/06) at 91:20-92:10.][1]

**Fairchild's Response:**    Power Integrations complains that Fairchild failed to dispute infringement of claim 1 of the '851 Patent during the first trial. Essentially, Power Integrations argues that it should have received a directed verdict. The Court already considered and denied this request. At the close of trial, Power Integrations sought a judgment as a matter of law that Fairchild infringed claim 1 of the '851 Patent. [D.I. 420, 10/6/06 Trial Tr. at 1480:17-23]. The

---

[1]    Also, at the time Fairchild made these arguments to the jury, it had no opinion of counsel or expert report that asserted that the claims were invalid in view of the Martin reference that Fairchild on which Fairchild relied for its arguments.

Court reserved judgment but refused to take the issue away from the jury. [*Id.* at 1481:17-1482:21].

Power Integrations also claims that the Court instructed Fairchild not to argue that it could not infringe an invalid patent. This is not correct. Instead, the Court agreed that Fairchild could make this argument to rebut the allegation of willful infringement. [D.I. 516, 10/2/06 Trial Tr. at 91:8-92:12]. Further, the Court specifically told both parties that it would "listen carefully" and issue a curative instruction should Fairchild overstate this argument. [*Id.*] Fairchild properly argued that it did not willfully infringe because the '851 Patent was invalid. Tacitly recognizing this, Power Integrations never sought – and the Court did not issue – any curative instruction.

**F.    Power Integrations' Allegation:**    Fairchild successfully moved in limine to preclude any reference to Power Integrations' litigation with System General [D.I. 384 at 9 (granting Fairchild motion in limine number 12)], then raised the issue itself during trial, affirmatively arguing that System General provided a non-infringing alternative to the patents in suit. [D.I. 418 (Trial Tr. 10/4/06) at 689:8-690:8.] But Fairchild knew, and prevented the jury from hearing by its motion, that Power Integrations had sued System General for patent infringement and obtained a judgment from the ITC that System General infringed Power Integrations' patents.[2]

**Fairchild's Response:**    As the Court noted in granting Fairchild's Motion in Limine, "the parties apparently agree that evidence regarding Plaintiff's successes in the Motorola and Systems General lawsuits is irrelevant to this action...." [D.I. 384, p. 9] This was the correct decision. Power Integrations should not be permitted to have argued that its successful litigation with respect to other parties and other patents is any indication that Fairchild infringed or that the patents-in-suit were not invalid. Power Integrations never sought reconsideration of this Order.

Fairchild did not raise this issue at trial. Instead, Fairchild properly pointed out that Power Integrations' own documents and witnesses identified the System General products as alternatives to the Power Integrations devices that allegedly practiced the asserted patents. [*See e.g.* D.I. 418, 10/4/06 Renouard Trial Tr. at 689:13-690:8 and DX1000 (Power Integrations' interrogatory responses)].

Power Integrations has never accused these particular System General products of infringing any of the patents-in-suit at issue in this case. The patents at issue in the System General ITC investigation were entirely different. Thus, the System General products constitute non-infringing alternatives with respect to the patents-in-suit.

Moreover, this issue was addressed at trial. When Fairchild sought to impeach Power Integrations' witnesses with inconsistent positions raised in the Systems General litigation, Power Integrations objected that this be excluded. Fairchild's attorney explained that the motion in limine was limited to the outcome of the Systems General litigation and could not be used a shield by Power Integrations to conceal its shifting positions. [D.I. 418, 10/4/06 Trial Tr. at 841:17-842:20]. The Court overruled Power Integrations objections but noted that if Fairchild exceeded the order in the Motion in Limine, this would open the door for further evidence by Power Integrations. [*Id.* at 842:21-23]. Fairchild did not violate the Court's order or "open the door", as recognized by Power Integrations' failure to pursue this matter after hearing the questions and testimony.

---

[2]    The Federal Circuit recently summarily affirmed the ITC's determination that System General's chips infringe Power Integrations' patents. Ex. L (Federal Circuit's Rule 36 affirmance). Notably, Fairchild purchased System General earlier this year. Ex. M (Fairchild press release re purchasing System General).

**G.    Power Integrations' Allegation:**    Fairchild told the jury about the alleged back-dating of stock options by Power Integrations, despite the Court's clear ruling that any reference to this issue should be excluded from trial. [D.I. 420 (Trial Tr. 10/6/06) at 1587:3-20; D.I. 384 at 15 (granting Power Integrations' motion in limine).]

**Fairchild's Response:**    Fairchild believed – and continues to believe – that it should have been permitted to introduce evidence of Power Integrations' admitted backdating. Once the Court granted Power Integrations' Motion in Limine, however, Fairchild scrupulously abided by the Court's decision.

