IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC., a
Delaware corporation,

   Plaintiff,

  v.

FAIRCHILD SEMICONDUCTOR
INTERNATIONAL, INC., a Delaware
corporation, and FAIRCHILD
SEMICONDUCTOR CORPORATION, a
Delaware corporation,

   Defendants.

C.A. No. 04-1371 JJF

**REDACTED**

---

**POWER INTEGRATIONS' REPLY BRIEF IN SUPPORT OF ITS MOTION FOR A
DECLARATION THAT THIS CASE IS EXCEPTIONAL, TREBLE DAMAGES, AND
ATTORNEYS' FEES**

FISH & RICHARDSON P.C.
William J. Marsden, Jr. (#2247)
Kyle Wagner Compton (#4693)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Telephone: (302) 652-5070
Email: marsden@fr.com
Email: kcompton@fr.com

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

Howard G. Pollack
Michael Headley
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Attorneys for Plaintiff
POWER INTEGRATIONS, INC.

Dated: January 16, 2008

Redacted: January 30, 2008

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ...................................................................................1

II.    ARGUMENT ........................................................................................2

     A.    Fairchild has not countered the evidence that each of the *Read* factors supports the enhancement of damages in this case. .......................2

         1.    Fairchild deliberately copied Power Integrations parts and patents. ................................................................................3

         2.    Fairchild's decision to sell the infringing products was made without a good faith belief that it did not infringe Power Integrations' patents or that the patents were invalid. ....................................................................................4

         3.    Fairchild did not cooperate in the litigation, as it suggests. .................................................................................6

         4.    Fairchild's size and financial condition support the enhancement of damages. ........................................................10

         5.    Fairchild's failure to prevail on any of its defenses in either trial supports an award of enhanced damages. .................10

         6.    Fairchild misleadingly suggests it took remedial action when, in fact, it expanded its infringement during this case, further supporting an award of enhanced damages.............12

         7.    Fairchild's motivation to harm Power Integrations by infringement was great and provided Fairchild with substantial financial gain...............................................................14

         8.    Fairchild deliberately concealed its expanding infringement during this case, meriting an enhanced damages award.........................................................................14

     B.    An Award of Fees and Costs in this Case is Proper. ...............................16

III.    CONCLUSION....................................................................................16

i

**TABLE OF AUTHORITIES**

**PAGE**

*nCUBE Corp. v. SeaChange International, Inc.,*
   313 F. Supp. 2d 361 (D. Del. 2004).................................................................................2

*Lucent Techs., Inc. v. Newbridge Networks Corp.,*
   168 F. Supp. 2d 269 (D. Del. 2001)..........................................................................2, 16

## I.    INTRODUCTION

Fairchild has had its day in court, and the time has come for Power Integrations to recover for the harm caused by Fairchild's willful infringement. The evidence at trial demonstrated that Fairchild, a competitor ten times the size of Power Integrations,[1] deliberately set out to copy Power Integrations' parts and patents almost ten years ago with little regard for the consequences. When Power Integrations discovered Fairchild's infringement, it sued Fairchild in 2004. But despite two jury verdicts confirming that Fairchild has willfully infringed all asserted claims of four Power Integrations' patents, and that all of the asserted claims are valid, Fairchild continues to infringe. Indeed, Fairchild has unapologetically expanded the scope of its infringement and continues to argue that it should not be enjoined and that Power Integrations should take nothing. The court should find this pattern of reckless conduct to be exceptional, and award Power Integrations treble damages and attorneys' fees.

Fairchild's actions in the marketplace speak far louder and truer than the arguments of its lawyers seeking to excuse that conduct. Fairchild's press releases about this case tell the Court all it needs to know about Fairchild's lack of respect for Power Integrations' patents and the judicial process. The day after Power Integrations filed suit, Fairchild called the suit "baseless" and defiantly told the world it "will continue to aggressively develop, produce, sell and support our Fairchild Power Switch (FPS) integrated circuit products." [PX139.][2] When the jury found Fairchild willfully infringed all four of the patents-in-suit, Fairchild issued another, similarly defiant press release, vowing to "continue offering its full line of pulse-width modulation (PWM)

---

[1]    Fairchild's total revenue for 2006 was $1.651 billion, *see* http://thomson.mobular.net/thomson/7/2249/2473/ at 3, whereas Power Integrations' 2006 revenue totaled $162 million. *See* http://yahoo.brand.edgar-online.com/EFX_dll/ EDGARpro.dll?FetchFilingHTML1?SessionID=WD8AC7y2l3h1FMr&ID=4969783.

[2]    In fact, Fairchild made these statements knowing that its only analysis of the '075 patent at that time confirmed that if Fairchild grounded the PTOP layer (which it did), it would infringe the '075 patent. Fairchild's only pre-suit opinion—which Fairchild management later testified *it did not rely on*—addressed only the '876 patent, did not say that the patent was not infringed, and relied on a single invalidity theory that Fairchild *never presented at trial*. And Fairchild had no legal analysis at that time on the '366 or '851 patents *at all*.