This is made clear by the portion of the record identified by Power Integrations. At no time did Fairchild allude to Power Integrations' backdating. [*See* D.I. 420, Trial Tr. 10/6/06 at 1587:3-20]. Instead, Fairchild made an entirely different argument – that a change in the accounting rules had required Power Integrations to expense its grant of stock options, drastically reducing the profit that Power Integrations had claimed to have made.

While these issues sound superficially similar in that both relate to stock options, they are very different. The backdating scandal (which the Court excluded) required Power Integrations do decertify its annual reports, upon which its damages expert had relied. The change in accounting rules was reflected in those decertified annual reports (and, thus, clearly unrelated to the backdating). [*See* DX108 or 524 (2004 Annual Report).

The Court presumably excluded evidence of Power Integrations' backdating for fear that evidence of such deliberate wrongdoing could be prejudicial. The significance of the change in the accounting rules was entirely different. As Dr. Keeley, Fairchild's damages expert, explained, the reduction in pro-forma net income caused by the change in accounting rules and reflected in Power Integrations' 2004 Annual Report was proof that Power Integrations' proposed 30% royalty was too high (since it was significantly more profit than Power Integrations actually made at the relevant time). [*See* D.I. 419 10/5/06 Keeley Trial Tr. at 1265:18-1269:9]. This testimony was submitted without objection from Power Integrations, who evidently agreed at the time that Dr. Keeley did not violate the Court's order not to testify with respect to the separate issue of backdating.

**H.    Power Integrations' Allegation:**    Fairchild continually refused to reveal its true contentions for both non-infringement and invalidity. For example, Power Integrations did not learn until during Dr. Horowitz's testimony on the third day of the invalidity trial that Fairchild had dropped all but one of its anticipation arguments for the three circuit patents. [D.I. 557 (Trial Tr. 9/19/07) at 835:9-836:18.] Fairchild also added new invalidity defenses during trial, such as Fairchild's argument that Dr. Eklund allegedly "abandoned" his invention. [DI 524 at 43 (Fairchild proposed jury instruction).]

**Fairchild's Response:**    Fairchild did not conceal its invalidity contentions from Power Integrations. The Court specifically considered this issue and rejected Power Integrations' demand for additional information. [D.I. 538, 9/12/07 Pretrial Conf. at 4:20-5:10].

Fairchild's invalidity contentions were voluminously disclosed in its discovery responses, expert reports, and expert depositions. Indeed, Fairchild disclosed each contention in the parties' September 9, 2007 Joint Pretrial Order. [*See* D.I. 518, Exh. 3B, where Fairchild identified the precise prior art references and combinations that it believed invalidated the asserted claims].

Power Integrations' issue boils down to the complaint that Power Integrations wanted Fairchild to drop additional defenses in advance of trial. As an initial matter, Fairchild was never required to do so. Moreover, Fairchild did not "conceal" this from Power Integrations. Instead, Fairchild sought additional time from the Court for the invalidity trial. Fairchild's request was only denied

during the pretrial conference (shortly before the invalidity trial began) and Fairchild spent the intervening time paring down its presentation as required by the Court. Had Fairchild had more time, it would have presented additional defenses but the amount of available time could not be known until witnesses were to testify. Having successfully precluded Fairchild from presenting meritorious arguments by limiting the time available for trial, it is disingenuous at best for Power Integrations to now argue that Fairchild improperly concealed its contentions.

**I.     Power Integrations' Allegation:**     Fairchild gamed the Court's bifurcation order, arguing one theory to the jury for infringement and the exact opposite for validity. Specifically, Dr. Horowitz argued that the Fairchild parts did not infringe the '876 patent allegedly because they had a structure "like a ROM" between the counter and the DAC. [D.I. 419 (Trial Tr. 10/5/06) at 1102:9-1103:1; id. at 1144:20-24; D.I. 420 (Trial Tr. 10/6/06) at 1594:1-20; id. at 1597:8-10.) At the validity trial, however, Dr. Horowitz relied on prior art that showed a ROM between the counter and the DAC. [D.I. 557 (Trial Tr. 9/19/07) at 829:4-21.] Similarly, in the first trial, Dr. Horowitz asserted that the claimed soft start circuit of the '366 patent required the latch, AND-gate, and comparator structures shown in the patent figures [D.I. 419 (Trial Tr. 10/5/06) at 1086-88], yet he argued in the second trial that prior art having none of those structures allegedly invalidated the claims. [D.I. 557 (Trial Tr. 9/19/07) at 845:10-14.]

**Fairchild's Response:**     Fairchild absolutely did not "game" the Court's bifurcation order. Fairchild consistently argued that bifurcating infringement and invalidity was improper and would result in the two juries reaching inconsistent decisions. [See D.I. 282 (5/31/06 Pretrial Conf.) and D.I. 274 (Motion for Reconsideration of Bifurcation)]. Power Integrations' complaint simply confirms that Fairchild's concerns were well founded and bifurcation was inappropriate.