# REDACTED

devices." [Ex. Y.][3]  When the jury rejected Fairchild's invalidity defenses, Fairchild again

defiantly proclaimed to the world that it "will keep fighting." [Ex. Z.]  Finally, during the course

of post-trial briefing, Fairchild finally disclosed

These

actions demonstrate Fairchild's complete lack of remorse and absence of good faith.

Moreover, this was not a close case.  Fairchild took extreme, unjustified positions at

every turn and waged a war of attrition in an effort to wear down Power Integrations' resolve.

But Power Integrations persevered, and Fairchild's many, varied, and contradictory theories

regarding claim construction, infringement, willfulness, damages, and validity were each rejected

in turn.  In the end, two juries saw the lack of merit in Fairchild's various attempts to evade

liability, and Fairchild's only success has been to complicate and prolong this litigation.  Because

Fairchild's response ignores the fact that it has had its day in court, and relies almost entirely on

arguments that have been repeatedly rejected, the Court should declare this case exceptional and

award Power Integrations treble damages, attorneys' fees, and the costs of suit.

## II.    ARGUMENT

### A.    Fairchild has not countered the evidence that each of the *Read* factors supports the enhancement of damages in this case.

As discussed in detail below, each of the *Read* factors supports enhancement of the

damages awarded by the jury.  When this Court has previously found cases exceptional, it has

not hesitated to enhance the damages awarded to the patentee.  *See, e.g., nCUBE Corp. v.

SeaChange Int'l, Inc.*, 313 F. Supp. 2d 361, 387-92 (D. Del. 2004) (doubling damages award

based on willful infringement and because only several of the *Read* factors weighed in favor of

enhancing damages); *Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 269,

274-76 (D. Del. 2001) (doubling damages award based on willful infringement and because only

"several" *Read* factors weighed in favor of enhancing damages).  Here, because *all* of the *Read*

---

[3]    All citations refer to the Declaration of Kyle Wagner Compton filed in connection with
Power Integrations' opening brief, D.I. 612, unless noted otherwise.

2

factors weigh heavily in favor of enhancing damages, this Court should treble the jury's damages award.

### 1.    Fairchild deliberately copied Power Integrations parts and patents.

Fairchild seeks to avoid the consequences of its copying by mischaracterizing what the evidence showed. The evidence clearly demonstrated that Fairchild obtained and reverse engineered Power Integrations' products (both their device structure and circuitry), that Fairchild studied Power Integrations' patents, and that Fairchild subsequently incorporated the device structure and circuitry of the Power Integrations patents in its own infringing products. Fairchild's argument that it did not copy Power Integrations' "commercial embodiments" [D.I. 636 at 3-8] completely ignores this pattern of deliberate copying, and merely seeks to re-hash positions the jury rejected at trial.

With respect to the '075 patent, Fairchild now acknowledges that its engineers knew from the start that, to avoid infringing the '075 patent, Fairchild would need to leave the PTOP floating (i.e. not grounded) "so as to have no reverse bias applied." Fairchild also concedes that it chose to ground the PTOP anyway because "floating the PTOP would not work." [D.I. 636 at 5.] Fairchild's interrogatory responses established that it studied the products incorporating the patented '075 structure and "looked to those products as a benchmark for Fairchild's new product line," and that "Fairchild engineers continued to review data sheets and examine or reverse engineer Power Integrations products, in particular the TOP221, TNY264, TOPGX and TNY266 devices, in order to benchmark those products." [Ex. A.]

After all of that work to analyze Power Integrations' patented device structure and commercial embodiments, Fairchild chose to use Power Integrations' reverse-biased PTOP structure instead of following its own engineers' advice to float the PTOP to avoid infringement. Fairchild has not presented any contemporaneous evidence that it designed around the '075 patent. Instead, Fairchild misleadingly cites to its engineers' report [Ex. D] for the proposition that the engineers "discovered that Power Integrations had disclaimed coverage of DMOS devices during prosecution." [D.I. 636 at 5 (citing FCS1330828).] The cited page says nothing

of the sort—it addresses another patent that has no bearing on the instant dispute[4]—and nowhere in the report in question did Fairchild set forth its litigation-induced theory regarding "DMOS" devices that the jury and the Court rejected on several occasions. [*See* Ex. D.] The Court should credit the contemporaneous evidence of Fairchild's decision to proceed with an infringing device structure after studying Power Integrations' patents and devices—as the jury did—rather than Fairchild's undocumented, post-hoc attempt to reargue the "DMOS" theory of non-infringement.