The Court specifically considered and rejected Power Integrations' argument that it would be "gaming" for an expert to provide an opinion in the second trial that incorporated the decisions made by the jury in the first trial. The Court granted Fairchild's Motion in Limine and precluded either party from "impeach[ing] witnesses based on their opinions at the first trial." [D.I. 541, p. 3]. Power Integrations never sought reconsideration of this decision.

More importantly, Dr. Horowitz's opinions were consistent in both trials. In the first trial, Dr. Horowitz explained that Fairchild did not infringe the '876 Patent because there was an intervening circuit elements between the counter and the digital to analog converter (or "DAC"). [See D.I. 419 10/5/06 Horowitz Trial Tr. at 1048:19-1050:17]. In the invalidity trial, Dr. Horowitz did not opine (and Fairchild never argued) that the Martin patent (which, likewise, has an intervening circuit element between the counter and the DAC) anticipated the '876 Patent. [See D.I. 557 9/19/07 Horowitz Trial Tr. at 835:9-836:18]. Instead, Fairchild argued that it would have been obvious to remove this intervening circuit element. [Id. at 718:1-7]. Even Power Integrations' expert conceded that if the Martin EPROM were removed and the counter directly connected to the DAC, the prior art Martin patent "would show every element of Claim 1 of Power Integrations' '876 Patent." [D.I. 558, 9/20/07 Blauschild Trial Tr. at 1077:4-11].

Therefore, Fairchild and its expert took entirely consistent positions in both trials with respect to claim 1 of the '876 Patent. Fairchild did not infringe because its counter is not coupled to the DAC (but, instead, to an intervening circuit element). Likewise, the Martin Patent invalidated the claim because it would have been obvious to remove the intervening circuit element. Fairchild did not argue at trial that the Martin patent (with the intervening circuit element) anticipated claim 1 of the '876 Patent.

Instead, as set forth in Fairchild's pending Motion for New Trial (D.I. 615) it is Power Integrations that took unfair advantage of the Court's bifurcation order. It was Power Integrations that argued to the first jury that the Fairchild devices infringed despite the fact that the counter and DAC were not coupled. It was Power Integrations that then reversed course 180

degrees and argued to the second jury that the Martin Patent did not invalidate this claim because it has a similar intervening circuit element effectively "decoupling" the counter and DAC.

**J.    Power Integrations' Allegation:**    Fairchild continuously changed its claim construction positions, originally agreeing that certain elements were means-plus-function terms and then later deciding that they were not means plus function. [Ex. N (de Blank letter of 12/9/05).] This behavior continued during trial, where Fairchild raised new claim construction arguments in front of the jury. For example, Fairchild's circuit expert argued that the Court's construction requiring the "frequency variation signal" to be "internal" did not mean that it had to be generated inside an integrated circuit. [D.I. 557 (Trial Tr. 9/19/07) at 815:4-9.] This was directly contrary to the entire course of briefing and argument on this term during claim construction. [See D.I. 231 at 33.] On the '075 patent, despite the fact that Fairchild's own opinion counsel stated that the claims of the '075 patent required a surface adjoining layer at multiple positions on both sides of the drain [Ex. I (DX136) at FCS1413653], Fairchild's expert argued for the first time at the validity trial that the claim read on a structure with a surface adjoining layer on only one side of the drain. [D.I. 556 (Trial Tr. 9/18/07) at 543:17-544:22.]

**Fairchild's Response:**    Power Integrations' suggestion that Fairchild was obligated to adopt a single claim construction position before discovery commenced and was then bound by that throughout the case is simply wrong. Fairchild's contentions naturally developed throughout the case as it learned more about the asserted patents and how they would be understood by one of ordinary skill in the art.

The absurdity of Power Integrations' argument is highlighted by the fact that despite the fact that it is the patentee and had presumably studied the patents-in-suit prior to filing suit, ___Power Integrations also changed its claim construction positions during the case.___ For example, Power Integrations changed its proposed construction of the key term "frequency variation signal" to add additional limitations that the signal "cyclically" vary and change the frequency within a "predetermined" range, apparently in response to prior art disclosed by Fairchild. [*Compare* Exh. A, pp. 10-11 (chart from Power Integrations' June 30, 2005 interrogatory responses) *with* D.I. 152 (Power Integrations' claim construction brief)].

In contrast, Fairchild had no notice of Power Integrations' infringement allegations before Power Integrations filed suit and had to learn the patents and technology during this litigation. At the very start of the case, Fairchild's attorney mistakenly assumed that the "soft start circuit" element was a means-plus-function element. After deposing Power Integrations' inventor, who testified about how the term would have been understood by one of ordinary skill in the art, and retaining and consulting with experts in the field, Fairchild's attorney learned that "soft start circuit" connoted sufficient structure that it should not be construed as a means-plus-function element. Consequently, Fairchild immediately wrote to Power Integrations and explained its newly proposed construction. [*See* D.I. 612, Exh. N].