Fairchild's copying was equally egregious with regard to the circuit patents, yet Fairchild's response ignores the evidence that its circuit designers knew about the patents-in-suit, reverse engineered the Power Integrations products incorporating those circuits, did not consult with an attorney regarding Power Integrations' patented technology, and then incorporated the patented circuitry into its successful line of power supply controller chips. [*See* D.I. 646 (Power Integrations' opening brief) at 6-8.] With respect to the '876 patent, Fairchild's circuit designer admitted that he only looked at the patent's figures and never read the text of the patent or the claims before deciding to incorporate the patented frequency jitter circuits into Fairchild's products. [D.I. 417 (Trial Tr. 10/3/06) at 585:8-594:20.] Moreover, the unrebutted evidence shows that Fairchild copied both circuit inventions (jitter and soft-start) and linked them by driving them with the same "frequency variation signal," a unique feature of the preferred embodiment of the patents. [D.I. 558 (Trial Tr. 9/20/07) at 1044:22-1046:1.] These unrebutted facts clearly and convincingly demonstrate that Fairchild copied Power Integrations' patented technology and are directly contrary to Fairchild's present assertion that it acted in good faith with respect to Power Integrations' patents.

2. **Fairchild's decision to sell the infringing products was made without a good faith belief that it did not infringe Power Integrations' patents or that the patents were invalid.**

Fairchild did not have a good faith belief that it did not infringe Power Integrations' patents or that the patents were invalid. Fairchild proceeded with its infringing device structure

---

[4] Power Integrations' '636 Patent, which is discussed in the engineering report, provides no excuse for Fairchild's decision to proceed with a device structure its engineers knew would infringe the asserted '075 patent.

years before it had any non-infringement or invalidity theory regarding the '075 patent—the "DMOS" theory and the challenge on the basis of Mr. Beasom's work both only surfaced after Fairchild was sued.

Fairchild attempts to rely on an opinion letter it received regarding the '876 patent (the only opinion letter it received before the suit was filed). This single pre-suit opinion letter on one patent does not support the conclusion that Fairchild acted in good faith for multiple reasons. First, Fairchild's witness regarding reliance on the opinions of counsel, Robert Conrad, admitted that he did not rely on that initial opinion letter and that he hadn't even seen the letter before he was deposed in this case. [D.I. 418 (Trial Tr. 10/4/06) at 908:5-12, 921:23-922:5 (noting reliance on the 12 post-suit opinions).][5] Second, Fairchild's brief points out that the first '876 opinion letter relies on the Wang reference for an assertion of invalidity [D.I. 636 at 10], but the letter said nothing about non-infringement, and Fairchild did not even present an invalidity argument at trial based on the Wang reference.

Fairchild also seeks to rely on the 12 opinion letters it obtained after it was sued [D.I. 636 at 10-11], but all of these post-hoc rationalizations for Fairchild's behavior have no bearing on the fact that Fairchild intentionally copied Power Integrations' technology and ignored its patent rights previously, when Fairchild developed and began selling the infringing chips. Moreover, the arguments of opinion counsel Fairchild now touts do not justify Fairchild's conduct because they were both ill-informed and so off the mark that they were not even relied upon by Fairchild's trial counsel. For example, Fairchild now notes opinion counsel's arguments regarding the TEA2262 device with respect to both the '851 and '366 patents, but opinion counsel *explicitly withdrew* its opinion regarding the TEA2262 and the '366 patent during the course of litigation [Ex. F (DX483) at FCS1693055], and Fairchild chose not to present *any* invalidity contention based on the TEA2262 device at trial. Fairchild's opinion with respect to

---

[5]    Mr. Conrad also admitted that he was not aware of Fairchild's interrogatory responses regarding its early review of the Power Integrations' patents and reverse engineering of Power Integrations' products until Power Integrations' counsel showed them to him during the course of his deposition. Ex. CC (Conrad 3/28/06 Tr.) at 126:10-135:14 to the Supplemental Declaration of Kyle Wagner Compton filed herewith.

the '075 patent could not reasonably have been relied upon because Fairchild did not provide its

counsel with an accurate description of its device structure.  [*See* Ex. J (DX137) at WOO1518.]

The timing of these opinions and their obvious deficiencies preclude any finding that Fairchild

could have relied upon them in good faith.

### 3.    Fairchild did not cooperate in the litigation, as it suggests.

Fairchild argues that it "cooperated with Power Integrations from the outset of this

litigation and continues to do so through today." [D.I. 636 at 13.]  Nothing could be further from

the truth, as shown by the unrebutted evidence that Fairchild's conduct throughout this litigation

has been vexatious and oppressive.