There is nothing improper about a party developing its understanding of the claims throughout the case. Indeed, it is a routine occurrence in patent litigation. Fairchild corrected its proposed claim construction on December 9, 2005 (barely a year into the case and in advance of the parties' opening claim construction briefs). Indeed, Fairchild also agreed to several of Power Integrations' proposed constructions at the same time – further indication that Fairchild was not playing games but working with Power Integrations to reach agreement on as many terms as possible.

Moreover, it is simply untrue that Fairchild "raised new claim construction arguments in front of the jury." At all times, Fairchild scrupulously followed the Court's claim construction even though Fairchild does not agree that this claim construction is correct. For instance, Fairchild's expert, Dr. Horowitz, first quoted and then applied the Court's construction of "frequency

variation signal:

> Q.    Okay.  Focusing first on the frequency variation element.  Do you have an understanding of what the frequency variation circuit and frequency variation signal, what those terms mean?
>
> A.    Yes.  The Court has defined what they mean.
>
> Q.    The Court's construction, do you recognize this?
>
> A.    I do.  Frequency variation circuit means a structure that provides the frequency variation signal.  Frequency variation signal is an internal signal that cyclically varies in magnitude during a fixed period of time and is used to modulate the frequency of the oscillation signal within a predetermined frequency range.

[D.I. 558, 9/20/07 Horowitz Trial Tr. at 1024:6-22.  In contrast, it was Power Integrations, Mr. Blauschild, that sought to change the claim construction and add the requirement that the frequency variation signal must also be integrated (in addition to "internal"):

> Q.    And what elements, in particular, would you point to as being missing still?
>
> A.    Well, you wouldn't have the internal frequency variation signal, so you wouldn't have the frequency variation circuit that produces *integrated* internal frequency variation signal.

[DI 558, 9/20/07 Blauschild Trial Tr. at 1039:11-17] (emphasis added).

With respect to the '075 Patent, Power Integrations simply mischaracterizes the opinion of Fairchild's expert, Dr. Gwozdz.  Dr. Gwozdz never claimed that a structure with a single surface adjoining position would invalidate the claims of the '075 Patent.  Instead, Dr. Gwozdz properly noted that the Beasom prior art did show multiple the surface adjoining positions on four sides of the drain contact (in a horseshoe like shape).  [D.I. 556, 9/18/07 Gwozdz Trial Tr. at 487:24-491:5].  Moreover, this argument could hardly have been a surprise to Power Integrations since Fairchild clearly disclosed that the Beasom patent anticipated the '075 Patent.  [D.I. 518 (September 9, 2007 Joint Pretrial Order), Exh. 3B].

**K.    Power Integrations' Allegation:**    Fairchild continually went beyond the scope of its expert reports at trial.  For example, during his direct testimony, Dr. Peter Gwozdz stated for the first time at trial that the Beasom documents disclosed a structure with an "infinite" number of surface adjoining positions, even though those positions existed on only one side of the drain, and even though this construction would ignore the plain meaning of the claim language in the '075 patent.  [D.I. 556 (Trial Tr. 9/18/07) at 492:8-19.]  Dr. Gwozdz later waffled on this point, arguing that the Beasom notebooks disclosed one, three and even an infinite number of surface adjoining positions, but none of these arguments about the Beasom notebook disclosing "multiple" surface adjoining positions appears in any of Dr. Gwozdz's expert reports.

**Fairchild's Response:**    Contrary to Power Integrations' assertion, the testimony of Fairchild's expert Dr. Gwozdz did not exceed the substance of his expert report.  Dr. Gwozdz clearly opined in his report that Beasom's documents showed a full conception of claim one and "[e]ach and every element of claim 1 of the '075 Patent is found" in Beasom's notes, including the claimed multiple "surface adjoining positions."  [Supp. Expert Report of Dr. Peter S. Gwozdz at ¶21]  Indeed, he specifically opined of the Beasom notes that "[o]ne of ordinary skill at the time would understand that 'P type drift region' and 'P-drain' together are an 'extended drain region' *'extending laterally each way…. to surface-adjoining positions*" in the meaning of

claim 1 of the '075 Patent. [*Id.* at ¶25 (emphasis added)]

Moreover, as was detailed in Fairchild's motion for a new trial regarding invalidity of the '075 Patent, Power Integrations' own expert Mr. Shields never disputed that Beasom's notes contained the claimed multiple "surface adjoining positions" *until trial*. [D.I. 616; *see also* Supp. Expert Report of Dr. Peter S. Gwozdz at ¶¶21-25 (observing that Power Integrations' expert only contested whether contacts were inherent and whether the extended drain extended "each way")].