Fairchild's 19-page, single-spaced Appendix[6] attempting to rebut the evidence of

Fairchild's vexatious litigation conduct underscores the need for an enhanced damages award, as

it provides further evidence of that conduct and shows that only a finding of exceptional case

will put an end to it.  The following examples show how far Fairchild is willing to go to re-cast

the facts and evidence in this case to obscure the reality of its conduct:

- Fairchild suggests it was justified in arguing during closing in the first trial that Power Integrations filed suit in order "to get acquired."  In doing so, Fairchild misleadingly suggests its theory "was supported by evidence from Power Integrations' own witnesses." [D.I. 636 at A3.]  In fact, the cited passage from Fairchild's cross-examination of Power Integrations' CEO shows that <u>Fairchild</u> offered to acquire Power Integrations during the course of this litigation during a meeting arranged by investment bankers.  Power Integrations' witnesses never suggested, much less stated, that the suit was filed as "[p]art of an acquisition strategy."[7]

- Fairchild provides no response to the evidence that it wrongly accused Power Integrations' lawyers and witnesses of intentionally misleading the jury during its rebuttal closing argument in the second trial. [D.I. 559 (Trial Tr. 9/21/07) at 1553:11-19 ("Don't believe a single thing you heard from Power Integrations, or

---

6    Fairchild's 19-page appendix, when combined with its 33-page brief, goes well beyond the 40-page limit provided under the local rules, and Fairchild's attempt to incorporate the Appendix by reference, D.I. 636 at 16, rather than responding to the evidence in the body of its responsive brief, is improper.

7    Although the investment banker who arranged the meeting between Fairchild and Power Integrations' CEOs will not provide any testimony without a subpoena, Power Integrations represents that, if subpoenaed, he would acknowledge that Power Integrations, in fact, did not initiate the discussions in question with Fairchild.

any of the witnesses, or any of their lawyers.").] Instead, Fairchild re-argues its incorrect theory that Dr. Eklund gave false testimony on cross-examination concerning one of the documents reflecting his work on the claimed invention, but Fairchild has no response to the evidence that Dr. Eklund addressed the document in question on two separate occasions, and testified that it showed simulations of an n-channel device and was prepared in 1986, when he was at Data General. [D.I. 558 (Trial Tr. 9/20/07) at 1143:3-13, 1200:15-1201:5; Ex. K (PX48) at KE1362-64.]

- Fairchild's response to the evidence that it incorrectly argued a diminished presumption of validity does not explain its actions. Instead, Fairchild incorrectly states that "Power Integrations had agreed that the jury should be instructed that the presumption of validity was easier to overcome." [D.I. 636 at A6.] As the Court is well aware, Power Integrations never agreed that the jury should be so instructed—if it had, there would be no argument about this point—and Fairchild's suggestion that Power Integrations should have interrupted its improper rebuttal closing argument about Supreme Court precedent does not excuse the fact that Fairchild knew the Court had already rejected its argument for a legally diminished presumption but argued the point to the jury anyway.

- In response to Power Integrations' explanation of Fairchild's false discovery response denying U.S. manufacturing of infringing devices, which Power Integrations only uncovered by moving to compel the deposition of H.K. Kim, Fairchild merely re-hashes a number of arguments it previously offered in opposing the deposition of Mr. Kim in the first place. [D.I. 636, Appendix at A14-A15.] None of Fairchild's statements contradicts the record showing it withheld critical evidence of U.S. manufacturing from Power Integrations (whether or not Fairchild also withheld that information from its own attorneys), and Fairchild's citation to a statement the Court made during the hearing in which it compelled the deposition that "I don't really believe Mr. Kim is going to help them" merely reflects the degree to which Fairchild was able to mislead the Court with respect to its U.S. manufacturing activities throughout discovery. Fairchild also relies on a self-serving declaration from Robert Conrad to suggest his statement during trial about manufacturing the "next generation" of products in Portland, Maine only referred to new non-infringing products [*id.* at A15-A16], but Fairchild has now conceded that several of its "new" products in fact contain circuits that are not colorably different from those adjudged to infringe. [D.I. 640 at 4 n. 5; D.I. 641 at Ex C, Schedule 1.]

In addition to the misleading and incorrect statements in the Appendix Fairchild filed with its response brief, Fairchild's conduct since trial provides further justification for an award of enhanced damages. First, Fairchild attempted to rely on a newly minted non-infringement argument in its JMOL motion regarding the '876 digital jitter patent –specifically that its parts

# REDACTED

allegedly do not vary their frequency "about a target frequency"– despite the fact that Fairchild's expert on the circuit technology never offered such an opinion during discovery, and neither Fairchild nor its experts offered such a theory at trial. [*See* D.I. 632 (Power Integrations' Opposition to Fairchild's JMOL re '876 patent) at 4-7.] Fairchild also vexatiously multiplied the proceedings in this case by pressing an inequitable conduct theory regarding the '876 patent that it knew was without merit [D.I. 585 at 34-39], because the true facts regarding the prosecution of the '876 patent were provided to Fairchild early in discovery and Fairchild's counsel received Power Integrations' motion explaining the lack of evidentiary support for a claim of inequitable conduct regarding the '876 patent more than a week before Fairchild filed its papers. [*See* D.I. 573-74.] These actions show that Fairchild continues to go well beyond the bounds of aggressive advocacy, instead continuing to engage in a do-anything/say-anything effort to stave off the day of judgment.