## II.     Fairchild Did Not Engage In Improper Discovery and Pre-Trial Abuses:

**L.     Power Integrations' Allegation:**     Fairchild stated in response to discovery that it never manufactured any accused products in the United States. [Ex. O (Fairchild Response to Interrogatory No. 8 ("Since none of the Accused Products are or have ever been manufactured in the United States, the amount of devices manufactured is irrelevant")).] During the deposition of H.K. Kim, though – a deposition Power Integrations had to move to compel because Fairchild repeatedly represented Mr. Kim was beyond its control and had no responsive knowledge – Power Integrations learned that Fairchild had manufactured 2.73 million accused products in Portland, Maine. Fairchild was eventually forced to supplement its interrogatory response to admit to this U.S. manufacturing. [Ex. P (Fairchild's Third Supplemental Response to Interrogatory No. 8).] Even then, however, Fairchild filed a motion to exclude the evidence of its U.S. manufacturing on the ruse that it was never "accused" or at issue, forcing the Court and Power Integrations to expend significant time and effort on products Fairchild certainly knew were at issue. The Court rejected Fairchild's efforts to hide its U.S. manufacturing of the FSD210HD parts [D.I. 384 at 6-7 (denying Fairchild motion in limine number 9)], and later, during the validity trial, Power Integrations learned for the first time that Fairchild was in fact significantly expanding this U.S. manufacturing of the infringing products. [D.I. 557 (Trial Tr. 9/19/07) at 605:23-606:16.] Indeed, during closing arguments in the validity trial, Fairchild played up its U.S. manufacturing, noting that Fairchild was "a fierce U.S. competitor" that has "done everything they can to protect their U.S. fabs." [Id. at 1546:10-20.]

**Fairchild's Response:**     Power Integrations is correct that attorneys for both parties learned for the first time during the deposition of H.K. Kim that Fairchild had, for a brief period, manufactured the FSD210HD within the United States. As soon as this became clear, Fairchild supplemented its interrogatory responses and provided additional information and witnesses about this manufacturing. While Fairchild regrets the confusion this may have caused, Fairchild did not attempt or intend to mislead Power Integrations or the Court or engage in any other form of discovery abuse.

It is important to understand the context of this issue. Throughout discovery, Power Integrations identified an ever shifting set of "accused products". [*See* D.I. 314, pp. 4-6]. Power Integrations, however, never accused the FSD210HD in either its interrogatory responses, supplemental responses, or expert reports. [*Id.*] This appeared to be deliberate since Fairchild had provided Power Integrations with information about sales of its FSD210HD devices.[3] [*Id.*]

The deposition of H.K. Kim was originally unrelated to the manufacturing issue. Fairchild attorneys spent over a week in Korea so that Power Integrations could depose Korean employees of non-party Fairchild Semiconductor Korea, Ltd. After these depositions were over and the Fairchild attorneys returned to the United States, Power Integrations requested a deposition of Mr. Kim for the first time. [*See* D.I. 148, p. 3]. Power Integrations never noticed this deposition

---

[3]     The fact that Fairchild provided this discovery about a device that was not accused does not mean that Fairchild believed the device to be at issue. Given the uncertainty in Power Integrations' contentions and the scope of its discovery requests, Fairchild provided discovery on a host of devices that were ultimately never accused by Power Integrations.

and was unable or unwilling to explain why it wished to depose Mr. Kim. [*Id.*, at p. 3 and n. 4]. Therefore, Fairchild opposed Power Integrations motion to compel.

Fairchild was not seeking to "hide" Mr. Kim. The Court ordered his deposition on February 2, 2008 and in less than a week (February 8, 2006) Fairchild had arranged for Mr. Kim to make a special trip to the United States so that he could be deposed on February 23, 2006 (well less than the 30 or 40 days that the Court allowed for this deposition). [D.I. 312, Exh. Q].

Amazingly, Power Integrations refused to depose Mr. Kim and claimed that none of the numerous attorneys representing Power Integrations were available that day requesting that Mr. Kim rearrange all of his plans in order to appear a day earlier. [*Id.*] In less than a day, Fairchild checked with Mr. Kim and explained to Power Integrations that this was not possible. [*Id.*] Fairchild, in fact, urged Power Integrations to please depose Mr. Kim on February 23, 2006. Power Integrations refused, responding that it "sees no good reason for Mr. Kim to make a special trip to the US for a brief deposition next week." [*Id.*] Fairchild tried one more time to convince Power Integrations to proceed with this deposition and explained that Mr. Kim did not regularly travel to the United States. On February 15, 2006, Power Integrations unequivocally refused to take the deposition it had successfully moved to compel less than two weeks earlier. [*Id.*]

Thus, the record is clear. Fairchild had legitimate reasons to oppose Mr. Kim's deposition. Indeed, the Court agreed that "I don't really believe Mr. Kim is going to help them" and limited the deposition to five hours. [D.I. 187 (2/2/06 Hearing) at 28:11-13]. Once the Court ordered Mr. Kim's deposition, however, Fairchild diligently sought to arrange it and it was Power Integrations – not Fairchild – that delayed and refused.