Similarly egregious is Fairchild's recent production of highly relevant documents it withheld during the course of this litigation,

These materials are obviously relevant, and they directly undercut the positions Fairchild took throughout the case, both in terms of Fairchild's U.S. sales organization being responsible for sales to customers overseas, and with respect to the importation of its products into the United States.

Moreover, although Fairchild objected to and moved to strike Power Integrations' expert's list of additional Fairchild products that should be subject to an injunction because they include infringing circuitry [D.I. 592-93], Fairchild now concedes that

# REDACTED

Thus, the improper withholding of these highly relevant documents is further evidence of Fairchild's vexatious litigation conduct, which has driven up costs throughout this litigation.

Despite this overwhelming evidence of Fairchild's failure to cooperate and abide by the rules governing discovery and trial, Fairchild suggests it "cooperated" with discovery by traveling to Korea to collect documents for production and "voluntarily produc[ing] foreign witnesses for depositions." [D.I. 636 at 14; D.I. 638 (Feeman Decl.).] Neither of these statements is correct. Fairchild's attorneys may well have traveled to Korea in February 2005 to collect documents for production, but that does not evidence anything more than standard discovery practice for large patent litigation involving a multinational corporation such as Fairchild, nor does it explain why Fairchild waited until mere days before discovery closed at the end of June 2006 to produce more than 800,000 pages of documents, many of them in Korean, to Power Integrations. [Exs. U-V (Schultz letters of 6/28/05 and 6/29/05 enclosing hard drives and CDs containing production documents).]

Fairchild is also incorrect in suggesting that its conduct with respect to depositions was "cooperative." First, Fairchild produced the full list of Korean deponents in response to a Court order, not voluntarily. During the August 23, 2005 hearing at which this issue was raised, Fairchild argued it should not be required to produce certain witnesses for deposition in Korea because it had agreed to produce other witnesses, and the Court responded "I understand you made an agreement, but it sounds like it doesn't fall within what my ruling is." [D.I. 97 (8/23/05 Hearing Tr.) at 10.] After some additional back and forth, the Court ordered Fairchild to produce Mr. C.S. Lim for deposition during the parties' trip to Korea or "if he's not available, [to] let me know right away, because then I'm going to weigh in with one of my arbitrary remedies." [*Id.* at 13:14-17.] When Fairchild subsequently refused to provide Mr. H.K. Kim for deposition despite his regular business travel to the United States, Power Integrations had to move to compel the deposition. [*See* D.I. 187 (2/2/06 Hearing Tr.) at 25:7-28:21.] Mr. Kim's deposition proved to be critical. As noted above, Power Integrations first learned during Mr. Kim's deposition that

9

Fairchild had begun manufacturing the accused FSD210 devices in the United States during the course of the litigation to meet the needs of Samsung Wireless, contrary to Fairchild's repeated assertion that all of the relevant activity took place overseas.

Fairchild also attempts to rely on a series of statements the Court made throughout this case, but these statements do not evidence a pattern of cooperation and amicable discovery, particularly in the context of the evidence of Fairchild's vexatious conduct as set forth above and in Power Integrations' opening brief.

### 4.    Fairchild's size and financial condition support the enhancement of damages.

Fairchild argues that its size and financial condition cut against the imposition of enhanced damages, but the opposite is true. Fairchild claims that the imposition of enhanced damages would cause "severe" prejudice [D.I. 636 at 17], but the evidence from Fairchild's own witnesses demonstrates otherwise—Fairchild sells over 20,000 different products [D.I. 419 (Trial Tr. 10/5/06) at 972:4-5] and has 9,000 employees worldwide [*id.* at 973:4-5], with total annual revenues of over $1.5 billion dollars. [*Id.* at 977:6-8.] Fairchild's sales of the FPS products alone, counting only from the date the complaint was filed through September 19, 2007, total more than $100 million. [D.I. 557 (Trial Tr. 9/19/07) at 634:4-6.] Fairchild also ignores the evidence that its infringement caused Power Integrations harm far in excess of the damages awarded at trial. [*See* D.I. 418 (Trial Tr. 10/4/06) at 675: 7-676:11, 754:17-755:4.] As such, it strains credulity for Fairchild to suggest that an award of enhanced damages would be "unduly prejudicial."

### 5.    Fairchild's failure to prevail on any of its defenses in either trial supports an award of enhanced damages.

This was not a close case. Fairchild did not prevail on any of its defenses. Because Fairchild's answering brief breaks out its argument for each of the patents separately, Power Integrations will address each in turn.

Fairchild first suggests that the issue of infringement on the '075 patent was close [D.I. 636 at 18], but there is no dispute that Fairchild's engineers studied the '075 patent, determined

that the only way to avoid infringement was to leave the PTOP layer floating instead of grounding it, and then proceeded to ground the PTOP layer anyway. [*Id.* at 5; PX296; D.I. 415.] This sequence of events is the only documented record of Fairchild's engineers' early understanding of the '075 patent, and it shows that Fairchild was, at best, reckless when it began selling products that infringe the '075 patent. Fairchild's litigation-inspired "DMOS" theory is irrelevant, as it was rejected early in the case during the claim construction proceedings. Fairchild's decision to file a motion seeking reconsideration of the Court's claim construction on the "DMOS" issue during the infringement trial does not make the issue any closer than it was when Fairchild first offered it.