During Mr. Kim's deposition, counsel for Fairchild learned for the first time that Fairchild had manufactured a limited quantity of the FSD210HD in the United States for a few months during the course of this case.[4] Fairchild immediately investigated this new fact and properly supplemented its interrogatory responses to provide further information. [D.I. 612, Exh. P]. Fairchild also agreed to provide additional deposition testimony concerning this limited manufacturing and Power Integrations deposed Ronald Dupois on August 3, 2006.

Fairchild provided this additional discovery even though Fairchild continued to believe that the FSD210HD was not at issue in this case since it was not included in Power Integrations' technical or damages expert reports as an allegedly infringing device. Clearly, Fairchild was not hiding any of this information. Instead, Fairchild brought this issue to the fore by seeking to strike a new expert report in which Power Integrations suddenly sought damages for the FSD210HD for the very first time. [D.I. 314]. While the Court agreed and struck part of Power Integrations' untimely report, it permitted Power Integrations to include the FSD210HD among the accused devices. [D.I. 385].

Finally, Power Integrations' suggestion that Fairchild is or plans to manufacture within the United States those devices found to have infringed is simply incorrect. As explained in accompanying Declaration of Robert Conrad, while Fairchild may at some future point begin manufacturing the "next generation" of power conversion products within the United States, this does not include those products found to have infringed:

---

[4] Power Integrations suggests that the 2.7 million units manufactured is an astronomical number. It is not. Long before this issue arose, Fairchild had disclosed that it sold over 26 million of the FSD210HD worldwide. Despite this, Power Integrations still did not accuse the FSD210HD in any of its discovery responses or expert reports. [*See* D.I. 314, pp. 4-6.]

6        During trial, I testified that Fairchild is "moving the next generation of the products that we're talking about here, our power conversion products, from some subcontractors in Asia as well as another factory that we have in Asia to the Maine site." I understand that Power Integrations has misunderstood this statement to mean the manufacture of products found to infringe will be moved to the United States. This is incorrect.

7        I am familiar with the manufacture of the accused Green FPS products found to infringe Power Integrations' patents. None of these products are currently manufactured within the United States and there are no plans to manufacture these products within the United States.

8        Instead, as I explained during my testimony, Fairchild hopes that, in the future, the "next generation" of Fairchild's power conversion products may be manufactured in the United States. This does not include the accused Green FPS products that were found to infringe at trial.

[*See* Contemporaneously filed Declaration of Robert Conrad in Support of Fairchild's Answering Brief in Opposition (1) to Power Integrations' Motion for a Declaration that this Case is Exceptional, Treble Damages, and Attorneys' Fees and (2) Power Integrations' Motion for Entry of Permanent Injunction].

**M     Power Integrations' Allegation:**     Fairchild continually attempted to block Power Integrations' efforts to obtain relevant discovery. For example, Fairchild originally argued that it did not need to produce witnesses employed in Korea. [Ex. Q (de Blank letter of 7/7/05).] Fairchild also contacted its customers – customers that Power Integrations had subpoenaed – and informed them that they had no responsive documents before they had even conducted a search. [Ex. R (Kim e-mail of 12/16/05).]

**Fairchild's Response:**     Rather than "misconduct", this is an example of Fairchild's cooperation with Power Integrations during discovery. Power Integrations sought to depose Korean witnesses not employed by any of the parties in this case (they are employees non-party Fairchild Semiconductor Korea, Ltd.). Fairchild properly objected and noted that it was not obligated to produce these witnesses. [D.I. 612, Exh. Q]. *__Notwithstanding this legitimate objection, Fairchild made witnesses available in Korea for Power Integrations to depose.__* Indeed, at great expense, Fairchild sent two attorneys to Korea for over a week of depositions and agreed that Power Integrations could depose these witnesses for more than a day each. Power Integrations ultimately spent nine days deposing six witnesses in Korea.