Fairchild also suggests that its challenge to the validity of the '075 patent presented a close case, but Fairchild merely re-argues the positions already rejected by the Court and the jury. For example, Fairchild argues that "Power Integrations failed to present legally sufficient evidence corroborating any invention date prior to the filing of the Beasom '173 patent" [D.I. 636 at 19], but the Court rejected this theory on summary judgment, and the jury rejected it after weighing all of the facts at trial. Fairchild also suggests that Power Integrations conceded that the Beasom patent anticipates the '075 patent at trial [*id.*], but Power Integrations made no such concession, and the facts demonstrated that Dr. Eklund was the first to invent the technology in question. Tellingly, none of Fairchild's three opinion letters on the '075 patent relied on the Beasom reference presented at trial. [*See* DX136; DX137; DX480.] Fairchild's re-hashed arguments and selective quotation of the evidence do not make this a close case.

Fairchild also asserts that the disputes regarding the circuit patents presented a close case, but the evidence Power Integrations presented at trial, which the jury agreed with across the board, shows otherwise. First, with respect to the '876 patent, Fairchild can only fall back on the arguments set forth in its JMOL motion, but as set forth in detail in Power Integrations' opposition to that motion, Fairchild cannot reconcile its expert's blatantly contradictory theories

unless it ignores what actually happened at trial.[8] Fairchild similarly re-hashes its rejected claim construction arguments with respect to the '366 patent, but Fairchild ignores the fact that its opinion counsel and its expert flip flopped on their theories for the '366 patent throughout the case. Fairchild's suggestion that its invalidity theory for the '366 patent based on the SMP240/260 device was a close case is also off base, as Fairchild lost on that theory and did not even move for judgment as a matter of law challenging the jury's decision. Similarly, Fairchild's alleged "close case" with respect to the validity of the '851 patent was based on an obviousness theory that was never raised in any opinion letter relied upon by Fairchild, and which ignored all the evidence of objective indicia of non-obviousness. Fairchild did not set forth any non-infringement theory at all at trial with respect to claim 1 of the '851 patent. In view of the record of what actually transpired in this case, the Court should reject Fairchild's assertion that the liability issues were "close."

Fairchild similarly overreaches when it claims that its arguments with respect to damages rendered this a close case. In its opposition brief, Fairchild argues that Power Integrations' "damages fail as a matter of law" [D.I. 636 at 25], but the Court rejected that contention on summary judgment, the jury rejected it again at trial, and Power Integrations has again explained the flaws in Fairchild's re-hashed arguments concerning "worldwide" damages in its opposition to Fairchild's JMOL motion on this issue. [See D.I. 646.] In sum, Fairchild's ever-shifting and self-contradictory theories on the patents-in-suit did not make this a close case.

### 6. Fairchild misleadingly suggests it took remedial action when, in fact, it expanded its infringement during this case, further supporting an award of enhanced damages.

Fairchild's cursory response on the sixth and seventh *Read* factors demonstrates that it did not act in good faith with regard to Power Integrations' patents. First, Fairchild makes no attempt to address its expanded infringement during the course of this case, ignoring the U.S. manufacturing of infringing devices that it failed to timely disclose during discovery. These

---

[8]    And how "close" can the merits of the '876 issues really have been if Fairchild felt the need to manufacture an entirely new non-infringement argument in its JMOL motion.

# REDACTED

actions undercut the assertion that Fairchild took any steps to remedy the infringement it deliberately set in motion years before. Instead, Fairchild cites to the multiple rounds of opinion letters it obtained during the course of litigation as evidence of "remedial action" [D.I. 636 at 26], but retaining counsel does not "remedy" infringement, and certainly did not do so in this case. First, post-hoc opinions of counsel cannot support a finding of good faith since Fairchild had long since charted a course of copying Power Integrations' patented inventions. Second, the jury resoundingly rejected Fairchild's litigation-induced, self-contradictory opinions in determining that Fairchild's infringement of all four patents was willful. Given the nature, the timing, and the inconsistencies and contradictions between Fairchild's various opinion letters and the positions its counsel set forth at trial, none of which Fairchild disputed in its opposition brief, the Court should find that Fairchild's opinion letters do not provide Fairchild with an excuse for its vexatious conduct.