Likewise, the suggestion that Fairchild interfered with Power Integrations' efforts to collect third party discovery is unfounded. Power Integrations subpoenaed Fairchild's customer, Samsung International, Inc. Samsung is one of Fairchild's largest customers and purchases hundreds of products completely unrelated to the accused devices. Therefore, Fairchild's attorneys spoke with Samsung's attorneys to identify the products at issue in this case. [D.I. 612, Exh. R]. During that discussion, it became clear that Samsung did not purchase any of the accused products and, thus, had no responsive information.[5]

There was nothing improper about Samsung discussing this case with Fairchild or Fairchild providing Samsung with information. Far from secret, the email between Samsung and Fairchild was provided to Power Integrations. [D.I. 612, Exh. R]. Telling, Power Integrations never disputes that Samsung complied with its subpoena or that Samsung had any further information

---

[5]     Samsung had purchased the FSCQ0765 from Fairchild but Power Integrations had dropped its allegations with respect to that product by the time it served its subpoena on Samsung. [D.I. 612, Exh. R].

that was not provided.

**N.    Power Integrations' Allegation:**    Fairchild and Intersil worked together to withhold key materials related to James Beasom's conception and reduction to practice of his '173 patent until after the conclusion of the first trial. [Ex. S (VanderZanden letter of 10/17/06).] These materials included prototype wafers, photographs, and test-chips that became the centerpiece of Fairchild's invalidity argument. Fairchild also first produced Mr. Beasom's critical invention disclosure forms after Mr. Beasom was deposed in January 2006 – documents that showed that Mr. Beasom added key features after Dr. Eklund had already invented and documented his '075 technology. [Ex. T (VanderZanden letter of 4/24/06).] Fairchild turned over all of these materials long after the close of discovery. [Footnote omitted]

**Fairchild's Response:** Fairchild did not withhold any material from Power Integrations. Rather, material in the possession of third-party Intersil was discovered later in the case, during the Fall of 2006—a full year before trial. Immediately upon receiving this material from Intersil, Fairchild produced it to Power Integrations. Power Integrations' expert was provided the opportunity to inspect these materials and Mr. Beasom was made available for deposition in June 2007 regarding these materials. Fairchild was entirely cooperative in making this materials promptly available to Power Integrations and took steps to ensure that Power Integrations was in no way prejudiced, providing substantial discovery on the materials and ensuring that Power Integrations had an adequate opportunity to explore these materials in the final year leading up to trial. Furthermore, Power Integrations made these same arguments in the fall of 2006, and the Court ruled that Fairchild may use this prior art at trial. [*See* Transcript of 11/20/06 Pretrial Conference].

**O.    Power Integrations' Allegation:**    Fairchild argued strenuously that the Court should limit the scope of Power Integrations infringement contentions to 4 claims, and the Court eventually set the limit at 7. [D.I. 291 (Fairchild's Motion to Compel Pared Down Infringement Contentions)] Later, when the Court similarly limited Fairchild to 7 prior art references, Fairchild objected and filed a motion requesting additional references but not identifying what additional art it wanted to raise. [D.I. 389.] Fairchild also continually changed the specific invalidity contentions it intended to raise at trial, dropping some on the eve of the validity trial, all the while continuing to serve section 282 notices listing over a hundred references. [See D.I. 422; D.I. 515.]

**Fairchild's Response:**    Power Integrations originally asserted 18 claims from four different patents. During the May 31, 2006 pretrial conference, Power Integrations agreed to reduce the number of claims. [D.I. 282, 5/31/06 Pretrial Conf. at 26:17-27:25]. Thereafter, Fairchild repeatedly requested that Power Integrations make good on its promise and drop the claims that it did not intend to assert at trial. [D.I. 291, Exhs. A & B]. Power Integrations refused so Fairchild was forced to seek the assistance of the Court. The Court agreed with Fairchild, limited the number of Power Integrations' claims, and rejected Power Integrations' suggestion that Fairchild misrepresented the record:

> ***The Court's order at the pretrial conference was clear****.* Power Integrations was required to pare down its claims and specify its groups of products. ***Power Integrations has failed to comply with the Court's order and accuses Fairchild of misrepresenting the record in this case and advancing outright false statements in its Motions****.* As for the pared downs claims and groups of products, the Court will order Power Integrations to select one claim per asserted patent to litigate at trial and to specify three groups of products that will be at issue.

[D.I. 330 (emphasis added)][6]. Far from evidence of a pretrial abuse by Fairchild, the record shows that Power Integrations ignored the Court's order and then tried to blame Fairchild for Power Integrations' misconduct.

Thereafter, Power Integrations sought to limit the number of prior art references upon which Fairchild could rely. [D.I. 343]. This was done as part of Power Integrations' opposition to Fairchild's motion in limine and not as a motion to which Fairchild had an opportunity to oppose. [D.I. 365, p. 26]. Consequently, when the Court granted Power Integrations' requested relief, Fairchild sought reconsideration. [D.I. 389]. The Court granted this request and permitted Fairchild to rely upon additional prior art. Far from evidence of improper conduct, the record shows that the Court agreed with Fairchild's positions.