Fairchild also suggests that its actions in designing a new "e-Series" of parts, which it did not release until <u>after</u> the judgment of infringement, somehow supports a conclusion of remedial action. [D.I. 636 at 27.][9] But the availability of new products does not address Fairchild's ongoing, expanded infringement, and Fairchild ignores the fact that it *continued to sell* the infringing devices after each trial and continues to sell them *to this day*. Indeed, Fairchild has argued in response to Power Integrations' motion for an injunction that

– precisely because Fairchild is still infringing. The Fairchild press release issued the day of the infringement verdict tells the true story: "[Fairchild] will continue offering its full line of pulse-width modulation (PWM) devices." [Ex. Y.] This uncontroverted evidence demonstrates that Fairchild did not engage in any significant remedial measures to address Power Integrations' patents.

---

[9]

   7.   **Fairchild's motivation to harm Power Integrations by infringement was great and provided Fairchild with substantial financial gain.**

Fairchild half-heartedly argues that it had no motive to harm Power Integrations [D.I. 636 at 28-29], but the record shows otherwise. Fairchild's deliberate copying and expanded infringement over time permitted it to enter an entirely new business, to steal Power Integrations' biggest customers (including $10,000,000 a year in business at Samsung alone), and to erode the market prices Power Integrations could command for its award-winning, patented products. [*See* D.I. 418 (Trial Tr. 10/4/06) at 746:16-763:7 (testimony of third party industry analyst).] Selling its infringing parts, Fairchild built a business that generates at least $30,000,000 in annual revenue.[10] [D.I. 418 (Trial Tr. 10/4/06) at 935:17-20; D.I. 557 (Trial Tr. 9/19/07) at 633:21-23.] It has taken years of work and millions of dollars in legal costs to bring Fairchild's misconduct to light, but at every turn Fairchild has exacerbated the harm to Power Integrations by pressing its litigation positions which were roundly rejected by two juries. Given the clear harm to Power Integrations and Fairchild's resulting financial gain, this factor also favors enhancement of damages.

   8.   **Fairchild deliberately concealed its expanding infringement during this case, meriting an enhanced damages award.**

Fairchild grossly overstates its case when it suggests "the record before the Court is devoid of any concealment by Fairchild." [D.I. 636 at 29.] Fairchild submitted sworn interrogatory responses during discovery stating "[N]one of the Accused Products are or have ever been manufactured in the United States" [Ex. O (Fairchild Response to Interrogatory No. 8).] Later, when Power Integrations successfully compelled the deposition of H.K. Kim, it learned that Fairchild was, in fact, manufacturing the accused FSD210 devices in Portland, Maine. Fairchild now suggests that it "truthfully provided discovery concerning its accused products to Power Integrations" but that it "was mistaken in its good-faith belief that *none* of the

---

[10]   Fairchild also suggests it is making little to no money on the products in question, but Fairchild's payment of $1,500,000 to Intersil for a bare license to file a counter-suit against Power Integrations clearly demonstrates that Fairchild grossly understates the value of its infringing activity; why spend that money, and millions more on expensive lawyers, if the ongoing infringement was not extremely profitable?

accused products had been manufactured in the United States." [D.I. 636 at 29-30.] There is no way to square these statements—statements Fairchild pressed in a motion for summary judgment arguing that "the Fairchild products at issue in this motion are manufactured and sold abroad" [D.I. 219 at 2]—with the evidence of U.S. manufacturing of the infringing devices that Power Integrations uncovered only as a result of a successful motion to compel.

Fairchild also states that it did not "learn" of the U.S. manufacturing activity until the deposition of H.K. Kim, but this is not credible. Fairchild's manufacturing of infringing devices in Portland, Maine was done by Fairchild, not some third party, and it required a team of people to coordinate this wafer production to supply infringing devices to meet the demands of the Samsung Wireless subcontractors. [See D.I. 418 (Trial Tr. 10/4/06) at 774:12-23 (stipulation of parties that Fairchild manufactured FSD210HD devices in Portland); PX380 at FCS1691710-17 (showing chips manufactured in the United States); PX381 at FCS1693108-17 (Fairchild meeting notes discussing increasing manufacturing of infringing chips by adding a manufacturing plant in Maine); PX334 ("As part of FAIRCHILD Semiconductor's ongoing effort to increase capacity, reduce cycle times and improve customer service, the *Green FPS products will be manufactured* in both 'Bucheon in Korea and *Maine in the USA*'." (emphasis added)).] If Fairchild's actively denying any U.S. manufacturing in sworn filings and discovery responses while simultaneously building infringing devices in its hometown does not constitute the sort of concealment that can justify an award of enhanced damages, this factor has no meaning whatsoever.[11]

Fairchild also incorrectly suggests that the standard under *Read* requires an inquiry into whether Fairchild tried to hide its *products*. [D.I. 636 at 29.] This *Read* factor asks "whether defendant attempted to conceal its *misconduct*," *id.* at 827 (emphasis added), and the evidence

---

[11]    The fact that Fairchild's trial counsel may not have known about the U.S. manufacturing activity has no bearing on the inquiry into whether *Fairchild concealed its actions*. If it did, parties could simply hide their misconduct from their outside counsel and have outside counsel argue it did everything "in good faith" to excuse the party's misconduct. Because this approach is obviously not the proper inquiry under *Read*, Fairchild's submissions from counsel and attorney argument on the issue of when "Fairchild" learned of the U.S. manufacturing are irrelevant.

here plainly showed that Fairchild misled Power Integrations (and the Court) and affirmatively misrepresented the scope of its activity in the U.S. until well after the close of discovery.