**P.    Power Integrations' Allegation:**    Fairchild filed 7 motions for summary judgment and 19 motions in limine before the first trial alone, and more generally attempted to bury Power Integrations in paper. Those 19 motions in limine, for example, included 60 pages of briefing and 66 exhibits, all of which were sent to Power Integrations after the deadline for filing, at 4 a.m. on the Saturday of Labor Day weekend. [D.I. 356.] Fairchild similarly dumped more than 800,000 pages of production documents, many of them in Korean, on Power Integrations in the final days of discovery. [Exs. U-V (Schultz letters of 6/28/05 and 6/29/05).]

**Fairchild's Response:**    Power Integrations does not dispute the merits of Fairchild's motions and the simple fact that Fairchild moved in limine and for summary judgment is not evidence of misconduct. Indeed, the Court granted Fairchild's motion for summary judgment with respect to pre-filing damages. [D.I. 265]. This ruling reduced Fairchild's liability by millions of dollars. Likewise, Power Integrations dropped its claim that Fairchild's products infringed the '075 Patent in response to Fairchild's motion for summary judgment of non-infringement. [D.I. 233, p. 11]. With respect to the other motions, the Court denied them finding that there was a potential dispute of fact. [D.I. 266]. Importantly, the Court did not deny the motions on their merits or consider them trivial.

Fairchild was likewise obligated move in limine. Once again, the merits of Fairchild's motions are underscored by the fact that many of them were granted by the Court. [*See* D.I. 344, 385, and 541].

**III.    Fairchild's "Other Relevant Conduct" Confirms It Acted Properly:**

**Q.    Power Integrations' Allegation:**    Fairchild obtained a "hunting license" from Intersil – a license whose sole purpose was to allow Fairchild to sue Power Integrations in the Eastern District of Texas, "to fight back." [Ex. W (Fairchild press release); D.I. 557 (Trial Tr. 9/19/07) at 657:1-23.] Fairchild has continued to pursue that case despite the fact that the priority of invention has now been determined in favor of Power Integrations' inventor, Dr. Klas Eklund.

**Fairchild's Response:**    As an initial matter, Power Integrations' complaint concerns entirely different litigation and cannot be a basis to enhance damages. Fairchild brought that action in good faith and continues to believe that it and Intersil have standing to enforce the Beasom patent and stop Power Integrations' continued infringement. [*See* 1:07-cv-187, D.I. 72].

While the Court disagreed with Intersil and Fairchild's position in that dismissed the complaint in that separate litigation, the Court expressly addressed and rejected Power Integrations demand that the dismissal be with prejudice because of Fairchild's alleged "hunting license":

---

[6]    The Court later permitted Power Integrations to select up to seven claims.

Power Integrations characterizes the PLA as a "hunting license," and contends that both public policy and the doctrine of champerty supports the dismissal of this action with prejudice.  While the Supreme Court has expressed disfavor toward the type of licensing arrangement made between Intersil and Fairchild, the Court is not prepared to go so far, at this juncture, as to dismiss this action with prejudice.

[1:07-cv-187, D.I. 39, pp. 17-18].

**R.**    **Power Integrations' Allegation:**    Fairchild attempted to hide its continued infringement by renumbering its parts and refusing to provide discovery on these new parts, even though they contain the exact same patented features as the existing products.  [Ex. X (Headley e-mail of 11/18/05).]  Fairchild has continued to tell potential customers that these "new" parts are "not subject to Power Integrations' patents" despite knowing that they contain substantially identical circuits to those found to infringe.[7]

**Fairchild's Response:**    Power Integrations' contention is perplexing.  Fairchild did not "hide its continued infringement by renumbering its parts." This is simply not true and Power Integrations does not cite any evidence whatsoever to support this baseless accusation.[8]  Clearly, had Fairchild ever sought to withhold relevant discovery (which Fairchild would not do), Power Integrations would seek to compel it.  The fact that Power Integrations did not bring any such dispute to the Court's attention is proof that there was no such misconduct.

It is possible that Power Integrations is referring to Fairchild's next generation products.  These products are not simply "renumbered" or "substantially identical" to the devices found to infringe.  Instead, as explained fully in Fairchild's answering brief to Power Integrations' motion for a permanent injunction and the supporting declarations, these devices were specially designed to avoid infringing the asserted patents and are very different from the accused products.

**REDACTED**

---

[7]    See D.I. 564-568 (Power Integrations' Motion for Entry of a Permanent Injunction
[8]    The single email cited by Power Integrations refers to two products – the FAN7602 and FSD500.  These were never "renumbered" products.

**REDACTED**

ASHBY & GEDDES

/s/ *Lauren E. Maguire*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

G. Hopkins Guy, III
Vickie L. Feeman
Bas de Blank
Brian H. VanderZanden
ORRICK, HERRINGTON & STUCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7400

Dated: December 21, 2007
186865.1