**B.    An Award of Fees and Costs in this Case is Proper.**

As explained in detail above, this was not a close case, and the evidence demonstrates that Fairchild did not act in good faith before or during the suit. Fairchild's decision to aggressively contest virtually every issue and turn it into a "hard-fought battle," despite the obvious weakness of many of its positions, supports, rather than undercuts Power Integrations' motion to find this case exceptional. For example, there was no reason for Fairchild to file seven summary judgment motions and more than 20 motions *in limine* (19 in advance of just one of the three pretrial conferences held in this case), or to repeatedly change its non-infringement and invalidity theories in a host of supplemental expert reports, or to spend $1.5 million on a hunting license to file a harassing countersuit against Power Integrations in the Eastern District of Texas, or to withhold highly relevant documents until after the conclusion of each of the trials in this case. Fairchild unnecessarily multiplied these proceedings at every opportunity, pressing arguments to suit the exigencies of the moment without apparent regard for their merit. Each time, Fairchild chose the path that required more work, more paper, and more attorneys and expert witness fees. This is precisely the type of case that calls for an award of attorneys' fees and costs.[12]

## III.    CONCLUSION

In view of the more than substantial evidence supporting the conclusion that this case is exceptional, including the jury's finding of willful infringement, Fairchild's subsequent

---

[12] Fairchild suggests that the Court's decision in *Lucent Technologies, Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 269 (D. Del. 2001) supports the conclusion that Power Integrations cannot recover fees or costs because it did not submit the amount with its opening brief, but the decision in *Lucent* directly contradicts that assertion. In *Lucent*, the Court found that it was sufficient to have submitted the fee estimate after the briefing on exceptional case and the entitlement to fees was completed and the parties resolved certain outstanding equitable issues. *Id.* at 276. Here, the parties similarly have more than eight post-trial motions pending, making the determination as to the proper amount of any fee award premature. As noted in Power Integrations' opening brief, it will supplement its request with detailed information regarding its fees and costs of suit submitted for *in camera* review when the Court determines it is proper to do so.

continued willful infringement, and Fairchild's litigation misconduct, the Court should declare this case exceptional, enhance the ultimate damages award (after accounting) by trebling it, and award Power Integrations its reasonable fees and costs associated with bringing and prosecuting this suit.

Dated: January 16, 2008                      FISH & RICHARDSON P.C.


                                   By:   */s/ Kyle Wagner Compton*
                                         William J. Marsden, Jr. (#2247)
                                         Kyle Wagner Compton (#4693)
                                         919 N. Market Street, Suite 1100
                                         P.O. Box 1114
                                         Wilmington, DE 19899-1114
                                         Telephone: (302) 652-5070
                                         Email: marsden@fr.com
                                         Email: kcompton@fr.com

                                         Frank E. Scherkenbach
                                         225 Franklin Street
                                         Boston, MA 02110-2804
                                         Telephone: (617) 542-5070

                                         Howard G. Pollack
                                         Michael Headley
                                         500 Arguello Street, Suite 500
                                         Redwood City, CA 94063
                                         Telephone: (650) 839-5070

                                   ATTORNEYS FOR PLAINTIFF
                                   **POWER INTEGRATIONS, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2008, a true and correct copy of POWER INTEGRATIONS' REPLY BRIEF IN SUPPORT OF ITS MOTION FOR A DECLARATION THAT THIS CASE IS EXCEPTIONAL, TREBLE DAMAGES, AND ATTORNEYS' FEES was caused to be served on the attorneys of record at the following addresses as indicated:

| | |
|---|---|
| **BY HAND AND ELECTRONIC MAIL**<br>John G. Day, Esq.<br>Steven J. Balick, Esq.<br>Ashby & Geddes<br>500 Delaware Avenue, 8th Floor<br>P.O. Box 1150<br>Wilmington, DE 19899 | Attorneys for Defendants<br>FAIRCHILD SEMICONDUCTOR<br>INTERNATIONAL, INC. and<br>FAIRCHILD SEMICONDUCTOR<br>CORPORATION |
| **BY HAND AND ELECTRONIC MAIL**<br>G. Hopkins Guy, III, Esq.<br>Bas de Blank, Esq.<br>Orrick, Herrington & Sutcliffe, LLP<br>1000 Marsh Road<br>Menlo Park, CA  94025 | Attorneys for Defendants<br>FAIRCHILD SEMICONDUCTOR<br>INTERNATIONAL, INC. and<br>FAIRCHILD SEMICONDUCTOR<br>CORPORATION |

/s/ Kyle Wagner Compton
Kyle Wagner Compton

80054311.doc